JUSTIN S. BECK
3501 ROSELLE ST.
OCEANSIDE, CA 92056
760-449-2509
justintimesd@gmail.com
*In Pro Per*

**FILED**

Jan 30 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY      s/ melodyq      DEPUTY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE

## SOUTHERN DISTRICT OF CALIFORNIA

JUSTIN S. BECK,

　　　　Plaintiff,

　　vs.

STATE OF CALIFORNIA; THE STATE
BAR OF CALIFORNIA; SUZANNE
GRANDT; RUBEN DURAN; ELI DAVID
MORGENSTERN; KENNETH
CATANZARITE,

　　　　Defendants,

UNITED STATES ATTORNEY GENERAL;
UNITED STATES OF AMERICA

　　　　Nominal Defendants

Case No.: **'23 CV0164 MMADEB**

**Judge Assigned:**

COMPLAINT FOR DAMAGES &
INJUNCTIVE RELIEF

[COUNT I]　　**18 U.S.C. § 1962(c)**
(RICO) RACKETEERING

[COUNT II]　　**18 U.S.C. § 1962(c)**
(RICO) RACKETEERING

[COUNT III]　　**18 U.S.C. § 1962(a)**
(RICO) INVESTING PROCEEDS OF
RACKETEERING IN AN ENTERPRISE

[COUNT IV]　　**18 U.S.C. § 1962(b)**
(RICO) ACQUIRED INTERESTS IN OR
CONTROL OF AN ENTERPRISE
THROUGH A PATTERN OF
RACKETEERING ACTIVITY

[COUNT V]　　**18 U.S.C. § 1962(b)**
(RICO) ACQUIRED INTERESTS IN OR
CONTROL OF AN ENTERPRISE
THROUGH A PATTERN OF
RACKETEERING ACTIVITY

[COUNT VI]　　**42 U.S.C. § 1983**
FOURTEENTH AMENDMENT—DUE
PROCESS—STATE CREATED DANGER

[COUNT VII]　　**42 U.S.C. § 1983**
FIRST AMENDMENT—"CITIZEN"
PLAINTIFF

1

23-CV-00018-JVS-DFM

COMPLAINT

Plaintiff JUSTIN S. BECK ("plaintiff" or "Beck") for his complaint against defendants STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; SUZANNE GRANDT; ELI DAVID MORGENSTERN; KENNETH CATANZARITE; (together "defendants"); and nominal defendants UNITED STATES ATTORNEY GENERAL; UNITED STATES OF AMERICA; alleges as follows:

SUMMARY

1. Plaintiff is an entrepreneur and executive who derives his money, business, and property by way of founding companies, mergers, and acquisitions.

2. Defendants have engaged in an unlawful, fraudulent scheme against plaintiff involving overt acts by wire and mail designed to convert his money, business, and property, harass and vex plaintiff, or to cover up the scheme under color of state law.

3. The fraudulent scheme targeting the plaintiff's money, business and property involves malicious prosecution of various lawsuits lacking objective probable cause.

4. The fraudulent scheme is predicated upon and continued through interests or control over the California judiciary acquired through a pattern of racketeering activity.

5. The fraudulent scheme involves ongoing, extra-judicial acts designed to harm plaintiff, his reputation, to willfully damage the value of his material financial interests, to prevent plaintiff from life, liberty, and happiness, and to restrain plaintiff from achieving fair and neutral adjudication of his genuine claims on their merits.

6. Plaintiff has been actually damaged in his business, property, and person, including through violation of his clearly established, federally protected constitutional rights.

7. Plaintiff has further been damaged in his prospective money, business and property, and his right to be free of impairment from attorney schemes to defraud him.

8. Plaintiff seeks his damages, treble damages, punitive damages, and injunctive relief. Business and property damage includes $32.67 million in stock of one issuer in a merger, $5.67 million in another, and career damage for not less than 25 years.

9. Plaintiff seeks United States intervention against The State Bar of California for cause.

23-CV-00018-JVS-DFM

## HISTORY OF THE STATE BAR OF CALIFORNIA

10. According to Wikipedia on January 14, 2022, "The State Bar of California is California's official attorney licensing agency.[2] It is responsible for managing the admission of lawyers to the practice of law, investigating complaints of professional misconduct, prescribing appropriate discipline, accepting attorney-member fees, and financially distributing sums paid through attorney trust accounts to fund nonprofit legal entities. It is directly responsible to the Supreme Court of California, however, its Trustees are now appointed by the Supreme Court, the California Legislature, and Governor of California.[3] All attorney admissions are issued as recommendations of the State Bar, which are then routinely ratified by the Supreme Court.[4] Attorney discipline is handled by the State Bar Office of Chief Trial Counsel, which acts as prosecutor before the State Bar Court of California.[5]"

11. For all times relevant, THE STATE BAR OF CALIFORNIA was controlled by active market participants in regulation of active market participants after 2015.

12. For all times relevant, THE STATE BAR OF CALIFORNIA lacked active supervision by STATE OF CALIFORNIA after 2015 as defined by antitrust law.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 under the Racketeer Influenced Corrupt Organizations Act ("RICO") for 18 § 1962(a)-(d) claims.

14. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 15 for private right of action for antitrust violations under the Sherman Act and Clayton Act.

15. This Court has subject matter jurisdiction due to a compromised judicial system in California under 15 U.S.C. § 1 and *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015).

16. This Court has original jurisdiction over constitutional claims under 42 U.S.C. § 1983 as being federal question under 28 U.S.C. § 1331 where each arise from abuse of control over the California state judicial system by The State Bar of California.

23-CV-00018-JVS-DFM

17. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because defendants do business in this district and are each subject to personal jurisdiction in this district, where process may be served in any judicial district of the United States per 18 U.S.C. § 1965(b), when required by the ends of justice. Nationwide service of process confers personal jurisdiction over a defendant in any judicial district where each defendant has contacts with the United States.

PARTY IDENTIFICATION

18. Plaintiff JUSTIN S. BECK ("Beck" or "plaintiff") is an individual United States citizen, entrepreneur, and member of the public among the protected class of citizenry lacking equal protection under the law by The State Bar of California and California judicial system according to the Fourteenth Amendment of the United States Constitution. Plaintiff is a person with a principal place of residence and business at 3501 Roselle St., Oceanside, California, 92056. Plaintiff beneficially owned or controlled 8,435,000 of CTI stock for all times relevant: 4,935,000 common shares and 3,500,000 Preferred Series A shares. Plaintiff had a right to own 8,435,000 shares individually in CTI's agreed merger with Western Troy Capital Resources on the senior "NEO" Stock Exchange. In March 2021, Plaintiff owned or had rights to 4,549,609 Subordinate Voting Shares in Contakt World Technologies Corp. ("CW"), 45,496 Compressed Shares in CW equivalent to 4,549,600 Subordinate Voting Shares in CW, 1,800,000 Subordinate Voting Share Warrants with a strike price of $.10 CAD and public valuation of $.80 CAD in March 2021 per Subordinate Voting Share, and a right to warrants to acquire an additional 2.5% of shares upon listing CW on a senior stock exchange like NASDAQ. Plaintiff developed certain intellectual property, provisional patents, USPTO applications, and software for healthcare between 2020 and 2021 during which National Health Expenditure grew 2.7% to $4.3 trillion and accounted for 18.3% of Gross Domestic Product in the United States. Plaintiff hosted and co-produced "Truth in Health" with iHeartMedia, among the top podcasts in the United States at that time, earning (2) "AVA Awards" and a "Webby Award" nomination. Before March 2021, plaintiff's company and technology received Honorable Mention as a "World

4

Changing Idea" by Fast Company. Before March 2021, Plaintiff's company and technology received a Gold "BIG Innovation Award" as well as (2) "Stevie Awards" in American business. Plaintiff is a layman, non-attorney, never admitted to any bar.

19. Defendant THE STATE OF CALIFORNIA ("State"), a sovereign entity among the United States and culpable person, is subject of plaintiff's denied government claims, and vested rights to sue. State is liable for itself, nonsovereign The State Bar of California, public employees, elected officials, and its court officers under Government Claims Act as provided by statute, including but not limited to those specified in this complaint. The economy for the State is the largest in the United States, with a $3.63 trillion gross state product as of 2022, making it the largest, global sub-national economy.

20. Defendant THE STATE BAR OF CALIFORNIA ("State Bar"), a non-sovereign public entity controlled by active market participants in regulation for all times relevant, and culpable person, is subject of plaintiff's denied government claims, and vested right to sue. The State Bar of California and those working for it or authorized by it cause liability to State on principles of *respondeat superior*, as provided by statute, and because State has assigned its sovereignty to active market participants in regulation. State Bar is an enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce.

21. Defendant KENNETH CATANZARITE, ESQ. ("KJC"), an individual and culpable person, is an attorney established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 2331 W. Lincoln Ave., Anaheim, California, 92801 with SBN #113750. KJC is an enterprise engaged in, or whose activities affect, interstate commerce.

22. Defendant SUZANNE GRANDT ("Grandt"), an individual and culpable person, is an attorney established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 180 Howard Street, San Francisco, California 94105 with SBN #304794. Grandt is Assistant General Counsel within the Office of General Counsel of State Bar ("OGC"). OGC is an enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce.

23-CV-00018-JVS-DFM

23. Defendant RUBEN DURAN ("Duran"), an individual and culpable person, is an attorney established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 2855 E. Guasti Road, Ontario, California with SBN #197780. Duran is Chairman of the Board of Trustees for State Bar ("BOT"). BOT is an enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce.

24. Defendant ELI DAVID MORGENSTERN ("Morgenstern"), an individual and culpable person, is an attorney established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 845 S. Figueroa, Los Angeles, 90017 with SBN #190560. Morgenstern is Senior Trial Counsel within Office of Chief Trial Counsel of State Bar ("OCTC"). OCTC is an enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce.

25. Defendant UNITED STATES ATTORNEY GENERAL ("USAG") has a duty to the United States of America, and to all citizens of the United States, amidst $3.63 trillion in interstate commerce adversely affected by the conduct at issue.

26. Defendant UNITED STATES OF AMERICA ("USA") is a sovereign country which has a duty to all citizens of USA, and to each of its states including State of California, amidst $3.63 trillion in interstate commerce adversely affected by the conduct at issue. If State refuses, USA has a duty to all persons harmed by State Bar through reverse incorporation (14th into 5th Amendment to U.S. Constitution).

RACKETEERING ACTIVITY AT ISSUE

27.                    **MAIL FRAUD – 18 U.S.C. § 1341**

"There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Schmuck v. United States*, 489 U.S. 705, 721 n. 10 (1989); *see also Pereira v. United States*, 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under . . . § 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme."); Laura A. Eilers & Harvey B. Silikovitz, *Mail and Wire Fraud*, 31 Am. Crim. L. Rev. 703, 704 (1994) (cases cited)." [DOJ Archives]

**28.**                    **WIRE FRAUD – 18 U.S.C. § 1343**

"The elements of wire fraud under Section 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme. *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (*citing United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (per curiam)); *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is identical to mail fraud statute except that it speaks of communications transmitted by wire); *see also, e.g.*, *United States v. Profit*, 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential elements of the crime of wire fraud are: (1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; (2) that the defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used) (*citing* Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit 6.18.1341 (West 1994)), *cert. denied*, 115 S.Ct. 2289 (1995); *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (two elements comprise the crime of wire fraud: (1) a scheme or artifice to defraud; and (2) use of interstate wire communication to facilitate that scheme); *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994) (essential elements of wire fraud are: (1) a scheme to defraud and (2) the use of, or causing the use of, interstate wire communications to execute the scheme), *cert. denied*, 115 S.Ct. 193 (1995); *United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993) (to prove wire fraud government must show (1) scheme to defraud by means of false pretenses, (2) defendant's knowing and willful participation in scheme with intent to defraud, and (3) use of interstate wire communications in furtherance of scheme); *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990) ("Wire fraud requires proof of (1) a scheme to defraud; and (2) the use of an interstate wire communication to further the scheme.").

29. More succinctly here in the 9th Circuit: "Criminal mail and wire fraud involves: (1) a scheme based on an intent to defraud; and (2) the use of the mails or wires to further that scheme." *United States v. Weaver*, 860 F. 3d 90, 94 (2nd Cir. 2017); *Bui v. Nguyen*, 712 Fed. Appx. 606, 609 (9th Cir. 2017)

## OPEN ENDED AND CLOSED-ENDED STATE BAR SCHEMES TO DEFRAUD

30. Racketeering activity in this case involves open-ended and closed-ended schemes with similar perpetrators among The State Bar of California enterprise.

31. Racketeering activity in this case involves similar methods of using protection of public entity The State Bar of California, materially false statements of The State Bar of California Board of Trustees, Office of General Counsel, and Office of Chief Trial Counsel actors by mail and wire, and the use of California's judicial system supported by mail and wire communications in furtherance of the schemes.

32. Racketeering activity in this case involves similar beneficiaries being the perpetrators engaged in overt acts and The State Bar of California enterprise itself.

33. Racketeering activity in this case involves similar victims being the non-attorney public, issuers of securities, and insurance carriers who are unwillingly forced to underwrite The State Bar of California enterprise schemes to defraud nationally.

34. Racketeering activity in this case involves similar victims being the United States itself, where The State Bar of California enterprise is the only one controlling an entire judicial system and $3.63 trillion in U.S. GDP, and further admitting members of The State Bar of California enterprise *pro hac vice* to defraud citizens and businesses of their money and property in other states.

35. Racketeering activity in this case is supported or driven by conspiracy among The State Bar of California enterprise and coerced persons, adverse representation of parties before the same tribunal or in the same or similar matters to monopolize due process rights, assuming the role of "counsel" for inanimate entities through the exculpation of conflict waivers among The State Bar of California enterprise and coerced persons, disregard of conflicts of interest policies necessary for a sustainable democracy, and general disregard of public interest in favor The State Bar of California enterprise actors with malice.

36. Attorney trust accounts are used to launder the undue profits of attorneys in most instances.

37. Racketeering activity in this case shows an acute threat of continuing by State Bar, CLC, KJC, Duran, Morgenstern, and Grandt.

23-CV-00018-JVS-DFM

PATTERN OF RACKETEERING ACTIVITY

38. "The heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding Corp. v. Mulley-duff & Assoc., Inc*. 483 U.S. 143, 154 (l 987).

39. A "pattern of racketeering activity" under 18 U.S.C. § 1961(5) requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years after the commission of a prior act of racketeering activity.

40. Using the postal mail and wire communications with intent to defraud in 2007, The State Bar of California enterprise's "Catanzarite did not tell the Court that his client…deeded his home to Catanzarite [who] took the property to pay for his fees, but did not tell the Court about this…'Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services." [**Exhibit 35, p. 4**]

41. Using the postal mail and wire communications with intent to defraud in 2011, The State Bar of California enterprise's "Catanzarite violated court rules by making statements to the court without any proof…Catanzarite does not care about the truth in making statements to the Court." [**Exhibit 35, p. 4**]

42. Using the postal mail and wire communications with intent to defraud in 2013, The State Bar of California enterprise's Catanzarite "was punished 'for saying one thing, then switching his story. The court stated that Catanzarite's case was a "sham."'" [**Exhibit 35, p. 4**]

43. From 2010 through 2021 using postal mail letters and wire communications with intent to defraud in favor of The State Bar of California enterprise, "State Bar closed more cases through nonpublic measures—a total of 22,600, or 10 percent of all case closures—than it did through public discipline, which totaled 11,200, or 5 percent of all case closures. During the same period, more than 700 attorneys each had four or more cases that the State Bar closed through nonpublic measures." [**Exhibit 34**].

44. On July 20, 2017, addressing The State Bar of California enterprise and OGC enterprise constituents Suzanne Grandt and Robert Retana, a federal judge says:

23-CV-00018-JVS-DFM

1
2
3

    "THE COURT: Get the State Bar to look into [Grandt's] conduct. Maybe my committee here in this Court, the committee that we have here for admitting to practice in this Court ought to look into Ms. Grandt's conduct. Maybe we'll have two investigations going at once."

4
5
6

    "THE COURT: And next time the State Bar will be a little bit more honest with the poor federal judge…I'm making this order because Ms. Grandt told me something that wasn't true, and I relied on it." [**Exhibit 2**]

7
8
9
10
11

45. On Friday, September 22, 2017, it was announced by United States Department of Justice that "Former Clerk in Orange County Superior Court Sentenced to Over 11 Years in Federal Prison for Racketeering Offense Stemming from Bribery Scheme to 'Fix' Criminal Cases and Traffic Charges" after pleading guilty to one count of conspiring to violate the federal Racketeer Influenced and Corrupt Organizations Act (RICO). [**Exhibit 13**].

12
13
14
15
16

46. Reviewing The State Bar of California enterprise's Thomas V. Girardi's corruption of the California judiciary as well as compromise of The State Bar of California enterprise by active market participants, an "investigation began on August 26, 2014 in response to a July 31, 2014 Report of Improper Activity from the Bar's Chief Trial Counsel" citing a "disturbing lack of transparency at the highest levels within the organization." [**Exhibit 1**].

17
18
19
20
21

47. Using the wire with intent to defraud on January 24, 2022 with actual knowledge of [**Exhibit 1**], "The State Bar of California's Board of Trustees announced today that it has been conducting an additional investigation into whether the State Bar's handling of past discipline complaints against former licensee Thomas V. Girardi was affected by Girardi's connections to or influence at the State Bar."

22
23
24
25
26

48. On November 2, 2022, Judge Thomas M. Durkin in United States District Court for the Northern District of Illinois Eastern Division *In Re Lion Air Flight JT 610 Crash*, Case No. 18 C 7686 wrote the "Court alerted the U.S. Attorney for this district to the facts of this case when this motion was filed because Girardi's conduct is unquestionably criminal" and a "stain on the legal profession." [**Exhibit 42**]

27
28

49. Using the wire with intent to defraud on November 3, 2022, an "Open Letter Regarding the State Bar's Thomas V. Girardi Disclosure" was delivered by The State Bar of

                       23-CV-00018-JVS-DFM

California enterprise citing "irreparable harm to hundreds of his clients. We can never allow something like this to happen again," said Duran. "Over the past 40 years, the State Bar opened 205 [notices of injury and theft we enabled for] Girardi [and used the wire and postal mail to close or 'abate' them]. Of the 205 [notices of injury and theft], approximately 120 involved allegations related to client trust [wire fraud]." [plaintiff edits]

50. Using the wire and postal mail with intent to defraud, Girardi of The State Bar of California enterprise obtained a $500 million fraudulent judgment pertaining to the Dole Fruit Company. (*In Re Girardi*, 611 Fed.3d 1027, 1039-1040)

51. Using the wire and postal mail with intent to defraud, Girardi of The State Bar of California enterprise stole more than $120 million in connection with the Gutierrez class action. (*Guttierez v. Girardi*, (2011) 194 Cal.App.4th 925).

52. On December 1, 2015, Orange County's Stephen Young Kang of The State Bar of California enterprise was indicted on 25-counts including wire fraud and money laundering. [**Exhibit 51**].

53. On September 21, 2018, after being carried on for nearly three years after a two- count wire fraud conviction, The State Bar of California enterprise disbarred Stephen Young Kang. [**Exhibit 52**].

54. "Catanzarite Law Corporation, Kenneth J. Catanzarite and Tim J. O'Keefe for Plaintiffs and Appellants." *Corzo v. Parks Palmer Turner & Yemenidjian, LLP*, No. B285691, (Cal. Ct. App. Nov. 29, 2018) "The trial court [found] finding that the amended complaint was a "sham" pleading.[] Was it? Yes. We agree with the trial court that Corzo's amended complaint was a sham pleading." *Corzo v. Parks Palmer Turner & Yemenidjian, LLP*, No. B285691, 2 (Cal. Ct. App. Nov. 29, 2018)

55. Using the postal mail and wire communications with intent to defraud Bank of America, "DENISE PINKERTON, individually, and as attorney in fact for Roger Root" appeared with Kenneth Catanzarite and Catanzarite Law Corporation as counsel. *Pinkerton v. Bank of Am., N.A.*, Case No. 5:19-cv-374-Oc-32PRL, (M.D. Fla. Nov. 26, 2019)

23-CV-00018-JVS-DFM

56. On October 4, 2022, Matthew Charles Elstein of The State Bar of California enterprise "Sentenced to More than 3 Years in Prison for Conning Clients via Sham Court Documents" after he "pleaded guilty to one count of wire fraud" in November 2021. [**Exhibit 81**].

57. On December 5, 2022, a Los Angeles Times article announces that Michael Avenatti of The State Bar of California enterprise "pled guilty to four counts of wire fraud" in Orange County. [**Exhibit 83**]

58. On June 16, 2020, using "Certified Mail Return Receipt" to OCTC, a "Report of Kenneth J. Catanzarite" cites a complaint filed "on behalf of 13,800 plus adversely affected investors" [**Exhibit 31, pp. 10-14**] without disclosing that Mr. Carlson testified that he did not believe he had suffered any damages, nor was he seeking an attorney, when Mr. Catanzarite visited him at his home. 9 putative class actions were filed on his behalf anyway by Kenneth Catanzarite and Catanzarite Law Corporation, and the United States Securities Exchange Commission has wasted resources on this scheme.

59. On March 9, 2022, the 11th Circuit Court of Appeals concludes the reality of Mr. Catanzarite's scheme in *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, (11th Cir. Mar. 9, 2022) affirming sanctions against "Catanzarite for violating a preliminary injunction that barred "the commencement of any further actions under the same or similar facts or circumstances to" lawsuits he had filed against bankruptcy creditors." *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, 1 (11th Cir. Mar. 9, 2022) "Catanzarite, an attorney licensed in California and admitted to appear *pro hac vice* in the bankruptcy court, filed adversary complaints against the Daymark companies for Richard Carlson" *(Id. at p. 2)* and "bankruptcy court ruled that Catanzarite, as counsel for and in active concert with the Carlson plaintiffs, *see* Fed. R. Civ. P. 65(d)(2)(B), violated the injunction by filing a civil action and lis pendens" *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, 3 (11th Cir. Mar. 9, 2022) "the bankruptcy court stated that it earlier had sanctioned Catanzarite for creating a website containing false and misleading

23-CV-00018-JVS-DFM

statements" *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, 3-4 (11th Cir. Mar. 9, 2022)

<u>INJURY PRODUCING, OVERT ACTS OF RACKETEERING</u>

60. **[OVERT ACT]**: For Beck, all was going well with his career until Catanzarite filed a complaint using the wire in Orange County Superior Court, with intent to defraud on 9/14/2018 at 12:36:59 PM in September 2018 for Denise Pinkerton with actual knowledge it was false. Pinkerton claimed to be acting as attorney in fact for Root, individually and as successor in interest to the claims of his deceased spouse (Sharon Root). The complaint alleged the Roots owned common stock in a company called Mobile Farming Systems, Inc. ("MFS") and that the lawsuit was also a shareholder derivative action on behalf of MFS." ("Pinkerton Action") Roger Root was not a shareholder of MFS, and MFS had been defunct for years. Roger Root's company, Jolly Roger, Inc. or Jolly Rogers Investments, Inc. had been offered shares in a company called Cultivation Technologies, Inc. but declined to purchase shares in 2015.

61. Parties witnessing this overt act include Clarissa Bustamante, Deputy Clerk, Orange County Superior Court, Judge Geoffrey T. Glass, and all named defendants.

62. **[OVERT ACT]** Overtly using the wire on Thursday, October 4, 2018 at 7:32AM PDT, with intent to defraud plaintiff, Kenneth Catanzarite did message from the address kcatanzarite@catanzarite.com        Samuel   Y.   Edgerton,   III   at   the   address sedgerton@fmglaw.com with the subject line: "Re: CTI Financial Information and settlement offer in the Root Matter (Privileged)" as follows:

23-CV-00018-JVS-DFM

On Oct 4, 2018, at 7:32 AM, Kenneth Catanzarite <kcatanzarite@catanzarite.com> wrote:

Sam: Thanks for the time yesterday I reviewed your proposal with Mr. Root's power holder. Obviously, you and the directors and officers are working from a fully informed position with all the financial information. Keep in mind that what we demand in settlement come is the main from the Founders who from our perspective should be more than willing to put this behind them. I have reviewed the matter with my client and our response is as follows:

1.  The founders collectively will deliver 10,000,000 Founders shares to Root along with whatever proportionate rights to other shares they obtained as a result of that ownership. In other words they will convey as well any stock, options, warrants and/or convertible note rights and interests to Root in proportion to 10 million to the 23 million shares issued. The founders should be willing to do this because if as you say the company has no value then they should be more than wiling to convey these shares. It allows them to retain in our view 13 million shares and rights that they bought for $13,000 and had no right to in the first place. And of course conveying the 10 million shares are shares they paid only $10,000 for in full.

2.  Such securities delivery to Root shall be lien free and coupled with a representation and warranty by the  conveying defendant and CTI that the same are validly issued and acknowledge the transfer.

3.  The Defendants will pay $600,000 to Root payable $200,000 now and the balance of $400,000 over 5 years at 8% fully amortized. Secured by the remaining 13 million Founders shares. Again they paid only $13,000 for these shares.

4.  Root's designee gets a seat on the CTI board.

5.  Mutual releases.

6.  Confidentially.

7.  Note that if we settle this among the Founders as a group they can agree to make these payments and CTI does not book this as a liability.

8.  Carve out for New Body MD claims against those named defendants.

This offer shall remain open until the close of business on Friday October 5 whereupon the same if not unconditionally accepted is withdrawn.

Ken

23-CV-00018-JVS-DFM

63. [**OVERT ACT**] Overtly using the Business Wire press release service and wire with intent to defraud, which was distributed further by Associated Press, on October 4, 2018 at 7:07AM with parties to the communication being any internet user:

**Orange County-Based Catanzarite Law Corporation Files a Lawsuit against Cultivation Technologies, Inc. Contesting Stock Ownership, Breaches of Fiduciary Duty and Director and Officer Misconduct**

ANAHEIM, Calif.--(BUSINESS WIRE)--Oct 4, 2018--On September 14, 2018, Catanzarite Law Corporation filed a lawsuit against Cultivation Technologies, Inc. ("CTI"), its shareholders, directors, officers and others. The matter styled *Denise Pinkerton, an individual as attorney in fact for Roger D. Root, et al. vs. Cultivation Technologies, Inc., et al.* was filed in the Orange County Superior Court as Case No. 30-2018 01018922. A copy of the complaint can be accessed at www.ctilitigation.com.

The complaint asserts claims on behalf of investor Roger Root, derivatively on behalf of Mobile Farming Systems, Inc. ("MFS"). Root, a resident of Florida, invested over $400,000 in MFS stock and was told by MFS representatives, including directors and officers Richard Probst, Richard O'Connor and Amy Cooper, that MFS owned CTI as a subsidiary. The lawsuit contends that MFS is the sole shareholder of CTI as of March 30, 2015 and that CTI directors and officers breached fiduciary duties to MFS as its shareholder including that CTI stock sales and other actions on and after June 30, 2015 are improper. Root also asserts individual claims for securities fraud. For further information, contact Catanzarite Law Corporation.

CONTACT: Catanzarite Law Corporation Timothy J. O'Keefe

Telephone: (714) 520-5544 Facsimile: (714) 520-0680

Email: tokeefe@catanzarite.com

23-CV-00018-JVS-DFM

64. [**OVERT ACT**] Overtly using the wire and Orange County Superior Court, with intent to defraud, on December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers named in the Pinkerton Action. Parties to the communications include all litigants, Orange County Superior Court clerks, and any person accessing the court records from within or outside the State of California.

65. [**OVERT ACT**] Overtly using the wire, with intent to defraud, KJC did make contact with represented and unrepresented parties directly and indirectly and did compromise the fraudulent derivative Pinkerton Action without Court approval in violation of F. R. Civ. P. 23.1(c) and California decisional laws intended to prevent collusion. KJC actually knew that Roger Root didn't own shares in MFS nor CTI, but he didn't care because he was protected by State Bar just like Thomas V. Girardi and could use the courts as he pleased.

66. [**OVERT ACT**] Overtly using the wire on December 21, 2018, after actual MFS counsel Kenneth Watnick was retained to defend the fraudulent derivative action filed by Pinkerton, KJC did deliver approximately 5,000 discovery requests *against* O'Connor, Cooper, with about 500 *against* MFS derivatively seeking private information.

67. [**OVERT ACT**] Overtly using the wire, with intent to defraud after KJC made direct or indirect contact with unrepresented and represented parties to compromise the fraudulent derivative Pinkerton Action, then Catanzarite set in motion his corporate takeover scheme using the signatures and property of coerced defendants to the Pinkerton Action.

68. [**OVERT ACT**] Overtly using the wire and the threat of fear to obtain signatures and property under color of official right, with intent to defraud using Orange County Superior Court and protection of State Bar, on January 4, 2019, CLC and KJC dismissed Scudder and Aroha from the Pinkerton Action without Court approval.

69. [**OVERT ACT**] Overtly using the wire in response to a motion for security filed by MFS to post bond concerning the fraudulent derivative action on January 7, 2019, KJC did revive the entity Jolly Rogers Investments, Inc. seeking to conceal a lack of standing in the Pinkerton Action after the entity had been dissolved from May 2015 through January

23-CV-00018-JVS-DFM

17, 2019. Parties to the communication include the Secretary of State of Washington as well as any internet user.

70. **[OVERT ACT]** Overtly using the wire and the threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court and protection of State Bar, on January 22, 2019, KJC dismissed O'Connor, TGAP Holdings, LLC, and Scott Unfug.

71. **[OVERT ACT]** Overtly using the wire and threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court and protection of State Bar, KJC did, the following day, Catanzarite dismissed Cooper and Higgerson on January 23, 2019.

72. **[OVERT ACT]** Overtly using the wire and threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court and protection of State Bar, KJC did direct, and it was directed, that O'Connor and Cooper used their MFS shareholder votes to reconstitute the MFS board of directors. MFS hired KJC as corporate counsel under the threat of fear.

73. **[OVERT ACT]** Overtly using the wire and threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court, KJC did direct, and it was directed, on January 23, 2019, O'Connor executed a unanimous written consent of the sole shareholder of CTI (2019 Consent), stating he was CEO of MFS and had authority to act by unanimous written consent without a meeting to adopt several resolutions. The first resolution stated MFS was the sole shareholder of CTI and O'Connor, in his capacity as CEO, could issue the written consent stating MFS fully paid for 28,000,000 shares of CTI common stock in March 2015. The next resolution stated the Amended Acts contained the false contention MFS "had not fully paid for all of its stock [was] facilitated by the wrongful and self-serving conduct" of Beck. Accordingly, all actions, issuance of shares, and promisors were void or voidable acts. In essence, the written consent sought to unwind three years of CTI's corporate acts.

23-CV-00018-JVS-DFM

74. O'Connor participated in at least 158 securities transactions involving CTI shares before January 23, 2019 in an authorized capacity for CTI, personally, or through TGAP Holdings, LLC to sell CTI shares for personal profits. KJC and O'Connor knew the 2019 Consent was fraudulent, but KJC knew The State Bar of California enterprise would protect him, just like Thomas V. Girardi and about 700 attorneys.

75. **[OVERT ACT]** Overtly using the mail and wire with intent to defraud plaintiff by threatening letter and color of official right to obtain signatures and property, KJC did deliver plaintiff the following two-page letter on January 25, 2019:

**CATANZARITE LAW CORPORATION**
ATTORNEYS & COUNSELORS AT LAW
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
(714) 520-5544
FACSIMILE: (714) 520-0680

KENNETH J. CATANZARITE
ATTORNEY AT LAW

DIRECT DIAL:
(714) 678-2100

E-MAIL ADDRESS:
KCATANZARITE@CATANZARITE.COM

DIRECT FAX:
(714) 399-0577

January 25, 2019

**Via U.S. Mail & Email:**
Samuel Y. Egerton, III
Jonny L. Antwiler
O'HAGAN MEYER, LLC
4695 MacArthur Court, Ste. 210
Newport Beach, CA 92660
sedgerton@ohaganmeyer.com
jantwiler@ohaganmeyer.com

Ken Watnick
Anderson, McPharlin & Conners
707 Wilshire Blvd, Suite 4000
Los Angeles, California 90017-3623
kdw@amclaw.com

Stephen J. Erigero, Esq.
Ivan L. Tjoe, Esq.
Alan J. Hart, Esq.
Ropers Majeski Kohn & Bentley PC
445 South Figueroa St., Ste 3000
Los Angeles, CA 90071-1608
Facsimile: (213) 312-2001
Email: stephen.erigero@rmkb.com
Email: ivan.tjoe@rmkb.com
Email: alan.hart@rmkb.com

Re:  *Denise Pinkerton v. Cultivation Technologies, Inc., et al.*, Case No. 30-2018-01018922: Meet & Confer Re CTI's Discovery Responses.

Notice by Mobile Farming Systems, Inc. ("MFS") as sole shareholder of Cultivation Technologies, Inc. ("CTI") of Actions

Notice of MFS Shareholders that Board of Directors is Removed

Counsel,

I write this letter to provide notice of the enclosed actions. We would like to immediately take control of the assets and operations of CTI for the benefit of the sole shareholder MFS. We have confirmation now that the share issuance on March 30, 2015 was in fact fully paid and that the shares were issued and due to MFS which is therefore the sole shareholder.

MFS will now assert all claims directly not derivatively and this firm will serve as counsel. An amended complaint is being prepared and will be circulated for possible stipulation or motion if necessary.

We would like to avoid any unnecessary disruption of corporate activity and therefore notify you that we will defer notice to all third parties until Monday January 28 in the hope that your clients will handle the transition in the interests of the shareholders. All shares issued after March 30, 2015 are a nullity, including the highly dilutive unauthorized shares issued to Messrs.

18

23-CV-00018-JVS-DFM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Samuel Y. Egerton, III
Jonny L. Antwiler
O'HAGAN MEYER, LLC
January 25, 2019
Page 2

Probst and Beck. It is our intention to offer those persons who purchased CTI shares, MFS shares
after a determination of amounts of money actually invested. The new directors and officers will
require turnover of:

1.  All books and records
2.  Probst and Beck to leave offices and turnover records and keys
3.  Bank accounts to be turned over
4.  Cash control to be turned over to new board
5.  Hand off of operative contracts
6.  Inventory of subsidiaries
7.  Personnel lists
8.  Office security codes and systems
9.  All computer pass codes to computer and security systems
10. All office pass codes and security systems

This is also notice that law enforcement is looking at both MFS and CTI. We are fully
cooperating with them and expect that your clients will do the same.

After you review the above please call me.

Very truly yours,

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite

19

23-CV-00018-JVS-DFM

76. **[OVERT ACT]** Using the wire with intent to defraud plaintiff in Orange County Superior Court, using the manufactured evidence of January 23, 2019 and assumption of "counsel" for the inanimate corporate entity MFS, KJC did on January 28, 2019, file the MFS Action. The claims were brought "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." It named as defendants CTI's board of directors including Beck, CTI attorneys and several entities. CTI was named as a nominal defendant. MFS raised nine causes of action and sought declaratory relief and a permanent injunction. MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary. KJC and CLC knew that MFS was not a shareholder of CTI. According to the MFS Action complaint, showing signatures and property obtained by KJC under color of official right, KJC did state:

> 56.    Founders O'Connor, Cooper, TGAP, Cliff Higgerson, Aroha Holdings, Inc. and Scott Unfug have agreed to renounce their Founders' Shares in favor of MFS.

77. **[OVERT ACT]** Using the wire with intent to defraud plaintiff February 20, 2019 "Catanzarite wrote a lengthy e-mail to Western Troy, warning the company it must speak with MFS's chief executive operating officer [the extorted, O'Connor] because there was currently litigation about whether MFS was CTI's sole shareholder. Catanzarite attached a copy of the MFS complaint to the e-mail. Catanzarite stated MFS disagreed with the merger and "we dispute and object to any agreement purportedly by and between Western Troy and CTI." (Bold and underline omitted.) Catanzarite demanded Western Troy withdraw its public notice about the merger and negotiate with MFS. Finally, Catanzarite insulted Western Troy. It started the e-mail by commenting it was unexpected the company did not have a receptionist to answer calls. Catanzarite noted Western Troy "appear[ed] to have no assets or operations of any value" and saw "no justification for Western Troy shareholders with a valueless company" to be entitled to CTI's shares via the merger.

23-CV-00018-JVS-DFM

78. **[OVERT ACT]** Using the wire with intent to defraud plaintiff and CTI's creditor where each were defrauded, KJC did also email CTI's creditor. At first glance, Catanzarite's e-mail simply looks like a notification about CTI's newly installed board of directors. The e-mail explains the new board was interested in working with CTI's creditor. However, later in the e-mail Catanzarite reveals MFS was litigating its right to control CTI as the sole shareholder and it attached a copy of the complaint to the e-mail. The remaining and largest section of the e-mail is devoted to slandering Beck.

79. **[OVERT ACT]** Overtly, using the wire, with intent to defraud through Orange County Superior Court and protection of the State Bar, KJC did file and did obtain a temporary restraining order under false pretenses through judicial fraud. For instance, suborned under penalty of perjury to support the TRO, KJC did extort the signature of O'Connor on March 19, 2019 who declared:

"As CEO and director of MFS acting on its behalf, MFS is rightfully and properly the owner as holder of 28,000,000 CTI shares of Common Stock and entitled to all of the rights, benefits and privileges of said shares, including the right to vote said shares and to not suffer dilution of nor interference with such right." And he did sign it on March 19, 2019 at Newport Beach, California in knowing furtherance of the scheme and it was submitted by wire to Orange County Superior Court. Before this, O'Connor participated in 158 securities transactions in CTI stock for millions of dollars. [**Exhibit #170**]

80. **[OVERT ACT]** Overtly, using the wire, with intent to defraud, and to steal personally identifiable information of CTI shareholders in furtherance of his scheme under color of official right of the fraudulently obtained TRO, KJC did obtain a list of all CTI shareholders through extortion veiled as "discovery" on behalf of MFS while seeking to *unwind* all CTI shares in a declaratory relief hearing on behalf of MFS scheduled for April 30, 2019, finishing on May 1, 2019.

81. **[OVERT ACT]** KJC did obtain the list of CTI shareholders under color of official right dated March 25, 2019, so he could continue his scheme where he knew the 709 hearing

1  would fail on the merits, but he knew he could rely upon State Bar's ongoing protection of

2  his fraudulent scheme no matter what, just like Thomas V. Girardi could for forty years.

3  82. **[OVERT ACT]** Overtly, using the wire with intent to defraud and steal personally

4  identifiable information to continue the scheme through Orange County Superior Court on

5  April 9, 2019, KJC did file a motion to disqualify plaintiff's counsel for conflicts while

6  engaging in the very conduct he complained of, or in the alternative sought to eliminate

7  plaintiff's defense coverage under color of official right. For instance, in support of the

8  motion, KJC did submit by wire the following statement in furtherance of the scheme under

9  penalty of perjury:

10  I, Kenneth J. Catanzarite, have personal knowledge of each fact set forth in this declaration

11  based upon my observation of, participation in, and recollection of, the matters and events to

12  which I declare.  I could and would competently testify to each fact set forth in this declaration if

13  called and duly sworn by this Court.  I certify and declare as follows:

13  1.   I am licensed to appear before this Court and the courts of the State of California.

14  2.   I am a principal attorney at Catanzarite Law Corporation and lead counsel for

15  Plaintiff Mobile Farming Systems, Inc., directly and derivatively on behalf of Cultivation

16  Technologies, Inc. in this above-entitled action.  As counsel for Plaintiff I am readily familiar

16  with the files in this case.

18  83. **[OVERT ACT]** Overtly, using the wire with intent to defraud, using the stolen information

19  on CTI shareholders acquired under color of official right while seeking to *unwind all CTI*

20  *shares* on behalf of MFS after purporting to do so through non-judicial fraud of O'Connor,

21  Duffy, and Zakhireh on January 23, 2019, "Catanzarite filed the Mesa Action in April 2019

22  for Richard Mesa and a *putative class* of MFS shareholders who also purchased CTI

23  shares. The complaint was framed as both a class action and a shareholder derivative action

24  filed "on behalf of" CTI. The complaint asserted the class of MFS/CTI shareholders wanted

25  to consolidate their lawsuit with MFS's derivative action "and to among other relief,

26  recognize the ownership and control of CTI" by MFS's ownership of 28,000,000 shares,

27  5,000,000 "Friends &Family CTI shares," and 3,000,000 CTI shares issued pursuant to the

28  2015 PPM.

84. [**OVERT ACT**] Overtly, using the wire with intent to defraud in furtherance of the scheme showing the coercion of O'Connor, Scudder, Cooper, Higgerson and threat of fear under color of official right to provide signatures and property, in knowing furtherance of the scheme, "Han Le" from the email address hle@catanzarite.com on April 19, 2019 at 2:27:53 PM PDT with "CC: Kenneth Catanzarite kcatanzarite@catanzarite.com , Beck Phillips bphillips@catanzarite.com , Jennifer Weaver jweaver@catanzarite.com , Richard O'Connor richard@tgapholdings.com " as follows:


**From:** Han Le <hle@catanzarite.com>
**Date:** April 19, 2019 at 2:27:53 PM PDT
**Cc:** Kenneth Catanzarite <kcatanzarite@catanzarite.com>, Becky Phillips <bphillips@catanzarite.com>, Jenifer Weaver <jweaver@catanzarite.com>, "Richard O'Connor (Richard@tgapholdings.com)" <Richard@tgapholdings.com>
**Subject: MFS SHAREHOLDERS - DO NOT SIGN CONSENT DOCUMENT JUST SENT BY POBST-- SUPPLEMENTAL EMAIL**

Dear Shareholders:

**Supplement to Email**

I want to be clear that neither I, Richard O'Connor, Tony Scudder nor anyone else sued in the Root Case or the Mobile Farming Case have settled any claims with Root or anyone else. All we did was agree to toll the statute of limitations to allow claims to be brought against us later.  No conflict. Instead we are working together in the best interests of Mobile Farming and Cultivation Technologies.

There is no conflict as they contend.  Instead **the conflict identified is those named Defendants taking the 17,000,000 Series A Preferred Shares with 3 times voting to your common shares, for $0, control of the company and their undisclosed compensation. That is the conflict. They want to keep that against your interest and we seek to cancel those shares and secret compensation arrangements. THEY COULD HAVE SETTLED THIS CASE BY AGREEING TO CANCEL THEIR PREFERRED SHARES AND CONTROL AND SALARIES--- *YOU NEED TO KNOW THAT THEY REFUSED. THAT IS WHY WE HAVE THIS DISPUTE.***

**The consent form should not be signed.** It does not allow you to reject the proposal so any signature would approve their request which I say is against the interests of Mobile Farming and Cultivation Technologies shareholders. If you have any questions feel free to call my cell at 760-409-6464.

Richard O'Connor
Director and Officer

85. After the opportunity to present evidence in a trial of fact on May 1, 2019, with KJC, O'Connor, and Cooper present seeking to unwind all shares of CTI in a 709 trial challenging CTI's valid election in November 2018 on the basis that MFS was entitled to vote 28,000,000 shares that didn't exist and showing who was responsible for that (Cooper and O'Connor):

```
14          THE COURT:  WE ARE BACK.  NOW THAT I HAVE HAD
15     TIME TO DECOMPRESS WITH THE AFTERNOON RECESS,
16     MR. CATANZARITE, EVERY FIBER OF MY BEING SAYS THAT THE
17     FACTS ARE OVERWHELMING AGAINST YOUR POSITION IN THIS
18     CASE.  SO UNLESS YOU CAN CONVINCE ME OTHERWISE, I AM
19     PREPARED TO RULE THAT THIS ELECTION WAS VALID.
20          MR. CATANZARITE:  WELL, THE ONLY THING I CAN SAY
21     IS THAT THE SOLE DOCUMENT UPON WHICH THEY RELY IS EXHIBIT
22     53, WHICH IS WHAT YOU SAY, AND I UNDERSTAND THE POSITION
23     IS AN ADMISSION AGAINST INTEREST AGAINST MOBILE FARMING
24     BECAUSE IT IS SIGNED BY THREE PERSONS WHO WERE ALSO
25     DIRECTORS AND IN CONTROL OF MOBILE FARMING.

6     CLAIMING HERE.  BUT WE HAVE REPUDIATION OF THE AGREEMENT
7     BY PEOPLE WHO WERE THE SAME PRINCIPALS IN THE PLAINTIFF.
8     WE HAVE ACTIONS -- REPEATED ACTIONS TAKEN SUBSEQUENTLY
9     CONSISTENT WITH THE NOTION THAT PLAINTIFF WAS NOT A
10    STOCKHOLDER.  THE DELAY IN BRINGING THIS ACTION IS
11    CONSISTENT WITH THAT CONCLUSION, THAT PLAINTIFF HAS BEEN
12    OF THE VIEW THAT THEY ARE NOT A SHAREHOLDER.
13          SO THE COURT CONCLUDES THAT THE CHALLENGE
14    DIRECTOR ELECTION IS DENIED, AND THE COURT CONCLUDES THAT
15    PLAINTIFF IS NOT A STOCKHOLDER IN CTI.
```

86. [**OVERT ACTS**] Overtly, using the wires in a series of acts with intent to defraud in furtherance of the scheme using protection of State Bar, just like Thomas V. Girardi, and just like others convicted of wire fraud amongst The State Bar of California enterprise for submitting "sham" court documents shown:

"[o]n or about May 6, 2019, I began receiving calls, text messages, and voicemails from Anthony Scudder ("Scudder") requesting that I execute a document…to facilitate replacement of CTI management [under different factual pretenses than January 23, 2019]. On or about May 8, 2019…I spoke with…Kenneth J. Catanzarite of Catanzarite Law Corporation…Catanzarite explained to me [by wire communication/cellular phone] the purpose…was to remove the board of directors of CTI through an action by majority written consent [by mail and/or wire] of the shareholders of CTI ("Shareholder Consent") [among whom MFS was notably not one and hasn't been; but here not even claimed by the Racket despite the ongoing, knowingly fraudulent 'MFS Action' and 'Pinkerton Action' and 'Mesa Action']. Following our conversation, Catanzarite sent me the Proxy and requested my signature…I explained to Scudder that I did not want to get involved and declined to execute the Proxy. On May 10, 2019, Richard O'Connor ("O'Connor") sent me text messages and voicemails offering me $5,000 to execute the Proxy; which I declined. On May 14, 2019, I was provided a copy of the Shareholder Consent dated as of May 14, 2019, executed by O'Connor as proxy holder for certain CTI shareholders with a register of purported proxies attached…Page 28 of the Shareholder Consent is a forged Proxy authorizing O'Connor to vote my shares." [**Exhibit #210**]

87. [**OVERT ACTS**] Overtly, using the wire in Orange County Superior Court, with intent to defraud, KJC appearing on behalf of directly adverse parties again purporting to advocate: "One month later, Catanzarite amended the Mesa Action complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. Catanzarite also changed the nature of the action to focus on unraveling CTI's financial dealings with its primary creditor and declare CTI's actions and contracts void. The shareholder no longer wished to join the MFS Action or seek recognition of MFS's controlling stock shares over CTI.

88. Thus, to briefly recap, at this point Catanzarite's concurrent and successive representation of adverse parties included the following: (1) Catanzarite was representing the Roots' elder abuse lawsuit against CTI and some of its Founders (the Probst Faction) as well as a derivative action against MFS; (2) Catanzarite had made a deal with a handful of CTI

23-CV-00018-JVS-DFM

Founders to dismiss them from the derivative Pinkerton Action without court approval; (3) he became MFS's counsel of record; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having lawsuits filed by other people claiming to be MFS shareholders; and (5) after filing two *derivative* shareholder lawsuits, Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors.

89. [**OVERT ACTS**] Overtly, using the wire in Orange County Superior Court, with intent to defraud, KJC working with BW, TJO and appearing *ultra vires* Catanzarite next filed two lawsuits **as CTI's corporate counsel** (the Creditor Action and Scottsdale Action). The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck other defendants in the Mesa Action.

90. This overt act against his insurance carrier, and others in cumulative, have caused irreparable harm to Beck in that he has been unable to obtain insurance coverage with fraudulent claims presented against him for more than four years, continuing. It has destroyed Beck's career as a CEO.

91. [**OVERT ACT**] Overtly, using the wire in knowing furtherance of the scheme to extort a settlement under color of official right, on Wednesday, July 10, 2019 at 10:01 AM "From: Becky Phillips [mailto:bphillips@catanzarite.com]" delivered a wire communication for, and copying, "CC: Kenneth Catanzarite kcatanzarite@catanzarite.com" an email "Subject: Cultivation Technologies, Inc. – Confidential Settlement Negotiations – Evidence Code §§ 1152 and 1154" without regard for the fraud and crime exceptions of Evidence Code § 956, reading: "Mr. Edgerton, Please see the attached settlement negotiations/agreement for your client(s) if there is an interest. This proposal, if not accepted, shall expire at 5:00 p.m. Thursday, July 19, 2019.…Very truly yours, Becky Phillips for Kenneth J. Catanzarite" "Legal Assistant" "Catanzarite Law Corporation" "2331 West Lincoln Avenue, Anaheim, CA 92801" "Direct Dial: (714) 678-2108"

23-CV-00018-JVS-DFM

"Direct Fax: (714) 399-0589" "Office Phone: (714) 520-5544" "Office Fax: (714) 520-0680" to which my defense counsel, Sam Y. Edgerton, III Partner of law firm Ohagan Meyer wrote back to "To: 'Kenneth Catanzarite' kcatanzarite@catanzarite.com "[b]ecause of the obvious fraud issue regarding your purported representation of CTI, this is not a protected settlement communication."

92. [**OVERT ACTS**] Overtly, using the wire even after a Court in trial of fact rejected the cooked up claims and sham, wired documents "with every fiber of [its] being," KJC was undeterred because he knew he could rely upon protection of State Bar just like Thomas V. Girardi knew he could for forty years.

"In July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action. It removed all derivative action claims made on behalf of MFS and CTI. Catanzarite claimed to be MFS's and CTI's corporate counsel. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].) *Beck v. Catanzarite Law Corp.*, No. G059766, 16-17 (Cal. Ct. App. Jul. 13, 2022) "However, the record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead." *Beck v. Catanzarite Law Corp.*, No. G059766, 32 (Cal. Ct. App. Jul. 13, 2022)

93. [**OVERT ACT**] Overtly, using the wire in Orange County Superior Court, with intent to defraud and to conceal its schemes, KJC did suborn perjury by affidavit (while "tolling claims" against O'Connor on behalf of MFS derivatively as "sole shareholder" of CTI) from O'Connor on November 4, 2019 seeking to avoid disqualification which directly conflicted with the March 19, 2019 declaration asserting MFS was the sole shareholder of CTI. [**Exhibit #141**]

94. [**OVERT ACT**] Overtly, using the wire in Orange County Superior Court, with intent to defraud and to conceal its schemes, KJC did suborn perjury by affidavit (while "tolling claims" against O'Connor on behalf of MFS derivatively as "sole shareholder" of CTI) from O'Connor on November 11, 2019:

5. As Chief Executive I issued 5,000,000 Founders Shares when CTI was formed at $.001 per share to each of Probst and Justin Beck for their contributions to the startup effort.

95. [**OVERT ACT**] Overtly, using the wire in Orange County Superior Court, with intent to defraud and to conceal its schemes, KJC did suborn perjury by affidavit (while "tolling claims" against O'Connor on behalf of MFS derivatively as "sole shareholder" of CTI) from O'Connor on December 27, 2019.

Regarding Calixto's sworn statement (Ex. 210) May 17, 2019 [**Exhibit #143, p. 4**]

12.     I am the person who solicited the common stock proxies not Mr. Catanzarite. As for the Probst contention about the proxies he is in error.

Regarding the non-judicial acts in furtherance of schemes [**Exhibit #143, p. 6**]

19.     On August 27, 2019 I appeared at the shareholders meeting and by proxy elected myself, Mr. Duffy and Ms. Cooper to the Board of Directors and to officer positions at CTI with my 51.15% proxies.

20.     On August 28, 2019 the common elected directors, namely myself, Cooper and Mr. Duffy, took action by written consent to appoint myself as Chief Financial and Chief Operating Officer, Ms. Cooper as Vice President and Mr. Duffy as President and Secretary.

21.     Myself, Mr. Duffy and Mrs. Cooper took action by unanimous written consent appointing Jeff Schunk, a CTI common shareholder, as Vice President, tasked with the responsibility to review conflicts of interest in the representation by Mr. Catanzarite and CLC.

Despite suing CTI and Beck from April – June 2017 about it with Zakhireh, Duffy:

29.     The very first time that the CTI shareholders learned of the purported issuance of the Preferred Stock was at that November 29, 2018 shareholders meeting where the shares were objected to as not validly issued.

96. [**OVERT ACT**] After plaintiff delivered notice to State Bar with specificity, exhaustive injury documentation showing serial fraud, perjury, representation of directly adverse parties, extortion for signatures and property [**Exhibit #172**], plaintiff did receive postal mail intending to defraud from Joy Nunley on behalf of her "Senior Trial Counsel Eli Morgenstern," who did defraud plaintiff and did unlawfully protect KJC, CLC, and its associate attorneys Brandon Woodward and Tim James O'Keefe on April 3, 2020. [**Exhibit #173**] Nunley and Morgenstern knew their letter was frivolous but sent it anyway.

97. **[OVERT ACT]** Plaintiff delivered notice again of his injuries and the serial fraud, sham court documents, and wire communications from KJC and CLC. On August 10, 2020, using the wire in Orange County Superior Court, with intent to defraud and continue the scheme, in conspiracy with State Bar and Morgenstern, the "MFS Cross Action" was filed against plaintiff which was just a regurgitation of the same cooked up claims that the Court rejected with "every fiber of [its] being" on May 1, 2019. KJC, BW, TJO, and CLC didn't care, because they knew they could rely on Morgenstern and The State Bar enterprise to protect them, just like Thomas V. Girardi knew he could for forty years.

98. **[OVERT ACT]** Where plaintiff delivered notice by postal mail to the "Complaint Review Unit" before understanding it was also Office of General Counsel for State Bar who also defends tort claims against itself and The State Bar of California enterprise, and also makes antitrust determinations for itself frivolously, plaintiff did receive another postal mail letter August 12, 2020 literally two days after the "MFS Cross Action" was filed by wire with intent to defraud. [**Exhibit 176**] Office of General Counsel knew the letter was frivolous, and Office of General Counsel did intend to defraud Beck, and Beck was defrauded again.

99. Plaintiff later realized the purpose of these postal mail communications was not only to protect The State Bar of California enterprise's schemes to defraud members of the public including plaintiff, any client of CLC, KJC, and any client of Thomas V. Girardi or Girardi-Keese, but it was *also* to generate leads for lawyers as part of an unlawful trust in restraint of trade. [**Exhibit 177**]

100.     **[OVERT ACT]** Incredulous that the conduct was still carried on by State Bar, Morgenstern, and "Complaint Review Unit" (Office of General Counsel) – plaintiff delivered notice to California Supreme Court that he needed a neutral hearing to present the case. Using the postal mail with intent to defraud plaintiff from its mail facility in San Francisco, Jorge E. Navarette did send plaintiff a letter on September 29, 2020 with an ambiguous case law from 1948 that had nothing to do with the conduct at issue ("In Re: Walker" scheme to defraud the public). [**Exhibit #182**] And again, Beck was defrauded by postal mail through the designed schemes.

23-CV-00018-JVS-DFM

101.     [**OVERT ACT**] Overtly, on July 20, 2022, using the wire with intent to defraud plaintiff and to protect KJC and CLC who were protected just like Thomas V. Girardi was for forty years, Grandt on behalf of Duran did deliver plaintiff a letter stating that the conduct of KJC and CLC did not give rise to The State Bar of California's duties to inform the public. Grandt knew the basis of this decision was not the merits, but the fact that plaintiff chose to sue The State Bar of California on behalf of himself, and with public interest standing. But Grandt didn't care, because she knew The State Bar of California controlled the entire judiciary in California, so she sent the letter anyway to Beck, who was defrauded.

102.     [**OVERT ACT**] After preparing a case for California Supreme Court, delivering it within the arbitrary, criminal-protecting timeline of 60-days, Jorge E. Navarette did ask that it be reformatted and did ask that he send the case to The State Bar of California Office of General Counsel, The State Bar of California Office of Chief Trial Counsel, and to send a copy to each of the California Supreme Court Justices. After back and forth by postal mail, Jorge E. Navarette did send plaintiff a postal mail letter intending to defraud him on March 22, 2021 stating that the case had been rejected not on the merits, but due to the criminal-protecting 60-day timeline during which plaintiff did provide a case. Navarette knew that KJC, BW, TJO, NMC, and CLC were among the protected attorneys, just like Thomas V. Girardi, and so he did defraud plaintiff by postal mail stating the case was "returned unfiled." And plaintiff was defrauded and experienced an emotional breakdown from which he has yet to recover with the cumulative foregoing acts of fraud and malice.

[**Exhibit 179**] [**Exhibit 182**] [**Exhibit 183**]

103.     [**OVERT ACT**] On February 14, 2022, Carissa Andresen with The State Bar of California enterprise in Office of General counsel did file the "unfiled" case as if it were

6.      Attached hereto as Exhibit A is a true and correct copy of the March 18, 2021 Accusation of Justin Beck Against an Attorney, filed by Petitioner in California Supreme Court Case No. S267752.

dispositive of The State Bar of California's duties to stop their criminal conduct, and even though Navarette said it was "returned unfiled."

104.    **[OVERT ACT]** On September 21, 2022, through September 26, 2022, plaintiff did file an antitrust petition in California Supreme Court after understanding the unlawful unity of interests within The State Bar of California and protection schemes that did and do defraud the public. Using the wire, with intent to defraud, plaintiff did receive a postal mail letter from Navarette that plaintiff's petition S276517 was "stricken" as premature. California Supreme Court directed that his petition be reviewed and determined by the unlawful trust itself: The State Bar of California enterprise without regard of *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) or 15 U.S.C. § 1. [**Exhibit 28**]

105.    **[OVERT ACT]** On October 17, 2022, using the wire with intent to defraud plaintiff and the United States, Office of General Counsel for The State Bar of California enterprise working with Grandt did deliver plaintiff "Antitrust Determination 2022-001" after removing four volumes of exhibits, 1,000+ pages of probative antitrust evidence, and ignoring *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) or 15 U.S.C. § 1 while citing stale case law *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 and conceding to the improper purposes of the determination being plaintiff's suits against State Bar. [**Exhibit #60**] Plaintiff's actual petition is shown, plus proofs of service. [**Exhibits #55   through #59**]

106.    **[OVERT ACT]** Using the wire, with intent to defraud plaintiff and the United States, California Supreme Court clerk Jorge E. Navarette working with Office of General Counsel's Robert Retana did obstruct and manipulate plaintiff's filings in TrueFiling and remove exhibits from the docket in S276517.

107.    **[OVERT ACT]** Using the wire, with intent to defraud plaintiff, the public, and the United States, Robert Retana of Office of General Counsel did deliver a wire communication on October 17, 2022 to Jorge E. Navarette citing the fraudulent "Antitrust Determination 2022-001" which was made without regard of the United States Supreme

1    Court, and was made after manipulating plaintiff's antitrust petition and exhibits, and was
2    made after California Supreme Court directed Office of General Counsel to make an
3    antitrust determination for itself while it was also defending tort claims against itself.
4    [**Exhibits #63 through #68**]

5    108.    [**OVERT ACT**] Using the wire, with intent to defraud plaintiff, the public, and the
6    United States, Jorge E. Navarette did start a new antitrust case without plaintiff's
7    authorization, which case was commenced in California Supreme Court under case number
8    S276939 using a manipulated record, which case did result in a fraudulent "En Banc"
9    decision by California Supreme Court on November 30, 2022. [**Exhibit #61**]

10   109.    [**OVERT ACT**] Using the wire, with intent to defraud plaintiff, Grandt did
11   inadvertently deliver evidence of the unlawful unity of interests existing by and between
12   Board of Trustees Ruben Duran, Executive Director Leah Wilson, Office of Chief Trial
13   Counsel George Cardona, Office of General Counsel Suzanne Grandt, and the malicious
14   basis for their decisions regarding the criminal conduct to which plaintiff has been subject
15   as plaintiff's decision to sue The State Bar of California. The wire communication shows
16   that Kenneth Catanzarite propounded patently false statements using the wire to Carissa
17   Andresen, who in turn regurgitated the false attorney statements despite court orders
18   proving the falsity, and even though The State Bar of California had a preservation of
19   evidence letter dated October 14, 2021 confirmed by Andresen on May 12, 2022, and it
20   did harm and defraud plaintiff once more. [**Exhibit #120**]

21   110.    [**OVERT ACT**] Overtly using the postal mail and wire, after plaintiff rejected the
22   false claims of "privilege" asserted to fraudulently conceal the scheme, Ellin Davtyan of
23   Office of General Counsel did threaten plaintiff, and Ellin Davtyan did seek to control the
24   enterprise on December 15, 2022, under color of state law. [**Exhibit #103**]

25   111.    [**OVERT ACT**] Overtly using the wire, plaintiff received document production
26   from a public records request on January 13, 2023, where Davtyan or Office of General
27   Counsel frivolously asserted that they actually had a right to file an antitrust petition in

28

California Supreme Court that was not authorized by plaintiff, which petition did defraud plaintiff, the public, and the United States.

112.    **[OVERT ACT]** Showing the acute threat of continuing schemes to defraud using the judicial system, using the wire with intent to defraud litigants or insurance carriers and a federal court [**Exhibit #202 juxtaposed with August 27, 2019 acts**], James Duffy is being used as a straw plaintiff against entities owned or controlled by Jeffrey Schunk by CLC. Neither Duffy nor Schunk would be known to CLC or KJC but for the fraudulent schemes to steal information through "discovery" under color of law commencing September 14, 2018, using protection of The State Bar of California enterprise, Office of Chief Trial Counsel, Office of General Counsel, and Board of Trustees for The State Bar of California – just like Thomas V. Girardi enjoyed for forty years.

113.    "Catanzarite does not care about the truth when making statements to the Court." This Court cannot trust one word or filing from CLC nor KJC, either and plaintiff notices the Court that it can't reasonably trust State Bar, either.

<u>INJURY STANDING UNDER RICO</u>

114.    Plaintiff is: (1) a "person" (2) who sustained injury (3) to his "business or property" (4) "by reason of" defendants' violation of § 1962.

115.    Plaintiff's injuries to business and property arise from (1) § 1962(c) from predicate acts detailed; (2) § 1962(a) arising from investment of racketeering income in an interstate enterprise; (3) § 1962(b) arising from acquisition of an interest in or control over an interstate enterprise; (4) arising from overt acts committed in furtherance of schemes to defraud plaintiff in conspiracy.

116.    Plaintiff seeks his damages, treble damages, and attorney fees for his § 1962 claims as follows for business and property:

117.    $1,282,000 immediate judgment against State for converted policies

118.    $8,433,000 total past and future lost earnings to business and property

119.    $27,407,250 total lost earnings capacity to business and property

120.    $32,667,351 business and property deliberately compromised (merger destroyed)

23-CV-00018-JVS-DFM

121.    $365,000 from real estate proceeds used to endure predicate conduct

122.    $5,649,297 business and property destroyed in March 2021/April 2021

123.    $32,667,351 future business and property (reasonable basis) from conduct

124.    $25,000,000 future business and property (reasonable basis) from conduct

125.    $1,000,000 inherited IRA shamefully depleted to endure predicate conduct

126.    Plaintiff seeks his damages, non-economic damages, and punitive damages for his claims under 42 U.S.C. § 1983 and 15 U.S.C. § 1 on these bases:

127.    $138,889,249 for damages as above as an alternative or cumulative

128.    $138,889,249 for pain, suffering, inconvenience, and oppression

129.    $138,889,249 for severe emotional distress leading to a seizure in Dec. 2022

130.    $138,889,249 for loss of consortium and inability to marry

131.    $138,889,249 for becoming disenfranchised, losing trust in State government

132.    $138,889,249 for severe grief, losing his parents and a mentor building CTI

133.    $138,889,249 for loss of enjoyment of life, consideration of suicide

134.    $138,889,249 for humiliation, losing friends and colleagues

135.    $138,889,249 for loss of 20% of his left arm due to Grandt, State Bar delays

136.    $138,889,249 for ratifying KJC, BW, TJO, CLC, NMC conduct pre-9/14/18

137.    $138,889,249 for ratifying KJC, BW, TJO, CLC, NMC conduct post-9/14/18

138.    This action was filed within the RICO statute of limitations. Plaintiff did not identify, nor could he have previously the deliberate schemes to defraud him despite his diligence, nor the active concert among State actors. All claims are filed in a timely manner.

23-CV-00018-JVS-DFM

1
2
3                                         **COUNT I**
4                                      **RACKETEERING**
5                            **Violation of 18 U.S.C. § 1962(c)**
6       139.    The allegations of paragraphs ¶ 1 through ¶ 136 are incorporated herein by reference
7               as if they were set forth fully.
8       140.    To recover under 18 § 1962(c), plaintiff must prove (1) conduct, (2) of an enterprise,
9               (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing
10              injury to plaintiff's business and property by the conduct constituting the violation. See
11              *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)
12      141.    Plaintiff did suffer injuries resulting from violation of 18 U.S.C. § 1962(c).
13      142.    This Count I is against Defendants THE STATE BAR OF CALIFORNIA and
14              STATE OF CALIFORNIA ("Count I Defendant(s)").
15      143.    MOBILE FARMING SYSTEMS, INC. is an enterprise engaged in and whose
16              activities affect interstate commerce. The Count I Defendant(s) are employed by or
17              associated with the enterprise.
18      144.    Prior to September 14, 2018, KJC and CLC did engage in a pattern of racketeering
19              activity enabled and carried on by The State Bar of California, its Office of Chief Trial
20              Counsel, and its Office of General Counsel.
21      145.    Duffy, Zakhireh, and O'Connor did sue or conspire to sue plaintiff and CTI "on
22              behalf of 92 shareholders" of CTI concerning the Preferred Series A shares of CTI which
23              they did settle on or around June 13, 2017, before January 23, 2019.
24      146.    With intent to defraud and malign plaintiff, Zakhireh and O'Connor did conspire to
25              defraud the United States Securities Exchange Commission in July 2017 without regard
26              for the truth, and the SEC and plaintiff were defrauded in pursuit of Zakhireh and
27              O'Connor's malice against plaintiff. KJC and CLC used this malice to extort O'Connor,
28

1     Zakhireh, Duffy, Cooper, Higgerson and others to produce evidence that KJC and CLC

2     knew was false or manufactured to suit the scheme to defraud Beck and others.

3     147.      O'Connor and Cooper did use the wire to pay $340,000 in illegal commissions to

4     Joseph Porche through MFS out of an investment in MFS securities of approximately

5     $450,000 by Jolly Roger Investments, Inc. or Jolly Roger, Inc. years before plaintiff ever

6     met O'Connor and Cooper in April 2015.

7     148.      On September 14, 2018, KJC and CLC did file the derivative "Pinkerton Action"

8     against MFS with intent to defraud through Orange County Superior Court. KJC knew the

9     claims to be false, but knew he could rely upon State Bar to protect him, just like Thomas

10    V. Girardi knew for forty years.

11    149.      On December 13, 2018, KJC did dismiss Joseph Porche, who did receive $340,000

12    in illegal commissions from O'Connor and Cooper via MFS, from the Pinkerton Action.

13    150.      Between December 13, 2018, and January 23, 2019, KJC did make direct or indirect

14    contact with unrepresented and represented parties defendant to the direct and derivative

15    Pinkerton Action, and it was compromised without Court approval.

16    151.      To obtain the property or other consideration from Cooper, Higgerson, and

17    O'Connor with their consent, under color of official right on behalf of MFS derivatively

18    and directly against them for securities fraud charges as KJC was "working with law

19    enforcement," Cooper, Higgerson, and O'Connor did provide their signatures and property

20    to MFS for KJC induced by a wrongful use of fear.

21    152.      Cooper, Higgerson, and O'Connor did provide their signatures and property to

22    MFS, KJC and CLC using the wire with intent to defraud plaintiff, and to conceal the

23    unlawful conduct of Cooper and O'Connor related to MFS and Joseph Porche.

24    153.      With intent to defraud plaintiff in continuance of their malicious purposes for all

25    times relevant, Duffy and Zakhireh did agree to non-judicial acts by wire with KJC in

26    furtherance of the scheme between January 4, 2019, and January 23, 2019.

27    154.      On January 23, 2019, O'Connor, Duffy, and Zakhireh did agree to unwind millions

28    of dollars in actual CTI securities transactions using MFS under KJC threat "working with

law enforcement," in order that KJC could take control of MFS to conceal a lack of standing for the derivative Pinkerton Action against MFS.

155.    The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

156.    The Count I Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

157.    As direct and proximate cause of State assigning its sovereignty to active market participants in regulation at State Bar, KJC and CLC were enabled and carried on to conduct racketeering activity described above. State was thus a substantial factor.

158.    As direct and proximate cause of State Bar protecting CLC and KJC despite their patterns of racketeering activity just like Thomas V. Girardi was protected, KJC and CLC were enabled to conduct racketeering activity described above. State Bar was thus a substantial factor, and State is responsible for State Bar on principles of *respondeat superior*.

159.    As direct and proximate cause of the Count I Defendant(s) racketeering activities, plaintiff lost actual and prospective business, property, and money.

160.    As direct and proximate result of the Count I Defendant(s) racketeering activities and violations of 18 U.S.C. § 1962(c), plaintiff has been injured in his business and property for which plaintiff seeks his damages, treble damages, and attorney's fees:

161.    $8,433,000 total past and future lost earnings to business and property

162.    $1,000,000 inherited IRA shamefully depleted, used to endure racketeering

163.    $365,000 from proceeds of real property used to endure racketeering

164.    WHEREFORE, plaintiff requests this Court enter judgment as follows:

165.    JUDGMENT in favor of plaintiff JUSTIN S. BECK against defendants THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA.

23-CV-00018-JVS-DFM

166.     MONEY JUDGMENT in favor of JUSTIN S. BECK against THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for $9,798,000 damages.

167.     MONEY JUDGMENT in favor of JUSTIN S. BECK against THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for $29,394,000 treble damages.

168.     PERMANENT INJUNCTIVE RELIEF as Court deems just.

23-CV-00018-JVS-DFM

1
2
3
4

**COUNT II**

5

**RACKETEERING**

6

**Violation of 18 U.S.C. § 1962(c)**

7    169.    The allegations of paragraphs ¶ 1 through ¶ 166 are incorporated herein by reference
8    as if they were set forth fully.

9    170.    Plaintiff did suffer injuries resulting from violation of 18 U.S.C. § 1962(c).

10   171.    This Count II is against defendants RUBEN DURAN; SUZANNE GRANDT; ELI
11   DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF
12   CALIFORNIA (the "Count II Defendant(s)").

13   172.    The State Bar of California is an enterprise engaged in and whose activities affect
14   interstate commerce. The Count II Defendant(s) are employed by or associated with the
15   enterprise.

16   173.    Duran was initially appointed to the Board of Trustees of the enterprise in 2018 by
17   Assembly Speaker of the State of California, Anthony Rendon.

18   174.    On Thursday, August 10, 2017, "University of San Diego (USD) School of Law
19   Center for Public Interest Law (CPIL) executive director Professor Robert C. Fellmeth was
20   quoted in Los Angeles Daily Journal article that reported on the State Bar promotion of an
21   attorney [Grandt] whom a federal judge recently accused of intentionally misleading him
22   during a hearing." Grandt did intentionally mislead the judge about State Bar Court.

23   175.    "The agency's promotion of Suzanne Grandt, a lawyer in the bar's Office of
24   General Counsel, was announced internally four days after U.S. District Judge William
25   Alsup wrote in an order that he was considering sanctioning the bar because of
26   "inaccuracies in attorney Grandt's statements." [**Exhibit 2**]

27   176.    Grandt and Duran were each appointed due to their *willingness* to defraud Courts
28   or the public with impunity.

177.    Eli David Morgenstern, Office of Chief Trial Counsel, and Office of General Counsel have known before September 14, 2018, and continue to know and freely enable through overt acts of mail fraud and wire fraud, the racketeering activity of KJC and CLC.

178.    The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

179.    The Count II Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

180.    As direct and proximate cause of the Count II Defendant(s) racketeering activity, plaintiff lost actual and prospective business, property, and money.

181.    As direct and proximate result of the Count II Defendant(s) racketeering activity, plaintiff has been injured in his business and property for which plaintiff seeks his damages, treble damages, injunctive relief, and attorney's fees as an alternative to any relief failing in Count I. Beck's ability to conduct business and obtain property is severely compromised due to the Count II Defendant(s) racketeering activity.

182.    WHEREFORE, plaintiff requests this Court enter judgment as follows:

183.    JUDGMENT in favor of plaintiff JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA.

184.    MONEY JUDGMENT in favor of plaintiff JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for all amounts of money failing in Count I as an alternative.

185.    PERMANENT INJUNCTIVE RELIEF as Court deems just.

23-CV-00018-JVS-DFM

1

2

3

4

**COUNT III**

5

**INVESTING OR USING PROCEEDS OF RACKETEERING**

6

**ACTIVITY IN AN INTERSTATE ENTERPRISE**

7

**Violation of 18 U.S.C. § 1962(a)**

8

186.   The allegations of paragraphs ¶ 1 through ¶ 183 are incorporated herein by reference

9

as if they were set forth fully.

10

187.   18 U.S.C. § 1962(a) prohibits a person from investing in an enterprise any income

11

derived from a pattern of racketeering activity.

12

188.   This Count III is against defendants RUBEN DURAN, THE STATE BAR OF

13

CALIFORNIA and STATE OF CALIFORNIA (the "Count III Defendant(s)").

14

189.   The Count III Defendant(s) used or invested income derived from a pattern of

15

racketeering activity in an interstate enterprise.

16

190.   The State Bar of California is an enterprise engaged in and whose activities affect

17

interstate commerce. The Count III Defendant(s) are employed by or associated with the

18

enterprise.

19

191.   The State Bar of California is an association-in-fact enterprise engaged in and

20

whose activities affect interstate commerce. The Count III Defendant(s) are employed by

21

or associated with the enterprise.

22

192.   The State Bar of California established, carried on, received income through

23

IOLTAs, then used and invested income from its licensees, a portion of which was derived

24

from the pattern of racketeering activity described above, to pay Duran, Morgenstern, and

25

Grandt their salaries and each did injure plaintiff.

26

193.   State of California used and invested income from the taxpayer public, including

27

the licensees and entities they control engaged in a pattern of racketeering activity, and

28

23-CV-00018-JVS-DFM

invested it in The State Bar of California, who invested or will invest it back to The State Bar of California enterprise while plaintiff and the public suffer.

194.    For instance, on July 13, 2022, by wire "The State Bar of California announced today that this year's $308 billion State Budget will furnish more than $105 million in funding for access to justice efforts through the State Bar, supporting legal aid organizations...This supplements the more than $50.5 million in funds the State Bar plans to distribute for similar assistance from Interest on Lawyers' Trust Accounts (IOLTA) earnings in 2023…The funding comes from state General Fund dollars as well as $20 million in federal homeless prevention funds."

195.    Similarly, "In the 2021 –22 state budget, the State Bar of California received a record amount, nearly $110 million, in similar funding" which it invested back into The State Bar of California enterprise while plaintiff was suffering injuries, and with actual knowledge of plaintiff's injuries.

196.    Just like Office of General Counsel/"Complaint Review Unit" is used to generate leads to pay lawyers as above, and to cause artificial demand for legal services while the public suffers, so too do these parallel investments create leads for The State Bar of California enterprise as the July 13, 2022, wire reads: "For a list of free legal aid providers for low-income Californians, please go to LawHelpCa.org."

197.    The State Bar of California used or invested in excess of $1 billion dollars while Beck and the public suffered 2018-2022, as Duran complained of a "lack of resources."

198.    Duran refuses to impose discipline or costs on racketeers controlled by and through The State Bar of California, and thus seeks to impose the costs on taxpayers so that The State Bar of California enterprise is free to defraud the public with Duran's permission.

199.    Plaintiff was not offered legal aid to sue The State Bar of California, Duran, Morgenstern, or Grandt where he is a "low-income Californian" because of The State Bar of California enterprise. Indeed, *because* plaintiff sued each, the racketeering activity was concealed, carried on, and furthered with malice and artificial discretion while Duran made

1    false statements by wire to defraud plaintiff, the public, and to defraud the United States
2    who provided $20 million in 2022.

3    200.    Plaintiff was not offered legal aid to defend against the criminal conduct of CLC
4          and KJC because they are each protected by State Bar, Office of Chief Trial Counsel, and
5          Office of General Counsel through investments made in Duran, Grandt, and Morgenstern.

6    201.    The preceding acts, including the overt acts set forth above, constitute a pattern of
7          racketeering activity pursuant to 18 U.S.C. § 1961(5).

8    202.    The Count III Defendant(s) have used or invested income derived from a pattern of
9          racketeering activity in violation of 18 U.S.C. § 1962(a).

10   203.    As direct and proximate cause of Count III Defendant(s) violation of 18 U.S.C. §
11         1962(a), plaintiff suffered injuries to his actual and prospective business and property.

12   204.    As direct and proximate result of the use or investment of racketeering income,
13         plaintiff suffered by way of his credit score, mounting debt he cannot pay, benefits he lost
14         or will not receive, special value of his IRA he lost, and other assets. Plaintiff also lost
15         earning capacity to his business and property which would not have happened but for the
16         use and investments made. For instance, had the investments been made in salaries for
17         persons who did not choose to carry on or engage in ongoing criminal conduct like Duran,
18         Grandt, or Morgenstern have chosen to do, the conduct would not have occurred. Plaintiff
19         is only 42 years old and will be damaged for the rest of his life.

20   205.    As direct and proximate result of the Count III Defendant(s) violations of 18 U.S.C.
21         § 1962(a), plaintiff has been injured in his actual and prospective business and property
22         and seeks his damages, treble damages, attorney's fees, and injunctive relief:

23   206.    $25,000,000 converted credit score, benefits, special IRA value, other assets.

24   207.    $27,407,250 lost earnings capacity to business and property as former CEO.

25   208.    WHEREFORE, plaintiff requests that this Court enter judgment against the Count
26         III Defendant(s) as follows:

27
28

209.    JUDGMENT in favor of plaintiff JUSTIN S. BECK against defendants THE STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA for violation of 18 U.S.C. § 1962(a).

210.    MONEY JUDGMENT in favor of JUSTIN S. BECK against RUBEN DURAN, THE STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA jointly and severally for damages in the amount of $52,407,250.

211.    MONEY JUDGMENT in favor of JUSTIN S. BECK against RUBEN DURAN, THE STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA jointly and severally for treble damages in the amount of $157,221,750.

212.    PERMANENT INJUNCTION as Court deems just.

23-CV-00018-JVS-DFM

1
2
3
4
5
6
7
8
9
10
11
12

**COUNT IV**

**ACQUIRED INTERESTS IN OR CONTROL OF AN ENTERPRISE**

**THROUGH A PATTERN OF RACKETEERING ACTIVITY**

**Violation of 18 U.S.C. § 1962(b)**

213.    The allegations of paragraphs ¶ 1 through ¶ 210 are incorporated herein by reference as if they were set forth fully.

214.    18 U.S.C. § 1962(b) prohibits a person from using a pattern of racketeering activity to acquire or maintain interests in or control over an enterprise.

215.    This Count IV is against defendants KENNETH CATANZARITE; CATANZARITE LAW CORPORATION; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA ("Count IV Defendant(s)").

216.    The Count IV Defendant(s) racketeering activity led to control of or interests in an enterprise, and those interests or that control resulted in injury to plaintiff.

217.    Mobile Farming Systems, Inc. is an enterprise engaged in and whose activities affect interstate commerce. The Count IV Defendant(s) are employed by or associated with the enterprise.

218.    KJC and CLC did use the pattern of racketeering activity described above before January 23, 2019, to assume control of MFS by extortion to force corporate actions, and to maintain control of MFS under color of state law to harm Beck.

219.    State Bar did know previously of the pattern of racketeering activity described above with similar methods, victims, and beneficiaries but chose to carry it on.

220.     State did know previously of the State Bar's ongoing refusal to protect the public, but it chose to allow State Bar to engage in the conduct under color of law.

221.     For all times relevant, State had a legal duty to Beck and to the United States under 15 U.S.C. § 1 and *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (201 5) but chose to enable the racketeering activity above anyway.

222.     State had negative mandatory duty under Gov. Cod. § 815.6 under Sherman Act and 15 U.S.C. § 1, but failed to exercise reasonable care, and did damage Beck.

223.     The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

224.     The Count IV Defendant(s) have directly and indirectly acquired or maintained interest in or control of an enterprise through a pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

225.     As direct and proximate cause of Count IV Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff has been injured in his actual and prospective business and property.

226.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), a $261 million merger in which plaintiff was CEO and within which he was entitled $32,667,351 was destroyed together with the company CTI.

227.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff has been injured for $32,667,351 as being a reasonable basis and equivalent amount that he will not receive for similar ownership for other businesses.

228.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff has been damaged in other actual and prospective business opportunities. Plaintiff is only 42 years old, and his actual and prospective business and property will be damaged for the rest of his life.

229.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), MFS is still controlled by CLC, KJC, and State Bar even though that control was acquired and is maintained through a pattern of racketeering activity, and even after the

23-CV-00018-JVS-DFM

fraudulent claims propounded filed by CLC and KJC for MFS using those interests in or control of MFS were rejected on May 1, 2019, by the trial Court "with every fiber of [its] being."

230.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), adjudication of plaintiff's claims are repeatedly compromised and delayed through artificial State procedures enabling criminal conduct through MFS, State Bar, and Orange County Superior Court.

231.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff has been injured in his business and property in that he experienced an emotional breakdown and resigned from a health technology company he started after Jorge E. Navarrette and California Supreme Court defrauded him under color of state law in March 2021 which caused him $5,649,297 in damages, and further tainted his ability to develop business and obtain property.

232.     As direct and proximate result of the Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), Beck lost an opportunity offered to him to work with an A-List celebrity to produce a podcast in 2021.

233.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff seeks actual damages of $1,700,000 from fees, policies, and converted assets paid to The State Bar of California enterprise.

234.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff seeks other lifetime remuneration he will not receive of $138,889,249 in business and property.

235.     As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff seeks his damages, treble damages, and injunctive relief.

236.     WHEREFORE, plaintiff requests this Court enter judgment against Count IV Defendants as follows:

23-CV-00018-JVS-DFM

237.    JUDGMENT in favor of plaintiff JUSTIN S. BECK against KENNETH CATANZARITE; CATANZARITE LAW CORPORATION; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 18 U.S.C. § 1962(b).

238.    MONEY JUDGMENT in favor of plaintiff JUSTIN S. BECK against KENNETH CATANZARITE; CATANZARITE LAW CORPORATION; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages in the amount of $210,683,999.

239.    MONEY JUDGMENT in favor of JUSTIN S. BECK against KENNETH CATANZARITE; CATANZARITE LAW CORPORATION; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for treble damages in the amount of $632,051,997.

240.    PERMANENT INJUNCTION against the maintenance of any interest in or control of MFS by Count IV Defendant(s) or any person associated or acting in concert with them including Nicole Marie Catanzarite Woodward, Brandon Woodward, Tim James O'Keefe, Eric V. Anderton or Jim Travis Tice, and each of them, and such other relief as the Court deems just.

1
2
3
4
5
6
7
8
9
10

**COUNT V**

**ACQUIRED INTERESTS IN OR CONTROL OF AN ENTERPRISE**

**THROUGH A PATTERN OF RACKETEERING ACTIVITY**

**Violation of 18 U.S.C. § 1962(b)**

241.     The allegations of paragraphs ¶ 1 through ¶ 239 are incorporated herein by reference as if they were set forth fully.

242.     This Count V is against defendants RUBEN DURAN, ELI DAVID MORGENSTERN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count V Defendant(s)").

243.     The State Bar of California is an enterprise engaged in and whose activities affect $3.63 trillion in interstate commerce, which enterprise includes Board of Trustees, Office of General Counsel, Office of Chief Trial Counsel, and 286,000 living licensees, of whom nearly 197,000 are on active status.

244.     For all times relevant, Ruben Duran acquired or maintained interests in or control of The State Bar of California enterprise through Board of Trustees by engaging in (directly or indirectly) a pattern of mail fraud and wire fraud against the non-attorney public, and through carrying on the unlawful activity of The State Bar of California enterprise.

245.     For all times relevant, Suzanne Grandt acquired or maintained interests in or control of The State Bar of California enterprise through Office of General Counsel by engaging

23-CV-00018-JVS-DFM

in a pattern of mail fraud and wire fraud, and through carrying on the unlawful activity of The State Bar of California enterprise.

246.    For all times relevant, Eli David Morgenstern acquired or maintained interests in or control of The State Bar of California enterprise through Office of Chief Trial Counsel by engaging in a pattern of mail fraud and wire fraud, and through carrying on the unlawful activity of The State Bar of California enterprise.

247.    For all times relevant, State of California lacked direct supervision of State Bar, and the racketeering activity described above was conducted unequally, and there was no clearly articulated State policy which allowed the racketeering activity.

248.    The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

249.    The Count V Defendant(s) have directly and indirectly acquired or maintained interest in or control of an enterprise through a pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

250.    As direct and proximate cause of Count V Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff has been injured in his actual and prospective business and property.

251.    As direct and proximate result of Count V Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff has been damaged in his business and property as set forth in all preceding paragraphs and therefore seeks his damages, treble damages, attorney's fees, and injunctive relief.

252.    WHEREFORE, plaintiff requests this Court enter judgment against the Count V Defendant(s):

253.    JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; ELI DAVID MORGENSTERN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 18 U.S.C. § 1962(b).

254.    MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; ELI DAVID MORGENSTERN; SUZANNE GRANDT; THE STATE BAR OF

CALIFORNIA; and STATE OF CALIFORNIA in the amount equal to any amount failing in the preceding paragraphs and Counts I through Count IV as an alternative.

255.     PERMANENT INJUNCTION as the Court deems just.

## COUNT VI

## FOURTEENTH AMENDMENT—DUE PROCESS

## STATE CREATED DANGER

### Violation of 42 U.S.C. § 1983

256.     The allegations of paragraphs ¶ 1 through ¶ 253 are incorporated herein by reference as if they were set forth fully.

257.     This Count VI is against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count VI Defendant(s)").

258.     This Count VI is for violation of 42 U.S.C. § 1983 which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

259.     In the 9th Circuit, "[i]t is well settled that a "person" subject to liability can be an individual sued in an individual capacity (*see Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)) or in an official capacity (*see Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013)).  A "person" subject to liability can also be a local governing body (*see Waggy v. Spokane County*, 594 F.3d 707, 713 (9th Cir. 2010).

260.     This Count VI is brought against RUBEN DURAN, SUZANNE GRANDT, and ELI DAVID MORGENSTERN acting individually and in their official capacity, where THE STATE BAR OF CALIFORNIA is controlled by active market participants in regulation due to STATE OF CALIFORNIA's decisions.

261.     RUBEN DURAN, SUZANNE GRANDT, and ELI DAVID MORGENSTERN each deprived plaintiff of particular rights under the United States Constitution.

262.     In this case, Duran, Grandt, and Morgenstern deprived plaintiff of his rights under the Fourteenth Amendment to the Constitution when each ratified the serial schemes to defraud by mail and wire involving State Bar, KJC, and CLC, and thereby placed the plaintiff into further danger through affirmative acts.

263.     Under the Fourteenth Amendment, plaintiff has the constitutional right to be free from a government employee affirmatively placing plaintiff in a position of actual, particularized danger (or in a situation of actual, particularized danger that is more dangerous than the position that the plaintiff already faced) if the government employee acted with deliberate indifference to a known or obvious danger.

264.     In order to prove Duran, Grandt, and Morgenstern deprived the plaintiff of this Fourteenth Amendment right, the plaintiff must prove the following by a preponderance of the evidence: (1) the defendants committed an affirmative act; (2) the affirmative act placed the plaintiff in a position of an actual, particularized danger by creating or exposing the plaintiff to a danger that he would not have otherwise faced; (3) the defendant acted with deliberate indifference to a known or obvious danger; and (4) the affirmative act that created that actual, particularized danger caused injury to the plaintiff that was foreseeable.

265.     In this context, "deliberate indifference" means that the defendants disregarded a known or obvious consequence of their actions. In other words, the defendant must have known that something was going to happen to plaintiff but ignored the risk and still exposed the plaintiff to that risk.

266.     Duran, Grandt, and Morgenstern each committed an affirmative act, and each did know that something was going to happen to plaintiff but they ignored the risk.

267.     The affirmative act of Duran, Grandt, and Morgenstern placed plaintiff in a position of an actual, particularized danger by creating or exposing the plaintiff to a danger that he would not otherwise have faced.

268.     Duran, Grandt, and Morgenstern acted with deliberate indifference to the known and obvious danger.

269.     The affirmative act that created the actual, particularized danger caused injury to the plaintiff that was foreseeable.

270.     As direct and proximate cause of Duran, Grandt, and Morgenstern violating plaintiff's clearly established constitutional rights, and State Bar's deliberate disregard of plaintiff, plaintiff was actually damaged, and he seeks special damages caused by the violation of his particular rights.

271.     $138,889,249 for actual damages and future damages as set forth above

272.     $138,889,249 for pain, suffering, inconvenience, and oppression

273.     $138,889,249 for severe emotional distress leading to a seizure in Dec. 2022

274.     $138,889,249 for loss of consortium and inability to marry

275.     $138,889,249 for becoming disenfranchised, losing trust in State government

276.     $138,889,249 for severe grief, losing his parents and a mentor building CTI

277.     $138,889,249 for loss of enjoyment of life, consideration of suicide

278.     $138,889,249 for humiliation, losing friends and colleagues

279.     $138,889,249 for loss of 20% of left arm due to surgery delays due to Grandt

280.     $138,889,249 for ratifying KJC, BW, TJO, CLC, NMC conduct pre-9/14/18

281.     $138,889,249 for ratifying KJC, BW, TJO, CLC, NMC conduct post-9/14/18

282.     Plaintiff also seeks punitive damages equal to the maximum amount permissible under the law but not less than $138,889,249 and up to $1,388,892,490.

283.     WHEREFORE, plaintiff requests this Court enter judgment against the Count VI Defendant(s):

284.     JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 42 U.S.C. § 1983.

285.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, ELI DAVID MORGENSTERN, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for damages of $138,889,249.

286.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, ELI DAVID MORGENSTERN, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for special damages of not less than $138,889,249 and up to $1,388,892,490.

287.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, ELI DAVID MORGENSTERN, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for punitive damages of not less than $138,889,249 and up to $1,388,892,490.

288.     PERMANENT INJUNCTION as the Court deems just.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VII

### FIRST AMENDMENT—"CITIZEN" PLAINTIFF

#### Violation of 42 U.S.C. § 1983

289.    The allegations of paragraphs ¶ 1 through ¶ 288 are incorporated herein by reference as if they were set forth fully.

290.    This Count VII is against RUBEN DURAN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count VII Defendant(s)").

291.    Under the First Amendment, a citizen has the right to petition the government and access the courts. To establish the Count VII Defendant(s) deprived the plaintiff of this First Amendment right, the plaintiff must prove the following additional elements by a preponderance of the evidence:

292.    (1) The plaintiff was engaged in a constitutionally protected activity; (2) the Count Defendant(s) actions against the plaintiff would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the plaintiff's protected activity was a substantial and motivating factor in the defendant's conduct.

293.    (1) Plaintiff's petitioning against the Count VII Defendant(s) was protected under the First Amendment, and therefore, the first element requires no proof.

294.    (2) The Count VII Defendant(s) actions against the plaintiff would chill a person of ordinary firmness from continuing to engage in the protected activity.

23-CV-00018-JVS-DFM

295.    (3) The plaintiff's protected activity was a substantial or motivating factor in the defendant's conduct.

296.    As direct and proximate cause of Count VII Defendant(s) violating plaintiff's clearly established constitutional rights, plaintiff was actually damaged, and he seeks special damages caused by the violation of his particular rights for any amount failing in Count I through Count VI.

297.    Plaintiff also seeks punitive damages equal to the maximum amount permissible under the law but not less than $138,889,249 and up to $1,388,892,490.

298.    WHEREFORE, plaintiff requests this Court enter judgment against the Count VII Defendant(s):

299.    JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 42 U.S.C. § 1983.

300.    MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for damages equal to any amount failing Counts I through Count VI as an alternative.

301.    MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for special damages for any amount failing Count VI as an alternative.

302.    MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for punitive damages for any amount failing Count VI as an alternative.

303.    PERMANENT INJUNCTION as the Court deems just.

23-CV-00018-JVS-DFM

**PLAINTIFF DEMANDS TRIAL BY JURY**

304.      For the foregoing reasons, plaintiff requests the Court enter judgment in his favor as set forth above.

305.      Plaintiff requests this Court act *Sua sponte* to restrict or enjoin the conduct at issue so that it does not contaminate this proceeding or cause further harm to plaintiff, the public, or the United States amidst $3.63 trillion interstate commerce – including but not limited to the appointment of non-partisan or bi-partisan racketeering investigator(s) under 18 U.S.C. § 1968 as a matter of public interest.

306.      CERTIFICATION AND CLOSING. Under F. R. Civ. P. 11, by signing below, I certify to the best of my knowledge, information, and believe that this complaint: (1 ) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2 ) is supported by existing law, or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3 ) the factual contentions have evidentiary support[]; and (4 ) the complaint otherwise complies with the requirements of Rule 11.


JANUARY 28, 2023

Certified and Verified as True                    JUSTIN S. BECK, as individual plaintiff

                                                                   *In Propria Persona*


23-CV-00018-JVS-DFM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

23-CV-00018-JVS-DFM