1
2
3
4
5
6

JUSTIN S. BECK
3501 ROSELLE ST.
OCEANSIDE, CA 92056
760-449-2509
justintimesd@gmail.com
*In Pro Per*



FILED

FEB 02 2023

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

7        **IN THE UNITED STATES DISTRICT COURT**

8                         **FOR THE**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  JUSTIN S. BECK, | Case No.: 23-CV-0164-MMA-DEB |
| 11            Plaintiff, | **Judge Assigned: Hon. Michael M. Anello** |
| 12        vs. | FIRST AMENDED COMPLAINT FOR DAMAGES & INJUNCTIVE RELIEF |
| 13 | |
| 14  STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; SUZANNE GRANDT; | [COUNT I]   **18 U.S.C. § 1962(c)** (RICO) RACKETEERING |
| 15  RUBEN DURAN; ELI DAVID MORGENSTERN; KENNETH CATANZARITE, | [COUNT II]   **18 U.S.C. § 1962(a)** (RICO) INVESTING PROCEEDS OF RACKETEERING IN AN ENTERPRISE |
| 16 | |
| 17            Defendants, | [COUNT III]   **18 U.S.C. § 1962(b)** (RICO) ACQUIRED INTERESTS IN OR CONTROL OF AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY |
| 18  UNITED STATES ATTORNEY GENERAL; UNITED STATES OF AMERICA | |
| 19 | [COUNT IV]   **18 U.S.C. § 1962(b)** (RICO) ACQUIRED INTERESTS IN OR CONTROL OF AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY |
| 20            Nominal Defendants | |
| 21 | |
| 22 | [COUNT V]   **42 U.S.C. § 1983** FOURTEENTH AMENDMENT—DUE PROCESS—STATE CREATED DANGER |
| 23 | |
| 24 | [COUNT VI]   **42 U.S.C. § 1983** FIRST AMENDMENT—"CITIZEN" PLAINTIFF |
| 25 | |
| 26 | [COUNT VII]   **15 U.S.C. § 15** ANTITRUST – PRIVATE RIGHT OF ACTION |
| 27 | |
| 28 | |

1

COMPLAINT

Plaintiff JUSTIN S. BECK ("plaintiff" or "Beck") for his first amended complaint for damages and injunctive relief against defendants STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; KENNETH CATANZARITE; (together "defendants"); and nominal defendants UNITED STATES ATTORNEY GENERAL; UNITED STATES OF AMERICA; alleges as follows:

SUMMARY

1. Plaintiff is an entrepreneur and executive who derives his money, business, and property by way of founding companies, mergers, and acquisitions.

2. Defendants have engaged in an unlawful, fraudulent scheme against plaintiff involving overt acts by wire and mail designed to convert or take his money, business, and property, harass, and vex plaintiff, or to cover up the scheme under color of state law.

3. The fraudulent scheme targeting the plaintiff's money, business and property involves malicious prosecution of various lawsuits lacking objective probable cause and antitrust violations.

4. The fraudulent scheme is predicated upon and continued through interests or control over the California judiciary acquired through a pattern of racketeering activity.

5. The fraudulent scheme involves ongoing, extra-judicial acts designed to harm plaintiff, his reputation, to willfully damage the value of his material financial interests, to prevent plaintiff from life, liberty, and happiness, and to restrain plaintiff from achieving fair and neutral adjudication of his genuine claims on their merits. Other U.S. citizens are being harmed similarly.

6. Plaintiff has been actually damaged in his business, property, and person, including through violation of his clearly established, federally protected constitutional rights.

7. Plaintiff has further been damaged in his prospective money, business and property, and his right to be free of impairment from attorney schemes to defraud him.

8. Plaintiff seeks his damages, treble damages, punitive damages, pre-judgment interest, and injunctive relief. Business and property damage includes $32.67 million in stock of one issuer in a merger, $5.67 million in another, and equivalent career damage for not less than 25 years.

9. Plaintiff seeks United States intervention against The State Bar of California for cause.

2

23-CV-0164-MMA-DEB

## HISTORY OF THE STATE BAR OF CALIFORNIA

10. According to Wikipedia on January 14, 2022, "The State Bar of California is California's official attorney licensing agency. It is responsible for managing the admission of lawyers to the practice of law, investigating complaints of professional misconduct, prescribing appropriate discipline, accepting attorney-member fees, and financially distributing sums paid through attorney trust accounts to fund nonprofit legal entities. It is directly responsible to the Supreme Court of California, however, its Trustees are now appointed by the Supreme Court, the California Legislature, and Governor of California.[3] All attorney admissions are issued as recommendations of the State Bar, which are then routinely ratified by the Supreme Court. Attorney discipline is handled by the State Bar Office of Chief Trial Counsel, which acts as prosecutor before the State Bar Court of California."

11. For all times relevant, THE STATE BAR OF CALIFORNIA was controlled by majority of active market participant Board of Trustees in regulation of active market participants after 2015.

12. For all times relevant, THE STATE BAR OF CALIFORNIA lacked active supervision by STATE OF CALIFORNIA after 2015 as defined by federal antitrust laws.

## HISTORY OF THE GOVERNMENT CLAIMS ACT OF 1963 IN CALIFORNIA

13. In 1961, the California Supreme Court in *Muskopf v. Corning Hospital District* (1961) 55 Cal.2d 211 "discarded as mistaken and unjust" the concept of sovereign immunity holding "when there is negligence, the rule is liability, immunity is the exception."

14. *Muskopf* led to Government Claims Act of 1963, which expressly provide sections of liability in this case for judgments against The State Bar of California and State of California in favor of Beck:

Cal. Gov. Cod. § 815 provides "(a) Except as provided by statute: a) A public entity is not liable for an injury, whether such injury rises out of an act or omission of the public entity or a public employee or any other person. (b) The liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person."

15. Statute is "otherwise provided" by:

Cal. Gov. Cod. § 815.2, which holds "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause

23-CV-0164-MMA-DEB

of action against that employee or his personal representative. (b) Except as provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity."

16. Statute is "otherwise provided" for intentional tort or criminal conduct by:

"Cal. Gov. Cod. § 815.3 (a) Notwithstanding any other provision of this part, unless the elected official and the public entity are named as codefendants in the same action, a public entity is not liable to a plaintiff under this part for any act or omission of an elected official employed by or otherwise representing that public entity, which act or omission constitutes an intentional tort, including, but not limited to, harassment, sexual battery, and intentional infliction of emotional distress. For purposes of this section, harassment in violation of state or federal law constitutes an intentional tort, to the extent permitted by federal law. This section shall not apply to defamation. (b) If the elected official is held liable for an intentional tort other than defamation in such an action, the trier of fact in reaching the verdict shall determine if the act or omission constituting the intentional tort arose from and was directly related to the elected official's performance of his or her official duties. If the trier of fact determines that the act or omission arose from and was directly related to the elected official's performance of his or her official duties, the public entity shall be liable for the judgment as provided by law. For the purpose of this subdivision, employee managerial functions shall be deemed to arise from, and to directly relate to, the elected official's official duties....(c) If the trier of fact determines that the elected official's act or omission did not arise from and was not directly related to the elected official's performance of his or her official duties, upon a final judgment, including any appeal, the plaintiff shall first seek recovery of the judgment against the assets of the elected official. If the court determines that the elected official's assets are insufficient to satisfy the total judgment, including plaintiff's costs as provided by law, the court shall determine the amount of the deficiency and the plaintiff may seek to collect that remainder of the judgment from the public entity. The public entity may pay that deficiency if the public entity is otherwise authorized by law to pay that judgment. (d) To the extent the public entity pays any portion of the judgment against the elected official pursuant to subdivision (c) or has expended defense costs in an action in which the trier of fact determines the elected official's action did not arise from and did not directly relate to his or her performance of official duties, the public entity shall pursue all available creditor's remedies against the elected official in indemnification, including garnishment, until the elected official has fully reimbursed the public entity. (e) If the public entity elects to appeal the judgment in an action brought pursuant to this section, the entity shall continue to provide a defense for the official until the case is finally adjudicated, as provided by law. (f) It is the intent of the Legislature that elected officials assume full fiscal responsibility for their conduct which constitutes an intentional tort not directly related to their official duties committed for which the public entity they represent may also be liable, while maintaining fair compensation for those persons injured by such conduct...(h) If any provision of this section or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the section which can be given effect without the invalid provision or application, and to this end the provisions of this section are severable."

23-CV-0164-MMA-DEB

17. Statute is "otherwise provided" by:

> Cal. Gov. Cod. § 815.6, which holds "[w]here a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

18. *Rodriguez v. Inglewood Unified School District* (1986) 186 Cal.App.3d 707 clarifies "[t]he statutes that provide for liability do not need to be part of the Government Claims Act, and do not need to provide specifically on their face that they apply to public entities."

19. 18 U.S.C. § 1962(a)-(c) apply to all defendants in this action, and violations of these sections by Suzanne Grandt, Ruben Duran, and Eli David Morgenstern within the scope of their employment provide for liability to The State Bar of California and State of California for judgments to Beck.

20. Beck was and is in special relationship to State of California, The State Bar of California, Ruben Duran, Suzanne Grandt, and Eli David Morgenstern as victim of ongoing schemes to defraud him – where each had actual knowledge of the schemes but chose to ratify them and carry them on with at least indifference or actual malice as to the harm it caused Beck.

21. Beck was and is among the protected class of citizenry that the statutes outlined herein were intended to protect from specific types of injuries, and Beck did suffer injuries.

22. Violations of 18 U.S.C. § 1962(a)-(d) do not have any associated immunities available by statute, and criminal conduct by Ruben Duran, Suzanne Grandt, and Eli David Morgenstern constitutes intentional torts under Cal. Gov. Cod. § 815.3 giving rise to State Bar and State liability.

23. The State Bar of California and State of California have negative duty under Cal. Gov. Cod. § 815.6 not to engage in violations of 18 U.S.C. § 1962(a)-(d) through their officials or employees.

24. Violations of 18 U.S.C. § 1962(a)-(d) would have and do give rise to causes of action against Ruben Duran, Eli David Morgenstern, and Suzanne Grandt because the associated acts or omissions would have apart from Cal. Gov. Cod. § 815.2.

25. 15 U.S.C. § 1 was designed to protect the public from particular kinds of injury related to antitrust violations, and The State Bar of California and State of California each failed to discharge their duties and cannot show they exercised reasonable diligence to discharge the duty after 2015.

23-CV-0164-MMA-DEB

26. 15 U.S.C. § 1 causes mandatory duty to The State Bar of California within the meaning of Cal. Gov. Cod. § 815.6, and it failed to exercise reasonable care because it repeatedly violated 15 U.S.C. § 1 through official acts of its elected officials, officers, and employees.

27. There are no immunities available for violating federal antitrust laws where The State Bar of California was majority-controlled by active market participants in the same industry it regulates.

28. There are no immunities available for violating RICO statutes, because that would "completely eviscerate Government Code section 815.6 which specifically provides for liability of the public entity for injuries resulting from a failure to carry out a mandatory duty imposed by a public enactment." *Elton v. County of Orange* (1970) 3 Cal.App.3d 1053, 1059; see also *Alejo*, 75 Cal.App.4th at p. 1194.

29. The State Bar of California, Ruben Duran, Eli David Morgenstern, and Suzanne Grandt are named together in this action with State of California, and violations of RICO statutes are intentional torts under Cal. Gov. Cod. § 815.3. State of California is liable for each of them, here.

30. The State Bar of California, Ruben Duran, Eli David Morgenstern, and Suzanne Grandt are named together in this action with State of California, and constitutional violations under 42 U.S.C. § 1983 constitute intentional torts within the meaning of Cal. Gov. Cod. § 815.3.

31. Beck has permission to sue California government under Government Claims Act, and Legislature's express intent is that Beck be paid his damages, as it relates to 11th Amendment of U.S. Constitution. Beck is also a citizen of California bringing this action for cause, in good faith.

## JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 under the Racketeer Influenced Corrupt Organizations Act ("RICO") for 18 § 1962(a)-(d) claims.

33. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 15 for private right of action for antitrust violations under the Sherman Act and Clayton Act.

34. This Court has subject matter jurisdiction due to a compromised judicial system in California under *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015).

23-CV-0164-MMA-DEB

35. This Court has original jurisdiction over constitutional claims under 42 U.S.C. § 1983 as being federal question under 28 U.S.C. § 1331 where each arise from abuse of control over the California state judicial system by one or more aspects of The State Bar of California.

36. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because defendants do business in this district and are each subject to personal jurisdiction in this district, where process may be served in any judicial district of the United States per 18 U.S.C. § 1965(b), when required by the ends of justice. Nationwide service of process confers personal jurisdiction over a defendant in any judicial district where each defendant has contacts with the United States.

## PARTY IDENTIFICATION

37. Plaintiff JUSTIN S. BECK ("Beck" or "plaintiff") is an individual United States and California citizen, entrepreneur, and member of the public among the protected class of citizenry lacking equal protection under the law by The State Bar of California and California judicial system according to the Fourteenth Amendment of the United States Constitution. Plaintiff is a person with a principal place of residence and business at 3501 Roselle St., Oceanside, California, 92056. Plaintiff beneficially owned or controlled 8,435,000 of CTI stock for all times relevant: 4,935,000 common shares and 3,500,000 Preferred Series A shares. Plaintiff had a right to own 8,435,000 shares individually in CTI's agreed merger with Western Troy Capital Resources on the senior "NEO" Stock Exchange in Canada, which shares would be held in the U.S. as a foreign private issuer. In March 2021, Plaintiff owned or had rights to 4,549,609 Subordinate Voting Shares in Contakt World Technologies Corp. ("CW"), 45,496 Compressed Shares in CW equivalent to 4,549,600 Subordinate Voting Shares in CW, 1,800,000 Subordinate Voting Share Warrants with a strike price of $.10 CAD and public valuation of $.80 CAD in March 2021 per Subordinate Voting Share, and a right to warrants to acquire an additional 2.5% of shares upon listing CW on a senior stock exchange like NASDAQ. Plaintiff developed certain intellectual property, provisional patents, USPTO applications, and software for healthcare between 2020 and 2021 during which National Health Expenditure grew 2.7% to $4.3 trillion and accounted for 18.3% of Gross Domestic Product in the United States. Plaintiff's intellectual property was compromised due to the conduct at issue. Plaintiff hosted and co-produced "Truth in Health" with iHeartMedia,

23-CV-0164-MMA-DEB

among the top podcasts in the United States at that time, earning (2) "AVA Awards" and a "Webby Award" nomination. Plaintiff was to produce and host another season with A-List celebrity Will Ferrell as creative director which was also compromised by the conduct at issue. Before March 2021, plaintiff's company and technology received Honorable Mention as a "World Changing Idea" by Fast Company. Before March 2021, Plaintiff's company and technology received a Gold "BIG Innovation Award" as well as (2) "Stevie Awards" in American business. After March 2021, CW was also compromised and destroyed by the conduct at issue. Plaintiff is a layman, non-attorney, never admitted to any bar.

38. Defendant THE STATE OF CALIFORNIA ("State"), a sovereign entity among the United States and culpable person, is subject of plaintiff's denied government claims, and vested rights to sue. State is liable for itself, nonsovereign assignee The State Bar of California, public employees, elected officials, and its court officers under Government Claims Act as provided by statute, including but not limited to those specified in this complaint. The economy for the State is the largest in the United States, with a $3.63 trillion gross state product as of 2022, making it the largest, global sub-national economy.

39. Defendant THE STATE BAR OF CALIFORNIA ("State Bar"), a non-sovereign public entity controlled by active market participants in regulation for all times relevant, and culpable person, is subject of plaintiff's denied government claims, and vested right to sue. The State Bar of California operates postal mail and wire facilities from 845 S. Figueroa Ave, Los Angeles, 90017 and 180 Howard Street, San Francisco, CA 94105 through which it conducts a pattern of racketeering activity by mail and wire approximately 44 times per day and 16,000 times per year. The State Bar of California and those working for it or authorized by it cause liability to State on principles of *respondeat superior*, as provided by statute, and because State has assigned its sovereignty to nonsovereign The State Bar of California and its active market participants in regulation of their peers. State Bar is an enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce, also affecting foreign commerce through banking and money transmissions to and from China and Taiwan through the "Leadership Bank Program:" American Continental Bank, Bank of the Orient, New Omni Bank, N.A., CTBC Bank Corp.

23-CV-0164-MMA-DEB

40. Defendant KENNETH J. CATANZARITE, ESQ. ("KJC"), an individual and culpable person, is an attorney established and carried on by State Bar through annual dues paid, with a principal place of business being 2331 W. Lincoln Ave., Anaheim, California, 92801 with SBN #113750. KJC is the CEO of Catanzarite Law Corporation ("CLC"), whose associated-in-fact attorneys licensed by State Bar include Nicole Marie Catanzarite Woodward, Brandon Woodward, Tim James Okeefe, Jim Travis Tice, Eric V. Anderson, and key employees Becky Phillips and Han Le. KJC is an enterprise engaged in, or whose activities affect, interstate commerce.

41. Defendant SUZANNE GRANDT ("Grandt"), an individual and culpable person, is an attorney established and carried on by State Bar receiving payment from racketeering activity, with a principal place of business being 180 Howard Street, San Francisco, California 94105 with SBN #304794. Grandt is Assistant General Counsel within the Office of General Counsel of State Bar ("OGC"). Grandt is sued in her personal capacity for alleged crimes, torts, and constitutional violations against Beck and in her official capacity for acts undertaken officially on behalf of and through State Bar. OGC is an enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce.

42. Defendant RUBEN DURAN ("Duran"), an individual and culpable person, is an attorney established and carried on by State Bar receiving payment from racketeering activity, with a principal place of business being 2855 E. Guasti Road, Ontario, California with SBN #197780. Duran is sued in his personal capacity for alleged crimes, torts, and constitutional violations against Beck and his official capacity for acts undertaken officially on behalf of and through State Bar and for the private law firm Best Best & Krieger. Duran is Chairman of the Board of Trustees for State Bar ("BOT"). BOT is an enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce.

43. Defendant ELI DAVID MORGENSTERN ("Morgenstern"), an individual and culpable person, is an attorney established and carried on by State Bar receiving payment from racketeering activity, with a principal place of business being 845 S. Figueroa, Los Angeles, 90017 with SBN #190560. Morgenstern is Senior Trial Counsel within Office of Chief Trial Counsel of State Bar ("OCTC"). Morgenstern is sued in his personal capacity for alleged crimes and intentional torts against Beck,

9

23-CV-0164-MMA-DEB

1  and in his official capacity for acts undertaken on behalf of and through State Bar. OCTC is an

2  enterprise engaged in, or whose activities affect, $3.63 trillion in interstate commerce.

3  44. Defendant UNITED STATES ATTORNEY GENERAL ("USAG") has a duty to the United States

4  of America, and to all citizens, amidst $3.63 trillion in interstate commerce adversely affected.

5  45. Defendant UNITED STATES OF AMERICA ("USA") is a sovereign country which has a duty

6  to all citizens of USA, is not an ordinary party to this proceeding, and whose duty extends to each

7  of its states including State of California, amidst $3.63 trillion in interstate commerce adversely

8  affected by the conduct at issue. If State refuses, USA has a duty to all persons harmed by State

9  Bar through reverse incorporation (14th into 5th Amendment to U.S. Constitution).

10  <u>RACKETEERING ACTIVITY AT ISSUE</u>

11  **46.**        **MAIL FRAUD – 18 U.S.C. § 1341**

12  "There are two elements in mail fraud: (1) having devised or intending to devise a scheme
to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose
13  of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Schmuck*
14  *v. United States*, 489 U.S. 705, 721 n. 10 (1989); *see also Pereira v. United States*, 347
U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under . . . § 1341 are (1) a
15  scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the
scheme."); Laura A. Eilers & Harvey B. Silikovitz, *Mail and Wire Fraud*, 31 Am. Crim.
16  L. Rev. 703, 704 (1994) (cases cited)." [DOJ Archives]

17

18  **47.**        **WIRE FRAUD – 18 U.S.C. § 1343**
"The elements of wire fraud under Section 1343 directly parallel those of the mail fraud
19  statute, but require the use of an interstate telephone call or electronic communication made
in furtherance of the scheme. *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995)
20  (*citing United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (per
curiam)); *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is identical to
21  mail fraud statute except that it speaks of communications transmitted by wire); *see
also, e.g., United States v. Profit*, 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential
22  elements of the crime of wire fraud are: (1) that the defendant voluntarily and intentionally
devised or participated in a scheme to defraud another out of money; (2) that the defendant
23  did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire
communications would be used; and (4) that interstate wire communications were in fact
24  used) (*citing* Manual of Model Criminal Jury Instructions for the District Courts of the
25  Eighth Circuit 6.18.1341 (West 1994)), *cert. denied*, 115 S.Ct. 2289 (1995); *United States
v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (two elements comprise the crime of wire
26  fraud: (1) a scheme or artifice to defraud; and (2) use of interstate wire communication to
facilitate that scheme); *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994)
27  (essential elements of wire fraud are: (1) a scheme to defraud and (2) the use of, or causing
28  the use of, interstate wire communications to execute the scheme), *cert. denied*, 115 S.Ct.

23-CV-0164-MMA-DEB

193 (1995); *United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993) (to prove wire fraud government must show (1) scheme to defraud by means of false pretenses, (2) defendant's knowing and willful participation in scheme with intent to defraud, and (3) use of interstate wire communications in furtherance of scheme); *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990) ("Wire fraud requires proof of (1) a scheme to defraud; and (2) the use of an interstate wire communication to further the scheme.").

48. More succinctly here in the 9th Circuit: "Criminal mail and wire fraud involves: (1) a scheme based on an intent to defraud; and (2) the use of the mails or wires to further that scheme." *United States v. Weaver*, 860 F. 3d 90, 94 (2nd Cir. 2017); *Bui v. Nguyen*, 712 Fed. Appx. 606, 609 (9th Cir. 2017)

<u>OPEN ENDED AND CLOSED-ENDED STATE BAR SCHEMES TO DEFRAUD</u>

49. Racketeering activity in this case involves open-ended and closed-ended schemes with similar perpetrators among The State Bar of California enterprise.

50. Racketeering activity in this case involves similar methods of using protection of public entity The State Bar of California, materially false statements of The State Bar of California Board of Trustees, Office of General Counsel, and Office of Chief Trial Counsel actors by mail and wire, and the use of California's judicial system supported by mail and wire communications in furtherance of the schemes.

51. Racketeering activity in this case involves similar beneficiaries being the perpetrators engaged in overt acts and The State Bar of California enterprise itself.

52. Racketeering activity in this case involves similar victims being the non-attorney public, issuers of securities, and insurance carriers who are unwillingly forced to underwrite The State Bar of California enterprise schemes to defraud nationally.

53. Racketeering activity in this case involves similar victims being the United States itself, where The State Bar of California enterprise is the only one controlling an entire judicial system and $3.63 trillion in U.S. GDP, and further admitting members of The State Bar of California enterprise *pro hac vice* to defraud citizens and businesses of their money and property in other states.

54. Racketeering activity in this case is supported or driven by conspiracy among The State Bar of California enterprise and coerced persons, adverse representation of parties before the same tribunal or in the same or similar matters to monopolize due process rights, assuming the role of "counsel" for inanimate entities through the exculpation of conflict waivers among The State Bar

23-CV-0164-MMA-DEB

of California enterprise and coerced persons, disregard of conflicts of interest policies necessary for a sustainable democracy, and general disregard of public interest in favor The State Bar of California enterprise actors with malice.

55. Attorney trust accounts are used to launder the undue profits of attorneys in most instances.

56. The majority of State Bar, BOT, OGC, and OCTC's daily activities constitute mail and wire fraud. Each overt act is misrepresented to help the public, but in reality, each overt act delays, estops, restricts, reduces, eliminates, harms, slanders, or destroys the rights, equity, money, property, and good will of the public that the State Bar is bound by law to protect above all else, overtly.

57. Racketeering activity in this case shows an acute threat of continuing by State Bar, CLC, KJC, Duran, Morgenstern, Grandt, OCTC, OGC, and BOT.

<u>PATTERN OF RACKETEERING ACTIVITY</u>

58. "The heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding Corp. v. Mulley-duff & Assoc., Inc.* 483 U.S. 143, 154 (1987).

59. A "pattern of racketeering activity" under 18 U.S.C. § 1961(5) requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years after the commission of a prior act of racketeering activity.

60. Using the postal mail and wire communications with intent to defraud in 2007, The State Bar of California enterprise's "Catanzarite did not tell the Court that his client…deeded his home to Catanzarite [who] took the property to pay for his fees, but did not tell the Court about this…'Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services." [**Exhibit 35, p. 4**]

61. Using the postal mail and wire communications with intent to defraud in 2011, The State Bar of California enterprise's "Catanzarite violated court rules by making statements to the court without any proof…Catanzarite does not care about the truth in making statements to the Court." [**Exhibit 35, p. 4**]

62. Using the postal mail and wire communications with intent to defraud in 2013, The State Bar of California enterprise's Catanzarite "was punished 'for saying one thing, then switching his story. The court stated that Catanzarite's case was a "sham."'" [**Exhibit 35, p. 4**]

23-CV-0164-MMA-DEB

63. From 2010 through 2021 using postal mail letters and wire communications with intent to defraud members of the public in favor of The State Bar of California enterprise, "State Bar closed more cases through nonpublic measures—a total of 22,600, or 10 percent of all case closures—than it did through public discipline, which totaled 11,200, or 5 percent of all case closures. During the same period, more than 700 attorneys each had four or more cases that the State Bar closed through nonpublic measures." [**Exhibit 34**].

64. On July 20, 2017, addressing The State Bar of California enterprise and OGC enterprise constituents Suzanne Grandt and Robert Retana, a federal judge says:

> "THE COURT: Get the State Bar to look into [Grandt's] conduct. Maybe my committee here in this Court, the committee that we have here for admitting to practice in this Court ought to look into Ms. Grandt's conduct. Maybe we'll have two investigations going at once."
> "THE COURT: And next time the State Bar will be a little bit more honest with the poor federal judge…I'm making this order because Ms. Grandt told me something that wasn't true, and I relied on it." [**Exhibit 2**]

65. On Friday, September 22, 2017, it was announced by United States Department of Justice that "Former Clerk in Orange County Superior Court Sentenced to Over 11 Years in Federal Prison for Racketeering Offense Stemming from Bribery Scheme to 'Fix' Criminal Cases and Traffic Charges" after pleading guilty to one count of conspiring to violate the federal Racketeer Influenced and Corrupt Organizations Act (RICO). [**Exhibit 13**].

66. Reviewing The State Bar of California enterprise's Thomas V. Girardi's corruption of the California judiciary as well as compromise of The State Bar of California enterprise by active market participants, an "investigation began on August 26, 2014 in response to a July 31, 2014 Report of Improper Activity from the Bar's Chief Trial Counsel" citing a "disturbing lack of transparency at the highest levels within the organization." [**Exhibit 1**].

67. Using the wire with intent to defraud on January 24, 2022, with actual knowledge of [**Exhibit 1**], "The State Bar of California's Board of Trustees announced today that it has been conducting an additional investigation into whether the State Bar's handling of past discipline complaints against former licensee Thomas V. Girardi was affected by Girardi's connections to or influence at the State Bar."

23-CV-0164-MMA-DEB

68. On November 2, 2022, Judge Thomas M. Durkin in United States District Court for the Northern District of Illinois Eastern Division *In Re Lion Air Flight JT 610 Crash*, Case No. 18 C 7686 wrote the "Court alerted the U.S. Attorney for this district to the facts of this case when this motion was filed because Girardi's conduct is unquestionably criminal" and a "stain on the legal profession." [**Exhibit 42**]

69. Using the wire with intent to defraud on November 3, 2022, an "Open Letter Regarding the State Bar's Thomas V. Girardi Disclosure" was delivered by The State Bar of California enterprise citing "irreparable harm to hundreds of his clients. We can never allow something like this to happen again," said Duran. "Over the past 40 years, the State Bar opened 205 [notices of injury and theft we enabled for] Girardi [and used the wire and postal mail to close or 'abate' them]. Of the 205 [notices of injury and theft], approximately 120 involved allegations related to client trust [wire fraud]." [plaintiff edits]

70. Using the wire and postal mail with intent to defraud, Girardi of The State Bar of California enterprise obtained a $500 million fraudulent judgment pertaining to the Dole Fruit Company. (*In Re Girardi*, 611 Fed.3d 1027, 1039-1040)

71. Using the wire and postal mail with intent to defraud, Girardi of The State Bar of California enterprise stole more than $120 million in connection with the Gutierrez class action. (*Guttierez v. Girardi*, (2011) 194 Cal.App.4th 925).

72. On December 1, 2015, Orange County's Stephen Young Kang of The State Bar of California enterprise was indicted on 25-counts including wire fraud and money laundering. [**Exhibit 51**].

73. On September 21, 2018, after being carried on for nearly three years after a two- count wire fraud conviction, The State Bar of California enterprise disbarred Stephen Young Kang. [**Exhibit 52**].

74. "Catanzarite Law Corporation, Kenneth J. Catanzarite and Tim J. O'Keefe for Plaintiffs and Appellants." *Corzo v. Parks Palmer Turner & Yemenidjian, LLP*, No. B285691, (Cal. Ct. App. Nov. 29, 2018) "The trial court [found] finding that the amended complaint was a "sham" pleading.[] Was it? Yes. We agree with the trial court that Corzo's amended complaint was a sham pleading." *Corzo v. Parks Palmer Turner & Yemenidjian, LLP*, No. B285691, 2 (Cal. Ct. App. Nov. 29, 2018)

23-CV-0164-MMA-DEB

75. Using the postal mail and wire communications with intent to defraud Bank of America, "DENISE PINKERTON, individually, and as attorney in fact for Roger Root" appeared with Kenneth Catanzarite and Catanzarite Law Corporation as counsel. *Pinkerton v. Bank of Am., N.A.*, Case No. 5:19-cv-374-Oc-32PRL, (M.D. Fla. Nov. 26, 2019)

76. On October 4, 2022, Matthew Charles Elstein of The State Bar of California enterprise "Sentenced to More than 3 Years in Prison for Conning Clients via Sham Court Documents" after he "pleaded guilty to one count of wire fraud" in November 2021. [**Exhibit 81**].

77. On December 5, 2022, a Los Angeles Times article announces that Michael Avenatti of The State Bar of California enterprise "pled guilty to four counts of wire fraud" in Orange County. [**Exhibit 83**]

78. On June 16, 2020, using "Certified Mail Return Receipt" to OCTC, a "Report of Kenneth J. Catanzarite" cites a complaint filed "on behalf of 13,800 plus adversely affected investors" [**Exhibit 31, pp. 10-14**] without disclosing that Mr. Carlson testified that he did not believe he had suffered any damages, nor was he seeking an attorney, when Mr. Catanzarite visited him at his home. 9 putative class actions were filed on his behalf anyway by Kenneth Catanzarite and Catanzarite Law Corporation, and the United States Securities Exchange Commission has wasted resources on this scheme.

79. On March 9, 2022, the 11th Circuit Court of Appeals concludes the reality of Mr. Catanzarite's scheme in *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, (11th Cir. Mar. 9, 2022) affirming sanctions against "Catanzarite for violating a preliminary injunction that barred "the commencement of any further actions under the same or similar facts or circumstances to" lawsuits he had filed against bankruptcy creditors." *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, 1 (11th Cir. Mar. 9, 2022) "Catanzarite, an attorney licensed in California and admitted to appear *pro hac vice* in the bankruptcy court, filed adversary complaints against the Daymark companies for Richard Carlson" *(Id. at p. 2)* and "bankruptcy court ruled that Catanzarite, as counsel for and in active concert with the Carlson plaintiffs, *see* Fed. R. Civ. P. 65(d)(2)(B), violated the injunction by filing a civil action and lis pendens" *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, 3 (11th

23-CV-0164-MMA-DEB

Cir. Mar. 9, 2022) and "the bankruptcy court stated that it earlier had sanctioned Catanzarite for creating a website containing false and misleading statements" *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, 3-4 (11th Cir. Mar. 9, 2022)

80. On February 1, 2023, Thomas V. Girardi was indicted by federal grand juries Illinois and in California on wire fraud charges related to $18 allegedly stolen from clients who had suffered catastrophic injuries or tragic deaths of loved ones.

## INJURY PRODUCING, OVERT ACTS OF RACKETEERING

81. **[OVERT ACT]**: For Beck, all was going well with his career until KJC filed a complaint against him using the wire in Orange County Superior Court, with intent to defraud on 9/14/2018 at 12:36:59 PM in for Denise Pinkerton with actual knowledge it was false. The "client" Pinkerton claimed to be acting as attorney in fact for Root, individually and as successor in interest to the claims of his deceased spouse (Sharon Root). The complaint alleged the Roots owned common stock in a company called Mobile Farming Systems, Inc. ("MFS") and that the lawsuit was also a shareholder derivative action on behalf of MFS. ("Pinkerton Action") Roger Root was not a shareholder of MFS, and MFS had been defunct for years. Roger Root's company, Jolly Roger, Inc. or Jolly Rogers Investments, Inc. had been offered shares in a company called Cultivation Technologies, Inc. ("CTI") but declined to purchase shares in 2015. Before filing the Pinkerton Action, KJC actually knew that Roger Root declined to purchase CTI shares, but filed the complaint against Beck anyway.

82. Parties witnessing this overt act include Clarissa Bustamante, Deputy Clerk, Orange County Superior Court, Judge Geoffrey T. Glass, and all named defendants including defendants-turned-extorted clients Amy Jeanette Cooper, Richard Francis O'Connor, Jr., and Cliff Higgerson.

23-CV-0164-MMA-DEB

83. **[OVERT ACT]** Overtly using the wire on Thursday, October 4, 2018 at 7:32AM PDT, with intent to defraud plaintiff, Kenneth Catanzarite did message from the address kcatanzarite@catanzarite.com Samuel Y. Edgerton, III at the address sedgerton@fmglaw.com with the subject line: "Re: CTI Financial Information and settlement offer in the Root Matter (Privileged)" as follows – seeking to unwind all CTI shares of MFS at the same time:

> On Oct 4, 2018, at 7:32 AM, Kenneth Catanzarite <kcatanzarite@catanzarite.com> wrote:
>
> Sam: Thanks for the time yesterday I reviewed your proposal with Mr. Root's power holder. Obviously, you and the directors and officers are working from a fully informed position with all the financial information. Keep in mind that what we demand in settlement come is the main from the Founders who from our perspective should be more than willing to put this behind them. I have reviewed the matter with my client and our response is as follows:
>
> 1. The founders collectively will deliver 10,000,000 Founders shares to Root along with whatever proportionate rights to other shares they obtained as a result of that ownership. In other words they will convey as well any stock, options, warrants and/or convertible note rights and interests to Root in proportion to 10 million to the 23 million shares issued. The founders should be willing to do this because if as you say the company has no value then they should be more than willing to convey these shares. It allows them to retain in our view 13 million shares and rights that they bought for $13,000 and had no right to in the first place. And of course conveying the 10 million shares are shares they paid only $10,000 for in full.
> 2. Such securities delivery to Root shall be lien free and coupled with a representation and warranty by the conveying defendant and CTI that the same are validly issued and acknowledge the transfer.
> 3. The Defendants will pay $600,000 to Root payable $200,000 now and the balance of $400,000 over 5 years at 8% fully amortized. Secured by the remaining 13 million Founders shares. Again they paid only $13,000 for these shares.
> 4. Root's designee gets a seat on the CTI board.
> 5. Mutual releases.
> 6. Confidentially.
> 7. Note that if we settle this among the Founders as a group they can agree to make these payments and CTI does not book this as a liability.
> 8. Carve out for New Body MD claims against those named defendants.
> This offer shall remain open until the close of business on Friday October 5 whereupon the same if not unconditionally accepted is withdrawn.
> Ken

84. **[OVERT ACT]** Overtly using the Business Wire press release service and wire with intent to defraud, which was distributed further by Associated Press, on October 4, 2018 at 7:07AM with parties to the communication being any internet user:

17

23-CV-0164-MMA-DEB

**Orange County-Based Catanzarite Law Corporation Files a Lawsuit against Cultivation Technologies, Inc. Contesting Stock Ownership, Breaches of Fiduciary Duty and Director and Officer Misconduct**

ANAHEIM, Calif.--(BUSINESS WIRE)--Oct 4, 2018--On September 14, 2018, Catanzarite Law Corporation filed a lawsuit against Cultivation Technologies, Inc. ("CTI"), its shareholders, directors, officers and others. The matter styled *Denise Pinkerton, an individual as attorney in fact for Roger D. Root, et al. vs. Cultivation Technologies, Inc., et al.* was filed in the Orange County Superior Court as Case No. 30-2018 01018922. A copy of the complaint can be accessed at www.ctilitigation.com.

The complaint asserts claims on behalf of investor Roger Root, derivatively on behalf of Mobile Farming Systems, Inc. ("MFS"). Root, a resident of Florida, invested over $400,000 in MFS stock and was told by MFS representatives, including directors and officers Richard Probst, Richard O'Connor and Amy Cooper, that MFS owned CTI as a subsidiary. The lawsuit contends that MFS is the sole shareholder of CTI as of March 30, 2015 and that CTI directors and officers breached fiduciary duties to MFS as its shareholder including that CTI stock sales and other actions on and after June 30, 2015 are improper. Root also asserts individual claims for securities fraud. For further information, contact Catanzarite Law Corporation.

CONTACT: Catanzarite Law Corporation Timothy J. O'Keefe

Telephone: (714) 520-5544 Facsimile: (714) 520-0680

Email: tokeefe@catanzarite.com

85. **[OVERT ACT]** Overtly using the wire and Orange County Superior Court, with intent to defraud, on December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers KJC named in the Pinkerton Action. Parties to the communications include all litigants, Orange County Superior Court clerks, and any person accessing the court records from within or outside the State of California.

18

23-CV-0164-MMA-DEB

86. **[OVERT ACT]** Overtly using the wire, with intent to defraud, KJC did make contact with represented and unrepresented parties directly and indirectly and did compromise the fraudulent derivative Pinkerton Action without Court approval in violation of F. R. Civ. P. 23.1(c) and California decisional laws intended to prevent collusion. KJC actually knew that Roger Root didn't own shares in MFS nor CTI, but he didn't care because he was protected by State Bar just like Thomas V. Girardi was for forty years before he was indicted. KJC knew he could use the courts as he pleased because State Bar controlled the judiciary, and KJC was protected by State Bar just like Girardi.

87. **[OVERT ACT]** Overtly using the wire on December 21, 2018, after actual MFS counsel Kenneth Watnick was retained to defend the fraudulent derivative Pinkerton Action, KJC did deliver approximately 5,000 discovery requests *against* O'Connor, Cooper, and other defendants with about 500 *against* MFS derivatively seeking to steal private data to continue the scheme.

88. **[OVERT ACT]** Overtly using the wire, with intent to defraud after KJC made direct or indirect contact with unrepresented and represented parties to compromise the fraudulent derivative Pinkerton Action, Catanzarite set in motion his corporate takeover scheme using the signatures and property of coerced defendants Richard Francis O'Connor, Jr., Amy Jeanette Cooper, Cliff Higgerson, Aroha Holdings, Inc. (Tony Scudder) and an ongoing threat of fear under color of official right of "working with law enforcement."

89. **[OVERT ACT]** Overtly using the wire and the threat of fear to obtain signatures and property under color of official right, with intent to defraud using Orange County Superior Court and protection of State Bar, on January 4, 2019, CLC and KJC dismissed Scudder and Aroha from the Pinkerton Action without Court approval in violation of F.R.Civ.P. 23.1(c).

90. **[OVERT ACT]** Overtly using the wire in response to a motion for security filed by MFS' actual counsel to post bond regarding the fraudulent derivative action January 7, 2019, KJC did revive the defunct entity Jolly Rogers Investments, Inc. to conceal a lack of standing in the Pinkerton Action after the entity had been dissolved from May 2015 through January 17, 2019. Parties to the communication include the Secretary of State of Washington as well as any internet user.

23-CV-0164-MMA-DEB

91. **[OVERT ACT]** Overtly using the wire and the threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court and protection of State Bar, on January 22, 2019, KJC dismissed O'Connor, TGAP Holdings, LLC, and Scott Unfug.

92. **[OVERT ACT]** Overtly using the wire and threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court and protection of State Bar, the following day, KJC dismissed Cooper and Higgerson on January 23, 2019 so they could start producing false evidence for KJC in exchange of their cooperation while claims were tolled against them.

93. **[OVERT ACT]** Overtly using the wire and threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court and protection of State Bar, KJC did direct, and it was directed, that O'Connor and Cooper used their MFS shareholder votes to reconstitute the MFS board of directors. MFS hired KJC, who was "working with law enforcement," as corporate counsel under the threat of fear.

94. **[OVERT ACT]** Overtly using the wire and threat of fear to obtain signatures and property under color of official right, with intent to defraud plaintiff using Orange County Superior Court, KJC did direct, and it was directed, on January 23, 2019, O'Connor executed a unanimous written consent of the sole shareholder of CTI (2019 Consent), stating he was CEO of MFS and had authority to act by unanimous written consent without a meeting to adopt several resolutions. The first resolution stated MFS was the sole shareholder of CTI and O'Connor, in his capacity as CEO, could issue the written consent stating MFS fully paid for 28,000,000 shares of CTI common stock in March 2015 which he knew to be false. The next resolution stated the Amended Acts contained the false contention MFS "had not fully paid for all of its stock [was] facilitated by the wrongful and self-serving conduct" of Beck. Accordingly, all actions, issuance of shares, and promisors were void or voidable acts. In essence, the written consent sought to unwind three years of CTI's corporate acts, many of which Mr. O'Connor participated in himself.

95. Before January 23, 2019, O'Connor participated in at least 158 securities transactions involving CTI shares in an authorized capacity, or personally to sell shares (or through TGAP Holdings,

23-CV-0164-MMA-DEB

1   LLC) for more than $2,000,000 in personal profits, on information and belief, to third parties. KJC

2   and O'Connor knew the 2019 Consent was fraudulent, but KJC knew State Bar would protect him,

3   just like it protected and aided Thomas V. Girardi and about 700 corrupt attorneys 2010-2021.

4   96. **[OVERT ACT]** Overtly using the mail and wire with intent to defraud plaintiff by threatening

5   letter using color of official right to obtain signatures and property, KJC did deliver plaintiff the

6   following two-page letter "Via U.S. Mail & Email" on January 25, 2019:

**CATANZARITE LAW CORPORATION**
**ATTORNEYS & COUNSELORS AT LAW**
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
(714) 520-5544
FACSIMILE: (714) 520-0680

KENNETH J. CATANZARITE
ATTORNEY AT LAW
DIRECT DIAL:
(714) 678-2100

E-MAIL ADDRESS:
KCATANZARITE@CATANZARITE.COM

DIRECT FAX:
(714) 389-0877

January 25, 2019

**Via U.S. Mail & Email:**
Samuel Y. Egerton, III
Jonny L. Antwiler
O'HAGAN MEYER, LLC
4695 MacArthur Court, Ste. 210
Newport Beach, CA 92660
segerton@ohaganmeyer.com
jantwiler@ohaganmeyer.com

Ken Watnick
Anderson, McPharlin & Conners
707 Wilshire Blvd, Suite 4000
Los Angeles, California 90017-3623
kdw@amclaw.com

Stephen J. Erigero, Esq.
Ivan L. Tjoe, Esq.
Alan J. Hart, Esq.
Ropers Majeski Kohn & Bentley PC
445 South Figueroa St., Ste 3000
Los Angeles, CA 90071-1608
Facsimile: (213) 312-2001
Email: stephen.erigero@rmkb.com
Email: ivan.tjoe@rmkb.com
Email: alan.hart@rmkb.com

Re:   *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* Case No. 30-2018-01018922: Meet & Confer Re CTI's Discovery Responses.

Notice by Mobile Farming Systems, Inc. ("MFS") as sole shareholder of Cultivation Technologies, Inc. ("CTI") of Actions

Notice of MFS Shareholders that Board of Directors is Removed

Counsel,

I write this letter to provide notice of the enclosed actions. We would like to immediately take control of the assets and operations of CTI for the benefit of the sole shareholder MFS. We have confirmation now that the share issuance on March 30, 2015 was in fact fully paid and that the shares were issued and due to MFS which is therefore the sole shareholder.

MFS will now assert all claims directly not derivatively and this firm will serve as counsel. An amended complaint is being prepared and will be circulated for possible stipulation or motion if necessary.

We would like to avoid any unnecessary disruption of corporate activity and therefore notify you that we will defer notice to all third parties until Monday January 28 in the hope that your clients will handle the transition in the interests of the shareholders. All shares issued after March 30, 2015 are a nullity, including the highly dilutive unauthorized shares issued to Messrs.

21

23-CV-0164-MMA-DEB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Samuel Y. Egerton, III
Jonnny L. Antwiler
O'HAGAN MEYER, LLC
January 25, 2019
Page 2

Probst and Beck. It is our intention to offer those persons who purchased CTI shares, MFS shares after a determination of amounts of money actually invested. The new directors and officers will require turnover of:

1. All books and records
2. Probst and Beck to leave offices and turnover records and keys
3. Bank accounts to be turned over
4. Cash control to be turned over to new board
5. Hand off of operative contracts
6. Inventory of subsidiaries
7. Personnel lists
8. Office security codes and systems
9. All computer pass codes to computer and security systems
10. All office pass codes and security systems

This is also notice that law enforcement is looking at both MFS and CTI. We are fully cooperating with them and expect that your clients will do the same.

After you review the above please call me.

Very truly yours,

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite

97. **[OVERT ACT]** Using the wire with intent to defraud plaintiff in Orange County Superior Court, using the manufactured evidence of January 23, 2019, and assumption of the extorted role of

22

23-CV-0164-MMA-DEB

"counsel" for the inanimate corporate entity MFS, KJC did on January 28, 2019, file the MFS Action. The claims were brought "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." It named as defendants CTI's board of directors including Beck, CTI attorneys and several entities. CTI was named as a nominal defendant. MFS raised nine causes of action and sought declaratory relief and a permanent injunction. MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary. KJC knew that MFS was not a shareholder of CTI. According to the MFS Action complaint and in admission of obtaining signatures and property obtained by KJC under color of official right, KJC did state:

> 56.    Founders O'Connor, Cooper, TGAP, Cliff Higgerson, Aroha Holdings, Inc. and Scott Unfug have agreed to renounce their Founders' Shares in favor of MFS.

98. **[OVERT ACT]** On February 5, 2019, Catanzarite received details on actual securities transactions in CTI and the pendency of a merger valued $176 million to $240+ million. Using the wire with intent to defraud plaintiff February 20, 2019 "Catanzarite wrote a lengthy e-mail to Western Troy, warning the company it must speak with MFS's chief executive operating officer [the extorted, O'Connor] because there was currently litigation about whether MFS was CTI's sole shareholder. Catanzarite attached a copy of the MFS complaint to the e-mail. Catanzarite stated MFS disagreed with the merger and "we dispute and object to any agreement purportedly by and between Western Troy and CTI." (Bold and underline omitted.) Catanzarite demanded Western Troy withdraw its public notice about the merger and negotiate with MFS. Finally, Catanzarite insulted Western Troy. It started the e-mail by commenting it was unexpected the company did not have a receptionist to answer calls. Catanzarite noted Western Troy "appear[ed] to have no assets or operations of any value" and saw "no justification for Western Troy shareholders with a valueless company" to be entitled to CTI's shares via the merger.

99. **[OVERT ACT]** Using the wire with intent to defraud plaintiff and CTI's creditor where each were defrauded, KJC did also email CTI's creditor. At first glance, Catanzarite's e-mail simply looks like a notification about CTI's newly installed board of directors. The e-mail explains the new

1  board was interested in working with CTI's creditor. However, later in the e-mail Catanzarite
2  reveals MFS was litigating its right to control CTI as the sole shareholder and it attached a copy
3  of the complaint to the e-mail. The remaining and largest section of the e-mail is devoted to
4  slandering Beck under the auspices that Catanzarite was working for others, and not himself.

5  100.  **[OVERT ACT]** Overtly, using the wire, with intent to defraud through Orange County
6  Superior Court and protection of the State Bar, KJC did file and did obtain a temporary restraining
7  order under false pretenses through judicial fraud. For instance, suborned under penalty of perjury
8  to support the TRO, KJC did extort the signature of O'Connor on March 19, 2019 who declared:
9  "As CEO and director of MFS acting on its behalf, MFS is rightfully and properly the owner as
10  holder of 28,000,000 CTI shares of Common Stock and entitled to all of the rights, benefits and
11  privileges of said shares, including the right to vote said shares and to not suffer dilution of nor
12  interference with such right." And he did sign it on March 19, 2019 at Newport Beach, California
13  in knowing furtherance of the scheme and it was submitted by wire to Orange County Superior
14  Court. Before this, O'Connor participated in 158 securities transactions in CTI stock for millions
15  of dollars. [**Exhibit #170**]

16  101.  **[OVERT ACT]** Overtly, using the wire, with intent to defraud, and to steal personally
17  identifiable information of CTI shareholders in furtherance of his scheme under color of official
18  right of the fraudulently obtained TRO, KJC did obtain a list of all CTI shareholders through
19  extortion veiled as "discovery" on behalf of MFS while seeking to *unwind* all CTI shares in a
20  declaratory relief hearing on behalf of MFS scheduled for April 30, 2019, finishing on May 1,
21  2019.

22  102.  **[OVERT ACT]** Using the fraudulently obtained TRO from Orange County Superior
23  Court, KJC did steal the list of CTI shareholders under color of official right dated March 25, 2019,
24  so he could continue his scheme where he knew the 709 hearing would fail on the merits, but he
25  knew he could rely upon State Bar's ongoing protection of his fraudulent scheme no matter what,
26  just like Thomas V. Girardi could for forty years.

27
28

24                          23-CV-0164-MMA-DEB

103.   **[OVERT ACT]** Overtly, using the wire with intent to defraud and extort settlements of others in order to continue the scheme through Orange County Superior Court on April 9, 2019, KJC did file a motion to disqualify plaintiff's counsel for conflicts while engaging in the very conduct he complained of, or in the alternative sought to eliminate plaintiff's defense coverage under color of official right. For instance, in support of the motion, KJC did submit by wire the following statement in furtherance of the scheme under penalty of perjury:

> I, Kenneth J. Catanzarite, have personal knowledge of each fact set forth in this declaration based upon my observation of, participation in, and recollection of, the matters and events to which I declare. I could and would competently testify to each fact set forth in this declaration if called and duly sworn by this Court. I certify and declare as follows:
>
> 1.   I am licensed to appear before this Court and the courts of the State of California.
>
> 2.   I am a principal attorney at Catanzarite Law Corporation and lead counsel for Plaintiff Mobile Farming Systems, Inc., directly and derivatively on behalf of Cultivation Technologies, Inc. in this above-entitled action. As counsel for Plaintiff I am readily familiar with the files in this case.

104.   **[OVERT ACT]** Overtly, using the wire with intent to defraud, using the stolen information on CTI shareholders acquired under color of official right while seeking to *unwind all CTI shares* on behalf of MFS after purporting to do so through non-judicial fraud of O'Connor, Duffy, and Zakhireh on January 23, 2019, "Catanzarite filed the Mesa Action in April 2019 for Richard Mesa and a *putative class* of MFS shareholders who also purchased CTI shares. The complaint was framed as both a class action and a shareholder derivative action filed "on behalf of" CTI. The complaint asserted the class of MFS/CTI shareholders wanted to consolidate their lawsuit with MFS's derivative action "and to among other relief, recognize the ownership and control of CTI" by MFS's ownership of 28,000,000 shares, 5,000,000 "Friends &Family CTI shares," and 3,000,000 CTI shares issued pursuant to the 2015 PPM.

23-CV-0164-MMA-DEB

105.     [**OVERT ACT**] Overtly, using the wire with intent to defraud in furtherance of the scheme showing the coercion of O'Connor, Scudder, Cooper, Higgerson and threat of fear under color of official right to provide signatures and property, in knowing furtherance of the scheme, "Han Le" from the email address hle@catanzarite.com on April 19, 2019 at 2:27:53 PM PDT with "CC: Kenneth Catanzarite kcatanzarite@catanzarite.com , Beck Phillips bphillips@catanzarite.com , Jennifer Weaver jweaver@catanzarite.com , Richard O'Connor richard@tgapholdings.com " as follows:

**From:** Han Le <hle@catanzarite.com>
**Date:** April 19, 2019 at 2:27:53 PM PDT
**Cc:** Kenneth Catanzarite <kcatanzarite@catanzarite.com>, Becky Phillips <bphillips@catanzarite.com>, Jenifer Weaver <jweaver@catanzarite.com>, "Richard O'Connor (Richard@tgapholdings.com)" <Richard@tgapholdings.com>
**Subject: MFS SHAREHOLDERS - DO NOT SIGN CONSENT DOCUMENT JUST SENT BY POBST-- SUPPLEMENTAL EMAIL**

Dear Shareholders:

**Supplement to Email**

I want to be clear that neither I, Richard O'Connor, Tony Scudder nor anyone else sued in the Root Case or the Mobile Farming Case have settled any claims with Root or anyone else. All we did was agree to toll the statute of limitations to allow claims to be brought against us later.  No conflict. Instead we are working together in the best interests of Mobile Farming and Cultivation Technologies.

There is no conflict as they contend.  Instead **the conflict identified is those named Defendants taking the 17,000,000 Series A Preferred Shares with 3 times voting to your common shares, for $0, control of the company and their undisclosed compensation. That is the conflict. They want to keep that against your interest and we seek to cancel those shares and secret compensation arrangements. THEY COULD HAVE SETTLED THIS CASE BY AGREEMING TO CANCEL THEIR PREFERRED SHARES AND CONTROL AND SALARIES--- *YOU NEED TO KNOW THAT THEY REFUSED. THAT IS WHY WE HAVE THIS DISPUTE.***

**The consent form should not be signed**. It does not allow you to reject the proposal so any signature would approve their request which I say is against the interests of Mobile Farming and Cultivation Technologies shareholders. If you have any questions feel free to call my cell at 760-409-6464.

Richard O'Connor
Director and Officer

23-CV-0164-MMA-DEB

106.     After the opportunity to present evidence in a trial of fact on May 1, 2019, with KJC, O'Connor, and Cooper present seeking to unwind all shares of CTI in a 709 trial challenging CTI's valid election in November 2018 on the basis that MFS was entitled to vote 28,000,000 shares that didn't exist and showing who was responsible for that (Cooper and O'Connor):

```
14          THE COURT:  WE ARE BACK.  NOW THAT I HAVE HAD
15   TIME TO DECOMPRESS WITH THE AFTERNOON RECESS,
16   MR. CATANZARITE, EVERY FIBER OF MY BEING SAYS THAT THE
17   FACTS ARE OVERWHELMING AGAINST YOUR POSITION IN THIS
18   CASE.  SO UNLESS YOU CAN CONVINCE ME OTHERWISE, I AM
19   PREPARED TO RULE THAT THIS ELECTION WAS VALID.
20          MR. CATANZARITE:  WELL, THE ONLY THING I CAN SAY
21   IS THAT THE SOLE DOCUMENT UPON WHICH THEY RELY IS EXHIBIT
22   53, WHICH IS WHAT YOU SAY, AND I UNDERSTAND THE POSITION
23   IS AN ADMISSION AGAINST INTEREST AGAINST MOBILE FARMING
24   BECAUSE IT IS SIGNED BY THREE PERSONS WHO WERE ALSO
25   DIRECTORS AND IN CONTROL OF MOBILE FARMING.
```

```
6   CLAIMING HERE.  BUT WE HAVE REPUDIATION OF THE AGREEMENT
7   BY PEOPLE WHO WERE THE SAME PRINCIPALS IN THE PLAINTIFF.
8   WE HAVE ACTIONS -- REPEATED ACTIONS TAKEN SUBSEQUENTLY
9   CONSISTENT WITH THE NOTION THAT PLAINTIFF WAS NOT A
10  STOCKHOLDER.  THE DELAY IN BRINGING THIS ACTION IS
11  CONSISTENT WITH THAT CONCLUSION, THAT PLAINTIFF HAS BEEN
12  OF THE VIEW THAT THEY ARE NOT A SHAREHOLDER.
13          SO THE COURT CONCLUDES THAT THE CHALLENGE
14  DIRECTOR ELECTION IS DENIED, AND THE COURT CONCLUDES THAT
15  PLAINTIFF IS NOT A STOCKHOLDER IN CTI.
```

23-CV-0164-MMA-DEB

107.     **[OVERT ACTS]** Overtly, using the wires in a series of acts with intent to defraud in furtherance of the scheme using protection of State Bar, just like Thomas V. Girardi, and just like others convicted of wire fraud amongst The State Bar of California enterprise for submitting "sham" court documents shown:

"[o]n or about May 6, 2019, I began receiving calls, text messages, and voicemails from Anthony Scudder ("Scudder") requesting that I execute a document…to facilitate replacement of CTI management [under different factual pretenses than January 23, 2019]. On or about May 8, 2019…I spoke with…Kenneth J. Catanzarite of Catanzarite Law Corporation…Catanzarite explained to me [by wire communication/cellular phone] the purpose…was to remove the board of directors of CTI through an action by majority written consent [by mail and/or wire] of the shareholders of CTI ("Shareholder Consent") [among whom MFS was notably not one and hasn't been; but here not even claimed by the Racket despite the ongoing, knowingly fraudulent 'MFS Action' and 'Pinkerton Action' and 'Mesa Action']. Following our conversation, Catanzarite sent me the Proxy and requested my signature…I explained to Scudder that I did not want to get involved and declined to execute the Proxy. On May 10, 2019, Richard O'Connor ("O'Connor") sent me text messages and voicemails offering me $5,000 to execute the Proxy; which I declined. On May 14, 2019, I was provided a copy of the Shareholder Consent dated as of May 14, 2019, executed by O'Connor as proxy holder for certain CTI shareholders with a register of purported proxies attached…Page 28 of the Shareholder Consent is a forged Proxy authorizing O'Connor to vote my shares." [**Exhibit #210**]

108.     **[OVERT ACTS]** Overtly, using the wire in Orange County Superior Court, with intent to defraud, KJC appearing on behalf of directly adverse parties again purporting to advocate: "One month later, Catanzarite amended the Mesa Action complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. Catanzarite also changed the nature of the action to focus on unraveling CTI's financial dealings with its primary creditor and declare CTI's actions and contracts void. The shareholder no longer wished to join the MFS Action or seek recognition of MFS's controlling stock shares over CTI."

109.     Thus, to briefly recap, at this point Catanzarite's concurrent and successive representation of adverse parties included the following: (1) Catanzarite was representing the Roots' elder abuse lawsuit against CTI and [Beck] as well as a derivative action against MFS; (2) Catanzarite had made a deal with a handful of CTI Founders to dismiss them from the derivative Pinkerton Action without court approval; (3) he became MFS's counsel of record; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having

23-CV-0164-MMA-DEB

lawsuits filed by other people claiming to be MFS and CTI shareholders; and (5) after filing two *derivative* shareholder lawsuits, Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors.

110.     **[OVERT ACTS]** Overtly, using the wire in Orange County Superior Court, with intent to defraud, KJC working with BW, TJO and appearing *ultra vires* Catanzarite next filed two lawsuits **as CTI's corporate counsel** (the Creditor Action and Scottsdale Action). The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck other defendants in the Mesa Action.

111.     This overt act against his insurance carrier, and others in cumulative, have caused irreparable harm to Beck in that he has been unable to obtain insurance coverage with fraudulent claims presented against him for more than four years, continuing. It has destroyed Beck's career as a CEO rendering him unemployable as an executive in most instances.

112.     **[OVERT ACT]** Overtly, using the wire in knowing furtherance of the scheme to extort a settlement under color of official right, on Wednesday, July 10, 2019 at 10:01 AM "From: Becky Phillips [mailto:bphillips@catanzarite.com]" delivered a wire communication for, and copying, "CC: Kenneth Catanzarite kcatanzarite@catanzarite.com" an email "Subject: Cultivation Technologies, Inc. – Confidential Settlement Negotiations – Evidence Code §§ 1152 and 1154" without regard for the fraud and crime exceptions of Evidence Code § 956, reading: "Mr. Edgerton, Please see the attached settlement negotiations/agreement for your client(s) if there is an interest. This proposal, if not accepted, shall expire at 5:00 p.m. Thursday, July 19, 2019....Very truly yours, Becky Phillips for Kenneth J. Catanzarite" "Legal Assistant" "Catanzarite Law Corporation" "2331 West Lincoln Avenue, Anaheim, CA 92801" "Direct Dial: (714) 678-2108" "Direct Fax: (714) 399-0589" "Office Phone: (714) 520-5544" "Office Fax: (714) 520-0680" to which my defense counsel, Sam Y. Edgerton, III Partner of law firm Ohagan Meyer wrote back to "To: 'Kenneth Catanzarite' kcatanzarite@catanzarite.com

29                                                          23-CV-0164-MMA-DEB

"[b]ecause of the obvious fraud issue regarding your purported representation of CTI, this is not a protected settlement communication."

113.    [**OVERT ACTS**] Overtly, using the wire even after a Court in trial of fact rejected the cooked-up claims and sham, wired documents "with every fiber of [its] being," KJC was undeterred because he knew he could rely upon protection of State Bar just like Thomas V. Girardi knew he could for forty years.

"In July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action. It removed all derivative action claims made on behalf of MFS and CTI. Catanzarite claimed to be MFS's and CTI's corporate counsel. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].) *Beck v. Catanzarite Law Corp.*, No. G059766, 16-17 (Cal. Ct. App. Jul. 13, 2022) "However, the record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead." *Beck v. Catanzarite Law Corp.*, No. G059766, 32 (Cal. Ct. App. Jul. 13, 2022)

114.    [**OVERT ACT**] Overtly, using the wire in Orange County Superior Court, with intent to defraud and to conceal its schemes, KJC did suborn perjury by affidavit (while "tolling claims" against O'Connor on behalf of MFS derivatively as "sole shareholder" of CTI) from O'Connor on November 4, 2019 seeking to avoid disqualification which directly conflicted with the March 19, 2019 declaration asserting MFS was the sole shareholder of CTI. [**Exhibit #141**]

115.    [**OVERT ACT**] Overtly, using the wire in Orange County Superior Court, with intent to defraud and to conceal its schemes, KJC did suborn perjury by affidavit (while "tolling claims" against O'Connor on behalf of MFS derivatively as "sole shareholder" of CTI) from O'Connor on November 11, 2019:

5.    As Chief Executive I issued 5,000,000 Founders Shares when CTI was formed at $.001 per share to each of Probst and Justin Beck for their contributions to the startup effort.

116.    [**OVERT ACT**] Overtly, using the wire in Orange County Superior Court, with intent to defraud and to conceal its schemes, KJC did suborn perjury by affidavit (while "tolling claims" against O'Connor on behalf of MFS derivatively as "sole shareholder" of CTI) from O'Connor on December 27, 2019.

23-CV-0164-MMA-DEB

Regarding Calixto's sworn statement (Ex. 210) May 17, 2019:

> 12.   I am the person who solicited the common stock proxies not Mr. Catanzarite. As for the Probst contention about the proxies he is in error.

Regarding the non-judicial acts in furtherance of schemes:

> 19.   On August 27, 2019 I appeared at the shareholders meeting and by proxy elected myself, Mr. Duffy and Ms. Cooper to the Board of Directors and to officer positions at CTI with my 51.15% proxies.
>
> 20.   On August 28, 2019 the common elected directors, namely myself, Cooper and Mr. Duffy, took action by written consent to appoint myself as Chief Financial and Chief Operating Officer, Ms. Cooper as Vice President and Mr. Duffy as President and Secretary.
>
> 21.   Myself, Mr. Duffy and Mrs. Cooper took action by unanimous written consent appointing Jeff Schunk, a CTI common shareholder, as Vice President, tasked with the responsibility to review conflicts of interest in the representation by Mr. Catanzarite and CLC.

Despite suing CTI and Beck from April – June 2017 about it with Zakhireh, Duffy:

> 29.   The very first time that the CTI shareholders learned of the purported issuance of the Preferred Stock was at that November 29, 2018 shareholders meeting where the shares were objected to as not validly issued.

117.   **[OVERT ACT]** After plaintiff delivered notice to State Bar with specificity, exhaustive injury documentation showing serial fraud, perjury, representation of directly adverse parties, extortion for signatures and property **[Exhibit #172]**, plaintiff did receive postal mail intending to defraud from Joy Nunley on behalf of her "Senior Trial Counsel Eli Morgenstern," who did defraud plaintiff and did unlawfully protect KJC, CLC, and its associate attorneys Brandon Woodward and Tim James O'Keefe on April 3, 2020. **[Exhibit #173]** Nunley and Morgenstern knew their letter was frivolous and that State Bar's postal mail scheme was fraudulent but sent it anyway. Each told plaintiff the fraud exacted upon him was "not serious enough" for "State Bar Court," which they knew or reasonably should have known to be false.

23-CV-0164-MMA-DEB

118.     **[OVERT ACT]** Plaintiff delivered notice again of his injuries and the serial fraud, sham court documents, and wire communications from KJC. On August 10, 2020, using the wire in Orange County Superior Court, with intent to defraud and continue the scheme, in conspiracy with State Bar and Morgenstern, the "MFS Cross Action" was filed against plaintiff which was just a regurgitation of the same cooked up claims that the Court rejected with "every fiber of [its] being" on May 1, 2019. KJC didn't care, because he knew he could rely on Morgenstern and The State Bar enterprise to protect him, just like Thomas V. Girardi knew he could for forty years before he was indicted on wire fraud charges.

119.     **[OVERT ACT]** Where plaintiff delivered notice by postal mail to the "Complaint Review Unit" before understanding it was also Office of General Counsel for State Bar who also defends tort claims against itself and The State Bar of California enterprise, and also makes antitrust determinations for itself frivolously, plaintiff did receive another postal mail letter August 12, 2020 literally two days after the "MFS Cross Action" was filed by wire with intent to defraud. **[Exhibit 176]** Office of General Counsel knew the letter was frivolous, and Office of General Counsel did intend to defraud Beck, and Beck was defrauded yet again by The State Bar of California's schemes.

120.     Plaintiff later realized the purpose of these postal mail communications was not only to protect The State Bar of California enterprise's schemes to defraud members of the public including plaintiff, any client of CLC, KJC, and any client of Thomas V. Girardi or Girardi-Keese, but it was *also* to generate leads for lawyers as part of an unlawful trust in restraint of U.S. commerce **[Exhibit 177]** .

121.     **[OVERT ACT]** Incredulous that the conduct was still carried on by State Bar, Morgenstern, and "Complaint Review Unit" (Office of General Counsel) – plaintiff delivered notice to California Supreme Court that he needed a neutral hearing to present the case. Overtly using postal mail with intent to defraud plaintiff from its mail facility in San Francisco, Jorge E. Navarette did send plaintiff a letter on September 29, 2020, with an ambiguous case law from 1948 that had nothing to do with the conduct at issue ("In Re: Walker" scheme to defraud the public). **[Exhibit #182]** And again, Beck was defrauded by postal mail through the designed schemes.

122.    **[OVERT ACT]** Overtly, on July 20, 2022, using the wire with intent to defraud plaintiff and to protect KJC and CLC who were protected just like Thomas V. Girardi was for forty years, Grandt on behalf of Duran did deliver plaintiff a letter stating that the conduct of KJC did not give rise to The State Bar of California's duties to inform the public. Grandt knew the basis of this decision was not the merits, but the fact that plaintiff chose to sue The State Bar of California on behalf of himself, and with public interest standing. But Grandt didn't care, because she knew The State Bar of California controlled the entire judiciary in California, so she sent the letter anyway to Beck on behalf of Duran, and Beck was defrauded once more by The State Bar of California's schemes.

123.    **[OVERT ACT]** After preparing a case for California Supreme Court, delivering it within the arbitrary, criminal-protecting timeline of 60-days, Jorge E. Navarette did ask that it be reformatted and did ask that he send the case to The State Bar of California Office of General Counsel, The State Bar of California Office of Chief Trial Counsel, and to send a copy to each of the California Supreme Court Justices. After back and forth by postal mail including various requests fulfilled by Beck, Jorge E. Navarette did send plaintiff a postal mail letter intending to defraud him on March 22, 2021 stating that the case had been rejected not on the merits, but due to the criminal-protecting 60-day timeline during which plaintiff did provide a case. Navarette knew that KJC, Brandon Woodward, Tim James O'Keefe, and CLC were among the protected attorneys, just like Thomas V. Girardi before he was indicted on wire fraud charges, and so Jorge E. Navarette did choose to defraud plaintiff by postal mail stating the case was "returned unfiled." And plaintiff was defrauded and experienced an emotional breakdown from which he has yet to recover with the cumulative foregoing acts of fraud and malice.

[**Exhibit 179**] [**Exhibit 182**] [**Exhibit 183**]

124.    **[OVERT ACT]** On February 14, 2022, Carissa Andresen with The State Bar of California enterprise in Office of General counsel did file in Orange County Superior Court the "unfiled" Supreme Court case delivered Beck by postal mail as if it were dispositive of The State Bar of California's duties to stop their own criminal conduct or that of KJC's, and even though Navarette said the case was "returned unfiled" to Beck by postal mail.

33                          23-CV-0164-MMA-DEB

6.     Attached hereto as Exhibit A is a true and correct copy of the March 18, 2021 Accusation of Justin Beck Against an Attorney, filed by Petitioner in California Supreme Court Case No. S267752.

125.     **[OVERT ACT]** On September 21, 2022, through September 26, 2022, plaintiff did file an antitrust petition in California Supreme Court after understanding the unlawful unity of interests within The State Bar of California and protection schemes that did and do defraud the public. Using the wire, with intent to defraud, plaintiff did once more receive a postal mail from Navarette that plaintiff's petition S276517 was "stricken" as premature. California Supreme Court directed that Beck's federal, antitrust petition be reviewed and determined by the unlawful trust itself: The State Bar of California enterprise without regard of *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) or 15 U.S.C. § 1. **[Exhibit 28]**

126.     **[OVERT ACT]** On October 17, 2022, overtly using the wire with intent to defraud plaintiff and the United States, Office of General Counsel for The State Bar of California enterprise working with Grandt did deliver plaintiff "Antitrust Determination 2022-001" after removing four volumes of exhibits, 1,000+ pages of probative antitrust evidence, and ignoring *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) or 15 U.S.C. § 1 while citing stale case law *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 and conceding to the improper purposes of the determination being plaintiff's suits against State Bar. **[Exhibit #60]**

127.     **[OVERT ACT]** Overtly using the wire, with intent to defraud plaintiff and the United States, California Supreme Court clerk Jorge E. Navarette working with Office of General Counsel's Robert Retana did obstruct and manipulate plaintiff's filings in TrueFiling and remove exhibits from the docket in S276517.

128.     **[OVERT ACT]** Overtly using the wire, with intent to defraud plaintiff, the public, and the United States, Robert Retana of Office of General Counsel did deliver a wire communication on October 17, 2022 to Jorge E. Navarette citing the fraudulent "Antitrust Determination 2022-001" which was made without regard of the United States Supreme Court, and was made after manipulating plaintiff's antitrust petition and exhibits. **[Exhibits #63 through #68]**

34                                    23-CV-0164-MMA-DEB

129.    **[OVERT ACT]** Overtly using the wire, with intent to defraud plaintiff, the public, and the United States, Jorge E. Navarette did start a new antitrust case without plaintiff's authorization, which case was commenced in California Supreme Court under case number S276939 using a manipulated record, which case did result in a fraudulent "En Banc" decision by California Supreme Court on November 30, 2022 in conspiracy with Navarette. [**Exhibit #61**]

130.    **[OVERT ACT]** Overtly using the wire, Grandt did inadvertently deliver evidence of the unlawful unity of interests existing by and between State Bar Board of Trustees Ruben Duran, Executive Director Leah Wilson, Office of Chief Trial Counsel George Cardona, Office of General Counsel Suzanne Grandt, and the malicious basis for their decisions regarding the concealment of criminal conduct to which plaintiff has been subject as being plaintiff's decision to sue The State Bar of California. The wire communications also show that Kenneth Catanzarite propounded patently false statements using the wire to Carissa Andresen, who in turn regurgitated the false attorney statements despite court orders proving their falsity, and even though The State Bar of California had a preservation of evidence letter dated October 14, 2021 confirmed by Andresen on May 12, 2022, and it did harm and defraud plaintiff once more. [**Exhibit #120**]

131.    **[OVERT ACT]** Overtly using the postal mail and wire, after plaintiff rejected the false claims of "privilege" asserted to fraudulently conceal the scheme, Ellin Davtyan of Office of General Counsel did threaten plaintiff, and Ellin Davtyan did seek to control the enterprise on December 15, 2022, under color of state law by demanding all recipients to whom Beck had forwarded the evidence. [**Exhibit #186**]

132.    **[OVERT ACT]** Overtly using the wire, plaintiff received document production from a public records request on January 13, 2023, where Davtyan or Office of General Counsel frivolously asserted that they rejected Beck's contention that Office of General Counsel did not have a right to file an antitrust petition in California Supreme Court that was not authorized, which antitrust petition did defraud plaintiff, the public, and the United States.

133.    **[OVERT ACT]** Showing the acute threat of continuing schemes to defraud using the judicial system, using the wire with intent to defraud litigants or insurance carriers and a federal court in Michigan [**Exhibit #202 juxtaposed with August 27, 2019 acts**], James Duffy is being

23-CV-0164-MMA-DEB

used as a straw plaintiff against entities owned or controlled by Jeffrey Schunk by CLC. Neither Duffy nor Schunk would be known to KJC and the law corporation CLC where KJC is CEO, but for the fraudulent schemes to steal information through "discovery" under color of law commencing September 14, 2018, using protection of The State Bar of California enterprise, Office of Chief Trial Counsel, Office of General Counsel, and Board of Trustees for The State Bar of California – just like Thomas V. Girardi enjoyed for forty years.

134.    "Catanzarite does not care about the truth when making statements to the Court." This Court cannot trust one word or filing from CLC nor KJC, either and plaintiff notices the Court that it can't reasonably trust State Bar, Duran, Morgenstern, nor Grandt, either.

<u>INJURY STANDING UNDER RICO</u>

135.    Plaintiff is: (1) a "person" (2) who sustained injury (3) to his "business or property" (4) "by reason of" defendants' violation of § 1962.

136.    Plaintiff's injuries to business and property arise from (1) § 1962(c) from predicate acts detailed; (2) § 1962(a) arising from investment of racketeering income in an interstate enterprise; (3) § 1962(b) arising from acquisition of an interest in or control over an interstate enterprise; (4) arising from overt acts committed in furtherance of schemes to defraud plaintiff in conspiracy.

137.    Plaintiff seeks his damages, treble damages, pre-judgment interest, and attorney fees for his § 1962 claims as follows for at least the following business and property:

138.    $1,282,000 immediate judgment against State for converted policies

139.    $8,433,000 total past and future lost earnings to business and property

140.    $27,407,250 total lost earnings capacity to business and property

141.    $32,667,351 business and property deliberately compromised (merger destroyed)

142.    $365,000 from real estate proceeds used to endure predicate conduct

143.    $5,649,297 business and property destroyed in March 2021/April 2021

144.    $32,667,351 future business and property (reasonable basis) from conduct

145.    $25,000,000 future business and property (reasonable basis) from conduct

146.    $1,000,000 inherited IRA shamefully depleted to endure predicate conduct

23-CV-0164-MMA-DEB

147.    Plaintiff seeks his damages, non-economic damages, and punitive damages for his claims

under 42 U.S.C. § 1983 and 15 U.S.C. § 1 on these bases:

148.    $138,889,249 for damages as above as an alternative or cumulative

149.    $138,889,249 for pain, suffering, inconvenience, and oppression

150.    $138,889,249 for severe emotional distress leading to a seizure in Dec. 2022

151.    $138,889,249 for loss of consortium and inability to marry

152.    $138,889,249 for becoming disenfranchised, losing trust in State government

153.    $138,889,249 for severe grief, losing his parents and a mentor building CTI

154.    $138,889,249 for loss of enjoyment of life, consideration of suicide

155.    $138,889,249 for humiliation, losing friends and colleagues

156.    $138,889,249 for loss of 20% of his left arm due to Grandt, State Bar delays

157.    $138,889,249 for ratifying KJC, BW, TJO, CLC, NMC conduct pre-9/14/18

158.    $138,889,249 for ratifying KJC, BW, TJO, CLC, NMC conduct post-9/14/18

159.    This action was filed within the RICO statute of limitations. Plaintiff did not identify, nor

could he have previously the deliberate schemes to defraud him despite his diligence, nor the active

concert among State actors. All claims are filed in a timely manner.

23-CV-0164-MMA-DEB

# COUNT I

## RACKETEERING

### Violation of 18 U.S.C. § 1962(c)

160.    The allegations of paragraphs ¶ 1 through ¶ 159 are incorporated herein by reference as if they were set forth fully.

161.    To recover under § 1962(c), plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. See *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

162.    Plaintiff did suffer injuries resulting from violation of 18 U.S.C. § 1962(c).

163.    This Count I is against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count I Defendant(s)").

164.    KJC is an enterprise engaged in and whose activities affect interstate commerce. The Count I Defendant(s) are employed by or associated with the KJC enterprise.

165.    The Count I Defendant(s) have directly and indirectly conducted and participated in the conduct of the KJC enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

166.    For instance, before September 14, 2018, KJC did engage in a pattern of racketeering activity enabled and carried on through wire fraud and mail fraud by The State Bar of California, its Office of Chief Trial Counsel, and its Office of General Counsel which were controlled by Board of Trustees.

167.    For instance, before January 23, 2019, Duffy, Zakhireh, and O'Connor did sue or conspire to sue plaintiff and CTI "on behalf of 92 shareholders" concerning the Preferred Series A shares of CTI which they did settle on or around June 13, 2017 (proving each knew their acts on or around January 23, 2019 to be fraudulent, which acts were directed by KJC).

23-CV-0164-MMA-DEB

168.    For instance, Zakhireh and O'Connor did defraud or conspire to defraud the United States Securities Exchange Commission in July 2017 without regard for the truth, and the SEC and plaintiff were defrauded in pursuit of Zakhireh and O'Connor's malice against plaintiff.

169.    For instance, KJC did use their malice against Beck and a threat of "working with law enforcement" to extort O'Connor, Zakhireh, Duffy, Cooper, Higgerson and others to produce evidence that KJC knew was false or manufactured to suit KJC's scheme to defraud Beck and others using the Court.

170.    For instance, O'Connor and Cooper did use the wire to pay $340,000 in illegal commissions to Joseph Porche through MFS out of an investment in MFS securities of approximately $450,000 by Jolly Roger Investments, Inc. or Jolly Roger, Inc. years before plaintiff ever met O'Connor and Cooper in April 2015. KJC did use this information to extort O'Connor, Cooper, and Higgerson, too.

171.    For instance, on September 14, 2018, KJC did file the derivative "Pinkerton Action" for a non-shareholder against MFS and Beck with intent to defraud through Orange County Superior Court. KJC knew the claims against Beck to be false, and that Roger Root was not a shareholder of MFS nor CTI, but KJC knew he could rely upon State Bar to protect him by wire and postal mail, just like Thomas V. Girardi knew for forty years before he was indicted on wire fraud charges.

172.    For instance, on December 13, 2018, KJC did dismiss Joseph Porche from the Pinkerton Action. Joseph Porche did receive $340,000 in illegal commissions from O'Connor and Cooper via MFS.

173.    For instance, between December 13, 2018, and January 23, 2019, KJC did make direct or indirect contact with unrepresented and represented parties' defendant to the direct and derivative Pinkerton Action, and the derivative action was compromised without Court approval.

174.    To obtain the property or other consideration from Cooper, Higgerson, and O'Connor with their consent, under color of official right on behalf of MFS derivatively and directly against them for securities fraud charges as KJC was "working with law enforcement," Cooper, Higgerson, and O'Connor did provide their signatures and property to KJC induced by a wrongful use of fear.

23-CV-0164-MMA-DEB

175. KJC did pay annual dues to State Bar he derived from a pattern of racketeering activity, and State Bar did accept them, then use them.

176. Duran was initially appointed to the Board of Trustees of The State Bar of California enterprise, which was and is associated with KJC, in 2018 by Assembly Speaker of the State of California, Anthony Rendon.

177. On Thursday, August 10, 2017, "University of San Diego (USD) School of Law Center for Public Interest Law (CPIL) executive director Professor Robert C. Fellmeth was quoted in Los Angeles Daily Journal article that reported on the State Bar promotion of an attorney [Grandt] whom a federal judge recently accused of intentionally misleading him during a hearing." Grandt did intentionally mislead the judge about State Bar Court, which is unconstitutional.

178. "The agency's promotion of Suzanne Grandt, a lawyer in the bar's Office of General Counsel, was announced internally four days after U.S. District Judge William Alsup wrote in an order that he was considering sanctioning the bar because of "inaccuracies in attorney Grandt's statements." [**Exhibit 2**] State Bar should have been sanctioned, because it freely engages in fraud.

179. Grandt and Duran were each appointed due to their willingness to defraud Courts or the public with impunity, including through carrying on the conduct of the KJC enterprise.

180. Eli David Morgenstern, Office of Chief Trial Counsel, and Office of General Counsel have known before September 14, 2018, and continue to know and freely enable through overt acts of mail fraud and wire fraud, the racketeering activity of the KJC enterprise.

181. The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

182. As direct and proximate cause of the Count I Defendant(s) racketeering activity, plaintiff lost actual and prospective business, property, and money.

183. As direct and proximate cause of State assigning its sovereignty to active market participants in regulation at State Bar, the KJC enterprise was enabled and carried on to conduct racketeering activity described above. State was thus a substantial factor which had a mandatory duty under Cal Gov. Cod. § 815.6 not to engage in racketeering against Beck, or in the alternative, State had a mandatory duty not to allow the racketeering against Beck but did so anyway.

184.   As direct and proximate cause of Morgenstern, Duran, or Grandt of State Bar acting officially under Cal. Gov. Cod. § 815.2, the KJC enterprise was enabled and carried on by wire and postal mail to defraud Beck and others.

185.   As direct and proximate cause of State Bar protecting the KJC enterprise despite its patterns of racketeering activity just like Thomas V. Girardi was protected, the KJC enterprise was enabled to conduct racketeering activity described above. State Bar was thus a substantial factor, and State is responsible for State Bar, Duran, Grandt, and Morgenstern on principles of *respondeat superior*.

186.   As direct and proximate result of the Count I Defendant(s) racketeering activities and violation of 18 U.S.C. § 1962(c), plaintiff has been injured in his business and property for which plaintiff seeks his damages, treble damages, injunctive relief, pre-judgment interest, and attorney's fees. Beck's ability to conduct business and obtain property is severely compromised due to the Count I Defendant(s) racketeering activity, which will affect Beck for not less than 25-years.

187.   WHEREFORE, plaintiff requests this Court enter judgment as follows:

188.   $8,433,000 total past and future lost base earnings to business and property

189.   $1,000,000 inherited IRA shamefully depleted, used to endure racketeering

190.   $365,000 from proceeds of real property used to endure racketeering

191.   WHEREFORE, plaintiff requests this Court enter judgment as follows:

192.   JUDGMENT in favor of plaintiff JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 18 U.S.C. 1962(c).

193.   MONEY JUDGMENT in favor of JUSTIN S. BECK against RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for $9,798,000 damages plus interest.

194.   MONEY JUDGMENT in favor of JUSTIN S. BECK against RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for $29,394,000 treble damages plus interest.

195.   PERMANENT INJUNCTIVE RELIEF as Court deems just to restrain the racketeering of Count I Defendants and the KJC enterprise under 18 U.S.C. 1964(a) and F.R.Civ.P. 65.

23-CV-0164-MMA-DEB

## COUNT II

### INVESTING OR USING PROCEEDS OF RACKETEERING

### ACTIVITY IN AN INTERSTATE ENTERPRISE

#### Violation of 18 U.S.C. § 1962(a)

196.     The allegations of paragraphs ¶ 1 through ¶ 195 are incorporated herein by reference as if they were set forth fully.

197.     18 U.S.C. § 1962(a) prohibits a person from investing in an enterprise any income derived from a pattern of racketeering activity.

198.     This Count II is against defendants RUBEN DURAN, THE STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA (the "Count II Defendant(s)").

199.     The State Bar of California, a nonsovereign public entity, is an enterprise engaged in and whose activities affect interstate commerce. The Count II Defendant(s) are employed by or associated with the enterprise.

200.     The State Bar of California, consisting of legal aid organizations staffed by licensees, and active and non-active licensees including approximately 700 identified by California State Auditor in Report 2022-030, is an association-in-fact enterprise engaged in and whose activities affect interstate commerce. The Count II Defendant(s) are employed by or associated with the enterprise.

201.     The Count II Defendant(s) used or invested income derived from a pattern of racketeering activity in an interstate enterprise.

202.     For instance, The State Bar of California established, carried on, received income through IOLTAs, then used and invested income from its licensees, a portion of which was derived from the pattern of racketeering activity described above, to pay Duran, Morgenstern, and Grandt their salaries and each did injure plaintiff.

203.     For instance, State of California used and invested income from the taxpayer public, including the licensees and entities they control engaged in a pattern of racketeering activity, and invested it in The State Bar of California, who invested or will invest it back to The State Bar of California enterprise horizontally to other active market participants regulating themselves, while plaintiff and the public suffer.

204.     For instance, on July 13, 2022, by wire "The State Bar of California announced today that this year's $308 billion State Budget will furnish more than $105 million in funding for access to justice efforts through the State Bar, supporting legal aid organizations...This supplements the more than $50.5 million in funds the State Bar plans to distribute for similar assistance from Interest on Lawyers' Trust Accounts (IOLTA) earnings in 2023...The funding comes from state General Fund dollars as well as $20 million in federal homeless prevention funds."

205.     For instance, "In the 2021 –22 state budget, the State Bar of California received a record amount, nearly $110 million, in similar funding" which it invested back into The State Bar of California enterprise while plaintiff was suffering injuries, and with actual knowledge of plaintiff's injuries.

206.     Just like Office of General Counsel/"Complaint Review Unit" is used to generate leads to pay lawyers as above, and to cause artificial demand for legal services while the public suffers from protectionist behavior of active market participants, so too do these parallel investments create leads for The State Bar of California enterprise as the July 13, 2022, wire reads: "For a list of free legal aid providers for low-income Californians, please go to LawHelpCa.org."

207.     The State Bar of California used or invested in excess of $1,058,800,000 (one billion fifty eight million eight hundred thousand dollars) while Beck and the public suffered between 2018-2022, as Duran complained by wire of a "lack of resources" and Morgenstern fraudulently asserted by mail that Beck's harm was "not serious enough" for "State Bar Court."

208.     Duran refuses to impose discipline or costs on racketeers controlled by and through The State Bar of California, and thus seeks to impose the costs on taxpayers so that The State Bar of California enterprise is free to defraud the public with Duran's permission and active concealment.

209.     Plaintiff was not offered legal aid to sue The State Bar of California, Duran, Morgenstern, or Grandt where he is a "low-income Californian" *because* of The State Bar of California enterprise. Indeed, *because* plaintiff sued each, the racketeering activity was concealed, carried on, and furthered with malice and artificial discretion while Duran made false statements by wire to defraud plaintiff, the public, and to defraud the United States who provided $20 million in 2022.

23-CV-0164-MMA-DEB

210.    Plaintiff was not offered legal aid to defend against the criminal conduct of KJC because KJC and his associates Nicole Marie Catanzarite Woodward, Brandon Woodward, Jim Travis Tice, and Eric V. Anderton aided by Becky Phillips and Han Le at CLC are protected by State Bar, Office of Chief Trial Counsel, and Office of General Counsel through investments made in Duran, Grandt, and Morgenstern similarly to the manner in which Thomas V. Girardi was unlawfully protected and carried on for forty years before Mr. Girardi was indicted on wire fraud charges.

211.    The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

212.    The Count II Defendant(s) have used or invested income derived from a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a).

213.    As direct and proximate cause of Count III Defendant(s) violation of 18 U.S.C. § 1962(a), plaintiff suffered injuries to his actual and prospective business and property.

214.    As direct and proximate result of the use or investment of racketeering income, plaintiff suffered by way of his credit score, mounting debt he cannot pay, benefits he lost or will not receive, opportunities converted to attorney schemes, special value of his IRA he lost, and other assets. Plaintiff also lost earning capacity to his business and property which would not have happened but for the use and investments made. For instance, had the investments been made in salaries for persons who did not choose to carry on or engage in ongoing criminal conduct like Duran, Grandt, or Morgenstern have chosen to do, the conduct would not have occurred. Plaintiff is only 42 years old and will be damaged for the rest of his life and career, not less than 25 years.

215.    As direct and proximate result of the Count III Defendant(s) violations of 18 U.S.C. § 1962(a), plaintiff has been injured in his actual and prospective business and property and seeks his damages, treble damages, pre-judgment interest, attorney's fees, and injunctive relief:

216.    $25,000,000 converted credit score, benefits, special IRA value, other assets.

217.    $27,407,250 lost earnings capacity to business and property as former CEO.

218.    WHEREFORE, plaintiff requests that this Court enter judgment against the Count II Defendant(s) as follows:

23-CV-0164-MMA-DEB

219.     JUDGMENT in favor of plaintiff JUSTIN S. BECK against defendants RUBEN DURAN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 18 U.S.C. § 1962(a).

220.     MONEY JUDGMENT in favor of JUSTIN S. BECK against RUBEN DURAN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages in the amount of $52,407,250 plus interest.

221.     MONEY JUDGMENT in favor of JUSTIN S. BECK against RUBEN DURAN; THE STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA jointly and severally for treble damages in the amount of $157,221,750 plus interest.

222.     PERMANENT INJUNCTION as Court deems just to restrain the investment of racketeering proceeds by Count II Defendants under 18 U.S.C. 1964(a) and F.R.Civ.P. 65.

23-CV-0164-MMA-DEB

## COUNT III

### ACQUIRED INTERESTS IN OR CONTROL OF AN ENTERPRISE

### THROUGH A PATTERN OF RACKETEERING ACTIVITY

#### Violation of 18 U.S.C. § 1962(b)

223. The allegations of paragraphs ¶ 1 through ¶ 222 are incorporated herein by reference as if they were set forth fully.

224. 18 U.S.C. § 1962(b) prohibits a person from using a pattern of racketeering activity to acquire or maintain interests in or control over an enterprise.

225. This Count III is against defendants KENNETH CATANZARITE; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA ("Count III Defendant(s)").

226. Mobile Farming Systems, Inc. is an enterprise engaged in and whose activities affect interstate commerce. The Count III Defendant(s) are employed by or associated with the enterprise.

227. The Count III Defendant(s) racketeering activity led to control of or interests in the MFS enterprise, and those interests or that control resulted in injury to plaintiff.

228. KJC did use the pattern of racketeering activity described above before January 23, 2019, to assume control of the MFS enterprise by extortion to force corporate actions, and to maintain control of the MFS enterprise under color of state law and civil procedure to harm Beck.

229. State Bar did know previously of the pattern of racketeering activity described above with similar methods, victims, and beneficiaries but chose to carry it on without regard of the non-attorney public it is bound by law to protect.

230. State did know previously of the State Bar's ongoing refusal to protect the public, but it chose to allow State Bar to engage in the conduct anyway and refused to actively supervise it.

231. For all times relevant, State had a legal duty to Beck and to the United States under 15 U.S.C. § 1 and *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) but chose to enable the racketeering activity above anyway and it did harm Beck and the U.S.

232. State had negative mandatory duty under Gov. Cod. § 815.6 under Sherman Act and 15 U.S.C. § 1, but failed to exercise reasonable care, and damaged Beck through the MFS enterprise.

46

23-CV-0164-MMA-DEB

233. The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

234. The Count III Defendant(s) have directly and indirectly acquired or maintained interest in or control of an enterprise through a pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

235. As direct and proximate cause of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff has been injured in his actual and prospective business and property.

236. As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), a $261 million merger in which plaintiff was CEO and within which he was entitled $32,667,351 in median share value was destroyed together with the company CTI.

237. As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff has been injured for $32,667,351 as being a reasonable basis and equivalent amount that he will not receive for similar ownership for other businesses.

238. As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff has been damaged in other actual and prospective business opportunities. Plaintiff is only 42 years old, and his actual and prospective business and property will be damaged for the rest of his life and career, and not less than 25 years of similar transactions.

239. As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), MFS is still controlled by CLC, KJC, and State Bar even though that control was acquired and is maintained through a pattern of racketeering activity, and even after the fraudulent claims against Beck filed by CLC and KJC for MFS using those interests in or control of MFS were rejected on May 1, 2019, by the trial Court "with every fiber of [its] being."

240. As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), adjudication of plaintiff's claims are repeatedly compromised and delayed through artificial State procedures enabling criminal conduct through MFS, State Bar, and Orange County Superior Court.

23-CV-0164-MMA-DEB

241.     As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff has been injured in his business and property in that he experienced an emotional breakdown and resigned from a health technology company he started after Jorge E. Navarette and California Supreme Court defrauded him under color of state law in March 2021 which caused him $5,649,297 in damages, and further tainted his ability to develop business and obtain property.

242.     As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff has been injured in his business and property in that he lost an opportunity to work with creative director Will Ferrell, further tainting his ability to develop business and obtain property.

243.     As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff seeks actual damages of $1,700,000 from fees, policies, and converted assets paid to The State Bar of California enterprise.

244.     As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff seeks other lifetime remuneration he will not receive of $138,889,249 in business and property over the course of 25-years.

245.     As direct and proximate result of Count III Defendant(s) racketeering activity and violation of 18 U.S.C. § 1962(b), plaintiff seeks his damages, treble damages, pre-judgment interest, and injunctive relief.

246.     WHEREFORE, plaintiff requests this Court enter judgment against Count IV Defendants as follows:

247.     JUDGMENT in favor of plaintiff JUSTIN S. BECK against KENNETH CATANZARITE; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 18 U.S.C. § 1962(b).

248.     MONEY JUDGMENT in favor of plaintiff JUSTIN S. BECK against KENNETH CATANZARITE; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages in the amount of $210,683,999 plus interest.

23-CV-0164-MMA-DEB

249.     MONEY JUDGMENT in favor of JUSTIN S. BECK against KENNETH CATANZARITE; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for treble damages in the amount of $632,051,997.

250.     PERMANENT INJUNCTION against the maintenance of any interest in or control of MFS by Count III Defendant(s) or any person associated or acting in concert with them including Nicole Marie Catanzarite Woodward, Brandon Woodward, Tim James O'Keefe, Eric V. Anderton or Jim Travis Tice, and each of them, and such other relief as the Court deems just under 18 U.S.C. § 1964(a) and F.R.Civ.P. 65.

23-CV-0164-MMA-DEB

**COUNT IV**

**ACQUIRED INTERESTS IN OR CONTROL OF AN ENTERPRISE**

**THROUGH A PATTERN OF RACKETEERING ACTIVITY**

**Violation of 18 U.S.C. § 1962(b)**

251.     The allegations of paragraphs ¶ 1 through ¶ 250 are incorporated herein by reference as if they were set forth fully.

252.     This Count IV is against defendants RUBEN DURAN; ELI DAVID MORGENSTERN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count IV Defendant(s)").

253.     The State Bar of California is an enterprise engaged in and whose activities affect $3.63 trillion in interstate commerce, which enterprise includes Board of Trustees, Office of General Counsel, Office of Chief Trial Counsel, and 286,000 living licensees, of whom nearly 197,000 are on active status.

254.     The Count IV Defendant(s) racketeering activity led to control of or interests in The State Bar of California enterprise, and those interests or that control resulted in injury to plaintiff.

255.     For all times relevant, Ruben Duran acquired or maintained interests in or control of The State Bar of California enterprise through Board of Trustees by engaging in (directly or indirectly) a pattern of mail fraud and wire fraud against the non-attorney public, and through carrying on the unlawful activity of The State Bar of California enterprise, MFS enterprise, and KJC enterprise.

256.     For all times relevant, Suzanne Grandt acquired or maintained interests in or control of The State Bar of California enterprise through Office of General Counsel by engaging in a pattern of mail fraud and wire fraud against the non-attorney public, and through carrying on the unlawful activity of The State Bar of California enterprise, MFS enterprise, and KJC enterprise.

257.     For all times relevant, Eli David Morgenstern acquired or maintained interests in or control of The State Bar of California enterprise through Office of Chief Trial Counsel by engaging in a pattern of mail fraud and wire fraud against the non-attorney public, and through carrying on the unlawful activity of The State Bar of California enterprise, MFS enterprise, and KJC enterprise.

23-CV-0164-MMA-DEB

258.    For all times relevant, State of California lacked direct supervision of State Bar, and the racketeering activity described above was conducted unequally in favor of attorneys and of detriment to the non-attorney public, and there was no clearly articulated State policy which allowed the racketeering activity to favor The State Bar of California enterprise.

259.    The preceding acts, including the overt acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

260.    The Count IV Defendant(s) have directly and indirectly acquired or maintained interest in or control of The State Bar of California enterprise, MFS enterprise, or KJC enterprise through a pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

261.    As direct and proximate cause of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff has been injured in his actual and prospective business and property.

262.    As direct and proximate result of Count IV Defendant(s) violation of 18 U.S.C. § 1962(b), plaintiff has been damaged in his business and property as set forth in all preceding paragraphs and therefore seeks his damages, treble damages, attorney's fees, pre-judgment interest, and injunctive relief.

263.    WHEREFORE, plaintiff requests this Court enter judgment against the Count IV Defendant(s):

264.    JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; ELI DAVID MORGENSTERN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 18 U.S.C. § 1962(b).

265.    MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; ELI DAVID MORGENSTERN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA in the amount equal to any amount failing in the preceding paragraphs and Counts I through Count III as an alternative.

266.    PERMANENT INJUNCTION as the Court deems just from acquiring or maintaining any interest in or control of The State Bar of California enterprise, MFS enterprise, or KJC enterprise through a pattern of racketeering activity, and divestiture thereof by each of the Count IV defendants under 18 U.S.C. § 1964(a) and F.R.Civ.P. 65.

51                          23-CV-0164-MMA-DEB

**COUNT V**

**FOURTEENTH AMENDMENT—DUE PROCESS**

**STATE CREATED DANGER**

**Violation of 42 U.S.C. § 1983**

267.     The allegations of paragraphs ¶ 1 through ¶ 266 are incorporated herein by reference as if they were set forth fully.

268.     This Count V is against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count V Defendant(s)").

269.     This Count VI is for violation of 42 U.S.C. § 1983 which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

270.     In the 9th Circuit, "[i]t is well settled that a "person" subject to liability can be an individual sued in an individual capacity (*see Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)) or in an official capacity (*see Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013)). A "person" subject to liability can also be a local governing body (*see Waggy v. Spokane County*, 594 F.3d 707, 713 (9th Cir. 2010).

271.     This Count V is brought against RUBEN DURAN; SUZANNE GRANDT; and ELI DAVID MORGENSTERN acting individually and in their official capacity, where THE STATE BAR OF CALIFORNIA is controlled by active market participants in regulation due to STATE OF CALIFORNIA's decisions and ratification.

272.     RUBEN DURAN; SUZANNE GRANDT; and ELI DAVID MORGENSTERN each deprived plaintiff of particular rights protected under the United States Constitution.

273.     In this case, Duran, Grandt, and Morgenstern deprived plaintiff of his rights under the Fourteenth Amendment to the Constitution when each ratified the serial schemes to defraud by mail and wire involving State Bar, KJC, and MFS, and thereby placed the plaintiff into further danger through affirmative acts.

274.     Under the Fourteenth Amendment, plaintiff has the constitutional right to be free from a government employee affirmatively placing plaintiff in a position of actual, particularized danger (or in a situation of actual, particularized danger that is more dangerous than the position that the plaintiff already faced) if Duran, Grandt, and Morgenstern acted with deliberate indifference to a known or obvious danger to Beck.

275.     In order to prove Duran, Grandt, and Morgenstern deprived Beck of this Fourteenth Amendment right, Beck must prove the following by a preponderance of the evidence: (1) the defendants committed an affirmative act; (2) the affirmative act placed the plaintiff in a position of an actual, particularized danger by creating or exposing the plaintiff to a danger that he would not have otherwise faced; (3) the defendant acted with deliberate indifference to a known or obvious danger; and (4) the affirmative act that created that actual, particularized danger caused injury to the plaintiff that was foreseeable.

276.     In this context, "deliberate indifference" means that the defendants disregarded a known or obvious consequence of their actions. In other words, the defendant must have known that something was going to happen to plaintiff but ignored the risk and still exposed the plaintiff to that risk.

277.     Duran, Grandt, and Morgenstern each committed an affirmative act, and each did know that something was going to happen to plaintiff but they ignored the risk.

278.     The affirmative act of Duran, Grandt, and Morgenstern placed plaintiff in a position of an actual, particularized danger by creating or exposing the plaintiff to a danger that he would not otherwise have faced.

279.     Duran, Grandt, and Morgenstern acted with deliberate indifference to the known and obvious danger.

23-CV-0164-MMA-DEB

280.     The affirmative act that created the actual, particularized danger caused injury to the plaintiff that was foreseeable.

281.     As direct and proximate cause of Duran, Grandt, and Morgenstern violating Beck's clearly established constitutional rights, and State Bar's deliberate disregard of Beck, Beck was actually damaged, and he seeks special damages caused by the violation of his particular rights.

282.     $138,889,249 for actual damages and future damages as set forth above

283.     $138,889,249 for pain, suffering, inconvenience, and oppression

284.     $138,889,249 for severe emotional distress leading to a seizure in Dec. 2022

285.     $138,889,249 for loss of consortium and inability to marry

286.     $138,889,249 for becoming disenfranchised, losing trust in State government

287.     $138,889,249 for severe grief, losing his parents and a mentor building CTI

288.     $138,889,249 for loss of enjoyment of life, consideration of suicide

289.     $138,889,249 for humiliation, losing friends and colleagues

290.     $138,889,249 for loss of 20% of left arm due to surgery delays due to Grandt's acts

291.     $138,889,249 for ratifying KJC and CLC conduct pre-9/14/18

292.     $138,889,249 for ratifying KJC and CLC conduct post-9/14/18

293.     Plaintiff also seeks punitive damages equal to the maximum amount permissible under the law but not less than $138,889,249 and up to $1,388,892,490.

294.     WHEREFORE, plaintiff requests this Court enter judgment against the Count VI Defendant(s):

295.     JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; ELI DAVID MORGENSTERN; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 42 U.S.C. § 1983.

296.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, ELI DAVID MORGENSTERN, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for damages of $138,889,249 plus interest.

23-CV-0164-MMA-DEB

297.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, ELI DAVID MORGENSTERN, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for special damages of not less than $138,889,249 and up to $1,388,892,490 plus interest.

298.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, ELI DAVID MORGENSTERN, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for punitive damages of not less than $138,889,249 and up to $1,388,892,490 plus interest.

299.     PERMANENT INJUNCTION as the Court deems just.

23-CV-0164-MMA-DEB

## COUNT VI

### FIRST AMENDMENT—"CITIZEN" PLAINTIFF

#### Violation of 42 U.S.C. § 1983

300.     The allegations of paragraphs ¶ 1 through ¶ 299 are incorporated herein by reference as if they were set forth fully.

301.     This Count VI is against RUBEN DURAN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count VI Defendant(s)").

302.     Under the First Amendment, a citizen has the right to petition the government and access the courts. To establish the Count VI Defendant(s) deprived the plaintiff of this First Amendment right, the plaintiff must prove the following additional elements by a preponderance of the evidence:

303.     (1) The plaintiff was engaged in a constitutionally protected activity; (2) the Count VI Defendant(s) actions against the plaintiff would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the plaintiff's protected activity was a substantial and motivating factor in the defendant's conduct.

304.     (1) Plaintiff's petitioning against the Count VI Defendant(s) was protected under the First Amendment, and therefore, the first element requires no proof.

305.     (2) The Count VI Defendant(s) actions against the plaintiff would chill a person of ordinary firmness from continuing to engage in the protected activity.

306.     (3) The plaintiff's protected activity was a substantial or motivating factor in the defendant's conduct.

307.     As direct and proximate cause of Count VI Defendant(s) violating plaintiff's clearly established constitutional rights, plaintiff was actually damaged, and he seeks special damages caused by the violation of his particular rights for any amount failing in Count I through Count VI.

308.     Plaintiff also seeks punitive damages equal to the maximum amount permissible under the law but not less than $138,889,249 and up to $1,388,892,490.

309.     WHEREFORE, plaintiff requests this Court enter judgment against the Count VI Defendant(s):

23-CV-0164-MMA-DEB

310.     JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for violation of 42 U.S.C. § 1983.

311.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN; SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages equal to any amount failing Counts I through Count VI as an alternative.

312.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for special damages for any amount failing Count VI as an alternative.

313.     MONEY JUDGMENT in favor of JUSTIN S. BECK against defendants RUBEN DURAN, SUZANNE GRANDT, THE STATE BAR OF CALIFORNIA, and STATE OF CALIFORNIA jointly and severally for punitive damages for any amount failing Count VI as an alternative.

314.     PERMANENT INJUNCTION as the Court deems just.

23-CV-0164-MMA-DEB

## COUNT VII

## ANTITRUST (PRIVATE RIGHT OF ACTION)

### Violation 15 § U.S.C. 15

315.   The allegations of paragraphs ¶ 1 through ¶ 314 are incorporated herein by reference as if they were set forth fully.

316.   This Count VII is against STATE OF CALIFORNIA (the "Count VII Defendant") directly and on behalf of UNITED STATES OF AMERICA derivatively for injunctive relief against The State Bar of California through UNITED STATES ATTORNEY GENERAL.

317.   In *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 448 (1993), the Supreme Court held: "The purpose of the [Sherman] Act is not to protect [attorneys] from the working of the market; it is to protect the public from the failure of the market." Per the California Supreme Court, "[a]lthough focused on private conduct, antitrust laws may apply to public entities under certain circumstances." The judicial market and machinery in California has failed the public interest.

318.   "The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of [Duran, Wilson, Grandt, Girardi, Girardi-Keese, Catanzarite, or Catanzarite Law Corporation]"). *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)

319.   15 U.S.C. § 15 holds that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

320.   It was forbidden for State to assign State Bar, controlled by an active market participant Board of Trustees led by Duran for all times relevant, to regulate an industry of its peers.

321.   It was forbidden by State Bar and Board of Trustees to regulate active market participants after 2015 through a majority active market participant comprised Board of Trustees.

322.   The purpose of federal antitrust laws as they relate to $3.63 trillion in interstate commerce controlled by The State Bar are to protect the public, not to protect attorneys.

23-CV-0164-MMA-DEB

323.　　Beck was injured by the antitrust violations described above, and State is liable as it failed to exercise reasonable care under Gov. Cod. § 815.6, where 15 U.S.C. § 1 and *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) cause mandatory duty.

324.　　The public was and is being injured by the antitrust violations described above, and USAG and USA have a duty to intervene where The State Bar of California refuses to be governed, and refuses to conform to federal antitrust laws.

325.　　WHEREFORE, plaintiff requests this Court enter judgment against the Count VII Defendant:

326.　　JUDGMENT in favor of JUSTIN S. BECK against defendant STATE OF CALIFORNIA for violation of 15 U.S.C. § 15.

327.　　JUDGMENT in favor of UNITED STATES OF AMERICA against The State Bar of California for violation of 15 U.S.C. § 1.

328.　　MONEY JUDGMENT in favor of JUSTIN S. BECK against defendant STATE OF CALIFORNIA jointly and severally for damages equal to any amount failing Counts I through Count VI as an alternative.

329.　　EXTRAORDINARY RELIEF in favor of UNITED STATES OF AMERICA for intervention against The State Bar of California for antitrust violations, and racketeering investigation under 18 U.S.C. § 1968 to identify all those persons causing harm, and all those persons harmed by the conduct so they may be remunerated. The citizens harmed by this conduct lack a neutral forum due to the conduct at issue, and each are due as a fundamental right in USA.

330.　　EXTRAORDINARY RELIEF in favor of UNITED STATES OF AMERICA citizens identified by USAG or racketeering investigator as being harmed by the antitrust violations through reverse incorporation of the Fourteenth Amendment into the Fifth Amendment.

331.　　PERMANENT INJUNCTION against The State Bar of California violating federal antitrust laws in regulation.

332.　　PERMANENT INJUNCTION for State of California to provide ongoing, active supervision and control through California State Auditor and an independent, non-active market participant function unaffiliated with The State Bar of California with federal oversight.

23-CV-0164-MMA-DEB

1  **PLAINTIFF DEMANDS TRIAL BY JURY**

2  333.      For the foregoing reasons, plaintiff requests the Court enter judgment in his favor as set

3  forth above.

4  334.      Plaintiff requests this Court act *Sua sponte* to restrict or enjoin the conduct at issue so that

5  it does not contaminate this proceeding or cause further harm to plaintiff, the public, or the United

6  States amidst $3.63 trillion interstate commerce – including but not limited to the appointment of

7  non-partisan or bi-partisan racketeering investigator(s) under 18 U.S.C. § 1968 as a matter of

8  public interest.

9  335.      CERTIFICATION AND CLOSING. Under F. R. Civ. P. 11, by signing below, I certify to

10  the best of my knowledge, information, and believe that this complaint: (1) is not being presented

11  for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the

12  cost of litigation; (2) is supported by existing law, or by a nonfrivolous argument for extending,

13  modifying, or reversing existing law; (3) the factual contentions have evidentiary support[]; and

14  (4) the complaint otherwise complies with the requirements of Rule 11.

15

16  February 1, 2023                          _____

17  Certified and Verified as True            JUSTIN S. BECK, as individual plaintiff

18                                            *In Propria Persona*

19

20

21

22

23

24

25

26

27

28

23-CV-0164-MMA-DEB