1   Justin S. Beck
    3501 Roselle St.,
2   Oceanside, CA 92056
3   760-449-2509
    justintimesd@gmail.com
4   *In Propria Persona*

FILED

MAR 27 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ 4UV _____ DEPUTY

5

6   **IN THE UNITED STATES DISTRICT COURT**
    **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

7   JUSTIN S. BECK,                              )   Case No.: 3:23-CV-0164-~~BAS~~-DDL
                                                 )                      AGS
8               Plaintiff,                       )
                                                 )   Judge:      Hon. ~~Cynthia A. Bashant~~
9                                                )              Andrew G. Schopler
         vs.                                     )
10                                               )   **PLAINTIFF JUSTIN S. BECK'S NOTICE**
                                                 )   **OF CROSS-MOTION AND CROSS-**
11  STATE OF CALIFORNIA; THE STATE BAR )            **MOTION FOR SANCTIONS UNDER F.R.**
    OF CALIFORNIA; SUZANNE GRANDT;    )            **CIV. P. 11(c)(2); MEMORANDUM OF**
12  RUBEN DURAN; ELI DAVID                       )   **POINTS AND AUTHORITIES IN**
    MORGENSTERN; KENNETH                         )   **SUPPORT THEREOF**
13  CATANZARITE,                                 )
                                                 )   Filed Concurrently With:
14              Defendants,                      )
                                                 )      Request for Judicial Notice
15                                               )
    UNITED STATES ATTORNEY GENERAL; )               Declaration of Justin S. Beck in Support
16  UNITED STATES OF AMERICA                     )
                                                 )   Hearing Date: [April 24, 2023]
17              Nominal Defendants               )
                                                 )   ~~NO ORAL ARGUMENT UNLESS~~
18                                               )   ~~ORDERED BY THE COURT~~

19                                                   Request For Oral Argument
                                                     Action Filed: January 30, 2023
20
21

22                                                   Trial Date:   None Set

23

24

25

26

27

28

                                    i                      3:23-CV-0164-BAS-DDL

**TO ALL PARTIES & THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 24, 2023, in the Courtroom of Honorable Cynthia A. Bashant, Courtroom 12B, James M. Carter and Judith N. Keep United States Courthouse, 333 West Broadway, San Diego, California 92101, Plaintiff will, and hereby does, move, pursuant to Federal Rules of Civil Procedure 11(c)(2) for an order to strike and sanction Defendants The State Bar of California ("State Bar"), Ruben Duran, Suzanne Grandt, and Eli David Morgenstern ("State Bar defendants") motion to dismiss Plaintiff's First Amended Complaint for Damages & Injunctive Relief ("FAC") as to all claims against the State Bar defendants ("Cross Motion").

The Cross Motion is made on the grounds that the State Bar defendants motion to dismiss pursuant to Federal Rules of Civil Procedure 8, 12(b)(1), and 12(b)(6) ("Motion to Dismiss") violates Federal Rules of Civil Procedure 11(b) in that State Bar defendants, by presenting to the court:

(1) Motion to Dismiss Violates F.R.Civ.P 11(b)(1) as Being Presented for Improper Purposes to Harass Plaintiff, Unnecessarily Delay this Proceeding, Avoid Answering the Specific Allegations, and Obstruct Justice

(2) Motion to Dismiss Violates F.R.Civ.P. 11(b)(2) as it Contains Defenses and Legal Contentions that Are Not Warranted by Existing Law or Nonfrivolous Argument for Extending, Modifying, Reversing Existing Law or Establishing New Law

(3) Motion to Dismiss Violates F.R.Civ.P. 11(b)(3) as it Contains Misleading Factual Contentions Designed to Obstruct Justice, Deny Plaintiff Due Process Rights, Defraud U.S. Court

(4) Motion to Dismiss Violates F.R.Civ.P. 11(b)(4) as the Denials or Ignorance of Factual Contentions Are Not Warranted on Evidence Filed in Related Case or RICO Case Statement

The Cross Motion is based on this Notice of Cross Motion, the Cross Motion, the Motion to Dismiss, the accompanying Memorandum of Points and Authorities of Plaintiff to the Cross Motion, the Memorandum of Points and Authorities of State Bar defendants to the Motion to Dismiss, the declaration of Justin S. Beck in support of the Cross Motion, the request for judicial notice in support of the Cross Motion, all pleadings and papers on file in this action and any related actions, and oral argument as may be presented to the Court.

1    To satisfy the statutory requirements of Federal Rules of Civil Procedure 11(c)(2), Plaintiff

2    served this Cross Motion on Monday, March 6, 2023, as set forth within the proof of service. This Cross

3    Motion will be filed for hearing April 24, 2023 if the Motion to Dismiss is not retracted within the 21-

4    day safe harbor period. Plaintiff's opposition to the Motion to Dismiss will address the points and

5    authorities set forth by State Bar defendants and State of California by joinder.

6    For the reasons set forth herein, Plaintiff requests the Court strike the Motion to Dismiss,

7    disqualify Office of General Counsel for violation of California Rules of Professional Conduct 1.7(d)(3),

8    California Rules of Professional Conduct 4.1, 18 U.S.C. § 1503(a), order a fine payable to the Court as

9    deterrent, or hold each Charles Tsai, Robert Retana, Ellin Davtyan, Ruben Duran, Suzanne Grandt, Eli

10    David Morgenstern, and The State Bar of California in contempt of Court. Plaintiff requests the Court

11    disqualify Best Best & Krieger, where State Bar defendants requested the instant case and 3:22-CV-

12    01616-BAS-DDL related, and Ruben Duran as public and private actor's law firm is not possibly

13    capable of maintaining this conflict, nor is Best Best & Krieger capable of representing alleged

14    conspirators with Ruben Duran. It makes the entire judicial machinery appear unfair.

15

16

17    Respectfully Prepared for Submission,        Justin S. Beck

18    March 6, 2023

19

20

21

22

23

24

25

26

27

28

iii             3:23-CV-0164-BAS-DDL

TABLE OF CONTENTS

I.    INTRODUCTION

II.   LEGAL STANDARD

III.  BACKGROUND

A. The State Bar of California is "Not the Sovereign" nor are Individuals per U.S. Law

1. *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015)

2. California Supreme Court Administrative Order 2017-09-20

3. State Assembly Bill 3249, Ch. 659 Clearly Applied Fed. Antitrust Law to State Bar

B. State Bar Defendants Subject to New State Laws as of January 1, 2019 (AB 3249)

1. The State Bar of California Corporation Can Be Sued Per California Law

2. State Bar Prohibited in Advancing Duran, Morgenstern, Grandt, Catanzarite Interests

3. State Bar Bound by Mandatory Law to Protect Plaintiff, Not Each Other or Catanzarite

4. Duran, Morgenstern, Grandt Can Be Held Liable Civilly as Individuals for Crimes

5. Racketeering Investigation Demand on U.S. is Not Subject of 11th Amendment

C. U.S. District Court Has Subject Matter Jurisdiction for RICO & Antitrust Claims

1. Plaintiff Outside State Bar Jurisdiction; Does Not Seek Discipline in State Bar Court

2. Jurisdiction Belongs to U.S. District Court for RICO per 18 U.S.C. § 1964(a)-(c)

3. Jurisdiction Belongs to U.S. District Court for Antitrust per 15 U.S.C. § 15

4. Due Process Violations Invoke *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) on U.S.

D. Plaintiff's RICO Case Statement is Part of Pleading to Satisfy Rule 9(b) Requirements

1. Plaintiff Filed RICO Case Statement Before Motion to Dismiss, Clerk Confirmed

2. Plaintiff's Ignored RICO Case Statement is to be Read as Part of the FAC

E. FAC Allegations Summarized Against State Bar, Grandt, Morgenstern, Duran

1. Majority Active Market Participant Controlled State Bar Led by Duran

2. Private Law Firm Best Best & Krieger Partner Ruben Duran, Chairman of State Bar

3. Active Market Participant Attorney Suzanne Grandt

4. Active Market Participant Attorney Eli David Morgenstern

5. State Bar Defendants Conducted, Directly or Indirectly, Catanzarite Enterprise Affairs

iv

3:23-CV-0164-BAS-DDL

IV.    **ARGUMENT**

    **A. Motion to Dismiss Violates F.R.Civ.P 11(b)(1) as Being Presented for Improper Purposes to Harass Plaintiff, Unnecessarily Delay this Proceeding, Avoid Answering the Specific Allegations, and Obstruct Justice**

        1. Relief Sought by Motion to Dismiss Violates Plaintiff's Due Process Rights

        2. Motion to Dismiss Ignores RICO Case Statement, Seeks to Delay Proceeding

        3. Office of General Counsel Endeavors to Obstruct Justice Further and Oppress Plaintiff

    **B. Motion to Dismiss Violates F.R.Civ.P. 11(b)(2) as it Contains Defenses and Legal Contentions that Are Not Warranted by Existing Law or Nonfrivolous Argument for Extending, Modifying, Reversing Existing Law or Establishing New Law**

        1. State Bar Defendants Are Not Immune from Federal Antitrust Laws

        2. Duran, Morgenstern, Grandt Are Not Immune as Individuals in Any Instance

        3. Every § 1983 Case Cited Pre-Dates January 1, 2019, or was Filed by Attorneys

        4. In Violating Antitrust Laws, State Bar Not State Agency for Purposes of RICO

        5. Duran, Morgenstern, Grandt Are Not Individually Above the Law to Violate RICO

    **C. Motion to Dismiss Violates F.R.Civ.P. 11(b)(3) as it Contains Misleading Factual Contentions Designed to Obstruct Justice, Deny Plaintiff Due Process Rights, Defraud U.S. Court**

        1. "Pending Civil Matters" Involve Six Competing, Fraudulent Cases Targeting Plaintiff

        2. Removal of State Actions Remanded for Removal Jurisdiction – Not Subject Matter

        3. Duran's Firm, BB&K, Representing Duran's Alleged Conspirators, RICO Violators

    **D. Motion to Dismiss Violates F.R.Civ.P. 11(b)(4) as the Denials or Ignorance of Factual Contentions Are Not Warranted on Evidence Filed in Related Case or RICO Case Statement**

        1. Misrepresentations of Law by Duran, Morgenstern, Grandt to O.C. Superior Court

        2. Fraudulent Statements of Fact by Duran, Morgenstern, Grandt to O.C. Superior Court

        3. State Bar's Overt Nomination of Associate Justices to Obstruct Plaintiff's State Cases

        4. Grandt, Davtyan Sought to Intimidate Plaintiff to Conceal Criminal Conduct

        5. Charles Tsai Transitioned from California DOJ to State Bar to Appear in this Court

        6. Fraudulent Antitrust Petition Filed for Plaintiff without Authority in Cal. Supreme Ct.

7. Fraudulent "En Banc" Decision with Knowledge of this Case, Petition to Congress

8. State Bar Defendants Do Not Deny Catanzarite's Fraudulent Schemes 2007-Present

9. State Bar Defendants May Be Held Liable for Conducting Affairs of KJC Enterprise

10. State Bar Defendants Silent on Individual Claims, Yet Seek Wholesale Dismissal

**V.      CONCLUSION & REQUEST FOR CROSS MOTION RELIEF**

1

<u>TABLE OF AUTHORITIES</u>

2

<u>Cases—State</u>

3

*In re Rose*, ..................................................................................................5

4

    22 Cal.4th 430, 438

5

<u>Statutes & Rules—State</u>

6

Cal. Bus. & Prof. Cod. § 6001.................................................................4

7

    Nonsovereign The State Bar of California is Subject to Suit

8

Cal. Bus. & Prof. Cod. § 6001.1.......................................................4, 10

9

    Plaintiff, as a Member of the Public, is Paramount

10

Cal. Bus. & Prof. Cod. § 6068(a) ..........................................................10

11

    Duty of Attorneys to Uphold United States Constitution

12

Cal. Bus. & Prof. Cod. § 6068(g) ..........................................................10

13

    Duty of Attorneys Not to Encourage Actions from Corrupt Motives of Passion or Interest

14

Cal. Bus. & Prof. Cod. § 6068(h) ..........................................................10

15

    Duty of Attorneys Not to Reject the Oppressed Plaintiff for Consideration to Themselves

16

Cal. Rul. Prof. Cond. 1.7(d)(3) .......................................................16, 20

17

<u>Cases—Federal</u>

18

*Bolling v. Sharpe*, ..............................................................................5

19

    347 U.S. 497, (1954)

20

*Center for Auto Safety v. Chrysler Grp.* ..............................................2

21

    809 F.3d 1092, 1102 (9th Cir. 2016)

22

*Devereaux v. Abbey*, ....................................................................12, 13

23

    263 F.3d 1070, 1074 (9th Cir. 2001)

24

*Diaz v. Int'l Longshore and Warehouse Union, Local 13*, ......................1

25

    474 F.3d 1202, 1205 (9th Cir. 2007)

26

*Hartmann v. Cal. Dep't of Corr. & Rehab.*, ..........................................12

27

    707 F.3d 1114, 1127 (9th Cir. 2013)

28

1  *Harlow v. Fitzgerald*, ..............................................................................13

2       457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)

3  *Hook v. Idaho*, ......................................................................................1

4       1:21-cv-00199-BLW, 3 (D. Idaho Feb. 4, 2022)

5

6  *Lipton v. Pathogenesis Corp.*, ......................................................................1

7       284 F.3d 1027, 1039 (9th Cir. 2002)

8  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, .......................................19

9       431 F.3d 353, 361 (9th Cir. 2005)

10  *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, .............................3, 11

11       574 U.S. 494, 503 (2015)

12  *Odom v. Microsoft*, ................................................................................19

13       486 F.3d at 548

14  *Parker v. Brown*, ..................................................................................3, 11

15       317 U.S., at 350–351, 63 S.Ct. 307

16  *United States v. Topco Associates, Inc.* ..........................................................3

17       ,405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)

18  *Waggy v. Spokane County*, ......................................................................12

19       594 F.3d 707, 713 (9th Cir. 2010)

20                          <u>Statutes & Rules—Federal</u>

21  Fifth Amendment, ...................................................................................10

22       U.S. Constitution

23  Eleventh Amendment, ................................................1, 4, 7, 12, 13, 15

24       U.S. Constitution.

25  Fourteenth Amendment, ............................................................................10

26       U.S. Constitution

27  15 U.S.C. § 1.......................................................................................13

28       Sherman Act

1   15 U.S.C. § 15.................................................................................................5

2       Federal Jurisdiction for Sherman Act & Clayton Act

3   18 U.S.C. § 1503(a) ..................................................................................1, 11

4       Obstruction of Justice

5   18 U.S.C. § 1962(a)-(d) .................................................................5, 6, 13, 19

6       RICO Code Sections

7   18 U.S.C. § 1964(a) .....................................................................................5

8       U.S. District Court Authority to Prevent, Restrain, Enforce RICO

9   18 U.S.C. § 1964(b) .....................................................................................5

10      U.S. Attorney General Authority to Prosecute RICO on Plaintiff Demand

11  18 U.S.C. § 1964(c) .....................................................................................5

12      Federal Jurisdiction for RICO Claims

13  18 U.S.C. § 1968........................................................................................4

14      U.S. Attorney General Procedures for Racketeering Investigation Demand of Plaintiff

15  18 U.S.C. § 1367.................................................................................*passim*

16      Supplemental Jurisdiction for U.S. District Court on Non-RICO, Non-Antitrust Claims

17  F.R.Civ.P. 11....................................................................................*passim*

18      U.S. District Court Procedures for Sanctioning Motion to Dismiss

19  F.R.Civ.P.11(b)(1) .....................................................................................9

20      Motion to Dismiss as Harassment of Plaintiff, Denying him Due Process

21  F.R.Civ.P.11(b)(2) ..................................................................................2, 11

22      Motion to Dismiss as Containing Unwarranted Legal Contentions

23  F.R.Civ.P.11(b)(3) .....................................................................................15

24      Motion to Dismiss as Containing Unwarranted or Misleading Factual Contentions

25  F.R.Civ.P.11(b)(4) .....................................................................................17

26      Motion to Dismiss as Containing Unwarranted or Misleading Factual Denials

27  F.R.Civ.P. 11(c)(2) ......................................................................................1

28

3:23-CV-0164-BAS-DDL

1

<u>Other Authorities</u>

2   California State Assembly Bill AB 3249, Chapter 659...............................................4, 10, 11, 13

3           Effective January 1, 2019

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

x                                   3:23-CV-0164-BAS-DDL

## I.  INTRODUCTION

To summarize State Bar defendants' Motion to Dismiss, 1) they do not dispute Catanzarite is engaged in serial fraud against non-attorneys inside and outside California; 2) they do not dispute Catanzarite engaged in patterns of serial fraud since 2007 enabled by them, just like Thomas V. Girardi; 3) they believe themselves above the law, namely, the Racketeer Influenced and Corrupt Organizations Act ("RICO") as *individuals*; 4) they believe the mere existence of an administrative order renders every operational act undertaken by each of them as legislative, 5) they do not have time to address specific allegations plainly identified in FAC, RICO Case Statement or now-related case; 6) they do not believe express intent of State Legislature, codifying Federal antitrust laws January 1, 2019 have any practical effect on their operational decision-making or application of case law, here; 7) they do not dispute they are engaged in deliberate fraud against Courts and Plaintiff; 8) they want Plaintiff's claims to go back to State Court they are shown to control with impunity; 9) they do not believe California Professional Rules of Conduct apply to them; 10) they believe all of the foregoing arises from discretion vested in them by State of California through sovereignty derived from the United States. And therein lies the rub.

Plaintiff will address 11th Amendment arguments and the extraordinary circumstances of this case (and broader issue) in his opposition to the Motion to Dismiss. This Cross Motion, which must stand alone according to F.R.Civ.P. 11(c)(2), focuses upon material misrepresentations or concealment of fact and law by State Bar defendants to this Court. These acts allegedly violate 18 U.S.C. § 1503(a).

The Court does not have authority to dismiss the FAC with prejudice. In exercising its discretion to summarily dismiss claims on its own motion or by motion of the defendants, the Court takes into consideration that, in any case, and more so in pro se cases, the law requires that plaintiffs be given an opportunity to amend their pleadings to remedy any deficiencies that were identified during screening or after a motion to dismiss has been adjudicated. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002) ("It is not unreasonable that plaintiffs may seek amendment after an adverse ruling, and in the normal course district courts should freely grant leave to amend when a viable case may be presented."). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citations omitted)." *Hook v. Idaho*, 1:21-cv-00199-BLW, 3 (D. Idaho Feb. 4, 2022)

1

## II.    LEGAL STANDARD

"District courts can use Rule 11 to impose sanctions on any party that files a motion for an improper purpose or who does so without a legal or factual basis." *Center for Auto Safety v. Chrysler Grp.*, LLC, 809 F.3d 1092, 1102 (9th Cir. 2016) (citation and internal quotation marks omitted). State Bar defendants, Charles Tsai, Ellin Davtyan, and Robert Retana should be disqualified and sanctioned.

Federal Rules of Civil Procedure 11 holds (a) Signature. Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention. (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: **(c)** SANCTIONS. **(1)** *In General*. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee. **(2)** *Motion for Sanctions*. A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion. **(3)** *On the Court's Initiative*. On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b). **(4)** *Nature of a Sanction*. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation. **(5)** *Limitations on Monetary Sanctions*. The court must not impose a monetary sanction: **(A)** against a represented party for violating Rule 11(b)(2); or **(B)** on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.**(6)** *Requirements for an Order*. An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction. 28 APPENDIX U.S.C. § 11 As amended Apr. 28, 1983, eff. Aug. 1, 1983; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007. Fed. R. Civ. P. 11

III.   **BACKGROUND**

   **A. The State Bar of California is "Not the Sovereign" nor are Individuals per U.S. Law**

   1. *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015

   "Federal antitrust law...is "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). "The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market." *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, 502 (2015) "[T]he Court in *Parker v. Brown* interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity. See 317 U.S., at 350–351, 63 S.Ct. 307." *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, 503 (2015). (This law protects public and free market, not State Bar defendants).

   2. California Supreme Court Administrative Order 2017-09-20 & FTC Guidance

   "In North Carolina State Board of Dental Examiners, the Supreme Court **reaffirmed** that a state **regulatory board is not the sovereign**. [emph.] Accordingly, a state regulatory board is not necessarily exempt from federal antitrust liability." Request for Judicial Notice, Ex. 1, p. 4. ("RJN"). "Actions of the State Bar that have the effect of advancing the interests of attorneys without a clear benefit to the public must be scrutinized closely for potential antitrust violations." Motion to Dismiss, RJN, Ex. 1, p. 4. "If an action of a regulatory agency such as the State Bar has a potential anticompetitive effect, and is not an action of the Supreme Court or the Legislature acting as sovereign, closer analysis will be required. Under these circumstances, antitrust immunity is available only if the regulatory entity's action is subject to *active state supervision* and is undertaken pursuant to a *clearly articulated policy*." Ibid.

   3. State Assembly Bill 3249, Ch. 659 Clearly Applied Fed. Antitrust Law to State Bar

   Assembly Bill No. 3249, Chapter 659 amended State Bar Act to conform with Federal antitrust laws. RJN, Ex. 2, p. 1. "(2) The act **requires** protection of the public to be the highest priority for the State Bar and the board of trustees in exercising their licensing, regulatory, and disciplinary functions...This bill would eliminate the authorization of the board to aid in all matters that may advance the professional interests of the members of the State Bar." Id., p. 2. (It became law January 1, 2019.)

**B. State Bar Defendants Subject to New State Laws as of January 1, 2019 (AB 3249)**

1. The State Bar of California Corporation Can Be Sued Per California Law

State Bar is **"not the sovereign"** according to United States Supreme Court. RJN, Ex. 1, p. 4. "The State Bar...may sue and be sued." Cal. Bus. & Prof. Cod. § 6001. (State Bar defendants are therefore, not by extension sovereign actors, either). Plaintiff is not suing Legislature or Supreme Court for sovereign conduct—State Bar defendants are sued for operational, not legislative conduct. FAC.

2. State Bar Prohibited in Advancing Duran, Morgenstern, Grandt, Catanzarite Interests

According to express Legislative intent in Assembly Bill 3249, Chapter 659, Administrative Order 2017-09-20 of California Supreme Court which renders operational decisions of State Bar subject to antitrust scrutiny, and binding United States Supreme Court decisional law, **State Bar is not sovereign** and is prohibited from advancing licensee interests of detriment to the public. RJN, Ex. 1, p. 4; Ex. 2, p. 1; Motion to Dismiss RJN, Ex. 1, p. 4. Charles Tsai, Ruben Duran, Suzanne Grandt, Ellin Davtyan, Robert Retana, Eli David Morgenstern, Kenneth Catanzarite, Thomas V. Girardi, Nicole Marie Catanzarite Woodward, Tim James O'Keefe, Brandon Woodward, and Jim Travis Tice are each a licensee. Motion to Dismiss, Caption, pp. 2-4. Plaintiff is a member of the public. Beck Decl., ¶ 30.

3. State Bar Defendants Bound by Mandatory Law to Protect Plaintiff, Not Licensees

"Protection of the public, which includes support for greater access to, and inclusion in, the legal system, shall be the highest priority for the State Bar of California and board of trustees in exercising their licensing, regulatory, and disciplinary functions. Whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount." Cal. Bus. & Prof. Cod. § 6001.1. Dictionary.com shows "paramount" to mean "1 chief in importance or impact; supreme; preeminent. 2 above others in rank or authority; superior in power or jurisdiction." anything else; supreme." RJN, Ex. 3, p. 1. So, Plaintiff is more important here, not State Bar defendants.

4. Duran, Morgenstern, Grandt Can Be Held Liable Civilly as Individuals for Crimes

Motion to Dismiss relies entirely on stale law as if it were sovereign while ignoring individual claims against Duran, Morgenstern, Grandt sued for alleged criminal conduct. Motion to Dismiss.

5. Racketeering Investigation Demand on U.S. is Not Subject of 11th Amendment

Nothing in the 11th Amendment bars requested U.S. intervention for cause. 18 U.S.C. § 1968.

**C. U.S. District Court Has Subject Matter Jurisdiction for RICO & Antitrust Claims**

1. <u>Plaintiff Outside State Bar Jurisdiction; FAC Does Not Seek State Bar Court Discipline</u>

There are no on-point cases after January 1, 2019, are cited by State Bar defendants Motion to Dismiss the FAC. Plaintiff is not seeking the institution of State Bar Court discipline in this case, indeed, many of the claims arise from State Bar defendants judicial and extra-judicial conduct completely unrelated to Catanzarite Law Corporation actors. FAC, p. 13, ¶¶ 63-7, p. 14, ¶¶68-73, p. 15, ¶ 76, p. 31, ¶ 117, p. 32, ¶ 118-121, p. 33, ¶¶ 122-4, p. 34, ¶¶ 125-8, p. 35, ¶¶ 129-32. Non-attorney Plaintiff did not agree to State Bar Court jurisdiction. Beck Decl. ¶ 30. State Bar relies heavily—much like they allegedly defrauded Orange County Superior Court—on a 2000 decision "*In re Rose*, 22 Cal.4th 430, 438" which preceded clarity on the non-sovereign status of State Bar defendants by United States Supreme Court, and preceded January 1, 2019, clarity that State Bar defendants were prohibited from helping licensees and hurting the public thereafter. Plaintiff is not an attorney affected by that case. Beck Decl. ¶ 30.

2. <u>Jurisdiction Belongs to U.S. District Court for RICO per 18 U.S.C. § 1964(a)-(c)</u>

U.S. district courts have jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962(a)-(d) per 18 U.S.C. § 1964(a). Nominal defendant Attorney General may institute RICO proceedings against State Bar defendants under 18 U.S.C. § 1964(b) per Plaintiff's demand. Plaintiff is a "person injured in his business or property by reason of a violation of section 1962" who may "sue therefor in any appropriate United States district court" per 18 U.S.C. § 1964(c). (This case belongs in U.S. Court.)

3. <u>Jurisdiction Belongs to U.S. District Court for Antitrust per 15 U.S.C. § 15</u>

Clayton Antitrust Act passed by U.S. Congress, law as of 1914, codified 15 U.S.C. § 15, holding "(a) any person who shall be injured in his business or property by reason of anything prohibited in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found to have an agent." (Oct. 15, 1914, ch. 323, § 4, 38 Stat. 731; Pub. L. 96-349, § 4(a)(1), Sept. 12, 1980, 94 Stat. 1156; Pub. L. 97-393, Dec. 29, 1982, 96 Stat. 1964). State Bar defendants allegedly violated things "prohibited in the antitrust laws." FAC, RICO Case Statement.

4. <u>Due Process Violations Invoke *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) on U.S.</u>

"(b) Discrimination may be so unjustifiable as to be violative of due process. P. 499." *Bolling v. Sharpe*, 347 U.S. 497, (1954). (This Court can't send Plaintiff back to the alleged enterprise itself.)

5

3:23-CV-0164-BAS-DDL

**D. Plaintiff's RICO Case Statement Supplements FAC for Rule 9(b) Requirements**

    1. <u>Plaintiff Filed RICO Case Statement Before Motion to Dismiss, Clerk Confirmed</u>

Plaintiff filed a RICO Case Statement at ECF #9 that sets forth in specific detail supporting facts and legal basis of his claims if there be ambiguity in his FAC. ECF 9-1, pp. 1-100 ("Supplement"). The clerk confirmed this was part of the record and he need not file it as a supplement. Beck Decl., ¶ 31.

    2. <u>Plaintiff's Ignored RICO Case Statement is to be Read as Part of the FAC</u>

State Bar defendants are defended by Office of General Counsel consistent with its alleged role. Supplement, p. 2, Lines 22:23. So are individuals Davtyan, Retana, and Tsai. Id., p. 10-11. (Plaintiff already possesses evidence for the allegations and cannot be denied forum to present or uncover more.)

**E. FAC Allegations Summarized Against State Bar, Grandt, Morgenstern, Duran**

    1. <u>Majority Active Market Participant Controlled State Bar Led by Duran</u>

U.S. Supreme Court: **State Bar not a sovereign actor**. RJN, Ex. 1, p. 4. State Bar engaged in a fraudulent scheme. FAC, ¶ 2. State Bar was controlled by majority of active market participants. ¶ 11. Violations of 18 U.S.C. § 1962(a)-(c) cause liability to State Bar for Duran, Morgenstern, Grandt. ¶ 19. State Bar operates postal mail and wire facilities affecting interstate commerce. FAC, p. 8, ¶ 39. State Bar uses those facilities to defraud the public. Id. State Bar aided Girardi for forty years to conduct racketeering and participated in the proceeds. Supplement, p. 11-2, 19-20. State Bar participated in proceeds from other racketeering and reinvested it. Id, pp. 1-100. FAC, ¶ 202. State Bar confessed to its role with Girardi. Id, p. 21. Catanzarite is like Girardi. FAC, pp. 35-6. State Bar misrepresents the conduct of Catanzarite, even here, and conceals actual knowledge of his fraud. Motion to Dismiss. State Bar's racketeering activity shows a threat of continuing (open-ended). Id, ¶ 57. State Bar is associated with the KJC enterprise. FAC, p. 38, ¶¶ 163-5. State Bar is an enterprise. ¶ 199. State Bar's associated-in-fact components include its associated-in-fact attorneys. ¶ 200. State Bar used money from racketeering activity and reinvested it, knowing some was from racketeering. ¶ 202. Duran protects those attorneys among State Bar enterprise engaged in racketeering. ¶ 208. State Bar is associated in fact with MFS enterprise. ¶ 225-6. State Bar knew of patterns of racketeering activity but chose to carry them on willfully. ¶ 228. Duran, Morgenstern, and Grandt conduct led to control or maintenance of State Bar enterprise. ¶ 253-4. State Bar enterprise is described by Plaintiff. Supplement, p. 74-78, 80-89.

3:23-CV-0164-BAS-DDL

2. <u>Private Law Firm Best Best & Krieger Partner Ruben Duran, Chairman of State Bar</u>

Duran is sued in his personal capacity for alleged crimes, torts, and constitutional violations. FAC, p. 9, ¶ 42. Duran is sued as partner of private law firm Best Best & Krieger. Ibid. Duran is sued as Chairman of Board of Trustees, whose activities affect $3.63 trillion in interstate commerce. Ibid. Duran receives payment from racketeering proceeds. Ibid. Duran's racketeering activity shows a threat of continuing (open-ended). Id, ¶ 57. Duran is associated with Kenneth Joseph Catanzarite enterprise. Supplement, p. 72-4. Duran is associated with, a principal of investing activity for, a perpetrator for, and victim of The State Bar of California enterprise. Id., p. 74-7. Duran is associated with Mobile Farming Systems, Inc. enterprise. Id., p. 78-80. Duran used the mail to deny Plaintiff's government claim but knew he would obstruct justice through control of California judiciary. Supplement, p. 49. With knowledge of 2014 MTO investigation into State Bar leadership and Girardi-Keese compromise of State Bar and California judiciary, Duran used the wire January 24, 2022, to defraud the public. Id. p. 19. Duran overtly caused nomination and appointment of three Court of Appeal Associate Justices (Sanchez, Motoike, and Delaney) on five specific dates of Plaintiff's Government Claims Act litigation, which allegedly used wire, and intended to obstruct justice and defraud Plaintiff. Id., p. 48 re: Sanchez; p. 50 re: Motoike; p. 50-1; Delaney, p. 56-7. Beck Decl., Ex. 23, 25. Duran used the wire as part of the fraudulent scheme May 19, 2022, to discuss the scheme targeting Plaintiff. Supplement, p. 51. Duran used the wire July 13, 2022, as part of the fraudulent scheme, also disclosing he accepted funds from the United States as it relates to 11th Amendment. Id. p. 54-5. Duran, via Grandt, used the mail and wire to defraud Plaintiff July 20, 2022. Id., p. 56. Duran defrauded Plaintiff and Judge Gastelum in Orange County Superior Court August 18, 2022. Id. p. 57. Duran defrauded Plaintiff and Judge Gastelum again in Orange County Superior Court, and Gastelum relied on the misrepresentations of Duran to defraud Plaintiff. Id. p. 58. Plaintiff filed an antitrust petition against Duran after learning State Bar is not sovereign actor. Id., p. 59. By wire through Grandt, Duran and State Bar appeared before Judge Gastelum October 11, 2022, to defraud Plaintiff and Judge Gastelum. Id. p. 60-1. Duran caused Plaintiff's writ petition to be obstructed through overt appointments of Sanchez, Motoike, and Delaney and ex parte communications. Id., p. 61-2. Despite being served, Duran refused to appear in 30-2020-01145998 and denied Plaintiff discovery again. Id., p. 62-3. November 3, 2022, Duran used the wire to

1    confess State Bar and Board of Trustees role with Girardi and carrying on his conduct for forty years.

2    Id. p 21. After procuring an order to strike a complaint that has since been remedied in 3:22-CV-01616-

3    BAS-DDL by Plaintiff on February 14, 2023, Duran, as being supervisor for Grandt, Tsai, and others,

4    caused Orange County Superior Court to reject July 2022 evidence and filings in 30-2021-01237499 to

5    further obstruct justice, defraud Plaintiff, and conceal the scheme on February 15, 2023. Id. p. 67.

6                    3. Active Market Participant Attorney Suzanne Grandt

7          Grandt is sued in her personal capacity for alleged crimes, torts, and constitutional violations.

8    Id., p. 41. She is also sued for her role in Office of General Counsel. Ibid. Grandt allegedly receives

9    payment from racketeering proceeds. Ibid. Grandt's racketeering activity allegedly shows a threat of

10   continuing (open-ended). Id, ¶ 57. Grandt is associated with Kenneth Joseph Catanzarite enterprise.

11   Supplement, p. 72-4. Grandt is associated with, perpetrator for, and victim of The State Bar of California

12   enterprise. Id., p. 74-7. Grandt is associated with Mobile Farming Systems, Inc. enterprise. Id., p. 78-

13   80. Grandt was promoted to Assistant General Counsel in July 2017 for her role in defrauding Federal

14   Judge William Alsup with Robert Retana. FAC, p. 40, ¶ 177-8. Grandt knows a parallel scheme of the

15   Kenneth Joseph Catanzarite enterprise starting with Richard Carlson defrauded innocent people and

16   Courts. Supplement, p. 24-30. Grandt worked with Andresen May 31, 2022, to defraud Plaintiff and

17   deny him due process. Id. p. 52-3. Grandt and Andresen propounded materially false statements of fact

18   and law to defraud Plaintiff and Judge Gastelum June 2, 2022. Id. p. 53. Grandt used the wire to defraud

19   Plaintiff and conceded to the scheme June 28, 2022. Id. p. 54. Duran, Grandt conceded July 20, 2022,

20   Plaintiff was retaliated against, was denied due process of law, and that Duran, State Bar, Morgenstern,

21   Cardona, were helping Catanzarite *because* Plaintiff sued State Bar. Id. p. 56. FAC, p. 33, ¶ 122. Grandt

22   used the wire August 18, 2022, to defraud Plaintiff and Judge Gastelum on knowingly false pretenses

23   of fact and law. Id. p. 57-8. Grandt used the wire again August 22, 2022, with Duran and Andresen to

24   defraud Plaintiff and Gastelum, who relied upon the false representation of blanket immunity, and that

25   State Bar did not coordinate decisions internally which she knew was false. Id. p. 58-9. Despite being

26   served, Grandt refused to appear in 30-2020-01145998 and denied Plaintiff discovery again. Id., p. 62-

27   3. Grandt disclosed collusion within State Bar among Duran, Cardona, Andresen, Wilson, then tried to

28   cover it up and intimidate Plaintiff. FAC, p. 35, ¶ 130. Davtyan then doubled-down days later. Id. ¶ 131.

4. <u>Active Market Participant Attorney Eli David Morgenstern</u>

Morgenstern is sued in his personal capacity for alleged crimes, torts, and constitutional violations. Id., ¶ 43. He is also sued for his role as Senior Trial Counsel. Ibid. Morgenstern allegedly receives payment from racketeering proceeds. Ibid. Morgenstern's racketeering activity allegedly shows a threat of continuing (open-ended). Id, ¶ 57. Morgenstern is associated with Kenneth Joseph Catanzarite enterprise. Supplement, p. 72-4. Morgenstern delivered mail to Plaintiff April 3, 2020, intending to defraud him. FAC, p. 31, ¶ 117. Supplement, pp. 45-6. Morgenstern conspired with Office of General Counsel and Kenneth Joseph Catanzarite to defraud Plaintiff April 3, 2020, through August 10-12, 2020. FAC, p. 32, ¶¶ 118-9. Morgenstern is associated with, an alleged perpetrator for, and victim of The State Bar of California enterprise. Supplement., p. 74-7. Morgenstern is associated with Mobile Farming Systems, Inc. enterprise. Id., p. 78-80. Through Grandt, Morgenstern propounded materially false statements of fact and law to defraud Plaintiff and Judge Gastelum June 2, 2022. Id. p. 53. Through Grandt, Morgenstern used the wire August 18, 2022, to defraud Plaintiff and Judge Gastelum on knowingly false pretenses of fact and law. Id. p. 57-8. Through Grandt, Morgenstern used the wire again August 22, 2022, with Duran and Andresen to defraud Plaintiff and Gastelum, who relied upon the false representation of blanket immunity, and that State Bar did not coordinate decisions internally which he knew was false. Id. p. 58-9. Despite being served, Morgenstern refused to appear in 30-2020-01145998 and denied Plaintiff discovery again. Id., p. 62-3. Beck Decl, Ex. 11, Ex. 4, pp. 4-5.

**IV.   ARGUMENT**

**A. Motion to Dismiss Violates F.R.Civ.P 11(b)(1) as Being Presented for Improper Purposes to Harass Plaintiff, Unnecessarily Delay this Proceeding, Avoid Answering the Specific Allegations, and Obstruct Justice**

F.R.Civ.P.11(b)(1) serves to punish the Motion to Dismiss for being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

1. <u>State Bar defendants and Office of General Counsel are Harassing Plaintiff</u>

Motion to Dismiss harasses Plaintiff and violates his constitutional rights. With knowledge that Plaintiff is victim of a fraudulent scheme and not a "business dispute," State Bar defendants and Office of General Counsel seek to cast Plaintiff as vexatious. Motion to Dismiss, p. 2. Supplement, p. 30-48.

9

3:23-CV-0164-BAS-DDL

2. <u>Relief Sought by Motion to Dismiss Violates Plaintiff's Due Process Rights</u>

Individual, non-sovereign State Bar defendants frivolously assert Plaintiff cannot state a claim against each, and that such claims should be dismissed with prejudice. Motion to Dismiss, p. 2. They further assert the judicial fraud, non-judicial fraud and racketeering allegations are somehow about Plaintiff's "dissatisfaction" with State Bar defendants, which is frivolous. Ibid. State Bar is not a sovereign actor according to United States Supreme Court, but State Bar defendants cast their *operational* acts and alleged crimes as being *legislative* acts of Supreme Court, which is also frivolous. RJN, Ex. 1, p. 4. Motion to Dismiss acknowledges Plaintiff's right to amend the FAC for any defects as with 3:22-CV-01616-BAS-DDL, before asserting that all claims should be dismissed with prejudice. Motion to Dismiss, p. 1. Office of General Counsel is performing as alleged. Supplement, pp. 10-1.

Plaintiff has a right to be free of State Bar defendants' and Catanzarite's attorney schemes to defraud him, but State Bar defendants continue them anyway. Cal. Bus. & Prof. Cod. § 6068(g). Plaintiff has a right to be free of oppression by State Bar defendants. Cal. Bus. & Prof. Cod. § 6068(h). State Bar defendants are prohibited by express mandatory law and legislative intent from promoting the interests of each other and Catanzarite after January 1, 2019, according to State law AB 3249, and according to Federal antitrust laws. RJN, Ex. 1, p. 4. Cal. Bus. & Prof. Cod. § 6001.1. Finally, State Bar defendants have a duty to support the Constitution and laws of the United States and of this state, but they endeavor to obstruct this proceeding and defraud this Court by denying Plaintiff due process. Cal. Bus. & Prof. Cod. § 6068(a). Fourteenth Amendment, U.S., Due Process Clause. Fifth Amendment, U.S., as it relates to Plaintiff's rights if State Bar defendants' conduct is ratified by this Court as requested.

3. <u>Motion to Dismiss Ignores RICO Case Statement, Seeks Unnecessary Delay</u>

Respectfully, it is not Plaintiff's fault there exist so many overt acts of racketeering (including convictions) associated with State Bar enterprise. FAC, pp. 1-60. Supplement, pp. 1-100. State Bar defendants choose not to address the specificity of his allegations – convictions for racketeering relate to the investment of proceeds by State Bar defendants and the pattern of racketeering activity to which Plaintiff is subject amidst three distinct and related enterprises (Kenneth Joseph Catanzarite enterprise, The State Bar of California enterprise, and the Mobile Farming Systems, Inc. enterprise). FAC, pp. 12-36. Plaintiff details the operations of each in the RICO Case Statement. Supplement, pp. 1-100.

3:23-CV-0164-BAS-DDL

4. <u>Office of General Counsel Endeavors to Obstruct Justice Further and Oppress Plaintiff</u>

Motion to Dismiss serves improper purpose of obstructing fair administration of justice. Plaintiff prays the Court will finally catch up to it. Where Plaintiff is informing U.S. Department of Justice Public Integrity Section and filing a petition to United States Congress on behalf of himself and those who can't help themselves (Beck Decl., ¶¶ 32-3), 18 U.S.C. § 1503(a) holds:

> "Whoever corruptly...endeavors to influence...officer in or of any court of the United States...in the discharge of [her] duty...or corruptly...influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). **(b)** The punishment for an offense under this section is—**(3)**...imprisonment for not more than 10 years, a fine under this title, or both."

Despite AB 3249 expressly forbidding it after January 1, 2019, Duran, Grandt, Morgenstern, Davtyan, Retana, and Tsai corruptly continue to protect and participate with Kenneth Joseph Catanzarite after four disqualification orders, several parallel schemes, and Plaintiff's likelihood of prevailing on three counts of malicious prosecution. FAC, p. 2, ¶ 1-9. (This is not only illegal, it is malicious.) Duran, Grandt, Morgenstern, Davtyan, Retana, and Tsai further "endeavor to influence" "officer" Honorable Cynthia A. Bashant "of [United States Southern District of California] "in the discharge of [her] duty" to Plaintiff and the United States because each are allegedly involved in the criminal conduct *concurrently acting as defense counsel.* 18 U.S.C. § 1503(a). (This is absurd). Each "corruptly...influences...obstructs...or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice" for Plaintiff, the United States, and others harmed by this conduct. Ibid.

**B. Motion to Dismiss Violates F.R.Civ.P. 11(b)(2) as it Contains Defenses and Legal Contentions that Are Not Warranted by Existing Law or Nonfrivolous Argument for Extending, Modifying, Reversing Existing Law or Establishing New Law**

F.R.Civ.P.11(b)(2) serves to punish the Motion to Dismiss because the claims, defenses, and other legal contentions are not warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

1. <u>Frivolous to Assert State Bar Defendant Immunity from Federal Antitrust Laws</u>

It is objectively frivolous for State Bar defendants to assert **legislative** immunity of *Parker v. Brown*, 317 U.S. 341 (1943) for operational acts, let alone ignore daily implications of *N.C. State Bd. Of Dental Exam'rs. V. FTC*, 574 U.S. (2015). The face of Administrative Order 2017-09-20 upon which

3:23-CV-0164-BAS-DDL

State Bar defendants rely in their blanket legal conclusion clearly states: "Actions of the State Bar that have the effect of advancing the interests of attorneys without a clear benefit to the public must be scrutinized closely for potential antitrust violations." Motion to Dismiss RJN, Ex. 1, p. 4. "If an action of a regulatory agency such as the State Bar has a potential anticompetitive effect, and is not an action of the Supreme Court or the Legislature acting as sovereign, closer analysis will be required. Under these circumstances antitrust immunity is available only if the regulatory entity's action is subject to active state supervision and is undertaken pursuant to a clearly articulated policy." Id., p. 5.

There exists no clearly articulated state policy for State Bar defendants to conduct racketeering in favor of attorneys, to the detriment of Plaintiff. Plaintiff alleges "[t]he majority of State Bar, BOT, OGC, and OCTC's daily activities constitute mail fraud and wire fraud [in that they are] misrepresented to help the public, but in reality, each overt act delays, estops, restricts, reduces, eliminates, harms, slanders, or destroys the rights, equity, money, property, and good will of the public that the State Bar is bound by law to protect above all else, overtly." FAC, p. 12, ¶ 56. The conduct of which Plaintiff alleges generally has nothing to do with policy or legislative decisions of Supreme Court, and everything to do with alleged crimes, fraud, and protectionist behavior of non-sovereign actors in regulation. FAC, p. 1-60. Supplement, pp. 1-100. Once more, underlying every single claim and every count in this case and the related case, State Bar is not the sovereign actor. All Motion to Dismiss arguments fail at threshold, where State Bar defendants lack sovereignty and are not subject of the 11th Amendment.

2. <u>Duran, Morgenstern, Grandt Are Not Immune as Individuals in Any Instance, Either</u>

If Plaintiff were suing California Supreme Court for legislative decisions, Duran, Morgenstern, and Grandt are subject to Plaintiff's intentional tort, antitrust, and constitutional claims as individuals. State Bar is not "the sovereign actor": active market participant defendants Duran, Morgenstern, nor Grandt are, either. "In the 9th Circuit, "[it] is well settled that a "person" subject to liability can be an individual sued in an individual capacity (see *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc) or in an official capacity (see *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013). A "person" subject to liability can also be a local governing body (see *Waggy v. Spokane County*, 594 F.3d 707, 713 (9th Cir. 2010). Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights. 42

12

3:23-CV-0164-BAS-DDL

1  U.S.C. § 1983. Qualified immunity, however, shields § 1983 defendants "[f]rom liability for civil
2  damages insofar as their conduct does not violate clearly established statutory or constitutional rights of
3  which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct.
4  2727, 73 L.Ed.2d 396 (1 9 8)." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001)

5          3. Every § 1983 Case Cited Pre-Dates January 1, 2019, or was Filed by Attorneys

6          Every § 1983 case cited by State Bar defendants in the Motion to Dismiss involves attorneys
7  (who consented to jurisdiction of State Bar Court, apparently) suing State Bar or its actors before January
8  1, 2019, or the President of the United States. None of these cases are on-point, because State Bar
9  defendants are bound by mandatory law and the express intent of Legislature to protect him, and further
10 prohibited by California and Federal law from advancing interests of each other or Catanzarite over the
11 interests of Plaintiff as of January 1, 2019. AB 3249, Chapter 659. RJN, Ex. 1, p. 4. (Plaintiff will answer
12 these cases with more specificity in opposition to the Motion to Dismiss.)

13         It is frivolous to assert State Bar defendants are immune from liability under the circumstances—
14 indeed—they've shown a Supreme Court Justice and President of the United States would not be
15 immune at this stage of proceedings even if their cases were on-point. Motion to Dismiss, Table of
16 Authorities. Grandt and Duran asserted in Superior Court they were not prosecutors, and now assert they
17 have prosecutorial immunity in Federal Court. Motion to Dismiss, pp. 11-13. Beck Decl, ¶ 34.

18         4. In Violating Antitrust Laws, State Bar Not State Agency for Purposes of RICO

19         State Bar is "not the sovereign" according to United States Supreme Court. RJN, Ex. 1, p. 4.
20 Conduct of which Plaintiff complains involves operational acts constituting alleged crimes violative of
21 18 U.S.C. § 1962(a)-(c) and 15 U.S.C. § 1 in restraint of $3.63 trillion in interstate commerce by active
22 market participants. FAC, pp. 1-60. Supplement, pp. 1-100. The State Bar of California does not benefit
23 from 11th Amendment immunity because it is a regulator of its own market controlled by an active
24 market participant Board of Trustees. FAC, p. 3, ¶ 11-2, p. 50, ¶ 253. Beck Decl, Ex. 7.

25         5. Duran, Morgenstern, Grandt Are Not Individually Above the Law to Violate RICO

26         Duran, Morgenstern, and Grandt are alleged to be associated with The State Bar of California
27 enterprise, Kenneth Joseph Catanzarite Enterprise, and Mobile Farming Systems, Inc. enterprise in fact.
28 Supplement, pp. 71-92 for descriptions of enterprise affairs, and their relation to each other. As one

former employee allegedly stated, "I was an investigator in the OCTC. The idea is NOT to investigate attorney misconduct but to draft memo after memo in an effort to make it look as if there had actually been an investigation. Nor is it designed to discipline attorneys. Last year, out of 15,000 complaints made to the State Bar, only 25 got an actual hearing." (This is fraud by mail, wire). Supplement, p. 15.

**Common Plan #1.** "For the Kenneth Joseph Catanzarite enterprise, it is alleged the plan consists of filing fraudulent cases that lack standing or probable cause predicated upon the ongoing protection of The State Bar of California enterprise...This plan is supported by deliberate indifference, actual concealment, or bribery by or of Office of Chief Trial Counsel, Office of General Counsel, and Board of Trustees for The State Bar of California enterprise. It is alleged this plan is consistent with that of the Girardi-Keese law firm...It is alleged this plan is evidenced by public records requests reflecting actual knowledge of The State Bar of California enterprise, and its refusal to mitigate public harm, and the impunity with which Kenneth Joseph Catanzarite enterprise conducts itself against innocent members of the public." (Prior, ongoing, parallel schemes to defraud involving this enterprise exist).

**Common Plan #2.** "For the Kenneth Joseph Catanzarite enterprise, it is alleged the plan consists of taking money and property from the Plaintiff commencing September 14, 2018 by any means through ongoing protection of and collusion with The State Bar of California enterprise. Not less than six cases were filed on behalf of directly adverse parties for this plan." (State Bar calls this a "business dispute.")

**Common Plan #3.** "For The State Bar of California enterprise and State of California, it is alleged the common plan is to prevent Plaintiff from fair and neutral forums to conceal the facts and evidence in his possession. Where the Plaintiff is alleged to be the first to file Government Claims Act litigation against The State Bar of California and has already shown a series of Court of Appeal decisions supporting allegations of at least three counts of malicious prosecution and not less than four mandatory disqualifications affecting Kenneth Joseph Catanzarite enterprise, it is alleged that Plaintiff constitutes a direct and ongoing threat to the interests of the criminal conduct of Office of General Counsel, Office of Chief Trial Counsel, Board of Trustees, and the Kenneth Joseph Catanzarite enterprise—as well as the links to each of these and the 700+ Club. To evidence this common plan, it is alleged that the efforts to stop Plaintiff from obtaining judgments to which he is allegedly entitled are greater than the efforts for the State of California and The State Bar of California to resolve them amicably on their merits as is

3:23-CV-0164-BAS-DDL

the duty of the government (the government is not an ordinary party)." (If The State Bar of California enterprise constituents Duran, Morgenstern, and Grandt are not engaged in criminal conduct, why do they try so earnestly to cover up Kenneth Joseph Catanzarite's, or their own, or enlist others to do so?)

**Common Plan #4.** "It is alleged The State Bar of California is not a sovereign entity protected by the 11th Amendment, and that it uses this guise to mislead Courts and to conduct racketeering with commingled operations among allegedly corrupt lawyers and law firms, as well as the IOLTA and client trusts through which they are alleged to launder money. It is alleged this money laundering affects Medicate and Medicaid, and involved pandemic funds [from the U.S.], as well as Chinese banks listed herein. Because The State Bar of California enterprise is responsible for monitoring the conduct of itself including its own alleged money laundering, it is alleged no lawyer can reasonably stop it, which is why the Courts have never seen a case such as this. It is alleged that The State Bar of California purports to operate as being under the sovereign authority of State of California, however, such conduct would need to be undertaken as if it were that of the State of California itself. If that were the case, State of California is a direct and proximate threat to the United States as it is abusing its sovereignty for unlawful taking from the public, which is unconscionable. It is alleged this plan is continued through deliberate obstruction of justice to prevent Federal Courts of competent jurisdiction from making decisional law that will stop The State Bar of California enterprise from these practices. Conduct of Mr. Tsai is evidence." (Mr. Tsai transitioned from Deputy Attorney General of California from the Executive Branch in December 2022 to Office of General Counsel of the non-sovereign regulator State Bar just to defend Plaintiff's cases – which seems to suggest strongly something is amiss when viewed with the cumulative allegations and record of evidence filed by Plaintiff already in 3:22-CV-01616-BAS-DDL). Supplement, p. 11. Beck Decl., Ex. 22, 24. (Tsai appears to serve some special purpose in this Court.)

**C. Motion to Dismiss Violates F.R.Civ.P. 11(b)(3) as it Contains Misleading Factual Contentions Designed to Obstruct Justice, Deny Plaintiff Due Process Rights, Defraud U.S. Court**

F.R.Civ.P.11(b)(3) serves to punish the Motion to Dismiss because the factual contentions do not evidentiary support or, if specifically so identified, are unlikely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

1. "Business Dispute" Involves Six Competing, Fraudulent Cases Targeting Plaintiff

3:23-CV-0164-BAS-DDL

Duran, Grandt, Morgenstern, Davtyan, Retana, and Tsai know the fraudulent scheme targeting Plaintiff is not a "business dispute." Motion to Dismiss, p. 2. Each know of the related pattern of racketeering activity outlined within Plaintiff's RICO Case Statement. Supplement, pp. 1-100. Each know the fraudulent scheme targeting Plaintiff relies on perjury, wire fraud, mail fraud, bank fraud, and insurance fraud but each chooses to enable it while concealing their knowledge from this Court for corrupt motives of passion or interest. Supplement, p. 30-48. Cal. Bus. & Prof. Cod. § 6068(g).

2. <u>Removal of State Actions Remanded for Removal Jurisdiction – Not Subject Matter</u>

State Bar defendants and co-defendants in 3:22-CV-01616-BAS-DDL Retana and Davtyan, with Deputy Attorney General-turned-State Bar general counsel Tsai, endeavor to defraud this Court by making Plaintiff appear vexatious concerning 30-2020-01145998 and 30-2021-01237499. Motion to Dismiss, p. 3, fn. 1. State Bar defendants refused to appear in the first despite service eight times, and corruptly influenced the second by any standard. Supplement, pp. 1-100 (Neither remanded for *subject matter* jurisdiction, rather, *removal* jurisdiction. See service of State cases, Beck Decl., Ex. 4, 5.) Allegedly involved in criminal conduct, each want the cases in State Court, which they are alleged to control. (If they did not endeavor to stop the fair administration of justice, they would answer the FAC and RICO Case Statement and stop making false assertions of fact and law in this Court with malice).

3. <u>Duran's Firm, BB&K, Representing Duran's Alleged Conspirators, RICO Violators</u>

Plaintiff's related case 3:22-CV-01616-BAS-DDL, which contains no allegation of facts that differs rather contains different legal theories which are sound, alleges Ruben Duran to control the California judicial system through State Bar. Supplement, pp. 1-100. Duran is not done furnishing evidence of this, where Duran's firm Best Best & Krieger was just retained to represent Judge John C. Gastelum, Orange County Superior Court, and Jorge E. Navarette in 3:22-CV-01616-BAS-DDL. Beck Decl. Ex. 27. The mere appearance of impropriety would cause Office of General Counsel and Best Best & Krieger's disqualification under any objective lens under California Rules of Professional Conduct 1.7(d)(3). Here, it involves Plaintiff's allegations that Duran directed each or conspired with each to defraud Plaintiff: this conduct is frivolous and is allegedly intended to defraud this Court further, and prevent the United States from evidence of Plaintiff's allegations. Beck Decl. Ex. 27. Similarly, Catanzarite was already disqualified four times in schemes targeting Plaintiff. Beck Decl. ¶ 35.

3:23-CV-0164-BAS-DDL

**D. Motion to Dismiss Violates F.R.Civ.P. 11(b)(4) as the Denials or Ignorance of Factual Contentions Are Not Warranted on Evidence Filed in Related Case or RICO Case Statement**

F.R.Civ.P.11(b)(4) serves to punish the Motion to Dismiss because the denials of factual contentions are not warranted on the evidence or, if specifically so identified, are not reasonably based on belief or a lack of information.

1. <u>Misrepresentations of Law by Duran, Morgenstern, Grandt to O.C. Superior Court</u>

Duran, Morgenstern, and Grandt represented materially false statements of law to Judge John C. Gastelum that each were immune from any and all claims in tort for any reason but knew each were subject to Government Claims Act after January 1, 2019. Beck Decl., ¶ 34.. If these statements or law were true, Orange County Superior Court would not have rejected July 2022 filings from Plaintiff's record on February 15, 2023 at 11:11 AM, after misleading this Court. Id. Ex. 29.

2. <u>Fraudulent Statements of Fact by Duran, Morgenstern, Grandt to O.C. Superior Court</u>

Duran, Morgenstern, and Grandt represented materially false statements of fact to Judge John C. Gastelum that each they did not coordinate decisions weighing public harm and attorney benefit, which they knew to be false, and where Gastelum relied upon them. Beck Decl. ¶ 34. If these statements of law were true, Grandt and Davtyan would not have threatened Plaintiff to destroy the evidence and would not have demanded a list of all persons to whom Plaintiff had sent the evidence on December 12, 2022, and December 15, 2022, respectively. Beck Decl. Ex. 6.

3. <u>State Bar's Overt Nomination of Associate Justices to Obstruct Plaintiff's State Cases</u>

Where the Motion to Dismiss mocks Plaintiff's allegation of control over the entire California judicial system to defraud the public and suit any given State Bar enterprise scheme, Plaintiff will seek expert testimony concerning the mathematical likelihood that Associate Justice Maurice Sanchez, Joanne Motoike, and Thomas Delaney would be either nominated or appointed to Fourth District, Division Three on: November 10, 2021, May 2, 2022, August 8, 2022, and October 11, 2022 respectively—which dates align with exact events in Plaintiff's State proceedings. Beck Decl., Ex. 25.

4. <u>Grandt, Davtyan Sought to Intimidate Plaintiff to Conceal Criminal Conduct</u>

Emails and letters to Plaintiff from Grandt and Davtyan threatening him in December 2022 after Grandt accidentally revealed her fraud in Orange County Superior Court show that Plaintiff is not

3:23-CV-0164-BAS-DDL

1    making baseless allegations. Beck Decl. ¶ 34, Ex. 6. (To any reasonable mind, one does not intimidate

2    a member of the public within your sphere of protection unless one has something *serious* to hide.)

3        5. Charles Tsai Transitioned from California DOJ to State Bar to Appear in this Court

4        For all the ongoing jabs at Plaintiff for being "pro se" or "in pro per" and notwithstanding the

5    material misrepresentations of law by the same persons to State or Federal Court, Charles Tsai

6    transitioned from Office of Attorney General for State of California to Office of General Counsel for

7    The State Bar of California between December 2022 and January 2023. Beck Decl. Ex. 22, 24. California

8    DOJ refused to produce public records underlying disclosures of State liability and State of California's

9    ongoing refusal to appear in Orange County Superior Court. Id. Ex. 4, 5, 21. (Whatever Plaintiff has

10   uncovered was apparently important enough for this concealment and Mr. Tsai's special role, here.)

11       6. Fraudulent Antitrust Petition Filed for Plaintiff without Authority in Cal. Supreme Ct.

12       Motion to Dismiss intentionally defrauds this Court concerning an antitrust petition filed by

13   Plaintiff in September 2022 that was stricken as "premature" on September 27, 2022. Beck Decl., Ex.

14   13. Plaintiff's petition and four volumes of exhibits were served on the United States Department of

15   Justice and Federal Trade Commission. Beck Decl. ¶ 35. Retana deliberately ignored four volumes of

16   exhibits and the underlying State case conduct 30-2021-01237499 as if that were reasonable. Id. Ex. 14.

17   Retana sent "Antitrust Determination 2022-0001" in violation of his duty at law according to the

18   California Supreme Court Administrative Order 2017-09-20 (it is not Plaintiff's job to stop State Bar's

19   antitrust violations—it is purportedly Office of General Counsel's; Motion to Dismiss RJN, Ex. 1).

20       Where this Court was misled to believe Mr. Navarrete's conduct was that of a California

21   Supreme Court clerk on a writ of certiorari, Plaintiff's "antitrust petition to exhaust state remedies"

22   (S276517) against Ruben Duran was obstructed, and then Navarette filed a petition on Plaintiff's behalf

23   on October 18, 2022, one day after receiving Retana's frivolous, obstructed filing October 17, 2022.

24   Beck Decl. ¶ 35. Plaintiff did not authorize Navarette to file an antitrust petition on his behalf (S276939),

25   much less authorize Retana to make an antitrust determination after removing or ignoring all probative

26   evidence of antitrust violations upon which the actual petition relied. Beck Decl., Ex. 13, 14, 15, 16.

27       7. Fraudulent "En Banc" Decision with Knowledge of this Case, Petition to Congress

28

                                    18                        3:23-CV-0164-BAS-DDL

State Bar defendants seek to defraud this Court by asserting Plaintiff's petition to California Supreme Court was "run of the mill." Plaintiff served the United States, which is something the Court and parties can re-visit after State Bar defendants answer the FAC, Supplement, or an amended pleading. Plaintiff did not file California Supreme Court Case No. S276939. Beck Decl. ¶ 35. It was filed one day after Plaintiff was purportedly given 60-days to seek cessation of the alleged antitrust violations to which he has been subject, and the United States is alleged to be subject. Beck Decl. Ex. 17, 18. (It led to a fraudulent "En Banc" decision on a case that should not exist. If this is not sufficient evidence that Plaintiff has uncovered criminal conduct, it is difficult to ascertain what might meet such threshold.)

### 8. State Bar Defendants Do Not Deny Catanzarite's Fraudulent Schemes 2007-Present

It is not Plaintiff's fault there exist so many predicate acts, where a pattern only requires two under 18 U.S.C. § 1961(5). Here, Plaintiff is unreasonably denied due process where State Bar defendants assert they can't be held liable for any reason, even if they committed crimes that caused damage to Plaintiff's business and property (or harmed the U.S.). This is simply not the case or the law, where each are "not the sovereign actor" as regulators according to United States Supreme Court. Plaintiff alleges serial fraud, and that State Bar defendants have willfully carried it out. They don't deny it, instead seeking to call Plaintiff somehow vexatious. FAC, pp. 1-60. Supplement, pp. 1-100.

### 9. State Bar Defendants May Be Held Liable for Conducting Affairs of KJC Enterprise

State Bar defendants appear to conflate the elements of 18 U.S.C. § 1962(c) in the Motion to Dismiss. To recover under 18 U.S.C. § 1962(c), Plaintiff must prove by a preponderance (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the Plaintiff's business or property. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). "An enterprise includes any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "definition is not very demanding." *Odom v. Microsoft*, 486 F.3d at 548. For purposes of 18 U.S.C. § 1962(c), a single individual or entity cannot be both the RICO enterprise and an individual defendant. *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (holding that plaintiff could not assert RICO claim against defendant bank because bank was also alleged to be RICO enterprise.) So Duran, Morgenstern, and Grandt are alleged to have conducted in the affairs of

19                                              3:23-CV-0164-BAS-DDL

1    the Kenneth Joseph Catanzarite enterprise through a pattern of racketeering activity. FAC, pp. 38-41.

2    Plaintiff alleges the liability for these acts to cause liability to The State Bar of California under Cal.

3    Gov. Cod. § 815.2. Id, p. 41. Regardless, Duran, Morgenstern, and Grandt can be liable individually if

4    they are proven by a preponderance to have conducted in the affairs of the Kenneth Joseph Catanzarite

5    enterprise through a pattern of racketeering activity. Supplement, pp. 71-4.

6              10. <u>State Bar Defendants Silent on Individual Claims, Yet Seek Wholesale Dismissal</u>

7         The Motion to Dismiss completely avoids individual allegations, or that Plaintiff alleges private

8    participation in conduct using The State Bar of California as a front for criminal conduct. Id., 70, 74-8.

9    Plaintiff shows The State Bar of California knew about Thomas V. Girardi undue influence on The State

10   Bar of California since 2014. Beck Decl., Ex. 1. State Bar's Duran confessed to enabling Girardi, where

11   he and others similarly situated did so for forty years. State Bar delivered public records to Plaintiff that

12   Mr. Catanzarite "does not care about the truth in making statements to the Court" and has allegedly

13   engaged in serial fraud. FAC, p. 34, ¶ 134. State Bar defendants admitted they chose not to help the

14   public because Plaintiff sued State Bar defendants. Supplement, p. 56. (This is malice and has no place

15   within a government protection agency—and it is illegal under State and Federal law).

16   **V.    CONCLUSION & REQUEST FOR CROSS MOTION RELIEF**

17        State Bar defendants had 21-days to remedy. Each are lying to this Court while painting

18   Plaintiff—a factual victim of serial fraud, malicious prosecution, and anticompetitive conduct in

19   regulation—as vexatious. Plaintiff requests the Court strike the Motion to Dismiss, disqualify Office of

20   General Counsel and Best Best & Krieger from this case and related case where California Rules of

21   Professional Conduct 1.7(d)(3) mandates it anyway, and that State Bar defendants, Charles Tsai, Robert

22   Retana, and Ellin Davtyan pay a fine to the Court, or the Court hold each in contempt. Plaintiff requests

23   the Court take time to review Plaintiff's allegations or direct their clarification. At minimum, individual

24   State Bar defendants can be held liable, but they are telling the Court they are somehow allowed to

25   engage in felonies because of sovereignty derived from the United States. This is simply not so.

26

27   Respectfully Prepared for Submission,

28   March 6, 2023                                               Justin S. Beck

**PROOF OF SERVICE**

1

2          I, Justin S. Beck, hereby declare: that I am over 18 years of age and am a party to this action

3    acting In Propria Persona, and that my address is 3501 Roselle St., Oceanside, CA 92056.

4          On March 6, 2023, I served one copy of the following documents:

5

6    **PLAINTIFF JUSTIN S. BECK'S NOTICE OF CROSS-MOTION AND CROSS-**
     **MOTION FOR SANCTIONS UNDER F.R. CIV. P. 11(c)(2); MEMORANDUM OF POINTS**
     **AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF JUSTIN S. BECK IN**
7    **SUPPORT OF PLAINTIFF JUSTIN S. BECK'S NOTICE OF CROSS-MOTION AND CROSS-**
     **MOTION FOR SANCTIONS UNDER F.R.CIV.P. 11(c)(2); REQUEST FOR JUDICIAL**
8    **NOTICE IN SUPPORT OF PLAINTIFF JUSTIN S. BECK'S NOTICE OF CROSS-MOTION**
     **AND CROSS-MOTION FOR SANCTIONS UNDER F.R. CIV.P. 11(c)(2)**
9

10         Participants in the case who are registered CM/ECF users will be served when these papers are

11   filed with the Court.

12         *See the CM/ECF service list.*

13         Parties in the case are being served electronically to satisfy safe harbor requirements of Rule 11,

14   and in support of public corruption allegations submitted United States Department of Justice PIN Unit.

15         State of California                      AGElectronicService@doj.ca.gov

16         Rob Bonta                                rob.bonta@doj.ca.gov

17         Governor of California                   govlegalunit@gov.ca.gov

18         The State Bar of California              serviceofprocess@calbar.ca.gov

19         Charles Tsai                             charles.tsai@calbar.ca.gov

20         Suzanne Grandt                           suzanne.grandt@calbar.ca.gov

21         Ruben Duran (Public)                     ruben.duran@calbar.ca.gov

22         Ruben Duran (Private)                    ruben.duran@bbklaw.com

23         Eli David Morgenstern                    eli.morgenstern@calbar.ca.gov

24         Corey Amundson                           corey.amundson@usdoj.gov

25         Todd Gee                                 todd.gee@usdoj.gov

26         Robert Heberle                           Robert.heberle@usdoj.gov

27         Sean Mulryne                             sean.mulryne@usdoj.gov

28         U.S. Attorney's Office                   efile.dkt.civ@usdoj.gov

                                                1                          3:22-CV-01616-BAS-DDL

1         By electronic mail by personally transmitting a true copy thereof via an electronic email service

2   connected to the internet, addressed to the email address listed above [X].

3         I declare the foregoing to be true under penalty of perjury under the laws of the State of California

4   and United States. I am signing this from Oceanside, California on March 6, 2023.

5

6

7   _____

8   Justin S. Beck, Declarant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3:22-CV-01616-BAS-DDL

1  Justin S. Beck
2  3501 Roselle St.,
   Oceanside, CA 92056
3  760-449-2509
4  justintimesd@gmail.com
   *In Propria Persona*

FILED

MAR 27 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          GAV          DEPUTY

5

## IN THE UNITED STATES DISTRICT COURT
6
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

7

8  JUSTIN S. BECK,                         )    Case No.: 8:23-CV-0164-~~BAS~~-DDL
                                           )                          AGS
9            Plaintiff,                    )    Judge:    Hon. ~~Cynthia A. Bashant~~
                                           )              Andrew G Schopler
10   vs.                                   )    **DECLARATION OF JUSTIN S. BECK IN**
                                           )    **SUPPORT OF PLAINTIFF JUSTIN S.**
11   STATE OF CALIFORNIA; THE STATE BAR )      **BECK'S NOTICE OF CROSS-MOTION**
12   OF CALIFORNIA; SUZANNE GRANDT;        )    **AND CROSS-MOTION FOR SANCTIONS**
     RUBEN DURAN; ELI DAVID                )    **UNDER F.R.CIV.P.11(c)(2)**
13   MORGENSTERN; KENNETH                  )
     CATANZARITE,                          )
14                                         )
15           Defendants,                   )    Filed concurrently with:
                                           )
16                                         )        Notice of Cross-Motion
     UNITED STATES ATTORNEY GENERAL; )
17   UNITED STATES OF AMERICA              )        Cross-Motion
                                           )
18           Nominal Defendants            )        Memorandum of Points and Authorities
                                           )
19   _____       )        Request for Judicial Notice
                                           )
20

21

22

23

24

25

26

27

28

                                    1                    8:23-CV-0164-BAS-DDL

1
2
3

**DECLARATION OF JUSTIN S. BECK IN SUPPORT OF PLAINTIFF JUSTIN S. BECK'S**
**NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SANCTIONS UNDER**
**FEDERAL CIVIL RULES OF PROCEDURE 11.(c)(2)**

4      I, Justin S. Beck, declare as follows under penalty of perjury under the laws of the United States

5   and State of California. I am over the age of 18. I have personal knowledge, could, and would

6   competently testify as to the truth and authenticity of each statement to which I declare. I have personal

7   knowledge as to the authenticity of each exhibit filed with this declaration.

8      1. Attached as <u>Exhibit 1</u> is a true and correct copy of an investigative report by Munger Tolles &

9          Olsen from 2014 commenced after allegations that leadership at The State Bar of California

10         engaged in a "five-layer chess game." I found this report online, which mentions "Girardi" 18

11         times and cites the potential influence of private law firm Girardi-Keese on The State Bar of

12         California leadership and governance.

13     2. Attached as <u>Exhibit 2</u> is a true and correct copy of a press release by The State Bar of California

14         issued January 24, 2022, entitled "State Bar Announces Additional Investigation into Handling

15         of Past Complaints Against Thomas Girardi." I found this online at The State Bar of California's

16         website link:  https://www.calbar.ca.gov/About-Us/News/News-Releases/state-bar-announces-

17         additional-investigation-into-handling-of-past-complaints-against-thomas-girardi

18     3. Attached as <u>Exhibit 3</u> is a true and correct copy of "Open Letter Regarding the State Bar's

19         Thomas V. Girardi Disclosure" from Board of Trustees quoting Ruben Duran: "We can never

20         let something like this happen again." I found this online at The State Bar of California's website

21         link:   https://www.calbar.ca.gov/Portals/0/documents/Open-Letter-Girardi-Disclosure-11-03-

22         22.pdf

23     4. Attached as <u>Exhibit 4</u> is a true and correct copy of proof of service upon State of California in

24         Orange County Superior Court Case No. 30-2020-01145998. State of California refuses to

25         appear in Orange County Superior Court since August 8, 2022, in 30-2020-01145998.

26     5. Attached as <u>Exhibit 5</u> is a true and correct copy of proof of service upon State of California in

27         Orange County Superior Court Case No. 30-2021-01237499. State of California refuses to

28         appear in Orange County Superior Court since May 2, 2022, in 30-2021-01237499.

6. Attached as Exhibit 6 is a true and correct copy of email and postal mail communication that I received from Ellin Davtyan after Suzanne Grandt sent me an email disclosing coordination of decisions within The State Bar of California between Ruben Duran, Carissa Andresen, George Cardoña, Leah Wilson related to me and several parallel series of cases involving Catanzarite Law Corporation and The State Bar of California.

7. Attached as Exhibit 7 is a true and correct copy of a page on The State Bar of California's website showing majority control by active market participants of Board of Trustees for The State Bar of California. I created the PDF.

8. Attached as Exhibit 8 is a true and correct copy of a motion for summary judgment in Orange County Superior Court Case No. 30-2021-01237499. I prepared it and filed it July 18, 2022. It was rejected seven months later on February 15, 2023, after this Court was noticed of its existence in 3:22-CV-01616-BAS-DDL in my opposition to motion to dismiss.

9. Attached as Exhibit 9 is a true and correct copy of a deposition subpoena I sent The State Bar of California July 26, 2022, to appear at its own address on September 9, 2022. I prepared and filed it, then served it on The State Bar of California.

10. Attached as Exhibit 10 is a true and correct copy of the response I received to the deposition subpoena. When I received this, I had already shown a likelihood of prevailing on at least three counts of malicious prosecution and delivered that Court of Appeal ruling to Suzanne Grandt on July 13, 2022. She filed an Anti-SLAPP for The State Bar of California about 7-months into the proceedings and threatened to impose legal fees on me if I didn't dismiss my Government Claims Act case. This Anti-SLAPP was then used to move my motion for summary judgment hearing. The Anti-SLAPP filings contained no showing of protected activity despite my allegations of fraud and corruption in 30-2021-01237499, or my ongoing malicious prosecution.

11. Attached as Exhibit 11 is a true and correct copy of refusals to produce special interrogatories by Suzanne Grandt, Eli David Morgenstern, and Ruben Duran dated October 13, 2022. I prepared the special interrogatories. I served The State Bar of California, Suzanne Grandt, Eli David Morgenstern, and Ruben Duran in 30-2020-01145998 in accordance with its procedures electronically. Each refused to appear, and misrepresented that they were not served.

12. Attached as <u>Exhibit 12</u> is a true and correct copy of a reply filed by Suzanne Grandt and Office of General Counsel to my opposition to the demurrer of The State Bar of California in Orange County Superior Court Case No. 30-2021-01237499 (calling me vexatious and asserting that I could not state a claim against anyone associated with The State Bar of California in Government Claims Act litigation after January 1, 2019 – I alleged negligence, violation of mandatory duty, constitutional violations, intentional infliction of emotional distress, conversion, recklessness including fraud and corruption). When she wrote this, she knew I had already shown likelihood of prevailing on three counts of malicious prosecution against me under her watch.

13. Attached as <u>Exhibit 13</u> is a true and correct copy of an email communication with Ines Calanoc of California Supreme Court discussing my actual petition S276517 and the persons on whom it was served.

14. Attached as <u>Exhibit 14</u> is a true and correct, partial copy of the file "Antitrust Determination 2022-001" I received from The State Bar of California on October 17, 2022. This contains only the legal opinion I received in response of my antitrust petition which contained four volumes of exhibits and referenced conduct in Orange County Superior Court No. 30-2021-01237499.

15. Attached as <u>Exhibit 15</u> is a true and correct copy of a screenshot I took of the California Supreme Court Docket (Register of Actions) for S276517. It shows the authorized petition I filed and three volumes of exhibits were tampered with and removed from TrueFiling.

16. Attached as <u>Exhibit 16</u> is a true and correct copy of a letter sent by Robert George Retana of Office of General Counsel to Jorge E. Navarette of California Supreme Court dated October 17, 2022. I was provided this letter in response to public records requests upon The State Bar of California. I have not been provided with the petition that was filed on my behalf, without my authority, yet. I am waiting for California Supreme Court or Judicial Council to produce it.

17. Attached as <u>Exhibit 17</u> is a true and correct copy of a screenshot I took of the California Supreme Court Docket (Register of Actions) for S276939. I did not file, nor did I authorize, this petition. It was filed without my authority one day after I was purportedly given 60-days by Mr. Retana's letter to challenge alleged antitrust violations of The State Bar of California and Ruben Duran.

8:23-CV-0164-BAS-DDL

18. Attached as <u>Exhibit 18</u> is a true and correct copy of an order I received by postal mail from California Supreme Court containing an "En Banc" decision on an antitrust petition that I did not file nor did I authorize to be filed in S276939 dated November 30, 2022. I have never even seen the petition filed on my behalf leading to this decision.

19. Attached as <u>Exhibit 19</u> is a true and correct copy of portions of my first amended complaint in 3:22-CV-01616-BAS-DDL, amicus text about State Bar and Girardi alleged by Phil Kay.

20. Attached as <u>Exhibit 20</u> is a true and correct copy of the docket in 30-2021-01237499 when I tried to remove it to Federal Court because I allege control of C11 and Judge John C. Gastelum's Court by Ruben Duran, Office of General Counsel, and The State Bar of California. This docket reflects inaccurate information, somehow referencing 30-2020-01145998, which was not before this District Court Judge Fred W. Slaughter ever. I also tried to remove 30-2020-01145998 because State of California, The State Bar of California, Ruben Duran, Suzanne Grandt, and Eli David Morgenstern refuse to appear in CX105 before Judge Sherman despite repeated service. Both cases were remanded for removal jurisdiction, not subject matter jurisdiction.

21. Attached as <u>Exhibit 21</u> is a true and correct copy of a December 29, 2022 letter I received concerning a December 8, 2022 public records request (DOJ PRA 2022-02717) upon California Department of Justice related to disclosures of my claims act litigation. I was promised records on January 3, 2023, although no records were produced.

22. Attached as <u>Exhibit 22</u> is a true and correct copy of an email I received January 17, 2023 at 10:33 AM from Charles Tsai showing he transitioned from California Department of Justice to Office of General Counsel for The State Bar of California.

23. Attached as <u>Exhibit 23</u> is a true and correct copy of "Judicial Nominees Evaluation Roster" where "members of this commission are exclusively appointed by the State Bar Board of Trustees."

24. Attached as <u>Exhibit 24</u> is a true and correct copy of Charles Tsai's LinkedIn, which is a screenshot I took January 18, 2023, at 11:35AM PST. At that time, it still reflected Mr. Tsai's role as "Deputy Attorney General at California Department of Justice."

8:23-CV-0164-BAS-DDL

25. Attached as <u>Exhibit 25</u> are true and correct copies from Fourth District, Division Three's website of profiles for Associate Justices Maurice Sanchez, Joanne Motoike, and Thomas Delaney. They show Honorable Sanchez nomination November 10, 2021 by The State Bar of California, two days before my government claim was denied; Honorable Motoike nomination May 2, 2022 by The State Bar of California, the day I filed my first amended complaint in 30-2021-01237499 and named State of California a defendant; and Thomas A. Delaney nomination on August 8, 2022 August 8, 2022 which is the day I filed a motion for summary judgment in 30-2020-01145998 when I named State of California a defendant, and Thomas A. Delaney confirmed October 11, 2022 by "Commission on Judicial Appointments" which is the day Judge John C. Gastelum "sustained demurrer without leave to amend" my Government Claims Act case against The State Bar of California in Orange County Superior Court. As of October 11, 2022 for this decision, the Commission on Judicial Appointments consisted of Attorney General Rob Bonta, then-Chief Justice of California Supreme Court Tani G. Cantil-Sakauye, and Presiding Appellate Justice of Fourth District, Division Three, Kathleen O'Leary.

26. Attached as <u>Exhibit 26</u> is a true and correct copy of an email and letter I received from Office of the Governor for State of California dated January 9, 2023. I asked the Office of Governor for all records related to The State Bar of California or Office of Attorney General disclosing Orange County Superior Court Case No. 30-2020-01145998 or 30-2021-01237499 in which State of California was named, or 3:22-CV-01616-BAS-DDL. Office of the Governor said there are no records responsive to my request in the custody of the Governor's Office.

27. Attached as <u>Exhibit 27</u> is a true and correct copy of an email chain between me, Lisa Atwood, and Matthew Green of Best Best & Krieger between February 28, 2023, and March 1, 2023. Lisa Atwood used to work in Ruben Duran's Ontario location for Best Best & Krieger. In the related case 3:22-CV-01616-BAS-DDL, I allege Duran's control of Orange County Superior Court, Jorge E. Navarette, and Judge John C. Gastelum. Best Best & Krieger is now representing each.

28. Attached as <u>Exhibit 28</u> is a true and correct copy of a Memorandum Opinion and Order Document #1450 in United States District Court for the Northern District of Illinois Eastern Division No. 18 C 7686 Judge Thomas M. Durkin about Thomas Girardi, David Lira, and Keith

8:23-CV-0164-BAS-DDL

Griffin of Girardi-Keese. This order was filed November 2, 2022, approximately 8 years after Board of Trustees or others similarly situated at The State Bar of California had actual knowledge of Mr. Girardi's influence on The State Bar of California.

29. Attached as <u>Exhibit 29</u> is an email notification from Swift Attorney Service which shows my motion for summary judgment papers filed July 18, 2022, in Orange County Superior Court Case No. 30-2021-01237499 were suddenly rejected February 15, 2023. This case is before Judge John C. Gastelum.

30. I am not an attorney and I have never been admitted to any bar. I am a member of the public.

31. After filing the RICO Case Statement at Document #9-1 in this case, I called the clerk to confirm it was part of the record the same day. The clerk confirmed I did not need to re-file it as a supplement and that it was part of the record and case now. This happened before the Motion to Dismiss was filed.

32. I am informing the Public Integrity Section for the United States Department of Justice in Washington, D.C. of all conduct in this Court and all other research and evidence of which I am aware involving the alleged corruption of California's judicial system by The State Bar of California.

33. I am preparing and coordinating a petition to United States Congress through an assigned case worker in accordance with my rights as a United States citizen. I intend to coordinate this petition with other persons I know have been harmed by conduct of which I complain, including their United States representatives.

34. Grandt and Duran asserted in Orange County Superior Court proceedings that each were not prosecutors and that they did not share information with Office of Chief Trial Counsel. Grandt later disclosed to me accidentally that Duran, Cardona, Wilson, Andresen did coordinate decisions.

35. My authorized antitrust petition S276517 was served on Federal Trade Commission and United States Department of Justice. I have not been provided a copy of the fraudulent petition filed on my behalf in S276939 as of today. I did not authorize its filing.

1       I DECLARE THE FOREGOING TO BE TRUE UNDER PENALTY OF PERJURY, SIGNED

2   TODAY, MARCH 5, 2023, FROM OCEANSIDE CALIFORNIA.

3

4

5   _____

6   Justin S. Beck, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8:23-CV-0164-BAS-DDL

# EXHIBIT
# 1



PRIVILEGED AND CONFIDENTIAL

# Independent Investigation for the State Bar of California: Summary of Findings and Recommendations

Mark B. Helm
Bart H. Williams
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

This report summarizes the major findings and recommendations of an independent investigation that Munger, Tolles & Olson LLP conducted as outside counsel for the State Bar of California ("State Bar" or "Bar"). We will provide a fuller recitation of the results of the investigation to the Board of Trustees ("Board") at a closed session meeting scheduled for October 17, 2014.

## I.     BACKGROUND AND SCOPE OF INVESTIGATION

The investigation began on August 26, 2014, in response to a July 31, 2014 Report of Improper Activity from the Bar's Chief Trial Counsel, Jayne Kim. Attachment 1. Among other things, Kim reports "concerns related to certain actions by Executive Director Joseph Dunn (ED), Chief Financial Officer Peggy Van Horn (CFO) and General Counsel Thomas Miller (GC) that demonstrate a disturbing [] lack of transparency at the highest levels within the organization." She claims that "State Bar leadership is failing to adhere to basic principles of governance" and that a "'five layer chess game' with key stakeholders and other executives" has "systematically fostered a culture of intimidation and isolation within the organization and resulted in dishonest communications to the Board of Trustees." In the investigation's early stages, we also received a memorandum from Deputy Executive Director Robert Hawley raising some issues relating to Van Horn's handling of various finance matters, including her handling of certain expense reports for Dunn's travel. Attachment 2.

We conducted an initial investigation consisting of interviews of five designated witnesses and a preliminary review of documents. This culminated in an interim report to the Board at a closed session meeting held September 14, 2014. The Bar then engaged us to undertake a second phase of the investigation that has involved, among other things, interviews of nineteen additional witnesses, collection and review of additional documents, and further legal analysis.

Our investigation probed the issues raised in Kim and Hawley's memoranda with particular focus on the following issues:

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

1

PRIVILEGED AND CONFIDENTIAL

- Whether Joseph Dunn misled the Board or allowed the public to be misled about the use of Bar funds in connection with travel to Mongolia;

- Whether Dunn and Thomas Miller failed adequately to inform the Board about the California Supreme Court's reservations about pending legislation (A.B. 852) when the Board was voting to sponsor that bill;

- Whether Van Horn mishandled expense reports relating to Dunn's travel, and whether she knowingly concealed those reports from the Bar's auditors;

- Whether Dunn engaged in cronyism or violated Bar procedures in his hiring of certain Bar employees (including General Counsel Thomas Miller), his handling of certain contracts for the provision of services, and/or offers of assistance to Board members or others.

The third phase of the investigation involved the preparation of this report. We reach the following major conclusions and recommendations:

- Dunn failed on several occasions to satisfy his contractual and fiduciary duties to provide complete and accurate disclosures to the Board. In particular, he misled the Board or allowed the public to be misled about the use of Bar funds in connection with travel to Mongolia; failed to inform the Board of the Supreme Court's concerns regarding A.B. 852; and made misstatements to a Board committee regarding the Supreme Court's views on the Bar's possible move to Sacramento. These concerns are aggravated by Dunn's lack of candor on several issues during the investigation. This misconduct justifies termination of Dunn's at will employment, although the Board should consider various factors discussed below in deciding whether to take that action.

- The quality and effectiveness of Van Horn's work as the Bar's chief financial officer are subject to serious question. In particular, Van Horn failed to correct improper accounting for the Mongolia travel and did not properly handle expense

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

reports relating to Dunn's travel.  For these reasons, we recommend that Van Horn be reprimanded and that the Board take appropriate steps to bring about that result.

- If it decides not to terminate Dunn, the Board should consider taking steps to strengthen the General Counsel position as a possible independent check on the Executive Director.  First, it may want to consider replacing Miller, whose ability to serve as an independent counterweight is questionable in light of his performance at the Board meetings on A.B. 852.  Second, whoever continues in that role, the Board should reinvigorate the policy that the General Counsel reports directly to both the Board and the Executive Director.

## II.   MAJOR FINDINGS

### A.   Mongolia Travel

In January 2014, Dunn, Bar employee Thomas Layton, and former State Bar President Howard Miller of the Girardi Keese law firm traveled to Mongolia in response to a request from the Mongolian government for help in implementing a new regulatory system for lawyers.  In April 2014, Layton and Miller traveled to Mongolia a second time.  Our investigation has focused on whether false statements were made about the use of Bar funds for the trip and how the Bar accounted for expenses related to the trip.

#### 1.   Statements concerning the use of Bar funds for travel to Mongolia

There is substantial evidence that Dunn (i) misinformed the Board that Bar funds would not be used for the Mongolia trip, and (ii) failed to correct Howard Miller's public statement that Bar funds had not been used—or at least failed to bring the issue to the Board's attention for its consideration.

The evidence strongly suggests that Dunn told the Board no Bar funds would be used for travel to Mongolia.  Three trustees recall that, at a meeting in November 2013, Dunn told the Board that no Bar funds would be used because Mongolia would cover the expenses.  Another

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

3

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 1 p. 005

Exhibit #1: 005
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

trustee could not recall whether Dunn affirmatively denied whether Board funds would be used for that purpose. No interviewees recalled Dunn ever telling the Board that Bar funds would be spent on trips to Mongolia, either in November or later. And several persons interviewed believed that, if Dunn *had* disclosed that information, it would have prompted Board discussion.

Dunn's representation that no Bar funds would be used proved to be untrue. In connection with the January trip, the Bar paid $6,041.72 in mandatory Bar dues for Dunn and Layton's airfare and cell phone roaming charges.[1] In connection with the April trip, the Bar paid $1,046.72 in expenses from the Administration of Justice Fund to cover Layton's hotel, meals and taxis. *Id.* Indeed, Dunn and Past President Luis Rodriguez acknowledge that they decided from the outset to use Bar funds for at least some of the costs of the January trip to Mongolia.

The extent to which Bar funds were used for the trip is complicated somewhat by the deposit into a State Bar fund on April 3, 2014 of a $5,000 check from the Girardi Keese firm dated March 20, 2014. Howard Miller said that the check was intended to cover past and future expenses related to Mongolia, and Van Horn has said she plans at some point to account for that deposit as a credit against Mongolia expenses. For several reasons, however, this check does not significantly mitigate the inaccuracy of Dunn's statement to the Board.

First, as of the start of this investigation on August 27, 2014, more than seven months after the first trip to Mongolia, and nearly five months after the check was received by the Bar, no accounting entry has been made to credit the donation against the expenses.

Second, the intent of the donation remains ambiguous, which may account for the delay in accounting treatment. Although Miller told us that the check dated March 20 was meant to reimburse the Bar for both past and future expenses, his contemporaneous email to Dunn indicated that the check was timed to enable booking the future *April* trip to Mongolia. That the

---

[1] This figure does not include $107.60 in expenses relating to meals and travel to and from the airport that Dunn submitted for reimbursement but that have not been processed.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

4

PRIVILEGED AND CONFIDENTIAL

check was intended to cover only future expenses is also consistent with Dunn and Rodriguez's stated understanding, noted above, that Bar funds *would* be used for the first trip.

Third, even if accounted for to cover past expenses, the $5,000 check is insufficient to cover the full $7,088.44 in expenses incurred by the Bar.

The inaccurate information that Bar funds had not been used for the Mongolia trip later appeared in an article written by Howard Miller, published in the *Daily Journal* on April 23, 2014. Miller wrote:

> *Under the direction of State Bar President Luis Rodriguez, and discussions with CEO/Executive Director Joseph Dunn, it was decided* since a sovereign state had asked for help in the administration of justice in a unique area of its expertise, the State Bar would designate representatives to visit and work with Mongolia, *so long as no bar funds were used*, and the State Bar would simply be acting as a facilitator and advisor.
>
> *With that understanding, three of us, including Dunn and Thomas Layton . . . .went to Ulaan Bataar, Mongolia* in January.

Miller, *The Mongolian Connection*, DAILY JOURNAL, Apr. 23, 2014 at 5 (emphasis added). Dunn admitted that he saw the article at the time and noticed the statement. Several trustees and State Bar staff reported that they read the article at the time it was published and noted the statement that no Bar funds would be used. But Dunn took no steps to correct the statement, either by requesting Miller to do so or by issuing his own correction. The two explanations Dunn offered for his failure to correct the statement were troubling and, in our view, were inadequate to explain the failure to take any corrective action.

First, he claimed that the article is ambiguous and can be read to say only that no Bar funds would be used for *future* trips (an interpretation Rodriguez echoed). But this is an untenable interpretation of the article's plain meaning.

Second, Dunn said that he felt no obligation to correct the inaccurate statement because he did not write it. But Miller was (or at least appeared to outsiders to be) acting as an agent of the Bar in connection with the trip to Mongolia: he participated in the official trips; he was the Bar's representative at a ceremony in Mongolia in April; and he was designated in the

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

memorandum of understanding between the State Bar and the Mongolian Bar Association as someone who, along with Dunn and Layton, would "manage all activities" related to that memorandum. *See* Memorandum of Understanding, ¶ 6; *see also* Cal. Civ. Code § 2317 ("Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."). For this reason, the Bar had an obligation to correct misstatements by Miller about the trip. *See* Restatement (Second) Agency § 256, cmt b ("If the principal discovers the untruth of a statement made by an agent on his account, he is under the same duty to reveal the truth to the other party as if he himself had innocently spoken an untruth.").

Indeed, quite apart from any legal obligations involved, Dunn's apparent insensitivity to the problems that could be created by perceived inaccurate statements by persons affiliated with the Bar—particularly in the area of how Bar funds are used—is troubling. The unique role of the organization he heads—administrator of the state's legal profession and the system of ethical rules governing the profession—heightens the need for the chief executive to be sensitive to such issues. This is particularly true in light of the Bar's recent pledge to make its commitment to transparency "paramount." *See* Five-Year Strategic Plan, p. 5.

At the very least, Dunn should have brought the inaccuracy of Miller's public statement to the Board's attention so that it could decide whether a correction was warranted. Instead, Dunn appears to have done the opposite, by taking steps to minimize attention paid to the trip-related expenditures. Communications officer Laura Ernde reported that Rex Bossert told her that Dunn was unhappy that she had circulated within the office a different article about the Bar's work with Mongolia—allegedly because Dunn believed the issue was causing problems with the Board. Dunn also asked Ernde to edit a draft of an article about the Mongolian delegation's visit to the Bar in June to remove a statement that no Bar funds were used for the two previous trips to Mongolia, presumably because he knew the statement was not true. According to Ernde, she told Dunn that the statement was from Miller's April article. Instead of

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

telling Ernde that the Miller article was inaccurate, Dunn simply told her that that article was not authorized by the Bar.

Dunn's inaccurate disclosures, failures to correct, and/or failures to disclose violated various duties he had. Under his contract, one of Dunn's "essential duties" is to "keep the Board and its President fully informed on matters of significance." Employment Agreement § II(E)(1). Likewise, as a senior executive of the Bar and the Board's agent, Dunn has a fiduciary duty to disclose material facts to the Board. *See Salahutdin v. Valley of Cal., Inc.*, 24 Cal. App. 4th 555, 562 (1994) ("The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud . . . ."); *People ex rel. Harris v. Rizzo*, 214 Cal. App. 4th 921, 950-51 (2013) (city reposed trust and confidence in its assistant chief administrative officer giving rise to fiduciary duties owed by the officer); *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (liability for nondisclosure of information may lie where the defendant is in a fiduciary relationship with the plaintiff). Other duties could also be implicated by Dunn's lack of candor with and failures to make disclosures to the Board.[2]

## 2.    Improper accounting of the Mongolia travel expenses

As noted above, the Bar has charged the $6,041.72 in expenses for the January trip to a mandatory dues account. Although Van Horn stated that she thought a case might be made for use of mandatory funds for the trip, no one else has suggested that this would be appropriate, and

---

[2]Although our findings and recommendations do not depend on it, Dunn's failure to keep the Board informed also could implicate his ethical duties as a lawyer. *See Sodikoff v. State Bar*, 14 Cal. 3d 422, 429 (1975) ("When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct."); Cal. Ethics Op. 1995-141 at *3 ("[W]hen rendering professional services that involve a fiduciary relationship, a member of the State Bar must conform to the professional standards of a lawyer even if the services performed could also be rendered by one licensed in a different profession."); *cf.* Cal. R. Prof. Conduct 3-500 ("A member shall keep a client reasonably informed about significant developments relating to the employment or representation . . . .").

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 1 p. 009

Exhibit #1: 009
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

it plainly would not be. *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990), requires that expenditures of mandatory dues be "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of legal service available to the *people of the State*." *Id.* at 13-14 (emphasis added). Helping Mongolia to implement a new regulatory regime, though a laudable goal, hardly satisfies this standard, and the accounting for these expenses raises two concerns.

First, although Van Horn has stated that she intends to change the accounting of these expenses so that they are no longer charged to mandatory dues, as of the date of her interview that had not happened. Under these circumstances, it is unclear whether, absent this investigation, Van Horn would have changed the accounting for these expenses to an appropriate voluntary account.

Second, Dunn himself showed a troubling lack of attention to whether expenses for the trip would be charged to mandatory or voluntary fees. The expense report he submitted for his own expenses for the January trip included an account code for mandatory fees. Seeking to disclaim responsibility for this allocation, he noted that his practice is to give his travel expenses to his administrative assistant and to let her and Van Horn decide how the expenses should be treated.

This explanation is not adequate. Given the unusual nature of the Mongolia trip, Dunn should have taken pains to direct Van Horn to make sure that *all* expenses were allocated to voluntary fees, which he did not do. Indeed, Sonja Oehler reported that she received no training on the circumstances under which mandatory Bar dues may be used to cover expenses. His failure even to ensure that his *own* expenses were properly allocated shows an inadequate sensitivity to what is a centrally important issue for the Bar, its reputation, and its relationship with its constituencies.

At a minimum, the Board should reprimand or counsel Dunn on his lack of leadership on this issue. It should also direct him to institute additional internal controls or training to ensure

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

that incidents of this kind do not occur in the future and that his CFO is more closely attuned to the need for scrupulous compliance in this area.

### B.    Dunn's communications with the Board regarding A.B. 852

After the Governor vetoed A.B. 888, the Bar was involved in promoting A.B. 852, which would have permitted it to bring civil enforcement actions against persons engaged in the unlawful practice of law (UPL). Last April, Beth Jay emailed Tom Miller (who forwarded it to Dunn) that the Chief Justice wants to "delay further action" – and emailed Dunn and Miller that the Chief Justice "wants this bill stopped" – pending the Bar's development of further information showing a need for the measure. The request that the Bar stand down on further efforts was repeated at a May 1, 2014 regular quarterly meeting attended by three Court and eight Bar representatives, including Dunn.

Dunn nonetheless thought it appropriate to ask the Board at its May meeting, just over a week later, to authorize the Bar to sponsor the legislation. Given constraints in the legislative calendar, Dunn says, the bill would have died had it not proceeded further that month, and he believed that killing the bill for this legislative session went beyond the Court's request. Dunn reasoned he could always pull the plug later if the Court ultimately so directed, but he could not later resurrect it if the Court ultimately were persuaded to let the bill proceed. He did not discuss this rationale with Court representatives, however, before making the request to the Board at its May meetings.

Nor did Dunn mention the Supreme Court's concerns to the Board so it could make its own decision on the wisdom of his rationale for proceeding despite the Court's request to stand down. In a memorandum dated May 6, 2014, to the Board Committee on Operations and the Board of Trustees outlining the proposed legislation, Dunn stated "[t]here is no known opposition to the measure." Dunn did not mention the Supreme Court's concerns in this memorandum, in his presentation to the Board Operations Committee on May 8, or in any discussions with the full Board on May 9, where the measure was on the consent calendar.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

Dunn said that he felt constrained not to mention directly to the Board the Court's possible opposition to the bill, because the Board meeting was held in public, and Beth Jay had previously said that Court views should not be mentioned in public, especially on possible legislation that might come before the Court later. He claimed in his interview, however, that he reconciled this dilemma by giving the Board a coded reference to the Court's directive, stating to the Board that a "critical stakeholder has concerns" and "we are trying to resolve them to decide if the bill can move forward." When Beth Jay asked Dunn after the Board meeting why he had not shared the Court's position with the Board, Dunn claimed in an email to her that the Board was "quietly aware" of the Supreme Court's interest.

The weight of the evidence contradicts Dunn's claim that he told the Board at one or more of the May meetings that a "critical stakeholder has concerns." No trustee we interviewed recalled any such reference, nor did his co-presenter at the May 8 meeting Jennifer Wada (though she said she could not rule it out). Moreover, two people who were present at one or more of the meetings, Jayne Kim and Jim Fox, were keenly listening to Dunn's remarks on this subject, because they were present at the May 1 meeting with Court representatives and were expecting some form of disclosure about the Court's concerns. Both are quite certain Dunn made no such reference, and they complained to Beth Jay afterwards precisely because they say he did not.

Indeed, Fox was so upset with the lack of disclosure that he says he specifically requested an exit interview with Dunn before leaving his employment at the Bar so he could voice his objection. Dunn and Fox met for that interview on July 29, 2014. When Dunn defended his conduct at that meeting by noting the constraints on mentioning Court views at open meetings, Fox told us (without any prior prompting) that he told Dunn he could easily have advised the Board that "there are unresolved issues with some of the key stakeholders that need to be resolved." The similarity between this phrase and the phrase that Dunn *claimed* during his interview with us to have used at the Board meeting is too striking to be pure coincidence—and

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

it seems unlikely that it was he who borrowed the phrase from Dunn rather than the other way around.

For these reasons, we think a factfinder would most likely conclude that Dunn did not tell the Board, either directly or through a veiled reference, about the Supreme Court's concerns regarding the bill. Further, the Court's concerns were plainly material to the decision Dunn was asking the Board to make and therefore should have been disclosed—as he implicitly concedes when he claims that he in fact attempted to make a disclosure of some kind. Finally, Dunn's evident violation of his duties discussed above to disclose material information to the Board was compounded by his (evidently) false claims to us in his interview that he in fact made a disclosure of some kind.

### C.   Misstatements Regarding Move to Sacramento

Our investigation has uncovered misrepresentations that Rodriguez and Dunn made to a Board committee about the Supreme Court's views regarding the Bar's possible move to Sacramento following a sale of its building in San Francisco. Rodriguez told the Board Operations Committee at a meeting held September 2, 2014, as well as at one or more earlier meetings in August, that the Supreme Court was aware of the possible move to Sacramento and supported or was amenable to it. Some present at that September 2, 2014 meeting also recall that Dunn made similar statements to the effect that the Chief had no problem with moving the Bar to Sacramento, that the issue had been "socialized" through both the Supreme Court and the Legislature, and that the Court was behind the Bar if it decided to move to Sacramento.

Rodriguez knew his statements were false. The Chief Justice told us that, although she said she was intrigued when she was told that the Bar's real estate brokers felt that the Bar could fetch an enormous sum for the building, she told him in the July 2014 time period that she did not think a move to Sacramento was a good idea. Specifically, she told him she was concerned about displacing long-term employees (which she said Rodriguez told her was a concern he shared). The Chief Justice also reported that, in a call held the day after the September 2

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

meeting, she expressed the view that she did not think it was wise to have the Bar headquartered near the Legislature, though she does not believe she mentioned that concern in the call before that September 2 meeting. The Chief Justice did not believe that her comments to Luis Rodriguez could fairly be characterized as supportive of a move to Sacramento.

The evidence also indicates that Dunn knew that his statements about Supreme Court amenability to the move were severely exaggerated at best and false at worst. First, Beth Jay reported that she attended a lunch with Dunn in June or July 2014, where the possible sale of the building was discussed. She says that she told him: "I hope you won't be moving to Sacramento!" Ms. Jay reported that she made the comment because she knew that Dunn had an affinity for the Sacramento setting but she was concerned that such a move would be inappropriate. Second, the Chief Justice recalls having a few conversations with Dunn before or during the Summer of 2014 when Dunn mentioned the possibility of selling the building and moving to Sacramento. Although she was not asked and did not express her opinion on the move, let alone express the opinion of the full Court, the Chief Justice told us she said nothing from which Dunn could have fairly concluded that she or the Court supported the move.

Based on this input from Court representatives, Dunn's statements to the Board committee that the Court supported the move, that the matter had been "socialized" with the Supreme Court and the Legislature, and that the Court was behind the Bar if it decided to move to Sacramento were unfounded and inaccurate. Dunn's claim that he in fact told the Board committee that the Chief Justice saw both downsides and upsides to the move does not accord with committee members' recollections of his statements to them—nor with the Chief's recollection of the import of her statements to Dunn.

### D.    Treatment of Dunn's expense reports

Hawley's memorandum provided twenty-three expense reports by which Dunn was seeking reimbursement for various expenses, which included some minor expenses associated with the Mongolia trip and other trips. Kim alleges that Van Horn knowingly concealed a

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

Mongolia-related expense report in that set from the State Bar's auditors. While we are unable to conclude whether or not Van Horn knowingly concealed any of these expense reports, the treatment of the expense reports raises concerns regarding Van Horn's leadership and the Bar's internal controls.

On February 4, 2014, Van Horn received nineteen Dunn expense reports seeking reimbursement for meals and other travel expenses incurred between August and December 2013 (including for foreign travel). On or about April 7, 2014, Van Horn received four expense reports from Dunn seeking reimbursement for travel in the beginning of 2014 (including approximately $110 incurred on the January Mongolia trip). Van Horn signed the first seven expense reports and asked Office of Finance Director Andrew Conover to look into certain taxi expenses on one report. Van Horn never signed the remaining sixteen reports. It was not until late May or early June 2014 that she provided the expense reports to Hawley, who needed to approve them for late processing because the reports had been submitted beyond the Bar's 60-day limit.

According to Hawley, Van Horn told him in words or substance that the expense reports "are late from Joe" and that she had held onto the reports, including the reports submitted several months earlier in February, because she did not want the auditors to see them. Hawley stated that the Bar's auditors had recently concluded a review of the Bar's 2013 Statement of Expenditures of Mandatory Membership Fees at the time Van Horn made this remark. A primary focus of the audit was whether the Bar had properly accounted for 2013 expenditures as between those chargeable to mandatory fees or not, as required under *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990). Hawley expressed concern that Dunn and Van Horn proposed to charge the travel expenses to mandatory fees, even though in Hawley's view it would be improper to treat the expenses in that manner. Hawley also expressed concern that, in presenting the 2013 audit to the Board in July 2014, Van Horn failed to disclose that she had withheld these expenditures from the auditors. To date Hawley has not approved the expense reports.

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

13

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 1 p. 015

Exhibit #1: 015
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

Van Horn does not deny that she gave the February expense reports to Hawley approximately two months after she received them. But Van Horn denied trying to conceal documents from the auditors, and she denied telling Hawley that she had done such a thing. Van Horn repeatedly stated that she never would have sent expense reports to Hawley without signing them first. During our initial interview with her (we had a few follow-up telephonic interviews as well), Van Horn stated that she felt so certain of this fact that she wondered whether Hawley had obtained the unsigned expense reports from her unlocked office. She further disputed that the *de minimis* amounts reflected in the expense reports would have been likely to prompt concerns with an auditor. Van Horn also noted that the auditors had conducted a review of expenses for calendar year 2013, and that the Mongolian travel all occurred during 2014.

When Andrew Conover of the procurement office was shown the unsigned expense reports during his initial interview, he did not supply an explanation for how Hawley would have received the reports unsigned. Conover told us in a subsequent email, however, that expense reports that are older than 60 days late are usually sent directly to Hawley for "late" approval before the procurement processing continues. Hawley rejected this explanation and stated that expense reports must be signed by the authorizing approver and submitted to him with an explanation (generally in writing) as to why they are late. Hawley reported that one of the reasons why he did *not* approve the late expense reports that he received in his in-box from Van Horn was that the vast majority of them had not been signed by Van Horn, the only person authorized to approve Dunn's expense reports.

Because there are no known other witnesses to the conversation between Van Horn and Hawley, we cannot definitively establish that Van Horn made the remarks attributed to her concerning the Bar's auditors, and the evidence points in conflicting directions.

On the one hand, it is difficult to understand why she would have confided in Hawley that she was withholding the reports from the auditors given that she does not like or trust

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

Hawley, and he could have used such an admission against her. It also is hard to understand why Van Horn would have been motivated to conceal the expense reports from the auditors. In comparison to airfare and cell phone roaming charges associated with Dunn's overseas trips—which no one claims anyone sought to conceal—the amounts that Dunn claimed on the expense reports (for meals and taxis on those and other trips) are small. The reports for the Mongolia travel in particular reflect expenses that are *de minimis* by any measure—just over one hundred dollars. Moreover, because Dunn incurred the Mongolia trip expenses in 2014, the auditors would not have examined them in connection with the 2013 audit in any event.

On the other hand, certain idiosyncrasies in these reports raise questions that no one has been able to answer, and there is some reason to credit Hawley's recollection of the conversation.

First, Van Horn has been unable to explain why she delayed for so long in submitting the expense reports to Hawley and why she gave Hawley sixteen unsigned expense reports, some of which refer to foreign travel, when it is her responsibility to review Dunn's expense reports as part of the approval process.[3]  Hawley vehemently denies Van Horn's speculation that Hawley may have taken unsigned Dunn expense reports from her office or that he would have had any reason to do so. Second, although the Mongolia trip expenses were small, the Mongolia trip expenses were the subject of some discussion among Bar employees, particularly in light of the Miller article published on April 23, 2014. Van Horn read the Miller article at the time and may have had on her mind these concerns about the use of Bar funds before she gave the expense reports to Hawley. Third, Hawley has shown himself to be a careful individual with respect to

---

[3] Van Horn said that she reviewed the expense reports all at once and stopped reviewing the reports when she came across one with an apparent $70 error in taxi expenses. She asked Andrew Conover to investigate the taxi expenses, and Conover provided her with corrections on a copy of the expense report. For reasons that are unclear, Van Horn did not correct the original expense report, and gave that report and the rest of the reports in the set to Hawley at some later date.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

international travel and expenditures generally. When he travels internationally on behalf of the Bar, he does so on his personal time and refuses to have the Bar pay for any of his expenses.

In short, we cannot determine whether or not Van Horn knowingly concealed the Dunn expense reports from auditors as alleged by Kim. At the same time, the evidence suggests several deficiencies in how Van Horn is performing her duties.

- Although she criticizes Hawley for failing to process the expense reports since she provided them to him in late May or early June, Van Horn did not deal promptly with the expense reports she received in February and instead let them sit for over three months.

- She approved for payment expense reports for the Mongolian trip (*e.g.*, approximately $600 in cell phone roaming charges) using mandatory Bar dues coding.

- As of the date that this investigation commenced – nearly five months after the second Mongolian trip took place and seven months after the first trip – she had not taken any steps to ensure that ledger entries were made on the Bar's books and records to connect the $5,000 check from the Girardi firm to the Mongolian trip expenses.

- Van Horn did not ensure that Dunn and his assistant are familiar with the account coding system.

### E.    Expense Budget Modifications

Van Horn's handling of Dunn's expense reports has fueled a troubling perception among Bar staff that Van Horn does not audit Dunn's expenses with the same level of attention and care afforded to other expenses. In particular, some witnesses reported that Van Horn polices each executive's use of the business expense account, except Dunn. Administrative Advisory No. 14-01 provides in part:

> Senior management may budget for "Business Expenses" (account code 40570). The amount in this account is determined by the Executive Director annually during the

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

budget planning process and is to be funded with non-mandatory fee revenues. This account is to be used at the senior managers' discretion in the course of their duties to cover applicable business expenses for themselves and others. . . .

No reimbursement will be made against the Business Expense Account unless there is a sufficient amount budgeted in the account to cover the expense. . . .

Business expenses that may be covered under this section include meals during which discussion of State Bar business occurs and there is a business need to keep participants together. Expenses for business meals will not be authorized for meetings where State Bar business is only nominally discussed or meetings with potential or existing vendors.

Administrative Advisory No. 14-01, VII A, C and D.

Both Van Horn and Hawley explained that the implementation of this policy changed sometime during Dunn's tenure. Before that policy change, senior executive staff members each had an individual expense budget of approximately $1,500 for their respective cost centers. Executives were expected to manage to the budgeted amount each year. Sometime during Dunn's tenure, all of the expense budget limits were aggregated into one budget line item. An expense budget limit of $50,000 was set for all senior management. Hawley, for example, explained that he no longer had visibility into how management was doing against the expense budget limit, and he does not have an individual expense limit to manage against.

Our review of financial records indicated that, during 2013, Dunn alone expensed at least $13,576.93 against the $50,000 limit, not including additional business expenses charged by employees within the Executive Director's business unit. Van Horn reported that the $50,000 limit was not exceeded even if all of the senior executives' expenses were combined. While we do not believe that this policy change constitutes a basis for discipline, the effect of this change was essentially to give Dunn an unlimited business expense budget. We recommend that the Board set a business expense budget limit for the Executive Director and that the finance committee of the board take over responsibility for review and approval of the Executive Director's expense reports.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

### F.  Issues Related to General Counsel Thomas Miller

#### 1.  Hiring Issues

Kim alleged that the Bar hired Thomas Miller as the General Counsel over allegedly more qualified candidates because he is friends with Dunn. The selection process, however, even if not perfect, did proceed with input and involvement by the Board, so we do not see a basis for finding wrongdoing in how Miller was selected. Rules & Regs. Pertaining to the Employment of Executive Staff Employees § 9(A) (senior executives are appointed by and serve at the pleasure of the Executive Director); Board Book, Tab 18 § 7(b) (Board approves selection of General Counsel); see also *id.* Tab 5, § 2(b)(11(D) (president's role is to manage the Executive Director by, inter alia, providing input with respect to the selection of the General Counsel).

#### 2.  Travel issues

Kim also complained that Miller has improperly billed for travel between Southern California, where he lives, and San Francisco, where the Office of General Counsel is based. We have learned that, between March and July 2014, Miller spent some forty-three nights in hotels in the Bay Area for a total cost of $7,855.88. Air fare expenses for the same period totaled $8,746, and Miller incurred $4,415.76 in additional expenses in this period for ground transportation, lodging, meals, and other miscellaneous travel expenses. Total travel related expenses for the period were therefore $21,017.64.

Expenses at these levels are not surprising, as the Bar clearly appears to have contemplated that Miller would be incurring travel expenses in order to take the position. His employment offer letter provides that he "will work out of the San Francisco and Los Angeles State Bar offices with frequent travel. As the Office of General Counsel is based in San Francisco, that office will be your 'home base.'" Because everyone seems to have known that Miller lived in San Clemente and never committed to move to the Bay Area, but he was told he would be based in San Francisco, the travel expenses were an expected result of this arrangement. The travel records also confirm that, at least through July, he lived up to the

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

requirement that he spend most of his time in San Francisco—something he did three or four days a week.

There is, however, a discrepancy in the parties' expectations going forward. Miller says that he told the Board members who interviewed him that he would spend most of his time (usually three days a week) in San Francisco for the first six months but that after he had established himself he hoped to spend most of his time (usually three days a week) in Los Angeles. Miller still believes that was the arrangement to which the parties agreed. At least one board member confirms that Miller said this in his first interview with a Board working group, which recommended he not be hired in part for that reason. But the board member also recalls Dunn and/or Rodriguez stating at a later time that Miller was now willing to commit indefinitely to having his home base be San Francisco—and that his hiring was approved on that basis. Miller was not aware of this but rather expects to wind down his San Francisco travel to two days per week rather than three. This suggests that Dunn and/or Rodriguez's representations to the Board about Miller's intentions and understanding were not accurate. For that reason, the Board will need to reach some common understanding with Miller about his future plans.

### 3. Disclosure Issues

Miller was aware that Beth Jay had directed the Bar to stand down on A.B. 852 before the May 8 and 9 Bar Board meetings and was present during Dunn's discussion of that bill, but he did nothing to inform the Board about the Supreme Court's concerns. Although he did not clearly recall that Dunn failed to mention Supreme Court concerns at the Board meetings, Miller said he would not have taken it upon himself to make this disclosure to the Board even if Dunn had not done so, for two reasons. First, he believed that Luis Rodriguez had been informed of the Supreme Court's concerns, though he admits he was not sure at the time of the May Board meeting that he knew this. Second, he thought the Board did not need to know about the Supreme Court's concerns, because he and Dunn were still trying to persuade the Court about the need for the bill and needed to keep the bill moving forward to avoid having it die for that

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

19

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 1 p. 021

Exhibit #1: 021
22-CV-01616-BAS-DDL

session. As with Dunn, Miller's nondisclosure raises questions about his commitment to giving the Board all of the information it needs to do its job.

### G.    Perceived Girardi Keese Influence at the Bar

Although we have not uncovered instances of any sort of misconduct involving or untoward influence exerted by Tom Girardi or his firm, the closeness of the relationship between some senior managers and that firm does raise potentially troubling perceptions that the Board should take action to rectify going forward.

The frequency with which Girardi's firm has surfaced in matters we investigated is striking.

- Kim alleged that Dunn violated Bar policy in sending OCTC employees to a seminar in Las Vegas for a group that Girardi supports or is affiliated with. Although we did not consider the policy so important that a deviation from it would be grounds for discipline, it is an example where Dunn bent (or attempted to bend) the normal rules to accommodate a request perceived as helpful to Girardi.

- Girardi surfaced in an extremely unusual meeting with Craig Holden before he was elected as Bar president. Luis Rodriguez indicated that Holden should have lunch with Tom Layton, because Layton was not yet sure if he would throw his support to Holden for president. That a bar employee is believed to have such an important role in who is elected bar president is unusual enough. But when Holden attended the meeting, Girardi showed up, suggesting that the "power broker" on whose support Holden's election depended was in fact Girardi.

- Girardi's name has also come up in other (disputed) allegations discussed below about offers of professional assistance to Jayne Kim.

- Dunn chose Girardi's partner Howard Miller to be an emissary for the Mongolia trip. We believe that Miller was eminently qualified for and deserving of this role, but others certainly would have fit the bill too. In light of the other accommodations

PRIVILEGED AND CONFIDENTIAL

Dunn has made for members of that firm, the selection forms a smaller piece of a larger pattern.

- In emails we reviewed on other topics, we noted that Miller was being consulted on matters related to A.B. 1515, a bill concerning client trust accounts. Again, we assume there are completely valid reasons for his involvement, and that he served admirably in whatever role he had, but the continuing connections are notable.
- During the investigation, Girardi suddenly and unexpectedly appeared as counsel for Sonja Oehler. In that capacity, he launched an unprofessional tirade of threats that we will recount more fully at the Board meeting. Although Girardi claims he became involved because our firm was rude during interviews and he is a long-time friend of Oehler's, his involvement also could be explained because he perceives a threat to Dunn as a threat to his possibly favored position with the Bar.

Although we do not believe that these incidents, either individually or collectively, form a basis for discipline, the pattern contributes to a potentially troubling perception that the Board should address.

### H.     Interference with Investigation

Luis Rodriguez engaged in various improper efforts to impede or influence the course of this investigation. The extent to which Dunn may or may not have participated in these efforts cannot be established conclusively. Although these efforts do not form a basis for imposing discipline at this time, the Board should consider taking steps to avoid problems like these in the future.

*First*, after Kim's complaint was sent, Rodriguez recused himself from the investigation and set up a working group composed of then-President Elect Craig Holden and two members of the Audit Committee (Heather Rosing and Michael Colantuono). As we discussed at the September Board meeting, Rodriguez later decided to rescind his recusal and form a newly configured working group based on two dubious grounds.

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

21

PRIVILEGED AND CONFIDENTIAL

One such ground was that Holden had supposedly revealed to one of his partners information about the investigation.  Rodriguez made this claim as a result of questions Tom Layton asked Rodriquez, which questions in turn arose from an oblique comment by Holden's partner at a lunch Layton had with him.  In fact, Holden did nothing more than make a routine, confidential request to two of his partners for a referral without revealing the substance of the allegations or the identity of any complainant.  Layton later told us he was wrong to leap to conclusions based on the stray comment from the partner—and said he had since apologized to the partner for doing so.

The second such ground was that the investigation might result in civil liability to the Bar by thwarting Dunn's chance to become Administrative Director of the Judicial Council.  Rodriguez asserted that "Joe has been tapped" for that position and "is number one on [the Chief Justice's] list."  Dunn told us the Chief Justice told him in the third week in July that he was "at the top of her list," something he repeated at the time to Rodriguez.

The Chief Justice told us, however, that this was not true.  She told Dunn that, while some justices supported him, she had someone else in mind for the job, not Dunn; that she had not asked and would not ask him to apply for the job; but that, only in the event the other applicants did not work out, she might come back to him to offer him the job.  When asked if there was any way Dunn could have concluded from their conversation that he was at the top of her list, she said there was not, because she was very clear that she had her eye on someone else (who in fact was offered the job).

*Second*, after rescinding his recusal and forming a new working group, Rodriguez attempted to influence the investigation by calling Van Horn just fifteen minutes before her interview was scheduled to begin and instructing her not to appear.  During his call with Van Horn, Rodriguez raised a challenge to our firm's involvement in the investigation.  When asked for his basis for advising Van Horn not to appear, he said that he did not think it was fair that Dunn's interview was postponed, while Van Horn's interview was not.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

*Third*, an issue arose at the last Board meeting whether our firm should question the Chief Justice on certain matters relating to the investigation. Apparently in an effort to stop this line of inquiry, Rodriguez advised Heather Rosing that the Chief Justice and Beth Jay were upset at the prospect of being pulled into the investigation as witnesses. The Chief Justice, however, denies that she ever conveyed such a sentiment to Rodriguez. According to the Chief Justice, Rodriguez told her that he was having disputes with Craig Holden, and she merely responded that any such dispute was between the two of them. Far from being reluctant to be questioned as part of this investigation, she told us she was happy to do so and spoke to us freely on more than one occasion. Beth Jay similarly reported that she was not at all reluctant to be interviewed in connection with this investigation and that she had never told anyone that that was the case.

Rodriguez's actions to interfere with the investigation were ill-advised and improper. Although they provide a cautionary tale for the Board about the handling of investigations in the future, we are not aware of any statute Rodriguez violated. Further, although he may well have violated his fiduciary duties, we see no reason to consider taking action against him unless he continues to receive Bar funding to permit him to represent the Bar as a past President.

If it could be shown that Dunn wrongfully participated in efforts to impede the investigation, this would violate his legal duty to "withdraw from any participation in" matters as to which he had a personal interest and to "refrain from attempting to influence" such matters[4] – violations that potentially could give rise to criminal liability.[5] However, evidence that he did so is inconclusive. The evidence does clearly show that Dunn misrepresented in July his status as the front-runner for the Administrative Director position. But we found no direct evidence that,

---

[4] Cal. Bus. & Prof. Code § 6036(d); *id.* (b) (Board members must disqualify themselves "where there exists a personal nonfinancial interest that will prevent the member from applying disinterested skill and undivided loyalty to the State Bar in making or participating in the making of decisions"); *id.* §6038 (subjecting to section 6036 employees designated in the Conflict of Interest Code of the State Bar); Conflict of Interest Code of the State Bar section 2, App. A (designating Executive Director).

[5] Cal. Bus. & Prof. Code § 6037.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

after the Kim complaint was lodged, he reasserted this falsehood in an effort to persuade Rodriguez to change the course of the investigation.[6] The misrepresentation may still be relevant to other issues raised in this investigation relating to Dunn's truth-telling propensities, but we have not concluded that it amounts to proof of interference with the investigation that would provide a basis for imposing discipline.

## I.    Consultant Hiring Irregularities

We uncovered certain irregularities in connection with the contract for communications contractor Richie Ross. Ross had previously assisted Dunn in his races for Senate and Controller. At Dunn's request, the State Bar retained Ross on a sole source basis in June 2011 at $6,000 a month to provide communications services, especially in connection with the Sergio Garcia litigation. Although State Bar procurement rules require the approval of a written memorandum justifying a sole source contract, Ross provided services for three months without a sole source memorandum.

For consulting services performed in June, July and August of 2011, Van Horn placed Ross's contract within the budget of the Office of General Counsel as a litigation related cost, which is excluded from the Bar's procurement process. Van Horn pressured Cathy Torney, then Director of Administration in the Office of the General Counsel, to approve the first three $6,000 invoices, which were for amounts over her approval authority. Torney alerted then-General Counsel Starr Babcock to the situation, and Babcock apparently took steps to prevent Ross's contract from being added to his office's budget. It was only then that Hawley prepared a sole

---

[6] There is circumstantial evidence suggesting he likely did so. An email from Rodriguez stated that Dunn was "very upset" about possible violations of his privacy rights, which implies that they did have a conversation about Dunn's concerns before Rodriguez rescinded his recusal. Further, Dunn told us in his interview that he believed the timing of Kim's complaint was calculated to interfere with his chances as front-runner for the job. Given that Dunn apparently expressed to Rodriguez other concerns that made him "very upset," it seems highly likely he also expressed his concern that the complaint was designed to upset his chances for the new job, for which he inaccurately claimed he was the front-runner—but we have no admission from either Dunn or Rodriguez that he in fact did so.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 1 p. 026

Exhibit #1: 026
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

source memorandum, dated September 23, 2011. It was not until December 5, 2011 that a fully-executed contract was finalized for Richie Ross, though it was executed with a retroactive effective date of June 1, 2011.

On March 29, 2013, the Recorder published an article discussing the Bar's contracts with Ross and his daughter Esperanza Ross, as well as the Bar's refusal to release copies of the contracts. Kim alleges that Dunn did not inform the senior executive management team of Richie Ross's contract before this article was published. This claim is inaccurate at least with respect to Hawley, Van Horn, and Babcock—all of whom became aware of the contract relationship sometime in 2011. The article, however, does appear to have prompted another action by the Bar—an April 9, 2013 Request for Proposal for the consulting services that Ross had been providing since June of 2011. In May of 2013, seven contractors (including Ross) submitted competitive bids, and Ross was selected as the most responsive bid.

The gravamen of Kim's observations regarding Ross is that the Bar's competitive bidding and sole source contracting procedures lack sufficient controls and are potentially subject to abuse. The foregoing episode confirms some of those concerns. On the one hand, the Bar's decision to initiate a RFP after the publication of the Recorder article raises questions about the propriety of the Bar's decision to contract Ross on a sole source basis. Torney's account also suggests that Van Horn attempted to "fix" a paperwork error by accounting for the sole source requisition in a way that may have been inappropriate. On the other hand, several witnesses reported a misunderstanding that Richie Ross was performing legal work, as his services related in part to the Sergio Garcia matter. If Babcock had agreed that Ross's work fell within his office's budget, the contract would have been excluded from the procurement process.

Although the Ross contracting process, by itself, does not serve as a basis for discipline, we recommend that the Board instruct senior management to adhere strictly to the competitive bidding and sole source requirements. The Board may also wish to ensure that senior management has a clear, shared understanding of the cost center that will be charged for any

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 1 p. 027

Exhibit #1: 027
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

contractor providing services on litigation related issues, directly or indirectly, *before* any fees are incurred. Finally, the senior manager who requests that the Bar retain a vendor on a sole source basis must take personal responsibility for the prompt completion of a memorandum supporting the sole source request.

### J.    Governance Issues Arising From Promises of or Requests for Assistance

We investigated certain governance issues arising from promises of assistance to Board members or others. In her interview, Kim said that Tom Layton came to her when she first became Chief Trial Counsel to offer assistance from Tom Girardi in helping her to become a judge or to achieve some other professional goal. Although Layton denies this, it is undisputed that Dunn made similar offers (without necessarily mentioning Girardi) to various Bar Presidents. Both Dunn and Craig Holden have confirmed that Dunn initiated a discussion in which Dunn asked how he could help Holden achieve any aspirations he had of becoming a judge or running for office. (Holden says that Dunn also offered Layton's assistance, and Layton and Holden both confirm that Holden later asked Layton to meet with a friend whom Holden recommended for a district court position.) While not recalling necessarily that he initiated other conversations, Dunn admits to making similar offers to Luis Rodriguez, who openly had political aspirations, and Jon Streeter, who wanted to become a judge.

Although we do not rely on these events as a basis to recommend discipline, we do believe that conversations like this during the term of a Bar President (or other trustee, if such conversations took place) pose unhealthy risks to proper governance. The provision of such assistance could make the Board President or trustee feel beholden to the chief executive or other staff member in a way that undermines the Board member's exercise of proper supervisory control.

### III.   ISSUES AS TO WHICH NO RECOMMENDATIONS ARE MADE

Several issues arose during our investigation that either did not result in recommendations or that we did not investigate.

24870086.1

26

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 1 p. 028

Exhibit #1: 028
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

- *UPL unit*. Kim complained that the development of the UPL unit raises concerns regarding cost inefficiency, overlapping jurisdiction with OCTC, and a lack of independence by the General Counsel. This appeared to us to be a turf issue that has been aggravated by a perception of favoritism and insularity within the organization. While we do not believe that this issue has resulted in any actionable wrongdoing, the Board may wish to consider giving an opportunity to be heard on this issue to Kim, who feels that her concerns on the issue have been ignored and disrespected.

- *Speakers fees*. Kim also raised concerns regarding the cost of outside speakers' fees. For reasons discussed on September 14, we did not see a problem here and have not pursued the issue further.

- *Retaliation*. Jayne Kim provided Hawley with a supplemental memorandum, dated September 16, 2014, regarding her concerns of a hostile work environment and potential retaliatory efforts towards her. Attachment 3. These issues seemed collateral to the thrust of our investigation, and with the agreement of the working group we have not pursued them. The Board should consider what if any additional action to take on the allegations.

- *Alleged manipulation of backlog numbers*. OCTC's Managing Director of Investigation John Noonen said during our interview that he believed Jayne Kim was manipulating her backlog numbers, but he expressed a fear of retaliation if Kim ever learned that he was making such accusations. We agreed with the working group that this matter was more appropriately addressed in some forum other than the present investigation.

## IV.    RECOMMENDATIONS

### A.    Joseph Dunn

Although certain other deficiencies in Dunn's performance would warrant counseling or reprimand only (such as his inattention to proper allocation of expenses between mandatory and

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

voluntary fees), Dunn's repeated failure to provide adequate or truthful information to the Board plainly provides an adequate basis to terminate his at will employment. Whether the Board should do so is a slightly different question, which requires evaluation of factors including how strongly Dunn has been performing in other ways—something as to which the Board has more information than we do. Nonetheless, however strong his performance has otherwise been, the nature of the misconduct involved here and the attitude Dunn showed when questioned by counsel could certainly justify termination.

Dunn repeatedly provided inadequate or inaccurate information to the Board in a way that undermined its ability to exercise its decision-making authority. He told (or implied to) the Board that no Bar funds would be used for the trip to Mongolia, when that was not the case. He failed to inform the Board about the Supreme Court's concerns regarding A.B. 852 that were highly relevant to a decision it was being asked to make about sponsoring the legislation. He misrepresented the Supreme Court's views about moving Bar operations to Sacramento even though the Board's discussions made plain to him that the Supreme Court's views were a central factor the Board was considering in making a hugely important decision for the Bar's future.

His truth-telling tendencies have also been called into question more generally based on how he described (or allowed to be described) to the Board Tom Miller's intentions about working in San Francisco, how he described to Luis Rodriguez his chances for a Judicial Council position, and how he described to Beth Jay and to us in his interview his disclosures to the Board about A.B. 852.

One piece of information that is often relevant to termination decisions of this kind is how effective and valuable the individual has been to the organization. Boards may be willing to tolerate more problems associated with an executive who is bringing huge value than with an executive who is a more average performer. The Board is far better able to judge the importance of Dunn's contributions to the Bar than we are. At the same time, two considerations are relevant to weighing this factor in the termination decision.

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

First, while Boards sometimes are willing to overlook or seek work-arounds for certain deficiencies in a high-performing executive, the deficiency of failing to be candid and truthful with the Board seems to strike at the very core of what a Board requires in its single employee.

Second, in assessing whether the problem is one that can be avoided in the future through reprimand or counseling, the Board should consider how Dunn responded on this issue when interviewed. It would be one thing if he were contrite and apologetic, acknowledging that his behavior in certain respects fell short of Board expectations. Dunn was the opposite: unapologetic, disingenuous, and (at least in one instance) untruthful. This reaction bodes ill for the possibility that future performance will be better.

Should it decide to do so, the Board plainly has the authority to terminate Dunn. Dunn's agreement provides that he is an at will employee who "serves at the pleasure and discretion of the Board and shall be terminable at will." Employment Agreement, § IV(C). "The Board as a whole has the authority to hire, supervise, and fire the Executive Director, and may do so through its designated leadership of Board President or other designate." Board Book Tab 18, Art. 3.

## B.    Peggy Van Horn and Financial Controls

Van Horn should be reprimanded for failing to perform her duties in accordance with applicable standards. There are constraints, however, on the extent to which the Board may do so directly.

Section 5 of the Rules and Regulations Pertaining to the Employment of Executive Staff Employees ("Exec. Staff Rules") provides: "Unless the Board has retained to itself the discretion to appoint or terminate an Executive Staff Employee, an Executive Staff employee serves at the pleasure of the State Bar and may be terminated, disciplined or demoted at will by the Executive Director." Exec. Staff Rules § 5(A) (emphasis added); see also Board Book, Tab 17, Art. 4, § 2 ("No personnel action . . . shall be undertaken without the approval of the Executive Director, or designee, through the Office of Human Resources."). The Board's Lines

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

of Authority Policy Statement provides that the Board "may provide advice to the Executive Director to support her/his management, but will not assume the role of managing other staff members unless there is a compelling reason to do so. Such a step would be considered a temporary and emergency action." Board Book, Tab 18, Art. 3, p. 18.

If the Board decides that Van Horn should be reprimanded, we recommend that it instruct Dunn (or his replacement) to do so. If he refuses, the Board may (1) "assume the role of managing" Van Horn in light of the "compelling" concerns raised by the investigation's findings and Dunn's refusal to take appropriate action; and/or (2) take Dunn's conduct into account in his performance review and the re-negotiation of his contract.

Further, management should implement additional internal controls and/or training to ensure that State Bar funds are appropriately administered and accounted for in accordance with all legal requirements. Specifically, we recommend the following:

- All members of the Board, senior management, and any Office of Finance staff member responsible for auditing travel and business expenses should undergo training on the *Keller* requirements, as well as the business unit account codes applicable to chargeable versus non-chargeable expenses.

- At a minimum, management should ensure that travel expenses for the Mongolia trip are properly allocated to voluntary fees.

- The Board should instruct senior management to allocate each executive staff member with an individual business expense budget each year. These allocations should be included in the annual budget to be approved by the Board, and internal controls should be implemented to ensure that each executive staff member's business expenses are appropriately audited by the Office of Finance. The Executive Director's business expenses should be audited by the finance committee of the Board.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

## C.  Thomas Miller

The Board should consider several matters with respect to Miller's position as General Counsel.

First, as noted above, unless it has changed its view, the Board should instruct Miller that it has always understood that he would spend a majority of his time in San Francisco indefinitely, and that it expects that practice to continue. It may deliver that feedback through the existing evaluation process. See Board Book Tab 18, Art. 3, p. 22 ("The General Counsel is subject to an annual performance review by both the Executive Director and the Board.").

Second, if the Board decides to reprimand but not terminate Dunn, it may want to revisit whether Miller is the best person for the General Counsel job. Having a strong General Counsel can act as a valuable check on a chief executive whose trustworthiness or candor has been called into question. Given the problems that have now come to light about Dunn, the Board may feel a greater need to have such a General Counsel in place than it did when Miller was hired, and it may question whether Miller is the right person if Dunn remains. Certainly, Miller failed to take action to correct the non-disclosure regarding AB 852 though he was in a position to do so, and his party-line explanation for failing to do so raises questions whether he has the gumption and independence to stand up to Dunn when the Board would want him to.

If the Board concludes that Miller should be replaced, we can discuss further at the Board meeting how to go about doing so. While the Executive Director must bring his or her choice for General Counsel to the Board for approval, it is unclear whether the Board has retained the discretion to dismiss someone from the General Counsel position. Compare Board Book Tab 18, Art. 1, § 7 (stating that Board must approve General Counsel hiring, but "otherwise all personnel decisions reside exclusively in the executive director"), with Board Book Tab 18, Art. 3, p. 17 ("The Executive Director will make recommendations for hiring and dismissal of these positions to the Board for their final approval.").

Finally, whoever continues in the role of General Counsel, the Board should reinvigorate the policy that the General Counsel reports directly to both the Board and the Executive Director.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

See Board Book, Tab 18 § 7 Authority of the General Counsel.  The job description posted, and Miller's understanding of the reporting relationship, do not precisely track the stated policy.  The Board should take steps to cultivate a direct relationship with the General Counsel and express an expectation that he or she perform a watchdog role.

### D.     Other Recommendations

1.      The State Bar should make a corrective public statement to clarify that Bar funds were in fact used for the Mongolia trip.

2.      The Board should adopt a policy that prohibits Bar employees from providing or offering to Board members during their terms of service assistance in professional matters unrelated to Bar activities and prohibits Board members from requesting such assistance.

3.      At some appropriate meeting, retreat, or other forum, the Board should receive from an outside expert training in protocols related to the proper conduct of independent investigations and should consider adopting written guidelines for the handling of such investigations in the future.

4.      The Board should instruct senior management how important it is to cultivate and maintain a public perception that the Bar represents all attorneys, and that no one law firm or segment of the bar has a special position.  It should further instruct management that its conduct to date may have created an unhealthy perception that Girardi and his firm have special influence or receive special treatment – and that management should take steps to dispel and avoid contributing further to this perception in the future.

5.      The Board should instruct all senior management to ensure strict adherence to the Bar's competitive bidding and sole source requirements.

6.      Bar management should be instructed to conduct all Bar business through their official email accounts and not to use personal email addresses for such matters (as it appeared to us that Dunn did on many occasions).

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

EXHIBIT 2



## News Releases

**Media Contact**

Office of Communications | 213-765-1388 | barcomm@calbar.ca.gov

### State Bar Announces Additional Investigation into Handling of Past Complaints Against Thomas Girardi



Monday, January 24, 2022    Categories: News Releases

The State Bar of California's Board of Trustees announced today that it has been conducting an additional investigation into whether the State Bar's handling of past discipline complaints against former licensee Thomas V. Girardi was affected by Girardi's connections to or influence at the State Bar. The investigation is intended to identify actions by anyone with ties to the State Bar that may constitute malfeasance in how discipline complaints against Girardi were handled.

"The State Bar Board leadership and staff take very seriously the immense harm done by Thomas Girardi to innocent victims," said Ruben Duran, Board Chair. "We have been proactively doing everything in our power to learn from the past and do better in the future to prevent harms like this from recurring. This necessarily includes assessing whether intentional wrongdoing by anyone associated with the State Bar may have influenced how complaints against Girardi were handled. Details of the investigation, including details of past closed complaints and investigations, must remain confidential to comply with the law and to give this investigation the greatest chance of success. Mark our words: we will go wherever the evidence leads us."

The State Bar has retained the law firm of Halpern May Ybarra Gelberg LLP to conduct the investigation.

Today's news follows the State Bar Court of California issuing on January 10 its decision and order recommending that the California Supreme Court disbar Girardi. Girardi was charged with numerous violations of the State Bar Act and Rules of Professional Conduct in three separate matters, including several acts of moral turpitude. He did not file a response to the notice of disciplinary charges (NDC), and his default was entered on August 6, 2021.

### ###

Follow the State Bar online

LinkedIn, Twitter, Facebook, and Instagram

*The State Bar of California's mission is to protect the public and includes the primary functions of licensing, regulation and discipline of attorneys; the advancement of the ethical and competent practice of law; and*

Declaration ISO Rule 11 Motion Ex. 2 p. 001

*support of efforts for greater access to, and inclusion in, the legal system.*

Previous Article                                                                                    **Next Article**

Copyright © 2023 The State Bar of California

EXHIBIT 3



## The State Bar
### *of California*

**BOARD OF TRUSTEES**

180 Howard Street, San Francisco, CA 94105

November 3, 2022

**OPEN LETTER REGARDING THE STATE BAR'S THOMAS V. GIRARDI DISCLOSURE**

Today, the State Bar of California is releasing information about disciplinary matters that were opened and closed over the past 40 years involving now-disbarred attorney Thomas V. Girardi. The handling of the Girardi matters brought to light serious failures in the State Bar's attorney discipline system, failures that have contributed to a lack of confidence in the State Bar's ability to carry out our core responsibility of protecting the public. There is no excuse being offered here; Girardi caused irreparable harm to hundreds of his clients, and the State Bar could have done more to protect the public. We can never allow something like this to happen again.

I speak on behalf of the entire Board of Trustees when I say that we want the public to know that we take our statutory mission to protect the public seriously. As articulated in our new strategic plan, our public protection mission is the guiding light for all that we do. Moreover, meaningful change begins with a culture that values transparency and accountability, principles the Board of Trustees and State Bar leadership hold central in our decision-making. In this spirit, and pursuant to a discretionary determination made by the Chief Trial Counsel and me, the State Bar is now releasing as much information about the Girardi matters as we believe is allowed under the law.

**THE GIRARDI DISCLOSURE – THE NUMBERS**

Over the past 40 years, the State Bar opened 205 disciplinary matters about Girardi. Of the 205 matters, approximately 120 involved allegations relating to client trust account violations. The remaining disciplinary matters involved various allegations ranging from failure to communicate with clients to failure to perform, as well as misrepresentations to courts and clients, among others. Of these 205 disciplinary matters, the State Bar received 69 complaints on or after December 18, 2020, when a petition was filed to force Girardi's law firm into bankruptcy. Nearly 60 of those recent complaints alleged client trust account violations.

Three of the 205 disciplinary matters resulted in Girardi's disbarment earlier this year. An additional 64 matters were thereafter closed due to his disbarment—after a disbarment, there is no further disciplinary action the State Bar can take. Before his disbarment, Girardi was never

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

3:23-0164-BAS-DDL
Declaration of RJC Rule 11 Motion Exp. 001002

November 3, 2022
Page 2

publicly disciplined by the State Bar. Thirteen other matters were previously resolved through non-public measures at the investigation, prefiling, or post filing stages.[1]

The remaining 125 matters were handled as follows:

- 60 complaints, or 48 percent, were closed at intake;
- Another 61 complaints, or just under 49 percent, were closed after investigation; and
- 4 complaints, or just over 3 percent, were closed at the prefiling stage.

The full disclosure accompanied by explanatory information is attached.

## THE STATE BAR'S RESPONSE

We recognize that the Girardi situation has undermined the public's trust in the State Bar as an institution. In response, the State Bar has initiated a number of efforts (highlighted below) and outlined bold goals for the attorney discipline system. We made significant progress on many fronts.

### BAR-INITIATED INVESTIGATIONS OF GIRARDI MATTERS

The State Bar began the process of righting the wrongs brought to light by the Girardi matters in 2021, when we conducted an audit of all closed disciplinary matters concerning Girardi. That was followed by the launch of a comprehensive investigation (still ongoing), into prior actions taken by any staff or other State Bar affiliated persons, to determine whether the State Bar's handling of matters involving Girardi was affected by his connections to, or relationships or influence with these individuals. As I have said previously about this investigation, we are pursuing the facts as vigorously as possible under the law and will go where the evidence leads us. We will share more information about both the audit and the investigation when the latter is completed.

### GIRARDI WAS DISBARRED AND THE STATE BAR ACCELERATED CLIENT SECURITY FUND PAYMENTS

The Chief Trial Counsel sought disbarment of Girardi in 2021; following a default, Girardi was disbarred by the Supreme Court in June 2022. Also in 2021, even before Girardi was disbarred, the State Bar's Client Security Fund began making payments to his victims on an accelerated basis.

---

[1] Non-public measures may include non-public private reprovals, agreements in lieu of discipline, admonitions, warning letters, or directional letters.

November 3, 2022
Page 3

**REFORMS TO ATTORNEY DISCIPLINE SYSTEM, INCLUDING ESTABLISHING THE NEW CLIENT TRUST ACCOUNT PROTECTION PROGRAM**

Under the Board's leadership, the State Bar has developed and implemented much-needed reforms to the attorney discipline system. We will continue to pursue these efforts to ensure the State Bar fulfills our mission to protect the public.

Among the important steps we have taken thus far is the creation of the new Client Trust Account Protection Program, which was approved by the California Supreme Court last month. This program will be in effect at the commencement of the 2023 annual license renewal cycle. The program will empower the State Bar—for the first time—to require licensed attorneys to report information about *all* of their client trust accounts annually, as well as provide the State Bar with new tools to enhance accountability and oversight of client trust accounts and deter misconduct. The Program includes resources and tools to assist licensees in complying with the new requirements.

Directly related to some of the issues reflected in the present disclosure, the State Bar also has undertaken the following:

*New Tools and Policies to Identify and Address Patterns of Complaints*
- Developed an automated process for identifying patterns of prior complaints at intake and implemented a new policy so that when new complaints are received about an attorney, the State Bar can identify previous complaints against that attorney and consider those previous complaints in determining how to proceed; and
- Implemented a new policy that cases resulting from small bank overdrafts may not be closed without investigation if the attorney has a pending or prior (within the last two years) overdraft or client trust account-related complaint.

*Restrictions on the Use of Nonpublic Measures*
- Revised our policies to provide clearer guidance and limits on the use of nonpublic measures to close cases.

The Board of Trustees also appointed George S. Cardona, a former federal prosecutor, as the State Bar's Chief Trial Counsel, who was confirmed by the Senate earlier this year —the first such confirmation in ten years. The new leadership team was further bolstered by the hiring of Ellin Davtyan as the State Bar's new general counsel.

Today's disclosure is another step forward in advancing our commitment to protect the public with greater impact, transparency, and urgency. The State Bar is committed to doing everything in our power to prevent something like this from happening again.

On behalf of the entire Board, I'd like to express our appreciation to all who have reached out with their thoughts, concerns, and complaints. We hear you, loud and clear. Your experiences serve as a

November 3, 2022
Page 4


sober reminder of the importance of our efforts to do better. We are committed to doing so, to fulfill our mission of protecting the public.

Sincerely,

Ruben Duran
Chair, Board of Trustees


Attachments

EXHIBIT 4

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | TELEPHONE NUMBER **(760) 449-2509** | FOR COURT USE ONLY |
|---|---|---|
| **Justin Beck**<br>**3501 Roselle St**<br>**Oceanside, CA 92056**<br>ATTORNEY FOR   **Self Represented** | | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CIVIL COMPLEX CENTER<br>751 W Santa Ana Blvd<br>Santa Ana, CA 92701 |
|---|

| SHORT TITLE OF CASE<br>Justin S. Beck vs. Kenneth Catanzarite |
|---|

| DATE:<br>11/04/2022 | TIME:<br>10:00 AM | DEP./DIV.<br>CX105 | CASE NUMBER:<br>30-2020-01145998-CU-BT-CXC |
|---|---|---|---|
| | **Proof of Service** | | Ref. No. or File No: |

1. At the time of service I was at least 18 years of age and not a party to this action, and I served copies of the:

   **Complaint; Amendment to Complaint; CMS - Case Management Statement; Notice of Motion and Motion for Summary Judgment; Declaration in Support; Separate Statement; Request for Judicial Notice**

2. Party Served: **THE STATE OF CALIFORNIA, a public entity By Serving Office of the Attorney General, Agent for Service**

3. Address: **1300 I St,  Sacramento, CA 95814**

   On: **8/10/2022**               At: **03:26 PM**

4. I served the Party named in item 2
   By substituted service:
   E. Maldonado  (Gender: M Age: 40 Height: 5'8" Weight: 200 Race: Caucasian Hair: Brown Other: )
   Badge #30

   (Business) A person at least 18 years of age apparently in charge at the office or usual place of business of the person served.
   I informed him or her of the general nature of the papers.

5. A declaration of diligence and/or mailing is attached, if applicable.

Person attempting service:

   a. Name: **Ricky Siebel**
   b. Address: **500 Allerton Street Suite 105, Redwood City, CA 94063**
   c. Reg. No.: **2021-041  d.County: Sacramento**
   e. Telephone number: **650-364-9612**
   f. The fee for this service was:  449.75
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

S W I F T

MORE THAN JUST OUR NAME
ITS WHAT WE DO

Ricky Siebel                                Date: 08/11/2022

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 4 p. 001

Electronically Filed by Superior Court of California, County of Orange, 01/03/2023 07:06:00 PM.
30-2020-01145998-CU-BT-CXC - ROA # 897 - DAVID H. YAMASAKI, Clerk of the Court By E. efilinguser, Deputy Clerk.

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| JUSTIN S. BECK<br>3501 ROSELLE ST.<br>OCEANSIDE, CA 92056<br><br>TELEPHONE NO.: 760-449-2509   FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional): justintimesd@gmail.com<br>ATTORNEY FOR (Name): In Pro Per | |

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>STREET ADDRESS: 751 W. SANTA ANA BLVD.<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: SANTA ANA, CA 92701<br>BRANCH NAME: CIVIL COMPLEX CENTER | |
| PLAINTIFF/PETITIONER: JUSTIN S. BECK<br><br>DEFENDANT/RESPONDENT: THE STATE OF CALIFORNIA | CASE NUMBER:<br>30-2020-01145998-CU-BT-CXC |
| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents):* Moving Papers for Summary Judgment and Summary Adjudication

3. a. Party served *(specify name of party as shown on documents served):*
      THE STATE OF CALIFORNIA, a public entity

   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      Rob Bonta, Attorney General | Michael Redding, Asst. AG    AGElectronicService@doj.ca.gov
                                                                  Michael.Redding@doj.ca.gov
4. Address where the party was served:   Office of Attorney General              Rob.Bonta@doj.ca.gov
                                          1300 "I" Street
5. I served the party *(check proper box)*   Sacramento, CA 95814
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*                      (2) at *(time):*
   b. [ ] **by substituted service.** On *(date):*                   at *(time):*                   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*              from *(city):*                      or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |

| PLAINTIFF/PETITIONER: JUSTIN S. BECK | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: THE STATE OF CALIFORNIA | 30-2020-01145998-CU-BT-CXC |

5. c. [ ] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the
   address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):*                                    (2) from *(city):*

   (3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed
       to me. *(Attach completed* Notice and Acknowledgement of Receipt.*) (Code Civ. Proc., § 415.30.)*

   (4) [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

   d. [✓] **by other means** *(specify means of service and authorizing code section):*

   ## CCP 1010.6
   ## CCP 474

   [✓] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. [ ] as an individual defendant.
   b. [ ] as the person sued under the fictitious name of *(specify):*
   c. [ ] as occupant.
   d. [ ] On behalf of *(specify):*
      under the following Code of Civil Procedure section:

   | | |
   |---|---|
   | [ ] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
   | [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
   | [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
   | [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
   | [X] 416.50 (public entity) | [ ] 415.46 (occupant) |
   | | [ ] other: |

7. **Person who served papers**
   a. Name:                  JUSTIN S· BECK                        Also Served Physically
   b. Address:          3501 ROSELLE ST, OCEANSIDE, CA 92056       On Office of Attorney
   c. Telephone number:      760-449-2509                          General By Third-
   d. **The fee** for service was: $                               Party Process Server
   e. I am:
      (1) [X] not a registered California process server.
      (2) [ ] exempt from registration under Business and Professions Code section 22350(b).
      (3) [ ] a registered California process server:
          (i)  [ ] owner  [ ] employee  [ ] independent contractor.
          (ii)  Registration No.:
          (iii)  County:

8. [X] **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   *or*

9. [ ] **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: JANUARY 3, 2023

**JUSTIN S. BECK**                                  ▶         *JUSTIN BECK*
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)                       (SIGNATURE )

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 4 p. 003

**Describing Service of Summons, Complaint, and Supplement to Complaint on
THE STATE OF CALIFORNIA, a public entity**

1) By third-party process server, who delivered it to Office of Attorney General and filed proof.

2) By electronic service under CCP 1010.6 to agelectronicservice@doj.ca.gov which is responsible for defending tort claims under Government Claims Act for THE STATE OF CALIFORNIA, and for paying judgments in tort claims on behalf of THE STATE OF CALIFORNIA.

3) By electronic service, again, through TrueFiling in connection with antitrust proceedings as a real party in interest, now pending before Federal Trade Commission.

4) By electronic service, again, through TrueFiling in current, original writ proceedings against respondent Orange County Superior Court (C11 and CX105) (G061896) as real parties in interest.

5) By electronic service, again, in connection with pending federal proceedings filed under Racketeer Influenced Corrupt Organizations Act 18 U.S.C Section 1962(a)-(d) ("RICO"), 15 U.S.C. Section 1 ("Sherman Act"), 42 U.S.C. § 1983 against defendants in this action and nominal defendant United States Attorney General.

6) By electronic service, again, in connection with racketeering investigation demand under 18 U.S.C. § 1968 on the United States Attorney General as nominal defendant.

7) By electronic service, again, in connection with claims against Orange County Superior Court and Orange County in ratification and carrying on unlawful activity and under RICO.

8) By electronic service, again, in connection with legislative audit demand on Board of Trustees for The State Bar of California related to the instant case and related cases for concealment of material state liability.

**Describing Service of Summons, Complaint, and Supplement to Complaint on
THE STATE BAR OF CALIFORNIA, a public entity; SUZANNE GRANDT, an individual; RUBEN
DURAN, an individual; ELI DAVID MORGENSTERN, an individual**

1) By electronic service to counsel of record, Office of General Counsel, in all related cases.

2) By electronic service to each party to their public email address.

3) By electronic service, again, through TrueFiling in connection with antitrust proceedings as real parties in interest, now pending before Federal Trade Commission.

4) By electronic service, again, through TrueFiling in current, original writ proceedings against respondent Orange County Superior Court (C11 and CX105) (G061896) as real parties in interest.

5) By electronic service, again, in connection with pending federal proceedings filed under Racketeer Influenced Corrupt Organizations Act 18 U.S.C Section 1962(a)-(d) ("RICO"), 15 U.S.C. Section 1 ("Sherman Act"), 42 U.S.C. § 1983 against most defendants in this action and nominal defendant United States Attorney General pending summons (3:22-CV-01616-BAS-DDL).

6) By electronic service, again, in connection with racketeering investigation demand under 18 U.S.C. § 1968 on the United States Attorney General as nominal defendant. (3:22-CV-01616-BAS-DDL)

7) By electronic service, again, in connection with claim notice delivered Orange County Superior Court and Orange County in ratification, RICO, and constitutional violations by court officials under color of state law and California Code of Civil Procedure under 42 U.S.C. § 1983.

8) By electronic service, again, in connection with audits commenced through Legislature concerning Board of Trustees, Office of General Counsel, and State of California's deliberate avoidance of merits-based hearings and concealment of material claims against each.

**Describing Service of Summons, Complaint, and Supplement to Complaint on**
**NICOLE MARIE CATANZARITE WOODWARD, ESQ., an individual**

1) By electronic service to counsel of record, Catanzarite Law Corporation et al.

2) By electronic service to individual email address.

DECLARED TRUE UNDER PENALTY OF PERJURY

January 3, 2023

Justin S. Beck – Plaintiff

EXHIBIT 5

Case 3:23-cv-00164-AGS-DDL   Document 18   Filed 03/27/23   PageID.423   Page 90 of 265
Electronically Filed by Superior Court of California, County of Orange, 07/26/2022 05:45:00 PM.
30-2021-01237499-CU-PN-CJC - ROA # 117 - DAVID H. YAMASAKI, Clerk of the Court by E. efilinguser, Deputy Clerk.

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| **Justin Beck**<br>**3501 Roselle St**<br>**Oceanside, CA 92056**<br>TELEPHONE NO.: **(760) 449-2509**   FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name):   **Self Represented** | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CENTRAL
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: 700 Civic Center Drive West
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CENTRAL

| PLAINTIFF/PETITIONER: Justin S. Beck | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Ruben Duran | 30-2021-01237499-CU-PN-CJC |

| PROOF OF SERVICE SUMMONS | Ref. No. or File No.: |
|---|---|

(Separate proof of service is required for each party served.)

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of: *Summons; Plaintiff Justin S. Beck's First Amended Complaint for Damages &amp; Injunctive Relief*

3. a. Party served (specify name of party as shown on documents served): *THE STATE OF CALIFORNIA*

   b. [X] Person (other than the party in Item 3a) served on behalf of an entity or as an authorized agent (and not a person under Item 5b on whom substituted service was made) (specify name and relationship to the party named in Item 3a): **Officer B. Silkwood, Authorized Agent**

4. Address where the party was served: *1300 I St, Sacramento, CA 95814*

5. I served the party (check proper box)
   a. [X] by personal service. I personally delivered the documents listed in Item 2 to the party or person authorized to receive service of process for the party (1) on: 7/21/2022 (2) at: **11:45 AM**
   b. [ ] by substituted service. On: at: I left the documents listed in item 2 with or in the presence of (name and title or relationship to person indicated in item 3):
   ( Gender: Female Height: Weight: Race: Hair: Other: )

   (1) [ ] (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
   (2) [ ] (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
   (3) [ ] (physical address unknown) a person of at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
   (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents:
   on:        from:        or [ ] a declaration of mailing is attached.

| PLAINTIFF/PETITIONER: Justin S. Beck<br>DEFENDANT/RESPONDENT: Ruben Duran | CASE NUMBER:<br>30-2021-01237499-CU-PN-CJC |
| --- | --- |

     (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

5.   c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

     (1) on:              (2) from:

     (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. (*Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

     (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

   d. ☐ **by other means** *(specify means of service and authorizing code section):*

     ☐ Additional page describing service is attached.

6.   The "Notice to the Person Served" (on the summons) was completed as follows:
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ as occupant.
   d. ☒ On behalf of *(specify):* **THE STATE OF CALIFORNIA**
     under the following Code of Civil Procedure section:

     ☐ 416.10 (corporation)           ☐ 415.95 (business organization, form unknown)
     ☐ 416.20 (defunct corporation)      ☐ 416.60 (minor)
     ☐ 416.30 (joint stock company/association)   ☐ 416.70 (ward or conservatee)
     ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
     ☒ 416.50 (public entity)           ☐ 415.46 (occupant)
                            ☐ other:

7.   **Person who served papers**
   a. Name: **Michael Lynn Henry**
   b. Address: **500 Allerton Street Suite 105, Redwood City, CA 94063**
   c. Telephone number: **650-364-9612**
   d. The fee for service was: 160.00
   e. I am:
     (1) ☐ not a registered California process server.
     (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
     (3) ☒ a registered California process server:
       (i) ☐ owner   ☐ employee   ☒ independent contractor.
       (ii) Registration No.: **2019-24**
       (iii) County: **Sacramento**

     **PROOF OF SERVICE OF SUMMONS**      

| PLAINTIFF/PETITIONER: Justin S. Beck DEFENDANT/RESPONDENT: Ruben Duran | CASE NUMBER: 30-2021-01237499-CU-PN-CJC |
|---|---|

8.  [ X ]  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Michael Lynn Henry                    Date: 07/22/2022

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 5 p. 003

EXHIBIT 6



**The State Bar**
*of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

ellin.davtyan@calbar.ca.gov
415-538-2000

December 15, 2022

**Via U.S. Mail and Email: justintimesd@gmail.com**
Justin S. Beck
3501 Roselle Street
Oceanside CA 92056

Dear Mr. Beck:

As we have already informed you, on December 12, 2022 at approximately 9:56 a.m., you received an email containing communication that is confidential and privileged, pursuant to and without limitation Business and Professions Code section 6086.1(b), and attorney-work product and attorney-client privileges. The forwarding of this email was inadvertent and should not be construed as a waiver of state confidentiality laws.

You assert that the State Bar's internal communications with its counsel are not privileged because of your mistaken belief that the State Bar performing its public function differently than you believe it should constitutes a "fraud." Setting aside the fact that your mischaracterizations do not control the application of the privilege, the crime-fraud exception you cite only applies where the specific communication was made for the purpose of aiding a crime or fraud. On its face, the communication you were inadvertently sent related to whether to grant *your* request to waive confidentiality as to certain complaints you have made against various attorneys. The State Bar's consideration of your request that it exercise its discretion in such a manner is neither a crime nor a fraud.

We reiterate that you have no right to share or retain the State Bar's privileged communications, and request that you identify all persons to whom you have distributed the communication and destroy any copies in your possession.

Thank you for your anticipated cooperation.

Sincerely,

Ellin Davtyan
General Counsel

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

EXHIBIT 7

 # The State Bar *of California*

## 2022–2023 Board of Trustees
### Officers

**Chair**
**Ruben Duran**
Assembly appointee, attorney member

**Vice-Chair**
**Brandon N. Stallings**
Supreme Court appointee, attorney member

### Trustees

**Mark Broughton**
Supreme Court appointee, attorney member

**Hailyn Chen**
Supreme Court appointee, attorney member

**José Cisneros**
Governor appointee, public member

**Juan De La Cruz**
Assembly appointee, public member

**Gregory E. Knoll**
Senate appointee, attorney member

**Melanie M. Shelby**
Governor appointee, public member

**Arnold Sowell Jr.**
Senate appointee, public member

**Mark W. Toney, PhD**
Governor appointee, public member

Back to Board of Trustees

Copyright © 2022 The State Bar of California

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 7 p. 001

 The State Bar *of California*

## Board of Trustees

The State Bar's governing body, the Board of Trustees, develops the guiding policies and principles underpinning its regulatory mission.

### Board meetings

The Board meets approximately six times a year, via Zoom and in-person from the State Bar's Los Angeles office. Meetings are open to the public except for closed sessions that are allowed by law.

- Meetings calendar
- Agendas for upcoming Board meetings
- Archive of agendas and minutes
- Meeting recordings

The State Bar is subject to meeting rules under the Bagley-Keene Open Meeting Act (Govt. Code Sections 11120, et seq.).

### Board composition

The full 13-member Board is comprised of:

- Five attorneys appointed by the California Supreme Court, who will serve four-year terms
- Two attorneys appointed by the Legislature, one by the Senate Committee on Rules and one by the Speaker of the Assembly
- Six "public" or nonattorney members, four appointed by the Governor, one by the Senate Committee on Rules and one by the Speaker of the Assembly

### Board committees

The Board has standing committees composed only of Board members, two of which are statutorily mandated: the Board Executive Committee and the Regulation and Discipline (RAD) Committee. Currently, the entire Board sits as the RAD Committee. Additional standing committees of the Board include the Audit Committee and the Finance Committee.

### Subentities of the Board

The Board appoints volunteers to serve on a variety of committees, task forces, and working groups that support the work of the State Bar. View the committee listing here, and see what committee meetings are coming up here.

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 7 p. 002

**More information**

- Rules of the State Bar of California - Title 6. Governance
- Board of Trustees Policy Manual
- Five-Year Strategic Plan
- Report on 2017 Operational Plan

Copyright © 2022 The State Bar of California

EXHIBIT 8

Electronically Filed by Superior Court of California, County of Orange, 07/18/2022 08:00:00 AM.
30-2021-01237499-CU-PN-CJC - ROA # 107 - DAVID H. YAMASAKI, Clerk of the Court By M. Johnson, Deputy Clerk.

1

2

**NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR
SUMMARY JUDGMENT OR IN THE ALTERNATIVE
FOR SUMMARY ADJUDICATION**

3

4   Justin S. Beck
    3501 Roselle St.
5   Oceanside, California 92056
    760-449-2509
6

    *In Pro Per*
7

8                    **IN THE SUPERIOR COURT OF CALIFORNIA**

9                              **COUNTY OF ORANGE**

| | |
|---|---|
| JUSTIN S. BECK, an individual | Case No: 30-2021-01237499-CU-PN-CJC |
| Plaintiff, | Judge Assigned: Honorable John C. Gastelum |
| v. | **NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION** |
| THE STATE BAR OF CALIFORNIA, a public corporation and public entity; ANAND KUMAR, an individual employee acting in an official capacity; ELI DAVID MORGENSTERN, an individual employee acting in an official capacity; JOY NUNLEY, an individual employee acting in an official capacity; THE STATE OF CALIFORNIA, a state and public entity; and DOES 1-30 | **Date: October 4, 2022** |
| | **Reservation Number: 73773752** |
| | **Time: 2:00PM** |
| | **Unlimited Civil Case** |
| Defendants | Action Filed: December 21, 2021 |
| | Trial Date: None |

-1-

3:23-0164-BAS-DDL                                   Exhibit #19: 002

Declaration ISO Rule 11 Motion Ex. 8 p. 001        22-CV-01616-BAS-DDL

**TO EACH PARTY AND TO COUNSEL OF RECORD FOR EACH PARTY:**

1

2          **YOU ARE HEREBY NOTIFIED THAT** on October 4, 2022 at 2:00 PM, in Department C11 of this

3   Court, located at Central Justice Center, 700 W. Civic Center Blvd., Santa Ana, California, 92701 or as soon

4   thereafter as the matter will be heard, plaintiff Justin S. Beck ("Beck" or plaintiff) will move the Court, pursuant

5   to Code of Civil Procedure section 437c in accordance with Rule 3.1350, for summary judgment in favor of

6   plaintiff Justin S. Beck and against defendants The State Bar of California and State of California, and for costs

7   of suit incurred herein and such other relief as may be just ("Motion"). This Motion is made on the grounds that:

8

9   1) State Bar waived any defense to this action predicated upon Beck's procedural adherence to Government

10  Claims Act claims presentation or filing requirements. Beck filed a sufficient government claim with State Bar

11  that was denied under GOV 910 in November 2021, vesting his right to sue. Beck filed this action in December

12  2021 based on the material facts and allegations underlying his denied claim within the requisite timeframe under

13  GOV 945.6 and updated his complaint as additional facts were learned on or around May 2, 2022, which is the

14  operative complaint (FAC) upon which this Motion is based. [ROA #60]

15

16  2) Beck suffered injuries in fact that continue, including severe emotional distress, and damages to his person and

17  property that are now further evidenced by [final] adjudicated facts and law relevant to this case (including

18  evidence of legal malice in at least three actions) (G059766). Beck pleads, proves defendants' "substantial factor"

19  in his harm, *and* substantial factor in defendants' violation of one or more enactments designed to prevent similar

20  injury to Beck because Court rulings in 2019 known to State Bar in January 2020 relied upon the same burdens

21  of proof. Beck also pleads and proves the special relationship existing by and between State Bar, Beck, and

22  Catanzarite, and the unique position necessitating due care under those specific circumstances.

23

24  3) Beck pleads, proves all seven causes of action, with liability "otherwise provided" by statue (GOV 815, 815.2,

25  815.3, 815.6, 835) yet he needs to prove only one cause of action (1st, 2nd, 3rd, 5th, 6th, or 7th) by a preponderance

26  of evidence to award summary judgment in Beck's favor under Government Claims Act, and one cause of action

27  (2nd, 6th, or 7th) by clear and convincing evidence (815.3) to award summary judgment in Beck's favor in

28  intentional tort against individuals, where State and State Bar are liable under Government Claims Act.

-2-
NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL                                    Exhibit #19: 003
Declaration ISO Rule 11 Motion Ex. 8 p. 002    22-CV-01616-BAS-DDL

4) There is no defense to this action, because one or more mandatory duties were violated (GOV 815.6) that were a substantial factor in Beck's harm (for which no immunity exists), there is no immunity for intentional tort (GOV 815.3), and Beck shows why State Bar's claim of immunity are misplaced and unjust where they always involve reasonable* "exercise" of any "function" that were each and together a substantial factor in Beck's harm. Beck's material facts (Material Facts) show disregard of Beck, and a lack of capacity. Specifically, Beck shows how the decisions (namely, official operational acts that aren't subject to any codified immunity) underlying his injuries were negligent (at minimum), extremely negligent (more likely), corrupt or oppressive or fraudulent or legally malicious, more likely than not implying consideration or promise of consideration to public employee lawyers*, or otherwise negligent and reckless beyond reasonable doubt according to actual knowledge by State Bar and the actual authority under which Catanzarite, and each of them operate as of this Motion. (Beck Decl., generally) In all instances, defendants are a "substantial factor" or even heightened "condition precedent" and worse sometimes an "enabling factor" even when they know of Beck's injury (CRPC 5.1) but usually the *greatest* factor.

5) Beck is entitled to monetary judgment for his economic and non-economic damages against defendants The State Bar of California and State of California because all conduct upon which liability is based on this Motion was undertaken officially, and it was at least a substantial factor in harming Beck.

6) Beck is entitled to monetary judgment for his punitive damages against *individual* defendants DOES 1-30, Eli David Morgenstern, Joy Nunley, and Anand Kumar in his favor against defendant The State Bar of California and State of California on principles of *respondeat superior* and GOV 815.3 (official acts only).

In the alternative, plaintiff Justin S. Beck will move the Court (defined herein for convenience as the "Motion" together with the motion for summary judgment) for an order adjudicating the following ISSUE [1]-[22]:

**ISSUE [1]**: GENERAL DUTY OWED BECK

**ISSUE [2]**: MANDATORY DUTY OWED BECK

-3-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 003

Exhibit #19: 004
22-CV-01616-BAS-DDL

1   **ISSUE [3]:** JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

2   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR VIOLATION OF MANDATORY

3   DUTY TO BECK UNDER GOV 815.6 [1st CAUSE OF ACTION DISPOSAL]

4

5   **ISSUE [4]:** JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

6   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR NEGLIGENCE VIOLATIVE OF GOV

7   815 AND/OR GOV 815.2, GOV 815.3, GOV 815.6, WITH A HIGH DEGREE OF CULPABILITY [2nd CAUSE

8   OF ACTION DISPOSAL]

9

10   **ISSUE [5]:** JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

11   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR OFFICIAL NEGLIGENCE

12   VIOLATIVE OF GOV 815/GOV 815.2 [3rd CAUSE OF ACTION DISPOSAL]

13

14   **ISSUE [6]:** JUDGMENT IN FAVOR OF JUSTIN S. BECK FOR PROVISIONAL LAWYER LICENSURE

15   UNDER GOV 814 PURSUANT TO CCP 128 [4th CAUSE OF ACTION DISPOSAL]

16

17   **ISSUE [7]:** JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

18   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR DANGEROUS CONDITION OF

19   PUBLIC PROPERTY UNDER GOV 835 [5th CAUSE OF ACTION DISPOSAL]

20

21   **ISSUE [8]:** JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

22   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR INTENTIONAL INFLICTION OF

23   EMOTIONAL DISTRESS UNDER GOV 815 AND GOV 815.3 [6th CAUSE OF ACTION DISPOSAL]

24

25   **ISSUE [9]:** JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

26   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR CONVERSION UNDER GOV 815,

27   GOV 815.2, GOV 815.3, AND/OR GOV 815.6 [7th CAUSE OF ACTION DISPOSAL]

28

**NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION**
3:23-0164-BAS-DDL                 Exhibit #19: 005
Declaration ISO Rule 11 Motion Ex. 8 p. 004     22-CV-01616-BAS-DDL

1   ISSUE [10]: THERE IS NO DEFENSE TO THIS ACTION FOR DEFENDANT THE STATE BAR OF

2   CALIFORNIA

3

4   ISSUE [11]: IMMUNITY UNDER GOV 815 NOT APPLICABLE TO INSTANT ACTION

5

6   ISSUE [12]: IMMUNITY UNDER GOV 818.2 NOT APPLICABLE TO INSTANT ACTION

7

8   ISSUE [13]: IMMUNITY UNDER GOV 818.4 NOT APPLICABLE TO INSTANT ACTION

9

10   ISSUE [14]: IMMUNITY UNDER GOV 820 NOT APPLICABLE TO INSTANT ACTION

11

12   ISSUE [15]: IMMUNITY UNDER GOV 820.2 NOT APPLICABLE TO INSTANT ACTION

13

14   ISSUE [16]: IMMUNITY UNDER GOV 820.4 NOT APPLICABLE TO INSTANT ACTION

15

16   ISSUE [17]: IMMUNITY UNDER GOV 820.8 NOT APPLICABLE TO INSTANT ACTION

17

18   ISSUE [18]: IMMUNITY UNDER GOV 821 NOT APPLICABLE TO INSTANT ACTION

19

20   ISSUE [19]: IMMUNITY UNDER GOV 821.2 NOT APPLICABLE TO INSTANT ACTION

21

22   ISSUE [20]: JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

23   STATE BAR OF CALIFORNA AND STATE OF CALIFORNIA FOR HIS ECONOMIC DAMAGES

24

25   ISSUE [21]: JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

26   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR HIS NON-ECONOMIC DAMAGES

27

28

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL                                              Exhibit #19: 006
Declaration ISO Rule 11 Motion Ex. 8 p. 005          22-CV-01616-BAS-DDL

1   **ISSUE [22]**: JUDGMENT IN FAVOR OF PLAINTIFF JUSTIN S. BECK AGAINST DEFENDANTS THE

2   STATE BAR OF CALIFORNIA AND STATE OF CALIFORNIA FOR PUNITIVE DAMAGES ARISING

3   FROM INDIVIDUAL DEFENDANTS ACTING OFFICIALLY

4

5   Plaintiff Justin S. Beck therefore seeks an order that the final judgment in this action shall, in addition to any

6   matters determined at trial, award judgment as established by such adjudication.

7          The Motion will be based on this notice, the attached memorandum in support, the separate statement of

8   undisputed material facts, the declaration of Justin S. Beck filed with this motion, the files and records in this

9   action, and any further evidence or argument that the Court may properly receive at or before the hearing.

10

11        DATE: July 17, 2022

12                                                        By Justin S. Beck, plaintiff and moving party

13                                                        *In Pro Per*

1

**TABLE OF AUTHORITIES**

2

CASES CITED IN MATERIAL FACTS OR MOTION OR FAC

3 *Alejo, supra*, 75 Cal.App.4th at p. 1194

4 *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1091 (*Brown*)

5 *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204 (*Brown v. USAT*)

6 *Elton v. County of Orange* (1970) 3 Cal.App.3d 1053, 1059

7 *Forrest v. Baeza* (1997) 58 Cal.App.4th 65, 76-77 (*Forrest*)

8 *Rodriquez v. Inglewood Unified School District* (1986) 186 Cal.App.3d 707 No. 68809.) (*Rodriquez*)

9 *Guzman v. County of Monterey*, 46 Cal.4th 887, 209 P.3D 89, 95 Cal.Rptr.3D 183 (*Guzman*)

10 *Hoff v. Vacaville Unified School Dist.* (19 Cal.4th 925 (Cal. 1998) (*Hoff*)

11 *Kimes v. Grosser* (2011) 195 Cal.App.4th 1556)

12 *Knutson, supra*, 25 Cal.App.5th at p. 1094

13 *Tirpak v. Los Angeles Unified School Dist.* (1986) 187 Cal.App.3d 639, 646

14 *Ramos v. County of Madera* (1971) 4 Cal.3d 685, 695

15 *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*)

16 *Johnson v. County of Los Angeles* (1983) 143 Cal.App.3d 298, 307-308 [191 Cal. Rptr.704] (*Johnson*)

17 *Tarasoff v. Regents of University of California*, supra, 17 Cal.3d at p. 435 (*Tarasoff*)

18 *Michel v. Smith* (1922) 188 Cal. 199

19 *Ogborn v. City of Lancaster* (2002) 101 Cal.App.4th 448, 462

20 *Ponsonby v. Sacramento Suburban Fruit Lands Co.* (1930) 210 Cal. 229, 232

21 *Ramos v. County of Madera* (1971) 4 Cal.3d 685, 695

22 *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619

23 *Rodriguez v. County of L.A.* (2014) 2014 US Dist LEXIS 183381

24 *Saben, Earlix & Associates v. Fll et* (2005) 134 Cal.App.4th 1024, 1032

25 *Stanley, supra,* 35 Cal.App.4th at p. 1087.)

26 *Thompson v. County of Alameda*, supra, 27 Cal.3d at p. 755)

27 *Tirpak v. Los Angeles Unified School Dist.* (1986) 187 Cal.A pp3d 639, 646

28 *Washington, supra*, 38 Cal.A pp4th at pp. 895-896; Gov. Code, § 815

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION

3:23-0164-BAS-DDL                                      Exhibit #19: 008
Declaration ISO Rule 11 Motion Ex. 8 p. 007      22-CV-01616-BAS-DDL

1                      CODES (US)

2   Title 15 U.S.C § 1 (Sherman Act)

3   Title 18 U.S.C § 1962 (RICO)

4   Title 10 U.S.C. § 921 – Art. 121 (Larceny)

5

6                  CODES (CALIFORNIA)

7   CCP 437c, et seq. (Motion Bases)

8   RULE 3.3150, et seq. (Motion Rules)

9   BPC 6001.1 (Protection of Beck is Paramount)

10   BPC 6077 (CRPC Binding on All Licensees)

11   BPC 6094 (State Bar Subject to GOV 810, et. seq)

12   CRPC 1.01 (Terminology)

13   CPRC 5.1 (Supervisory Lawyers)

14   CRPC 1.7 (Conflicts of Interest)

15   CRPC 1.9 (Duties to Former Clients)

16   CRPC 8.4 (Moral Turpitude Including Fraud)

17   BPC 6104 (Appearing Corruptly and Willfully, without Authority)

18   BPC 6106 (Dishonesty and Corruption)

19   GOV 810, et seq. (Liability Sections of Instant Action)

20   GOV 814 (Relief Other than Money or Damages)

21   GOV 815 (State Bar and State)

22   GOV 815.2 (Based on CCP 1714 and Reasonable Care)

23   GOV 815.3 (Intentional Tort with State Bar and DOES in Same Action Defendants)

24   GOV 815.6 (Liability for Violation of Mandatory Duty)

25   GOV 818.2 (Inapplicable or Irrelevant Immunity)

26   GOV 818.4 (Inapplicable or Irrelevant Immunity)

27   GOV 820 (Inapplicable or Irrelevant Immunity)

28   GOV 820.2 (Inapplicable or Irrelevant Immunity)

-8-

**NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION**

3:23-0164-BAS-DDL             Exhibit #19: 009

Declaration ISO Rule 11 Motion Ex. 8 p. 008      22-CV-01616-BAS-DDL

1   GOV 820.4 (Inapplicable or Irrelevant Immunity)

2   GOV 820.8 (Inapplicable or Irrelevant Immunity)

3   GOV 821 (Inapplicable or Irrelevant Immunity)

4   GOV 821.2 (Inapplicable or Irrelevant Immunity)

5   GOV 835 (Dangerous Condition of Public Premises Liability)

6                       OTHER AUTHORITIES

7   CACI No. 430 2022 ("Substantial Factor")

8   Cal. Law Revision Com. com. to Gov. Code, § 818.2

9   4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 555, p. 2822

10  Prosser, Law of Torts [3d ed. 1964] at pp. 332-333.

11  Rest.3d Torts, supra, § 40, com. h, pp. 42–43.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-9-

**NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE**
**ALTERNATIVE FOR SUMMARY ADJUDICATION**

I.  **INTRODUCTION**

II.  **SUMMARY OF RELEVANT FACTS TO DISPOSE OF MOTION**

   A. Beck Noticed State Bar of His Injuries in January 2020 Under Oath [ROA #49]

   B. Beck Noticed State Bar Again in March 2021 Under Oath [ROA #49]

   C. Adjudicated Facts/Law Prove Beck's Harm, Undermine State Bar "Protection" (G059766)

III.  **LEGAL DISCUSSION**

   A. Multiple Legal Theories Support Summary Judgment in Beck's Favor

     1. Violations of Mandatory Duty Substantial Factor in Beck's Injury

     2. Negligence (High Culpability/Understaffing) Also Substantial Factor

     3. Negligence in Violation of Other Duties Also Substantial Factor

     4. Beck's Refined Request for Relief is Reasonable Under GOV 814

     5. Dangerous Conditions of State Bar Premises Also Substantial Factor

     6. State Bar Substantial Factor in Beck's Severe Emotional Distress

     7. State Bar Substantial Factor in Conversion of Beck's Personal Property

   **B. Beck is Entitled to Judgment for Money and Damages in his Favor as a Matter of Law**

     1. Beck is Entitled to Judgment for Compensatory Damages

       i. Economic Damages

       ii. Non-Economic Damages

     2. Beck is Entitled to Punitive Damages Against Individuals

       i. Official Acts were Intentionally Tortious to Beck

   **C. There Is No Defense to this Action for State Bar or State**

IV.  **CONCLUSION**

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 010

Exhibit #19: 011
22-CV-01616-BAS-DDL

## I.    INTRODUCTION

Do public employees have a general duty to exercise reasonable care? Do State Bar officials and employees have a duty to act when they know* of licensee fraud* supported by court orders or credible evidence? What about when evidence of a pattern exists, including conduct meeting the definition of "racketeering activity," like securities, mail or wire fraud, larceny, extortion, or money laundering? What about for violating mandatory law designed to prevent specific injury? Can State Bar be held liable if its actors are a substantial factor in a persons' severe emotional distress? Is State Bar a substantial factor in licensee conduct, generally? The answer to each these questions is unambiguously *yes*.

Plaintiff's statement of undisputed material facts ("Material Facts") in support of plaintiff's motion for summary judgment, or in the alternative, summary adjudication accompanying this motion prove *beyond* a preponderance of evidence that before Beck's injury was sustained starting September 14, 2018 (*Bec k v. Catanzari e Law Corporation, et al.* G059744 [July 13, 2021]) ("G059766") – The State Bar of California knew* or reasonably should have known* that Beck's injury would happen to someone, because it was already happening to others from 2002-2022 according to audits (Beck RJN 1 ISO, Ex. 3-24). State Bar possessed clear and convincing evidence of a pattern similar conduct involving public employees (to employ safeguards ([ROA #93] Beck RJN 1 Ex. 234, p. 465) against abuse of public authority) (*Id.* at p. 465) and involving Catanzarite (to take steps in reasonable mitigation for serial fraud* known* to State Bar dating back to 2007 or earlier) (Material Facts, p. 31-52)

On notice of fraud (Beck Decl. ISO, Ex. A, p. 33) in interstate and foreign securities backed by final rulings in Courts of Appeal summarized in G059766, and in *Perrine* Material Facts, p. 31, and in *Alexandros v. Cole* )*Id.* at p. 32), and in *Edwards v. Noroski* (*Ibid*.), and regarding nine class actions filed on behalf of Richard Carlson involving "$437,315,000" in gross proceeds affecting "13,858" investors *(Id.* at p. 33), and Renato Corzo (*Ibid*.), and Denise Pinkerton (G059766), State Bar still protects Catanzarite. Judgment on this Motion is appropriate in favor of Beck. Beck is entitled to judgment for "fair compensation" (economic, non-economic damages), and separate judgment for punitive damages against State Bar and State of California for conduct of individual defendants acting in an official capacity (*repondeat superior*) in intentional tort (GOV 815.2 or GOV 815.3). In alternative to summary judgment, summary adjudication followed by swift jury trial is requested by plaintiff.

-11-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 011

Exhibit #19: 012
22-CV-01616-BAS-DDL

1  **II.    SUMMARY OF RELEVANT FACTS TO DISPOSE OF MOTION**

2       A. Beck Noticed State Bar of His Injuries in January 2020 Under Oath [ROA #49]

3       B. Beck Noticed State Bar Again in March 2021 Under Oath [ROA #49]

4       C. Adjudicated Facts/Law Prove Beck's Harm, Undermine State Bar "Protection" (G059766)

5

6  **III.    LEGAL DISCUSSION**

7       This case is ready for summary judgment on this Motion because it is based on questions of law, or

8  facts of law, and the case has no defense. Many of the tortious acts proven by Beck involve employee

9  licensees of State Bar (aka – lawyers* acting for the government), and this Court can determine where

10 they have failed and harmed Beck as a matter of law. As for the rest (non-licensees), the results speak

11 for themselves, and they too are bound by BPC 6001.1 insofar as any enactment relates to CRPC or the

12 State Bar Act, as amended. (Material Facts, 1ˢᵗ Issue p. 4-10 and 2ⁿᵈ Issue p. 10-21, "Duty" or "duty")

13      "Substantial factor [CACI 430] causation is the correct causation standard for an intentional breach

14 of [public] duty…" (*Knutson, supra*, 25 Cal.App.5th at p. 1094.) under "…the legal malpractice standard

15 of causation to [Beck's claims]….The court cited The Rutter Group's treatise on professional

16 responsibility to equate causation for legal malpractice with causation for all breaches of fiduciary duty:

17 ' "The rules concerning causation, damages, and defenses that apply to lawyer negligence actions . . .

18 also govern actions for breach of [public] duty." ' This statement of the law is correct, however, only as

19 to claims of breach of [public] duty [in exercising public functions] arising from negligent conduct."

20 (*Knutson, supra*, 25 Cal.App.5th at p. 1094, internal citations omitted.)

21      Insofar as there is any dispute to Beck's indisputable facts, "[e]xpert testimony is not

22 required…where the attorney conduct is a matter beyond common knowledge." (*Stanley, supra,* 35

23 Cal.App.4th at p. 1087, internal citations omitted.) There is evidence that The State Bar of California

24 itself lacks an understanding of Government Claims Act, or the on-point cases preceding this.

25      To summarize substantial factor, causation, and conduct of licensees who are defendants to this

26 action (where State Bar is liable directly, and State is liable derivatively): **State Bar is at least a**

27 **substantial factor in virtually all public chattels, monies, rights, and titles in California insofar as**

28 **it involves a licensee or entity licensee in any manner.** State Bar is a substantial factor in the same

---

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION

3:23-0164-BAS-DDL                                          Exhibit #19: 013

Declaration ISO Rule 11 Motion Ex. 8 p. 012        22-CV-01616-BAS-DDL

1  within interstate or foreign jurisdictions (Beck Decl., Ex. B, pp. 37, 222). To claim otherwise would

2  frustrate the very duty undertaken by a lawyer* for another person* and would reasonably* restrict any

3  capacity for such lawyer* to make decisions or representations on behalf of another person* before any

4  tribunal*. More importantly, if State Bar weren't a substantial factor in lawyer conduct, then the capacity

5  of a lawyer* for another would accord with such triviality and materiality *only*. But that is not the case,

6  here, either. State Bar has more duties than Beck can fit on these pages, under the circumstances.

7  (Material Facts) State Bar wastes an awful lot of money (Material Facts, generally citing auditor and

8  results of operations) if it is not at least a "substantial factor" in lawyer* conduct. (Material Facts, p. 17)

9       Where State Bar owes a duty, the standard of care (for Beck's claims in tort against licensed

10  defendants in this action acting officially) are judged in fact according to law (*Stanley*), including CRPC,

11  State Bar Act, and their own procedures cited by Beck as statutory schemes relevant under *Guzman*

12  (BPC 6001.1, and thereafter). The Court will find *overwhelm ing* evidence of violations to Beck, cited

13  as part of a statutory scheme (*Guzm an*) conducted officially for The State Bar of California (Material

14  Facts, p. 21-59), that each and together were at least a substantial factor in Beck's injuries and harm.

15  Due to control factors inherent to State Bar, licensees, and public – State Bar is the *only* common

16  denominator in public injury caused by lawyers* under its umbrella (Beck Decl., Ex. B, p. 37-228). In

17  other words, State Bar is "condition precedent," not only "substantial factor". Substantial* is itself

18  defined for a lawyer by CRPC (Material Facts, p. 23). The authority of a lawyer* to give effect to a

19  transaction involving money, property, chattels, rights (under a presumption of competence, namely,

20  under control of State Bar) is material to <u>any person acting reasonably</u>. (*Id.* at p. 23, see also G059766)

21       "The scope of an [State Bar employee or official] attorney's [public or affirmative] duty may be

22  determined as a matter of law based on the Rules of Professional Conduct which, 'together with statutes

23  and general principles relating to other fiduciary relationships, all help define the duty component of the

24  [public, mandatory, or general] duty which an attorney [acting on behalf of State Bar and public interest]

25  owes to [the public, generally] and [an injured person whose equity and rights are under their actual or

26  apparent control, as with Beck].' " (*Stanley, supra,* 35 Cal.App.4th at p. 1087.)

27       ***More On Public Employees + Public Entity Duties***

28

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL                                                    Exhibit #19: 014
Declaration ISO Rule 11 Motion Ex. 8 p. 013          22-CV-01616-BAS-DDL

1    Before diving deeper on "mandatory duty" for State Bar to Beck, he respectfully requests the Court

2    consider "*Guzman v. County of Monterey*, 46 Cal.4th 887, 209 P.3D 89, 95 Cal.Rptr.3D 183 ("*Guzman*")

3    "This [first] requirement does not specify…mandatory duty. **But that is not the end of it**." The Court

4    aptly held in *Guzman*: "We have no difficulty concluding…mandatory duties" under GOV 815.6.

5        Mandatory duty to Beck (Material Facts, p. 10-21) is everywhere you look before and after

6    September 14, 2018 (G059766) in this action when his injury started accruing, and State Bar repeatedly

7    failed to act reasonably based on the *results* (Beck Decl. generally, see also Ex. B and G059766).

8    Licensees of State Bar are bound to CRPC by BPC 6077 and the scope of their duty (and the

9    reasonableness of their conduct, as a matter of law) can be judged thereby in this Court using Beck's

10   case law – presented in his complaint, his amended complaint, and on this Motion.

11

12   **A. Multiple Legal Theories Support Summary Judgment in Beck's Favor**

13       "In California, governmental tort liability must be based on statute."   (*Washington*, *supra*, 38

14   Cal.App.4th at pp. 895-896; Gov. Code, § 815.)

15       1. Violations of Mandatory Duty Substantial Factor in Beck's Injury

16       Government Code section 815.6 is one statute to impose liability for Beck's injury (Material Facts,

17   Issue #3, p. 21-59), which provides "[w]here a public entity is under a mandatory duty imposed by an

18   enactment that is designed to protect against the risk of a particular kind of injury, the public entity is

19   liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public

20   entity establishes that it exercised reasonable diligence to discharge the duty." An "enactment" includes

21   "a constitutional provision, statute, charter provision, ordinance or regulation." (GOV § 810.6.)] (e.g.

22   5th and 14th US Constitution).

23       Beck was injured in fact [ROA #49] (G059766) – namely, attorneys with a history of fraud*

24   appeared corruptly and willfully, without authority, filing six lawsuits for and against adverse parties

25   before the same tribunal commencing September 14, 2018 to the ongoing harm of Beck (Beck Decl.,

26   Ex. D, pp. 229-270) (G059766). This fraudulent judicial and non-judicial conduct destroyed aspects of

27   Beck's life, his company, and all shareholder value associated therewith ($261M+) (Beck Decl. ISO

28   MSJ or SA, p. 7, ¶ 20-23, and Ex. A) while causing him severe emotional distress in fact and lifelong

-14-

**NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE**
**ALTERNATIVE FOR SUMMARY ADJUDICATION**

1  injury (Beck Decl. ISO, p. 3, ¶ 9, p. 5, ¶ 12, p. 10-12, ¶ 30-37). The Court will find one or more

2  mandatory duties that were breached. (Material Facts, Issue #3, p. 21-59)

3      In interpreting an enactment pleaded for Beck's 1st cause of action, the "first task . . . is to ascertain

4  the intent of the Legislature [AB 3249] [or, those involved in the 5th and 14th Amendments to US

5  Constitution] so as to effectuate the purpose of the law," [BPC 6001.1] and "[i]n determining such intent,

6  a court must look first to the words of the statute themselves, giving to the language its usual, ordinary

7  import and according significance ([ROA #93] Beck RJN 1 [Ex 25]) [e.g. "paramount" (*Id.* at p. 538)

8  "function" (*Id.* at p. 540) "exercise" (*Id.* at p. 539) if possible, to every word, phrase and sentence in

9  pursuance of the legislative purpose. . . The words …must be construed in context, keeping in mind the

10 statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized,

11 both internally and with each other, to the extent possible."  (*Dyna-Med, Inc. v. Fair Employment &*

12 *Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387.) ("*Dyna-Med*") Beck incorporates relevant text of

13 AB 3249, including the plain words "requires" (Material Facts, p. 14) and "prohibits" (Material Facts,

14 p. 27, see also AB 3249) beyond the plain language of BPC 6001.1 , BPC 6077 and CRPC cited. Under

15 *Guzm an*, which is sound, State Bar's lack of reasonable care and violation of mandatory duties are

16 abundant to any reasonable\* lawyer\*, and certainly this Court. Beck needs to prove but one violation

17 by a preponderance, and this Motion can be granted summarily.

18     Beck provides indisputable facts in support of this Motion constituting *not less* than a *legal*

19 preponderance of evidence proving all three elements of his "per se" negligence claim met (Material

20 Facts, Issue #3, p. 21-59). State Bar violated (as a whole, or through one or more acts, where any was a

21 substantial factor in Beck's injury) BPC 6001.1, BPC 6104, BPC 6077 + CRPC 1.7 and/or 5.1

22 (G059766). A trial by jury should not be necessary to support judgment in his favor and an award of

23 economic damages and non-economic damages on this Motion. BPC 6001.1 is intended to stop injury

24 to the public inflicted by State Bar or its licensees, "but that is not the end of it." (*Guzm an*) Each statute

25 and enactment cited by Beck (BPC 6001.1, BPC 6104, BPC 6077 + CRPC 1.7 and/or 5.1 is intended to

26 stop a specific behavior of licensees from injuring him based on the plain language.

27     If somehow State Bar convinces this Court that a statutory scheme as a whole presented by Beck

28 (*Guzm an*), and the accompanying legislative intent (AB 3249) taking effect as of at least January 1,

-15-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 015

Exhibit #19: 016
22-CV-01616-BAS-DDL

2019 do not impose *any* mandatory duty to him that was violated by State Bar under GOV 815.6 – the "substantial factor" test (for all causes of action) and/or "special relationship" test (control of licensees, actual knowledge of injury, foreseeability of harm to Beck specifically, *Rowland* factors) all weigh in Beck's favor.

### *Mandatory Duties Exist Under Enactments, or Affirmative Duties to Protect Beck*

The Court in *Hoff* provides helpful analysis on Beck's point of mandatory duty through enactment or special relationship [unlike Hoff, Beck is a member of the public and not outside the protection of State Bar]. A more recent, on-point decision unrelated to Government Claims Act shows how mandatory duties can arise beyond one invoked by enactment [e.g., common law violations of a duty invoked by special relationship or affirmative duty to protect would be at least negligent under GOV 815/815.2/815.3, or 815.6 – and the "substantial factor" test is the only burden of proof beyond duty breach and injury here.] While common law is not the subject of this action, the imposition of liability is based on "substantial factor" insofar as it involves violation of a statute, or otherwise. (*Brown* and *Brown v. USAT*)

On April 1, 2021, the California Supreme Court instructed all lower courts to use a two-part analysis to determine if a defendant owed a duty of care to protect a plaintiff harmed by a third party. Cited by Beck to further illustrate the special relationship and unique control possessed by State Bar, in *Brown v. U SA Taekwondo* (2021) – the Supreme Court agreed that USAT owed Brown a duty due to control factors similar to those between State Bar and Catanzarite. Brown was harmed by Gitelman [instructor for USAT, akin to Catanzarite and public employees under control of State Bar with Beck as victim]. The Court confirmed *Rowland* factors came after the first test (special relationship). Gitelman was under control of USAT, as evidenced by factors similar to the instant case as to State Bar, its public employees and elected officials, its licensees, and especially Catanzarite. (Beck Decl., Ex. B)

Unlike *Brown* and *Brown v. U SAT*, this case, imputes liability to State under Government Claims Act GOV 815 / 815.2 / 815.3 / 815.6 / and/or 835 on a far simpler analysis of only "substantial factor" (Material Facts, p. 17, Citing CACI 430 (2022) where a reasonable person would consider to have contributed to Beck's harm, separately because State controls State Bar through the Legislature, or

-16-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 016

Exhibit #19: 017
22-CV-01616-BAS-DDL

1  derivatively where State is liable for State Bar (*respondeat superior*). So Beck has to prove by a

2  preponderance of evidence that State Bar was a substantial factor.

3      Beck asserts that any reasonable* person would agree that State Bar is a "substantial factor" in

4  virtually all conduct of its licensees. Pretty much any stone you turn over proves or implies actual control

5  by State Bar over its licensees, which any reasonable* person would agree is a substantial factor in any

6  instance or case because any control is more than just something that has "contributed" (CACI 430) and

7  even under licensee defendants definition of substantial* (Material Facts, p. 24, citing CRPC 1.01(l),)

8  any reasonable person would consider control to be substantial "when used in reference to degree or

9  extent means a material matter of clear and weighty importance." (*Ibil*.).

10      Evidence of control (by State Bar over licensee defendants acting officially under CRPC 5.1) starts

11  where licensees need the express authority from State Bar to practice law in California, and the budget

12  used by State Bar in "exercising its licensing, regulatory, and disciplinary functions." (BPC 6001.1)

13  More evidence of control exists through improper "private letters" (Material Facts, p. 42) to an attorney

14  with 165 complaints over 7 years (*Ibil*.), or "State Bar dismisses about 10 percent of complaints using

15  nonpublic measures such as private letters" (*Ibil*.) or involve "de minimis" closures which later result

16  in "federal conviction for money laundering." sent to those licensees causing public injury without even

17  notifying the injured (*Id.* at p. 54), evidence of waiving material conflict by State Bar's public employees

18  or elected officials causing public injury in an alarming 1/3rd or more of cases (*Id.* at p. 74), the actual

19  ability of State Bar to regulate (e.g. BPC 6077, CRPC, State Bar Act, ~$100M+ annually spent) its

20  licensees when they are proven to inflict public harm and pose a threat for future harm, the legislative

21  intent and "required" language of AB 3249 and the entire statutory scheme thereunder (*Guzman*), and

22  the actual control State Bar possesses over both the licensees who are charging the public legal fees

23  under implied competency, and the public who are damaged by licensees frequently, without reasonable

24  mitigation (CRPC 5.1), and often under *actual conflct* of interest known to State Bar (Material Fact,s

25  p. 74). The point is this: could Catanzarite Law Corporation conduct its ongoing schemes to defraud*

26  without State Bar? **Nope**. [ROA #49], (G059776), (Beck Decl., Ex. B)

27      To prove violation of one or more mandatory duties, Beck must prove through a preponderance of

28  evidence: 1. That public entity The State Bar of California violated Business and Professions Code §

1  6001.1 [or] Licensees working officially on behalf of The State Bar of California violated Business and

2  Professions Code § 6077 and California Rules of Professional Conduct 5.1 (or 1.7) [or] That individual

3  public employees or elected officials acting for State Bar violated the civil rights of Justin Beck protected

4  by the 5th or 14th Amendments of the United States Constitution through unlawful taking and/or

5  depriving him of life, liberty, and property through undue process; [and, with one of these satisfied, also]

6  2. That Justin Beck was harmed; and 3. That The State Bar of California's failure to perform its duty

7  under any or each of these respective sections was a substantial factor in causing Justin Beck's harm.

8     Beck proves more than one violation (Material Facts, Issue #3, p. 21-59) that was a substantial factor

9  (Material Facts, p. 17, citing CACI No. 430 (2022).) in his harm (Beck Decl. ISO, generally, and see

10  specifically p. 2-12 ¶ 7-37, Ex. A Warning to Licensees, Ex. B Catanzarite Law Corporation is

11  Suspended, Ex. C G059766, Ex. D Other Property Damages).

12     Having sufficiently proven by a preponderance of evidence under GOV 815.6, where at least one

13  violation was a substantial factor in Beck's injuries – Beck is entitled to summary judgment on this

14  action in his favor, or in the alternative, summary adjudication on this 1st cause of action as a matter of

15  law with liability under GOV 815.6.

16

17     2. Negligence (High Culpability/Understaffing) Also Substantial Factor

18     State Bar's public employee defendants Morgenstern, Kumar, Nunley, and DOES acted with

19  "recklessness" on behalf of State Bar if any one of them knew it was highly probable that [their]

20  respective conduct would cause harm to Beck (Material Facts, p. 2-92), and each or any of them

21  knowingly disregarded this risk. (Ibid.) [ROA #49] Statement Under Oath, (G059766)

22     "Recklessness" is more than just the failure to use reasonable care. Liability in this cause of action

23  comes under GOV 815, 815.2, or 815.3. Negligence with high culpability, another way to meet a cause

24  of action pleaded by Beck, can also be proven through civil rights violations to Beck under 5th and 14th

25  amendments as violation of mandatory duty under GOV 815.3 or GOV 815.6 for understaffing

26  (Fenimore v. Regents of University of California (2016) 245 Cal.App.4th 1339, 1349) [200 Cal.Rptr.3d

27  345].) (Material Facts, p. 105)

28

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL                              Exhibit #19: 019
Declaration ISO Rule 11 Motion Ex. 8 p. 018      22-CV-01616-BAS-DDL

1   This is a cumulative or alternate theory for Beck to recover his damages (Material Facts p. 130-133).

2   If the Court determines that State Bar somehow acted with reasonable* care in exercising its mandatory

3   duties to Beck (Material Facts, Issue 2, Issue 3), then the Court will find sufficient evidence of

4   understaffing before September 14, 2018 and civil rights violations to Beck specifically (G059766) as

5   well as other conduct or lack thereof undertaken with at least disregard to Beck by defendants (G059766)

6   that caused Beck emotional harm(Beck Decl., p. 10-12, ¶ ¶ 29-37), to uphold judgment in Beck's favor.

7   The Court will also find, where no reasonable mind could differ, that the conduct in question generally

8   involving State Bar from 2002-2022 is outrageous as a *body of work* (Beck RJN 1 ISO, Ex. 3-24).

9   As an alternate or cumulative theory to the highly probable risk their conduct would injure Beck,

10   and the disregard of Beck's injury for this 2nd cause of action – Beck claims that The State Bar of

11   California and individual defendants Eli David Morgenstern, Joy Nunley, Anand Kumar, and DOES (1-

12   30) acting officially for The State Bar of California violated his civil rights. To establish this claim,

13   Justin Beck must prove: 1. That defendants intentionally or without regard for the emotional harm of

14   Justin Beck did: allow ongoing abuse of the judicial system by licensees in violation of Beck's rights

15   under the 5th and/or 14th Amendment to the United States Constitution [or] failed to take reasonable

16   steps to mitigate harm to Beck after actual knowledge of his injury, [or] with deliberate indifference,

17   unlawfully take legal fees and various personal property from Justin Beck without just compensation

18   [or] corruptly utilize official licensing, regulatory, and discipline functions of The State Bar of California

19   for personal benefit, motive, passion, or interest [and, with at least one of the above proven,] all of the

20   following: 2. That individual defendant public employees were each acting officially or purporting to

21   act officially for The State Bar of California, in the performance of each of each or any of their official

22   duties, and 3. That any individual defendants' conduct violated Justin Beck's rights, including those

23   protected by the 5th and 14th Amendments to the United States Constitution, which holds that he not "be

24   deprived of life, liberty, or property, without due process of law; nor shall private property be taken for

25   public use, without just compensation," 4. That Justin Beck was "deprived of life, liberty, or property

26   without due process of law" [or] one or more items of Beck's "private property was taken for public

27   use, without just compensation" 5. At least one of the individual defendants' acting for State Bar

28

-19-

1   [Morgenstern, Nunley, Kumar, DOES] conduct was a substantial factor in causing Justin Beck's harm

2   or damages to property having special value. (Material Facts, Issues 1-22)

3       Having sufficiently proven by a preponderance of evidence in support of this claim for recklessness

4   based on high probability and disregard to Beck [and/or] recklessness evidenced by understaffing, or

5   harassment (GOV 815.3) or civil rights violations under GOV 815.6, GOV 815.2, or GOV 815.3 – Beck

6   asserts he is entitled to summary judgment or adjudication on this 2nd cause of action as a matter of law.

7

8       3. <u>Negligence in Violation of Other Duties Also Substantial Factor</u>

9       If State Bar is not liable to Beck for violating mandatory duties to Beck, or by its recklessness and/or

10   civil rights violations to Beck – public employees *at least* owe Beck a duty to exercise reasonable care

11   under GOV 815/815.2.

12       A violation of any duty results in liability to State Bar insofar as the acts were taken in an official or

13   purportedly official public capacity, which is the case here (Beck Decl. ISO, p. 18, ¶ 47) and any single

14   act by any single actor were a substantial factor (Material Facts, p. 17) in Beck's injury. (Beck Decl.

15   ISO, generally) The conduct of public employees or elected officials were, in fact, a substantial factor

16   in Beck's injury before/after September 14, 2018 (Material Facts, p. 31-51) (G059766) – where no

17   reasonable* mind could differ.

18       After *Walker* (1948) and *Bollotin* (1955) (each regarding attorney discipline, not government tort as

19   with the instant case) – a landmark ruling in *Muskopf v. Corning Hospital District* (55 C.2d 211; 11

20   Cal.Rptr. 89, 359, P.2d 457) ("*Muskopf*") was clear "[i]n formulating 'rules' and 'exceptions' relating

21   to governmental immunity from liability [here, what became the "liability" sections of GOV 815, 815.2,

22   815.3, 815.6, and 835], it should be borne in mind that **when there is negligence, the rule is liability,**

23   **immunity is the exception**." *Muskopf* led to Government Claims Act (1963), which of course was after

24   *Walker* and after *Bollotin* [yes, the law does provide for such liability, today].

25       "The effect of [GOV 815.2] is to incorporate 'general standards of tort liability as the primary basis

26   for *respondeat superior* liability of public entities….[t]hus, in a cause of action for negligence, the

27   existence and extent of an entity's vicarious liability under [GOV 815.2, sub. (a)] will be determined by

28   the scope of the duty legally attributed to its employees." "A public employee is liable for negligence

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 020

Exhibit #19: 021
22-CV-01616-BAS-DDL

1   'to the same extent as a private person.' (GOV 820)." (*Hoff v. Vacaville Unified School Dist.*, 19 Cal.4th

2   925 (1998).)

3       In other words, does State Bar have a duty to protect the public from attorney misconduct through

4   the exercise of reasonable care? Yes. Might it extend, under certain circumstances where the greatest

5   issue is foreseeability of harm (*Brown v. USAT* 2021) to the conduct of its public employees? What

6   about the licensees over which it has [monopolistic] control? The statute says yes to all, where even the

7   purported immunity on the "back end" of GOV 815 and GOV 815.2 holds "except as otherwise provided

8   by statute, a public employee is not liable for an injury caused by the act or omission of another person.

9   **Nothing in this section exonerates a public employee from liability for injury proximately caused**

10   **by his own negligent or wrongful act or omission.**" (GOV 820.8)

11       Should the public expect protection from the State Bar, or at least reasonable care, when on notice

12   of injury? Indeed – people less fortunate than Beck demand it. *How else will the protection of free speech*

13   *be balanced with the reasonably regulated speech in the private forum of Courts? Are regular (non-*

14   *lawyer) persons allowed to lie, cheat, steal, and conduct ongoing schemes to defraud? Why aren't*

15   *lawyers, whose speech is actually proffered on behalf of others, subject to a <u>greater standard</u> when there*

16   *are lawyers like Catanzarite? Why is Catanzarite specfically allowed to lie, cheat, steal, and continue*

17   *to defraud innocent people?*

18       The statutes and law governing civil rights, Anti-SLAPP in California CCP § 425.16, litigation

19   privilege under CCP § 47, attorney-client privilege exemptions under EVID § 956, the disfavored

20   [common law] tort of malicious prosecution requiring "final determination" (G059766) and the

21   materially injurious implications of a "post-trial" fraud defense **all <u>require</u> due care exercised by The**

22   **State Bar of California in "exercising its licensing, regulatory, and disciplinary functions."** Courts

23   have an expectation of competency when they receive filings from a licensee…and it should go without

24   saying that The State Bar of California is <u>required</u> to uphold its side of the bargain and AB 3249's

25   passage "eliminate[d] the authorization" of State Bar to aid Catanzarite (Material Facts, p. 4)

26       Less than 5% of intakes saw discipline from 2012-2022 (Beck RJN 1 ISO, Ex. 3-24) (Beck Decl. p.

27   12). Worse, even in the most severe cases where State Bar wakes up and smells the roses decaying on

28   the floor of its $76M building, discipline rarely (*if ever*) accommodates actual injury to public, courts,

-21-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL

Declaration ISO Rule 11 Motion Ex. 8 p. 021

Exhibit #19: 022
22-CV-01616-BAS-DDL

1   and legal profession. No, apparently, State Bar licensees can commit larceny and fraud for years, and

2   members of the public need to retain another State Bar licensee to seek their damages. Even worse still,

3   "discipline" or "regulatory" functions take a year to ten years to resolve (by design or results, matters

4   not). So, if an attorney is corrupt, they will abuse this system (Material Facts, p. 31-51) (G059766), and

5   people are *suffering* (Beck Decl., p. 10-12) – in substantial\* numbers that show no signs of receding

6   (Material Facts, p. 52-59). They are *suffering* because State Bar is negligent and infected with corruption

7   (Material Facts, p. 21, 52-59). One expert on corruption says its based on a simple formula, and that

8   formula objectively spells disaster for our future in California, which is purportedly among the largest

9   economies in the world if it were itself a country involving $3.4 trillion in gross state product ([ROA

10   #60] FAC p. 7, ¶ 24).

11       So, to establish a claim for negligence under the liability sections of Government Claims Act for

12   which State Bar [and/or State] is liable – Beck must prove: 1. That <u>any</u> public employee, elected official,

13   or State Bar, or State was negligent through official or purportedly official acts of State Bar; 2. That

14   Beck was harmed; 3. That the overall conduct, series of acts, or any single act of a public employee or

15   elected official acting on behalf of State Bar was a substantial factor in causing Beck's harm.

16       Having sufficiently proven by a preponderance of evidence in support of his prior claim for

17   violations of mandatory duties and/or recklessness in the 1st and 2nd causes of action, each sufficiently

18   prove garden variety negligence if not mandatory duties or intentional tort – therefore Beck asserts he

19   is entitled to summary judgment on this action, or summary adjudication on this 3rd cause of action as a

20   matter of law with liability under GOV 815 and/or GOV 815.2.

21

22      <u>4. Beck's Refined Request for Relief is Reasonable Under GOV 814</u>

23      "The Court's paramount concern should be to preserve public trust in the scrupulous administration

24   of justice and the integrity of the Bar." (*Calf. Self-insurers' Securi̇ y Fund v. Superior Court* (2018) 19

25   Cal.App.5th 1065, 1071).

26      Beck seeks a single form of relief under GOV 814 (Material Facts, p. 93-94) and subjects himself to

27   this Court's available powers on this Motion (even if it denies the request entirely). Beck believes it vital

28   to preserve public trust that he be provided provisional licensure to practice law in California under the

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL

Declaration ISO Rule 11 Motion Ex. 8 p. 022

Exhibit #19: 023
22-CV-01616-BAS-DDL

1   Court's inherent powers codified by Cal. Cod. Civ. Proc. 128, under reasonable terms and stricture
2   which he presents in his proposed judgment.

3       Beck's provisional licensure is requested from this Court or by referral to the Supreme Court on the
4   conditions that, for a period of 5-years, 1) he allowed to represent, file and try cases within [Superior
5   Courts or Supreme Court] as a complete alternative to State Bar attorney misconduct complaints or
6   client security fund applications, thereby replacing *In RE: Walker*, 2) and that he be allowed to represent,
7   file, and try cases involving attorney malpractice, malicious prosecution, or fraud in any California
8   Court, and 3) for any other representation (not subject to 1 or 2), a State Bar licensee appears on all
9   agreements, attorney-client work product, and all court filings involving Beck's representation, and 4)
10  that any attorney discipline accusation against him be filed directly to Supreme Court without State Bar.

11      Beck's licensure is requested to transition to "regular" licensure conditioned upon a hearing before
12  the Supreme Court after 5-years and approval of the Supreme Court alone (not State Bar). Beck believes
13  he can serve a dire need for "access" that existing State Bar licensees are unlikely to meet out of fear by
14  serving only those lacking access to neutral courts and serve to restrain the abuses proven by him on this
15  Motion and evidenced through [ROA #49] and G059766.

16

17      5. Dangerous Conditions of State Bar Premises Also Substantial Factor

18      If State Bar's violation of mandatory duty, negligence with high degree of culpability, or negligence
19  in violation of reasonable standard of care to Beck were not a substantial factor in Beck's injury and
20  harm – then it was caused by a dangerous condition of State Bar's premises that State Bar had actual
21  knowledge of. Emotional distress (Beck Decl., p. 10-12) constitutes an "injury" (GOV 810.8) under
22  Government Claims Act.

23      It was reasonably foreseeable to State Bar that Beck would never visit State Bar's premises, or if he
24  did, such visit would be a fraction of time compared to other reasonably foreseeable interactions with
25  Beck that would not result in his physical presence there. (Material Facts, p. 94-100). It was reasonably
26  foreseeable to State Bar that injuries arising from its normal, day-to-day operations would almost
27  certainly be "any other injury that a person may suffer to his person, reputation, character, feelings or
28  estate, of such nature that it would be actionable if inflicted by a private person." (*Ibid*.)

-23-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 023

Exhibit #19: 024
22-CV-01616-BAS-DDL

1  A "visit" to the premises (physically) would only be necessary after or while frustrating all

2  administrative or judicial remedies, or for litigation pursuant to Government Claims Act after injury

3  (*Ibid*). And thus, Beck advances the (sound) theory that a dangerous condition of State Bar's property

4  is different than one of a school, for instance. And that any reasonable person would agree: State Bar's

5  premises is in a dangerous condition that has been sufficiently noticed for long enough (10+ years) (*Ibid*)

6  (Beck RJN 1 Ex. 3-24)

7  Where a school protects its students physical and emotional well-being on premises with limited

8  exception (Material Facts, p. 18-19) (citing *Hoff* and *Tarasofff*), State Bar protects individuals' (and

9  explicitly, the public's) life, liberty, property under an expectation that State Bar will protect others from

10  the dangers that would be so clearly obvious to any reasonable person: attorneys engaged in fraud will

11  most certainly cause "other injury that a person may suffer to his person, reputation, character, feelings

12  or estate." State Bar takes unique *possession* of these specific characteristics of a person when it accepts

13  *intake* of a complaint. (*Ibid*.) (*Brown v. USAT*(2021).)

14  If the Court finds that reasonable care was indeed exercised by State Bar as to his negligence claims

15  before September 14, 2018 on this Motion, then State Bar's property created a substantial risk of Beck's

16  injury when it was used with due care in a reasonably foreseeable manner. Whether the property is in a

17  dangerous condition is to be determined without regard to whether Beck exercised or failed to exercise

18  reasonable care in use of the property. (CACI 1102)." The Auditor said that State Bar's operations posed

19  a threat to the public, and Beck is a member of the public: Audit Report **2015**-030, "[i]nstead of focusing

20  its resources on improving its discipline system—such as engaging in workforce planning to ensure it

21  had sufficient staffing—**it instead spent $76.6M to purchase and renovate a building [premises] in**

22  **Los Angeles in 2012**…**Delays [in intake, investigation, etc.] allow attorneys under investigation to**

23  **continue practicing law while their cases are pending, increasing the potential for harm [injury]**

24  **to the public.**" (Material Facts, p. 59-79)

25

26  6. <u>State Bar Substantial Factor in Beck's Severe Emotional Distress</u>

27  Even if State Bar is found not to have violated mandatory duties, acted with reckless disregard of

28  public injury, understaffed, or violated Beck's civil rights, or violated a reasonable standard of care –

-24-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 024

Exhibit #19: 025
22-CV-01616-BAS-DDL

1  Beck proves one or more acts or omissions and actors among Anand Kumar, Eli David Morgenstern,

2  Joy Nunley, and DOES 1-30, acting officially for The State Bar of California under Government Code

3  815, 815.2, 815.3 caused him to suffer severe emotional distress (Beck Decl., p. 10-12, Beck did in fact

4  suffer severe emotional distress and damages for which State Bar is or was a substantial factor. (Beck

5  Decl. pp. 10-12, ¶ ¶ 30-37).

6      To establish this claim, Justin Beck must prove all the following: 1. That any one of Anand Kumar,

7  Eli David Morgenstern, Joy Nunley, or DOES 1-30's conduct was <u>outrageous</u>. 2. That Anand Kumar,

8  Eli David Morgenstern, Joy Nunley, or DOES 1-30 acted with reckless disregard of the probability that

9  Justin Beck would suffer emotional distress, knowing that Justin Beck was present when the conduct

10  occurred; 3. That Justin Beck suffered severe emotional distress; and 4. Anand Kumar, Eli David

11  Morgenstern, Joy Nunley, or DOES 1-30 conduct was a substantial factor in causing Justin Beck's

12  severe emotional distress. Beck incorporates G059766 by reference, juxtaposed with [ROA #49].

13      Beck's severe emotional distress can be implied by the circumstances just like legal malice

14  (G059766) and his testimony alone (Beck Decl. pp. 10-12, ¶ ¶ 30-37) is sufficient proof according to a

15  recent case *Knutson v. Foster*, 25 Cal.App.5th 1075, 1078-79 (Cal. Ct. App. 2018) "we hold that in a

16  case such as this, where the plaintiff's emotional distress consisted of anxiety, [fear of ongoing lawyer*

17  fraud and its implications], shame, a sense of betrayal, and a continuing impact on personal relationships,

18  the testimony of the plaintiff alone is sufficient to support emotional distress damages. [Beck's sworn

19  declaration (Beck Decl. ISO MSJ or SA, generally), and prior information under oath delivered to State

20  Bar in March 2021 prove] stress and extra pressure that made [living, working] an emotionally painful

21  activity, that [he] felt shamed and betrayed when [he] learned about [Catanzarite's prior conduct, and

22  State Bar's disregard for his injury, and injury to others]. (Beck Decl. p. 10-12)

23      In March 2021 while in special relationship to Beck after repeated notices to State Bar between

24  January 2020 and March 2021 (Beck Decl, generally), he filed formal allegations under oath [ROA #49]

25  to State Bar, wherein he "presented his allegations…as acts of moral turpitude or fraud by [Catanzarite]

26  under oath of Beck, pursuant to the [State Bar Act]. (BPC 6106) All the filing proves is actual knowledge

27  by State Bar of Beck's injury in 2021, and further, outrageous conduct with disregard for the same –

28  here Beck's severe emotional distress. (Beck Decl. ISO pp. 10-12, ¶ ¶ 30-37).

-25-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 025

On page 9 of 53 [ROA #49], for instance, Beck says under oath to State Bar in March 2021: "[Catanzarite] has been disqualified twice by a trial court for purporting to represent directly adverse parties before the same tribunal against [Beck], and [Catanzarite is] under investigation by [State Bar] for similar conduct in another unrelated case [Corzo]. Worse, [Catanzarite] assumed representation of a corporate entity [MFS, CTI] without permission of the entity itself...[Catanzarite] has attempted to appear on virtually every side of a pending control dispute that it manufactured in the face of known contradictory facts and has compromised alleged derivative actions [Fed. 23.1(c)] by colluding with various parties [inc. Amy Cooper] to settle those claims in return for manufactured evidence after making contact with represented parties." These allegations are now supported by "final" evidence beyond reasonable doubt known to State Bar, cited by Beck (e.g. G058700 which upheld *m andatory law*, and other Catanzarite cases (2007-2022) affecting more than 13,800 investors and SEC resources (Beck Decl. p. 21).

On or around June 28, 2021, the Court of Appeal concluded Catanzarite violated more than one *mandatory law*, including CRPC 1.7 and BPC 6104, where it "filed six lawsuits while simultaneously representing two corporations, three corporate subsidiaries, and a group of minority shareholders of both corporations" in a 12-month period. They were all sham (fraudulent*) pleadings or amended pleadings filed or advocated by Kenneth J. Catanzarite, Jim Travis Tice, Brandon E. Woodward, Tim James O'Keefe, and/or Nicole Marie Catanzarite Woodward (FAC p. 46-48, ¶ 130) (G058700). The same associated attorneys have undertaken similar fraud* dating back to at least 2007, known to State Bar. (Material Facts, p. 31-51)

Having sufficiently proven by clear and convincing evidence in support of this claim for intentional infliction of emotional distress – Beck asserts he is entitled to summary judgment on this 6th cause of action as a matter of law for intentional infliction of emotional distress under GOV 815.3.

Having sufficiently proven by clear and convincing evidence in support of this claim for intentional infliction of emotional distress – Beck asserts he is entitled to judgment in his favor for punitive damages against individual defendants acting officially for State Bar, as a multiple of 1X to 10X his total combined economic and non-economic damages, and that State Bar and State are liable therefore (Material Facts, Issue #20)

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 026

Exhibit #19: 027
22-CV-01616-BAS-DDL

7. <u>State Bar Substantial Factor in Conversion of Beck's Personal Property</u>

Beck claims that State Bar, through its public employees, licensees, and elected officials, wrongfully exercised control over items of Beck's personal property. Beck claims that all of his economic damages and non-economic damages fall in this category if the other causes of action somehow fail, but he discretely identifies property and values in supporting his damage claims (Beck Decl. ISO MSJ or SA Ex. [A] 33-36, Ex. [B], Ex. [D] p. 271-278 and Ex. [E] CACI Draft pp. 283-285).

Beck proves the property referenced in his pleadings and the associated evidence (including adjudicated facts and law) are sufficient to uphold civil judgment in his favor. Some items had special value, which Beck generally describes in his declaration and the draft jury instructions (Beck Decl. ISO MSJ or SA Ex. [D] p. 271-278 and Ex. [E] CACI Draft pp. 283-285)

**B. Beck is Entitled to Judgment for Money and Damages in his Favor as a Matter of Law**

    1. Beck is Entitled to Judgment for Compensatory Damages

        i. Economic Damages (Material Facts, Issue #20)

        ii. Non-Economic Damages (Material Facts, Issue #21)

    2. Beck is Entitled to Punitive Damages Against Individuals

        i. Official Acts were Intentionally Tortious to Beck  (Material Facts, Issue #22)

**C. There Is No Defense to this Action for State Bar or State**

While defendants' claim of "immunity" is moot in this action for other reasons described by Beck (Material Facts, Issues #10-#19) and known to the Court, State Bar would have this Court believe that its public employees and/or elected officials are somehow *authorized* to participate in, permit, ratify, not act reasonably to mitigate, or even facilitate "conduct" that meets the definition of "racketeering activity" (namely wire fraud, securities fraud, mail fraud, money laundering, and larceny) that cause serious public injury known to them.

But Beck defeats each immunity and each affirmative defense, and a trial may prove a waste of time that serves to further conceal – not reveal – the injuries similar to Beck (Beck Decl., generally). There

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 027

Exhibit #19: 028
22-CV-01616-BAS-DDL

1   are one or more acts that were a substantial factor (CACI No. 430) in Beck's injuries resulting in

2   damages (Beck Decl. Ex. [A] 33-36, Ex. [B], Ex. [D] p. 271-278 and Ex. [E] CACI Draft pp. 283-285).

3   The acts were either in violation of mandatory duties (GOV 815.6) intentionally tortious (GOV 815.3)

4   — or they were negligent within operational decisions lacking reasonable care (for which no immunity

5   exists) — or they involved fraud, legal malice, corruption, or oppression of Beck and others at least to a

6   civil degree of certainty on this Motion. There is simply no defense to this action for State Bar and/or

7   State as a matter of law.

8

9   CRPC Definition of Reasonable* Governs All Public Licensee Conduct

10       Because some claims rest on the exercise of reasonable care (and not "blanket Immunity" as

11   proposed by State Bar), Beck notes that the legal definition of "reasonable*" and "reasonable belief*"

12   is tested under an *objective* standard. That means that this Court can easily determine if State Bar's

13   conduct is, in fact (law), reasonable* or supported by reasonable belief*. Acts that violate CRPC 1.7,

14   CRPC 5.1, or other enactments cited by Beck are not supported by reasonable belief (objectively). Nor

15   is continued malicious prosecution of people without legal counsel. (G059766)

16       "In a tort action against a public entity [State Bar] [State], the question of duty is a threshold issue.

17   The next question is whether any statutory immunity applies to bar plaintiffs' negligence cause of action.

18   (*Davils on v. City of Westminster* (1982) 32 Cal.3d 197, 202.)  [State Bar] contends that it is immune

19   under Government Code sections [815] [820] [821] [821.2].  None of these immunities is applicable."

20   Beck also shows why 818.2, 820.4, 818.4, and 820.8 fail (Material Facts, Issues #10-19)

21       For instance, "Government Code section 818.2 provides that a public entity "is not liable for an

22   injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." This section

23   was intended to provide immunity for legislative and quasi-legislative action [e.g. policy decisions] and

24   to protect the exercise of discretion by law enforcement officers in carrying out their duties [in the

25   exercise of these functions, their conduct is governed by a reasonable standard of care, and may arise to

26   mandatory duty].  (See Cal. Law Revision Com. com. to Gov. Code, § 818.2.)  The companion section

27   [emphasis added] Government Code section 821, extends the same immunity to the public employee.

28   To apply these sections to immunize [State Bar] from liability for breach of a mandatory duty "would

-28-

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 028

Exhibit #19: 029
22-CV-01616-BAS-DDL

1  completely eviscerate Government Code section 815.6 which specifically provides for liability of the
2  public entity for injuries resulting from a failure to carry out a mandatory duty imposed by a public
3  enactment." (*Elton v. County of Orange* (1970) 3 Cal.App.3d 1053, 1059; see also *Alejo, supra*, 75
4  Cal.App.4th at p. 1194.)"

5  "Government Code section 820.4 extends immunity to a public employee "for his [or her] act or
6  omission, <u>exercising due care</u> [emphasis added], in the execution or enforcement of any law. . . ." This
7  statute does not warrant dismissal of plaintiffs' negligence claims because there is a <u>question of fact</u>
8  [that can be decided on this Motion; emphasis added] as to whether [State Bar] exercised "due care" in
9  reviewing and responding to [specific notice of Beck's injuries and/or irreparable harm to him and
10 others] (See *Ogborn v. City of Lancaster* (2002) 101 Cal.App.4th 448, 462.)

11 "The immunity provided by Government Code section 818.4 pertains to injuries caused by the public
12 entity's "issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend
13 or revoke, any permit, license, certificate, approval, order, or similar authorization where the public
14 entity or an employee of the public entity is authorized by enactment to determine whether or not such
15 authorization should be issued, denied, suspended or revoked." Government Code section 821.2 extends
16 the same immunity to the public employee.  <u>**These sections do not apply here because there was no**</u>
17 <u>**discretionary licensing decision**</u> [emphasis added].  The wrongful act was the failure to comply with
18 the duty to review misconduct, fraud, and injury reported to State Bar, and to exercise reasonable
19 licensing, regulatory, and disciplinary functions guided by BPC 6001.1 (overall, and upon each
20 operational decision, and especially those involving CRPC 1.7 or BPC 6104 violations]…to [order
21 involuntary inactive enrollment, and/or exercise control over Catanzarite Law Corporation for good
22 cause shown; and/or to commence expedited hearings; and/or to mitigate or enjoin the conduct under its
23 control until such time a hearing may occur; and/or to enforce the misconduct proven by clear and
24 convincing evidence dating back to 2005; and/or suspend and/or disbar for "one violation" as per the
25 standards].

26 Finally, Government Code section 820.8, which provides that a public employee "is not liable for
27 an injury caused by the act or omission of another person" is inapplicable because the injury is shown
28 to have been caused by the public employee's negligence.  Indeed, Government Code section 820.8

NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 029

Exhibit #19: 030
22-CV-01616-BAS-DDL

1  concludes, "**Nothing in this section** exonerates a public employee from liability for injury

2  proximately caused by his own negligent or wrongful act or omission."

3

4     **IV. CONCLUSION**

5       Beck is entitled to his economic damages and non-economic damages on one or more theories, and

6  punitive damages against individuals acting officially for State Bar. (Beck Decl., Ex. E) (Material Facts,

7  Issues 20-22)

8       Cal. Cod. Civ. Proc. Section 437c provides "(a) (1) A party may move for summary judgment in an

9  action or proceeding if it is contended that the action has no merit or that there is no defense to the action

10 or proceeding." Section 437c, subdivision (c) holds "summary judgment shall be granted if all the papers

11 submitted show that the moving party is entitled to a judgment as a matter of law" as here to Beck.

12      Section 437c, subdivision (m)(1) says "[a] summary judgment entered under this section is an

13 appealable judgment as in other cases." However, "[t]he order granting the motion is not itself a

14 judgment. [Beck] must prepare a proposed judgment, serve it upon opposing counsel and submit it to

15 the judge for signature and filing." (*Id.*, § 10:330; see also *Saben, Earlix & Assoc ites v. FII et* (2005)

16 134 Cal.App.4th 1024, 1032). Beck includes this with his moving papers on this Motion.

17      Rule 3.1350(b) of the California Rules of Court says, in relevant part, "[i]f summary adjudication is

18 sought...alternative to the motion for summary judgment, the specific cause of action, affirmative

19 defense, claims for damages, or issues of duty must be stated specifically in the notice of motion and be

20 repeated, verbatim, in the separate statement of undisputed material facts." Beck conforms to this section

21 (citing Issues # 1-22, verbatim) and requests an expedited trial by jury if there are any issues of triable

22 fact remaining, assuming that Beck failed to achieve a burden of proof on any other theory on this

23 Motion to award summary judgment and thereby render such trial unnecessary. "The Court's paramount

24 concern should be "to preserve in the scrupulous administration of justice and the integrity of the Bar."

25 (*Calif. Self-insurer's Security Fund. V Superior Court* (2018) 19 Cal.App.5th 1065, 1071). This Court

26 should exercise any power it has to prevent further injury to public, courts, and legal profession.

27      Beck prepared a draft "written order...unless expressly waived." (Rule 3.1312(a).) Beck furnishes

28 the Court with an editable document (.docx or Microsoft® Word) under Section 437c, subdivision (g)

-30-
NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE
ALTERNATIVE FOR SUMMARY ADJUDICATION
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 030

Exhibit #19: 031
22-CV-01616-BAS-DDL

1   so the Court may "specify the reasons for the court's determination." Similarly, if the court denies the

2   motion, it must "specifically refer to the evidence proffered in support of and in opposition to the motion

3   which indicates that a triable controversy exists." (*Ibid*.)

4

5   Dated July 17, 2022

6   Oceanside, California

7

8

9   Respectfully Submitted,

10

11   _____

12   Justin S. Beck, plaintiff and moving party

13   *In Pro Per*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION**
3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 8 p. 031

Exhibit #19: 032
22-CV-01616-BAS-DDL

[Proof of E-Service]

I, Justin S. Beck, the plaintiff in this action and moving party, served by electronic mail:

Notice of Motion and Motion of Plaintiff for Summary Judgment or In the Alternative Summary Adjudication, Declaration of Justin S. Beck in Support of Plaintiff's Motion for Summary Judgment or In the Alternative Summary Adjudication; Separate Statement of Undisputed Material Facts In Support of Plaintiff's Motion for Summary Judgment or In the Alternative Summary Adjudication; and Proposed Order Granting Motion for Summary Judgment (or Summary Adjudication) upon defendants The State Bar of California, Anand Kumar, Joy Nunley, Eli David Morgenstern, and DOES 1-30 (each acting in an official capacity) to the Office of the General Counsel for The State Bar of California:

Suzanne.Grandt@statebar.ca.gov
Ruben.Duran@bbklaw.com
Carissa.Andresen@statebar.ca.gov

Upon defendant State of California, who is jointly and severably liable derivatively for State Bar:

AGelectronicservice@doj.ca.gov

Dated July 17, 2022
Oceanside, California

Respectfully Submitted,

Justin S. Beck, plaintiff and moving party
*In Pro Per*

-1-

EXHIBIT 9

**SUBP-020**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
JUSTIN S. BECK
3501 ROSELLE ST.
OCEANSIDE, CALIFORNIA 92056
TELEPHONE NO.: 760-449-2509    FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):* JUSTINTIMESD@GMAIL.COM
ATTORNEY FOR *(Name):* IN PRO PER

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 W. CIVIC CENTER DR.
MAILING ADDRESS:
CITY AND ZIP CODE: SANTA ANA, CALIFORNIA 92701
BRANCH NAME: CENTRAL JUSTICE CENTER

PLAINTIFF/PETITIONER: JUSTIN S. BECK
DEFENDANT/RESPONDENT: THE STATE BAR OF CALIFORNIA, ET AL.

**DEPOSITION SUBPOENA**
**FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS**

CASE NUMBER:
30-2021-01237499-CU-PN-CJC

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of deponent, if known):*
THE STATE BAR OF CALIFORNIA, 845 S. Figueroa Ave., Los Angeles, California 90017  (213) 765-1000

1. **YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS** in this action at the following date, time, and place:

Date: 09/09/2022    Time: 09:00 AM    Address: 845 S. FIGUEROA AVE., LOS ANGELES, CA 90017

 a. ☑ As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc., § 2025.230.)
 b. ☑ You are ordered to produce the documents and things described in item 3.
 c. ☑ This deposition will be recorded stenographically  ☑ through the instant visual display of testimony and by  ☑ audiotape  ☑ videotape.
 d. ☑ This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows:
   See Notice of Deposition Attachment 3 Items (1) - (22)
   ☑ Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:
   See Notice of Deposition Attachment 4 Items (1) - (22)
   ☑ Continued on Attachment 4.

5. IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.

6. *At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.*

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: 07/26/22

_____
(SIGNATURE OF PERSON ISSUING SUBPOENA )

David H. Yamasaki          Clerk of the Court
(TYPE OR PRINT NAME)              (TITLE)

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
SUBP-020 [Rev. January 1, 2009]

DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE
AND PRODUCTION OF DOCUMENTS AND THINGS

Code of Civil Procedure §§ 2020.510,
2025.220, 2025.250, 2025.250, 2025.620;
Government Code, § 68097.1
www.courtinfo.ca.gov

L-1259 [Rev. December 2, 2016]

(Proof of service on reverse)

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 9 p. 002

| | |
|---|---|
| PLAINTIFF/PETITIONER: JUSTIN S. BECK | CASE NUMBER: |
| DEFENDANT/RESPONDENT: THE STATE BAR OF CALIFORNIA, ET AL. | 30-2021-01237499-CU-PN-CJC |

SUBP-020

## PROOF OF SERVICE OF DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS

1. I served this *Deposition Subpoena for Personal Appearance and Production of Documents and Things* by personally delivering a copy to the person served as follows:

   a. Person served *(name)*:

   b. Address where served:

   c. Date of delivery:

   d. Time of delivery:

   e. Witness fees and mileage both ways *(check one)*:
      (1) ☐ were paid. Amount: . . . . . . . . . . $ _____
      (2) ☐ were not paid.
      (3) ☐ were tendered to the witness's public entity employer as required by Government Code section 68097.2. The amount tendered was *(specify)*: . . . . . . . $ _____

   f. Fee for service: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

2. I received this subpoena for service on *(date)*:

3. Person serving:
   a. ☐ Not a registered California process server
   b. ☐ California sheriff or marshal
   c. ☐ Registered California process server
   d. ☐ Employee or independent contractor of a registered California process server
   e. ☐ Exempt from registration under Business and Professions Code section 22350(b)
   f. ☐ Registered professional photocopier
   g. ☐ Exempt from registration under Business and Professions Code section 22451
   h. Name, address, telephone number, and, if applicable, county of registration and number:

I **declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

**(For California sheriff or marshal use only)**
I **certify** that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

**PROOF OF SERVICE
DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE
AND PRODUCTION OF DOCUMENTS AND THINGS**

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 9 p. 003

**NOTICE OF DEPOSITION**

Justin S. Beck
justintimesd@gmail.com
3501 Roselle St.
Oceanside, California 92056
760-449-2509

*In Pro Per*

**IN THE SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF ORANGE**

| | |
|---|---|
| JUSTIN S. BECK, an individual | Case No: 30-2021-01237499-CU-PN-CJC |
| Plaintiff, | Judge Assigned: Honorable John C. Gastelum |
| v. | |
| THE STATE BAR OF CALIFORNIA, a public corporation and public entity; ANAND KUMAR, an individual employee acting in an official capacity; ELI DAVID MORGENSTERN, an individual employee acting in an official capacity; JOY NUNLEY, an individual employee acting in an official capacity; THE STATE OF CALIFORNIA, a state and public entity; and DOES 1-30 | **NOTICE OF DEPOSITION** |
| | Action Filed: December 21, 2021 |
| | Trial Date: None |
| Defendants | **Unlimited Civil Case** |

**TO EACH PARTY AND TO THE COUNSEL OF RECORD FOR EACH PARTY:**

   **YOU ARE HEREBY NOTIFIED THAT THE DEPOSITION OF** defendant THE STATE BAR OF CALIFORNIA, a public corporation and public entity ("STATE BAR"), will be taken on **Friday, September 9, 2022,** at The State Bar of California, 845 S. Figueroa Ave., Los Angeles, California 90017 commencing at **9:00 AM** and continuing as permitted by Code of Civil Procedure section 2025.290.

-1-

NOTICE OF DEPOSITION

**YOU ARE FURTHER NOTIFIED THAT:**

The deponent is not a natural person. The matters on which the deponent will be examined are as follows:

(1) Government Claims Act Forms, Procedures, and Official Actors Before 10/14/21

(2) 10/14/21, Preservation of Evidence Letter Delivered by Plaintiff to STATE BAR

(3) 10/18/21, Claim Presentation by Plaintiff Under Government Claims Act (GOV § 910)

(4) 11/12/21, Plaintiff Claim Denial by STATE BAR

(5) 12/21/21, Filing of Instant Action by Plaintiff (GOV § 945.6)

(6) Plaintiff's Rejected Supreme Court Accusations Filed by STATE BAR in Declaration [ROA #49]

(7) Disclosures to California State Auditor RE: Gov. Claim/Instant Action

(8) Disclosures to Macias Gini & O'Connell LLP ("MGO") RE: Gov. Claim/Instant Action

(9) Demurrer Filings [ROA #49] [ROA #51] [ROA #55] [ROA #73] [ROA #77] [ROA #79]

(10) Plaintiff Filing of First Amended Complaint in Instant Action 05/02/22 [ROA #60] ("FAC")

(11) Case Management Statement Filed by Plaintiff on 05/03/2022 [ROA #67]

(12) Case Management Statement Filed by STATE BAR on 05/10/2022 [ROA #69]

(13) Form Interrogatories and Requests for Admissions Set #1 05/13/2022 [Production Date ~08/09/22]

(14) Plaintiff's Noticed RICO § 1962 ("RICO") Allegations Known to STATE BAR

(15) Fourth District, Division Three Court of Appeal Rulings in G059766, G058700, G059457

(16) 07/12/22, Letter to DURAN, ANDRESEN, GRANDT from Plaintiff (w/Attachments)

(17) Separate Statement filed 07/18/2022 ("Material Facts") [ROA #103]

(18) California State Auditor Whistleblower Case #I2022-1019

(19) Published/Un-Published Procedures for All "Licensing, Regulatory, Disciplinary Functions"

(20) Complaint Review Unit, generally (Before October 14, 2021, and After October 18, 2021)

(21) 07/20/22, Response from Office of General Counsel RE: 05/19/22 and 07/12/22 Emails to DURAN

(22) Declaration [#2] of Justin S. Beck [ROA #111] + Catanzarite Cases (EVID § 956)

It is the duty of THE STATE BAR OF CALIFORNIA to identify the individual(s) most qualified to testify on these subjects.

The deponent, who is a party to this action, is required to produce the following at the deposition: All documents, electronically stored information, records, or other materials regarding each item (1)-(22):

(1) Government Claims Act Forms, Procedures, and Official Actors Before 10/14/21

(2) 10/14/21, Preservation of Evidence Letter Delivered by Plaintiff to STATE BAR

(3) 10/18/21, Claim Presentation by Plaintiff Under Government Claims Act (GOV § 910)

(4) 11/12/21, Plaintiff Claim Denial by STATE BAR

(5) 12/21/21, Filing of Instant Action by Plaintiff (GOV § 945.6)

(6) Plaintiff's Rejected Supreme Court Accusations Filed by STATE BAR in Declaration [ROA #49]

(7) Disclosures to California State Auditor RE: Gov. Claim/Instant Action

(8) Disclosures to Macias Gini & O'Connell LLP ("MGO") RE: Gov. Claim/Instant Action

(9) Demurrer Filings [ROA #49] [ROA #51] [ROA #55] [ROA #73] [ROA #77] [ROA #79]

(10) Plaintiff Filing of First Amended Complaint in Instant Action 05/02/22 [ROA #60] ("FAC")

(11) Case Management Statement Filed by Plaintiff on 05/03/2022 [ROA #67]

(12) Case Management Statement Filed by STATE BAR on 05/10/2022 [ROA #69]

(13) Form Interrogatories and Requests for Admissions Set #1 05/13/2022 [Production Date ~08/09/22]

(14) Plaintiff's Noticed RICO § 1962 ("RICO") Allegations Known to STATE BAR

(15) Fourth District, Division Three Court of Appeal Rulings in G059766, G058700, G059457

(16) 07/12/22, Letter to DURAN, ANDRESEN, GRANDT from Plaintiff (w/Attachments)

(17) Separate Statement filed 07/18/2022 ("Material Facts") [ROA #103]

(18) California State Auditor Whistleblower Case #I2022-1019

(19) Published/Un-Published Procedures for All "Licensing, Regulatory, Disciplinary Functions"

(20) Complaint Review Unit, generally (Before October 14, 2021, and After October 18, 2021)

(21) 07/20/22, Response from Office of General Counsel RE: 05/19/22 and 07/12/22 Emails to DURAN

(22) Declaration [#2] of Justin S. Beck [ROA #111] + Catanzarite Cases (EVID § 956)

1    Where electronically stored information is requested, the form in which it should be produced is PDF on

2   two physical "thumb" drives (one original and one backup) organized by each item (1)-(22) in folders, and further

3   as (a) "Name of Document" followed by a short description and the persons to whom it was addressed, intended,

4   received, delivered, and the methods of each (e.g., electronic email or other form of wire or postal mail

5   communication, if applicable). If there are more than 26 documents in a given (1)-(22) folder (e.g., (a)-(z),) please

6   re-start (aa), and so on to (zz), then over again (aaa) and so on to (zzz) within each respective folder. In the

7   alternative to physical "thumb" drives as requested by Plaintiff, STATE BAR may judicially notice all documents

8   as being verified internally to avoid undue waste of court and party resources, or as may be otherwise agreed.

9

10    The deposition proceedings will be recorded both stenographically and by audio/video/livestream on

11   social media recordings.

12

13    As per prior notice by Plaintiff to STATE BAR, he will also seek by motion an order appointing referee

14   under California Code of Civil Procedure section 639(a)(5) for good cause on all matters pertaining to discovery.

15   Because such motion for an order appointing referee may not be heard prior to the upcoming October 4, 2022,

16   hearing on his motion for summary judgment, or in the alternative summary adjudication [ROA #107], Plaintiff

17   seeks a joint stipulation now to appoint a neutral referee for this deposition (inactive State Bar licensee designated

18   by Plaintiff), and that they rule upon any matter related to privileges and exemptions from privilege under the

19   circumstances. Specifically, Plaintiff seeks to eliminate any purported privilege held by STATE BAR or

20   Catanzarite Law Corporation actors under exemptions related to fraud and/or crimes (e.g., EVID § 956) like

21   conduct meeting the definition of racketeering activity under RICO § 1961 that preceded October 14, 2018

22   (predicate) and continuous (ongoing, plus parallel) acts meeting the federal definitions of wire fraud, mail fraud,

23   securities fraud, bribery or extortion, and [fraudulent concealment]. **A list of all parties or attorneys for parties**

24   **on whom this Notice of Deposition is being served is shown on the accompanying proof of service.**

25

26    DATE: July 26, 2022        By _____

27                    Justin S. Beck, plaintiff

28                    *In Pro Per*

-4-

1    [Proof of E-Service]

2

3    I, Justin S. Beck, the plaintiff in this action and moving party, served by electronic mail:

4

5    Notice of Deposition (defendant The State Bar of California)

6    Deposition for Personal Appearance and Production of Records (defendant The State Bar of California)

7

8    Suzanne.Grandt@statebar.ca.gov

9    Ruben.Duran@bbklaw.com

10   Carissa.Andresen@statebar.ca.gov

11

12   Upon defendant State of California, who is jointly and severally liable derivatively for State Bar:

13

14   [Physical Service Notice Forthcoming Until Office of Attorney General Accepts Electronic Service]

15

16                   Dated July 26, 2022

17                   Oceanside, California

18

19                   Respectfully Submitted,

20

21                   _____

22                   Justin S. Beck, plaintiff and moving party

23                   *In Pro Per*

24

25

26

27

28

-5-

NOTICE OF DEPOSITION          3:23-0164-BAS-DDL
                Declaration ISO Rule 11 Motion Ex. 9 p. 008

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address)<br><br>**Justin Beck**<br>**3501 Roselle St**<br>**Oceanside, CA 92056**<br>ATTORNEY FOR   **Self Represented** | TELEPHONE NUMBER<br>**(760) 449-2509** | FOR COURT USE ONLY |
|---|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CENTRAL<br>700 Civic Center Drive West<br>Santa Ana, CA 92701 | | |
| SHORT TITLE OF CASE:<br>Justin S. Beck vs. The State Bar of California | | |
| DATE:<br>09/09/2022 | TIME:<br>9:00 AM   DEP./DIV. | CASE NUMBER:<br>30-2021-01237499-CU-PN-CJC |
| **Declaration of Reasonable Diligence** | | Ref. No. or File No: |

Person to Serve: **The State Bar of California**

Documents
Received:
**Deposition Subpoena for Personal Appearance and Production of Documents and Things; Notice of Deposition**

I declare the following attempts were made to effect personal service, no other residence or business address is known to me:

**Aug 01**
**2022**   11:51 AM   180 Howard St, San Francisco, CA 94105; Rejected, accepted via email ONLY.

Person attempting service:

a. Name: **Donald Schlipp**
b. Address: **500 Allerton Street Suite 105, Redwood City, CA 94063**
c. Telephone number: **650-364-9612**
d. Registration Number: **496**
e. County: **San Mateo**
f. Expiration Date: **10/12/2023**
g. **The** fee for this service was: **120.00**
h. I am an independent contractor:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.



Donald Schlipp                                    Date: **08/11/2022**

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 9 p. 009

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | TELEPHONE NUMBER (760) 449-2509 | FOR COURT USE ONLY |
|---|---|---|
| Justin Beck<br>3501 Roselle St<br>Oceanside CA 92056<br>ATTORNEY FOR     Self Represented | | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CENTRAL |
|---|
| 700 Civic Center Drive West<br>Santa Ana, CA 92701 |

| SHORT TITLE OF CASE: |
|---|
| Justin S. Beck vs. The State Bar of California |

| INVOICE NO.<br>6215959 | DATE:<br>09/09/2022 | TIME:<br>9:00 am | DEP./DIV. | CASE NUMBER:<br>30-2021-01237499-CU-PN-CJC |
|---|---|---|---|---|

**BY FAX**

1. I am at least 18 years old.

    a. My residence or business address is **500 Allerton Street, Suite 105, Redwood City, Ca 94063**

    b. My electronic service address is **info@swiftattorneyservice.com**

2. I electronically served the following documents:

Proof of Electronic Service
Deposition Subpoena for Personal Appearance and Production of Documents and Things
Notice of Deposition

3. I electronically served the documents listed in 2 as follows:

    a. Name of person(s) Served:     James Chung james.chang@calbar.ca.gov
    b. Electronic service address of person(s) served:  180 Howard St San Francisco, CA 94105 (Business)
    c. On:  08/11/2022
    d. At:  11:57 AM

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

8/11/2022

Talam White                                          >  _White_

**Proof of Electronic Service**

Billing Code: SysGen

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 9 p. 010

*Swift*                                                    Swift Legal <info@swiftlegal.com>

## RE: Deposition Subpoena for Personal Appearance and Production of Documents and Things and Notice of Deposition for Case # 30-2021-01237499-CU-PN-CJC
1 message

**Swift Legal** <info@swiftlegal.com>                     Thu, Aug 11, 2022 at 11:57 AM
To: james.chang@calbar.ca.gov

Hello,

Our office tried to serve the Office of General Counsel in San Francisco and was told that legal documents are accepted by email only, see attached document referenced above in regards to the case also mentioned above, please confirm receipt of the email along with the documents.

Taiam White

📄 **6215959-CombineDocuments.pdf**
942K

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 9 p. 011

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | TELEPHONE NUMBER (760) 449-2509 | FOR COURT USE ONLY |
|---|---|---|
| **Justin Beck**<br>**3501 Roselle St**<br>**Oceanside, CA 92056**<br>ATTORNEY FOR **Self Represented** | | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CENTRAL<br>700 Civic Center Drive West<br>Santa Ana, CA 92701 |
|---|

| SHORT TITLE OF CASE:<br>Justin S. Beck vs. The State Bar of California |
|---|

| DATE:<br>09/09/2022 | TIME:<br>9:00 AM | DEP./DIV. | CASE NUMBER:<br>30-2021-01237499-CU-PN-CJC |
|---|---|---|---|

| **Proof of Service Civil Subpoena** | Ref. No. or File No: |
|---|---|

1. I served this *Deposition Subpoena for Personal Appearance and Production of Documents and Things; Notice of Deposition* by personally delivering a copy to the person served as follows:

   a. Person served *(name)*: The State of California By Serving: G. Arcebide #10 - Officer

   b. Address where served: **1300 I St, Sacramento, CA 95814**

   c. Date of delivery: 7/28/2022
   d. Time of delivery: 09:39 AM
   e. Witness fees *(check one)*:

   (1) ☐ were offered or demanded
   and paid, Amount: . . . . . . . $ 0.00

   (2) ☒ were not demanded or paid.

   f. Fee for service: . . . . . . . . . . . . . . . $ 110.00

2. Person attempting service:
   a. Name: **Peli Thao**
   b. Address: **500 Allerton Street Suite 105, Redwood City, CA 94063**
   c. Telephone number: **650-364-9612**
   d. I am:
      (i) [X] Independent Contractor
      (ii) Registration No.: **2020-02**
      (iii) County: **Sacramento**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.



Peli Thao                                    Date: 07/28/2022

---

EXHIBIT 10



**The State Bar**
*of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

July 29, 2022

**Via Email: justintimesd@gmail.com**
Justin Beck
3501 Roselle Street
Oceanside, CA 92056

RE:   *Justin S. Beck v. State Bar of California, et al.*
      Orange County Superior Court Case No. 30-2021-01237499-CU-PN-CJC

Dear Mr. Beck:

On July 27, 2022, the State Bar Defendants filed and served the attached Special Motion to Strike your First Amended Complaint pursuant to the California Code of Civil Procedure section 425.16 (commonly referred to as an "anti-SLAPP motion"). Subsection (g) provides for an automatic stay of discovery upon filing of this motion, with the stay to remain in effect until notice of entry of order ruling on such motion.

As such, the State Bar has no obligation to respond to your July 26, 2022 deposition subpoena and will not be making a witness available for deposition on September 9, 2022. The State Bar will also not be responding to your pending Interrogatories, Request for Admissions, or Requests for Production of Documents until after our motion to strike is ruled upon.

Lastly, please be advised that if the Court grants our anti-SLAPP motion, you will be liable for the State Bar's attorney's fees and costs incurred in bringing the motion. (Cal. Code Civ. Proc.§ 425.16(c).) For the reasons outlined in the attached motion and our pending demurrer, your lawsuit is barred on a number of well-established legal grounds and we expect to prevail on our anti-SLAPP motion. Accordingly, I encourage you to dismiss your case now and avoid potential payment of attorney's fees and costs down the road.

Sincerely,

*/s/ Suzanne C. Grandt*

Suzanne C. Grandt
Assistant General Counsel

cc: Carissa N. Andresen
Enclosures

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 10 p. 001

EXHIBIT 11



# The State Bar
## *of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

October 13, 2022

**Via U.S. Mail and Email: justintimesd@gmail.com**
Justin S. Beck
3501 Roselle Street
Oceanside CA 92056

RE: *Justin S. Beck v. Kenneth Catanzarite, Esq., et al.*
Orange County Superior Court Case No. 30-2020-01145998-CU-BN-CJC
Plaintiff Justin S. Beck's Special Interrogatories to Defendant Suzanne Grandt, Set One

Dear Mr. Beck:

I am writing in response to the document titled "Plaintiff Justin S. Beck's Special Interrogatories to Defendant Suzanne Grandt, Set One" in the above-referenced Superior Court action. I am not a party to this action as I have never been served with a summons in this litigation. Your purported amendment to the complaint to add me as a Defendant pursuant to California Code of Civil Procedure 474 (ROA # 690) does not comply with statutory procedures for service of process and proof of service under this section. Accordingly, the Superior Court lacks personal jurisdiction over me in this matter. (*Kremerman v. White* (2021) 71 Cal.App.5th 358, 374 ["[C]ompliance with the statutory procedures for service of process is essential to establish personal jurisdiction."].)

Moreover, these interrogatories were not properly or timely propounded pursuant to the California Discovery Act. (Ca. Code Civ. Pr. § 2030.20(b) ["A plaintiff may propound interrogatories to a party without leave of court at any time that is 10 days after the service of the summons on, or appearance by, that party, whichever occurs first."].) I have not been served with a summons, nor have I appeared in this case.

For the reasons stated herein, I have no obligation to respond to discovery requests absent a properly issued subpoena. Accordingly, I will not be responding to your Special Interrogatories in this matter.

Sincerely,

*/s/ Suzanne C. Grandt*
Suzanne C. Grandt
Assistant General Counsel

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

3:23-0164-BAS-DDL
Motion Ex. 6 p. 001

Exhibit #74: 028
22-CV-01616-BAS-DDL

ocument received by the CA 4th District Court of Appeal Division 3.



The State Bar
of California

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

October 13, 2022

**Via U.S. Mail and Email: justintimesd@gmail.com**
Justin S. Beck
3501 Roselle Street
Oceanside CA 92056

RE:     *Justin S. Beck v. Kenneth Catanzarite, Esq., et al.*
        Orange County Superior Court Case No. 30-2020-01145998-CU-BN-CJC
        Plaintiff Justin S. Beck's Special Interrogatories to Defendant Eli David Morgenstern
        Set One

Dear Mr. Beck:

I am writing on behalf of Eli David Morgenstern in response to the document titled "Plaintiff Justin S. Beck's Special Interrogatories to Defendant Eli David Morgenstern, Set One" in the above-referenced Superior Court action. Mr. Morgenstern is not a party to this action as he has never been served with a summons in this litigation. Your purported amendment to the complaint to add Mr. Morgenstern as a Defendant pursuant to California Code of Civil Procedure 474 (ROA # 688) does not comply with statutory procedures for service of process and proof of service under this section. Accordingly, the Superior Court lacks personal jurisdiction over Mr. Morgenstern in this matter. (*Kremerman v. White* (2021) 71 Cal.App.5th 358, 374 ["[C]ompliance with the statutory procedures for service of process is essential to establish personal jurisdiction."].)

Moreover, these interrogatories were not properly or timely propounded pursuant to the California Discovery Act. (Ca. Code Civ. Pr. § 2030.20(b) ["A plaintiff may propound interrogatories to a party without leave of court at any time that is 10 days after the service of the summons on, or appearance by, that party, whichever occurs first."].) Mr. Morgenstern has not been served with a summons, nor has he appeared in this case.

For the reasons stated herein, Mr. Morgenstern has no obligation to respond to discovery requests absent a properly issued subpoena. Accordingly, Mr. Morgenstern will not be responding to your Special Interrogatories in this matter.

Sincerely,

*/s/ Suzanne C. Grandt*
Suzanne C. Grandt
Assistant General Counsel

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

3:23-0164-BAS-DDL
Motion Ex. 6 p. 002

Exhibit #74: 029
22-CV-01616-BAS-DDL

ocument received by the CA 4th District Court of Appeal Division 3.



**The State Bar**
*of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

October 13, 2022

**Via U.S. Mail and Email: justintimesd@gmail.com**
Justin S. Beck
3501 Roselle Street
Oceanside CA 92056

RE:   *Justin S. Beck v. Kenneth Catanzarite, Esq., et al.*
Orange County Superior Court Case No. 30-2020-01145998-CU-BN-CJC
Plaintiff Justin S. Beck's Special Interrogatories to Defendant Ruben Duran, Set One

Dear Mr. Beck:

I am writing on behalf of Ruben Duran in response to the document titled "Plaintiff Justin S. Beck's Special Interrogatories to Defendant Ruben Duran, Set One" in the above-referenced Superior Court action. Mr. Duran is not a party to this action as he has never been served with a summons in this litigation. Your purported amendment to the complaint to add Mr. Duran as a Defendant pursuant to California Code of Civil Procedure 474 (ROA # 691) does not comply with statutory procedures for service of process and proof of service under this section. Accordingly, the Superior Court lacks personal jurisdiction over Mr. Duran in this matter. (*Kremerman v. White* (2021) 71 Cal.App.5th 358, 374 ["[C]ompliance with the statutory procedures for service of process is essential to establish personal jurisdiction."].)

Moreover, these interrogatories were not properly or timely propounded pursuant to the California Discovery Act. (Ca. Code Civ. Pr. § 2030.20(b) ["A plaintiff may propound interrogatories to a party without leave of court at any time that is 10 days after the service of the summons on, or appearance by, that party, whichever occurs first."].) Mr. Duran has not been served with a summons, nor has he appeared in this case.

For the reasons stated herein, Mr. Duran has no obligation to respond to discovery requests in this action absent a properly issued subpoena. Accordingly, Mr. Duran will not be responding to your Special Interrogatories.

Sincerely,

*/s/ Suzanne C. Grandt*

Suzanne C. Grandt
Assistant General Counsel

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

3:23-0164-BAS-DDL          Exhibit #74: 030
Motion Ex. 6 p. 003       22-CV-01616-BAS-DDL

*Document received by the CA 4th District Court of Appeal Division 3.*

1    Justin S. Beck
     3501 Roselle St.
2    Oceanside, California 92056
     760-449-2509
3    justintimesd@gmail.com

4    *In Pro Per*

5              **IN THE SUPERIOR COURT OF CALIFORNIA**

6                      **COUNTY OF ORANGE**

7    JUSTIN S. BECK, an individual,          )   Case No: 30-2020-01145998-CU-BN-CJC
8                    Plaintiff,              )   Judge Assigned: Honorable Randall J. Sherman
9         v.                                 )
10   KENNETH CATANZARITE, ESQ., an           )   **PLAINTIFF JUSTIN S. BECK'S SPECIAL**
     individual; CATANZARITE LAW             )   **INTERROGATORIES TO DEFENDANT**
11   CORPORATION, a California corporation;  )   **SUZANNE GRANDT**
12   MOBILE FARMING SYSTEMS, INC., a         )   **SET ONE**
     California corporation; BRANDON         )
13   WOODWARD, ESQ., an individual; TIM JAMES)   **Unlimited Civil Case**
14   OKEEFE, ESQ., an individual; RICHARD    )
     FRANCIS O'CONNOR, JR., an individual; AMY)  Action Filed: May 26, 2020
15   JEANETTE COOPER, an individual; CLIFF   )
16   HIGGERSON, an individual; TONY SCUDDER, )   Trial Date: Bench Trial November X, 2022
     an individual; JAMES DUFFY, an individual;)
17   MOHAMMED ZAKHIREH, an individual; TGAP  )             January 6, 2023
18   HOLDINGS, LLC, a Nevada limited liability)
     corporation; AROHA HOLDINGS, INC., a    )
19   California corporation; THE STATE OF     )
     CALIFORNIA, a public entity; THE STATE BAR)
20   OF CALIFORNIA, a public entity; SUZANNE )
     GRANDT, an individual; RUBEN DURAN, an  )
21   individual; ELI DAVID MORGENSTERN, an   )
22   individual; NICOLE MARIE CATANZARITE    )
     WOODWARD, ESQ., and DOES 1-9            )
23                                           )
                     Defendants.             )
24                                           )

25   _____

26   PROPOUNDING PARTY:   JUSTIN S. BECK

27   RESPONDING PARTY:    SUZANNE GRANDT

28   SET NUMBER:          ONE (1)

---
                              1

**PLAINTIFF JUSTIN S. BECK'S SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT**

*[right margin, vertical text:]* ocument received by the CA 4th District Court of Appeal Division 3

**TO DEFENDANT SUZANNE GRANDT AND HER ATTORNEY:**

Plaintiff Justin S. Beck requests that defendant Suzanne Grandt respond to the following interrogatories separately and fully in writing and under oath, pursuant to *§ 2030.010 et seq. of the Code of Civil Procedure*, and that the response be signed by them and be served on Plaintiff, Justin S. Beck within 30 days (35 days if these Interrogatories were served by mail within California) from the date of service.

In answering these interrogatories, furnish all information that is available to you. If you cannot answer an interrogatory completely, answer it to the extent possible. If you do not have personal knowledge sufficient to respond fully to an interrogatory, so state, but make a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, unless the information is equally available to the propounding party.

**DEFINITIONS**

Each of the defined terms in Terminology Rule 1.0.1 (effective November 1, 2018) of the California Rules of Professional Conduct shall have the meaning ascribed to it as per (a)-(n) respectively with its footnotes in comment. **Each defined term will appear as being capitalized entirely, or with an asterisk\* if not capitalized entirely**. Plaintiff includes the definitions here for the avoidance of doubt:

(a)   "BELIEF" or "BELIEVES" means that the person\* involved actually supposes the fact in question to be true. A person's\* belief may be inferred from circumstances.

(b)   [Reserved]

(c)   "FIRM" or "LAW FIRM" means a law partnership; a professional law corporation; a lawyer acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal services organization or in the legal department, division or office of a corporation, of a government organization, or of another organization.

(d)   "FRAUD" or "FRAUDULENT" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive.

(e)   "INFORMED CONSENT" means a person's\* agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks,

PLAINTIFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT
3:23-0164-BAS-DDL          Exhibit #74: 032
Motion Ex. 6 p. 005        22-CV-01616-BAS-DDL

1   including any actual and reasonably\* foreseeable adverse consequences of the proposed course of

2   conduct.

3   (e-1) "INFORMED WRITTEN CONSENT" means that the disclosures and the consent required by

4   paragraph (e) must be in writing.\*

5   (f)     "KNOWINGLY," "KNOWN," or "KNOWS" means actual knowledge of the fact in question.

6   A person's\* knowledge may be inferred from circumstances.

7   (g)     "PARTNER" means a member of a partnership, a shareholder in a law firm\* organized as a

8   professional corporation, or a member of an association authorized to practice law.

9   (g-1) "PERSON" has the meaning stated in Evidence Code section 175.

10  (h)     "REASONABLE" or "REASONABLY" when used in relation to conduct by a lawyer means

11  the conduct of a reasonably prudent and competent lawyer.

12  (i)     "REASONABLE BELIEF" or "REASONABLY BELIEVES" when used in reference to a

13  lawyer means that the lawyer believes the matter in question and that the circumstances are such that

14  the belief is reasonable.

15  (j)     "REASONABLY SHOULD KNOW" when used in reference to a lawyer means that a lawyer

16  of reasonable prudence and competence would ascertain the matter in question.

17  (k)     "SCREENED" means the isolation of a lawyer from any participation in a matter, including the

18  timely imposition of procedures within a law firm\* that are adequate under the circumstances (i) to

19  protect information that the isolated lawyer is  obligated to protect under these rules or other law; and

20  (ii) to protect against other law firm\* lawyers and nonlawyer personnel communicating with the lawyer

21  with respect to the matter.

22  (l)     "SUBSTANTIAL" when used in reference to degree or extent means a material matter of clear

23  and weighty importance.

24  (m)     "TRIBUNAL" means: (i) a court, an arbitrator, an administrative law judge, or an administrative

25  body acting in an adjudicative capacity and authorized to make a decision that can be binding on the

26  parties involved; or (ii) a special master or other PERSON\* to whom a court refers one or more issues

27  and whose decision or recommendation can be binding on the parties if approved by the court.

28

3

PLAINTIFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT
3:23-0164-BAS-DDL          Exhibit #74: 033
Motion Ex. 6 p. 006          22-CV-01616-BAS-DDL

11

1  (n)     "WRITING" or "WRITTEN" has the meaning stated in Evidence Code section 250.   A

2  "SIGNED" writing includes an electronic sound, symbol, or process attached to or logically associated

3  with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to

4  sign the writing.

5

6  **Comment**

7

8  *Firm\* or Law Firm\**

9  [1]     Practitioners who share office space and occasionally consult or assist each other ordinarily

10  would not be regarded as constituting a law firm.*  However, if they present themselves to the public in

11  a way that suggests that they are a law firm* or conduct themselves as a law firm,* they may be regarded

12  as a law firm* for purposes of these rules. The terms of any formal agreement between associated

13  lawyers are relevant in determining whether they are a firm,* as is the fact that they have mutual access

14  to information concerning the clients they serve.

15

16  [2]     The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,*

17  other than as a partner* or associate, or officer or shareholder, that is close, personal, continuous, and

18  regular.  Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed

19  a member of a law firm* for purposes of these rules will also depend on the specific facts.  (Compare

20  People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135

21  [86 Cal.Rptr.2d 816] with Chambers v. Kay (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

22

23  *Fraud\**

24  [3] When the terms "fraud"* or "fraudulent"* are used in these rules, it is not necessary that anyone has

25  suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of

26  those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer

27  assisting in the perpetration of a fraud,* or otherwise frustrate the imposition of discipline on lawyers

28  who engage in fraudulent* conduct.  The term "fraud"* or "fraudulent"* when used in these rules does

4

Document received by the CA 4th District Court of Appeal Division 3

1  not include merely negligent misrepresentation or negligent failure to apprise another of relevant

2  information.

3

4  ***Informed Consent\* and Informed Written Consent\****

5  [4] The communication necessary to obtain informed consent* or informed written consent* will vary

6  according to the rule involved and the circumstances giving rise to the need to obtain consent.

7

8  ***Screened\****

9  [5]     The purpose of screening* is to assure the affected client, former client, or prospective client that

10  confidential information known* by the personally prohibited lawyer is neither disclosed to other law

11  firm* lawyers or nonlawyer personnel nor used to the detriment of the person* to whom the duty of

12  confidentiality is owed.  The personally prohibited lawyer shall acknowledge the obligation not to

13  communicate with any of the other lawyers and nonlawyer personnel in the law firm* with respect to

14  the matter.  Similarly, other lawyers and nonlawyer personnel in the law firm* who are working on the

15  matter promptly shall be informed that the screening* is in place and that they may not communicate

16  with the personally prohibited lawyer with respect to the matter.  Additional screening* measures that

17  are appropriate for the particular matter will depend on the circumstances.  To implement, reinforce and

18  remind all affected law firm* personnel of the presence of the screening,* it may be appropriate for the

19  law firm* to undertake such procedures as a written* undertaking by the personally prohibited lawyer

20  to avoid any communication with other law firm* personnel and any contact with any law firm* files or

21  other materials relating to the matter, written* notice and instructions to all other law firm* personnel

22  forbidding any communication with the personally prohibited lawyer relating to the matter, denial of

23  access by that lawyer to law firm* files or other materials relating to the matter, and periodic reminders

24  of the screen* to the personally prohibited lawyer and all other law firm* personnel.

25

26  [6]     In order to be effective, screening* measures must be implemented as soon as practical after a

27  lawyer or law firm* knows* or reasonably should know* that there is a need for screening.*

28

*(right margin, vertical text)* ocument received by the CA 4th District Court of Appeal Division 3

Interrogatory No. 1:

When did you take the oath codified by BPC § 6068?

Interrogatory No. 2:

Describe the limitations of your personal immunity from tort claims.

Interrogatory No. 3:

How many times have you appeared for defendant Ruben Duran using public funds?

Interrogatory No. 4:

Describe defendant Ruben Duran's emphasis on transparency as it relates to Plaintiff's claims against The State Bar of California.

Interrogatory No. 5:

Describe defendant Ruben Duran's emphasis on complex conflicts of interest issues as it relates to your representation of him individually.

Interrogatory No. 6:

What factors contributed to General Counsel Vanessa Holton's decision to announce her retirement via press release on or around February 7, 2022?

Interrogatory No. 7:

How long have you worked for defendant The State Bar of California?

Interrogatory No. 8:

Describe any instance of FRAUD that was not disclosed to the California State Auditor prior to its publication of Report 2022-030 known to you.

6

ocument received by the CA 4th District Court of Appeal Division 3

1  Interrogatory No. 9:

2  How is the Office of General Counsel for defendant The State Bar of California involved in tort claims?

3

4  Interrogatory No. 10:

5  What do you have in common with defendant Ruben Duran?

6

7  Interrogatory No. 11:

8  Based on the Complaint Review Unit files, in what unlawful ways are IOLTA accounts used?

9

10  Interrogatory No. 12:

11  How is the Office of General Counsel for defendant The State Bar of California involved in public

12  records requests?

13

14  Interrogatory No. 13:

15  When did you obtain INFORMED WRITTEN CONSENT to appear in *Justin S. Beck v. The State Bar*

16  *of California et al.* (OCSC Case No. 30-2021-01237499)?

17

18  Interrogatory No. 14:

19  How do you believe defendant Eli David Morgenstern was compensated by defendant Kenneth

20  Catanzarite, Esq. between January 2020 and March 2020?

21

22  Interrogatory No. 15:

23  Who are the real decision makers at The State Bar of California?

24

25  Interrogatory No. 16:

26  Who else investigated Plaintiff's *prima facie* case prior to Ruben Duran's filing of an "Anti-SLAPP" in

27  *Justin S. Beck v. The State Bar of California et al.* (OCSC Case No. 30-2021-01237499)?

28

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT
3:23-0164-BAS-DDL          Exhibit #74: 037
Motion Ex. 6 p. 010       22-CV-01616-BAS-DDL

*ocument received by the CA 4th District Court of Appeal Division 3*

Interrogatory No. 17:

Who supervises defendant Eli David Morgenstern directly?

Interrogatory No. 18:

Which specific findings of California State Auditor Report 2022-030 do you dispute?

Interrogatory No. 19:

How many payments from an IOLTA account from 2012-2022 have you received?

Interrogatory No. 20:

How do LAWYERS use property owners' associations to defraud persons*?

Interrogatory No. 21:

How does Court of Appeal's ruling in G059766 reflect on your exercise of reasonable care to Plaintiff?

Interrogatory No. 22:

How is CCP § 425.16 abused according to your expert belief*?

Interrogatory No. 23:

Why do you believe* defendant The State Bar of California is immune from claims in tort?

Interrogatory No. 24:

How does Office of General Counsel identify deliberate schemes to defraud by LAWYERS*?

Interrogatory No. 25:

Describe the reasonable care exercised by the Board of Trustees for defendant The State Bar of California since Plaintiff noticed his claims on or around October 14, 2021.

8

Document received by the CA 4th District Court of Appeal Division 3

1    Interrogatory No. 26:

2    In what ways has defendant The State Bar of California protected Plaintiff?

3

4    Interrogatory No. 27:

5    Describe why some lawyers are enabled to commit FRAUD, but not others.

6

7    Interrogatory No. 28:

8    Why is the conduct shown by Plaintiff in the instant case and in *Justin S. Beck v. The State Bar of*

9    *California, et al.* (OCSC Case No. 30-2021-01237499) not subject to at least one sub-section of RICO

10   § 1962(a)-(d)?

11

12   Interrogatory No. 29:

13   Describe the conveyance of 180 Howard Street, San Francisco, California on or around July 27, 2022.

14

15   Interrogatory No. 30:

16   How does Office of General Counsel perform SCREENING?*

17

18   Interrogatory No. 31:

19   Describe why Plaintiff should answer fraudulent* litigation, but you should not face genuine tort claims.

20

21   Interrogatory No. 32:

22   Why is the attorney oath important to you as a person*?

23

24   Interrogatory No. 33:

25   Was Eli David Morgenstern among those who received payments according to the Thomas Girardi

26   investigation?

27

28

ocument received by the CA 4th District Court of Appeal Division 3

9

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT
3:23-0164-BAS-DDL          Exhibit #74: 039
Motion Ex. 8 p. 012       22-CV-01616-BAS-DDL

1 | Interrogatory No. 34:

2 | Which law firms* have the most public employees working for defendant The State Bar of California?

3 |

4 | Interrogatory No. 35:

5 | Why did you ratify the conduct of lawyer* defendants in this action?

6 |

7 |

8 |

9 | By: _____

10 |      Justin S. Beck, Plaintiff, In Pro Per, Propounding Party

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

10

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT

Document received by the CA 4th District Court of Appeal Division 3.

PROOF OF SERVICE ONLY

*Justin S. Beck v. Suzanne Grandt et al*

Orange County Superior Court Case No. 30-2020-01145998-CU-BN-CJC

Judge Assigned: Honorable Randall J. Sherman

**Hearing Date: November 4, 2022**

**CX105**

I, Justin S. Beck, delivered by electronic service and/or ordered physical the following upon all parties and their counsel using their respective email addresses:

**PLAINTIFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT**

I swear under penalty of perjury under the laws of the State of California that the foregoing is true and correct. I'm signing this declaration from Oceanside, California as proof of service today.

September 11, 2022

Justin S. Beck, declarant

Plaintiff, propounding party

*In Pro Per*

11

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT SUZANNE GRANDT

3:23-0164-BAS-DDL          Exhibit #74: 041

Motion Ex. 6 p. 014          22-CV-01616-BAS-DDL

ocument received by the CA 4th District Court of Appeal Division 3.

1   Justin S. Beck
     3501 Roselle St.
2   Oceanside, California 92056
     760-449-2509
3   justintimesd@gmail.com

4   *In Pro Per*

5

              **IN THE SUPERIOR COURT OF CALIFORNIA**
6
                     **COUNTY OF ORANGE**
7

8   JUSTIN S. BECK, an individual,        Case No: 30-2020-01145998-CU-BN-CJC

             Plaintiff,           Judge Assigned: Honorable Randall J. Sherman
9

10      v.

     KENNETH CATANZARITE, ESQ., an    **PLAINTIFF JUSTIN S. BECK'S SPECIAL**
11  individual; CATANZARITE LAW       **INTERROGATORIES TO DEFENDANT**
     CORPORATION, a California corporation;  **RUBEN DURAN**
12  MOBILE FARMING SYSTEMS, INC., a
     California corporation; BRANDON       **SET ONE**
13  WOODWARD, ESQ., an individual; TIM JAMES
     OKEEFE, ESQ., an individual; RICHARD    **Unlimited Civil Case**
14  FRANCIS O'CONNOR, JR., an individual; AMY
     JEANETTE COOPER, an individual; CLIFF   Action Filed: May 26, 2020
15  HIGGERSON, an individual; TONY SCUDDER,
     an individual; JAMES DUFFY, an individual;  Trial Date: Bench Trial ~~NOVEMBER X XX2~~
16  MOHAMMED ZAKHIREH, an individual; TGAP
     HOLDINGS, LLC, a Nevada limited liability          January 6, 2023
17  corporation; AROHA HOLDINGS, INC., a
     California corporation; THE STATE OF
18  CALIFORNIA, a public entity; THE STATE BAR
     OF CALIFORNIA, a public entity; SUZANNE
19  GRANDT, an individual; RUBEN DURAN, an
     individual; ELI DAVID MORGENSTERN, an
20  individual; NICOLE MARIE CATANZARITE
     WOODWARD, ESQ., and DOES 1-9
21

22          Defendants.
23

24

25

26  PROPOUNDING PARTY:   JUSTIN S. BECK

27  RESPONDING PARTY:     RUBEN DURAN

28  SET NUMBER:          ONE (1)

                             1

**PLAINTIFF JUSTIN S. BECK'S SPECIAL INTERROGATORIES TO DEFENDANT RUBEN DURAN**

*Document received by the CA 4th District Court of Appeal Division 3*

1    **TO DEFENDANT RUBEN DURAN AND HIS ATTORNEY:**

2           Plaintiff Justin S. Beck requests that defendant Ruben Duran respond to the following

3    interrogatories separately and fully in writing and under oath, pursuant to *§ 2030.010 et seq. of the Code*

4    *of Civil Procedure*, and that the response be signed by them and be served on Plaintiff, Justin S. Beck

5    within 30 days (35 days if these Interrogatories were served by mail within California) from the date of

6    service.

7           In answering these interrogatories, furnish all information that is available to you. If you cannot

8    answer an interrogatory completely, answer it to the extent possible. If you do not have personal

9    knowledge sufficient to respond fully to an interrogatory, so state, but make a reasonable and good faith

10   effort to obtain the information by inquiry to other natural persons or organizations, unless the

11   information is equally available to the propounding party.

12

13   **DEFINITIONS**

14   Each of the defined terms in Terminology Rule 1.0.1 (effective November 1, 2018) of the California

15   Rules of Professional Conduct shall have the meaning ascribed to it as per (a)-(n) respectively with its

16   footnotes in comment. **Each defined term will appear as being capitalized entirely, or with an**

17   **asterisk\* if not capitalized entirely**. Plaintiff includes the definitions here for the avoidance of doubt:

18   (a)    "BELIEF" or "BELIEVES" means that the person* involved actually supposes the fact in

19   question to be true. A person's* belief may be inferred from circumstances.

20   (b)    [Reserved]

21   (c)    "FIRM" or "LAW FIRM" means a law partnership; a professional law corporation; a lawyer

22   acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal

23   services organization or in the legal department, division or office of a corporation, of a government

24   organization, or of another organization.

25   (d)    "FRAUD" or "FRAUDULENT" means conduct that is fraudulent under the law of the applicable

26   jurisdiction and has a purpose to deceive.

27   (e)    "INFORMED CONSENT" means a person's* agreement to a proposed course of conduct after

28   the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks,

*Document received by the CA 4th District Court of Appeal Division 3.*

1  including any actual and reasonably* foreseeable adverse consequences of the proposed course of

2  conduct.

3  (e-1)  "INFORMED WRITTEN CONSENT" means that the disclosures and the consent required by

4  paragraph (e) must be in writing.*

5  (f)      "KNOWINGLY," "KNOWN," or "KNOWS" means actual knowledge of the fact in question.

6  A person's* knowledge may be inferred from circumstances.

7  (g)      "PARTNER" means a member of a partnership, a shareholder in a law firm* organized as a

8  professional corporation, or a member of an association authorized to practice law.

9  (g-1)  "PERSON" has the meaning stated in Evidence Code section 175.

10 (h)      "REASONABLE" or "REASONABLY" when used in relation to conduct by a lawyer means

11 the conduct of a reasonably prudent and competent lawyer.

12 (i)      "REASONABLE BELIEF" or "REASONABLY BELIEVES" when used in reference to a

13 lawyer means that the lawyer believes the matter in question and that the circumstances are such that

14 the belief is reasonable.

15 (j)      "REASONABLY SHOULD KNOW" when used in reference to a lawyer means that a lawyer

16 of reasonable prudence and competence would ascertain the matter in question.

17 (k)      "SCREENED" means the isolation of a lawyer from any participation in a matter, including the

18 timely imposition of procedures within a law firm* that are adequate under the circumstances (i) to

19 protect information that the isolated lawyer is  obligated to protect under these rules or other law; and

20 (ii) to protect against other law firm* lawyers and nonlawyer personnel communicating with the lawyer

21 with respect to the matter.

22 (l)      "SUBSTANTIAL" when used in reference to degree or extent means a material matter of clear

23 and weighty importance.

24 (m)     "TRIBUNAL" means: (i) a court, an arbitrator, an administrative law judge, or an administrative

25 body acting in an adjudicative capacity and authorized to make a decision that can be binding on the

26 parties involved; or (ii) a special master or other PERSON* to whom a court refers one or more issues

27 and whose decision or recommendation can be binding on the parties if approved by the court.

28

3

1    (n)      "WRITING" or "WRITTEN" has the meaning stated in Evidence Code section 250.   A

2    "SIGNED" writing includes an electronic sound, symbol, or process attached to or logically associated

3    with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to

4    sign the writing.

5

6    **Comment**

7

8    *Firm* or Law Firm*

9    [1]      Practitioners who share office space and occasionally consult or assist each other ordinarily

10   would not be regarded as constituting a law firm.*  However, if they present themselves to the public in

11   a way that suggests that they are a law firm* or conduct themselves as a law firm,* they may be regarded

12   as a law firm* for purposes of these rules. The terms of any formal agreement between associated

13   lawyers are relevant in determining whether they are a firm,* as is the fact that they have mutual access

14   to information concerning the clients they serve.

15

16   [2]      The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,*

17   other than as a partner* or associate, or officer or shareholder, that is close, personal, continuous, and

18   regular.  Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed

19   a member of a law firm* for purposes of these rules will also depend on the specific facts.  (Compare

20   People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135

21   [86 Cal.Rptr.2d 816] with Chambers v. Kay (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

22

23   *Fraud**

24   [3] When the terms "fraud"* or "fraudulent"* are used in these rules, it is not necessary that anyone has

25   suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of

26   those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer

27   assisting in the perpetration of a fraud,* or otherwise frustrate the imposition of discipline on lawyers

28   who engage in fraudulent* conduct.  The term "fraud"* or "fraudulent"* when used in these rules does

<br>

4

1   not include merely negligent misrepresentation or negligent failure to apprise another of relevant

2   information.

3

4   ***Informed Consent\* and Informed Written Consent\****

5   [4] The communication necessary to obtain informed consent\* or informed written consent\* will vary

6   according to the rule involved and the circumstances giving rise to the need to obtain consent.

7

8   ***Screened\****

9   [5]      The purpose of screening\* is to assure the affected client, former client, or prospective client that

10  confidential information known\* by the personally prohibited lawyer is neither disclosed to other law

11  firm\* lawyers or nonlawyer personnel nor used to the detriment of the person\* to whom the duty of

12  confidentiality is owed.   The personally prohibited lawyer shall acknowledge the obligation not to

13  communicate with any of the other lawyers and nonlawyer personnel in the law firm\* with respect to

14  the matter.  Similarly, other lawyers and nonlawyer personnel in the law firm\* who are working on the

15  matter promptly shall be informed that the screening\* is in place and that they may not communicate

16  with the personally prohibited lawyer with respect to the matter.  Additional screening\* measures that

17  are appropriate for the particular matter will depend on the circumstances.  To implement, reinforce and

18  remind all affected law firm\* personnel of the presence of the screening,\* it may be appropriate for the

19  law firm\* to undertake such procedures as a written\* undertaking by the personally prohibited lawyer

20  to avoid any communication with other law firm\* personnel and any contact with any law firm\* files or

21  other materials relating to the matter, written\* notice and instructions to all other law firm\* personnel

22  forbidding any communication with the personally prohibited lawyer relating to the matter, denial of

23  access by that lawyer to law firm\* files or other materials relating to the matter, and periodic reminders

24  of the screen\* to the personally prohibited lawyer and all other law firm\* personnel.

25

26  [6]      In order to be effective, screening\* measures must be implemented as soon as practical after a

27  lawyer or law firm\* knows\* or reasonably should know\* that there is a need for screening.\*

28

PLAINTIFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT RUBEN DURAN
3:23-0164-BAS-DDL              Exhibit #74: 046
Motion Ex. 6 p. 019          22-CV-01616-BAS-DDL

*Document received by the CA 4th District Court of Appeal Division 3*

Interrogatory No. 1:

How did the rulings in Case No. 21-12766 in the United States Court of Appeals for the Eleventh Circuit influence your operational decisions communicated to Plaintiff in writing* on July 20, 2022?

Interrogatory No. 2:

How did rulings in Fourth District, Division Three in this case (G059766, inc. citations of G058700, G059457) affect your decision to file a motion to strike Plaintiff's complaint under CCP § 425.16 in *Justin S. Beck v. The State Bar of California, et al.* (OCSC Case No. 30-2021-01237499)?

Interrogatory No. 3:

Describe your emphasis on open government as it relates to Plaintiff's claims against The State Bar of California.

Interrogatory No. 4:

Describe your emphasis on transparency as it relates to Plaintiff's claims against you individually.

Interrogatory No. 5:

Describe your emphasis on complex conflicts of interest issues as it relates to defendant Suzanne Grandt's representation of you individually using public funds.

Interrogatory No. 6:

How did *Justin S. Beck v. The State Bar of California, et al.* (OCSC Case No. 30-2021-01237499) influence General Counsel for The State Bar of California Vanessa Holton's decision to retire?

Interrogatory No. 7:

Describe how defendant The State Bar of California has exercised reasonable care to Plaintiff since September 14, 2018.

6

Document received by the CA 4th District Court of Appeal Division 3

Interrogatory No. 8:

Based on the publicly funded investigation of Thomas Girardi by The State Bar of California, which public employees received unlawful payments from IOLTA accounts?

Interrogatory No. 9:

Describe the process for members of the public to file claims against The State Bar of California subject to the liability sections of the Government Claims Act.

Interrogatory No. 10:

What do you have in common with defendant Kenneth Catanzarite, Esq.?

Interrogatory No. 11:

How does The State Bar of California determine the amount that meets its definition of "*de minimis*" as it relates to IOLTA complaints?

Interrogatory No. 12:

What do you, as a LAWYER, consider clear and convincing evidence?

Interrogatory No. 13:

How does the LAW FIRM Best Best & Kriger LLP benefit from your role at The State Bar of California?

Interrogatory No. 14:

How did public entity defendant law firm* The State Bar of California and private law firm* Best Best & Krieger LLP manage informed written consents* related to your defense in this case?

Interrogatory No. 15:

Do you believe yourself immune from all claims in tort in any capacity?

7

ocument received by the CA 4th District Court of Appeal Division 3

1  Interrogatory No. 16:

2  Describe why you believe* you were appointed to the Board of Trustees for defendant The State Bar of

3  California in 2018.

4

5  Interrogatory No. 17:

6  Describe why you believe* you were appointed Chairman of the Board of Trustees for defendant The

7  State Bar of California by the Supreme Court.

8

9  Interrogatory No. 18:

10  Which findings of California State Auditor Report 2022-030 were the most "profoundly **eye**-opening

11  and **troubling**" to you?

12

13  Interrogatory No. 19:

14  Are you involved in violations of 18 U.S. Code § 1960 through Interest Only Lawyer Trust Accounts

15  (IOLTA) in California?

16

17  Interrogatory No. 20:

18  How do LAWYERS use property owners' associations to launder money instruments?

19

20  Interrogatory No. 21:

21  How does Court of Appeal's ruling in G059766 reflect on your exercise of reasonable care to Plaintiff?

22

23  Interrogatory No. 22:

24  What findings from the Court of Appeal's ruling in G059766 pertain to you?

25

26  Interrogatory No. 23:

27  How do the Court of Appeal's findings in G059766 reflect on Eli David Morgenstern's operational

28  decisions?

8

ocument received by the CA 4th District Court of Appeal Division 3

1  Interrogatory No. 24:

2  Describe the policy decisions providing discretion to enable deliberate schemes to defraud.

3

4  Interrogatory No. 25:

5  Describe the reasonable care exercised by defendant Suzanne Grandt since Plaintiff filed the first

6  amended complaint in *Justin S. Beck v. The State Bar of California, et al.* (OCSC Case No. 30-2021-

7  01237499).

8

9  Interrogatory No. 26:

10  Describe specifically how The State Bar of California protects Plaintiff.

11

12  Interrogatory No. 27:

13  Describe why your rights are more important than Plaintiff's.

14

15  Interrogatory No. 28:

16  Describe why the conduct shown by Plaintiff in the instant case and in *Justin S. Beck v. The State Bar*

17  *of California, et al.* (OCSC Case No. 30-2021-01237499) is not subject to RICO § 1962(a)-(d).

18

19  Interrogatory No. 29:

20  Why is Plaintiff treated as subordinate to defendant Suzanne Grandt?

21

22  Interrogatory No. 30:

23  Describe why you believe defendant Suzanne Grandt can defend you personally against Plaintiff's

24  allegations of FRAUD.

25

26  Interrogatory No. 31:

27  Describe why you believe defendant Suzanne Grandt can defend Eli David Morgenstern against

28  Plaintiff's allegations of corruption.

9

*Document received by the CA 4th District Court of Appeal Division 3.*

1    Interrogatory No. 32:

2    Why is the attorney oath important to you as a person*?

3

4    Interrogatory No. 33:

5    Has Eli David Morgenstern disclosed all communications with Kenneth Catanzarite, Esq.?

6

7    Interrogatory No. 34:

8    Describe your indemnification from law firm* Best Best & Krieger LLP related to your role at law firm*

9    The State Bar of California.

10

11   Interrogatory No. 35:

12   Why is Kenneth Catanzarite, Esq. enabled by The State Bar of California?

13

14

15

16   By: _____

17        Justin S. Beck, Plaintiff, In Pro Per, Propounding Party

18

19

20

21

22

23

24

25

26

27

28

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT RUBEN DURAN
3:23-0164-BAS-DDL                    Exhibit #74: 051
Motion Ex. 6 p. 024               22-CV-01616-BAS-DDL

*ocument received by the CA 4th District Court of Appeal Division 3*

PROOF OF SERVICE ONLY

*Justin S. Beck v. Kenneth Catanzarite, Esq. et al.*

Orange County Superior Court Case No. 30-2020-01145998-CU-BN-CJC

Judge Assigned: Honorable Randall J. Sherman

**Hearing Date: November 4, 2022**

**CX105**

I, Justin S. Beck, delivered by electronic service and/or ordered physical the following upon all parties and their counsel using their respective email addresses:

**PLAINTIFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT RUBEN DURAN**

I swear under penalty of perjury under the laws of the State of California that the foregoing is true and correct. I'm signing this declaration from Oceanside, California as proof of service today.

September 11, 2022

_____

Justin S. Beck, declarant

Plaintiff, propounding party

*In Pro Per*

11

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT RUBEN DURAN

3:23-0164-BAS-DDL          Exhibit #74: 052

Motion Ex. 6 p. 025      22-CV-01616-BAS-DDL

Document received by the CA 4th District Court of Appeal Division 3.

Justin S. Beck
3501 Roselle St.
Oceanside, California 92056
760-449-2509
justintimesd@gmail.com

*In Pro Per*

## IN THE SUPERIOR COURT OF CALIFORNIA

### COUNTY OF ORANGE

| | |
|---|---|
| JUSTIN S. BECK, an individual, | Case No: 30-2020-01145998-CU-BN-CJC |
| Plaintiff, | Judge Assigned: Honorable Randall J. Sherman |
| v. | |
| KENNETH CATANZARITE, ESQ., an individual; CATANZARITE LAW CORPORATION, a California corporation; MOBILE FARMING SYSTEMS, INC., a California corporation; BRANDON WOODWARD, ESQ., an individual; TIM JAMES OKEEFE, ESQ., an individual; RICHARD FRANCIS O'CONNOR, JR., an individual; AMY JEANETTE COOPER, an individual; CLIFF HIGGERSON, an individual; TONY SCUDDER, an individual; JAMES DUFFY, an individual; MOHAMMED ZAKHIREH, an individual; TGAP HOLDINGS, LLC, a Nevada limited liability corporation; AROHA HOLDINGS, INC., a California corporation; THE STATE OF CALIFORNIA, a public entity; THE STATE BAR OF CALIFORNIA, a public entity; SUZANNE GRANDT, an individual; RUBEN DURAN, an individual; ELI DAVID MORGENSTERN, an individual; NICOLE MARIE CATANZARITE WOODWARD, ESQ., and DOES 1-9 | **PLAINTIFF JUSTIN S. BECK'S SPECIAL INTERROGATORIES TO DEFENDANT ELI DAVID MORGENSTERN** <br><br> **SET ONE** <br><br> **Unlimited Civil Case** <br><br> Action Filed: May 26, 2020 <br><br> Trial Date: Bench Trial November 14, 2022 <br><br> January 6, 2023 |
| Defendants. | |

PROPOUNDING PARTY:   JUSTIN S. BECK

RESPONDING PARTY:   ELI DAVID MORGENSTERN

SET NUMBER:   ONE (1)

1

*ocument received by the CA 4th District Court of Appeal Division 3*

**TO DEFENDANT ELI DAVID MORGENSTERN AND HIS ATTORNEY:**

Plaintiff Justin S. Beck requests that defendant Ei David Morgenstern respond to the following interrogatories separately and fully in writing and under oath, pursuant to *§ 2030.010 et seq. of the Code of Civil Procedure*, and that the response be signed by them and be served on Plaintiff, Justin S. Beck within 30 days (35 days if these Interrogatories were served by mail within California) from the date of service.

In answering these interrogatories, furnish all information that is available to you. If you cannot answer an interrogatory completely, answer it to the extent possible. If you do not have personal knowledge sufficient to respond fully to an interrogatory, so state, but make a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, unless the information is equally available to the propounding party.

**DEFINITIONS**

Each of the defined terms in Terminology Rule 1.0.1 (effective November 1, 2018) of the California Rules of Professional Conduct shall have the meaning ascribed to it as per (a)-(n) respectively with its footnotes in comment. **Each defined term will appear as being capitalized entirely, or with an asterisk\* if not capitalized entirely.** Plaintiff includes the definitions here for the avoidance of doubt:

(a)     "BELIEF" or "BELIEVES" means that the person\* involved actually supposes the fact in question to be true. A person's\* belief may be inferred from circumstances.

(b)     [Reserved]

(c)     "FIRM" or "LAW FIRM" means a law partnership; a professional law corporation; a lawyer acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal services organization or in the legal department, division or office of a corporation, of a government organization, or of another organization.

(d)     "FRAUD" or "FRAUDULENT" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive.

(e)     "INFORMED CONSENT" means a person's\* agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks.

*ocument received by the CA 4th District Court of Appeal Division 3*

1  including any actual and reasonably* foreseeable adverse consequences of the proposed course of

2  conduct.

3  (e-1)   "INFORMED WRITTEN CONSENT" means that the disclosures and the consent required by

4  paragraph (e) must be in writing.*

5  (f)     "KNOWINGLY," "KNOWN," or "KNOWS" means actual knowledge of the fact in question.

6  A person's* knowledge may be inferred from circumstances.

7  (g)     "PARTNER" means a member of a partnership, a shareholder in a law firm* organized as a

8  professional corporation, or a member of an association authorized to practice law.

9  (g-1)   "PERSON" has the meaning stated in Evidence Code section 175.

10  (h)     "REASONABLE" or "REASONABLY" when used in relation to conduct by a lawyer means

11  the conduct of a reasonably prudent and competent lawyer.

12  (i)     "REASONABLE BELIEF" or "REASONABLY BELIEVES" when used in reference to a

13  lawyer means that the lawyer believes the matter in question and that the circumstances are such that

14  the belief is reasonable.

15  (j)     "REASONABLY SHOULD KNOW" when used in reference to a lawyer means that a lawyer

16  of reasonable prudence and competence would ascertain the matter in question.

17  (k)     "SCREENED" means the isolation of a lawyer from any participation in a matter, including the

18  timely imposition of procedures within a law firm* that are adequate under the circumstances (i) to

19  protect information that the isolated lawyer is  obligated to protect under these rules or other law; and

20  (ii) to protect against other law firm* lawyers and nonlawyer personnel communicating with the lawyer

21  with respect to the matter.

22  (l)     "SUBSTANTIAL" when used in reference to degree or extent means a material matter of clear

23  and weighty importance.

24  (m)    "TRIBUNAL" means: (i) a court, an arbitrator, an administrative law judge, or an administrative

25  body acting in an adjudicative capacity and authorized to make a decision that can be binding on the

26  parties involved; or (ii) a special master or other PERSON* to whom a court refers one or more issues

27  and whose decision or recommendation can be binding on the parties if approved by the court.

28

3

1  (n)    "WRITING" or "WRITTEN" has the meaning stated in Evidence Code section 250.  A

2  "SIGNED" writing includes an electronic sound, symbol, or process attached to or logically associated

3  with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to

4  sign the writing.

5

6  **Comment**

7

8  *Firm* or Law Firm**

9  [1]     Practitioners who share office space and occasionally consult or assist each other ordinarily

10  would not be regarded as constituting a law firm.*  However, if they present themselves to the public in

11  a way that suggests that they are a law firm* or conduct themselves as a law firm,* they may be regarded

12  as a law firm* for purposes of these rules. The terms of any formal agreement between associated

13  lawyers are relevant in determining whether they are a firm,* as is the fact that they have mutual access

14  to information concerning the clients they serve.

15

16  [2]     The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,*

17  other than as a partner* or associate, or officer or shareholder, that is close, personal, continuous, and

18  regular.  Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed

19  a member of a law firm* for purposes of these rules will also depend on the specific facts.  (Compare

20  People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135

21  [86 Cal.Rptr.2d 816] with Chambers v. Kay (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

22

23  *Fraud**

24  [3] When the terms "fraud"* or "fraudulent"* are used in these rules, it is not necessary that anyone has

25  suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of

26  those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer

27  assisting in the perpetration of a fraud,* or otherwise frustrate the imposition of discipline on lawyers

28  who engage in fraudulent* conduct.  The term "fraud"* or "fraudulent"* when used in these rules does

4

Document received by the CA 4th District Court of Appeal Division

1   not include merely negligent misrepresentation or negligent failure to apprise another of relevant

2   information.

3

4   *Informed Consent\* and Informed Written Consent\**

5   [4] The communication necessary to obtain informed consent\* or informed written consent\* will vary

6   according to the rule involved and the circumstances giving rise to the need to obtain consent.

7

8   *Screened\**

9   [5]      The purpose of screening\* is to assure the affected client, former client, or prospective client that

10   confidential information known\* by the personally prohibited lawyer is neither disclosed to other law

11   firm\* lawyers or nonlawyer personnel nor used to the detriment of the person\* to whom the duty of

12   confidentiality is owed.  The personally prohibited lawyer shall acknowledge the obligation not to

13   communicate with any of the other lawyers and nonlawyer personnel in the law firm\* with respect to

14   the matter.  Similarly, other lawyers and nonlawyer personnel in the law firm\* who are working on the

15   matter promptly shall be informed that the screening\* is in place and that they may not communicate

16   with the personally prohibited lawyer with respect to the matter.  Additional screening\* measures that

17   are appropriate for the particular matter will depend on the circumstances.  To implement, reinforce and

18   remind all affected law firm\* personnel of the presence of the screening,\* it may be appropriate for the

19   law firm\* to undertake such procedures as a written\* undertaking by the personally prohibited lawyer

20   to avoid any communication with other law firm\* personnel and any contact with any law firm\* files or

21   other materials relating to the matter, written\* notice and instructions to all other law firm\* personnel

22   forbidding any communication with the personally prohibited lawyer relating to the matter, denial of

23   access by that lawyer to law firm\* files or other materials relating to the matter, and periodic reminders

24   of the screen\* to the personally prohibited lawyer and all other law firm\* personnel.

25

26   [6]      In order to be effective, screening\* measures must be implemented as soon as practical after a

27   lawyer or law firm\* knows\* or reasonably should know\* that there is a need for screening.\*

28

ocument received by the CA 4th District Court of Appeal Division

Interrogatory No. 1:

When did you take the oath codified by BPC § 6068?

Interrogatory No. 2:

How much has Office of Chief Trial Counsel recovered from LAWYERS* since 2012, in total?

Interrogatory No. 3:

Why does The State Bar of California rely upon public funding to protect lawyers* and law firms?*

Interrogatory No. 4:

Describe how The State Bar of California is a substantial factor in the conduct of lawyers.*

Interrogatory No. 5:

In what ways have you communicated with persons* associated with Catanzarite Law Corporation?

Interrogatory No. 6:

How long have you known Kenneth Catanzarite, Esq.?

Interrogatory No. 7:

Describe any instance when you threatened a self-represented person* with the imposition of legal fees under CCP § 425.16.

Interrogatory No. 8:

How have the operations for Office of Chief Trial Counsel changed since January 1, 2019?

Interrogatory No. 9:

What guidance have you received concerning your potential liability in tort claims?

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT ELI DAVID MORGENSTERN
3:23-0164-BAS-DDL
Motion Ex. 6 p. 031

Exhibit #74: 058
22-CV-01616-BAS-DDL

Document received by the CA 4th District Court of Appeal Division 3

1    Interrogatory No. 10:

2    Describe specifically how The State Bar of California protects the public, and not attorneys.

3

4    Interrogatory No. 11:

5    Based on the conduct described in the Court of Appeal's ruling in G059766, what sort of severe

6    emotional distress do you believe Plaintiff reasonably* experienced?

7

8    Interrogatory No. 12:

9    What do you believe constitutes irreparable harm?

10

11   Interrogatory No. 13:

12   How does irreparable harm impact your decisions in your official capacity?

13

14   Interrogatory No. 14:

15   How were you compensated by defendant Kenneth Catanzarite, Esq.?

16

17   Interrogatory No. 15:

18   Who made the decision to abate investigations of Kenneth Catanzarite, Esq.?

19

20   Interrogatory No. 16:

21   Describe how your office identifies abuse of CCP § 425.16.

22

23   Interrogatory No. 17:

24   What is the worst thing you've ever received evidence of LAWYER* doing?

25

26   Interrogatory No. 18:

27   How does The State Bar of California select which files to share with California State Auditor?

28

7

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT ELI DAVID MORGENSTERN

3:23-0164-BAS-DDL          Exhibit #74: 059

Motion Ex. 6 p. 032        22-CV-01616-BAS-DDL

document received by the CA 4th District Court of Appeal Division 3

1   Interrogatory No. 19:

2   What sort of benefits have you received apart from your salary since becoming a public employee?

3

4   Interrogatory No. 20:

5   How long have you worked for defendant The State Bar of California?

6

7   Interrogatory No. 21:

8   How do you determine whether a violation is "serious enough" to warrant investigation?

9

10  Interrogatory No. 22:

11  How is CCP § 425.16 abused by LAWYERS according to your expert belief*?

12

13  Interrogatory No. 23:

14  How much does it cost to obtain protection from Office of Chief Trial Counsel?

15

16  Interrogatory No. 24:

17  How do you identify deliberate schemes to defraud in the performance of your public duties?

18

19  Interrogatory No. 25:

20  Describe why you are currently acting as "advisor" to an investigation conducted by Amy Yarbrough.

21

22  Interrogatory No. 26:

23  Given your role as a civil defendant, why did your office refuse Plaintiff's demand that a third-party

24  investigate FRAUD allegations involving public employees known to you?

25

26  Interrogatory No. 27:

27  How does your office decide what FRAUD to allow, and what FRAUD to prosecute?

28

8

PLAINITFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT ELI DAVID MORGENSTERN

3:23-0164-BAS-DDL            Exhibit #74: 060
Motion Ex. 6 p. 033         22-CV-01616-BAS-DDL

document received by the CA 4th District Court of Appeal Division 3

Interrogatory No. 28:

Why is the conduct shown by Plaintiff in the instant case and in *Justin S. Beck v. The State Bar of California, et al.* (OCSC Case No. 30-2021-01237499) not subject to at least one sub-section of RICO § 1962(a)-(d)?

Interrogatory No. 29:

Describe the limitations of your immunity from claims in tort.

Interrogatory No. 30:

How does Office of Chief Trial Counsel perform SCREENING?*

Interrogatory No. 31:

Describe why Plaintiff should answer fraudulent* litigation, but you should not face genuine tort claims.

Interrogatory No. 32:

Why was your filing of an untimely "Anti-SLAPP" objectively reasonable after the Fourth District, Division Three issued its ruling in G059766 on July 13, 2022?

Interrogatory No. 33:

What public employees received payments according to the Thomas Girardi investigation?

Interrogatory No. 34:

Other than yourself, who makes decisions for Office of Chief Trial Counsel?

Interrogatory No. 35:

Describe how you were not involved in a "portion of the proceedings" in this case as alleged.

By: _____

    Justin S. Beck, Plaintiff, In Pro Per, Propounding Party

9

Document received by the CA 4th District Court of Appeal Division

1

**PROOF OF SERVICE ONLY**

2

*Justin S. Beck v. Eli David Morgenstern et al*

3

Orange County Superior Court Case No. 30-2020-01145998-CU-BN-CJC

4

Judge Assigned: Honorable Randall J. Sherman

5

**Hearing Date: November 4, 2022**

6

**CX105**

7

8

9    I, Justin S. Beck, delivered by electronic service and/or ordered physical the following upon all

10   parties and their counsel using their respective email addresses:

11

12   **PLAINTIFF JUSTIN S. BECK SPECIAL INTERROGATORIES TO DEFENDANT ELI**

13   **DAVID MORGENSTERN**

14

15   I swear under penalty of perjury under the laws of the State of California that the foregoing is

16   true and correct. I'm signing this declaration from Oceanside, California as proof of service today.

17

18

19   September 11, 2022        _____

20                             Justin S. Beck, declarant

21                             Plaintiff, propounding party

22                             *In Pro Per*

23

24

25

26

27

28

10

3:23-0164-BAS-DDL          Exhibit #74: 062
Motion Ex. @ p. 035        22-CV-01616-BAS-DDL

Document received by the CA 4th District Court of Appeal Division 3

EXHIBIT 12

ELLIN DAVTYAN (238608)
General Counsel
ROBERT G. RETANA (148677)
Deputy General Counsel
SUZANNE C. GRANDT (304794)
Assistant General Counsel
OFFICE OF GENERAL COUNSEL
THE STATE BAR OF CALIFORNIA
180 Howard Street
San Francisco, CA 94105-1639
Tel: (415) 538-2381; Fax: (415) 538-2321
Email: suzanne.grandt@calbar.ca.gov

Attorneys for Defendants The State Bar of California; Anand Kumar;
Eli David Morgenstern; Joy Nunley; Ruben Duran; Carissa Andresen; Suzanne Grandt

**Exempt from Filing Fees Pursuant to Government
Code Section 6103**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| JUSTIN S. BECK, an individual, | CASE NO. 30-2021-01237499-CU-PN-CJC |
| Plaintiff, | ASSIGNED FOR ALL PURPOSES TO: JUDICIAL OFFICER JOHN C. GASTELUM DEPARTMENT C11 |
| v. | |
| THE STATE BAR OF CALIFORNIA, a public corporation; ANAND KUMAR, an individual; ELI DAVID MORGENSTERN, an individual; JOY NUNLEY, an individual; RUBEN DURAN, an individual; CARISSA ANDRESEN, an individual; SUZANNE GRANDT, an individual; and DOES 4 -20, | **DEFENDANTS THE STATE BAR OF CALIFORNIA, ANAND KUMAR, ELI DAVID MORGENSTERN, and JOY NUNLEY'S REPLY IN SUPPORT OF THE STATE BAR DEFENDANTS' DEMURRER TO FIRST AMENDED COMPLAINT** |
| Defendants. | HEARING DATE: October 11, 2022 HEARING TIME: 2:00 p.m. DEPT: C11 ACTION FILED: December 21, 2021 TRIAL DATE: None |

STATE BAR DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' DEMURRER TO FIRST AMENDED COMPLAINT
Case No. 30-2021-01237499-CU-PN-CJC

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 12 p. 001

## I.   INTRODUCTION

Each of the claims alleged in the First Amendment Complaint ("FAC") is deficient in a myriad of ways, and Plaintiff Justin Beck ("Plaintiff")' Opposition to the State Bar Defendants' Demurrer (titled "Opposition to Defective Pleading #79", [ROA #180 (the "Opposition")]), does nothing to save them. The Opposition fails to respond to dispositive arguments plainly asserted in the State Bar Defendants' Memorandum of Points and Authorities and advances incoherent positions unsupported by law or any well-pled factual allegation (or both). As Plaintiff has not addressed any of the legal points raised in the State Bar's demurrer, he has effectively conceded its merits. (*See, e.g., People v. Stanley* (1995) 10 Cal.4th 764, 793 (See, *Sehulster Tunnels/Pre-Con v. Trylor Brothers, Inc.* (2003) 111 Cal.App.4th 1328, 1345, n. 16 [failure to address point in opposition brief "is equivalent to a concession."].) The law is clear that the State Bar Defendants Demurrer should be sustained for the following reasons:

*First*, this Court lacks subject matter jurisdiction over this lawsuit. There are no well-plead allegations in the FAC that do not arise from Plaintiff's dissatisfaction with the way his attorney discipline complaints were handled by the State Bar. Plaintiff's sole recourse is to seek relief in the California Supreme Court, which has original, exclusive jurisdiction over attorney discipline.

*Second*, all Defendants are immune from all claims asserted in this action.

*Third*, Plaintiff's vague allegations of general wrongdoing are woefully insufficient to state a cognizable cause of action against the State Bar or any State Bar employee.

Because Plaintiff has not demonstrated that any of his claims can survive well-established jurisdictional bars and/or are sufficiently pled, the Court should sustain the State Bar Defendants' demurrer. Plaintiff will be unable to cure any of these defects through amendment as this Court lacks jurisdiction over his case, and all State Bar Defendants are immune from suit. Accordingly, the State Bar Defendants' demurrer should be sustained, and this entire lawsuit dismissed with prejudice.[1]

---

[1] Plaintiff has already added two State Bar employees as Doe Defendants, without adding any factual allegations regarding these specific individuals (ROA #113, #114, #115.) He has also purported to add yet another state Bar employee as a Doe Defendant (ROA #213.) Should this case not be dismissed in its entirety, Plaintiff will continue to add State employee after State employee as Doe Defendants, despite no relation to the facts at hand, and that all defenses apply with equal force to any State Bar employee or officer.

1

## II.    ARGUMENT

### A. The Demurrer is Not Defective or Unlawful.

Plaintiff contends the demurrer is invalid because it "fails to state the named Plaintiff whose complaint it seeks to strike," fails to state the relevant grounds to each cause of action and pleads one or more grounds under each paragraph. (Opposition at 3, 12-13.) The State Bar Defendants' demurrer properly complies with all procedural requirements. The first page expressly indicates that the State Bar Defendants are demurring to Justin Beck's First Amended Complaint and indicates that the demurrer is made "pursuant to Code of Civil Procedure § 430.10 and § 430.30." (ROA # 79 at 1.) It also properly only states one ground for demurrer in each paragraph, albeit citing multiple citations for each ground. (*Id*). In any event, Plaintiff does not—and cannot show—he did not have adequate notice of the demurrer or that it was unclear what the State Bar Defendants' bases for their demurrer are.

### B. This Court Lacks Subject Matter Jurisdiction Over This Action.

All of Plaintiff's claims arise directly from the State Bar's exercise of its disciplinary functions, which is subject to the sole and exclusive jurisdiction of the California Supreme Court. (*Obrien v. Jones* (2000) 23 Cal.4th 40, 48; *Jacobs v. State Bar* (1977) 20 Cal.3d 191, 198.) "In California, the inherent judicial power of the superior court does *not* extend to attorney disciplinary actions. That power is exclusively held by the Supreme Court and the State Bar, acting as its administrative arm." (*Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1710.) The purpose for this is to provide an efficient process for administering discipline. "To allow attorneys to initiate superior court proceedings to circumvent or 'shortcut' this function . . . would tend to jeopardize the integrity of the process." (*Jacobs*, at 196; cf. *Bollotin v. California State Personnel Board* (1995) 131 Cal.App.2d 197, 200 [superior court could not hear lawsuit against the State Bar for dereliction of its duty in not disciplining an attorney; only Supreme Court could].)

Accordingly, this Court lacks subject matter jurisdiction over this entire action. Plaintiff does not address this controlling legal authority whatsoever, thereby conceding this point of law. Plaintiff's only response is that he pleads "a public interest standing and cannot be denied forum" and contends that it is somehow Defendants' burden to move the case to federal court. (Opposition, at

2

1   12.) This is nonsensical as it is Plaintiff's burden to bring his lawsuit in the proper forum, and his

2   failure to do so requires dismissal of this proceeding for lack of subject matter jurisdiction.

### C. Plaintiff's Claims Must Be Dismissed Because the State Bar and its Employees Are Immune.

5     The demurrer should also be sustained because Plaintiff's claims are barred based on a host of

6   statutory immunities. The State Bar and its employees are statutorily immune from tort claims, from

7   claims based on their failure to enforce the law, from acts taken in connection with attorney licensing

8   and from discretionary acts. (Gov. Code, §§ 815 818.4, 820.2, and 821.) Such immunities apply to

9   each cause of action here. (*See generally*, Demurrer and Memorandum of Points and Authorities,

10  ROA #79.) Plaintiff does not coherently address a single one of these immunities, except to argue

11  that the State Bar owes him a "non-delegable duty" under the United States and California

12  Constitution (Opposition at 11). He argues that this is a "duty to uphold the United States

13  Constitution including the 5th and 14th amendment" and "a duty under the Government Claims Act

14  that he be paid fair compensation for his damages." (Opposition at 11-12.)

15    Government Code, section 815.6 provides: "Where a public entity is under a mandatory duty

16  imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the

17  public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty

18  unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

19  Plaintiff does not—and cannot—explain how the United States and California Constitution establish

20  any such "duty" under section 815.6. Application of section 815.6 requires that the enactment require

21  that a particular action be taken or not taken. (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887,

22  898). Therefore, to constitute a mandatory duty, there must be a specific enactment that

23  "affirmatively imposes the duty and provides implementing guidelines." (*Ibid.*; *see also*, *Srouy v. San

24  Diego Unified School District* (2022) 2022 WL 557183.) The Fifth and Fourteenth Amendments of

25  the Constitution do not have any such mandatory enactment applicable to the State Bar. Nor is there

26  anything in the Government Claims Act that creates any mandatory duty to pay Plaintiff damages.

27    As laid out in detail in the State Bar Defendants Demurrer and Memorandum of Points and

28  Authorities, the State Bar does not owe Plaintiff any mandatory duty and the above-referenced

STATE BAR DEFENDANTS REPLY IN SUPPORT OF DEFENDANTS' DEMURRER TO FIRST AMENDED COMPLAINT
Case No. 30-2021-01237499-CU-PN-CJC

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 12 p. 004

1    statutory immunities apply to each and every cause of action in this case. Accordingly, the FAC

2    should be dismissed with prejudice.

3        **D. Plaintiff's Claims Must be Dismissed Because the FAC Fails to Allege Facts**
         **Sufficient to State a Claim for Any Cause of Action.**
4

5        The State Bar Defendants' Demurrer and Memorandum of Points and Authorities explained

6    in detail how for each cause of action, the FAC failed to state any cognizable legal claim. Plaintiff's

7    Opposition ignores the State Bar's legal argument entirely, simply iterating that the allegations are

8    well plead and that the State Bar Defendants "cannot show on demurrer that they did not engage in

9    the acts pled, or relief isn't needed." (Opposition 14- 19.) Of course, it is Plaintiff's burden to plead

10   facts that constitute a cause of action. In failing to substantively address the State Bar Defendants'

11   arguments, Plaintiff has conceded he has not sufficiently stated any cause of action.  (*See,*

12   *e.g., Sehulster Tunnels/Pre-Con, supra,* 111 Cal.App.4th at 1345, n. 16.)

13       Ultimately, Plaintiff offers nothing except broad legal conclusions to support his causes of

14   action. In determining whether the allegations of the FAC are sufficient to state a cause of action,

15   Plaintiff's conclusions should be disregarded. (*Faulkner v. California Toll Bridge Authority* (1953)

16   40 Cal.2d 317, 329.) Significantly, Plaintiff bears the burden of stating facts constituting a cause of

17   action without the aid of conjectured facts which are not directly alleged. (*Hawkins v. Oakland Title*

18   *Ins. & Guar Co.* (1958) 165 Cal.App.2d 116.) Plaintiff has stated numerous assumptions in the FAC,

19   but not sufficient *facts* as required by law. Plaintiff's unhappiness with how the State Bar handled his

20   disciplinary complaints cannot constitute viable tort claims against a public entity. As such, all claims

21   should be dismissed for failure to state a cause of action.

22       **E. The State Bar Defendant's Demurrer Should be Sustained Without Leave to**
         **Amend.**
23

24       A demurrer should be sustained without leave to amend absent a showing by Plaintiff that a

25   reasonable possibility exists that the defects can be cured by amendment. (*Torres v. City of Yorba*

26   *Linda* (1993) 13 Cal. App. 4th 1035, 1041.) The burden of proving such a reasonable possibility rests

27   on Plaintiff. (*Id.*)

28

                                    4
─────────────────────────────────────────────
STATE BAR DEFENDANTS REPLY IN SUPPORT OF DEFENDANTS' DEMURRER TO FIRST AMENDED COMPLAINT

1    There is no possible way that Plaintiff can cure these defects through amendment because this

2    Court lacks subject matter jurisdiction over this matter and the State Bar and all State Bar employees

3    are immune from suit. There are no additional facts that Plaintiff could plead to overcome these

4    procedural defects. Further, allowing amendment will subject the State Bar to additional vexatious

5    filings by Plaintiff, such as frivolous sanctions motions and the addition of a never-ending slew of

6    high ranking public officers and employees that bear no relation to the facts at hand.  (ROA #113-

7    115, 213 [addition of multiple State Bar officer and employee Doe Defendants without new factual

8    allegations]; ROA # 165, 215 [two separate motions for sanctions against the State Bar simply for

9    filing motions to strike and demurrer].) Accordingly, the demurrer should be sustained without leave

10   to amend and this entire lawsuit dismissed with prejudice.

11   **III.    CONCLUSION**

12       For these reasons, the State Bar Defendants respectfully request this Court sustain their

13   demurrer to Plaintiff's First Amended Complaint in its entirety, and without leave to amend, and that

14   this lawsuit be dismissed with prejudice.

15

16   Dated: October 4, 2022                     Respectfully submitted,
                                                 OFFICE OF GENERAL COUNSEL
17                                               THE STATE BAR OF CALIFORNIA

18

19                                               By: /s/ SUZANNE C. GRANDT
20                                                   SUZANNE C. GRANDT
                                                     Attorneys for Defendants
21                                                   The State Bar of California; Anand Kumar;
                                                     Eli David Morgenstern; Joy Nunley

22

23

24

25

26

27

28

# PROOF OF SERVICE

I, Joan Randolph, hereby declare: that I am over the age of eighteen years and am not a party to the within above-entitled action, that I am employed in the City and County of San Francisco, that my business address is The State Bar of California, 180 Howard Street, San Francisco, CA 94105.

On October 4, 2022, I served a copy of:

**DEFENDANTS THE STATE BAR OF CALIFORNIA, ANAND KUMAR, ELI DAVID MORGENSTERN, JOY NUNLEY'S REPLY IN SUPPORT OF THE STATE BAR DEFENDANTS' DEMURRER TO FIRST AMENDED COMPLAINT**

on the parties listed below:

Justin S. Beck
3501 Roselle Street
Oceanside CA 92056
Email: justintimesd@gmail.com
Pro Per

☒ **By electronic mail** by personally transmitting a true copy thereof via an electronic mail service connected to the internet, addressed to the email address listed above.

☒ **By UPS** overnight delivery.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at San Francisco, California on October 4, 2022.

*/s/ Joan Randolph*
Joan Randolph

3:23-0164-BAS-DDL   PROOF OF SERVICE, Case No. 30-2021-01237499-CU-PN-CJC
Declaration ISO Rule 11 Motion Ex. 12 p. 007

EXHIBIT 13

Gmail - Proof of Service on Office of General Counsel, Board of Trustees, and Private Law Firm

 **Gmail**

**Justin Beck <justintimesd@gmail.com>**

## Proof of Service on Office of General Counsel, Board of Trustees, and Private Law Firm

Justin Beck <justintimesd@gmail.com>                                    Mon, Sep 26, 2022 at 10:08 AM
To: "Calanoc, Ines" <Ines.Calanoc@jud.ca.gov>
Cc: "Grandt, Suzanne" <Suzanne.Grandt@calbar.ca.gov>, Ellin.Davtyan@calbar.ca.gov, "Andresen, Carissa"
<Carissa.Andresen@calbar.ca.gov>, ruben.duran@bbklaw.com, "Duran, Ruben" <Ruben.Duran@calbar.ca.gov>,
hailyn.chen@mto.com, eric.garner@bbklaw.com
Bcc: jose.cisneros@sfgov.org

RE: *Justin S. Beck v. Ruben Duran* (The State Bar of California) S276517

Ms. Calanoc,

Thank you for your call today. I can confirm, and attach for your files, that the petition for review was served on the Office of General Counsel for The State Bar of California as well as its Board of Trustees, and the managing partner for the private law firm Best Best and Krieger.

The petition was served and filed on September 17, 2022 -- and again on September 21, 2022 with accompanying exhibit attachments 1-3. Finally, an additional batch of exhibits were served and filed in case the Court is unable to judicially notice other evidence referenced.

All parties were thus served the petition and the exhibit files marked [1 to 3] and then [4 of 3] with an added verification.

Sincerely,

Justin S. Beck

**Justin Beck**
**760-449-2509**

*This email is informational and planning purposes only and does not constitute an offer or solicitation to sell shares or securities in any company (the "Company"). Any offer or solicitation will be made only by means of a confidential Offering Memorandum and in accordance with the terms of all applicable securities and other laws. None of the information or analyses presented are intended to form the basis for any investment decision, and no specific recommendations are intended. Accordingly, this email does constitute investment advice or counsel or solicitation for investment in any security. This email or its contents and attachments do not constitute or form part of, and should not be construed as, any offer for sale or subscription of, or any invitation to offer to buy or subscribe for, any securities, nor should it or any part of it form the basis of, or be relied on in any connection with, any contract or commitment whatsoever. The Company and Justin Beck expressly disclaim any and all responsibility for any direct or consequential loss or damage of any kind whatsoever arising directly or indirectly from: (i) reliance on any information contained in this email or its attachments, (ii) any error, omission or inaccuracy in any such information or (iii) any action resulting therefrom. The Company and Justin Beck make no warranties or representations on the ability to finalize any initiatives outlined within this email or its attachments. This information is being provided upon request only.*

📄 **POS Binder for Supreme Court.pdf**
99K

EXHIBIT 14

The State Bar
*of California*

OFFICE OF GENERAL COUNSEL

180 Howard Street, San Francisco, CA 94105

TELEPHONE: 415-538-2000
FAX: (415) 538-2220
http://www.ca.bar.ca.gov

October 17, 2022

### ANTITRUST DETERMINATION 2022-0001

A. <u>Authority</u>

This determination is made pursuant to California Supreme Court Administrative Order 2017-09-20, which mandates that the State Bar Office of General Counsel provide a determination on issues submitted to it for resolution of potential antitrust concerns.

B. <u>Issue Presented</u>

<u>Request for Antitrust Determination</u>:  On September 17, 2022, Justin S. Beck ("Requestor") emailed a Request for Antitrust Determination on the State Bar to various individuals affiliated with the State Bar. His email message was addressed to the Chair of the State Bar Board of Trustees (BOT) and the Office of the General Counsel ("OGC").

The Request states as follows:

> This determination is to be made by the California Supreme Court or United States District Court where the pro se violations of federal antitrust laws exist and Office of General Counsel is controlled by active market participants in violation of federal law.

<u>Petition for Review</u>:  The accompanying "Petition for Review of Per Se + Alleged Antitrust Violations Presented by Member of the Public" ("Petition") was filed with the California Supreme Court on September 21, 2022 (Case No. S276517). On September 27, 2022, the California Supreme Court ordered the Petition stricken as premature.

The Petition's "Statement of Case" alleges that OGC and the BOT Board each lack direct oversight in regulation despite being controlled by a majority of active market participants. The Petition further alleges that "No state actor may claim sovereign immunity as of 2015 under binding decisional law of the highest Court of the United States." Petition, p. 2.

The Petition alleges that the State Bar "is not operated in a manner consistent with public statements made by the Chairman of the Board of Trustees. Ongoing patterns of conduct prejudicial to public, courts, and legal profession exist, each failing to objectively under the Court's own Rules of Professional Conduct (CRPC) which is binding upon every lawyer under Bus. and Prof. Cod. § 6077. It continues under color of law. CRPC 5.1" *Id.*

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 14 p. 001

Exhibit #60: 002
22-CV-01616-BAS-DDL

Antitrust Determination 2022-0001
October 17, 2022
Page 2

Moreover, the Petition asserts that: "This Court must review because the horizontal trade of law, namely lawyer controlling $3.4 trillion gross state product annually cannot govern themselves as a matter of law. *They have not adequately governed themselves*, where no reasonable mind could differ, and anticompetitive conduct has become the rule rather than the exception. Where this Court lacked transparency before, the record is now overwhelming."

The Petition's Statement of Case lists various conclusions of fact about the State Bar, including that:

- The State Bar is controlled by the BOT and the OGC in a Unity of Interest;
- A majority of the BOT is comprised of active market participants in the horizontal market for legal services;
- The BOT substantially influences California and Interstate Commerce;
- The State Bar's divisions are controlled by active market participants;
- The BOT controls decisions by various offices of the State Bar;
- The BOT controls every aspect of the California Legal Industry

*Id.* at p. 3. No evidence or citations are offered to support these sweeping conclusions other than a footnote citing various appeals and "ROAs." How those matters relate to these allegations is not explained.

The Petition's Argument section states various legal conclusions citing *North Carolina State Board of Dental Examiners v. FTC* (2015) 547 U.S 494. To the extent it can be understood, the Petition appears to concern the handling of his complaints against attorneys submitted to the State Bar's Office of Chief Trial Counsel ("OCTC") that were not resolved to his satisfaction. The two Superior Court lawsuits Requestor references pertain to disputes with his attorneys and with the State Bar, given his dissatisfaction with how OCTC handled his complaints. *Id.* at p. 5. The Requestor also takes issue with various motions filed by OGC in those cases but fails to explain how responding to his complaints in a court of law amounts to a violation of the federal antitrust laws. *Id.* at 6.

The Petition also makes many references to allegations of racketeering, money laundering, wire fraud, and mail fraud. *Id.* at 7. Given that the allegations are not comprehensible and this Request is related explicitly to antitrust concerns, no response to such allegations is warranted or given in this Response. Should Requestor make such allegations in other proceedings, the State Bar reserves all rights to defend against such allegations that appear gratuitous.

As discussed below, Requestor's complaints about how OGC is responding to his civil complaints now pending in Superior Court do not fall within the scope of federal antitrust laws, and no order or decision therein is ripe for consideration by this Court. Whatever dissatisfaction he may feel about said litigation should be taken up with the Superior Court as appropriate or on appeal.

Antitrust Determination 2022-0001
October 17, 2022
Page 3

Moreover, this Request does not provide a premature appeal to the California Supreme Court of matters pending in the Superior Courts simply because Requestor is unhappy with the State Bar's positions. By its very nature, litigation involves parties with differing viewpoints. Such disagreements cannot form the basis of a federal antitrust complaint. Thus, the State Bar has tried to distill the Petition to the essence of the issue(s) raised related to antitrust concerns. At bottom, this appears to be a dissatisfaction with the State Bar's handling of Requestor's complaints against his attorneys. See Petition at p. 10.

C. Analysis

1. Attorney Discipline Is State Action Immune From Antitrust Prohibitions.

The U.S. Supreme Court has held that the antitrust laws do not apply to state legislative enactments, regardless of anti-competitive intent or effect. (See, e.g., Parker v. Brown (1943) 317 U.S. 341, 350-51 ["We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature."]; Hoover v. Ronwin (1984) 466 U.S. 558, 568-69 ["When the conduct is that of the sovereign itself . . . the danger of unauthorized restraint of trade does not arise. Where the conduct is that of the state legislature or supreme court, we do not need to address the issues of clear articulation and active supervision."].) This immunity is known as the state action doctrine.

The State Bar is mandated by statute to investigate and recommend to the Supreme Court discipline of attorneys.[1] The State Bar's role in the attorney discipline process is merely precatory; the Supreme Court retains its inherent authority to regulate the practice of law and attorney discipline can only be effectuated by order of the Court.[2] The California Supreme Court

---

[1] (Bus & Prof. Code, § 6078 ["After a hearing for any of the causes set forth in the laws of the State of California warranting disbarment, suspension, or other discipline, the board has the power to recommend to the Supreme Court the disbarment or suspension from practice of members or to discipline them by reproval, public or private, without such recommendation."].)

[2] (In re Rose (2000) 22 Cal. 4th 430, 436 [93 Cal. Rptr. 2d 298, 302, 993 P.2d 956, 960] ["The State Bar Court exercises no judicial power, but rather makes recommendations to [the Supreme Court], which then undertakes an independent determination of the law and the facts, exercises its inherent jurisdiction over attorney discipline, and enters the first and only disciplinary order."]; Brotsky v. State Bar of Cal. (1962) 57 Cal. 2d 287, 301 [19 Cal. Rptr. 153, 160, 368 P.2d 697, 704] [holding "in matters of discipline and disbarment, the State Bar is but an arm of [the Supreme Court], and that this court retains its power to control any such disciplinary proceeding at any step."]; Bus & Prof. Code, § 6100 ["For any of the causes provided in this article, arising after an attorney's admission to practice, he or she may be disbarred or suspended by the Supreme Court. Nothing in this article limits the inherent power of the Supreme Court to discipline, including to summarily disbar, any attorney."]; State Bar of California Rules of Procedure, rule 5.120 ["Unless the Court orders otherwise, the State Bar court's final recommendation to suspend or disbar a member and the accompanying record will be sent to the Supreme Court after all applicable cost certificates have been filed, or an additional 30 days has expired, whichever is earlier."].)

Antitrust Determination 2022-0001
October 17, 2022
Page 4

has held explicitly that the discipline of California attorneys by the Court, acting on recommendation of the State Bar, is exempt from antitrust laws. (*Lebbos v. The State Bar of California* (1991) 53 Cal. 3d 37, 47 ["Our enforcement of disciplinary rules by suspending or disbarring an attorney is state action and, as such, is immune from Sherman Antitrust Act liability."].)

D. <u>Conclusion</u>

Based on the foregoing analysis, there is no antitrust violation related to the State Bar's attorney discipline system, which falls within the immunity of the state action doctrine.

E. <u>Reviewability</u>

OGC's determination of potential antitrust violations may be reviewed de novo by filing a petition with the California Supreme Court, pursuant to rule 9.13, subsections (d) through (f), California Rules of Court, **within 60 days of the date of this determination.**

EXHIBIT 15

# TrueFiling

## Case Details

**BECK v. DURAN (STATE BAR OF CALIFORNIA)**
S276517
CA Supreme Court
Case Type: STATE BAR

[File to This Case]

### Case Contacts (1)

| Name | Roles | Status | Organization | Email |
|---|---|---|---|---|
| Beck, Justin | Pro Se | Verified | Court Added | justinbeck49@gmail.com |

Add Myself / Connected User    View Participant Activity

[Share My Contact]   [Remove]

### Filings (1)

« Prev   Page 1 of 1   Next »

| Filing Name | Filing Type | Filer | Submitter | Submission Date | Status |
|---|---|---|---|---|---|
| Exhibits in Support 4 of 3 (Final, with Verification of New Exhibits) | ADDITIONAL DOCUMENTS | Beck, Justin (Pro Per) | Justin Beck | 09/23/2022 at 07:07:50 AM | Filed |

Status Updates   Service Recipients / Status

| Status | Date | Comments |
|---|---|---|
| Filed | 09/26/2022 07:53:24 AM | TZHANG: Filed I Your submitted filing has been filed by the Court. |
| Paid | 09/23/2022 07:11:02 AM | INFO: Payment Accepted. OrderId: 266098036473, Tracking Id: 6d715362-cb18-475a-8c17-a5c2ef8f7c35. Original Filing Id: d3a3efc3-3e664-437b-a6cd-411923d2188b |

[Filed Stamped Copy]
[Payment Receipt]

Contact Support

Notice regarding California Rules of Court, rules 8.20, 8.70 and 8.75 of the California Rules of Court, which govern the requirements for signatures on documents electronically filed with the court. The court also amended Rule 10 of the e-filing rules to require that electronically filed documents entered include a notation of that fact on the cover page of the document. Both amendments take effect on January 1, 2022.

Notice regarding California Rules of Court, rules 8.78. In both the California Court of Appeal and the California Supreme Court, registration with the court's electronic filing service provider is deemed to show agreement to accept service electronically at the email address provided, unless a party affirmatively opts out of electronic service under rule 8.78.

EXHIBIT 16



**The State Bar**
*of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

robert.retana@calbar.ca.gov
415-538-2337

October 17, 2022

**VIA EMAIL TO** JORGE.NAVARRETE@JUD.CA.GOV

Jorge E. Navarrete
Supreme Court Clerk and Executive Officer
Supreme Court of California
350 McAllister Street
San Francisco CA 94102-4797

Re:     State Bar Antitrust Determination 2022-0001

Dear Mr. Navarrete:

Pursuant to Supreme Court Administrative Order 2017-09-20 [State Bar Antitrust Policy], the State Bar of California hereby submits to the Court the enclosed Antitrust Determination issued on October 17, 2022.

The Requestor has 60 days from October 17th to file a Petition for Review pursuant to Rule 9.13 of the California Rules of Court.

Should you have any questions, please do not hesitate to contact me at 415-538-2337 or robert.retana@calbar.ca.gov.

Sincerely,

*/s/ Robert G. Retana*

Robert G. Retana
Deputy General Counsel

Enclosure

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 16 p. 001

EXHIBIT 17

Appellate Courts Case Information

# CALIFORNIA COURTS
THE JUDICIAL BRANCH OF CALIFORNIA

Change court ∨

Briefs

Lower Court

© 2022 Judicial Council of California

Welcome

Search

E-mail

Calendar

Help

Opinions

## Supreme Court

### Case Summary

### Disposition

Docket

Parties and Attorneys

## Docket (Register of Actions)

**BECK v. DURAN (STATE BAR OF CALIFORNIA)**
Division SF
Case Number S276939

| Date | Description | Notes |
|------|-------------|-------|
| 10/18/2022 | Petition for review filed | Petitioner: Justin S. Beck Pro Per |
| 10/18/2022 | Received: | Letter dated October 17, 2022, from State Bar of California. |
| 11/30/2022 | Petition for review denied | |

Click here to request automatic e-mail notifications about this case.

Careers | Contact Us | Accessibility | Public Access to Records | Terms of Use | Privacy



EXHIBIT 18

SUPREME COURT
FILED

State Bar Antitrust Determination 2022-0001

NOV 3 0 2022

Jorge Navarrete Clerk

S276939

Deputy

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

JUSTIN S. BECK, Petitioner,

v.

RUBEN DURAN, Respondent;

STATE BAR OF CALIFORNIA, Real Party in Interest.

---

The petition for review is denied.

CANTIL-SAKAUYE

*Chief Justice*

EXHIBIT 19

1   Added Pub. L. 99-570, title I, §1352(a), Oct. 27, 1986, 100 Stat. 3207-21; amended Pub. L. 100-
2   690, title VI, §§6182, 6184, 6469(a)(2), Nov. 18, 1988, 102 Stat. 4354, 4377; Pub. L. 102-550,
    title XV, §§1526(b), Oct. 28, 1992, 1527, Oct. 28, 1992, 106 Stat. 4065; Pub. L. 103-322, title
3   XXXIII, §3300200020,, 108 Stat. 2149; Pub. L. 103-325, title IV, §413(c)(2), Sept. 23, 1994,
    108 Stat. 2255; Pub. L. 109-177, title IV, §403(c)(2), Mar. 9, 2006, 120 Stat. 243; Pub. L. 111-
4   21, §2(f)(2), May 20, 2009, 123 Stat. 1618; Pub. L. 112-186, §4(b)(2), Oct. 5, 2012, 126 Stat.
5   1429

6   Illegal Money Transmitters -- 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 1960

7       119.   Where THE STATE BAR OF CALIFORNIA, through overt acts of RUBEN DURAN,

8   ESQ. and LEAH T. WILSON, ESQ. in conspiracy with Board of Trustees and others, knowingly

9   conduct an unlicensed money transmitting business amidst $5 billion in daily average balances

10  through domestic and Chinese banks, and through the distribution of approximate $80 million yearly,

11  and potentially $150 million in 2023, 18 U.S.C. § 1960 holds:

12      (a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or
13      part of an unlicensed money transmitting business, shall be fined in accordance with this
        title or imprisoned not more than 5 years, or both. (b) As used in this section-(1) the term
14      "unlicensed money transmitting business" means a money transmitting business which
        affects interstate or foreign commerce in any manner or degree and-(A) is operated
15      without an appropriate money transmitting license in a State where such operation is
16      punishable as a misdemeanor or a felony under State law, whether or not the defendant
        knew that the operation was required to be licensed or that the operation was so
17      punishable; (B) fails to comply with the money transmitting business registration
        requirements under section 5330 of title 31, United States Code, or regulations
18      prescribed under such section; or (C) otherwise involves the transportation or
19      transmission of funds that are known to the defendant to have been derived from a
        criminal offense or are intended to be used to promote or support unlawful activity;
20      (2) the term "money transmitting" includes transferring funds on behalf of the public by
        any and all means including but not limited to transfers within this country or to locations
21      abroad by wire, check, draft, facsimile, or courier; and (3) the term "State" means any
22      State of the United States, the District of Columbia, the Northern Mariana Islands, and
        any commonwealth, territory, or possession of the United States.
23
        Added Pub. L. 102-550, title XV, §1512(a), Oct. 28, 1992, 106 Stat. 4057; amended Pub.
24      L. 103-325, title IV, §408(c), Sept. 23, 1994, 108 Stat. 2252; Pub. L. 107-56, title III,
25      §373(a), Oct. 26, 2001, 115 Stat. 339; Pub. L. 109-162, title XI, §1171(a)(2), Jan. 5,
        2006, 119 Stat. 3123.
26
27      **B. The Late Phil Kay's Amicus Re-Visited After Public Fraud by Duran, Others**

28      **INTRODUCTION – Amicus Curiae by Phil Kay**

                                    27                      22-CV-1616-BAS-DDL

120.   This matter has borne out the inevitable unconstitutional misuse and abuse of the State Bar anticipated by California Supreme Court (CSC) Justices Brown and Kennard in their dissenting opinions in the In re Rose and Obrien decisions of the CSC, in which Justice George, who authored the In re Rose decision, ceded the Court's authority to the State Bar."

121.   In this corner of the law, at least, we seem to be presiding over a union of the legislative and judicial components of government. It may be efficient; it certainly isn't pretty. And because it seems antithetical to the constitutional design . . ." – Justice Brown (In re Rose, 22 Cal.4th 430, 470 (2000).)

122.   "Because the law at issue makes **State Bar Court judges subservient to members of the political branches**, and because it alters the composition of the State Bar Court in a way likely to reduce public confidence in the attorney discipline system, the law is invalid under the separation of powers clause of the California Constitution." – Justice Kennard (*Obrien v. Jones* 23 Cal.4th 40, 63 (2000).)

123.   The State Bar desperately wants the Los Angeles attorney to shut up, go away and stop giving voice to the egregious corruption taking place in the State Bar. To accomplish this, the State Bar has pursued a malicious State Bar case and criminal prosecution to cover up the criminal malfeasance of Thomas Girardi for purely political reasons. The CSC's abdication of its former duty to hear oral argument and issue a written decision in State Bar disciplinary proceedings has resulted in this egregious denial of federal constitutional – due process rights and privilege.

124.   The solution is provided in the State Bar Act, as discussed by dissenting Justice Kennard, in In re Rose, supra, at 465:

125.   The majority asserts that this court can no longer spare the time and resources required to hold oral argument and write an opinion in every attorney suspension and disbarment proceeding. (Maj. opn., ante, at pp. 457-458.) Even if the majority is correct, as it may be, the proper solution is not an expedient but unreasonable construction of the state Constitution to deny attorneys the privileges granted to holders of all other occupational licenses. The Legislature has already given this court a better solution. In 1988, the Legislature amended Business and Professions Code section 6082 to permit review of an attorney discipline recommendation "by the California Supreme Court *or by a*

1    *California Court of Appeal* in accordance with the procedure prescribed by the California Supreme

2    Court." (Italics added.) Under the statute as amended, this court need only establish a suitable

3    procedure, and the burden of giving disciplined attorneys their day in court can be broadly distributed

4    among the Courts of Appeal. At current levels-attorneys sought review in roughly 40 suspension and

5    disbarment matters in 1990 (see maj. opn., ante, at p. 457)-these attorney discipline cases would not

6    substantially add to the workload of the nearly 90 justices of the Courts of Appeal. Should the volume

7    of attorney discipline cases at any point begin to strain the capacity of the Courts of Appeal, the

8    number of Court of Appeal justices could be increased. (Emphasis.)

9        126.   However, as long as *In re Rose* remains the law, the State Bar will continue to plague

10   innocent respondents. [Plaintiff notes that *In re Rose* is NOT the law applied to him, a non-lawyer]

11        127.   Based on this Court's holding in *In re Kramer*, 193 Fed.3d 1131, 1132-1333, Mr. Doe

12   is entitled an examination of the record in the State Bar proceeding, which denied him federal

13   constitutional – due process.

14        128.   In *Selling v. Radford*, 243 U.S. 46, 50-51, 37 S.Ct. 377, 61 L.Ed. 585 (1917), the Court

15   held that a federal court could impose reciprocal discipline on a member of its bar based on a state's

16   disciplinary adjudication, if an independent review of the record reveals: (1) no deprivation of due

17   process; (2) sufficient proof of misconduct; and (3) no grave injustice would result from the imposition

18   of such discipline. Thus, while federal courts generally lack subject matter jurisdiction to review the

19   state court decisions, see D.C. Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S.Ct. 1303, 75

20   L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16, 44 S.Ct. 149, 68 L.Ed. 362

21   (1923), a federal court may "examine a state court disciplinary proceeding if the state court's order is

22   offered as the basis for suspending or disbarring an attorney from practice before a federal court."

23   *MacKay v. Nesbett*, 412 F.2d 846, 847 (9th Cir.1969) (citing *Theard v. United States*, 354 U.S. at 281-

24   82, 77 S.Ct. 1274). (Id.)

25        129.   Mr. Doe was never found culpable of misconduct by any constitutional court.

26   Moreover, he was not found culpable in the State Bar based on any evidence, a trial on the merits and

27   review. Rather, he was the victim of an unconstitutional ultra vires void default strategy, which

28   required him to be in two places at the same time. Doe was never allowed to present a defense by

29

22-CV-1616-BAS-DDL

1   calling his clients or any other witnesses, cross-examine witnesses or challenge the false charges to
2   establish a record to be reviewed by the CSC. (See State Bar Act – [Bus. & Prof. Code] §6085.2.)
3   Rather, based on the default, there was no record to review and thus, no review under In re Rose.
4   Thus, without a record to review, he received no review in the CSC and has been denied the federal
5   constitutional – due process, which *In re Rose*, supra, at 439 references but does not provide.

6       130.   State Bar Court Hearing Department (Hearing Department) conducts evidentiary
7   hearings on the merits in disciplinary matters. (Rules Proc. of State Bar (hereafter, Rules of
8   Procedure), rules 2.60, 3.16.) An attorney charged with misconduct is entitled to receive reasonable
9   notice, to conduct discovery, to have a reasonable opportunity to defend against the charge by the
10  introduction of evidence, to be represented by counsel, and to examine and cross-examine witnesses.
11  (§ 6085.) The Hearing Department renders a written decision recommending whether the attorney
12  should be disciplined. (Rules Proc., rule 220.) Any disciplinary decision of the Hearing Department
13  is reviewable by the State Bar Court Review Department (Review Department) at the request of the
14  attorney or the State Bar. (Id., rule 301(a).) In such a review proceeding, the matter is fully briefed,
15  and the parties are given an opportunity for oral argument. (Id., rules 302-304.) The Review
16  Department independently reviews the record, files a written opinion, and may adopt findings,
17  conclusions, and a decision or recommendation at variance with those of the Hearing Department.
18  (Id., rule 305.) A recommendation of suspension or disbarment, and the accompanying record, is
19  transmitted to this court after the State Bar Court's decision becomes final. (§ 6081; Rules Proc., rule
20  250.)

21      131.   The CSC is not a trial court and cannot determine facts regarding the federal
22  constitutional claims. The State Bar cannot determine these facts under Cal. Const. Art. III, sec. 3.5.
23  (See *Hirsh v. Justices of Supreme Court of California*, 67 Fed.3d 708, 712-713 (1995). The CSC
24  should have either dismissed the politically motivated charges against Mr. Doe or assigned the
25  evidentiary issues raised by Doe's Petition for Review to a constitutional — article VI court for fact-
26  finding to afford him the right to contest the charges, present evidence, cross-examine witnesses and
27  establish a record for CSC review. However, based on the lack of any record resulting from the default
28

                    30              22-CV-1616-BAS-DDL

1  and lack of jurisdiction in the State Bar, the federal constitutional claims cannot be determined through

2  an unconstitutional summary denial afforded under *In re Rose*.

3  **RELEVANT FACTS [Phil Kay Amicus Continues]**

4  132. **Mr. Girardi's Fraud Is the Motivating Factor for the State Bar Proceeding**

5  **against Mr. Doe**

6  133. Mr. Doe was co-counsel with Mr. Girardi personally and Girardi & Keese in multiple

7  class actions and personal injury lawsuits. The cases were generated by Doe. Also assisting Girardi

8  was senior partner Howard Miller, who subsequently became State Bar President during the time that

9  the Ninth Circuit Court of Appeals had filed disciplinary charges against Girardi, personally, together

10  with others arising out of a $500 million fraudulent judgment pertaining to the Dole Fruit Company.

11  (*See In re Girardi*, 611 Fed.3d 1027.)

12  134. In Doe's class actions with Girardi — Girardi secretly received $10 million

13  compensation to himself, which was paid to him by opposing counsel and their insurers in the class

14  action. Each of these opposing counsels were members of the State Bar Board of Governors with

15  Miller. The class members were awarded a judgment, which was not collectible because Girardi had

16  misappropriated more than $10 million belonging to the class and to the medical lienors, including

17  Medicare, Medicaid, and Medi-Cal.

18  135. Doe had personal knowledge in connection with Girardi's fraudulent activities in his

19  cases and in other cases of Girardi, Miller and their law firm that should have resulted in Girardi's

20  substantial discipline by the Ninth Circuit Court of Appeals, including disbarment. Girardi's

21  testimony and that of Walter Lack and others before the Ninth Circuit Court of Appeals was fabricated

22  and intentionally false. Girardi feared that Gottschalk would testify against him in connection with

23  the disciplinary proceedings. Doe filed complaints to require Girardi to return **more than a billion**

24  **dollars that Girardi** had misappropriated together with Lack and others, including the $10 million

25  that by court order was required to be paid to the class members and no money was awarded to Girardi

26  or his firm. Girardi had breached fiduciary duties and engaged in **actual conflicts of interest together**

27  **with Lack and others** and were terminated as class counsel and personal injury counsel by the

28  plaintiffs. [emphasis added as to the PORA of material conflicts for Catanzarite and State Bar, *here*]

31                                    22-CV-1616-BAS-DDL

136.    **The Malicious State Bar Charges and Default Strategy**

137.    To attempt to prevent Doe from testifying against Girardi and bringing Girardi's misconduct to the attention of the Ninth Circuit judges, including with respect to other similar fraud schemes to the Dole Fruit Company investigation and void judgment, Girardi launched an unprecedented malicious and criminal attack against Gottschalk. Girardi and Miller, the President of the State Bar, secretly filed a State Bar complaint against Doe seeking the State Bar to take over Doe's law practice, make Doe ineligible to practice law, and transfer the class action cases and the personal injury cases to Girardi, Miller and their firm. The trial judge in these cases warned the defense counsel that their conduct against Doe was not privileged and that he would disqualify defense counsel if they participated in such intentional fraud scheme and obstruction of justice against Doe, acting in concert with Girardi and others. As a result of Girardi's misconduct in seeking to punish Doe and to take over these cases to conceal Girardi's receipt of more than $10 million in sub rosa unlawful compensation, Doe and his clients lost more than $20 million in settlement funds that would have been paid to these plaintiffs who received no moneys from the class action judgment of more than $30 million. [PORA]

138.    The State Bar prosecutor Paul O'Brien stated that the State Bar had no jurisdiction to take over Doe's law practice because there were no formal proceedings against him. Subsequently, Doe learned that Girardi and Miller, as President of the State Bar, had promised O'Brien a judgship in the Los Angeles Superior Court if he filed disciplinary charges against Doe and then sought to have Doe be deemed mentally incompetent by the State Bar so that he could not testify against Girardi in the federal disciplinary proceedings and in the civil litigation. O'Brien brought a fabricated disciplinary complaint against Doe based on knowingly fabricated evidence and withheld from Doe exculpatory evidence that showed that Doe was completely innocent.

139.    Thereafter, Doe and his counsel prepared the case to go to trial, filed an extensive answer to the fabricated charges, produced voluminous documents that showed that Doe was innocent, and listed more than 150 witnesses to be called at trial, including Girardi and Miller. However, on the eve of trial, O'Brien filed an emergency motion with the State Bar supervising judge stating that the State Bar had violated Doe's constitutional rights by withholding for more than three years O'Brien's belief that Doe was mentally incompetent and therefore should be deemed involuntarily inactive.

140.    The State Bar hearing officer [Patrice McElroy] did not believe O'Brien and stated on the record that Doe was perfectly sane. However, Girardi and Miller approached McElroy ex parte and promised to renew her hearing officer judgeship if she caused Doe to become inactive.

141.    The proceedings dragged on for more than six months, in which Doe could not represent himself or testify against Girardi. Doe finally prevailed in the State Bar Court mental health hearing. The State Bar Court [McElroy] ruled that the declarations of the witnesses against Doe were not credible and that any witnesses against Doe would have to testify in person and be subject to vigorous cross-examination.

142.    After Doe had won the parallel civil cases to the fraudulent case in the State Bar Court, the State Bar prosecutor O'Brien, acting in concert with Girardi and Miller, caused the District Attorney to charge Doe with the crime of embezzlement with the District Attorney of Los Angeles County, even though Doe won the parallel civil cases regarding the same issues and the same complainants. Doe was arrested an incarcerated for 29 days in the Twin Tower's Psychiatric Ward at the direction of O'Brien, Girardi, Miller and others. However, as discussed, immediately prior to this, the State Bar Court [McElroy] had ruled at trial that Doe was perfectly sane and was able to practice law without a monitor.

143.    Immediately thereafter, McElroy, acting in concert with Girardi, Miller, and O'Brien, stated that Doe's State Bar case would go to trial on the same date and time as the preliminary hearing in the Criminal Court. Thus, the State Bar and Criminal proceedings would take place simultaneously in two courts at the same time unless Doe surrendered his license to practice law.

144.    Doe was mistreated in the County Jail and Mr. O'Brien, acting in concert with Mr. Girardi and Mr. Miller, told the Los Angeles County Sheriff's Dept. And their high command to withhold Doe's diabetic diet and diabetic medication and to substitute his vitamins for diabetes with anti-psychotic drugs without the knowldege or consent of Doe. Doe was held in solitary confinement for 29 days even though excessive bail was available within one day of his arrest.

145.    In the mean time, the CSC mandated the State Bar Court and the State Bar Board of Governors, including Miller, as President of the State Bar, to vacate its intentional default rules against respondents and to no longer engage in an intentional default strategy to discipline lawyers in violation

1  of their constitutional rights, including their due process rights. This was contained in a memorandum

2  by Colin Wong to the State Bar judges and the State Bar prosecutors from the CSC

3      146.  Regardless, O'Brien, acting in concert with Girardi and Miller, proceeded to engage in

4  the same intentional default strategy that had been condemned by the CSC and ordered to be vacated

5  and not utilized by the State Bar prosecutors and State Bar judges against respondents and similarly

6  situated persons such as Mr. Doe.

7      147.  O'Brien had been offered a judgship in the Los Angeles Superior Court and other

8  unlawful consideration by Girardi if he intentionally defaulted Doe and thereby caused Doe to be

9  deemed inactive and disbarred without a trial. O'Brien was ordered to attend a multi-day evidentiary

10  hearing in the Criminal Court preparatory to the preliminary hearing that was to take place at the same

11  time and date as the State Bar Court trial. O'Brien secretly went before the State Bar Court prior to

12  attending the evidentiary hearing in the Criminal Court with respect to the intentional withholding of

13  exculpatory evidence by the prosecutors in both the State Bar Court and the Criminal Court. He spent

14  five minutes to intentionally default Doe to make him inactive and to recommend Doe's disbarment

15  without serving the pleadings on Doe's counsel. O'Brien prepared fabricated declarations for each of

16  the complainants and told them that, if they signed the fabricated declarations, they would receive

17  money from the Client Security Fund to irreparably prejudice Doe.

18      148.  O'Brien was the subject matter of multiple media reports as to his prosecutorial

19  misconduct and fabrication of evidence against multiple attorneys. Leader of the Criminal Court Bar

20  and others asked former Governor Schwarzenegger to withdraw O'Brien's name from nomination as

21  a judge, which the Governor did based on the pattern of prosecutorial misconduct not disclosed by

22  O'Brien in his applications to be a judge.

23      149.  Doe's attorneys filed six (6) declarations of fault under Code Civ. Proc.

24  §§473(b)& (d),which was not contested by the State Bar prosecutor, but ignored by the State Bar

25  judge. The proposed recommendation of disbarment was prepared by the prosecutor and included a

26  provision that Girardi was entitled to the $10 million that he received. This is contrary to the court's

27  order denying Girardi any moneys whatsoever, especially since he had been fired by the class lead

28

34                                    22-CV-1616-BAS-DDL

1   counsel and the plaintiffs for breaches of fiduciary of duty and actual conflicts of interest, without any

2   disclosure on the record.

3       150.   **Girardi's Connection to Doe's State Bar Proceeding**

4       151.   Girardi is the chief power broker in connection with the State Bar and with the State

5   Bar Board of Governors. He is also the largest contributor to the State Bar Foundation, which he also

6   controls together with his associates commonly referred to as the Girardi Group. This includes Jerome

7   Falk, who was appointed by the State Bar to be the special prosecutor in the State Bar disciplinary

8   case against Girardi and Lack.

9       152.   Falk did not disclose on the record that he and his firm were long time personal

10   attorneys for Girardi and Lack, including with respect to the misappropriation of $20 million of class

11   members' moneys rom the settlement of a San Diego Superior Court class action. Falk and his firm

12   Howard Rice did not disclose to Doe when they were representing Doe that they also represented

13   Girardi and Girardi & Keese. Howard Rice requested Doe to provide them under an attorney/client

14   relationship with information as to moneys misappropriated by Girardi from class actions and mass

15   settlements, as well as similar fraud schemes to that practiced against Dole Fruit Company. This

16   information that was provided in confidence to Howard Rice was provided to Girardi by said Howard

17   Rice and their attorneys.

18       153.   Girardi and Miller then conceived a corrupt plan and scheme to try and shut Doe up to

19   prevent him from testifying in the federal disciplinary case against Girardi and in conjunction with

20   major misappropriations of client moneys in multi-million dollar settlements and without paying the

21   super priority medical liens in connection therewith in excess of billions of dollars. Girardi instigated

22   the State Bar proceedings and offered a judgship in the Los Angeles Superior Court to O'Brien to

23   intentionally default Doe and to cause him to be falsely charged with fabricated crimes, even though

24   he was innocent and had prevailed in the parallel civil cases.

25       154.   Girardi has continued to seek disbarment sub rosa with respect to his co-counsel in

26   litigation after Girardi is caught settling cases for moneys that belong to the clients and not Mr.

27   Girardi. For example, Girardi received sub rosa more than $50 million in the Erin Brockovich case,

28   which was reported to Mr. Doe by multiple attorneys in connection with those transactions. Girardi

1    misappropriated more than $120 million in connection with the Gutierrez class action in a published

2    opinion, Gutierrez v. Girardi, (2011) 194 Cal.App.4th 925. Girardi was involved in massive illegal

3    campaign contributions to the John Edwards national campaign for President and in other election

4    campaigns, including elections of judges of the Los Angeles Superior Court. Girardi had his private

5    investigator Tom Layton put on the State Bar payroll to be used to dig up dirt against his opponents

6    and to intervene on behalf of candidates for judgeships with the Governor to secure their appointment,

7    without disclosure that they were hand picked by Girardi.

8         155.   **Girardi's State Bar Connections**

9         156.   Girardi cemented his power broker status and political connections with the State Bar

10   hierarchy with the use of illegal contributions and funding to supplement their income. He supported

11   each State Bar chief trial counsel with illegal contributions that were not reported for income tax

12   purposes. This included former State Bar Chief Prosecutor Michael Nisperos for whom Girardi

13   underwrote his extensive illegal drug consumption, including heroin. Girardi illegally funded the

14   campaigns of Joe Dunn with Medicare Trust Funds and other illegal contributions. Girardi gave

15   massive gifts to the State Bar hierarchy, including the use of his private planes for their transportation,

16   including Beth Jay and Joe Dunn. Girardi personally intervened on behalf of his clients, such as Ron

17   Burkle, to fabricate State Bar cases against Burkle's opponents. Girardi withheld major settlements

18   from Doe's former clients, without providing them an accounting or copies of the settlements when

19   they occurred and utilized a substantial portion of that money to fund illegal contributions in judicial

20   campaigns to put his friends on the court and to funnel moneys illegally to politicians that he

21   controlled and would reward Girardi with financial favors.

22        157.   Girardi, Miller and the Girardi Organization control the State Bar through its inter-

23   relationship with the Judicial Council and CSC, including the extensive relationship with the former

24   Chief Justice George and with the present personal counsel Beth Jay to the current Chief Justice and

25   former Justice George.

26        158.   The major misappropriation of moneys by the Administration of Courts (AOC) is

27   traceable directly to those who were appointed at the direction of Girardi to executive positions with

28   the AOC. Girardi is known as the banker with regard to class action and complex lawsuits filed in the

1  Los Angeles Superior Court, whose complex department is commonly referred to as the bank. In one

2  recent case, Girardi did not disclose his personal relationship with the chief opposing counsel, who

3  made arrangements to give Girardi $90 million for essentially services that were never performed and

4  to defraud the insureds of Farmers Insurance Co. in excess of one billion dollars. None of the judges

5  of the complex department disclosed on their economic forms 700 the receipt of millions of dollars

6  from Girardi over multiple years, which is why Girardi is known as the banker nationwide. He is also

7  the banker for the State Bar and the State Bar Foundation. He has also arranged for unlawful moneys

8  to be paid to State Bar officials, including the Executive Director of the State Bar and the former head

9  of State Bar Discipline Judy Johnson, her friends and associates.

10      159.   Girardi did not disclose that he was actively seeking a federal judgeship for Rory Little,

11  the special prosecutor in his disciplinary case, and had personally intervened with multiple U.S.

12  Senators on his behalf. Girardi also did not disclose his relationship with Little's wife and her law

13  firm when he sought the appointment as the special prosecutor in his case. Additionally, Girardi

14  sought intervention to appoint the current President of the State Bar to a federal judgeship who assisted

15  Girardi in connection with the appointment of Little as the special prosecutor in Girardi's discipline

16  case, knowing that Mrs. Little was a partner of that firm.

17      160.   **The Politically Connected Thomas Girardi Is Found Not Culpable by the State**

18  **Bar – Contrary to the Decision of this Court**

19      161.   The politically connected Girardi, Lack and Paul Traina were sanctioned $390,000 and

20  admonished and/or suspended by the Ninth Circuit for committing fraud on the court, but never

21  subjected to any proceeding or discipline by the State Bar. Due to Girardi being the law partner of

22  State Bar President Miller and Miller's involvement in the fraudulent matter, a State Bar insider and

23  colleague of Miller's, Falk of the Howard Rice firm, was appointed as a special prosecutor. [Falk's

24  partner Douglas Winthrop is an officer of the State Bar and serves on the Board of the California Bar

25  Foundation with Miller.] Falk then ignored the Ninth Circuit findings that these lawyers committed a

26  fraud on the Court.

27      162.   In the Ninth Circuit, special master Judge A. Wallace Tashima concluded Girardi

28  "recklessly" made false statements, while Lack and Traina acted "knowingly, intentionally and

37                                          22-CV-1616-BAS-DDL

1    recklessly" and assessed sanctions ($390,000), which the offending firms and lawyers did not oppose.

2    However, based on the lawyers' objections to the findings regarding their intent to defraud the Court,

3    the Ninth Circuit appointed Hastings law professor Little as a special prosecutor, who found Judge

4    Tashima's findings to be "accurate and provable by clear and convincing evidence." The Ninth Circuit

5    then adopted Judge Tashima's report and conclusions in a published opinion – *In re Girardi*, 611

6    Fed.3d 1027, 1039-1040 (2006).

7         163.    "The history of the enforcement action demonstrates the multiple occasions on which

8    they chose to remain willfully blind to the fact that they were making false statements. By the time

9    they appeared in this court, the attempt to salvage their case became indistinguishable from a knowing

10   submission of false documents. Suspension is the appropriate discipline for these Respondents . . .

11   Respondents in this case have been respected members of the bar, and each has presented significant

12   mitigating evidence. Their conduct in this case, however, cannot be excused on that basis, given their

13   culpability and the substantial injury their conduct caused the opposing parties and this court. We

14   have carefully considered the recommendations of Judge Tashima and Professor Little, who have

15   made our task substantially easier and whose assistance we gratefully acknowledge. We impose

16   discipline as follows:

17        164.    THOMAS V. GIRARDI is formally reprimanded.

18        165.    WALTER J. LACK and PAUL A. TRAINA are suspended from practice before the

19   Ninth Circuit for six months.

20        166.    These disciplinary orders and findings satisfy the State Bar's standard of proof for

21   imposing discipline and are considered res judicata (proven), which State Bar respondents are

22   collaterally estopped from denying or disputing. (§ 6049.1; *In re Kittrell*, supra, 4 Cal. State Bar Ct.

23   Rptr. 195, p.7.) Regardless, the State Bar and Falk exonerated these lawyers solely on political

24   grounds.

25        167.    Thus, without having been found to have engaged in misconduct by any constitutional

26   court, Doe is severely disciplined [disbarred]; whereas, the State Bar exonerated Girardi, Lack and

27   Traina; all of whom were found to have engaged in severe misconduct by this Court.

28

168.   The State Bar's pursuit of charges against Gottschalk on such an improper and selective basis constitutes an egregious abuse of the prosecutor's duties and a denial of due process. (*Freeman v. City of Santa Ana* (9th Cir. 1995) 68 Fed.3d 1180, 1187.) As arm of the California Supreme Court, the State Bar must regulate "impartially" to ensure that "justice shall be done." (*Berger v. United States* (1935) 295 U.S. 78, 85, 88 [government not "an ordinary party," but is a 'sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done"].) Plainly, that was not done here." [end Amicus Curiaea/Facts; Phil Kay]

**B. Girardi, Lira, and 700+ CLUB Carried on by State Bar with Actual Knowledge**

169.   Revisiting Phil Kay's Amicus after Girardi was carried on, where the MTO Report in Exhibit 1 shows actual knowledge of the Board of Trustees as per the preceding paragraphs:

Case: 1:18-cv-07686 Document #: 1450 Filed: 11/02/22 Page 1 of 14 PageID #:15898

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE LION AIR
FLIGHT JT 610 CRASH

No. 18 C 7686

Judge Thomas M. Durkin

MEMORANDUM OPINION AND ORDER

Tragically, on October 29, 2018, Lion Air Flight 610 crashed shortly after takeoff killing all aboard. That tragedy was compounded when attorney Thomas Girardi stole some of the money five of his clients were owed from settlements with defendant Boeing of claims arising out of the crash.

"The Court alerted the U.S. Attorney for this district to the facts of this case when this motion was first filed because Girardi's conduct is **unquestionably criminal.** The Court is aware that the State Bar of California (the state in which Griffin and Lira are admitted) is monitoring these proceedings." R. 1296-58 at 2 (Ex. 167-002); see also R. 1296-61 at

39

22-CV-1616-BAS-DDL

2 (Ex. 170-002) (similar letter claiming that Girardi was "dealing with the head of the IRS" regarding the supposed tax issue). These letters contained outrageous lies. Before sending the letters, Girardi's secretary shared them with Griffin and Lira. See R. 1296-57 (Ex. 166); R. 1296-58 (Ex. 167)

The order concludes (See *Ex. 42*):

Thomas Girardi's actions are a stain on the legal profession and, due to the international nature of this case, have damaged the reputation of the American legal system. All of the plaintiffs in this case were citizens and residents of another country, many of whom do not speak English and have little to no experience with American society and certainly not its court system. Most are not very well-off. They all suffered the tragic loss of family members.

In need of help, they trusted American attorneys to shepherd them through the legal process and achieve at least some relief for their losses with amounts of money that are likely life-changing in their country. Girardi took advantage of vulnerable people at their most vulnerable moments, and he used the prestige of his profession, the reputation of American courts, and the imprimatur of this Court to do it. It is nearly impossible to mend such a breach of trust. The best we can do is demonstrate that the legal system Girardi besmirched has the ability to rectify its errors and bring bad actors to account. With the hearings and settlements initiated by the Edelson firm, a step has been taken in that direction.

**[End Court Order] See *Ex. 42* for Entire Court Order November 2, 2022**

170.     In May 2022 while prosecuting THE STATE BAR OF CALIFORNIA and its actors in Government Claims Act litigation before it was obstructed via enterprise control with JOHN C.

40                                    22-CV-1616-BAS-DDL

GASTELUM, ROBERT GEORGE RETANA, ESQ. and SUZANNE CELIA GRANDT, ESQ. Plaintiff delivered a public records request for information known to The State Bar of California about CATANZARITE LAW CORPORATION actors, and about Thomas Girardi.

171.   After noticing Plaintiff of extending production time in May 2022, Girardi's disbarment was announced, which would otherwise seem a coincidence if not for the related "read and react" strategy of the enterprise.. His penalty for his "unquestionably criminal" conduct was a mere $2.2 million, after perhaps $1 billion or more was stolen using *protection* of THE STATE BAR OF CALIFORNIA, using trust accounts and IOLTA.

172.   *Stolen*, an insurance company foot the bill for the conduct knowingly carried on by THE STATE BAR OF CALIFORNIA, ratified by the Board of Trustees and others, and concealed from the public: where THE STATE BAR OF CALIFORNIA acted only in the most extreme circumstance perhaps ever witnessed, *after* Plaintiff made a public records request.

**C. State Auditor Reveals More PORA, Protectionist Acts, Threat of Continuing**

173.   According to the California State Auditor, "An attorney exhibited a pattern of failing to provide settlement payments or to provide files to clients until the client complained. The State Bar closed cases against this attorney 28 times over 16 years using nonpublic measures and all of the other closed cases were closed outright. However, complaints against the attorney continued to increase. From 2014 to 2021, the attorney was the subject of 165 complaints. Despite the high number of complaints, many for similar matters, the State Bar has imposed no discipline, and the attorney still maintains an active license.  In one early case, the State Bar issued a warning letter to the attorney for failing to release a client's file for nearly a year. However, the attorney has continued to generate complaints from other clients for this same issue. In the 11 years since the State Bar issued that warning letter, complaints have led the State Bar to issue 11 directional letters requiring the attorney to return client files."

174.   According to the California State Auditor, "The State Bar closed multiple complaints that were made against an attorney over the course of about 18 months, each alleging that the attorney had failed to pay clients their settlement funds. Generally, the State Bar closed each complaint after the attorney finally paid the client, noting either that the matter was resolved between the attorneys

41                                    22-CV-1616-BAS-DDL

**EXHIBIT 20**

(ADSx),CLOSED,DISCOVERY,MANADR,REMANDED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
### CIVIL DOCKET FOR CASE #: 8:23-cv-00022-FWS-ADS

Justin S. Beck v. The State Bar of California et al
Assigned to: Judge Fred W. Slaughter
Referred to: Magistrate Judge Autumn D. Spaeth
Demand: $9,999,000
Case in other court: Orange County Superior Court, 30-02021-
                     01237499
Cause: 28:1441 Notice of Removal

Date Filed: 01/05/2023
Date Terminated: 01/12/2023
Jury Demand: Defendant
Nature of Suit: 950 Constitutional - State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**Justin S. Beck**
*an individual*

represented by **Justin S. Beck**
3501 Roselle Street
Oceanside, CA 92056
760-449-2509
PRO SE

V.

**Defendant**

**The State Bar of California**
*a public corporation and public entity*

represented by **Suzanne Grandt**
The State Bar of California
180 Howard Street
San Francisco, CA 94105
415-538-2388
Fax: 415-538-2321
Email: suzanne.grandt@calbar.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Anand Kuman**

represented by **Suzanne Grandt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ruben Duran**
*an individual employee acting in an official
capacity*

represented by **Suzanne Grandt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 20 p. 001

**Carissa Andresen**
*an individual employee acting in an official
capacity*

represented by **Suzanne Grandt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Suzanne Grandt**
*an individual employee acting in an official
capacity*

represented by **Suzanne Grandt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Legislature of the State of California**

**Defendant**

**Office of Attorney General**
*law firm for State of California*

**Defendant**

**Speaker of the California State Assembly**
*an individual elected official acting in an
official capacity*

**Defendant**

**President Pro Tempore of the California
State Senate**
*an individual elected official acting in an
official capacity*

**Defendant**

**Leah T. Wilson**
*an individual acting in an official capacity*

**Defendant**

**DOES**
*9-30*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/05/2023 | 1 | NOTICE OF REMOVAL from Orange County Superior Court, filed by Plaintiff Justin S. Beck. Case number 30-2021-1237499 with copy of complaint. Case assigned to Judge Fred W. Slaughter, Discovery to Magistrate Judge Autumn D. Spaeth. (Attachments: # 1 Part 2, # 2 Part 3, # 3 Part 4, # 4 CV71) (jtil) (Entered: 01/11/2023) |
| 01/05/2023 | 2 | REQUEST to Proceed In Forma Pauperis, Declaration in Support filed by Plaintiff Justin S. Beck. (jtil) (Entered: 01/11/2023) |
| 01/11/2023 | 3 | NOTICE OF ASSIGNMENT to District Judge Fred W. Slaughter and Magistrate Judge Autumn D. Spaeth. (jtil) (Entered: 01/11/2023) |
| 01/11/2023 | 4 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (jtil) (Entered: 01/11/2023) |

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 20 p. 002

| 01/11/2023 | 5 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (jtil) (Entered: 01/11/2023) |
|---|---|---|
| 01/11/2023 | 6 | CIVIL STANDING ORDER by Judge Fred W. Slaughter. (mku) (Entered: 01/11/2023) |
| 01/12/2023 | 7 | MINUTES ORDER REMANDING Action 1 and DENYING AS MOOT IFP Request 2 by Judge Fred W. Slaughter: Plaintiff may not remove the underlying action filed in Orange County Superior Court, Case No. 30-2020-01145998, the court concludes that removal is improper and REMANDS the action. The court also DENIES AS MOOT Plaintiffs Request to Proceed In Forma Pauperis. The clerk is directed to close this case. (MD JS-6, Case Terminated.) (jp) (Entered: 01/12/2023) |
| 01/12/2023 | 8 | TRANSMITTAL of documents to Orange County Superior Cour. A certified copy of the order of remand and a copy of the docket sheet from this court was sent to Orange County Superior Court - Central Justice Center. Case number: 30-02021-01237499. (jp) (Entered: 01/12/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/22/2023 12:54:03 | | | |
| PACER Login: | justintimesd | Client Code: | |
| Description: | Docket Report | Search Criteria: | 8:23-cv-00022-FWS-ADS End date: 1/23/2023 |
| Billable Pages: | 3 | Cost: | 0.30 |

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 20 p. 003

EXHIBIT 21



***ROB BONTA***
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
Public: (916) 445-9555
Telephone: (916) 210-6183
E-Mail: PublicRecords@doj.ca.gov

December 29, 2022

***Via E-mail to:***
Justin Beck
3501 Roselle Street
Oceanside, CA 92056
justintimesd@gmail.com

RE:   Public Records Act Request: DOJ PRA 2022-02717

Dear Mr. Beck:

This correspondence is in response to your online request form submission dated December 8, 2022, which was received by the California Department of Justice (the Department) on the same date, in which you sought records pursuant to the Public Records Act (PRA) as set forth in Government Code section 6250 et seq.

Specifically, you requested:

*1) When was Justin S. Beck v. State of California et al. (OCSC Case No. 30-2021-01237499) first disclosed to the DOJ, how, and by whom?*

*2) When was Justin S. Beck v. State of California et al. (OCSC Case No. 30-2020-01145998) first disclosed to the DOJ, how, and by whom?*

*3) When was Justin S. Beck v. The Superior Court of Orange County et al. (4DCA Original Writ Proceedings G061896) first disclosed to the DOJ, how, and by whom?*

*4) When was Justin S. Beck v. Catanzarite Law Corporation et al. (U.S. Southern District of California 22-CV-01616-BAS-DDL) first disclosed to the DOJ, how, and by whom?*

*5) Other than The State Bar of California, what other state agencies require Government Claims Act claim presentation to an entity other than the Department of General Services?*

*6) Has the Judicial Council reported my new claim for ratification and RICO against Orange County Superior Court to DOJ related to these matters? If so, when did it get reported and by whom?*

Justin Beck
December 29, 2022
Page 2

*7) Why does the draft audit from MGO in April 2022 presented by The State Bar of California lack disclosure of the materiality of my government claims?*

*8) When was the California State Auditor notified of the materiality of my claims -- which could result in an award of monetary judgment exceeding $1B based on evidence presented, unobjected?*

*9) Who manages claims act litigation for the Department of Justice -- who has a duty to resolve claims act litigation and satisfaction of judgments?*

*10) Does the DOJ require me to file a new government claim related to these matters in order that DGS be joined to these cases?*

*11) I just experienced what I allege to be fraud and concealment by California Supreme Court clerk Jorge Navarette after the Office of General Counsel for The State Bar of California filed a fraudulent antitrust petition on my behalf without my authorization in CSC. Given the conflict, am I correct to assume the new claim should be presented to DGS or DOJ and not Mr. Navarette and CSC?*

*12) When the State of California is liable under the Government Claims Act, why is the DOJ not managing claim presentations and denials for The State Bar of California? "Investigation" of claims, denial, and legal representation of themselves for claims filed by the public violate California Rules of Professional Conduct 1.7(d)(3) and 15 U.S.C. Section 1.*

*13) Why does the DOJ allow the Board of Trustees for The State Bar of California, controlled by active market participant lawyers, to make decisions on behalf of itself after N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n, 574 U.S. 494, (2015) and its references to Parker v. Brown , 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315?*

*14) Who is legal counsel for the claims act litigation for DOJ?*

*15) Who is representing LEGISLATURE in OCSC Case No. 30-2021-01237499 and G061896, and how will DOJ prevent unconstitutional use of State Bar Court from impeding or obstructing state and federal proceedings? 16) Why does DOJ allow The State Bar of California to use Office of General Counsel to defend tort claims against itself and its lawyers?*

For the reasons set forth below, the Department is extending the date for responding to your request. Agencies are permitted to extend the date for responding to a public records request for fourteen days beyond the original 10-day deadline for responding under specified circumstances (Gov. Code, § 6253, subd. (c)). As your request was received by this office on December 8, 2022, the time established for the original response was December 19, 2022. Fourteen days beyond that date is January 2, 2023. Due to the state holiday on January 2, the Department's response will be due on January 3, 2023.

Justin Beck
December 29, 2022
Page 3

Agencies may invoke the extension for several reasons, which may be summarized as follows:

1. The need to search for and collect records from field offices or other facilities that are separate from the office processing the request.
2. The need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request.
3. The need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein.

In this instance, an extension is needed to consult with multiple components of the Department's with a substantial interest in the records requested.

Sincerely,

/s/ Public Records Coordinator

Public Records Coordinator

For     ROB BONTA
        Attorney General

EXHIBIT 22

Case 3:23-cv-00164-AGS-DDL   Document 18   Filed 03/27/23   PageID.563   Page 230 of 265

1/19/23, 12:48 PM                    Gmail - Justin S. Beck v. Catanzarite Law Corporation, et al. (3:22-CV-01616-BAS-DDL)- First Amended Complaint and Ex Parte Application...

 Gmail                                                          Justin Beck <justintimesd@gmail.com>

## Justin S. Beck v. Catanzarite Law Corporation, et al. (3:22-CV-01616-BAS-DDL)- First Amended Complaint and Ex Parte Application for Temporary Restraining Order

**Tsai, Charles** <Charles.Tsai@calbar.ca.gov>                              Tue, Jan 17, 2023 at 10:33 AM
To: "justintimesd@gmail.com" <justintimesd@gmail.com>

Dear Mr. Beck:

I have not received any response from you with respect to the below email and attached documents. Please advise by 5:00 p.m. today whether you will enter into the attached stipulation. If I do not hear from you by that time, the State Bar defendants will proceed tomorrow (January 18, 2023) with an *ex parte* application to extend the time to respond to the First Amended Complaint.

I believe you may be attempting to use a prior email address of mine (Charles.Tsai@doj.ca.gov) for other communications. Please note that this email address is no longer valid/active. Please use this email address (Charles.Tsai@calbar.ca.gov) to contact me.

[Quoted text hidden]

**3 attachments**

📄 **State Bar Letter to Beck RE Stipulation 1-11 FINAL.pdf**
   210K

📄 **Beck Stipulation EOT FINAL.pdf**
   111K

📄 **Beck Proposed Order EOT FINAL.pdf**
   86K

EXHIBIT 23

# The State Bar *of California*

## 2022 Commission on Judicial Nominees Evaluation Roster

*Members of this commission are exclusively appointed by the State Bar Board of Trustees

## Officers

Chair
**Adam Hofmann**
Attorney member

Vice-Chair
**Justin A. Palmer**
Attorney member

## Members

**Daniel L. Allender**
Attorney member

**Caley R. Anderson**
Attorney member

**André R. Bollinger**
Attorney member

**Julia S. Choe**
Attorney member

**Frine C. Eger-Gelston**
Attorney member

**Noemi Nuñez Esparza**
Attorney member

**Diana A. Garrido**
Attorney member

**Stacey Guillory**
Attorney member

**Pamela Hemann**
Public member

**Mack A. Jenkins**
Public member

**Chhaya Malik**
Attorney member

**Sandra A. Mori**
Attorney member

**Agustin D. Orozco**
Attorney member

**Ugochi L. Anaebere-Nicholson**
Attorney member

**Matthew Barnachia**
Public member

**Aundrea J. Brown**
Attorney member

**Jamie Crook**
Attorney member

**Jeffrey El-Hajj**
Attorney member

**Tara C. Doss**
Attorney member

**Winnifred Gin**
Attorney member

**Hon. Brenda Harbin-Forte (Ret.)**
Attorney member

**Theresa Hurley**
Public member

**Jeanine Kraybill**
Public member

**Meghan McMeel**
Attorney member

**Sandra A. Mori**
Attorney member

**Loren C. Peñaloza**
Attorney member

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 23 p. 001

**T. Peter Pierce**

Attorney member

**Francesca Serrano**

Attorney member

**Ryan R. Tacorda**

Attorney member

**Corey R. Weber**

Attorney member

**Donald W. Yoo**

Attorney member

**Judith Reif**

Attorney member

**David J. Sutton**

Attorney member

**Hon. Randa M. Trapp (Ret.)**

Attorney member

**Jaime E. Wrage**

Attorney member

**Michael J. Yraceburn**

Attorney member

Copyright © 2023 The State Bar of California

 The State Bar *of California*

## Commission on Judicial Nominees Evaluation

Roster

## Purpose

The Commission on Judicial Nominees Evaluation (JNE) of the State Bar of California assists the Governor in the judicial selection process, promoting a California judiciary of quality and integrity by providing independent, comprehensive, accurate and fair evaluations of candidates for judicial appointment and nomination.

## Staff contact

Elgin Webb IV, 415-538-2085, elgin.webb@calbar.ca.gov
Chair: Adam Hofmann

## Additional information

- Rules and Procedures of the Commission on Judicial Nominees Evaluation
- Frequently Asked Questions
- Statewide Demographics Reports
- Review Committee of the Commission on Judicial Nominees Evaluation
- Learn more about committee appointment opportunities

Copyright © 2023 The State Bar of California

EXHIBIT 24





## Charles Tsai (formerly Gladfelter) · 3rd
**Deputy Attorney General at California Department of Justice**

Los Angeles, California, United States · Contact info

334 connections



🔒 Message    + Follow    More

 California Department of
Justice, Office of the
Attorney General

 The Ohio State University
Moritz College of Law

### Activity
336 followers

**Charles hasn't posted lately**
Charles' recent posts and comments will be displayed here.

Show all activity →

### Experience

 **Deputy Attorney General**
California Department of Justice, Office of the Attorney General
2015 – Present · 8 yrs 1 mo
Los Angeles, California

 **Tax Counsel**
State of California Board of Equalization
2013 – 2015 · 2 yrs
Norwalk, California

 **Assistant Attorney General**
Illinois Attorney General's Office
2011 – 2013 · 2 yrs
Chicago

Charles Tsai

Deputy Attorney General, California Department of Justice, Office of the Attorney General

Screenshot from LinkedIn Taken by Justin S. Beck January 18, 2023 at 11:35AM PST

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 24 p. 001

EXHIBIT 25

1/19/23, 10:53 AM

Maurice Sanchez, Associate Justice - 4DCA

Cancel    Print



# CALIFORNIA COURTS
## THE JUDICIAL BRANCH OF CALIFORNIA

# Maurice Sanchez, Associate Justice



On November 10, 2021, Governor Gavin Newsom nominated Maurice Sanchez to serve as an Associate Justice of the Fourth District Court of Appeal, Division Three. Justice Sanchez was rated "exceptionally well qualified" for the position by the Commission of the California State Bar on Judicial Nominees Evaluation. He was confirmed by unanimous vote of the Commission on Judicial Appointments on January 6, 2022. Prior to his appointment to the Court of Appeal, Justice Sanchez served on the Family Law Panel of the Superior Court of Orange County. He was appointed to the Superior Court by Governor Jerry Brown on October 27, 2018.

Justice Sanchez was born in Orange, California, the fourth child of Mexican immigrants. Spanish was his first language. Justice Sanchez graduated from Mater Dei High School in 1974. He earned a Bachelor of Arts Degree from the University of California, Irvine in 1978 and a Juris Doctorate from the University of California, Berkeley in 1981. While in law school, he was an extern for Justice Mathew O. Tobriner of the California Supreme Court and co-director of the McBaine Honors Moot Court Board.

Justice Sanchez began his legal career with Rutan & Tucker after being sworn-in as an attorney on December 1, 1981. He later worked as in-house counsel for Hyundai Motor America and Mazda Motor of America, Inc. He returned to private practice with a firm that later became known as Alvarado, Smith & Sanchez. He subsequently became an equity partner with two AmLaw100 law firms; Baker & Hostetler (where he was named National Leader of the Distribution and Franchise Team) and Nelson Mullins Riley & Scarborough (where he helped start their Los Angeles Office).

Justice Sanchez has served on numerous charitable and professional boards, including president of the Orange County Hispanic Bar Association, chairman of Olive Crest (which provides services for abused children in Orange County and the western United States), the UCI School of Social Ecology Dean's Advisory Board, and the Hispanic Education Endowment Fund. He has served as an assistant coach for the Mater Dei High School Mock Trial team and has served as a mentor in the Orange County Superior Court's judicial extern program. He has also been active with various other community organizations promoting education.

Justice Sanchez has been married to his high school sweetheart since 1980. He and his wife, Teri, have three adult children and one grandchild.

Cancel    Print



# CALIFORNIA COURTS
## THE JUDICIAL BRANCH OF CALIFORNIA

# Joanne Motoike, Associate Justice



Justice Joanne Motoike was nominated to the 4th District Court of Appeal, Division 3, by Governor Gavin Newsom on May 2, 2022. She was rated "exceptionally well qualified" for the position by the Commission on Judicial Nominees Evaluation of the State Bar of California. On June 16, 2022, she was confirmed by unanimous vote of the Commission on Judicial Appointments.

Prior to her appointment to the Court of Appeal, Justice Motoike was assigned to the Orange County Juvenile Court and served as the Presiding Judge of the Juvenile Court from 2018 to 2022 during which time she was responsible for the administration of the county's juvenile justice and child welfare courts, services, and programs. From 2013 to 2015, she was assigned to the Stephen K. Tamura - West Justice Center where she presided over adult criminal matters.

In 2021, Justice Motoike was honored with the Judicial Excellence Award by the Orange County Asian American Bar Association, the Honorable Roger B. Robbins Judge of the Year Award by the North Orange County Bar Association, and the Asian American and Pacific Islander Heritage Month Award of Distinction by the Orange County Department of Education.

Prior to her judicial appointment by Governor Brown in 2013, Justice Motoike worked as a senior deputy public defender at the Orange County Public Defender's Office. She was also a trial attorney with the United Nations, Office of the Prosecutor, International Criminal Tribunal for the former Yugoslavia from 2006 to 2008 and a deputy public defender at the Orange County Public Defender's Office from 1994 to 2006. She earned a Juris Doctor degree from Loyola Law School, Los Angeles and a Bachelor of Arts degree from the University of California, Irvine.

Justice Motoike currently serves on the Education Committee of the California Asian - Pacific American Judges Association.



Cancel    Print

# CALIFORNIA COURTS
## THE JUDICIAL BRANCH OF CALIFORNIA

# Thomas A. Delaney, Associate Justice



Thomas A. Delaney was nominated to the California Court of Appeal, Fourth Appellate District, Division Three, by Governor Gavin Newsom on August 8, 2022, and was confirmed by unanimous vote of the Commission on Judicial Appointments on October 11, 2022. Prior to his confirmation, Justice Delaney served as a judge of the Superior Court in Orange County since 2014. At the time of his nomination, he served as Supervising Judge of the Collaborate Courts, where he presided over the Veterans Courts, among others. He previously served on the Unlimited Civil Panel at the Central Justice Center and the Limited Criminal Panel at the Harbor Justice Center.

Justice Delaney is President of the California Latino Judges Association where he previously served on the Executive Board as Secretary and as a Member At-Large. Between 2020 and 2021, Justice Delaney served as the 89th President of the California Judges Association, which represents more than 2200 active and retired judicial officers and appellate court justices from all 58 California counties. During that same time, he also served as an Advisory Member of the Judicial Council of California.

In Orange County, Justice Delaney serves on Governor Gavin Newsom's Judicial Selection Advisory Committee, the Board of Directors of the Masters Division of the Orange County Bar Association, and the Judicial Advisory Board of the Constitutional Rights Foundation of Orange County. He also is a Past President of the William P. Gray Legion Lex Inn of Court.

Justice Delaney has earned a number of awards for his judicial service, including the 2021 Orange County Probation Chief's Award, the 2020 Orange County Hispanic Bar Association, Judge James O. Perez Trailblazer Award, the 2019 American Board of Trial Advocates Orange County Chapter George Francis Civility Award, the 2018-2019 Constitutional Rights Foundation of Orange County Mock Trial Judge of the Year, and the 2016 Loyola Law School Orange County Distinguished Alumni Award.

Before his appointment to the Superior Court, Justice Delaney was a trial lawyer at Sedgwick LLP where he focused his practice on the defense of mass tort and individual product liability and specialty tort actions involving catastrophic physical injuries and psychological disorders, as well as employment and commercial cases. He served as Vice-Chair of the law firm's Complex Litigation Division and as a Professor at the firm's Trial Academy. In addition, he was founding chair of the firm's Hispanic Lawyers Forum and worked pro bono in partnership with KIND (Kids in Need of Defense) and UCI Law School students representing youth who were in immigration / removal proceedings without their parents or other adult supervision. He also started a student externship program for high school students at Girls Incorporated of Orange County.

Justice Delaney earned his Juris Doctorate from Loyola Law School in Los Angeles and his undergraduate degree from Loyola Marymount University. He also studied at St. John's College, Oxford University, in Oxford, England, where he was a member of the St. John's College Boat Club.

Justice Delaney and his wife live with their children in Orange County.

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 25 p. 003

1/1

EXHIBIT 26

1/19/23, 1:15 PM                                        Gmail - Public Records Act Request

 Gmail                                    **Justin Beck <justintimesd@gmail.com>**

---

## Public Records Act Request

**Gov Legal Unit** <govlegalunit@gov.ca.gov>                     Mon, Jan 9, 2023 at 11:00 AM
To: "justintimesd@gmail.com" <justintimesd@gmail.com>

Dear Mr. Beck,

Please find the attached response to your correspondence received on December 27, 2022.

Thank you,

Legal Affairs Unit
Office of Governor Gavin Newsom
-------
#CaliforniaForAll

---

🗎 **Beck Response Letter 01-09-23.pdf**
    143K



# OFFICE OF THE GOVERNOR

January 9, 2023

*Via Electronic Mail*

Justin Beck
justintimesd@gmail.com

RE:   <u>Public Records Act Request</u>

Dear Mr. Beck:

This letter is in response to your correspondence received December 27, 2022, requesting: "...public records related to all disclosures made to your office in connection with these cases which have material state liability thus far undisclosed to the public. I would also like a primary point of contact for the government upon award of my money judgments. Thank you, Justin Beck 760-449-2509 Plaintiff, Individually Guardian Ad Litem to U.S. Interests Guardian Ad Litem to ROES 1-150,000."

There are no records responsive to your request in the custody of the Governor's Office.

Thank you for contacting the Governor's Office.

Sincerely,

JULIA SPIEGEL
Deputy Legal Affairs Secretary

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 26 p. 002

EXHIBIT 27

# M Gmail

Justin Beck <justintimesd@gmail.com>

---

## Beck v. Catanzarite Law Corp., et al., - Case No. 22cv01616-BAS-DDL, signed Waivers of Service of Summons

---

Matthew Green <Matthew.Green@bbklaw.com>
To: Justin Beck <justintimesd@gmail.com>
Cc: Lisa Atwood <Lisa.Atwood@bbklaw.com>

Wed, Mar 1, 2023 at 10:31 AM

Mr. Beck,

We are representing Judge Gastelum and Mr. Navarrette in any capacities in which they have been named in the action. This also confirms that Judge Gastelum, Mr. Navarrette, and Orange County Superior Court have waived service of the summons in this action and will be responding to the Second Amended Complaint within the 60-day period provided under FRCP 4(d)(3), i.e., by March 31.

**Matthew Green**

**Of Counsel**



matthew.green@bbklaw.com

**T: (619) 525-1370  C: (619) 481-1881**

**www.BBKlaw.com**  in 🐦 ⓘ

**From:** Justin Beck <justintimesd@gmail.com>
**Sent:** Tuesday, February 28, 2023 7:30 PM
**To:** Lisa Atwood <Lisa.Atwood@bbklaw.com>
**Cc:** Matthew Green <Matthew.Green@bbklaw.com>
**Subject:** Re: Beck v. Catanzarite Law Corp., et al., - Case No. 22cv01616-BAS-DDL, signed Waivers of Service of Summons

CAUTION - EXTERNAL SENDER.

---

Ms. Atwood & Mr. Green,

Thank you for sending these waivers.

1) Can you confirm you are waiving service for the second amended complaint? It was accepted 2/27/23. I've attached a copy.

2) Are you representing Mr. Navarette and Mr. Gastelum in both their individual capacities and their official capacities?

Please see the RICO Case Statement in the related case which is also now before Honorable Cynthia A. Bashant (3:22-CV-0164-BAS-DDL). I don't expect to file another unless the Court requests it.

It is odd to see BB&K representing these parties when the cases involve alleged anticompetitive conduct in regulation under 15 U.S.C. Section 15 and *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015). I trust and hope that we can work together in a manner more amicably than I have experienced with the Office of General Counsel and Board of Trustees for The State Bar of California, and that your firm has conflict walls in accordance with the law related to Ruben Duran, Partner of BB&K's Ontario office and in his capacity as Chairman of Board of Trustees.

Respectfully,

Justin S. Beck

On Tue, Feb 28, 2023 at 5:00 PM Lisa Atwood <Lisa.Atwood@bbklaw.com> wrote:

Mr. Beck - please see the attached Waivers of Service of Summons sent to you on behalf of the Superior Court of California, County of Orange; Hon. John C. Gastelum, Judge of the Superior Court; and Jorge E. Navarrette, Clerk/Executive of the California Supreme Court.  Mr. Matthew Green will be representing the Defendants in this matter.

Lisa

**Lisa Atwood**

**Legal Secretary**

lisa.atwood@bbklaw.com



T: (619) 525-1322

**www.BBKlaw.com**

This email and any files or attachments transmitted with it may contain privileged or otherwise confidential information. If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and immediately delete the email you received.

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 27 p. 002

--

==========

**Justin Beck**

**760-449-2509**

EXHIBIT 28

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE LION AIR<br>FLIGHT JT 610 CRASH | No. 18 C 7686<br><br>Judge Thomas M. Durkin |

MEMORANDUM OPINION AND ORDER

Tragically, on October 29, 2018, Lion Air Flight 610 crashed shortly after takeoff killing all aboard. That tragedy was compounded when attorney Thomas Girardi stole some of the money five of his clients were owed from settlements with defendant Boeing of claims arising out of the crash.

The law firm Edelson P.C. (the "Edelson firm") served as Girardi's local counsel here in Chicago. On December 2, 2020, the Edelson firm filed a motion for rule to show cause alerting the Court to the fact that the clients had not been fully paid and arguing that Girardi and his firm should be held in contempt. *See* R. 842. In his response, Girardi admitted he had not paid the clients the full settlement amount and that he did not have the money to pay them the balance. *See* R. 847 at 2-3 (¶¶ 8-9). On December 14, 2020, the Court found Girardi and his firm, Girardi & Keese, in civil contempt and entered a judgment against them in the amount of the outstanding payments. *See* R. 848.

The Edelson firm's motion also implicated Girardi associates David Lira and Keith Griffin. The Edelson firm, Griffin, and Lira filed briefs and participated in a three-day hearing in December 2021, at which Griffin, Lira, and attorneys from the

Edelson firm testified. Subsequently, the Edelson firm brokered a settlement with its insurance carrier resulting in the clients being paid in full. *See* R. 1360. The Court commends Jay Edelson and his firm for being the first to pursue these issues and for doing what was necessary to see that the clients were made whole.

These settlements with the Edelson firm's insurer satisfy the Court's primary concern in addressing this motion. To the extent the Court was considering sanctioning Griffin, Lira, and/or Edelson firm attorneys for their roles in the misappropriation of the client's funds or their failure to protect the clients from Girardi, that concern is now moot because the clients have received the money to which they are entitled. To the extent any of the conduct at issue here was contemptuous or sanctionable (and at least some of it certainly was), there is no longer any party to be made whole, and no action that needs to be compelled, which removes these issues from the realm of civil contempt and the Court's power to sanction in this case. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999) ("Civil contempt proceedings are coercive and remedial, but not punitive, in nature and sanctions for civil contempt are designed to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy."). For these reasons, the motion for rule to show cause is denied.

Evaluation of counsel's conduct is now left to more proper authorities, whether they be a state bar, criminal prosecutors, or one of the several ongoing civil proceedings addressing the relationship between these parties specifically or

2

Girardi's actions more generally. The Court alerted the U.S. Attorney for this district to the facts of this case when this motion was first filed because Girardi's conduct is unquestionably criminal. The Court is aware that the State Bar of California (the state in which Griffin and Lira are admitted) is monitoring these proceedings. Girardi and his firm are in bankruptcy proceedings. And the Edelson firm has sued Girardi, Griffin, and Lira. Additionally, Girardi's theft in this case, and apparently many others, has been well publicized nationally. In light of this Court's limited jurisdiction in this matter, and the ongoing investigations and proceedings in other venues, the Court finds that it need not take any further action with respect to Griffin, Lira, and/or the Edelson firm or any of its attorneys. Nevertheless, in the interest of the larger goal of unwinding Girardi's fraud, and identifying those responsible, the Court will review the salient facts that emerged from the three-day hearing.

By March 30, 2020, all the clients' settlements were funded by transfers from Boeing to the Girardi & Keese account. *See* R. 1319-48 at 4 (Ex. 247-4). According to the settlement agreements, the clients should have received their payments from Girardi within 30 days of the funding. But it wasn't until May 11, 2020, after the clients complained about not yet having been paid, *see, e.g.*, R. 1296-56 at 2 (Ex. 165-002), that partial payments were made. *See* R. 1319-48 at 11 (Ex. 247-11). Installment payments were of course not part of any agreement with the clients. When Girardi & Keese received the money, it should have been sent to the clients promptly.

Upon receipt of partial payments, the clients immediately and understandably inquired about the balance by email to Girardi, Griffin, and Lira. *See, e.g.*, R. 1296-

3

63 (Ex. 172). In response, Girardi drafted a letter to one of the clients stating the following:

> I got enough of the problem taken care of so we were able to release 50% of the settlement. I feel pretty good about the next payment. There are tax issues etc. I am working very hard.

R. 1296-57 (Ex. 166-002). A similar letter to another client stated:

> We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%. I feel fairly confident the balance will be done within 30 days. There was also a tax issue that came up that I am trying to resolve.

R. 1296-58 at 2 (Ex. 167-002); *see also* R. 1296-61 at 2 (Ex. 170-002) (similar letter claiming that Girardi was "dealing with the head of the IRS" regarding the supposed tax issue). These letters contained outrageous lies. Before sending the letters, Girardi's secretary shared them with Griffin and Lira. *See* R. 1296-57 (Ex. 166); R. 1296-58 (Ex. 167). In response, Lira stated "There are no tax issues." R. 1296-59 at 1 (Ex. 168). Lira also shared the letters with co-counsel at another firm, noting that he (Lira) had "intercepted this letter from going out." R. 1296-60 at 1 (Ex. 169). Co-counsel responded that if the client read the letter, "Tom won't know how to put the fire out." *Id.* at 3. That attorney also cryptically noted that the letter "reminds me of the letter in the Blythe case." *Id.* To which Lira responded, "Indeed." *Id.* at 4. Lira told Girardi's secretary, "I wouldn't send any of these letters. They are lies and can come back to haunt Tom." R. 1296-62 at 7 (Ex. 171).

Griffin and Lira both testified at the hearing on this motion that the statements in these letters were false. *See* R. 1316 at 105 (105:13–106:2) (Griffin); R.

4

1316 at 124 (124:8-15) (Griffin); R. 1317 at 23 (297:2-16) (Lira); R. 1317 at 25 (299:5-7). This series of email communications proves that Griffin and Lira knew that the clients should have been paid the full settlement amounts by April 30, 2020 at the latest and that Girardi was planning to and, in at least two cases where the letters were sent to clients, actually did lie to the clients about the reason for his failure to do so.

Even after Griffin and Lira "intercepted" Girardi's letters to the clients lying to them about the status of the funds, the Edelson firm remained unaware that the settlements had been funded by Boeing more than a month earlier. *See* R. 1317 at 194 (468:19-21); *id.* at 196 (470:8-24) (testimony of Edelson general counsel Rafey Balabanian); R. 1318 at 24 (575:10-14); *id.* at 25 (576:9–577:8) (testimony of Jay Edelson). At this point, the Edelson firm also did not know that Girardi was withholding settlement funds from the clients. Because they were under the impression that the settlements had not funded, getting the settlements funded was their primary concern. They considered independently contacting Boeing to investigate why the settlements had not been funded but decided against it in ultimately ill-advised deference to Girardi & Keese, who were the primary attorneys on the case. *See id.* at 197 (471:5-18) (Balabanian testimony). Apparently neither Griffin nor Lira ever informed anyone at the Edelson firm that Girardi had lied to the clients about the reasons for the delay in payment. *See, e.g.,* R. 1317 at 199 (473:23-25) (Balabanian testimony that Lira never told him); *id.* at 201 (475:8-10) (Balabanian testimony that Griffin never told him).

5

According to Balabanian, it wasn't until the middle of June 2020 that the Edelson firm first learned that Boeing had funded the settlements previously in March. *See* R. 1317 at 198 (472:16–473:12). Later in June, in a conversation with Griffin, Balabanian learned that Girardi had paid only part of the settlement money to the clients. *See* R. 1317 at 200-01 (474:25–475:7). On July 6, 2020, Lira sent the Edelson firm a check for $77,500 as partial payment for the Edelson firm's attorney's fees. *See* R. 1296-12 (Ex. 116). Balabanian testified that the Edelson firm never cashed this check due to their concerns about the clients not being fully paid. *See* R. 1317 at 201-02 (475:15–476:13). Balabanian told Lira (and Girardi) as much in a letter dated July 10, 2020. The primary purpose of that letter, however, was to express the Edelson firm's concern and displeasure with the fact that they had not been told that the settlements had been funded and that the clients had not been fully paid. *See* R. 1296-13 (Ex. 117). Lira responded with a letter focused on responsibility for paying the Edelson firm's fees and largely ignoring the more important concern of the clients' money. Lira devoted only two sentences to that issue stating: "Lastly as to the current status of payment to the [clients] . . . referred to Keith and Tom, I do not know the current status. I resigned from Girardi [&] Keese effective on June 13, 2020, and I do not have access to such information." R. 1296-14 (Ex. 118).

Balabanian eventually had a phone conversation with Girardi himself later in July. Girardi told him that the delayed payments were due the length of time it took to get releases of the clients claims, tax issues with the IRS, and Girardi's health issues. *See* R. 1317 at 203-04. Balabanian testified that to the extent he and the

6

Edelson firm did not believe Girardi's explanations, they thought Girardi was simply motivated to delay in paying the Edelson firm its share of the attorney's fees. *Id.* at 207 (481:2-5); *see also* R. 1318 at 48 (599:1-10) (Jay Edelson testified similarly). They did not believe that Girardi was attempting to avoid paying the clients the settlement money. *See id.* (481:16-22). Yet, in text messages with Griffin in August 2020, Balabanian twice threatened that the Edelson firm would be forced to alert the Court if the clients were not paid. *See* R. 1296-15 at 8 (Ex. 119-008) (text from Aug. 3, 2020); *id.* at 10 (Ex. 119-110) (text from Aug. 24, 2020). According to Balabanian, however, the Edelson firm "ultimately felt as though the explanations were reasonable in terms of Mr. Girardi's ailments [and] in terms of it being the result of a mistake." R. 1317 at 215 (489:16-19); *see also* R. 1318 at 141 (692) (similar testimony from Jay Edelson).

Girardi made additional partial payment to the clients in September. After further communications with Griffin about these payments, Balabanian spoke with Girardi again on September 30. According to Balabanian, Girardi falsely assured him that he had finally paid the clients in full. *See* R. 1317 at 212-213. Balabanian and the Edelson firm took Girardi at his word.

Then on November 17, 2020, Griffin texted Balabanian that Girardi still had not fully paid the clients. *See* R. 1296-15 at 27-28 (Ex. 119-027-28). The Edelson firm attorneys had a phone call with Griffin thereafter, and Griffin told them he did not believe Girardi or the Girardi & Keese firm had the money to pay the clients and that he had contacted a malpractice attorney on behalf of the clients. *See* R. 1317 at 219 (493:3-14). It turns out, however, that the attorney Griffin recommended was

7

formerly associated with Girardi & Keese, *see* R. 1317 at 85 (359:9-14), and he suspiciously urged the Edelson firm attorneys not to seek court intervention. *See* R. 1317 at 220 (494:14-22). The Edelson firm wisely disregarded this suggestion and finally alerted the Court regarding these circumstances by filing this motion two weeks later on December 2, 2020.

There was also evidence presented at the hearing regarding checks written to and from the Girardi & Keese accounts and how much money may have been in the accounts at various points in time. *See* R. 1332; R. 1333; R. 1334. There was evidence presented about Lira's authority as a signatory on those accounts and irregularities in the Girardi & Keese firm's compliance with bank signature requirements. *See, e.g.,* R. 1317 at 115-23. The Court was interested in this evidence as it is relevant to whether the delays in alerting the Court to Girardi's failure to pay the clients caused losses to the clients that could have been avoided if the Court had been informed earlier. This analysis is complicated by the large number of clients Girardi & Keese had and the large sums of money coming into and out of the firm's accounts almost daily. Ultimately, the fact that the clients have been made whole by the settlements with the Edelson firm's insurer means it is unnecessary for the Court to pursue these questions further.

While the money trail is complex and unclear, the knowledge of Griffin, Lira, and the Edelson firm is relatively uncontested and straightforward. Griffin and Lira knew from the start that Girardi did not pay the clients when he was supposed to. And they knew at least as early as May 12, 2020 that Girardi was lying to the clients

about the reasons for the failure to pay the full amounts. Griffin and Lira both testified that they never believed that Girardi intended to steal the money, and that they always assumed he would eventually pay the clients. The Court is skeptical of these assertions, however. Evidence of Girardi's repeated malfeasance with clients has been well-documented in the press since these allegations surfaced. Griffin and Lira worked with Girardi for many years. Indeed, Lira is his son-in-law. It is not credible that Griffin and Lira were so completely unaware of the prior disputes over client payments that they had no suspicions of Girardi's conduct and motives.

Moreover, the email communications regarding this specific incident indicate that Griffin and Lira were not surprised that Girardi was lying to the clients. First of all, Girardi's secretary apparently found it appropriate and necessary to check with Griffin and Lira before sending the letters. This is a curious process unless the staff had some sense that Girardi was not to be entirely trusted. Furthermore, Griffin stated that he had "intercepted" the letters, implying that he was regularly playing defense with respect to Girardi's conduct. And Lira's communications referenced another previous instance of similar conduct. In short, it is difficult to believe Griffin and Lira were unaware that Girardi was running a Ponzi scheme with client money, which in fact he was.

In any event, even if Griffin and Lira were so naïve as to be unaware that Girardi was willfully misappropriating client money, once they witnessed him lie to clients about the status of settlement money, they should have informed this Court. Griffin and Lira argue that they were under no obligation to make such a report. In

making this argument, they rely on the California Rules of Professional Conduct, which require only "reasonable remedial measures," and do not specifically require "disclosure to the tribunal," as do the ABA Model Rules. *See* R. 1343 at 14-15. But when, as was the case here, the attorney who controls the clients' money has already delayed more than a month in making payments and then actively lies to the clients about the reasons for the failure to pay, "reasonable remedial measures" must include alerting the relevant court. That is especially true here where the settlements in question required a Court order because they involved minor plaintiffs. Whether Griffin and Lira were directly beholden to the court orders is irrelevant. They have an obligation as officers of the Court to alert the Court to what amounts to using legal proceedings as cover for criminal activity. Griffin's and Lira's failures to do so here were entirely unreasonable and improper.

These failures were compounded by Griffin's and Lira's lack of candor with the Edelson firm. Once they learned that the settlements had been funded but the clients had not been fully paid, the Edelson firm inquired with Lira and Girardi about the reasons. Unsurprisingly, Girardi reiterated the lies he told his clients. Lira did not repeat Girardi's lies, but he already knew Girardi's excuses were false and kept that information hidden from the Edelson firm. His failure to inform Edelson that Girardi was lying is a lie by omission. This kept the Edelson firm in the dark, so when Balabanian finally had a conversation directly with Girardi, he had no solid basis to immediately question Girardi's excuses. Lira's decision to leave Girardi & Keese and, in his letter to Edelson, to rely on that departure as an implicit excuse to not reveal

Girardi's lies and seemingly absolve himself of any additional responsibility for the clients' money, was at best disingenuous and at worst improper.[1]

Griffin's conduct was just as bad, if not worse. Like Lira, Griffin knew that Girardi's excuses were lies. And like Lira, Griffin abetted the lies by hiding them from the Edelson firm. Griffin was in regular communication with Balabanian through the summer and fall of 2020. Not only did Griffin not reveal Girardi's lies, he came perilously close to repeating them when he told Balabanian in a text message, "I know [Girardi] is working on this." R. 1296-15 at 8 (Ex. 119). Girardi was working on nothing but trying to hide the theft. Even when he finally informed the Edelson firm in November 2020 that the clients had not been fully paid and Girardi didn't have the money to pay them, Griffin did not reveal that he had known since May that Girardi was lying to the clients. Further, he continued to attempt to dissuade the Edelson attorneys from involving the Court by recommending they consult a conflicted former Girardi & Keese attorney who he claimed to have arranged to pursue malpractice claims. This conduct is at best an effort to pass the buck and at worst a knowing cover-up. None of it demonstrates concern with the money owed to clients whose family members were victims of a tragic accident. All of it is simply inexcusable.

---

[1] Lira was a signatory on the account that would have received the clients' settlement money. Lira testified that his signature was forged on some checks written from the account. It is not clear whether Lira signed checks drawing on this account when he should not have, considering his knowledge that the clients had not been paid. Obviously, if Lira signed checks from the account thereby reducing its balance while knowing that the money was owed to the clients from that account, then his culpability here is much greater. Regardless, it is undisputed that both Lira and Griffin accepted salaries from Girardi & Keese knowing that the firm had not met its obligations to the clients.

11

By contrast, there is no evidence that the Edelson firm ever had knowledge that Girardi was lying to the clients. Balabanian's and Jay Edelson's testimony regarding their communications with Griffin, Lira, and Girardi shows that they regularly inquired to confirm that the clients would be paid. Their inquiries were consistently met with excuses begging forgiveness and more time. The Court understands the desire to extend professional courtesy, but the Edelson firm should have acted sooner than they did. They admitted as much in their testimony. That being said, the evidence in the record indicates that, unlike Griffin and Lira, the Edelson firm never had any reason to believe that Girardi was perpetrating a massive fraud. In effect, they deferred to Girardi, who had a reputation as a titan of the plaintiffs' bar in California and throughout the country. Indeed, Girardi's gaudy displays of wealth and extravagant lifestyle furthered the fiction that he and his firm were successful and solvent. From the Edelson firm's perspective, based on the information available to them, the risk they were running was simply abetting delayed payment, not a risk of non-payment. The delay was contrary to the settlement agreements and to the Court's orders approving the settlements. But delays are often a fact of life for one reason or another, illnesses like Girardi's being one. Delays are not inherently criminal or unethical. And delayed monetary payments can be easily remedied, if necessary, with interest payments. This realm of potential risk the Edelson firm reasonably perceived is not so great that the Court could find that the Edelson firm or any of its attorneys bears any responsibility for the clients' potential losses. To the extent the Edelson firm or any of its attorneys did

bear any such responsibility, they more than made up for it in arranging for its insurer to pay the clients, which was the only somewhat positive development from this debacle.

*     *     *     *

Thomas Girardi's actions are a stain on the legal profession and, due to the international nature of this case, have damaged the reputation of the American legal system. All of the plaintiffs in this case were citizens and residents of another country, many of whom do not speak English and have little to no experience with American society and certainly not its court system. Most are not very well-off. They all suffered the tragic loss of family members.

In need of help, they trusted American attorneys to shepherd them through the legal process and achieve at least some relief for their losses with amounts of money that are likely life-changing in their country. Girardi took advantage of vulnerable people at their most vulnerable moments, and he used the prestige of his profession, the reputation of American courts, and the imprimatur of this Court to do it. It is nearly impossible to mend such a breach of trust. The best we can do is demonstrate that the legal system Girardi besmirched has the ability to rectify its errors and bring bad actors to account. With the hearings and settlements initiated by the Edelson firm, a step has been taken in that direction.

For these reasons, the motion for rule to show cause [842] is denied.

13

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: November 2, 2022

14

EXHIBIT 29

**M** Gmail                                    Justin Beck <justintimesd@gmail.com>

## Court eFiling Order Rejected for Justin S. Beck vs. The State Bar of California, Case # 30-2021-01237499-CU-PN-CJC

donotreply@swiftattorneyservice.mail.legalconnect.com                    Wed, Feb 15,
<donotreply@swiftattorneyservice.mail.legalconnect.com>                  2023 at 11:11 AM
To: justintimesd@gmail.com

### Court eFiling Order Rejected

Your Court eFiling order has been rejected. Please review the rejection notice and resubmit your filing.

**Rejection Notice (court returned document)**

**Notice of Confirmation of Filing (court returned document)**

**Payment Receipt (court returned document)**

**Notice of Motion (court returned document)**

**Notice of Confirmation of Filing (court returned document)**

**Separate Statement (court returned document)**

**Notice of Confirmation of Filing (court returned document)**

**Declaration in Support (court returned document)**

Filing Status: **Rejected**

At: **Central Justice Center**

Should you have any questions, please contact us or log in and manage your cases and orders at http://www.swiftattorneyservice.com

Thank you for using Swift Attorney Service.

Order(s): **6172307**

Billing Code: **SysGen**

This automated message is being sent by Swift Attorney Service it is intended exclusively for the individuals and/or entities to which it is addressed. This communication including any links or attachments, may contain information that is proprietary, confidential, privileged or otherwise exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate any part of this message, or any part of any links or attachments thereto. If you have received this message in error, please notify the sender immediately by email and delete all copies of the message and attachments from your records.

© 2023 Swift Attorney Service All Rights Reserved.
500 Allerton Street Suite 105, Redwood City, CA 94063
Contact Us

3:23-0164-BAS-DDL
Declaration ISO Rule 11 Motion Ex. 29 p. 001

Gmail - Court eFiling Order Rejected for Justin S. Beck vs. The State Bar of California, Case # 30-2021-01237499-CU-FN-CJC

Declaration ISO Rule 11 Motion Ex. 29 p. 002