1  Justin S. Beck
2  3501 Roselle St.,
   Oceanside, CA 92056
3  760-449-2509
   justintimesd@gmail.com
4  *In Propria Persona*

5

**FILED**

MAR 27 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ GAV _____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN S. BECK, | Case No.: 8:23-CV-0164-~~BAS~~-DDL |
| | *AGS* |
| Plaintiff, | Judge:   Hon. ~~Cynthia A. Bashant~~ |
| | *Andrew G. Schopler* |
| vs. | **REQUEST FOR JUDICIAL NOTICE IN** |
| | **SUPPORT OF PLAINTIFF JUSTIN S.** |
| STATE OF CALIFORNIA; THE STATE BAR | **BECK'S NOTICE OF CROSS-MOTION** |
| OF CALIFORNIA; SUZANNE GRANDT; | **AND CROSS-MOTION FOR SANCTIONS** |
| RUBEN DURAN; ELI DAVID | **UNDER F.R. CIV.P. 11(c)(2)** |
| MORGENSTERN; KENNETH | |
| CATANZARITE, | |
| | |
| Defendants, | Filed concurrently with: |
| | |
| UNITED STATES ATTORNEY GENERAL; | Notice of Cross-Motion |
| UNITED STATES OF AMERICA | |
| | Cross-Motion |
| Nominal Defendants | |
| | Memorandum of Points and Authorities |
| | |
| | Declaration of Justin S. Beck |

**TO DEFENDANTS, DEFENDANTS ACTING AS DEFENSE COUNSEL AND DEFENSE LAW FIRM, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Federal Rule of Evidence 201, Plaintiff Justin S. Beck will and hereby does request this Court take judicial notice of the following documents in support of Plaintiff's Notice of Cross Motion and Cross-Motion for Sanctions under F.R.Civ.P. 11(c)(2).

1. "[T]he [United States] Supreme Court reaffirmed that a state regulatory board is not the sovereign." Federal Trade Commission "FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants" attached hereto as Exhibit 1. Exhibit 1 is available on Federal Trade Commission's website, also referenced within Supreme Court of California, Administrative Order 2017-09-20 of which State Bar defendants have requested this Court take notice. PageID.307.

2. Excerpt from Legislative Counsel's Digest for California State Assembly Bill No. 3249, Chapter 659, which amended various sections of State Bar Act in California. This was approved by Governor September 21, 2018, and filed by Secretary of State September 21, 2018, a copy of which is attached hereto as Exhibit 2. Exhibit 2 is a public record of California State Legislature. Amendments to Sections 6001, 6001.1, and 6094 became law on January 1, 2019.

3. Dictionary.com definition of "paramount," a true and correct copy of which is attached hereto as Exhibit 3. Exhibit 3 is general knowledge which is easily verifiable. Business & Professions Code Section 6001.1 holds that the public interest is "paramount" in this proceeding.

4. California Rules of Professional Conduct 1.0.1 "Terminology" for "fraud" or "fraudulent" as it relates to attorneys appearing or as parties' defendants to this proceeding, and related footnote [3], attached hereto as Exhibit 4. Exhibit 4 is readily available through The State Bar of California's website.

5. California Rules of Professional Conduct 1.7(d)(3) which mandates disqualification for the representation of adverse parties in the same or substantially related matters attached hereto as Exhibit 5. Exhibit 5 is readily available through The State Bar of California's website.

6. California Rules of Professional Conduct 4.1 "Truthfulness in Statements to Others" where "in the course of representing a client a lawyer shall not knowingly:* (a) make a false statement of material fact or law to a third person:* or (b) failed to disclose a material fact to a third person* when disclosure is necessary to avoid assisting a criminal or fraudulent* act by a client, unless disclosure is

1  prohibited by Business and Professions Code section 6068, subdivision (e)(1) or rule 1.6," a copy of

2  which is attached hereto as <u>Exhibit 6</u>. <u>Exhibit 6</u> is readily available through The State Bar of California's

3  website.

4        7. Plaintiff's RICO Case Statement filed at Docket #9, Document #1, pp. 1-100 in the instant

5  case as it relates to the Motion to Dismiss asserting Plaintiff's claims lack clarity or specificity. ECF #9.

6  This is a public record and filing in the Court accepted by the Clerk. This document is a supplement to

7  the First Amended Complaint subject of the Motion to Dismiss.

8        Rule 201 of the Federal Rules of Evidence authorizes a Court to take judicial notice of a fact that

9  is not subject to reasonable dispute because the fact "is either (1) generally known within the territorial

10  jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources

11  whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

12        "A trial court may presume that public records are authentic and trustworthy." *Gillbrook v. City*

13  *of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

14        For the foregoing reasons, Plaintiff requests this Court take judicial notice of Exhibit 1, Exhibit

15  2, Exhibit 3, Exhibit 4, Exhibit 5, Exhibit 6, and Plaintiff's RICO Case Statement at Document 9-1, ECF

16  #9.

17

18  Dated:      March 6, 2023           Respectfully Submitted,

19

20

21                                 Justin S. Beck

22                                 In Pro Per

23

24

25

26

27

28

EXHIBIT 1

RJN
Rule 11 Cross Motion

# FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants[*]

## I.     Introduction

States craft regulatory policy through a variety of actors, including state legislatures, courts, agencies, and regulatory boards. While most regulatory actions taken by state actors will not implicate antitrust concerns, some will. Notably, states have created a large number of regulatory boards with the authority to determine who may engage in an occupation (*e.g.*, by issuing or withholding a license), and also to set the rules and regulations governing that occupation. Licensing, once limited to a few learned professions such as doctors and lawyers, is now required for over 800 occupations including (in some states) locksmiths, beekeepers, auctioneers, interior designers, fortune tellers, tour guides, and shampooers.[1]

In general, a state may avoid all conflict with the federal antitrust laws by creating regulatory boards that serve only in an advisory capacity, or by staffing a regulatory board exclusively with persons who have no financial interest in the occupation that is being regulated. However, across the United States, "licensing boards are largely dominated by active members of their respective industries . . ."[2] That is, doctors commonly regulate doctors, beekeepers commonly regulate beekeepers, and tour guides commonly regulate tour guides.

Earlier this year, the U.S. Supreme Court upheld the Federal Trade Commission's determination that the North Carolina State Board of Dental Examiners ("NC Board") violated the federal antitrust laws by preventing non-dentists from providing teeth whitening services in competition with the state's licensed dentists. *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101 (2015). NC Board is a state agency established under North Carolina law and charged with administering and enforcing a licensing system for dentists. A majority of the members of this state agency are themselves practicing dentists, and thus they have a private incentive to limit

---

[*] This document sets out the views of the Staff of the Bureau of Competition. The Federal Trade Commission is not bound by this Staff guidance and reserves the right to rescind it at a later date. In addition, FTC Staff reserves the right to reconsider the views expressed herein, and to modify, rescind, or revoke this Staff guidance if such action would be in the public interest.

[1] Aaron Edlin & Rebecca Haw, *Cartels By Another Name: Should Licensed Occupations Face Antitrust Scrutiny*, 162 U. PA. L. REV. 1093, 1096 (2014).

[2] *Id.* at 1095.

competition from non-dentist providers of teeth whitening services. NC Board argued that, because it is a state agency, it is exempt from liability under the federal antitrust laws. That is, the NC Board sought to invoke what is commonly referred to as the "state action exemption" or the "state action defense." The Supreme Court rejected this contention and affirmed the FTC's finding of antitrust liability.

In this decision, the Supreme Court clarified the applicability of the antitrust state action defense to state regulatory boards controlled by market participants:

> "The Court holds today that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal's* [*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980)] active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

In the wake of this Supreme Court decision, state officials have requested advice from the Federal Trade Commission regarding antitrust compliance for state boards responsible for regulating occupations. This outline provides FTC Staff guidance on two questions. *First*, when does a state regulatory board require active supervision in order to invoke the state action defense? *Second*, what factors are relevant to determining whether the active supervision requirement is satisfied?

Our answers to these questions come with the following caveats.

➤ Vigorous competition among sellers in an open marketplace generally provides consumers with important benefits, including lower prices, higher quality services, greater access to services, and increased innovation. For this reason, a state legislature should empower a regulatory board to restrict competition only when necessary to protect against a credible risk of harm, such as health and safety risks to consumers. The Federal Trade Commission and its staff have frequently advocated that states avoid unneeded and burdensome regulation of service providers.[3]

➤ Federal antitrust law does <u>not</u> require that a state legislature provide for active supervision of any state regulatory board. A state legislature may, and generally should, prefer that a regulatory board be subject to the requirements of the federal antitrust

---

[3] *See, e.g.,* Fed. Trade Comm'n Staff Policy Paper, *Policy Perspectives: Competition and the Regulation of Advanced Practice Registered Nurses* (Mar. 2014), https://www.ftc.gov/system/files/documents/reports/policy-perspectives-competition-regulation-advanced-practice-nurses/140307aprnpolicypaper.pdf; Fed. Trade Comm'n & U.S. Dept. of Justice, Comment before the South Carolina Supreme Court Concerning Proposed Guidelines for Residential and Commercial Real Estate Closings (Apr. 2008), https://www.ftc.gov/news-events/press-releases/2008/04/ftcdoj-submit-letter-supreme-court-south-carolina-proposed.

3:22-CV-0164-BAS-DDL
RJN for Rule 11 Motion, Ex. 1, p. 002

laws. If the state legislature determines that a regulatory board should be subject to antitrust oversight, then the state legislature need not provide for active supervision.

➢ Antitrust analysis – including the applicability of the state action defense – is fact-specific and context-dependent. The purpose of this document is to identify certain overarching legal principles governing when and how a state may provide active supervision for a regulatory board. We are not suggesting a mandatory or one-size-fits-all approach to active supervision. Instead, we urge each state regulatory board to consult with the Office of the Attorney General for its state for customized advice on how best to comply with the antitrust laws.

➢ This FTC Staff guidance addresses only the active supervision prong of the state action defense. In order successfully to invoke the state action defense, a state regulatory board controlled by market participants must also satisfy the clear articulation prong, as described briefly in Section II. below.

➢ This document contains guidance developed by the staff of the Federal Trade Commission. Deviation from this guidance does not necessarily mean that the state action defense is inapplicable, or that a violation of the antitrust laws has occurred.

## II.     Overview of the Antitrust State Action Defense

"Federal antitrust law is a central safeguard for the Nation's free market structures . . . . The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market." *N.C. Dental*, 135 S. Ct. at 1109.

Under principles of federalism, "the States possess a significant measure of sovereignty." *N.C. Dental*, 135 S. Ct. at 1110 (*quoting Community Communications Co. v. Boulder*, 455 U.S. 40, 53 (1982)). In enacting the antitrust laws, Congress did not intend to prevent the States from limiting competition in order to promote other goals that are valued by their citizens. Thus, the Supreme Court has concluded that the federal antitrust laws do not reach anticompetitive conduct engaged in by a State that is acting in its sovereign capacity. *Parker v. Brown*, 317 U.S. 341, 351-52 (1943). For example, a state legislature may "impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *N.C. Dental*, 135 S. Ct. at 1109.

Are the actions of a state regulatory board, like the actions of a state legislature, exempt from the application of the federal antitrust laws? In *North Carolina State Board of Dental Examiners*, the Supreme Court reaffirmed that a state regulatory board is not the sovereign. Accordingly, a state regulatory board is not necessarily exempt from federal antitrust liability.

More specifically, the Court determined that "a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates" may invoke the state action defense only when two requirements are satisfied: first, the challenged restraint must be clearly articulated and affirmatively expressed as state policy; and second, the policy must be actively supervised by a state official (or state agency) that is not a participant in the market that is being regulated. *N.C. Dental*, 135 S. Ct. at 1114.

➢      The Supreme Court addressed the clear articulation requirement most recently in *FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003 (2013). The clear articulation requirement is satisfied "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Id.* at 1013.

➢      The State's clear articulation of the intent to displace competition is not alone sufficient to trigger the state action exemption. The state legislature's clearly-articulated delegation of authority to a state regulatory board to displace competition may be "defined at so high a level of generality as to leave open critical questions about how

and to what extent the market should be regulated." There is then a danger that this delegated discretion will be used by active market participants to pursue private interests in restraining trade, in lieu of implementing the State's policy goals. *N.C. Dental*, 135 S. Ct. at 1112.

➢ The active supervision requirement "seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming [antitrust] immunity." *Id.*

Where the state action defense does not apply, the actions of a state regulatory board controlled by active market participants may be subject to antitrust scrutiny. Antitrust issues may arise where an unsupervised board takes actions that restrict market entry or restrain rivalry. The following are some scenarios that have raised antitrust concerns:

➢ A regulatory board controlled by dentists excludes non-dentists from competing with dentists in the provision of teeth whitening services. *Cf. N.C. Dental*, 135 S. Ct. 1101.

➢ A regulatory board controlled by accountants determines that only a small and fixed number of new licenses to practice the profession shall be issued by the state each year. *Cf. Hoover v. Ronwin*, 466 U.S. 558 (1984).

➢ A regulatory board controlled by attorneys adopts a regulation (or a code of ethics) that prohibits attorney advertising, or that deters attorneys from engaging in price competition. *Cf. Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977); *Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975).

## III.    Scope of FTC Staff Guidance

A. This Staff guidance addresses the applicability of the state action defense under the federal antitrust laws. Concluding that the state action defense is inapplicable does <u>not</u> mean that the conduct of the regulatory board necessarily violates the federal antitrust laws. A regulatory board may assert defenses ordinarily available to an antitrust defendant.

   1. **Reasonable restraints on competition do not violate the antitrust laws, even where the economic interests of a competitor have been injured.**

   Example 1: A regulatory board may prohibit members of the occupation from engaging in fraudulent business practices without raising antitrust concerns. A regulatory board also may prohibit members of the occupation from engaging in untruthful or deceptive advertising. *Cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999).

   Example 2: Suppose a market with several hundred licensed electricians. If a regulatory board suspends the license of one electrician for substandard work, such action likely does not unreasonably harm competition. *Cf. Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696 (4th Cir. 1991) (en banc).

   2. **The ministerial (non-discretionary) acts of a regulatory board engaged in good faith implementation of an anticompetitive statutory regime do not give rise to antitrust liability. See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 344 n. 6 (1987).**

   Example 3: A state statute requires that an applicant for a chauffeur's license submit to the regulatory board, among other things, a copy of the applicant's diploma and a certified check for $500. An applicant fails to submit the required materials. If for this reason the regulatory board declines to issue a chauffeur's license to the applicant, such action would not be considered an unreasonable restraint. In the circumstances described, the denial of a license is a ministerial or non-discretionary act of the regulatory board.

   3. **In general, the initiation and prosecution of a lawsuit by a regulatory board does not give rise to antitrust liability unless it falls within the "sham exception." Professional Real Estate Investors v. Columbia Pictures Industries, 508 U.S. 49 (1993); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972).**

   Example 4: A state statute authorizes the state's dental board to maintain an action in state court to enjoin an unlicensed person from practicing dentistry. The members of the dental board have a basis to believe that a particular individual is practicing dentistry but does not hold a valid license. If the dental board files a lawsuit against that individual, such action would not constitute a violation of the federal antitrust laws.

---

October 2015                                                                 6

B. Below, FTC Staff describes when active supervision of a state regulatory board is required in order successfully to invoke the state action defense, and what factors are relevant to determining whether the active supervision requirement has been satisfied.

### 1. When is active state supervision of a state regulatory board required in order to invoke the state action defense?

***General Standard***: "[A] state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

***Active Market Participants***: A member of a state regulatory board will be considered to be an active market participant in the occupation the board regulates if such person (i) is licensed by the board or (ii) provides any service that is subject to the regulatory authority of the board.

> ➤ If a board member participates in any professional or occupational sub-specialty that is regulated by the board, then that board member is an active market participant for purposes of evaluating the active supervision requirement.

> ➤ It is no defense to antitrust scrutiny, therefore, that the board members themselves are not directly or personally affected by the challenged restraint. For example, even if the members of the NC Dental Board were orthodontists who do not perform teeth whitening services (as a matter of law or fact or tradition), their control of the dental board would nevertheless trigger the requirement for active state supervision. This is because these orthodontists are licensed by, and their services regulated by, the NC Dental Board.

> ➤ A person who temporarily suspends her active participation in an occupation for the purpose of serving on a state board that regulates her former (and intended future) occupation will be considered to be an active market participant.

***Method of Selection***: The method by which a person is selected to serve on a state regulatory board is not determinative of whether that person is an active market participant in the occupation that the board regulates. For example, a licensed dentist is deemed to be an active market participant regardless of whether the dentist (i) is appointed to the state dental board by the governor or (ii) is elected to the state dental board by the state's licensed dentists.

***A Controlling Number, Not Necessarily a Majority, of Actual Decisionmakers:***

> ➢ Active market participants need not constitute a numerical majority of the members of a state regulatory board in order to trigger the requirement of active supervision. A decision that is controlled, either as a matter of law, procedure, or fact, by active participants in the regulated market (*e.g.*, through veto power, tradition, or practice) must be actively supervised to be eligible for the state action defense.

> ➢ Whether a particular restraint has been imposed by a "controlling number of decisionmakers [who] are active market participants" is a fact-bound inquiry that must be made on a case-by-case basis. FTC Staff will evaluate a number of factors, including:

>> ✓ The structure of the regulatory board (including the number of board members who are/are not active market participants) and the rules governing the exercise of the board's authority.

>> ✓ Whether the board members who are active market participants have veto power over the board's regulatory decisions.

**Example 5:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of five board members. Thus, no regulation may become effective without the assent of at least one electrician member of the board. In this scenario, the active market participants effectively have veto power over the board's regulatory authority. The active supervision requirement is therefore applicable.

>> ✓ The level of participation, engagement, and authority of the non-market participant members in the business of the board — generally and with regard to the particular restraint at issue.

>> ✓ Whether the participation, engagement, and authority of the non-market participant board members in the business of the board differs from that of board members who are active market participants — generally and with regard to the particular restraint at issue.

>> ✓ Whether the active market participants have in fact exercised, controlled, or usurped the decisionmaking power of the board.

**Example 6:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of a majority of board members. When voting on proposed regulations, the non-electrician members routinely defer to the preferences of the electrician members. Minutes of

board meetings show that the non-electrician members generally are not informed or knowledgeable concerning board business – and that they were not well informed concerning the particular restraint at issue. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

**Example 7.** The state board of electricians consists of four non-electrician members and three practicing electricians. Documents show that the electrician members frequently meet and discuss board business separately from the non-electrician members. On one such occasion, the electrician members arranged for the issuance by the board of written orders to six construction contractors, directing such individuals to cease and desist from providing certain services. The non-electrician members of the board were not aware of the issuance of these orders and did not approve the issuance of these orders. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

### 2.  What constitutes active supervision?

FTC Staff will be guided by the following principles:

> ➤ "[T]he purpose of the active supervision inquiry . . . is to determine whether the State has exercised sufficient independent judgment and control" such that the details of the regulatory scheme "have been established as a product of deliberate state intervention" and not simply by agreement among the members of the state board. "Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy." The State is not obliged to "[meet] some normative standard, such as efficiency, in its regulatory practices." *Ticor*, 504 U.S. at 634-35. "The question is not how well state regulation works but whether the anticompetitive scheme is the State's own." *Id.* at 635.

> ➤ It is necessary "to ensure the States accept political accountability for anticompetitive conduct they permit and control." *N.C. Dental*, 135 S. Ct. at 1111. *See also Ticor*, 504 U.S. at 636.

> ➤ "The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the 'mere potential for state supervision is not an adequate substitute for a decision by the State.' Further, the state supervisor may not itself be an active market participant." *N.C. Dental*, 135 S. Ct. at 1116–17 (citations omitted).

> ➤ The active supervision must precede implementation of the allegedly anticompetitive restraint.

> ➤ "[T]he inquiry regarding active supervision is flexible and context-dependent." "[T]he adequacy of supervision . . . will depend on all the circumstances of a case." *N.C. Dental*, 135 S. Ct. at 1116–17. Accordingly, FTC Staff will evaluate each case in light of its own facts, and will apply the applicable case law and the principles embodied in this guidance reasonably and flexibly.

**3. What factors are relevant to determining whether the active supervision requirement has been satisfied?**

FTC Staff will consider the presence or absence of the following factors in determining whether the active supervision prong of the state action defense is satisfied.

> ➤ The supervisor has obtained the information necessary for a proper evaluation of the action recommended by the regulatory board. As applicable, the supervisor has ascertained relevant facts, collected data, conducted public hearings, invited and received public comments, investigated market conditions, conducted studies, and reviewed documentary evidence.

>> ✓ The information-gathering obligations of the supervisor depend in part upon the scope of inquiry previously conducted by the regulatory board. For example, if the regulatory board has conducted a suitable public hearing and collected the relevant information and data, then it may be unnecessary for the supervisor to repeat these tasks. Instead, the supervisor may utilize the materials assembled by the regulatory board.

> ➤ The supervisor has evaluated the substantive merits of the recommended action and assessed whether the recommended action comports with the standards established by the state legislature.

> ➤ The supervisor has issued a written decision approving, modifying, or disapproving the recommended action, and explaining the reasons and rationale for such decision.

>> ✓ A written decision serves an evidentiary function, demonstrating that the supervisor has undertaken the required meaningful review of the merits of the state board's action.

>> ✓ A written decision is also a means by which the State accepts political accountability for the restraint being authorized.

**Scenario 1: Example of satisfactory active supervision of a state board regulation designating teeth whitening as a service that may be provided only by a licensed dentist, where state policy is to protect the health and welfare of citizens and to promote competition.**

➤   The state legislature designated an executive agency to review regulations recommended by the state regulatory board. Recommended regulations become effective only following the approval of the agency.

➤   The agency provided notice of (i) the recommended regulation and (ii) an opportunity to be heard, to dentists, to non-dentist providers of teeth whitening, to the public (in a newspaper of general circulation in the affected areas), and to other interested and affected persons, including persons that have previously identified themselves to the agency as interested in, or affected by, dentist scope of practice issues.

➤   The agency took the steps necessary for a proper evaluation of the recommended regulation. The agency:

   ✓   Obtained the recommendation of the state regulatory board and supporting materials, including the identity of any interested parties and the full evidentiary record compiled by the regulatory board.

   ✓   Solicited and accepted written submissions from sources other than the regulatory board.

   ✓   Obtained published studies addressing (i) the health and safety risks relating to teeth whitening and (ii) the training, skill, knowledge, and equipment reasonably required in order to safely and responsibly provide teeth whitening services (if not contained in submission from the regulatory board).

   ✓   Obtained information concerning the historic and current cost, price, and availability of teeth whitening services from dentists and non-dentists (if not contained in submission from the regulatory board). Such information was verified (or audited) by the Agency as appropriate.

   ✓   Held public hearing(s) that included testimony from interested persons (including dentists and non-dentists). The public hearing provided the agency with an opportunity (i) to hear from and to question providers, affected customers, and experts and (ii) to supplement the evidentiary record compiled by the state board. (As noted above, if the state regulatory board has previously conducted a suitable public hearing, then it may be unnecessary for the supervising agency to repeat this procedure.)

➤   The agency assessed all of the information to determine whether the recommended regulation comports with the State's goal to protect the health and

welfare of citizens and to promote competition.

> The agency issued a written decision accepting, rejecting, or modifying the scope of practice regulation recommended by the state regulatory board, and explaining the rationale for the agency's action.

**Scenario 2: Example of satisfactory active supervision of a state regulatory board administering a disciplinary process.**

A common function of state regulatory boards is to administer a disciplinary process for members of a regulated occupation. For example, the state regulatory board may adjudicate whether a licensee has violated standards of ethics, competency, conduct, or performance established by the state legislature.

Suppose that, acting in its adjudicatory capacity, a regulatory board controlled by active market participants determines that a licensee has violated a lawful and valid standard of ethics, competency, conduct, or performance, and for this reason, the regulatory board proposes that the licensee's license to practice in the state be revoked or suspended. In order to invoke the state action defense, the regulatory board would need to show both clear articulation and active supervision.

> In this context, active supervision may be provided by the administrator who oversees the regulatory board (*e.g.*, the secretary of health), the state attorney general, or another state official who is not an active market participant. The active supervision requirement of the state action defense will be satisfied if the supervisor: (i) reviews the evidentiary record created by the regulatory board; (ii) supplements this evidentiary record if and as appropriate; (iii) undertakes a de novo review of the substantive merits of the proposed disciplinary action, assessing whether the proposed disciplinary action comports with the policies and standards established by the state legislature; and (iv) issues a written decision that approves, modifies, or disapproves the disciplinary action proposed by the regulatory board.

Note that a disciplinary action taken by a regulatory board affecting a single licensee will typically have only a de minimis effect on competition. A pattern or program of disciplinary actions by a regulatory board affecting multiple licensees may have a substantial effect on competition.

**The following do <u>not</u> constitute active supervision of a state regulatory board that is controlled by active market participants:**

> ➤ The entity responsible for supervising the regulatory board is itself controlled by active market participants in the occupation that the board regulates. *See N.C. Dental*, 135 S. Ct. at 1113-14.

> ➤ A state official monitors the actions of the regulatory board and participates in deliberations, but lacks the authority to disapprove anticompetitive acts that fail to accord with state policy. *See Patrick v. Burget*, 486 U.S. 94, 101 (1988).

> ➤ A state official (*e.g.*, the secretary of health) serves ex officio as a member of the regulatory board with full voting rights. However, this state official is one of several members of the regulatory board and lacks the authority to disapprove anticompetitive acts that fail to accord with state policy.

> ➤ The state attorney general or another state official provides advice to the regulatory board on an ongoing basis.

> ➤ An independent state agency is staffed, funded, and empowered by law to evaluate, and then to veto or modify, particular recommendations of the regulatory board. However, in practice such recommendations are subject to only cursory review by the independent state agency. The independent state agency perfunctorily approves the recommendations of the regulatory board. *See Ticor*, 504 U.S. at 638.

> ➤ An independent state agency reviews the actions of the regulatory board and approves all actions that comply with the procedural requirements of the state administrative procedure act, without undertaking a substantive review of the actions of the regulatory board. *See Patrick*, 486 U.S. at 104-05.

RJN Exhibit 2



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

Assembly Bill No. 3249

CHAPTER 659

An act to amend Sections 30, 6001, 6001.1, 6001.2, 6002, 6002.1, 6003, 6004, 6005, 6006, 6007, 6008.1, 6008.4, 6009.5, 6013.5, 6015, 6016, 6020, 6022, 6023, 6024, 6031, 6031.5, 6032, 6033, 6044, 6044.5, 6046, 6046.5, 6049, 6049.1, 6049.2, 6051, 6053, 6054, 6056, 6060, 6060.3, 6061, 6062, 6068, 6069, 6070, 6071, 6075, 6076, 6076.5, 6077, 6077.5, 6078, 6079.1, 6080, 6081, 6082, 6083, 6084, 6085.5, 6086, 6086.1, 6086.2, 6086.65, 6086.8, 6086.10, 6086.13, 6086.14, 6086.15, 6087, 6090.5, 6090.6, 6092, 6092.5, 6093.5, 6094, 6094.5, 6095, 6102, 6103.5, 6103.7, 6125, 6126, 6126.3, 6127, 6140, 6140.02, 6140.03, 6140.05, 6140.1, 6140.12, 6140.16, 6140.5, 6140.55, 6140.56, 6140.6, 6140.7, 6140.9, 6141, 6141.1, 6141.3, 6142, 6143, 6143.5, 6144.5, 6145, 6157, 6157.2, 6157.3, 6157.5, 6158.4, 6158.5, 6158.7, 6159.1, 6167, 6172, 6175, 6175.5, 6177, 6180, 6180.3, 6180.4, 6180.5, 6180.10, 6180.12, 6180.14, 6185, 6190, 6190.1, 6190.3, 6200, 6203, 6211, 6225, 6233, 6235, 6236, 6237, and 6241 of, to amend the heading of Article 3 (commencing with Section 6040) of Chapter 4 of Division 3 of, to amend and renumber the heading of Article 3 (commencing with Section 6055) of Chapter 4 of Division 3 of, to add Section 6001.3 to, and to repeal Sections 6040, 6041, 6042, 6043, 6045, 6048, and 6090 of, the Business and Professions Code, to amend Section 55.32 of the Civil Code, to amend Section 9795 of the Government Code, to amend Section 1872.95 of the Insurance Code, and to amend Section 19280 of the Revenue and Taxation Code, relating to attorneys.

[Approved by Governor September 21, 2018. Filed with
Secretary of State September 21, 2018.]

LEGISLATIVE COUNSEL'S DIGEST

AB 3249, Committee on Judiciary. State Bar Act: attorneys: discipline: annual membership fee.

(1) The State Bar Act provides for the licensure and regulation of attorneys by the State Bar of California, a public corporation governed by a board of trustees. Existing law, until January 1, 2019, requires the board to charge an annual membership fee for active members of up to $315 for 2018.

This bill would, until January 1, 2020, require the board to charge an annual license fee in the same amount for 2019. The bill would replace the terms "member," "membership," and "dues" with "licensee," "license," and "fees," respectively, throughout the act. The bill would provide that any reference to "member of the State Bar" in any provision of law is deemed to mean a "licensee of the State Bar."

92

(2) The act requires protection of the public to be the highest priority for the State Bar and the board of trustees in exercising their licensing, regulatory, and disciplinary functions.

This bill would provide that protection of the public includes support for greater access to, and inclusion in, the legal system.

(3) The act provides that the officers of the State Bar are a president, vice president, secretary, and a treasurer and requires the officers of the State Bar to continue in office until their successors are elected and qualify. Existing law requires the treasurer of the State Bar to certify under oath the State Bar's financial statement for each fiscal year.

This bill would instead provide that the officers of the State Bar are a chair, vice chair, and a secretary and that they shall continue in office until their successors are appointed or selected. The bill would instead require the chief financial officer of the State Bar to certify the financial statement.

(4) The act authorizes the board to aid in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice, including, but not by way of limitation, all matters that may advance the professional interests of the members of the State Bar. The act requires the State Bar to assist the sections to incorporate as a private, nonprofit corporation and to transfer the section functions to the nonprofit corporation, defined as the association in the act. Existing law requires the nonprofit corporation to be called any name meeting certain requirements and approved by the Chief Justice.

This bill would eliminate the authorization of the board to aid in all matters that may advance the professional interests of the members of the State Bar. The bill would require the association to be called the California Lawyers Association, and would make various conforming changes in this regard.

(5) The act requires applicants for admission to the State Bar to, among other things, take and pass a bar examination and offers the examination in February and July. The act requires an application to take the bar examination filed between the last business day of November and January 15, for the February examination, or between the last business day of April and June 15, for the July examination, to be accepted if it is accompanied by a timely filing fee and late fee. The act prohibits an application filed after January 15 for the February examination and June 15 for the July examination from being accepted.

The act authorizes the board to establish an examining committee to be comprised of 19 members, 9 of whom shall be public members. The act provides that the public members shall serve a term of 4 years commencing at the conclusion of the annual meeting of the State Bar.

This bill would change the filing time described above to before January 1 for the February examination and to before June 1 for the July examination and would prohibit an application for examination from being accepted after January 1 and July 1, respectively.

The bill would require the State Bar to develop and implement a plan to meet certain goals relating to access, fairness, and diversity in the legal profession and the elimination of bias in the practice of law. The bill would

92

require the State Bar to prepare and submit a report on the plan and its implementation to the Legislature, by March 15, 2019, and every 2 years thereafter.

This bill would remove the provision providing that the terms of the public members of the examining committee begin at the conclusion of the annual meeting of the State Bar.

(6)  The act authorizes the State Bar to collect voluntary fees or donations on behalf of the Conference of Delegates of California Bar Associations, as specified.

This bill would end that authorization on January 1, 2020.

(7)  The act requires the State Bar to establish and administer an Attorney Diversion and Assistance Program and requires the program to be funded by mandatory fees, as specified. Under existing law, these fees are for the support of the program and related programs, as provided. The act requires participants in the program to be responsible for all expenses related to treatment and recovery and requires the State Bar to establish a financial assistance program to ensure no member is denied acceptance into the program solely due to lack of ability to pay. The act authorizes applicants who are in law school or have applied for admission to the State Bar to enter the program, subject to the approval of the board of trustees.

This bill, on and after January 1, 2019, would require $1 of that mandatory fee, as specified, to be transferred to a statewide nonprofit corporation, established by attorneys that has, for the last 25 years or more, provided peer support to attorneys recovering from alcohol and substance abuse in a confidential and anonymous manner, to fund the support and recovery efforts of the nonprofit corporation and would require the nonprofit corporation to submit an annual report to the State Bar accounting for use of the funds, as specified. The bill would instead require the State Bar to establish a program to provide financial assistance to a licensee and a person eligible for services who otherwise would be denied acceptance into the program solely due to the lack of ability to pay, as specified, and would also authorize the mandatory fees to be used for treatment services for those who demonstrate an inability to pay for treatment.

(8)  The act provides for the investigation and discipline of members of the State Bar, requires the board of trustees to establish a State Bar Court to act in the board of trustees' place in the determination of disciplinary proceedings, requires the board of trustees to appoint a chief trial counsel, and requires the board of trustees to enroll a member as an inactive member, as specified. The act requires the State Bar to enroll a member to inactive status under certain circumstances and authorizes the State Bar to enroll a member to inactive status under other circumstances, including upon a finding that the attorney's conduct poses a substantial threat of harm to the interests of the attorney's clients or to the public if certain factors are found, including, among other things, that the attorney has caused or is causing substantial harm to the attorney's clients or the public and that the attorney's clients or the public are likely to suffer greater injury from the denial of inactive enrollment than the attorney is likely to suffer if granted, or there

RJN EXHIBIT 3

DICTIONARY.COM                    THESAURUS.COM

🔍 paramount                                              ✕

MEANINGS      GAMES      LEARN      WRITING      WORD OF THE DAY

◆   We Just Added New Words!                    See Words        ✕

**Top Definitions**      **Quiz**      **Related Content**      **Examples**      **British**

FEEDBACK

📖 **Middle School Level**

# paramount

[ **par**-*uh*-mount ]  SHOW IPA  🔊  ☆

**See synonyms for *paramount* on Thesaurus.com**

*adjective*

1   chief in importance or impact; supreme; preeminent:
    *a point of paramount significance.*

2   above others in rank or authority; superior in power or jurisdiction.

*noun*

3   a supreme ruler; overlord.

RJN Exhibit 4

# The State Bar *of California*

**Rule 1.0.1 Terminology**
**(Rule Approved by the Supreme Court, Effective November 1, 2018)**

(a)    "Belief" or "believes" means that the person* involved actually supposes the fact in question to be true.  A person's* belief may be inferred from circumstances.

(b)    [Reserved]

(c)    "Firm" or "law firm" means a law partnership; a professional law corporation; a lawyer acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal services organization or in the legal department, division or office of a corporation, of a government organization, or of another organization.

(d)    "Fraud" or "fraudulent" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive.

(e)    "Informed consent" means a person's* agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks, including any actual and reasonably* foreseeable adverse consequences of the proposed course of conduct.

(e-1)    "Informed written consent" means that the disclosures and the consent required by paragraph (e) must be in writing.*

(f)    "Knowingly," "known," or "knows" means actual knowledge of the fact in question. A person's* knowledge may be inferred from circumstances.

(g)    "Partner" means a member of a partnership, a shareholder in a law firm* organized as a professional corporation, or a member of an association authorized to practice law.

(g-1)    "Person" has the meaning stated in Evidence Code section 175.

(h)    "Reasonable" or "reasonably" when used in relation to conduct by a lawyer means the conduct of a reasonably prudent and competent lawyer.

(i)    "Reasonable belief" or "reasonably believes" when used in reference to a lawyer means that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable.

(j)    "Reasonably should know" when used in reference to a lawyer means that a lawyer of reasonable prudence and competence would ascertain the matter in question.

(k)    "Screened" means the isolation of a lawyer from any participation in a matter, including the timely imposition of procedures within a law firm* that are adequate under the circumstances (i) to protect information that the isolated lawyer is

1

obligated to protect under these rules or other law; and (ii) to protect against other law firm* lawyers and nonlawyer personnel communicating with the lawyer with respect to the matter.

(l)   "Substantial" when used in reference to degree or extent means a material matter of clear and weighty importance.

(m)   "Tribunal" means: (i) a court, an arbitrator, an administrative law judge, or an administrative body acting in an adjudicative capacity and authorized to make a decision that can be binding on the parties involved; or (ii) a special master or other person* to whom a court refers one or more issues and whose decision or recommendation can be binding on the parties if approved by the court.

(n)   "Writing" or "written" has the meaning stated in Evidence Code section 250. A "signed" writing includes an electronic sound, symbol, or process attached to or logically associated with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to sign the writing.

## Comment

*Firm\* or Law Firm\**

[1]   Practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a law firm.* However, if they present themselves to the public in a way that suggests that they are a law firm* or conduct themselves as a law firm,* they may be regarded as a law firm* for purposes of these rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm,* as is the fact that they have mutual access to information concerning the clients they serve.

[2]   The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,* other than as a partner* or associate, or officer or shareholder, that is close, personal, continuous, and regular. Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed a member of a law firm* for purposes of these rules will also depend on the specific facts. (Compare *People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 [86 Cal.Rptr.2d 816] with *Chambers v. Kay* (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

2

*Fraud\**

[3]     When the terms "fraud"* or "fraudulent"* are used in these rules, it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer assisting in the perpetration of a fraud,* or otherwise frustrate the imposition of discipline on lawyers who engage in fraudulent* conduct.   The term "fraud"* or "fraudulent"* when used in these rules does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information.

*Informed Consent\* and Informed Written Consent\**

[4]     The communication necessary to obtain informed consent* or informed written consent* will vary according to the rule involved and the circumstances giving rise to the need to obtain consent.

*Screened\**

[5]     The purpose of screening* is to assure the affected client, former client, or prospective client that confidential information known* by the personally prohibited lawyer is neither disclosed to other law firm* lawyers or nonlawyer personnel nor used to the detriment of the person* to whom the duty of confidentiality is owed.   The personally prohibited lawyer shall acknowledge the obligation not to communicate with any of the other lawyers and nonlawyer personnel in the law firm* with respect to the matter.   Similarly, other lawyers and nonlawyer personnel in the law firm* who are working on the matter promptly shall be informed that the screening* is in place and that they may not communicate with the personally prohibited lawyer with respect to the matter.   Additional screening* measures that are appropriate for the particular matter will depend on the circumstances.   To implement, reinforce and remind all affected law firm* personnel of the presence of the screening,* it may be appropriate for the law firm* to undertake such procedures as a written* undertaking by the personally prohibited lawyer to avoid any communication with other law firm* personnel and any contact with any law firm* files or other materials relating to the matter, written* notice and instructions to all other law firm* personnel forbidding any communication with the personally prohibited lawyer relating to the matter, denial of access by that lawyer to law firm* files or other materials relating to the matter, and periodic reminders of the screen* to the personally prohibited lawyer and all other law firm* personnel.

[6]     In order to be effective, screening* measures must be implemented as soon as practical after a lawyer or law firm* knows* or reasonably should know* that there is a need for screening.*

3

RJN EXHIBIT 5



# The State Bar *of California*

## Rule 1.7 Conflict of Interest: Current Clients
## (Rule Approved by the Supreme Court, Effective November 1, 2018)

(a)   A lawyer shall not, without informed written consent* from each client and compliance with paragraph (d), represent a client if the representation is directly adverse to another client in the same or a separate matter.

(b)   A lawyer shall not, without informed written consent* from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person,* or by the lawyer's own interests.

(c)   Even when a significant risk requiring a lawyer to comply with paragraph (b) is not present, a lawyer shall not represent a client without written* disclosure of the relationship to the client and compliance with paragraph (d) where:

   (1)   the lawyer has, or knows* that another lawyer in the lawyer's firm* has, a legal, business, financial, professional, or personal relationship with or responsibility to a party or witness in the same matter; or

   (2)   the lawyer knows* or reasonably should know* that another party's lawyer is a spouse, parent, child, or sibling of the lawyer, lives with the lawyer, is a client of the lawyer or another lawyer in the lawyer's firm,* or has an intimate personal relationship with the lawyer.

(d)   Representation is permitted under this rule only if the lawyer complies with paragraphs (a), (b), and (c), and:

   (1)   the lawyer reasonably believes* that the lawyer will be able to provide competent and diligent representation to each affected client;

   (2)   the representation is not prohibited by law; and

   (3)   the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

(e)   For purposes of this rule, "matter" includes any judicial or other proceeding, application, request for a ruling or other determination, contract, transaction, claim, controversy, investigation, charge, accusation, arrest, or other deliberation, decision, or action that is focused on the interests of specific persons,* or a discrete and identifiable class of persons.*

## Comment

[1]   Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.   The duty of undivided loyalty to a current client prohibits

1

undertaking representation directly adverse to that client without that client's informed written consent.* Thus, absent consent, a lawyer may not act as an advocate in one matter against a person* the lawyer represents in some other matter, even when the matters are wholly unrelated. (See *Flatt v. Superior Court* (1994) 9 Cal.4th 275 [36 Cal.Rptr.2d 537].) A directly adverse conflict under paragraph (a) can arise in a number of ways, for example, when: (i) a lawyer accepts representation of more than one client in a matter in which the interests of the clients actually conflict; (ii) a lawyer, while representing a client, accepts in another matter the representation of a person* who, in the first matter, is directly adverse to the lawyer's client; or (iii) a lawyer accepts representation of a person* in a matter in which an opposing party is a client of the lawyer or the lawyer's law firm.* Similarly, direct adversity can arise when a lawyer cross-examines a non-party witness who is the lawyer's client in another matter, if the examination is likely to harm or embarrass the witness. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require informed written consent* of the respective clients.

[2]     Paragraphs (a) and (b) apply to all types of legal representations, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the formation of a partnership for several partners* or a corporation for several shareholders, the preparation of a pre-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an "uncontested" marital dissolution. If a lawyer initially represents multiple clients with the informed written consent* as required under paragraph (b), and circumstances later develop indicating that direct adversity exists between the clients, the lawyer must obtain further informed written consent* of the clients under paragraph (a).

[3]     In *State Farm Mutual Automobile Insurance Company v. Federal Insurance Company* (1999) 72 Cal.App.4th 1422 [86 Cal.Rptr.2d 20], the court held that paragraph (C)(3) of predecessor rule 3-310 was violated when a lawyer, retained by an insurer to defend one suit, and while that suit was still pending, filed a direct action against the same insurer in an unrelated action without securing the insurer's consent. Notwithstanding *State Farm*, paragraph (a) does not apply with respect to the relationship between an insurer and a lawyer when, in each matter, the insurer's interest is only as an indemnity provider and not as a direct party to the action.

[4]     Even where there is no direct adversity, a conflict of interest requiring informed written consent* under paragraph (b) exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal. For example, a lawyer's obligations to two or more clients in the same matter, such as several individuals seeking to form a joint venture, may materially limit the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the other clients. The risk is that the lawyer may not be

2

able to offer alternatives that would otherwise be available to each of the clients.  The mere possibility of subsequent harm does not itself require disclosure and informed written consent.*  The critical questions are the likelihood that a difference in interests exists or will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably* should be pursued on behalf of each client.  The risk that the lawyer's representation may be materially limited may also arise from present or past relationships between the lawyer, or another member of the lawyer's firm*, with a party, a witness, or another person* who may be affected substantially by the resolution of the matter.

[5]     Paragraph (c) requires written* disclosure of any of the specified relationships even if there is not a significant risk the relationship will materially limit the lawyer's representation of the client.   However, if the particular circumstances present a significant risk the relationship will materially limit the lawyer's representation of the client, informed written consent* is required under paragraph (b).

[6]     Ordinarily paragraphs (a) and (b) will not require informed written consent* simply because a lawyer takes inconsistent legal positions in different tribunals* at different times on behalf of different clients.  Advocating a legal position on behalf of a client that might create precedent adverse to the interests of another client represented by a lawyer in an unrelated matter is not sufficient, standing alone, to create a conflict of interest requiring informed written consent.*  Informed written consent* may be required, however, if there is a significant risk that: (i) the lawyer may temper the lawyer's advocacy on behalf of one client out of concern about creating precedent adverse to the interest of another client; or (ii) the lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case, for example, when a decision favoring one client will create a precedent likely to seriously weaken the position taken on behalf of the other client.  Factors relevant in determining whether the clients' informed written consent* is required include: the courts and jurisdictions where the different cases are pending, whether a ruling in one case would have a precedential effect on the other case, whether the legal question is substantive or procedural, the temporal relationship between the matters, the significance of the legal question to the immediate and long-term interests of the clients involved, and the clients' reasonable* expectations in retaining the lawyer.

[7]     Other rules and laws may preclude the disclosures necessary to obtain the informed written consent* or provide the information required to permit representation under this rule.  (See, e.g., Bus. & Prof. Code, § 6068, subd. (e)(1) and rule 1.6.)  If such disclosure is precluded, representation subject to paragraph (a), (b), or (c) of this rule is likewise precluded.

[8]     Paragraph (d) imposes conditions that must be satisfied even if informed written consent* is obtained as required by paragraphs (a) or (b) or the lawyer has informed the client in writing* as required by paragraph (c).  There are some matters in which the conflicts are such that even informed written consent* may not suffice to permit representation.  (See *Woods v. Superior Court* (1983) 149 Cal.App.3d 931 [197 Cal.Rptr.

3

185]; *Klemm v. Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; *Ishmael v. Millington* (1966) 241 Cal.App.2d 520 [50 Cal.Rptr. 592].)

[9]     This rule does not preclude an informed written consent* to a future conflict in compliance with applicable case law.   The effectiveness of an advance consent is generally determined by the extent to which the client reasonably* understands the material risks that the consent entails.  The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably* foreseeable adverse consequences to the client of those representations, the greater the likelihood that the client will have the requisite understanding.  The experience and sophistication of the client giving consent, as well as whether the client is independently represented in connection with giving consent, are also relevant in determining whether the client reasonably* understands the risks involved in giving consent.  An advance consent cannot be effective if the circumstances that materialize in the future make the conflict nonconsentable under paragraph (d).  A lawyer who obtains from a client an advance consent that complies with this rule will have all the duties of a lawyer to that client except as expressly limited by the consent.  A lawyer cannot obtain an advance consent to incompetent representation. (See rule 1.8.8.)

[10]     A material change in circumstances relevant to application of this rule may trigger a requirement to make new disclosures and, where applicable, obtain new informed written consents.*  In the absence of such consents, depending on the circumstances, the lawyer may have the option to withdraw from one or more of the representations in order to avoid the conflict.  The lawyer must seek court approval where necessary and take steps to minimize harm to the clients.  See rule 1.16.  The lawyer must continue to protect the confidences of the clients from whose representation the lawyer has withdrawn. (See rule 1.9(c).)

[11]     For special rules governing membership in a legal service organization, see rule 6.3; and for work in conjunction with certain limited legal services programs, see rule 6.5.

4

RJN EXHIBIT 6

# The State Bar *of California*

**Rule 4.1 Truthfulness in Statements to Others**
**(Rule Approved by the Supreme Court, Effective November 1, 2018)**

In the course of representing a client a lawyer shall not knowingly:*

(a)     make a false statement of material fact or law to a third person;* or

(b)     fail to disclose a material fact to a third person* when disclosure is necessary to avoid assisting a criminal or fraudulent* act by a client, unless disclosure is prohibited by Business and Professions Code section 6068, subdivision (e)(1) or rule 1.6.

## Comment

[1]     A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts.  A misrepresentation can occur if the lawyer incorporates or affirms the truth of a statement of another person* that the lawyer knows* is false.  However, in drafting an agreement or other document on behalf of a client, a lawyer does not necessarily affirm or vouch for the truthfulness of representations made by the client in the agreement or document.  A nondisclosure can be the equivalent of a false statement of material fact or law under paragraph (a) where a lawyer makes a partially true but misleading material statement or material omission.  In addition to this rule, lawyers remain bound by Business and Professions Code section 6106 and rule 8.4.

[2]     This rule refers to statements of fact.  Whether a particular statement should be regarded as one of fact can depend on the circumstances.  For example, in negotiation, certain types of statements ordinarily are not taken as statements of material fact.  Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are ordinarily in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.*

[3]     Under rule 1.2.1, a lawyer is prohibited from counseling or assisting a client in conduct that the lawyer knows* is criminal or fraudulent.*  See rule 1.4(a)(4) regarding a lawyer's obligation to consult with the client about limitations on the lawyer's conduct.  In some circumstances, a lawyer can avoid assisting a client's crime or fraud* by withdrawing from the representation in compliance with rule 1.16.

[4]     Regarding a lawyer's involvement in lawful covert activity in the investigation of violations of law, see rule 8.4, Comment [5].

3:23-0164-BAS-DDL
RJN ISO Rule 11 Motion Ex. 6  p. 001