1  Justin S. Beck
   3501 Roselle St.,
2  Oceanside, CA 92056
   760-449-2509
3  justintimesd@gmail.com
4  *In Propria Persona*

FILED

MAR 3 0 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

5

6
## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

7  JUSTIN S. BECK,

8              Plaintiff,

9       vs.

10
11 STATE OF CALIFORNIA; THE STATE BAR
   OF CALIFORNIA; SUZANNE GRANDT;
12 RUBEN DURAN; ELI DAVID
   MORGENSTERN; KENNETH
13 CATANZARITE,

14             Defendants,

15

16 UNITED STATES ATTORNEY GENERAL;
   UNITED STATES OF AMERICA
17

18             Nominal Defendants

19

20

21

22

23

24

25

26

27

28

)  Case No.: 3:23-CV-0164-AGS-DDL
)
)  Judge:      Hon. Andrew G. Schopler
)
)  **PLAINTIFF JUSTIN S. BECK'S**
)  **OPPOSITION TO STATE BAR**
)  **DEFENDANTS' MOTION TO DISMISS,**
)  **STATE OF CALIFORNIA JOINDER**
)  **THERETO, MEMORANDUM OF**
)  **POINTS AND AUTHORITIES IN**
)  **SUPPORT THEREOF**
)
)  Filed Concurrently With:
)
)    Request for Judicial Notice
)
)
)
)  Hearing Date: April 24, 2023

NO ORAL ARGUMENT UNNLESS
ORDERED BY THE COURT

Action Filed: January 30, 2023

Trial Date:   None Set

i                                    3:23-CV-0164-AGS-DDL

1

TABLE OF CONTENTS

2    I.   INTRODUCTION..........................................................................1

3    II.   LEGAL STANDARD.....................................................................2

4     A. Federal Rules of Civil Procedure 8(a)(2) and 8(d)(1)

5     B. Federal Rules of Civil Procedure 9(b)

6     C. Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(d)

7    III.   BACKGROUND..................................................................3-5

8     A. The State Bar of California is "Not the Sovereign," Nor its Actors by Extension

9      1. *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015

10     2. California Supreme Court Administrative Order 2017-09-20 & FTC Guidance

11     3. State Assembly Bill 3249, Ch. 659 Clearly Applied Fed. Antitrust Law to State Bar

12    B. The Eleventh Amendment is Irrelevant to the Instant Case for Non-Diverse Plaintiff

13     1. Eleventh Amendment is Moot for Non-Diverse Plaintiff with Permission to Sue State

14     2. State's Conduct for and with State Bar Defendants is Illegal under Federal Law

15     3. State Refuses to Appear in Superior Court of California Since May 2, 2022

16     4. Eleventh Amendment Does Not Bar Suit Against Duran, Grandt, or Morgenstern

17     5. State Bar Accepted Federal Funds and is Alleged to Defraud the United States

18   IV.   ARGUMENT.............................................................6-20

19    A. If FAC, RICO Case Statement Need Amendments, it is Not Dispositive of Any Claim

20     1. It is Improper to Request Dismissal for Purported Deficiencies of FAC, Supplement

21     2. A Short and Plain Statement will Not Suffice for RICO or Antitrust Based on Fraud

22     3. Majority Active Market Participant Controlled State Bar Led by Duran Allegations

23     4. Best Best & Krieger Partner Ruben Duran, Chairman of State Bar Allegations

24     5. Active Market Participant Attorney Suzanne Grandt Allegations

25     6. Active Market Participant Attorney Eli David Morgenstern Allegations

26    B. U.S. District Court's Subject Matter Jurisdiction for RICO, Antitrust, U.S. Constitution

27     1. U.S. District Court Jurisdiction for Antitrust Violations (Injunctions & Damages)

28     2. U.S. District Court Jurisdiction for RICO Violations (Injunctions & Damages)

ii

3:23-CV-0164-AGS-DDL

3. U.S. District Court Jurisdiction for Claims Arising from U.S. Constitution

4. For Prospective Injunctive Relief Against Individuals, Ex Parte Young is Instructive

5. State of California's Enablement of Unlawful Conduct Does Not Make it Legal

6. *Respondeat Superior* Liability for State of California for its Non-Sovereign Actors

7. Plaintiff Outside State Bar Jurisdiction; FAC Does Not Seek State Bar Court Discipline

**C. FAC and Supplement Do Not Fail to Allege Sufficient Facts to State a Claim**

1. Pattern of Racketeering Activity Includes Convictions of Related Conduct

2. Enterprise Operation Descriptions (All Associated in Fact to State Bar Defendants)

3. FAC and Supplement Contain More than Formulaic Recitation of Elements

4. Four Fraudulent Schemes Associated with State Bar Defendants' Predicate Acts

5. Plaintiff's Constitutional Claims Conform to F.R.Civ.P. 8(a)

6. For Damages, Plaintiff Offers Explanations in Supplement, Proof in Related Case

7. Court Must Establish Briefing Schedule Under F.R.Civ.P. 12(d) and F.R.Civ.P. 56

**V.    CONCLUSION** ....................................................................................................20

iii

3:23-CV-0164-AGS-DDL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

### Statutes & Rules—State

Cal. Gov. Cod. § 815(a) .......................................................................*passim*

    Except as Provided by Statute (e.g., RICO), State Bar & State Are Immune from Tort Claims

Cal. Gov. Cod. § 815.2.........................................................................14

    Statute Causing *Respondeat Superior* Liability for Duran, Grandt, Morgenstern

Cal. Gov. Cod. § 815.3.........................................................................14

    Statute Causing *Respondeat Superior* Liability for Intentional Torts & Crimes

Cal. Gov. Cod. § 815.6.........................................................................14

    Statute Causing State, State Bar Liability for Violating Mandatory Enactments

Cal. Rul. Prof. Cond. 1.7(d)(3) ..............................................................*passim*

    Un-waivable Conflicts of Interest for Office of General Counsel, Ruben Duran, BB&K

### Cases—Federal

*Ashcroft v. Iqbal,* ...............................................................................2, 18

    556 U.S. 662, 679, 129 S.Ct. 1937, 1950, 173 L.Ed. 2d 868 (2009)

*Ashker v. Cal. Dep't of Corr.,* .................................................................5

    112 F.3d 392, 394–95 (9th Cir. 1997)

*Bell Atlantic Corp. v. Twombly,* ..............................................................2

    550 U.S. 544, 555 (2007)

*Bell* v. *Hood,* ......................................................................................1

    327 U.S. 678, 682 (1946)

*Bolling v. Sharpe,* ................................................................................5

    347 U.S. 497, (1954)

*Bray* v. *Alexandria Women's Health Clinic,* .................................................11

    506 U.S. 263, 285 (1993)

*Bui v. Nguyen,* ....................................................................................15

    712 Fed. Appx. 606, 609 (9th Cir. 2017)

*Burgert v. Lokelani Bernice Pauahi Bishop Trust*, ....................................................2
     200 F.3d 661, 663 (9th Cir. 2000)

*California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, ...........................................1
     445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)

*Chisholm Ex'r. v. Georgia*, .................................................................................*passim*
     2 U.S. 419, (1793)

*City of San Jose v. Superior Court* (Lands Unlimited), ...............................................6
     12 Cal. 3d 447, 455 (1974)

*Conley v. Gibson*, ......................................................................................2
     355 U.S. 41, 47, 78 S.Ct. 99, 103, 2L.Ed. 2d. 80 (1957)

*Cornel v. Hawaii*, ...........................................................................................5
     37 F.4th 527, 531 (9th Cir. 2022)

*Diaz v. Int'l Longshore and Warehouse Union, Local 13*, ...........................................7
     474 F.3d 1202, 1205 (9th Cir. 2007)

*Ex parte Young*, ........................................................................................13
     209 U.S. 123 (1908)

*FTC v. Phoebe Putney Health System, Inc.*, ...........................................................1
     568 U.S. 216, 225, 133 S.Ct. 1003, 1010, 185 L.Ed.2d 43 (2013)

*FTC v. Ticor Title Ins*, .....................................................................................1
     504 U.S. 636 (1992)

*Gilligan v. Jamco Dev. Corp.*, .........................................................................7
     108 F.3d 246, 248-49 (9th Cir. 1997)

*Goldfarb v. Virginia State Bar*, ........................................................................1
     421 U.S. 773, 791, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)

*Hafer v. Melo*, ............................................................................................5
     502 U.S. 21, 30–31 (1991)

*Hook v. Idaho*, ..............................................................................................1
     1:21-cv-00199-BLW, 3 (D. Idaho Feb. 4, 2022)

*Hoover v. Ronwin,* ..................................................................................................1, 14

      567–568, 104 S.Ct. 1989

*Lipton v. Pathogenesis Corp.,* ................................................................................7

      284 F.3d 1027, 1039 (9th Cir. 2002)

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,* .......................................19

      431 F.3d 353, 361 (9th Cir. 2005)

*Lovell v. Chandler* ...................................................................................................5

      303 F.3d at 1051

*Miranda v. Ponce Federal Bank,* ............................................................................6

      948 F.2d 41, 44 n.3 (1st Cir. 1991)

*Mitchell v. Washington,* ...........................................................................................5

      818 F.3d 436, 442 (9th Cir. 2016)

*Montana-Dakota Util. Co. v. Northwestern Public Service Co.,* ...........................11

      341 U.S. 246, 249 (1951)

*N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n,* ..........................1, 3, 14

      574 U.S. 494, 503-5 (2015)

*Oneida Indian Nation of N. Y. v. County of Oneida,* ............................................11

      414 U.S. 661, 666 (1974)

*Pelayo v. Nestle USA, Inc. et al.,* .............................................................................2

      989 F.Supp.2d 973 978 (C.D.Cal. 2013)

*Pena v. Gardner,* .....................................................................................................5

      976 F.2d 469, 472 (9th Cir. 1992)

*Parker v. Brown,* ...........................................................................................1, 3, 4, 14

      317 U.S., at 350–351, 63 S.Ct. 307

*Porter v. Jones,* .......................................................................................................5

      319 F.3d 483, 491 (9th Cir. 2003)

*Romano v. Bible,* .....................................................................................................5

      169 F.3d 1182, 1186 (9th Cir. 1999)

3:23-CV-0164-AGS-DDL

*Romero* v. *International Terminal Operating Co.,* ................................................11

    358 U.S. 354, 359 (1959)

*The Fair* v. *Kohler Die & Specialty Co.* ..............................................................11

    228 U.S. 22, 25 (1913)

*United States v. Topco Associates, Inc.* ...............................................................3

    ,405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)

*United States v. Weaver,* ......................................................................................15

    860 F.3d 90, 94 (2nd Cir. 2017)

*Vinson v. Thomas,* ..................................................................................................5

    288 F.3d 1145, 1151 (9th Cir. 2002)

*Wool v. Tandem Computers, Inc.* ..........................................................................2

    818 F.2d 1433, 1439 (9th Cir. 1987)

<u>Statutes & Rules—Federal</u>

Eleventh Amendment, ............................................................................4, 9, 19, 20

    U.S. Constitution

15 U.S.C. § 1................................................................................................*passim*

    Sherman Act

15 U.S.C. § 4.........................................................................................................12

    Federal Jurisdiction for Antitrust Injunctions

15 U.S.C. § 15.......................................................................................................12

    Federal Jurisdiction for Sherman Act & Clayton Act Damages Claims

18 U.S.C. § 1346..........................................................................................*passim*

    Fraudulent Scheme Includes Intangible Right to Good and Honest Services in Government

18 U.S.C. § 1503(a) .............................................................................................17

    Obstruction of Justice

18 U.S.C. § 1962(a)-(d) .........................................................................8, 12, 13, 15

    RICO Code Sections

18 U.S.C. § 1964(a) ..............................................................................12

      U.S. District Court Authority to Prevent, Restrain, Enforce RICO

18 U.S.C. § 1964(b) ..............................................................................12

      U.S. Attorney General Authority to Prosecute RICO on Plaintiff Demand

18 U.S.C. § 1964(c) ..............................................................................13

      Federal Jurisdiction for RICO Claims

18 U.S.C. § 1968...................................................................................7

      U.S. Attorney General Procedures for Racketeering Investigation Demand of Plaintiff

18 U.S.C. § 1331...........................................................................*passim*

      U.S. District Court Jurisdiction for Claims Arising from U.S. Law Violations, Constitution

18 U.S.C. § 1367...........................................................................*passim*

      Supplemental Jurisdiction for U.S. District Court on Non-RICO, Non-Antitrust Claims

F.R.Civ.P. 8(a)..............................................................................2, 20

      Pleading Standards (Non-Fraud or Mistake)

F.R.Civ.P. 8(a)(2) .........................................................................2, 20

      Pleading Standards (Non-Fraud or Mistake)

F.R.Civ.P. 8(d)(1) .............................................................................2

      Pleading Standards (Simple, Concise, Direct)

F.R.Civ.P. 9(b) .........................................................................2, 7, 15

      Pleading Standards (Fraud or Mistake Specificity)

F.R.Civ.P. 11....................................................................................20

      U.S. District Court Procedures for Sanctioning Motion to Dismiss

F.R.Civ.P. 12(b)(1) ....................................................................2, 7, 15

      Motion to Dismiss for Subject Matter Jurisdiction

F.R.Civ.P. 12(b)(6) ..........................................................................20

      Motion to Dismiss for Inability to State a Claim

3:23-CV-0164-AGS-DDL

1   F.R.Civ.P. 12(d)..............................................................................2, 20
2       Conversion of Motion to Dismiss to Summary Judgment; Parties Right to present Pertinent
3       Material under F.R.Civ.P. 56
4   F.R.Civ.P. 56..................................................................................2, 20
5       Motion for Summary Judgment
6                                   Other Authorities
7   California State Assembly Bill AB 3249, Chapter 659...............................4, 10, 11, 13
8       Effective January 1, 2019
9   University of Pennsylvania Law Review, Vol. 169, February 2021, No. 3...................4, 5
10      The Misunderstood Eleventh Amendment. William Baude & Stephen E. Sachs.
11  C. Wright & A. Miller, Federal Practice and Procedure ...................................11
12      §1350, p. 196, n. 8 and cases cited (2d ed. 1990)
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

"[T]he Court in *Parker v. Brown* interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity. See 317 U.S., at 350–351, 63 S.Ct. 307. *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, 503 (2015). "In this case [State Bar defendants] argue[] its members were invested by [California] with the power of the State and that, as a result, [State Bar defendants'] actions are cloaked with *Parker* immunity. This argument fails, however. A nonsovereign actor controlled by active market participants—such as [State Bar defendants]—enjoys *Parker* immunity only if it satisfies two requirements: "first that 'the challenged restraint ... be one clearly articulated and affirmatively expressed as state policy,' and second that 'the policy ... be actively supervised by the State.' " *FTC v. Phoebe Putney Health System, Inc.,*568 U.S. 216, 225, 133 S.Ct. 1003, 1010, 185 L.Ed.2d 43 (2013) (quoting *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) ).

"But while the Sherman Act confers immunity on the States' own anticompetitive policies out of respect for federalism, it does not always confer immunity where, as here, a State delegates control over a market to a nonsovereign actor." See *Parker, supra,* at 351, 63 S.Ct. 307 ("[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful"). For purposes of *Parker,* a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself. See *Hoover, supra,* at 567–568, 104 S.Ct. 1989. State agencies are not simply by their governmental character sovereign actors for purposes of state-action immunity. See *Goldfarb v. Virginia State Bar,*421 U.S. 773, 791, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) ("The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of [State actors, State Bar defendants nor Catanzarite]"). Immunity for state agencies, therefore, requires more than a mere facade of state involvement, for it is necessary in light of *Parker* 's rationale to ensure the States accept political accountability for anticompetitive conduct they permit and control." See *FTC v. Ticor Title Ins,* 504 U.S. 636 (1992). *N.C. State Bd., supra,* 574 U.S. 494, 504-5 (2015).

The supplemented FAC alleges serial fraud by public, private attorneys. To the extent the Motion to Dismiss can be understood, what is disputed is the sovereignty of such conduct against the public.

3:23-CV-0164-AGS-DDL

1  **II.    LEGAL STANDARD**

2      **A. Federal Rules of Civil Procedure 8(a)(2) and 8(d)(1)**

3      F.R.Civ.P. 8(a)(2)'s purpose is to "give the defendant fair notice of what the…claim is and the

4  grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*

5  *v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2L.Ed. 2d. 80 (1957). For claims that do not involve fraud

6  or mistake, Plaintiff need only plead a "short and plain statement of the claim showing the pleader is

7  entitled to relief." F.R.Civ.P. 8(a). (A short and plain statement will not suffice for fraud, however).

8      **B. Federal Rules of Civil Procedure 9(b)**

9      The FAC and supplemental RICO Case Statement at Docket #9 "is sufficient under rule 9(b) if

10 it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer

11 from the allegations. While statements of the time, place, and nature of the alleged fraudulent activities

12 are sufficient, mere conclusory allegations of fraud are insufficient." *Wool v. Tandem Computers, Inc.*

13 818 F.2d 1433, 1439 (9th Cir. 1987). "The question of whether a business practice is deceptive in most

14 cases presents a question of fact not amenable to resolution on a motion to dismiss." *Pelayo v. Nestle*

15 *USA, Inc. et al.*, 989 F.Supp.2d 973 978 (C.D.Cal. 2013). (Fraud is thus improper for dismissal, here).

16     **C. Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(d)**

17     F.R.Civ.P. 12(b)(1) allows a party to assert "lack of subject-matter jurisdiction," whereas

18 F.R.Civ.P. 12(b)(6) allows a party to assert "failure to state a claim upon which relief can be claimed"

19 by motion. Quoting *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000),

20 "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the

21 nonmoving party" (Plaintiff). "A court considering a motion to dismiss can choose to begin by

22 identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption

23 of truth. While legal conclusions can provide the framework of a complaint, they must be supported by

24 factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity

25 and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556

26 U.S. 662, 679, 129 S.Ct. 1937, 1950, 173 L.Ed. 2d 868 (2009). F.R.Civ.P. 12(d) converts the Motion to

27 Dismiss into one for summary judgment under Rule 56 if "matters outside the pleadings are presented

28 to and not excluded by the Court," as here, granting all parties opportunity to present pertinent material.

3:23-CV-0164-AGS-DDL

1   **III.    BACKGROUND**

2   **A. The State Bar of California is "Not the Sovereign," Nor its Actors by Extension**

3       1. _N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n, 574 U.S. 494, (2015_

4   "Federal antitrust law…is "as important to the preservation of economic freedom and our free-

5   enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." _United_

6   _States v. Topco Associates, Inc.,_ 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). "The antitrust

7   laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing,

8   and other combinations or practices that undermine the free market." _N.C. State Bd. of Dental Examiners_

9   _v. Fed. Trade Comm'n_, 574 U.S. 494, 502 (2015) "[T]he Court in _Parker v. Brown_ interpreted the

10  antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign

11  capacity. See 317 U.S., at 350–351, 63 S.Ct. 307." _N.C. State Bd. of Dental Examiners v. Fed. Trade_

12  _Comm'n_, 574 U.S. 494, 503 (2015). (This law protects Plaintiff, _not_ State Bar defendants nor State).

13      2. California Supreme Court Administrative Order 2017-09-20 & FTC Guidance

14  "In North Carolina State Board of Dental Examiners, the Supreme Court **reaffirmed** that a state

15  **regulatory board is not the sovereign.** [emph.] _Accordingly_, a state regulatory board is not necessarily

16  exempt from federal antitrust liability." Request for Judicial Notice, Ex. 1, p. 4. ("RJN"). "Actions of

17  the State Bar that have the effect of advancing the interests of attorneys without a clear benefit to the

18  public must be scrutinized closely for potential antitrust violations." Motion to Dismiss, RJN, Ex. 1, p.

19  4. "If an action of a regulatory agency such as the State Bar has a potential anticompetitive effect, and

20  is not an action of the Supreme Court or the Legislature acting as sovereign, closer analysis will be

21  required. Under these circumstances, antitrust immunity is available only if the regulatory entity's action

22  is subject to _active state supervision_ and is undertaken pursuant to a _clearly articulated policy_." Ibid.

23      3. State Assembly Bill 3249, Ch. 659 Clearly Applied Fed. Antitrust Law to State Bar

24  Assembly Bill No. 3249, Chapter 659 amended State Bar Act to conform with Federal antitrust

25  laws. RJN, Ex. 2, p. 1. "(2) The act **requires** protection of the public to be the highest priority for the

26  State Bar and the board of trustees in exercising their licensing, regulatory, and disciplinary

27  functions…This bill would eliminate the authorization of the board to aid in all matters that may advance

28  the professional interests of the members of the State Bar." Id., p. 2. (It became law January 1, 2019.)

**B. The Eleventh Amendment is Irrelevant to the Instant Case for Non-Diverse Plaintiff**

1. <u>Eleventh Amendment is Moot for Non-Diverse Plaintiff with Permission to Sue State</u>

"The Eleventh Amendment might be the most misunderstood amendment to the Constitution. Both its friends and enemies have treated the Amendment's written text, and the unwritten doctrines of state sovereign immunity, as one and the same—reading broad principles into its precise words, or treating the written Amendment as merely illustrative of unwritten doctrines. The result is a bewildering forest of case law, which takes neither the words nor the doctrines seriously." University of Pennsylvania Law Review, Vol. 169: 609. RJN, Ex. 7, p. 1-2. "The truth is simpler: the Eleventh Amendment means what it says. It strips the federal government of judicial power over suits against states, in law or equity, brought by diverse plaintiffs. It denies subject-matter jurisdiction in all such cases, to federal claims as well as state ones, and in only such cases." Ibid. "By the same token, the Eleventh Amendment *does not* mean what it *does not* say." Id. at p. 613. RJN, Ex. 7, p. 5. The Amendment restricts suits by diverse plaintiffs, **and only by diverse plaintiffs**." ." RJN, Ex. 7, p. 15-16. (*Not* Plaintiff with rights to sue.)

2. <u>State's Conduct for and with State Bar Defendants is Illegal under Federal Law</u>

As we learned in *Parker, supra,* at 351, 63 S.Ct. 307 ("[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, **or by declaring that their action is lawful**".) [emph.] State Bar defendants assert themselves to be sovereign, which is patently false thus estopping all immunities State Bar defendants rely upon – and State cannot grant State Bar defendants authority to engage in conduct violative of U.S. antitrust law against non-attorneys just because it says so or prefers it that way. (Public *needs* U.S. protection from State and State Bar defendants' conduct.)

3. <u>State Refuses to Appear in Superior Court of California Since May 2, 2022</u>

Defendant since May 2, 2022, in Orange County Superior Court Case No. 30-2021-01237499 and since August 8, 2022, in Case No. 30-2020-01145998, State of California refuses to appear despite repeated physical and electronic service in both cases. RJN, Ex. 7. 8. Orange County Superior Court is an enterprise defendant in related case 3:22-CV-01616-AGS-DDL. Plaintiff alleges overt nominations of Court of Appeal justices on specific dates of State litigation to obstruct it. Due process violations against Plaintiff by State of California invoke *Bolling v. Sharpe*, 347 U.S. 497, (1954). Plaintiff cannot be denied forum where State allegedly abuses sovereignty to steal from the public and defraud the U.S.

### 4. Eleventh Amendment Does Not Bar Suits Against Duran, Grandt, or Morgenstern

The Eleventh Amendment does not bar suits seeking damages against state officials in their personal capacity. *See Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022) ("[P]laintiffs may seek damages against a state official in his personal capacity."); *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991); *Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir. 2016) (stating the Eleventh Amendment does not "bar claims for damages against state officials in their *personal* capacities"); *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003); *Ashker v. Cal. Dep't of Corr.*, 112 F.3d 392, 394–95 (9th Cir. 1997); *Pena v. Gardner*, 976 F.2d 469, 472 (9th Cir. 1992) (per curiam). "[W]hen a plaintiff sues a defendant for damages, there is a presumption that he is seeking damages against the defendant in his personal capacity." *Mitchell*, 818 F.3d at 442 (citing *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999).)

### 5. State Bar Accepted Federal Funds and is Alleged to Defraud the United States

The State Bar of California announced it accepted $20 million from the U.S. government on July 13, 2022, which it used to pay active market participants. (Supplement, pp. 54-5) The 9th Circuit addressed the issue, "reaffirming…precedent that a State waives Eleventh Amendment immunity by accepting federal funds. *Vinson v. Thomas*, 288 F.3d 1145, 1151 (9th Cir. 2002) (reaffirming *Douglas's* holding that by accepting federal funds, a state waives its sovereign immunity); *Lovell*, 303 F.3d at 1051.

Plaintiff alleges State of California is abusing sovereignty by allowing The State Bar of California to defraud U.S. citizens under color of law amidst $3.63 trillion in U.S. GDP. (Id., pp. 76-7). "State of California is a passive participant in that it benefits from the alleged fraud against the United States government through the conduct of The State Bar of California enterprise against national insurance carriers, student loan programs, Medicare, and through the appearance by The State Bar of California enterprise constituents *pro hac vice* in 49 other States." (Id. p. 78). It…controls a large percentage of the national market for legal education. Where it is alleged The State Bar of California is corrupted and commingled with State of California, this is allegedly defrauding the United States as underwriter for student loans for legal [students] controlled by the same racketeering activity." (Id. p. 89). "State of California is a passive participant in that it refuses to place active supervision over The State Bar of California as defined by federal antitrust laws and FTC guidance after 2015." (Id. p. 78).

5

1

## IV.    ARGUMENT

2         State Bar defendants offer no on-point case or logical argument in seeking wholesale dismissal
3  of Plaintiff's claims. Motion to Dismiss, Table of Authorities. To summarize Plaintiff's position in
4  opposition: 1) State Bar defendants are not sovereign actors in their official capacity, which is not subject
5  to debate; 2) State Bar defendants fail to address individual allegations whatsoever; 3) Plaintiff is not an
6  attorney rendering most cases cited irrelevant; 4) Plaintiff filed a RICO Case Statement, *Miranda v.*
7  *Ponce Federal Bank*, 948 F.2d 41, 44 n.3 (1st Cir. 1991) (a RICO Case Statement will be treated as an
8  extension of the complaint); 5) Plaintiff offers plain statement legal conclusions to provide framework
9  for the complaint, and factual allegations to support the framework in pleading with further description
10 in the RICO Case Statement as an extension of the FAC; 6) Plaintiff pleads clearly established
11 constitutional rights and bad faith actions violative of those rights to defeat sovereign immunities were
12 they available, which they are not; 7) Plaintiff is a non-diverse citizen of California suing the State with
13 permission where all claims arise from State's enablement of antitrust violations by active market
14 participants causing either direct or *respondeat superior* liability; 8) Plaintiff has permission to sue the
15 government, and his claims lie in alleged abuse and control of State Courts where State of California
16 *refuses to appear[1]*; 9) Plaintiff pleads patterns of racketeering associating more than one non-sovereign
17 enterprise including convictions for related activity, and open-ended threat of continuity. FAC, p. 11-2.
18        If anything, State Bar defendants have effectively argued for Plaintiff's right to amend his
19 complaint if it does not yet satisfy the Court when read with its RICO Case Statement. ECF #9. State
20 Bar defendants argue sufficiently why it is far too early to consider immunities that require a showing
21 of elements that cannot be ascertained at this stage (indeed, not even Supreme Court Justices, nor
22 President of the United States, would succeed on the Motion to Dismiss). State Bar defendants'
23 arguments hinge upon wide-reaching sovereignty that does not exist under binding decisional law of the
24 highest Court in the United States, while ignoring other binding laws and Legislative intent of State of
25 California as if that were reasonable. The Motion to Dismiss must be denied and should be sanctioned.

26 _____

27 [1] The purpose of the claim presentation requirement is "to provide the public entity sufficient
28 information to enable it to adequately investigate claims and to settle them, if appropriate, without the
expense of litigation." See *City of San Jose v. Superior Court* (Lands Unlimited), 12 Cal. 3d 447, 455
(1974). Despite State's service, State Bar defendant collusion denies Plaintiff due process within State.

3:23-CV-0164-AGS-DDL

**A. If FAC, RICO Case Statement Need Amendments, it is Not Dispositive of Any Claim**

      1. It is Improper to Request Dismissal for Purported Deficiencies of FAC, Supplement

The Ninth Circuit is particularly hostile to motions to dismiss under Rule 12(b)(6). *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997). ("The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim.") The Court does not have authority to dismiss the FAC and its supplemental RICO Case Statement at ECF #9 with prejudice. If the Court does not find them sufficient yet, Plaintiff must be granted opportunity to amend *until* they satisfy the Court as with the related case 3:22-CV-01616-AGS-DDL, which is not and will not be dispositive of his claims. "In exercising its discretion to summarily dismiss claims on its own motion or by motion of the defendants, the Court takes into consideration that, in any case, and more so in pro se cases, the law requires that plaintiffs be given an opportunity to amend their pleadings to remedy any deficiencies that were identified during screening or after a motion to dismiss has been adjudicated. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002) ("It is not unreasonable that plaintiffs may seek amendment after an adverse ruling, and in the normal course district courts should freely grant leave to amend when a viable case may be presented."). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citations omitted)." *Hook v. Idaho*, 1:21-cv-00199-BLW, 3 (D. Idaho Feb. 4, 2022) Plaintiff can't be denied due process yet again, here.

      2. A Short and Plain Statement will Not Suffice for RICO or Antitrust Based on Fraud

Plaintiff's FAC and supplemental RICO Case Statement must satisfy Rule 8 for Counts V, VI and VII, and 9(b) for fraud allegations underlying Count I, Count II, Count III, Count IV, and Count VII. State Bar defendants want Plaintiff's case dismissed because of the sheer volume of alleged, specific, fraud related and unrelated to Mr. Catanzarite. (To put it mildly, the conduct to which Plaintiff has been subject is voluminous, continuous, and shows an acute threat of continuing against Plaintiff and other innocent members of the public. This does not warrant dismissal just because State Bar defendants don't want to answer the specificity or veracity, if anything, it emphasizes the need for Attorney General of the United States to be named a party to this case—and dire need for federal intervention through at least racketeering investigations pursuant to 18 U.S.C. § 1968 as demanded).

3:23-CV-0164-AGS-DDL

### 3. Majority Active Market Participant Controlled State Bar Led by Duran Allegations

U.S. Supreme Court: **State Bar not the sovereign actor**. RJN, Ex. 1, p. 4. State Bar engaged in a fraudulent scheme. FAC, ¶ 2. State Bar was controlled by majority of active market participants. ¶ 11. Violations of 18 U.S.C. § 1962(a)-(c) cause liability to State Bar for Duran, Morgenstern, Grandt. ¶ 19. State Bar operates postal mail and wire facilities affecting interstate commerce. FAC, p. 8, ¶ 39. State Bar uses those facilities to defraud the public. Ibid. State Bar aided Girardi for forty years to conduct racketeering and participated in the proceeds. Supplement, p. 11-2, 19-20. State Bar participated in proceeds from other racketeering and reinvested it. Id, pp. 1-100. FAC, ¶ 202. State Bar confessed to its role with Girardi. Id, p. 21. Catanzarite is like Girardi. FAC, pp. 35-6. State Bar misrepresents the conduct of Catanzarite, even here, and conceals actual knowledge of his fraud. Motion to Dismiss. State Bar's racketeering activity shows a threat of continuing (open-ended). Id, ¶ 57. State Bar is associated with the KJC enterprise. FAC, p. 38, ¶¶ 163-5. State Bar is an enterprise. ¶ 199. State Bar's associated-in-fact components include its associated-in-fact attorneys. ¶ 200. State Bar used money from racketeering activity and reinvested it, knowing some was from racketeering. ¶ 202. Duran protects those attorneys among State Bar enterprise engaged in racketeering. ¶ 208. State Bar is associated in fact with MFS enterprise. ¶ 225-6. State Bar knew of patterns of racketeering activity but chose to carry them on willfully. ¶ 228. Duran, Morgenstern, and Grandt conduct led to control or maintenance of State Bar enterprise. ¶ 253-4. State Bar enterprise is described by Plaintiff. Supplement, p. 74-78, 80-89.

### 4. Best Best & Krieger Partner Ruben Duran, Chairman of State Bar Allegations

Duran is sued in his personal capacity for alleged crimes, torts, and constitutional violations. FAC, p. 9, ¶ 42. Duran is sued as partner of private law firm Best Best & Krieger. Ibid. Duran is sued as Chairman of Board of Trustees, whose activities affect $3.63 trillion in interstate commerce. Ibid. Duran receives payment from racketeering proceeds. Ibid. Duran's racketeering activity shows a threat of continuing (open-ended). Id, ¶ 57. Duran is associated with Kenneth Joseph Catanzarite enterprise. Supplement, p. 72-4. Duran is associated with, a principal of investing activity for, a perpetrator for, and victim of The State Bar of California enterprise. Id., p. 74-7. Duran is associated with Mobile Farming Systems, Inc. enterprise. Id., p. 78-80. Duran used the mail to deny Plaintiff's government claim but knew he would obstruct justice through control of California judiciary. Supplement, p. 49. With

3:23-CV-0164-AGS-DDL

knowledge of 2014 MTO investigation into State Bar leadership and Girardi-Keese compromise of State Bar and California judiciary, Duran used the wire January 24, 2022, to defraud the public. Id. p. 19. Duran overtly caused nomination and appointment of three Court of Appeal Associate Justices (Sanchez, Motoike, and Delaney) on five specific dates of Plaintiff's Government Claims Act litigation, which allegedly used wire, and intended to obstruct justice and defraud Plaintiff. Id., p. 48 re: Sanchez; p. 50 re: Motoike; p. 50-1; Delaney, p. 56-7. Beck Decl., Ex. 23, 25. Duran used the wire as part of the fraudulent scheme May 19, 2022, to discuss the scheme targeting Plaintiff. Supplement, p. 51. Duran used the wire July 13, 2022, as part of the fraudulent scheme, also disclosing he accepted funds from the United States as it relates to 11th Amendment. Id. p. 54-5. Duran, via Grandt, used the mail and wire to defraud Plaintiff July 20, 2022. Id., p. 56. Duran defrauded Plaintiff and Judge Gastelum in Orange County Superior Court August 18, 2022. Id. p. 57. Duran defrauded Plaintiff and Judge Gastelum again in Orange County Superior Court, and Gastelum relied on the misrepresentations of Duran to defraud Plaintiff. Id. p. 58. Plaintiff filed an antitrust petition against Duran after learning State Bar is not sovereign actor. Id., p. 59. By wire through Grandt, Duran and State Bar appeared before Judge Gastelum October 11, 2022, to defraud Plaintiff and Judge Gastelum. Id. p. 60-1. Duran caused Plaintiff's writ petition to be obstructed through overt appointments of Sanchez, Motoike, and Delaney and ex parte communications. Id., p. 61-2. Despite being served, Duran refused to appear in 30-2020-01145998 and denied Plaintiff discovery again. Id., p. 62-3. November 3, 2022, Duran used the wire to confess State Bar and Board of Trustees role with Girardi and carrying on his conduct for forty years. Id. p 21. After procuring an order to strike a complaint that has since been remedied in 3:22-CV-01616-AGS-DDL by Plaintiff on February 14, 2023, Duran, as being supervisor for Grandt, Tsai, and others, caused Orange County Superior Court to reject July 2022 evidence and filings in 30-2021-01237499 to further obstruct justice, defraud Plaintiff, and conceal the scheme on February 15, 2023. Id. p. 67.

### 5. Active Market Participant Attorney Suzanne Grandt Allegations

Grandt is sued in her personal capacity for alleged crimes, torts, and constitutional violations. Id., p. 41. She is also sued for her role in Office of General Counsel. Ibid. Grandt allegedly receives payment from racketeering proceeds. Ibid. Grandt's racketeering activity allegedly shows a threat of continuing (open-ended). Id, ¶ 57. Grandt is associated with Kenneth Joseph Catanzarite enterprise.

3:23-CV-0164-AGS-DDL

Supplement, p. 72-4. Grandt is associated with, perpetrator for, and victim of The State Bar of California enterprise. Id., p. 74-7. Grandt is associated with Mobile Farming Systems, Inc. enterprise. Id., p. 78-80. Grandt was promoted to Assistant General Counsel in July 2017 for her role in defrauding Federal Judge William Alsup with Robert Retana. FAC, p. 40, ¶ 177-8. Grandt knows a parallel scheme of the Kenneth Joseph Catanzarite enterprise starting with Richard Carlson defrauded innocent people and Courts. Supplement, p. 24-30. Grandt worked with Andresen May 31, 2022, to defraud Plaintiff and deny him due process. Id. p. 52-3. Grandt and Andresen propounded materially false statements of fact and law to defraud Plaintiff and Judge Gastelum June 2, 2022. Id. p. 53. Grandt used the wire to defraud Plaintiff and conceded to the scheme June 28, 2022. Id. p. 54. Duran, Grandt conceded July 20, 2022, Plaintiff was retaliated against, was denied due process of law, and that Duran, State Bar, Morgenstern, Cardona, were helping Catanzarite *because* Plaintiff sued State Bar. Id. p. 56. FAC, p. 33, ¶ 122. Grandt used the wire August 18, 2022, to defraud Plaintiff and Judge Gastelum on knowingly false pretenses of fact and law. Id. p. 57-8. Grandt used the wire again August 22, 2022, with Duran and Andresen to defraud Plaintiff and Gastelum, who relied upon the false representation of blanket immunity, and that State Bar did not coordinate decisions internally which she knew was false. Id. p. 58-9. Despite being served, Grandt refused to appear in 30-2020-01145998 and denied Plaintiff discovery again. Id., p. 62-3. Grandt disclosed collusion within State Bar among Duran, Cardona, Andresen, Wilson, then tried to cover it up and intimidate Plaintiff. FAC, p. 35, ¶ 130. Davtyan then doubled-down days later. Id. ¶ 131.

### 6. Active Market Participant Attorney Eli David Morgenstern Allegations

Morgenstern is sued in his personal capacity for alleged crimes, torts, and constitutional violations. Id., ¶ 43. He is also sued for his role as Senior Trial Counsel. Ibid. Morgenstern allegedly receives payment from racketeering proceeds. Ibid. Morgenstern's racketeering activity allegedly shows a threat of continuing (open-ended). Id, ¶ 57. Morgenstern is associated with Kenneth Joseph Catanzarite enterprise. Supplement, p. 72-4. Morgenstern delivered mail to Plaintiff April 3, 2020, intending to defraud him. FAC, p. 31, ¶ 117. Supplement, pp. 45-6. Morgenstern conspired with Office of General Counsel and Kenneth Joseph Catanzarite to defraud Plaintiff April 3, 2020, through August 10-12, 2020. FAC, p. 32, ¶¶ 118-9. Morgenstern is associated with, an alleged perpetrator for, and victim of The State Bar of California enterprise. Supplement., p. 74-7. Morgenstern is associated with Mobile Farming

1  Systems, Inc. enterprise. Id., p. 78-80. Through Grandt, Morgenstern propounded materially false
2  statements of fact and law to defraud Plaintiff and Judge Gastelum June 2, 2022. Id. p. 53. Through
3  Grandt, Morgenstern used the wire August 18, 2022, to defraud Plaintiff and Judge Gastelum on
4  knowingly false pretenses of fact and law. Id. p. 57-8. Through Grandt, Morgenstern used the wire again
5  August 22, 2022, with Duran and Andresen to defraud Plaintiff and Gastelum, who relied upon the false
6  representation of blanket immunity, and that State Bar did not coordinate decisions internally which he
7  knew was false. Id. p. 58-9. Despite being served, Morgenstern refused to appear in 30-2020-01145998
8  and denied Plaintiff discovery again. Id., p. 62-3.

9      **B. U.S. District Court's Subject Matter Jurisdiction for RICO, Antitrust, U.S. Constitution**

10      "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause
11  of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or
12  constitutional *power* to adjudicate the case. See generally 5A C. Wright & A. Miller, Federal Practice
13  and Procedure §1350, p. 196, n. 8 and cases cited (2d ed. 1990). As we stated in *Bell* v. *Hood,* 327 U.S.
14  678, 682 (1946), "[j]urisdiction … is not defeated … by the possibility that the averments might fail to
15  state a cause of action on which petitioners could actually recover." Rather, the District Court has
16  jurisdiction if "the right of petitioners to recover under their complaint will be sustained if the
17  Constitution and laws of the United States are given one construction and will be defeated if they are
18  given another," *id.*, at 685, unless the claim "clearly appears to be immaterial and made solely for the
19  purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.*, at
20  682—683; see also *Bray* v. *Alexandria Women's Health Clinic,* 506 U.S. 263, 285 (1993); *The
21  Fair* v. *Kohler Die & Specialty Co.,*228 U.S. 22, 25 (1913). Dismissal for lack of subject-matter
22  jurisdiction because of the inadequacy of the federal claim is proper only when the claim is "so
23  insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid
24  of merit as not to involve a federal controversy." *Oneida Indian Nation of N. Y.* v. *County of Oneida,* 414
25  U.S. 661, 666 (1974); see also *Romero* v. *International Terminal Operating Co.,* 358 U.S. 354, 359
26  (1959). The question whether a federal statute creates a claim for relief is not jurisdictional"); *Montana-
27  Dakota Util. Co.* v. *Northwestern Public Service Co.,* 341 U.S. 246, 249 (1951). Motion to Dismiss fails,
28  where Plaintiff's claims are not wholly insubstantial or frivolous by any measure.

3:23-CV-0164-AGS-DDL

1   **1. U.S. District Court Jurisdiction for Antitrust Violations (Injunctions & Damages)**

2      State Bar defendants' Rule 12(b)(1) arguments fail at threshold on antitrust allegations.

3   Plaintiff's cases, both of which arise from conduct by active market participants after U.S. Supreme

4   Court clarity on their lack of sovereign character or protections, are properly in this Court.

5      For injunctions, 15 U.S.C. § 4 holds: The several district courts of the United States are invested
    with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be
6   the duty of the several United States attorneys, in their respective districts, under the direction of
    the Attorney General, to institute proceedings in equity to prevent and restrain such violations.
7   Such proceedings may be by way of petition setting forth the case and praying that such violation
    shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly
8   notified of such petition the court shall proceed, as soon as may be, to the hearing and
    determination of the case; and pending such petition and before final decree, the court may at any
9   time make such temporary restraining order or prohibition as shall be deemed just in the premises.

10     (July 2, 1890, ch. 647, § 4, 26 Stat. 209; Mar. 3, 1911, ch. 231, § 291, 36 Stat. 1167; June 25,
11  1948, ch. 646, § 1, 62 Stat. 909.)

12     For damages, 15 U.S.C. § 15 holds: any person who shall be injured in his business or property
    by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the
13  United States in the district in which the defendant resides or is found or has an agent, without
    respect to the amount in controversy, and shall recover threefold the damages by him sustained,
14  and the cost of suit, including a reasonable attorney's fee. []

15     (Oct. 15, 1914, ch. 323, § 4, 38 Stat. 731; Pub. L. 96–349, § 4(a)(1), Sept. 12, 1980, 94 Stat.
16  1156; Pub. L. 97–393, Dec. 29, 1982, 96 Stat. 1964.)

17  **2. U.S. District Court Jurisdiction for RICO Violations (Injunctions & Damages)**

18     State Bar defendants' Rule 12(b)(1) arguments fail at threshold on RICO allegations. Plaintiff's

19  cases, both of which arise from conduct involving alleged RICO violations by non-sovereign active

20  market participants and the State that enabled them unlawfully against non-diverse Plaintiff:

21     For injunctions, 18 U.S.C. § 1964 (a) holds "The district courts of the United States shall have
    jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing
22  appropriate orders, including, but not limited to: ordering any person to divest himself of any
    interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future
23  activities or investments of any person, including, but not limited to, prohibiting any person from
    engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect
24  interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise,
    making due provision for the rights of innocent persons."
25

26     For U.S. Attorney General, 18 U.S.C. § 1964(b) holds "The Attorney General may institute
    proceedings under this section. Pending final determination thereof, the court may at any time
27  enter such restraining orders or prohibitions, or take such other actions, including the acceptance
    of satisfactory performance bonds, as it shall deem proper."
28

3:23-CV-0164-AGS-DDL

For damages, 18 U.S.C. § 1964(c) holds: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.**(d) A** final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States."

(Added Pub. L. 91-452, title IX, §901(a), Oct. 15, 1970, 84 Stat. 943; amended Pub. L. 98-620, title IV, §402(24)(A), Nov. 8, 1984, 98 Stat. 3359; Pub. L. 104-67, title I, §107, Dec. 22, 1995, 109 Stat. 758.)

### 3. U.S. District Court Jurisdiction for Claims Arising from U.S. Constitution

State Bar defendants Rule 12(b)(1) arguments fail at threshold on claims arising from alleged violation of Plaintiff's rights under United States Constitution. "(b) Discrimination may be so unjustifiable as to be violative of due process. P. 499." *Bolling v. Sharpe*, 347 U.S. 497, (1954). In seeking to dismiss Plaintiff's claim on the mere basis he is acting pro se, State Bar defendants are furthering their due process violations through more overt discrimination and oppression. Clearly, Plaintiff will not have a fair forum in Superior Court where State refuses to appear, much less answer.

For 42 U.S.C. 1983 claims, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, § 1, July 25, 1958, 72 Stat. 415; Pub. L. 94–574, § 2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, § 2(a), Dec. 1, 1980, 94 Stat. 2369.)

### 4. For Prospective Injunctive Relief Against Individuals, Ex Parte Young is Instructive

Plaintiff pleads clearly established rights to equal protection (FAC, p. 31, ¶ 117), right to be free of attorney schemes to defraud him (Supplement), and a right to petition the government for redress (Id. ¶¶ 122, 127, 131). His rights were allegedly violated. Even though they are not sovereign, if they were, "[t]he primary holding of Ex Parte Young: If [individual State Bar defendants] attempt to enforce an unconstitutional law, sovereign immunity does not prevent people whom the law harms from suing those officials in their individual capacity for injunctive relief. This is because they are not acting on behalf of the state in this situation." *Ex parte Young*, 209 U.S. 123 (1908) (State Bar defendants' conduct is not sovereign, and they were not acting in capacity of the State in harming him.) FAC, 1-60. Supplement.

3:23-CV-0164-AGS-DDL

5. State of California's Enablement of Unlawful Conduct Does Not Make it Legal

State of California is properly named in this case. "[T]he Court in *Parker v. Brown* interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity. See 317 U.S., at 350–351, 63 S.Ct. 307. *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, 503 (2015) As cited and pleaded, State of California's refusal to actively supervise active market participants controlled by State Bar defendants does not make their conduct legal. See *Parker, supra,* at 351, 63 S.Ct. 307 ("[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful"). For purposes of *Parker,* a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself. See *Hoover, supra,* at 567–568, 104 S.Ct. 1989. Each Ruben Duran, Suzanne Grandt, Eli David Morgenstern, Kenneth Joseph Catanzarite, Brandon Woodward, Tim James O'Keefe, Thomas V. Girardi, Nicole Marie Catanzarite Woodward, Charles Tsai, Ellin Davtyan, Robert Retana, George Cardona, and Jim Travis Tice are active market participants under actual control and regulation of non-sovereign State Bar. State of California's failures or refusals to supervise the conduct are self-evident as it relates to State Bar defendants and Kenneth Joseph Catanzarite enterprise. FAC, p. 58-9.

6. *Respondeat Superior* Liability for State of California for its Non-Sovereign Actors

Cal. Gov. Cod. § 815.2, § 815.3 cause *respondeat superior* liability for non-sovereign, individual State Bar defendant conduct, and Cal. Gov. Cod. § 815.6 causes State liability in favor of non-diverse, California citizen Plaintiff according to plain language of each. Motion to Dismiss fails to address this.

7. Plaintiff Outside State Bar Jurisdiction; FAC Does Not Seek State Bar Court Discipline

There are no on-point cases after January 1, 2019, cited by State Bar defendants Motion to Dismiss the FAC. Plaintiff is not seeking the institution of State Bar Court discipline in this case, indeed, many of the claims arise from State Bar defendants judicial and extra-judicial conduct completely unrelated to Catanzarite Law Corporation actors. FAC, p. 13, ¶¶ 63-7, p. 14, ¶¶ 68-73, p. 15, ¶ 76, p. 31, ¶ 117, p. 32, ¶ 118-121, p. 33, ¶¶ 122-4, p. 34, ¶¶ 125-8, p. 35, ¶¶ 129-32. Non-attorney Plaintiff did not agree to State Bar Court jurisdiction. (If Suzanne Grandt, Eli David Morgenstern, or Ruben Duran were to murder someone, would that go to State Bar Court for criminal prosecution? Subject matter jurisdiction arguments propounded by State Bar defendants are objectively frivolous; they all fail.)

14

3:23-CV-0164-AGS-DDL

**C. FAC and Supplement Do Not Fail to Allege Sufficient Facts to State a Claim**

1. <u>Pattern of Racketeering Activity Includes Convictions of Related Conduct</u>

"A pattern of racketeering activity requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "Criminal mail and wire fraud involves: (1) a scheme based on an intent to defraud; and (2) the use of the mails or wires to further that scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2nd Cir. 2017); *Bui v. Nguyen*, 712 Fed. Appx. 606, 609 (9th Cir. 2017).

Plaintiff alleges four schemes, *infra,* with 72 related predicate acts in his RICO Case Statement with detailed specificity in conformance with F.R.Civ.P. 9(b). Supplement, pp. 17-68. Plaintiff alleges 47 related predicate acts that caused injury in his FAC, each of which were carried on by State Bar defendants or were undertaken by State Bar defendants. FAC, p. 12-36, ¶¶ 60-134.

Plaintiff cites actual convictions of related conduct in Orange County related to State Bar enterprise and Orange County Superior Court. Supplement, p. 68. This means Plaintiff need only prove one additional predicate act of wire fraud that caused him injury to succeed on 18 U.S.C. § 1962(c) claims in his FAC and Supplement (for instance). The Motion to Dismiss is simply not credible under the circumstances; it is understandable that State Bar defendants and Office of General Counsel don't want to answer their own alleged criminal conduct which may implicate them in crimes further.

2. <u>Enterprise Operation Descriptions (All Associated in Fact to State Bar Defendants)</u>

"The Kenneth Joseph Catanzarite enterprise allegedly consists of Catanzarite Law Corporation, Nicole Marie Catanzarite Woodward, Brandon Woodward, Tim James O'Keefe, Eric V. Anderton, Jim Travis Tice, Becky Phillips, Han Le, unnamed persons within Orange County District Attorney's Office, unnamed persons within Anaheim Police Department, unnamed persons within Anaheim City Attorney's Office, Aegis Asset Management, Inc. (CRD #305008), David M. Piller, Aegis Properties, Inc., Parkgate Center, LP, 2331 W. Lincoln Ave., Anaheim, CA, 92801, Kim Catanzarite, Ellen C. Catanzarite Living Trust, 354 Hazel Dr., Corona Del Mar, property owners associations in Orange County to control real estate allegedly acquired through a pattern of racketeering activity, Eli David Morgenstern, Ruben Duran, Suzanne Grandt, other persons within Office of General Counsel, Office of

15

3:23-CV-0164-AGS-DDL

1    Chief Trial Counsel, and Board of Trustees similarly situated to Ruben Duran, Suzanne Grandt, and Eli
2    David Morgenstern, and one or more banks holding IOLTA and trust accounts used to allegedly transfer
3    proceeds by and between the foregoing persons." Supplement, p. 72.
4         "Beyond the foregoing core constituents of the Kenneth Joseph Catanzarite enterprise, it is
5    alleged the foregoing persons engage in bribery of witnesses or straw litigants, and that the Kenneth
6    Joseph Catanzarite enterprise includes presently Mobile Farming Systems, Inc., Amy Jeanette Cooper,
7    James Duffy, Anthony B. Scudder, Richard Francis O'Connor, II, Cliff Higgerson, Denise Pinkerton,
8    Richard Carlson, and Renato Corzo." Ibid. The operations of Kenneth Joseph Catanzarite enterprise are
9    described by Plaintiff thereafter. Ibid. The association in fact is alleged thereafter, and as a non-fraud
10   allegation, Plaintiff can show it later in this proceeding. Ibid.
11        "The State Bar of California enterprise allegedly consists of: the non-sovereign entity, The State
12   Bar of California, Office of General Counsel, Office of Chief Trial Counsel, Board of Trustees,
13   Commission on Judicial Nominees Evaluation, Client Security Fund, Judicial Council, Superior Courts,
14   Courts of Appeal, Supreme Court, District Attorney's Offices, City Attorney's Offices, California Crime
15   Victim's Bureau, the postal mail facilities located at 180 Howard St., San Francisco, CA 94105 and 845
16   S. Figueroa St., Los Angeles, CA 90017, State Bar Court, LawHelpCA.org legal aid organizations,
17   American Continental Bank attorney trust accounts, Bank of America attorney trust accounts, Bank of
18   the Orient attorney trust accounts, Chase Business attorney trust accounts, Citibank attorney trust
19   accounts, City First Bank attorney trust accounts, CommerceWest Bank attorney trust accounts, CTBC
20   Bank Corp. attorney trust accounts, First Bank attorney trust accounts, LendingClub attorney trust
21   accounts, New Omni Bank attorney trust accounts, Poppy Bank attorney trust accounts, Signature Bank-
22   NY attorney trust accounts, Wells Fargo Bank attorney trust accounts, Ellin Davtyan, Suzanne Grandt,
23   Robert George Retana, Charles Tsai, Todd Spitzer, Hailyn Chen, Jorge E. Navarette, Joan Randolph,
24   Kenneth Joseph Catanzarite, Nicole Marie Catanzarite Woodward, Thomas V. Girardi, David Lira,
25   Walter Lack, Gloria Allred, Brandon Woodard, Tim James O'Keefe, Eric V. Anderton, Jim Travis Tice,
26   Girardi-Keese, Catanzarite Law Corporation, and others among 700+ Club. The 700+ Club was
27   identified through statistical anomalies by California State Auditor Report 2022-030. 700 attorneys each
28   had at least 4 notices of injury disposed of by The State Bar of California through private letters, and

16                                                   3:23-CV-0164-AGS-DDL

1   more than 700 attorneys who were disciplined in other jurisdictions did not result in any form of public

2   protection. It is alleged this statistical anomaly is significant, and that The State Bar of California

3   operates for 700+ Club." Supplement, p. 74-5. The operations are described by Plaintiff thereafter. Id.

4   pp. 75-8. The association in fact is alleged thereafter, and as a non-fraud allegation, Plaintiff can show

5   it later in this proceeding. Ibid.

6        "The Mobile Farming Systems, Inc. enterprise was a defunct company from March 2015 through

7   January 23, 2019, which was already shown through a trial of fact in which Mr. Catanzarite participated.

8   An entity named Jolly Rogers Investments, Inc. or Jolly Roger, Inc. invested approximately $450,000

9   in the entity in 2012-2013 years before the Plaintiff met the principals of Mobile Farming Systems, Inc.:

10   Richard Francis O'Connor, II, Amy Jeanette Cooper, and Richard Probst ("MFS Founders") on or about

11   April 7, 2015. The MFS Founders formed a new company, Cultivation Technologies, Inc. ("CTI") and

12   capitalized it in June 2015 through the issuance of 23,000,000 shares. CTI operated from June 2015

13   through January 23, 2019 as if MFS were bankrupt and non-existent. It is alleged that, between January

14   4, 2019 and January 23, 2019, Mr. Catanzarite extorted Richard Francis O'Connor, II and Amy Jeanette

15   Cooper to force corporate actions under the threat of securities fraud charges in the Pinkerton Action in

16   order to produce false evidence. It is alleged this threat was backed by Mr. Catanzarite "working with

17   law enforcement" and the knowledge that Mr. O'Connor and Ms. Cooper allegedly paid $340,000 in

18   illegal commissions through MFS to a Joseph Porche. Mr. Catanzarite, Ms. Cooper, and Mr. O'Connor

19   each knew that MFS was not a shareholder of CTI, however, [MFS] was used as a corporate shell to

20   sabotage the Plaintiff, the entity CTI, and further disrupt the Plaintiff's business and property

21   (continuing). The Court of Appeal concluded similarly in G059766. Nevertheless, it is alleged that the

22   Mobile Farming Systems, Inc. enterprise serves the purpose of continuing the fraudulent schemes to

23   which the Plaintiff is subject, using ongoing assistance of The State Bar of California as if it were a

24   "pending civil matter." It is alleged that Charles Tsai in Office of General Counsel is now aiding in this

25   process to defraud this Court and obstruct justice by seeking to move this case to another Court in which

26   it is alleged The State Bar of California has asserted control through misrepresentations." Id., pp. 78-9

27   (Charles Tsai was successful after making material misrepresentations and concealing material facts

28   from Honorable Cynthia A. Bashant to allegedly obstruct justice, 18 U.S.C. §1503(a).)

17

3:23-CV-0164-AGS-DDL

### 3. FAC and Supplement Contain More than Formulaic Recitation of Elements

"A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 1950, 173 L.Ed. 2d 868 (2009).

To provide a framework of the complaint, Plaintiff includes the statutes giving rise to *respondeat superior* liability for individual conduct. FAC, p. 3-6, ¶¶ 13-31. He alleges State Bar is not the sovereign, nor are its actors. Id, p. 3, ¶¶ 11-2. He offers short and plain statement for each RICO claim asserted "to provide framework," preceded by actual convictions for predicate acts. FAC, pp. 38-51, ¶¶ 160-266.

### 4. Four Fraudulent Schemes Associated with State Bar Defendant's Predicate Acts

**Common Plan #1.** "For the Kenneth Joseph Catanzarite enterprise, it is alleged the plan consists of filing fraudulent cases that lack standing or probable cause predicated upon the ongoing protection of The State Bar of California enterprise...This plan is supported by deliberate indifference, actual concealment, or bribery by or of Office of Chief Trial Counsel, Office of General Counsel, and Board of Trustees for The State Bar of California enterprise. It is alleged this plan is consistent with that of the Girardi-Keese law firm...It is alleged this plan is evidenced by public records requests reflecting actual knowledge of The State Bar of California enterprise, and its refusal to mitigate public harm, and the impunity with which Kenneth Joseph Catanzarite enterprise conducts itself against innocent members of the public." (Prior, ongoing, parallel schemes to defraud involving this enterprise exist).

**Common Plan #2.** "For the Kenneth Joseph Catanzarite enterprise, it is alleged the plan consists of taking money and property from the Plaintiff commencing September 14, 2018 by any means through ongoing protection of and collusion with The State Bar of California enterprise. Not less than six cases were filed on behalf of directly adverse parties for this plan." (State Bar calls this a "business dispute.")

**Common Plan #3.** "For The State Bar of California enterprise and State of California, it is alleged the common plan is to prevent Plaintiff from fair and neutral forums to conceal the facts and evidence in his possession. Where the Plaintiff is alleged to be the first to file Government Claims Act

3:23-CV-0164-AGS-DDL

litigation against The State Bar of California and has already shown a series of Court of Appeal decisions supporting allegations of at least three counts of malicious prosecution and not less than four mandatory disqualifications affecting Kenneth Joseph Catanzarite enterprise, it is alleged that Plaintiff constitutes a direct and ongoing threat to the interests [and] criminal conduct of Office of General Counsel, Office of Chief Trial Counsel, Board of Trustees, and the Kenneth Joseph Catanzarite enterprise—as well as the links to each of these and the 700+ Club. To evidence this common plan, it is alleged that the efforts to stop Plaintiff from obtaining judgments to which he is allegedly entitled are greater than the efforts for the State of California and The State Bar of California to resolve them amicably on their merits as is the duty of the government (the government is not an ordinary party)." (If The State Bar of California enterprise constituents Duran, Morgenstern, and Grandt are not engaged in criminal conduct, why do they try so earnestly to cover up Kenneth Joseph Catanzarite's, or their own, or enlist others to do so?)

**Common Plan #4.** "It is alleged The State Bar of California is not a sovereign entity protected by the 11th Amendment, and that it uses this guise to mislead Courts and to conduct racketeering with commingled operations among allegedly corrupt lawyers and law firms, as well as the IOLTA and client trusts through which they are alleged to launder money. It is alleged this money laundering affects Medicate and Medicaid, and involved pandemic funds [from the U.S.], as well as Chinese banks listed herein. Because The State Bar of California enterprise is responsible for monitoring the conduct of itself including its own alleged money laundering, it is alleged no lawyer can reasonably stop it, which is why the Courts have never seen a case such as this. It is alleged that The State Bar of California purports to operate as being under the sovereign authority of State of California, however, such conduct would need to be undertaken as if it were that of the State of California itself. If that were the case, State of California is a direct and proximate threat to the United States as it is abusing its sovereignty for unlawful taking from the public, which is unconscionable. It is alleged this plan is continued through deliberate obstruction of justice to prevent Federal Courts of competent jurisdiction from making decisional law that will stop The State Bar of California enterprise from these practices. Conduct of Mr. Tsai is evidence." Supplement, pp. 71-1. (Mr. Tsai transitioned from Deputy Attorney General of California from the Executive Branch in December 2022 to Office of General Counsel of the non-sovereign regulator State Bar just to defend Plaintiff's cases – which seems to suggest strongly something is amiss

19

3:23-CV-0164-AGS-DDL

1    when viewed with the cumulative allegations and record of evidence filed by Plaintiff already in 3:22-
2    CV-01616-AGS-DDL). Supplement, p. 11. (Tsai appears to serve some special purpose in this Court;
3    among the reasons PIN for United States DOJ is being informed.)

4              5. <u>Plaintiff's Constitutional Claims Conform to F.R.Civ.P. 8(a)</u>

5              Plaintiff alleges State Bar defendants failed to grant him equal protection under the law
6    continuing in this Court, and that they created additional dangers through their deliberate indifference
7    or actual malice. FAC, p. 31, ¶ 117-21, pp. 33-5, ¶¶ 122-31, pp. 52-3. Plaintiff alleges retaliation against
8    him for suing State Bar defendants through a series of overt acts in Orange County Superior Court then
9    California Supreme Court continuing in this Court. FAC, p. 33, ¶ 122, p. 35, ¶ 130, pp. 56-7.

10             6. <u>For Damages, Plaintiff Offers Explanations in Supplement, Proof in Related Case</u>

11             It is too early in this case to disregard Plaintiff's damages arbitrarily when it does not appear
12   State Bar defendants have even read the FAC or RICO Case Statement since they believe themselves
13   immune even if it is proven by a preponderance, they committed felonies. Motion to Dismiss. Plaintiff
14   describes damages to his business and property in RICO Case Statement and understands non-economic
15   compensatory damages and punitive damages to be a multiple of this. Supplement, p. 92-4.

16             7. <u>Court Must Establish Briefing Schedule Under F.R.Civ.P. 12(d) and F.R.Civ.P. 56</u>

17             Motion to Dismiss is "based on...Request for Judicial Notice, all pleadings and papers on file in
18   this action and any related actions." F.R.Civ.P. 12(d) converts Motion to Dismiss into one for summary
19   judgment under Rule 56 if "matters outside the pleadings are presented to and not excluded by the
20   Court," granting all parties opportunity to present pertinent material. The Court must order a schedule.

21   **V.    CONCLUSION**

22             State Bar defendants (and State) offer no authority relevant to the instant case except to support
23   why they are not sovereign, and Eleventh Amendment is moot. If it pleases the Court, Plaintiff must be
24   granted opportunity to amend. That there exist so many related predicate acts amidst the pattern is not
25   cause to dismiss Plaintiff's claims. Plaintiff requests the Court sanction on Cross-Motion per F.R.Civ.P.
26   11. The Motion to Dismiss must be denied or turned into a summary judgment motion as above.

27             Respectfully Submitted,

28             March 29, 2023,                                    _____
                                                        Justin S. Beck, Opposing Party, Plaintiff

                                           20                          3:23-CV-0164-AGS-DDL

**PROOF OF SERVICE**

I, Brian Bargabus, hereby declare that I am over 18 years of age and am not a party to this action, and that my address is 3501 Roselle St., Oceanside, CA 92056.

On March 30, 2023, I served one copy of the following documents:

**PLAINTIFF JUSTIN S. BECK'S OPPOSITION TO STATE BAR DEFENDANTS' MOTION TO DISMISS, STATE OF CALIFORNIA JOINDER THERETO, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION; REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF JUSTIN S. BECK'S OPPOSITION TO STATE BAR DEFENDANTS' MOTION TO DISMISS**

Participants in the case who are registered CM/ECF users will be served when these papers are filed with the Court.

*See the CM/ECF service list.*

Electronic service is scheduled for delivery March 30, 2023, to the following email addresses:

| | |
|---|---|
| State of California | AGElectronicService@doj.ca.gov |
| Tim Jude Vanden Heuvel | tim.vandenheuvel@doj.ca.gov |
| Azucena Lopez | azucena.lopez@doj.ca.gov |
| Rhonda Mallory | rhonda.mallory@doj.ca.gov |
| Tania Hopkins | tania.hopkins@doj.ca.gov |
| Robert Retana | robert.retana@calbar.ca.gov |
| Ellin Davtyan | ellin.davtyan@calbar.ca.gov |
| Governor of California | govlegalunit@gov.ca.gov |
| Matthew Green | matthew.green@bbklaw.com |
| Ruben Duran (Public) | ruben.duran@calbar.ca.gov |
| Ruben Duran (Private) | ruben.duran@bbklaw.com |
| Corey Amundson | corey.amundson@usdoj.gov |
| Todd Gee | todd.gee@usdoj.gov |
| Robert Heberle | Robert.heberle@usdoj.gov |
| Sean Mulryne | sean.mulryne@usdoj.gov |
| U.S. Attorney's Office | efile.dkt.civ@usdoj.gov |

1

3:23-CV-0164-AGS-DDL

1         By electronic mail by personally transmitting a true copy thereof via an electronic email service

2    connected to the internet, addressed to the email address listed above [X].

3         I declare the foregoing to be true under penalty of perjury under the laws of the State of California

4    and United States. I am signing this from Oceanside, California on March 30, 2023.

5

6

7                                   _____

8                                  Brian Bargabus, Declarant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                      2                       3:23-CV-0164-AGS-DDL

Justin S. Beck
3501 Roselle St.,
Oceanside, CA 92056
760-449-2509
justintimesd@gmail.com
*In Propria Persona*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JUSTIN S. BECK,

      Plaintiff,

      vs.

STATE OF CALIFORNIA; THE STATE BAR
OF CALIFORNIA; SUZANNE GRANDT;
RUBEN DURAN; ELI DAVID
MORGENSTERN; KENNETH
CATANZARITE,

      Defendants,

UNITED STATES ATTORNEY GENERAL;
UNITED STATES OF AMERICA

      Nominal Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 8:23-CV-0164-AGS-DDL

Judge:    Hon. Andrew G. Schopler

**REQUEST FOR JUDICIAL NOTICE IN
SUPPORT OF PLAINTIFF JUSTIN S.
BECK'S OPPOSITION TO STATE BAR
DEFENDANTS' MOTION TO DISMISS**

Filed concurrently with:

    Opposition to Motion to Dismiss

    Memorandum of Points and Authorities

1

8:23-CV-0164-AGS-DDL

**TO DEFENDANTS, DEFENDANTS ACTING AS DEFENSE COUNSEL AND DEFENSE LAW FIRM CONCURRENTLY, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Federal Rule of Evidence 201, Plaintiff Justin S. Beck will and hereby does request this Court take judicial notice of the following documents in opposition of State Bar defendants' motion to dismiss Plaintiff's First Amended Complaint for Damages & Injunctive Relief ("FAC").

1. "[T]he [United States] Supreme Court reaffirmed that a state regulatory board is not the sovereign." Federal Trade Commission "FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants" attached hereto as <u>Exhibit 1</u>. <u>Exhibit 1</u> is available on Federal Trade Commission's website, also referenced within Supreme Court of California, Administrative Order 2017-09-20 of which State Bar defendants have requested this Court take notice. PageID.307.

2. Excerpt from Legislative Counsel's Digest for California State Assembly Bill No. 3249, Chapter 659, which amended various sections of State Bar Act in California. This was approved by Governor September 21, 2018, and filed by Secretary of State September 21, 2018, a copy of which is attached hereto as <u>Exhibit 2</u>. <u>Exhibit 2</u> is a public record of California State Legislature. Amendments to Sections 6001, 6001.1, and 6094 became law on January 1, 2019.

3. Dictionary.com definition of "paramount," a true and correct copy of which is attached hereto as <u>Exhibit 3</u>. <u>Exhibit 3</u> is general knowledge which is easily verifiable. Business & Professions Code Section 6001.1 holds that the Plaintiff, as a member of the public, is "paramount" in this proceeding.

4. California Rules of Professional Conduct 1.0.1 "Terminology" for "fraud" or "fraudulent" as it relates to attorneys appearing or as parties' defendants to this proceeding, and related footnote [3], attached hereto as <u>Exhibit 4</u>. <u>Exhibit 4</u> is readily available through The State Bar of California's website.

5. California Rules of Professional Conduct 1.7(d)(3) which mandates disqualification for the representation of adverse parties in the same or substantially related matters attached hereto as <u>Exhibit 5</u>. <u>Exhibit 5</u> is readily available through The State Bar of California's website.

6. California Rules of Professional Conduct 4.1 "Truthfulness in Statements to Others" where "in the course of representing a client a lawyer shall not knowingly:* (a) make a false statement of material fact or law to a third person:* or (b) failed to disclose a material fact to a third person* when

1  disclosure is necessary to avoid assisting a criminal or fraudulent* act by a client, unless disclosure is

2  prohibited by Business and Professions Code section 6068, subdivision (e)(1) or rule 1.6," a copy of

3  which is attached hereto as <u>Exhibit 6</u>. <u>Exhibit 6</u> is readily available through The State Bar of California's

4  website.

5     7. "The Misunderstood Eleventh Amendment," University of Pennsylvania Law Review, Vol.

6  169, February 2021, No. 3 by William Baude (Professor of Law, University of Chicago Law School) &

7  Stephen E. Sachs (Colin W. Brown Professor of Law, Duke University School of Law) a copy of which

8  is attached hereto as <u>Exhibit 7</u>. <u>Exhibit 7</u> is readily available from the Penn Carey Law, University of

9  Pennsylvania, Legal Scholarship Repository at the following web page. The Repository Citation is

10  William Baude & Stephen E. Sachs *The Misunderstood Eleventh Amendment*, 169 U. Pa. L. Rev. 609

11  (2021). Available at: <u>https://scholarship.law.upenn.edu/penn_law_review/vol169/iss3/1</u>

12     8. Proof of service upon State of California in Orange County Superior Court Case No. 30-2021-

13  01237499 a copy of which is attached hereto as <u>Exhibit 8</u>. <u>Exhibit 8</u> is a public record and filing in

14  Orange County Superior Court. State of California refuses to appear in Orange County Superior Court

15  despite being named defendant since May 2, 2022.

16     9. Proof of service upon State of California in Orange County Superior Court Case No. 30-2020-

17  01145998 a copy of which is attached hereto as <u>Exhibit 9</u>. <u>Exhibit 9</u> is a public record and filing in

18  Orange County Superior Court. State of California refuses to appear in Orange County Superior Court

19  despite being named defendant since August 8, 2022.

20     10. Plaintiff's RICO Case Statement filed at Docket #9, Document #1, pp. 1-100 in the instant

21  case as it relates to the Motion to Dismiss asserting Plaintiff's claims lack clarity or specificity. ECF #9.

22  This is a public record and filing in the Court accepted by the Clerk. This document is a supplement to

23  the First Amended Complaint subject of the Motion to Dismiss.

24     Rule 201 of the Federal Rules of Evidence authorizes a Court to take judicial notice of a fact that

25  is not subject to reasonable dispute because the fact "is either (1) generally known within the territorial

26  jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources

27  whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

28

3                                    8:23-CV-0164-AGS-DDL

1    "A trial court may presume that public records are authentic and trustworthy." *Gillbrook v. City*

2  *of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

3    For the foregoing reasons, Plaintiff requests this Court take judicial notice of Exhibit 1, Exhibit

4  2, Exhibit 3, Exhibit 4, Exhibit 5, Exhibit 6, Exhibit 7, Exhibit 8, Exhibit 9 and Plaintiff's RICO Case

5  Statement at Document 9-1, ECF #9.

6  Dated:        March 6, 2023                    Respectfully Submitted,

7

8

9                                                 Justin S. Beck, In Pro Per

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

RJN
Opposition to State
Bar Defendants'
Motion to Dismiss

# FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants[*]

## I.    Introduction

States craft regulatory policy through a variety of actors, including state legislatures, courts, agencies, and regulatory boards. While most regulatory actions taken by state actors will not implicate antitrust concerns, some will. Notably, states have created a large number of regulatory boards with the authority to determine who may engage in an occupation (*e.g.*, by issuing or withholding a license), and also to set the rules and regulations governing that occupation. Licensing, once limited to a few learned professions such as doctors and lawyers, is now required for over 800 occupations including (in some states) locksmiths, beekeepers, auctioneers, interior designers, fortune tellers, tour guides, and shampooers.[1]

In general, a state may avoid all conflict with the federal antitrust laws by creating regulatory boards that serve only in an advisory capacity, or by staffing a regulatory board exclusively with persons who have no financial interest in the occupation that is being regulated. However, across the United States, "licensing boards are largely dominated by active members of their respective industries . . ."[2] That is, doctors commonly regulate doctors, beekeepers commonly regulate beekeepers, and tour guides commonly regulate tour guides.

Earlier this year, the U.S. Supreme Court upheld the Federal Trade Commission's determination that the North Carolina State Board of Dental Examiners ("NC Board") violated the federal antitrust laws by preventing non-dentists from providing teeth whitening services in competition with the state's licensed dentists. *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101 (2015). NC Board is a state agency established under North Carolina law and charged with administering and enforcing a licensing system for dentists. A majority of the members of this state agency are themselves practicing dentists, and thus they have a private incentive to limit

---

[*] This document sets out the views of the Staff of the Bureau of Competition. The Federal Trade Commission is not bound by this Staff guidance and reserves the right to rescind it at a later date. In addition, FTC Staff reserves the right to reconsider the views expressed herein, and to modify, rescind, or revoke this Staff guidance if such action would be in the public interest.

[1] Aaron Edlin & Rebecca Haw, *Cartels By Another Name: Should Licensed Occupations Face Antitrust Scrutiny*, 162 U. Pa. L. Rev. 1093, 1096 (2014).

[2] *Id.* at 1095.

October 2015                                                                                    1

competition from non-dentist providers of teeth whitening services. NC Board argued that, because it is a state agency, it is exempt from liability under the federal antitrust laws. That is, the NC Board sought to invoke what is commonly referred to as the "state action exemption" or the "state action defense." The Supreme Court rejected this contention and affirmed the FTC's finding of antitrust liability.

In this decision, the Supreme Court clarified the applicability of the antitrust state action defense to state regulatory boards controlled by market participants:

> "The Court holds today that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal's* [*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980)] active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

In the wake of this Supreme Court decision, state officials have requested advice from the Federal Trade Commission regarding antitrust compliance for state boards responsible for regulating occupations. This outline provides FTC Staff guidance on two questions. *First*, when does a state regulatory board require active supervision in order to invoke the state action defense? *Second*, what factors are relevant to determining whether the active supervision requirement is satisfied?

Our answers to these questions come with the following caveats.

➤   Vigorous competition among sellers in an open marketplace generally provides consumers with important benefits, including lower prices, higher quality services, greater access to services, and increased innovation. For this reason, a state legislature should empower a regulatory board to restrict competition only when necessary to protect against a credible risk of harm, such as health and safety risks to consumers. The Federal Trade Commission and its staff have frequently advocated that states avoid unneeded and burdensome regulation of service providers.[3]

➤   Federal antitrust law does <u>not</u> require that a state legislature provide for active supervision of any state regulatory board. A state legislature may, and generally should, prefer that a regulatory board be subject to the requirements of the federal antitrust

---

[3] *See, e.g.*, Fed. Trade Comm'n Staff Policy Paper, *Policy Perspectives: Competition and the Regulation of Advanced Practice Registered Nurses* (Mar. 2014), https://www.ftc.gov/system/files/documents/reports/policy-perspectives-competition-regulation-advanced-practice-nurses/140307aprnpolicypaper.pdf; Fed. Trade Comm'n & U.S. Dept. of Justice, Comment before the South Carolina Supreme Court Concerning Proposed Guidelines for Residential and Commercial Real Estate Closings (Apr. 2008), https://www.ftc.gov/news-events/press-releases/2008/04/ftcdoj-submit-letter-supreme-court-south-carolina-proposed.

3:22-CV-0164-BAS-DDL
RJN for Rule 11 Motion, Ex. 1, p. 002

laws. If the state legislature determines that a regulatory board should be subject to antitrust oversight, then the state legislature need not provide for active supervision.

➢       Antitrust analysis – including the applicability of the state action defense – is fact-specific and context-dependent. The purpose of this document is to identify certain overarching legal principles governing when and how a state may provide active supervision for a regulatory board. We are not suggesting a mandatory or one-size-fits-all approach to active supervision. Instead, we urge each state regulatory board to consult with the Office of the Attorney General for its state for customized advice on how best to comply with the antitrust laws.

➢       This FTC Staff guidance addresses only the active supervision prong of the state action defense. In order successfully to invoke the state action defense, a state regulatory board controlled by market participants must also satisfy the clear articulation prong, as described briefly in Section II. below.

➢       This document contains guidance developed by the staff of the Federal Trade Commission. Deviation from this guidance does not necessarily mean that the state action defense is inapplicable, or that a violation of the antitrust laws has occurred.

October 2015                                                                                      3

## II.    Overview of the Antitrust State Action Defense

"Federal antitrust law is a central safeguard for the Nation's free market structures . . . . The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market." *N.C. Dental*, 135 S. Ct. at 1109.

Under principles of federalism, "the States possess a significant measure of sovereignty." *N.C. Dental*, 135 S. Ct. at 1110 (*quoting Community Communications Co. v. Boulder*, 455 U.S. 40, 53 (1982)). In enacting the antitrust laws, Congress did not intend to prevent the States from limiting competition in order to promote other goals that are valued by their citizens. Thus, the Supreme Court has concluded that the federal antitrust laws do not reach anticompetitive conduct engaged in by a State that is acting in its sovereign capacity. *Parker v. Brown*, 317 U.S. 341, 351-52 (1943). For example, a state legislature may "impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *N.C. Dental*, 135 S. Ct. at 1109.

Are the actions of a state regulatory board, like the actions of a state legislature, exempt from the application of the federal antitrust laws? In *North Carolina State Board of Dental Examiners*, the Supreme Court reaffirmed that a state regulatory board is not the sovereign. Accordingly, a state regulatory board is not necessarily exempt from federal antitrust liability.

More specifically, the Court determined that "a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates" may invoke the state action defense only when two requirements are satisfied: first, the challenged restraint must be clearly articulated and affirmatively expressed as state policy; and second, the policy must be actively supervised by a state official (or state agency) that is not a participant in the market that is being regulated. *N.C. Dental*, 135 S. Ct. at 1114.

➢    The Supreme Court addressed the clear articulation requirement most recently in *FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003 (2013). The clear articulation requirement is satisfied "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Id.* at 1013.

➢    The State's clear articulation of the intent to displace competition is not alone sufficient to trigger the state action exemption. The state legislature's clearly-articulated delegation of authority to a state regulatory board to displace competition may be "defined at so high a level of generality as to leave open critical questions about how

and to what extent the market should be regulated." There is then a danger that this delegated discretion will be used by active market participants to pursue private interests in restraining trade, in lieu of implementing the State's policy goals. *N.C. Dental,* 135 S. Ct. at 1112.

➤ The active supervision requirement "seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming [antitrust] immunity." *Id.*

Where the state action defense does not apply, the actions of a state regulatory board controlled by active market participants may be subject to antitrust scrutiny. Antitrust issues may arise where an unsupervised board takes actions that restrict market entry or restrain rivalry. The following are some scenarios that have raised antitrust concerns:

➤ A regulatory board controlled by dentists excludes non-dentists from competing with dentists in the provision of teeth whitening services. *Cf. N.C. Dental,* 135 S. Ct. 1101.

➤ A regulatory board controlled by accountants determines that only a small and fixed number of new licenses to practice the profession shall be issued by the state each year. *Cf. Hoover v. Ronwin,* 466 U.S. 558 (1984).

➤ A regulatory board controlled by attorneys adopts a regulation (or a code of ethics) that prohibits attorney advertising, or that deters attorneys from engaging in price competition. *Cf. Bates v. State Bar of Ariz.,* 433 U.S. 350 (1977); *Goldfarb v. Va. State Bar,* 421 U.S. 773 (1975).

## III.    Scope of FTC Staff Guidance

A. This Staff guidance addresses the applicability of the state action defense under the federal antitrust laws. Concluding that the state action defense is inapplicable does <u>not</u> mean that the conduct of the regulatory board necessarily violates the federal antitrust laws. A regulatory board may assert defenses ordinarily available to an antitrust defendant.

1. **Reasonable restraints on competition do not violate the antitrust laws, even where the economic interests of a competitor have been injured.**

Example 1: A regulatory board may prohibit members of the occupation from engaging in fraudulent business practices without raising antitrust concerns. A regulatory board also may prohibit members of the occupation from engaging in untruthful or deceptive advertising. *Cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999).

Example 2: Suppose a market with several hundred licensed electricians. If a regulatory board suspends the license of one electrician for substandard work, such action likely does not unreasonably harm competition. *Cf. Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696 (4th Cir. 1991) (en banc).

2. **The ministerial (non-discretionary) acts of a regulatory board engaged in good faith implementation of an anticompetitive statutory regime do not give rise to antitrust liability. See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 344 n. 6 (1987).**

Example 3: A state statute requires that an applicant for a chauffeur's license submit to the regulatory board, among other things, a copy of the applicant's diploma and a certified check for $500. An applicant fails to submit the required materials. If for this reason the regulatory board declines to issue a chauffeur's license to the applicant, such action would not be considered an unreasonable restraint. In the circumstances described, the denial of a license is a ministerial or non-discretionary act of the regulatory board.

3. **In general, the initiation and prosecution of a lawsuit by a regulatory board does not give rise to antitrust liability unless it falls within the "sham exception." Professional Real Estate Investors v. Columbia Pictures Industries, 508 U.S. 49 (1993); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972).**

Example 4: A state statute authorizes the state's dental board to maintain an action in state court to enjoin an unlicensed person from practicing dentistry. The members of the dental board have a basis to believe that a particular individual is practicing dentistry but does not hold a valid license. If the dental board files a lawsuit against that individual, such action would not constitute a violation of the federal antitrust laws.

B. Below, FTC Staff describes when active supervision of a state regulatory board is required in order successfully to invoke the state action defense, and what factors are relevant to determining whether the active supervision requirement has been satisfied.

   1. **When is active state supervision of a state regulatory board required in order to invoke the state action defense?**

*General Standard*: "[A] state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

*Active Market Participants*: A member of a state regulatory board will be considered to be an active market participant in the occupation the board regulates if such person (i) is licensed by the board or (ii) provides any service that is subject to the regulatory authority of the board.

> ➤  If a board member participates in any professional or occupational sub-specialty that is regulated by the board, then that board member is an active market participant for purposes of evaluating the active supervision requirement.

> ➤  It is no defense to antitrust scrutiny, therefore, that the board members themselves are not directly or personally affected by the challenged restraint. For example, even if the members of the NC Dental Board were orthodontists who do not perform teeth whitening services (as a matter of law or fact or tradition), their control of the dental board would nevertheless trigger the requirement for active state supervision. This is because these orthodontists are licensed by, and their services regulated by, the NC Dental Board.

> ➤  A person who temporarily suspends her active participation in an occupation for the purpose of serving on a state board that regulates her former (and intended future) occupation will be considered to be an active market participant.

*Method of Selection*: The method by which a person is selected to serve on a state regulatory board is not determinative of whether that person is an active market participant in the occupation that the board regulates. For example, a licensed dentist is deemed to be an active market participant regardless of whether the dentist (i) is appointed to the state dental board by the governor or (ii) is elected to the state dental board by the state's licensed dentists.

***A Controlling Number, Not Necessarily a Majority, of Actual Decisionmakers:***

> ➤ Active market participants need not constitute a numerical majority of the members of a state regulatory board in order to trigger the requirement of active supervision. A decision that is controlled, either as a matter of law, procedure, or fact, by active participants in the regulated market (*e.g.*, through veto power, tradition, or practice) must be actively supervised to be eligible for the state action defense.

> ➤ Whether a particular restraint has been imposed by a "controlling number of decisionmakers [who] are active market participants" is a fact-bound inquiry that must be made on a case-by-case basis. FTC Staff will evaluate a number of factors, including:

>> ✓ The structure of the regulatory board (including the number of board members who are/are not active market participants) and the rules governing the exercise of the board's authority.

>> ✓ Whether the board members who are active market participants have veto power over the board's regulatory decisions.

**Example 5:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of five board members. Thus, no regulation may become effective without the assent of at least one electrician member of the board. In this scenario, the active market participants effectively have veto power over the board's regulatory authority. The active supervision requirement is therefore applicable.

>> ✓ The level of participation, engagement, and authority of the non-market participant members in the business of the board – generally and with regard to the particular restraint at issue.

>> ✓ Whether the participation, engagement, and authority of the non-market participant board members in the business of the board differs from that of board members who are active market participants – generally and with regard to the particular restraint at issue.

>> ✓ Whether the active market participants have in fact exercised, controlled, or usurped the decisionmaking power of the board.

**Example 6:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of a majority of board members. When voting on proposed regulations, the non-electrician members routinely defer to the preferences of the electrician members. Minutes of

board meetings show that the non-electrician members generally are not informed or knowledgeable concerning board business – and that they were not well informed concerning the particular restraint at issue. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

**Example 7:** The state board of electricians consists of four non-electrician members and three practicing electricians. Documents show that the electrician members frequently meet and discuss board business separately from the non-electrician members. On one such occasion, the electrician members arranged for the issuance by the board of written orders to six construction contractors, directing such individuals to cease and desist from providing certain services. The non-electrician members of the board were not aware of the issuance of these orders and did not approve the issuance of these orders. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

### 2.  What constitutes active supervision?

FTC Staff will be guided by the following principles:

➢   "[T]he purpose of the active supervision inquiry . . . is to determine whether the State has exercised sufficient independent judgment and control" such that the details of the regulatory scheme "have been established as a product of deliberate state intervention" and not simply by agreement among the members of the state board. "Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy." The State is not obliged to "[meet] some normative standard, such as efficiency, in its regulatory practices." *Ticor*, 504 U.S. at 634-35. "The question is not how well state regulation works but whether the anticompetitive scheme is the State's own." *Id.* at 635.

➢   It is necessary "to ensure the States accept political accountability for anticompetitive conduct they permit and control." *N.C. Dental*, 135 S. Ct. at 1111.  *See also Ticor*, 504 U.S. at 636.

➢   "The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the 'mere potential for state supervision is not an adequate substitute for a decision by the State.' Further, the state supervisor may not itself be an active market participant." *N.C. Dental*, 135 S. Ct. at 1116–17 (citations omitted).

---

> ➤    The active supervision must precede implementation of the allegedly anticompetitive restraint.

> ➤    "[T]he inquiry regarding active supervision is flexible and context-dependent." "[T]he adequacy of supervision . . . will depend on all the circumstances of a case." *N.C. Dental*, 135 S. Ct. at 1116–17. Accordingly, FTC Staff will evaluate each case in light of its own facts, and will apply the applicable case law and the principles embodied in this guidance reasonably and flexibly.

### 3.  What factors are relevant to determining whether the active supervision requirement has been satisfied?

FTC Staff will consider the presence or absence of the following factors in determining whether the active supervision prong of the state action defense is satisfied.

> ➤    The supervisor has obtained the information necessary for a proper evaluation of the action recommended by the regulatory board. As applicable, the supervisor has ascertained relevant facts, collected data, conducted public hearings, invited and received public comments, investigated market conditions, conducted studies, and reviewed documentary evidence.

>> ✓    The information-gathering obligations of the supervisor depend in part upon the scope of inquiry previously conducted by the regulatory board. For example, if the regulatory board has conducted a suitable public hearing and collected the relevant information and data, then it may be unnecessary for the supervisor to repeat these tasks. Instead, the supervisor may utilize the materials assembled by the regulatory board.

> ➤    The supervisor has evaluated the substantive merits of the recommended action and assessed whether the recommended action comports with the standards established by the state legislature.

> ➤    The supervisor has issued a written decision approving, modifying, or disapproving the recommended action, and explaining the reasons and rationale for such decision.

>> ✓    A written decision serves an evidentiary function, demonstrating that the supervisor has undertaken the required meaningful review of the merits of the state board's action.

>> ✓    A written decision is also a means by which the State accepts political accountability for the restraint being authorized.

October 2015

10

**Scenario 1: Example of satisfactory active supervision of a state board regulation designating teeth whitening as a service that may be provided only by a licensed dentist, where state policy is to protect the health and welfare of citizens and to promote competition.**

> The state legislature designated an executive agency to review regulations recommended by the state regulatory board. Recommended regulations become effective only following the approval of the agency.

> The agency provided notice of (i) the recommended regulation and (ii) an opportunity to be heard, to dentists, to non-dentist providers of teeth whitening, to the public (in a newspaper of general circulation in the affected areas), and to other interested and affected persons, including persons that have previously identified themselves to the agency as interested in, or affected by, dentist scope of practice issues.

> The agency took the steps necessary for a proper evaluation of the recommended regulation. The agency:

✓    Obtained the recommendation of the state regulatory board and supporting materials, including the identity of any interested parties and the full evidentiary record compiled by the regulatory board.

✓    Solicited and accepted written submissions from sources other than the regulatory board.

✓    Obtained published studies addressing (i) the health and safety risks relating to teeth whitening and (ii) the training, skill, knowledge, and equipment reasonably required in order to safely and responsibly provide teeth whitening services (if not contained in submission from the regulatory board).

✓    Obtained information concerning the historic and current cost, price, and availability of teeth whitening services from dentists and non-dentists (if not contained in submission from the regulatory board). Such information was verified (or audited) by the Agency as appropriate.

✓    Held public hearing(s) that included testimony from interested persons (including dentists and non-dentists). The public hearing provided the agency with an opportunity (i) to hear from and to question providers, affected customers, and experts and (ii) to supplement the evidentiary record compiled by the state board. (As noted above, if the state regulatory board has previously conducted a suitable public hearing, then it may be unnecessary for the supervising agency to repeat this procedure.)

> The agency assessed all of the information to determine whether the recommended regulation comports with the State's goal to protect the health and

welfare of citizens and to promote competition.

➤ The agency issued a written decision accepting, rejecting, or modifying the scope of practice regulation recommended by the state regulatory board, and explaining the rationale for the agency's action.

**Scenario 2: Example of satisfactory active supervision of a state regulatory board administering a disciplinary process.**

A common function of state regulatory boards is to administer a disciplinary process for members of a regulated occupation. For example, the state regulatory board may adjudicate whether a licensee has violated standards of ethics, competency, conduct, or performance established by the state legislature.

Suppose that, acting in its adjudicatory capacity, a regulatory board controlled by active market participants determines that a licensee has violated a lawful and valid standard of ethics, competency, conduct, or performance, and for this reason, the regulatory board proposes that the licensee's license to practice in the state be revoked or suspended. In order to invoke the state action defense, the regulatory board would need to show both clear articulation and active supervision.

➤ In this context, active supervision may be provided by the administrator who oversees the regulatory board (*e.g.*, the secretary of health), the state attorney general, or another state official who is not an active market participant. The active supervision requirement of the state action defense will be satisfied if the supervisor: (i) reviews the evidentiary record created by the regulatory board; (ii) supplements this evidentiary record if and as appropriate; (iii) undertakes a de novo review of the substantive merits of the proposed disciplinary action, assessing whether the proposed disciplinary action comports with the policies and standards established by the state legislature; and (iv) issues a written decision that approves, modifies, or disapproves the disciplinary action proposed by the regulatory board.

Note that a disciplinary action taken by a regulatory board affecting a single licensee will typically have only a de minimis effect on competition. A pattern or program of disciplinary actions by a regulatory board affecting multiple licensees may have a substantial effect on competition.

**The following do not constitute active supervision of a state regulatory board that is controlled by active market participants:**

> ➤ The entity responsible for supervising the regulatory board is itself controlled by active market participants in the occupation that the board regulates. *See N.C. Dental*, 135 S. Ct. at 1113-14.

> ➤ A state official monitors the actions of the regulatory board and participates in deliberations, but lacks the authority to disapprove anticompetitive acts that fail to accord with state policy. *See Patrick v. Burget*, 486 U.S. 94, 101 (1988).

> ➤ A state official (*e.g.*, the secretary of health) serves ex officio as a member of the regulatory board with full voting rights. However, this state official is one of several members of the regulatory board and lacks the authority to disapprove anticompetitive acts that fail to accord with state policy.

> ➤ The state attorney general or another state official provides advice to the regulatory board on an ongoing basis.

> ➤ An independent state agency is staffed, funded, and empowered by law to evaluate, and then to veto or modify, particular recommendations of the regulatory board. However, in practice such recommendations are subject to only cursory review by the independent state agency. The independent state agency perfunctorily approves the recommendations of the regulatory board. *See Ticor*, 504 U.S. at 638.

> ➤ An independent state agency reviews the actions of the regulatory board and approves all actions that comply with the procedural requirements of the state administrative procedure act, without undertaking a substantive review of the actions of the regulatory board. *See Patrick*, 486 U.S. at 104-05.

October 2015

13

RJN Exhibit 2



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

Assembly Bill No. 3249

CHAPTER 659

An act to amend Sections 30, 6001, 6001.1, 6001.2, 6002, 6002.1, 6003, 6004, 6005, 6006, 6007, 6008.1, 6008.4, 6009.5, 6013.5, 6015, 6016, 6020, 6022, 6023, 6024, 6031, 6031.5, 6032, 6033, 6044, 6044.5, 6046, 6046.5, 6049, 6049.1, 6049.2, 6051, 6053, 6054, 6056, 6060, 6060.3, 6061, 6062, 6068, 6069, 6070, 6071, 6075, 6076, 6076.5, 6077, 6077.5, 6078, 6079.1, 6080, 6081, 6082, 6083, 6084, 6085.5, 6086, 6086.1, 6086.2, 6086.65, 6086.8, 6086.10, 6086.13, 6086.14, 6086.15, 6087, 6090.5, 6090.6, 6092, 6092.5, 6093.5, 6094, 6094.5, 6095, 6102, 6103.5, 6103.7, 6125, 6126, 6126.3, 6127, 6140, 6140.02, 6140.03, 6140.05, 6140.1, 6140.12, 6140.16, 6140.5, 6140.55, 6140.56, 6140.6, 6140.7, 6140.9, 6141, 6141.1, 6141.3, 6142, 6143, 6143.5, 6144.5, 6145, 6157, 6157.2, 6157.3, 6157.5, 6158.4, 6158.5, 6158.7, 6159.1, 6167, 6172, 6175, 6175.5, 6177, 6180, 6180.3, 6180.4, 6180.5, 6180.10, 6180.12, 6180.14, 6185, 6190, 6190.1, 6190.3, 6200, 6203, 6211, 6225, 6233, 6235, 6236, 6237, and 6241 of, to amend the heading of Article 3 (commencing with Section 6040) of Chapter 4 of Division 3 of, to amend and renumber the heading of Article 3 (commencing with Section 6055) of Chapter 4 of Division 3 of, to add Section 6001.3 to, and to repeal Sections 6040, 6041, 6042, 6043, 6045, 6048, and 6090 of, the Business and Professions Code, to amend Section 55.32 of the Civil Code, to amend Section 9795 of the Government Code, to amend Section 1872.95 of the Insurance Code, and to amend Section 19280 of the Revenue and Taxation Code, relating to attorneys.

[Approved by Governor September 21, 2018. Filed with
Secretary of State September 21, 2018.]

LEGISLATIVE COUNSEL'S DIGEST

AB 3249, Committee on Judiciary. State Bar Act: attorneys: discipline: annual membership fee.

(1) The State Bar Act provides for the licensure and regulation of attorneys by the State Bar of California, a public corporation governed by a board of trustees. Existing law, until January 1, 2019, requires the board to charge an annual membership fee for active members of up to $315 for 2018.

This bill would, until January 1, 2020, require the board to charge an annual license fee in the same amount for 2019. The bill would replace the terms "member," "membership," and "dues" with "licensee," "license," and "fees," respectively, throughout the act. The bill would provide that any reference to "member of the State Bar" in any provision of law is deemed to mean a "licensee of the State Bar."

92

(2) The act requires protection of the public to be the highest priority for the State Bar and the board of trustees in exercising their licensing, regulatory, and disciplinary functions.

This bill would provide that protection of the public includes support for greater access to, and inclusion in, the legal system.

(3) The act provides that the officers of the State Bar are a president, vice president, secretary, and a treasurer and requires the officers of the State Bar to continue in office until their successors are elected and qualify. Existing law requires the treasurer of the State Bar to certify under oath the State Bar's financial statement for each fiscal year.

This bill would instead provide that the officers of the State Bar are a chair, vice chair, and a secretary and that they shall continue in office until their successors are appointed or selected. The bill would instead require the chief financial officer of the State Bar to certify the financial statement.

(4) The act authorizes the board to aid in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice, including, but not by way of limitation, all matters that may advance the professional interests of the members of the State Bar. The act requires the State Bar to assist the sections to incorporate as a private, nonprofit corporation and to transfer the section functions to the nonprofit corporation, defined as the association in the act. Existing law requires the nonprofit corporation to be called any name meeting certain requirements and approved by the Chief Justice.

This bill would eliminate the authorization of the board to aid in all matters that may advance the professional interests of the members of the State Bar. The bill would require the association to be called the California Lawyers Association, and would make various conforming changes in this regard.

(5) The act requires applicants for admission to the State Bar to, among other things, take and pass a bar examination and offers the examination in February and July. The act requires an application to take the bar examination filed between the last business day of November and January 15, for the February examination, or between the last business day of April and June 15, for the July examination, to be accepted if it is accompanied by a timely filing fee and late fee. The act prohibits an application filed after January 15 for the February examination and June 15 for the July examination from being accepted.

The act authorizes the board to establish an examining committee to be comprised of 19 members, 9 of whom shall be public members. The act provides that the public members shall serve a term of 4 years commencing at the conclusion of the annual meeting of the State Bar.

This bill would change the filing time described above to before January 1 for the February examination and to before June 1 for the July examination and would prohibit an application for examination from being accepted after January 1 and July 1, respectively.

The bill would require the State Bar to develop and implement a plan to meet certain goals relating to access, fairness, and diversity in the legal profession and the elimination of bias in the practice of law. The bill would

92

require the State Bar to prepare and submit a report on the plan and its implementation to the Legislature, by March 15, 2019, and every 2 years thereafter.

This bill would remove the provision providing that the terms of the public members of the examining committee begin at the conclusion of the annual meeting of the State Bar.

(6) The act authorizes the State Bar to collect voluntary fees or donations on behalf of the Conference of Delegates of California Bar Associations, as specified.

This bill would end that authorization on January 1, 2020.

(7) The act requires the State Bar to establish and administer an Attorney Diversion and Assistance Program and requires the program to be funded by mandatory fees, as specified. Under existing law, these fees are for the support of the program and related programs, as provided. The act requires participants in the program to be responsible for all expenses related to treatment and recovery and requires the State Bar to establish a financial assistance program to ensure no member is denied acceptance into the program solely due to lack of ability to pay. The act authorizes applicants who are in law school or have applied for admission to the State Bar to enter the program, subject to the approval of the board of trustees.

This bill, on and after January 1, 2019, would require $1 of that mandatory fee, as specified, to be transferred to a statewide nonprofit corporation, established by attorneys that has, for the last 25 years or more, provided peer support to attorneys recovering from alcohol and substance abuse in a confidential and anonymous manner, to fund the support and recovery efforts of the nonprofit corporation and would require the nonprofit corporation to submit an annual report to the State Bar accounting for use of the funds, as specified. The bill would instead require the State Bar to establish a program to provide financial assistance to a licensee and a person eligible for services who otherwise would be denied acceptance into the program solely due to the lack of ability to pay, as specified, and would also authorize the mandatory fees to be used for treatment services for those who demonstrate an inability to pay for treatment.

(8) The act provides for the investigation and discipline of members of the State Bar, requires the board of trustees to establish a State Bar Court to act in the board of trustees' place in the determination of disciplinary proceedings, requires the board of trustees to appoint a chief trial counsel, and requires the board of trustees to enroll a member as an inactive member, as specified. The act requires the State Bar to enroll a member to inactive status under certain circumstances and authorizes the State Bar to enroll a member to inactive status under other circumstances, including upon a finding that the attorney's conduct poses a substantial threat of harm to the interests of the attorney's clients or to the public if certain factors are found, including, among other things, that the attorney has caused or is causing substantial harm to the attorney's clients or the public and that the attorney's clients or the public are likely to suffer greater injury from the denial of inactive enrollment than the attorney is likely to suffer if granted, or there

92

RJN EXHIBIT 3

Paramount Definition & Meaning | Dictionary.com

DICTIONARY.COM                    THESAURUS.COM

🔍 paramount                                            ✕

MEANINGS    GAMES    LEARN    WRITING    WORD OF THE DAY

◆  We Just Added New Words!                    See Words    ✕

**Top Definitions**    **Quiz**    **Related Content**    **Examples**    **British**

FEEDBACK

📖 **Middle School Level**

# paramount

[ **par**-*uh*-mount ] SHOW IPA 🔊 ☆

See synonyms for *paramount* on Thesaurus.com

---

*adjective*

1   chief in importance or impact; supreme; preeminent:
    *a point of paramount significance.*

2   above others in rank or authority; superior in power or jurisdiction.

*noun*

3   a supreme ruler; overlord.

3:23-0164-BAS-DDL
RJN ISO Rule 11 Motion Ex. 3 p. 001

RJN Exhibit 4

 The State Bar *of California*

**Rule 1.0.1 Terminology**
**(Rule Approved by the Supreme Court, Effective November 1, 2018)**

(a)   "Belief" or "believes" means that the person* involved actually supposes the fact in question to be true.  A person's* belief may be inferred from circumstances.

(b)   [Reserved]

(c)   "Firm" or "law firm" means a law partnership; a professional law corporation; a lawyer acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal services organization or in the legal department, division or office of a corporation, of a government organization, or of another organization.

(d)   "Fraud" or "fraudulent" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive.

(e)   "Informed consent" means a person's* agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks, including any actual and reasonably* foreseeable adverse consequences of the proposed course of conduct.

(e-1) "Informed written consent" means that the disclosures and the consent required by paragraph (e) must be in writing.*

(f)   "Knowingly," "known," or "knows" means actual knowledge of the fact in question. A person's* knowledge may be inferred from circumstances.

(g)   "Partner" means a member of a partnership, a shareholder in a law firm* organized as a professional corporation, or a member of an association authorized to practice law.

(g-1) "Person" has the meaning stated in Evidence Code section 175.

(h)   "Reasonable" or "reasonably" when used in relation to conduct by a lawyer means the conduct of a reasonably prudent and competent lawyer.

(i)   "Reasonable belief" or "reasonably believes" when used in reference to a lawyer means that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable.

(j)   "Reasonably should know" when used in reference to a lawyer means that a lawyer of reasonable prudence and competence would ascertain the matter in question.

(k)   "Screened" means the isolation of a lawyer from any participation in a matter, including the timely imposition of procedures within a law firm* that are adequate under the circumstances (i) to protect information that the isolated lawyer is

1

3:23-0164-BAS-DDL
RJN Opposition Ex. 4  p. 001

obligated to protect under these rules or other law; and (ii) to protect against other law firm* lawyers and nonlawyer personnel communicating with the lawyer with respect to the matter.

(l)    "Substantial" when used in reference to degree or extent means a material matter of clear and weighty importance.

(m)    "Tribunal" means: (i) a court, an arbitrator, an administrative law judge, or an administrative body acting in an adjudicative capacity and authorized to make a decision that can be binding on the parties involved; or (ii) a special master or other person* to whom a court refers one or more issues and whose decision or recommendation can be binding on the parties if approved by the court.

(n)    "Writing" or "written" has the meaning stated in Evidence Code section 250. A "signed" writing includes an electronic sound, symbol, or process attached to or logically associated with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to sign the writing.

**Comment**

*Firm\* or Law Firm\**

[1]    Practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a law firm.* However, if they present themselves to the public in a way that suggests that they are a law firm* or conduct themselves as a law firm,* they may be regarded as a law firm* for purposes of these rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm,* as is the fact that they have mutual access to information concerning the clients they serve.

[2]    The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,* other than as a partner* or associate, or officer or shareholder, that is close, personal, continuous, and regular. Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed a member of a law firm* for purposes of these rules will also depend on the specific facts. (Compare *People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 [86 Cal.Rptr.2d 816] with *Chambers v. Kay* (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

2

*Fraud\**

[3]     When the terms "fraud"* or "fraudulent"* are used in these rules, it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer assisting in the perpetration of a fraud,* or otherwise frustrate the imposition of discipline on lawyers who engage in fraudulent* conduct.  The term "fraud"* or "fraudulent"* when used in these rules does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information.

*Informed Consent\* and Informed Written Consent\**

[4]     The communication necessary to obtain informed consent* or informed written consent* will vary according to the rule involved and the circumstances giving rise to the need to obtain consent.

*Screened\**

[5]     The purpose of screening* is to assure the affected client, former client, or prospective client that confidential information known* by the personally prohibited lawyer is neither disclosed to other law firm* lawyers or nonlawyer personnel nor used to the detriment of the person* to whom the duty of confidentiality is owed.   The personally prohibited lawyer shall acknowledge the obligation not to communicate with any of the other lawyers and nonlawyer personnel in the law firm* with respect to the matter.  Similarly, other lawyers and nonlawyer personnel in the law firm* who are working on the matter promptly shall be informed that the screening* is in place and that they may not communicate with the personally prohibited lawyer with respect to the matter.  Additional screening* measures that are appropriate for the particular matter will depend on the circumstances.  To implement, reinforce and remind all affected law firm* personnel of the presence of the screening,* it may be appropriate for the law firm* to undertake such procedures as a written* undertaking by the personally prohibited lawyer to avoid any communication with other law firm* personnel and any contact with any law firm* files or other materials relating to the matter, written* notice and instructions to all other law firm* personnel forbidding any communication with the personally prohibited lawyer relating to the matter, denial of access by that lawyer to law firm* files or other materials relating to the matter, and periodic reminders of the screen* to the personally prohibited lawyer and all other law firm* personnel.

[6]     In order to be effective, screening* measures must be implemented as soon as practical after a lawyer or law firm* knows* or reasonably should know* that there is a need for screening.*

3

EXHIBIT 5
RJN

 The State Bar *of California*

### Rule 1.7 Conflict of Interest: Current Clients
### (Rule Approved by the Supreme Court, Effective November 1, 2018)

(a)  A lawyer shall not, without informed written consent* from each client and compliance with paragraph (d), represent a client if the representation is directly adverse to another client in the same or a separate matter.

(b)  A lawyer shall not, without informed written consent* from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person,* or by the lawyer's own interests.

(c)  Even when a significant risk requiring a lawyer to comply with paragraph (b) is not present, a lawyer shall not represent a client without written* disclosure of the relationship to the client and compliance with paragraph (d) where:

   (1)  the lawyer has, or knows* that another lawyer in the lawyer's firm* has, a legal, business, financial, professional, or personal relationship with or responsibility to a party or witness in the same matter; or

   (2)  the lawyer knows* or reasonably should know* that another party's lawyer is a spouse, parent, child, or sibling of the lawyer, lives with the lawyer, is a client of the lawyer or another lawyer in the lawyer's firm,* or has an intimate personal relationship with the lawyer.

(d)  Representation is permitted under this rule only if the lawyer complies with paragraphs (a), (b), and (c), and:

   (1)  the lawyer reasonably believes* that the lawyer will be able to provide competent and diligent representation to each affected client;

   (2)  the representation is not prohibited by law; and

   (3)  the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

(e)  For purposes of this rule, "matter" includes any judicial or other proceeding, application, request for a ruling or other determination, contract, transaction, claim, controversy, investigation, charge, accusation, arrest, or other deliberation, decision, or action that is focused on the interests of specific persons,* or a discrete and identifiable class of persons.*

### Comment

[1]  Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.  The duty of undivided loyalty to a current client prohibits

1

undertaking representation directly adverse to that client without that client's informed written consent.* Thus, absent consent, a lawyer may not act as an advocate in one matter against a person* the lawyer represents in some other matter, even when the matters are wholly unrelated. (See *Flatt v. Superior Court* (1994) 9 Cal.4th 275 [36 Cal.Rptr.2d 537].) A directly adverse conflict under paragraph (a) can arise in a number of ways, for example, when: (i) a lawyer accepts representation of more than one client in a matter in which the interests of the clients actually conflict; (ii) a lawyer, while representing a client, accepts in another matter the representation of a person* who, in the first matter, is directly adverse to the lawyer's client; or (iii) a lawyer accepts representation of a person* in a matter in which an opposing party is a client of the lawyer or the lawyer's law firm.* Similarly, direct adversity can arise when a lawyer cross-examines a non-party witness who is the lawyer's client in another matter, if the examination is likely to harm or embarrass the witness. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require informed written consent* of the respective clients.

[2]     Paragraphs (a) and (b) apply to all types of legal representations, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the formation of a partnership for several partners* or a corporation for several shareholders, the preparation of a pre-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an "uncontested" marital dissolution. If a lawyer initially represents multiple clients with the informed written consent* as required under paragraph (b), and circumstances later develop indicating that direct adversity exists between the clients, the lawyer must obtain further informed written consent* of the clients under paragraph (a).

[3]     In *State Farm Mutual Automobile Insurance Company v. Federal Insurance Company* (1999) 72 Cal.App.4th 1422 [86 Cal.Rptr.2d 20], the court held that paragraph (C)(3) of predecessor rule 3-310 was violated when a lawyer, retained by an insurer to defend one suit, and while that suit was still pending, filed a direct action against the same insurer in an unrelated action without securing the insurer's consent. Notwithstanding *State Farm*, paragraph (a) does not apply with respect to the relationship between an insurer and a lawyer when, in each matter, the insurer's interest is only as an indemnity provider and not as a direct party to the action.

[4]     Even where there is no direct adversity, a conflict of interest requiring informed written consent* under paragraph (b) exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal. For example, a lawyer's obligations to two or more clients in the same matter, such as several individuals seeking to form a joint venture, may materially limit the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the other clients. The risk is that the lawyer may not be

2

able to offer alternatives that would otherwise be available to each of the clients. The mere possibility of subsequent harm does not itself require disclosure and informed written consent.* The critical questions are the likelihood that a difference in interests exists or will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably* should be pursued on behalf of each client. The risk that the lawyer's representation may be materially limited may also arise from present or past relationships between the lawyer, or another member of the lawyer's firm*, with a party, a witness, or another person* who may be affected substantially by the resolution of the matter.

[5]     Paragraph (c) requires written* disclosure of any of the specified relationships even if there is not a significant risk the relationship will materially limit the lawyer's representation of the client. However, if the particular circumstances present a significant risk the relationship will materially limit the lawyer's representation of the client, informed written consent* is required under paragraph (b).

[6]     Ordinarily paragraphs (a) and (b) will not require informed written consent* simply because a lawyer takes inconsistent legal positions in different tribunals* at different times on behalf of different clients. Advocating a legal position on behalf of a client that might create precedent adverse to the interests of another client represented by a lawyer in an unrelated matter is not sufficient, standing alone, to create a conflict of interest requiring informed written consent.* Informed written consent* may be required, however, if there is a significant risk that: (i) the lawyer may temper the lawyer's advocacy on behalf of one client out of concern about creating precedent adverse to the interest of another client; or (ii) the lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case, for example, when a decision favoring one client will create a precedent likely to seriously weaken the position taken on behalf of the other client. Factors relevant in determining whether the clients' informed written consent* is required include: the courts and jurisdictions where the different cases are pending, whether a ruling in one case would have a precedential effect on the other case, whether the legal question is substantive or procedural, the temporal relationship between the matters, the significance of the legal question to the immediate and long-term interests of the clients involved, and the clients' reasonable* expectations in retaining the lawyer.

[7]     Other rules and laws may preclude the disclosures necessary to obtain the informed written consent* or provide the information required to permit representation under this rule. (See, e.g., Bus. & Prof. Code, § 6068, subd. (e)(1) and rule 1.6.) If such disclosure is precluded, representation subject to paragraph (a), (b), or (c) of this rule is likewise precluded.

[8]     Paragraph (d) imposes conditions that must be satisfied even if informed written consent* is obtained as required by paragraphs (a) or (b) or the lawyer has informed the client in writing* as required by paragraph (c). There are some matters in which the conflicts are such that even informed written consent* may not suffice to permit representation. (See *Woods v. Superior Court* (1983) 149 Cal.App.3d 931 [197 Cal.Rptr.

3

185]; *Klemm v. Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; *Ishmael v. Millington* (1966) 241 Cal.App.2d 520 [50 Cal.Rptr. 592].)

[9]     This rule does not preclude an informed written consent* to a future conflict in compliance with applicable case law.  The effectiveness of an advance consent is generally determined by the extent to which the client reasonably* understands the material risks that the consent entails.  The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably* foreseeable adverse consequences to the client of those representations, the greater the likelihood that the client will have the requisite understanding.  The experience and sophistication of the client giving consent, as well as whether the client is independently represented in connection with giving consent, are also relevant in determining whether the client reasonably* understands the risks involved in giving consent.  An advance consent cannot be effective if the circumstances that materialize in the future make the conflict nonconsentable under paragraph (d).  A lawyer who obtains from a client an advance consent that complies with this rule will have all the duties of a lawyer to that client except as expressly limited by the consent.  A lawyer cannot obtain an advance consent to incompetent representation. (See rule 1.8.8.)

[10]     A material change in circumstances relevant to application of this rule may trigger a requirement to make new disclosures and, where applicable, obtain new informed written consents.*  In the absence of such consents, depending on the circumstances, the lawyer may have the option to withdraw from one or more of the representations in order to avoid the conflict.  The lawyer must seek court approval where necessary and take steps to minimize harm to the clients.  See rule 1.16.  The lawyer must continue to protect the confidences of the clients from whose representation the lawyer has withdrawn. (See rule 1.9(c).)

[11]     For special rules governing membership in a legal service organization, see rule 6.3; and for work in conjunction with certain limited legal services programs, see rule 6.5.

4

EXHIBIT 6
RJN

# The State Bar *of California*

**Rule 4.1 Truthfulness in Statements to Others**
**(Rule Approved by the Supreme Court, Effective November 1, 2018)**

In the course of representing a client a lawyer shall not knowingly:*

(a)     make a false statement of material fact or law to a third person;* or

(b)     fail to disclose a material fact to a third person* when disclosure is necessary to avoid assisting a criminal or fraudulent* act by a client, unless disclosure is prohibited by Business and Professions Code section 6068, subdivision (e)(1) or rule 1.6.

**Comment**

[1]     A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts.  A misrepresentation can occur if the lawyer incorporates or affirms the truth of a statement of another person* that the lawyer knows* is false.  However, in drafting an agreement or other document on behalf of a client, a lawyer does not necessarily affirm or vouch for the truthfulness of representations made by the client in the agreement or document. A nondisclosure can be the equivalent of a false statement of material fact or law under paragraph (a) where a lawyer makes a partially true but misleading material statement or material omission.  In addition to this rule, lawyers remain bound by Business and Professions Code section 6106 and rule 8.4.

[2]     This rule refers to statements of fact.  Whether a particular statement should be regarded as one of fact can depend on the circumstances.  For example, in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are ordinarily in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.*

[3]     Under rule 1.2.1, a lawyer is prohibited from counseling or assisting a client in conduct that the lawyer knows* is criminal or fraudulent.*  See rule 1.4(a)(4) regarding a lawyer's obligation to consult with the client about limitations on the lawyer's conduct.  In some circumstances, a lawyer can avoid assisting a client's crime or fraud* by withdrawing from the representation in compliance with rule 1.16.

[4]     Regarding a lawyer's involvement in lawful covert activity in the investigation of violations of law, see rule 8.4, Comment [5].

EXHIBIT 7
RJN

# UNIVERSITY *of* PENNSYLVANIA LAW REVIEW

### Founded 1852

---

#### Formerly
#### AMERICAN LAW REGISTER

---

© 2021 University of Pennsylvania Law Review

---

| VOL. 169 | FEBRUARY 2021 | NO. 3 |
|---|---|---|

---

## ARTICLE

---

## THE MISUNDERSTOOD ELEVENTH AMENDMENT

### WILLIAM BAUDE[†] & STEPHEN E. SACHS[††]

*The Eleventh Amendment might be the most misunderstood amendment to the Constitution. Both its friends and enemies have treated the Amendment's written*

---

† Professor of Law, University of Chicago Law School.
†† Colin W. Brown Professor of Law, Duke University School of Law.
We are grateful for comments and suggestions from Sam Bray, Tom Colby, Scott Dodson, Jonathan Gienapp, Tara Grove, Julian Davis Mortenson, Caleb Nelson, Jim Pfander, Richard Re, Amanda Schwoerke, Eric Segall, Jonathan Urick, Ingrid Wuerth, and from participants in the Fall Speaker Series of the Georgetown Center for the Constitution, the Hugh & Hazel Darling Foundation Originalism Works-in-Progress Conference at the University of San Diego Law School, and Advanced Topics in Federal Courts at the University of Virginia School of Law. Thanks as well to Brendan Anderson, Kurtis Michael, and Scotty Schenck for research assistance, and to the SNR Denton Fund and Alumni Faculty Fund at Chicago for research support.

*text, and the unwritten doctrines of state sovereign immunity, as one and the same—reading broad principles into its precise words, or treating the written Amendment as merely illustrative of unwritten doctrines. The result is a bewildering forest of case law, which takes neither the words nor the doctrines seriously.*

*The truth is simpler: the Eleventh Amendment means what it says. It strips the federal government of judicial power over suits against states, in law or equity, brought by diverse plaintiffs. It denies subject-matter jurisdiction in all such cases, to federal claims as well as state ones, and in only such cases. It can't be waived. It can't be abrogated. It applies on appeal. It means what it says. Likewise, the Amendment does not mean what it does not say: it neither abridges nor enlarges other, similar rules of sovereign immunity, derived from the common law and the law of nations, that limit the federal courts' personal jurisdiction over unconsenting states.*

*Current case law runs roughshod over these distinctions, exposing sound doctrines to needless criticism and sometimes leading the Court off track. Understanding the Amendment's text lets us correct these errors and respect the unwritten law the Amendment left in place.*

INTRODUCTION ......................................................................... 611

I. "POSTULATES WHICH LIMIT AND CONTROL" ............................. 614
    A. *Beyond "Eleventh Amendment Immunity"* ......................................... 614
    B. *The "Postulates" and the Amendment* ............................................. 618
    C. *The "Postulates" and the Modern Court* ........................................ 620

II. THE ELEVENTH AMENDMENT .................................................. 623
    A. *"The Judicial power of the United States": Waiver* ............................. 625
        1. Text and History .................................................................. 625
    B. *"shall not be construed to extend": Federal Questions* ......................... 632
        1. Text ..................................................................................... 633
        2. History ................................................................................ 636
        3. Purpose .............................................................................. 644
    C. *"to any suit": Abrogation* ............................................................. 646
    D. *"in law or equity": Admiralty Jurisdiction* ..................................... 648
    E. *"commenced or prosecuted": Appellate jurisdiction* ............................ 650
        1. Text and History ................................................................. 651
        2. Precedent ........................................................................... 652
    F. *"against one of the United States": Defendants* ................................ 657
    G. *"by Citizens of another State, or by Citizens or Subjects of any Foreign State": Plaintiffs* ......................................................... 659

This Article may be reproduced and distributed, in any format, to students for classroom use or for other educational or research purposes at or below cost, provided that any such reproduction identifies the authors, the University of Pennsylvania Law Review, and the volume, first page, and year of the Article's publication in the Law Review, and includes this copyright provision.

CONCLUSION ............................................................................662

## INTRODUCTION

The competition is tough, but the Eleventh Amendment still might be the most misunderstood amendment to the Constitution. Adopted in 1795, the Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.[1]

Ever since, the Amendment's friends and enemies have competed with each other to misconstrue it. Despite their differences, they've even made the same mistake: treating the written text of the Amendment, and the unwritten doctrines of state sovereign immunity, as one and the same. The result is a bewildering forest of case law, which takes neither the words nor the doctrines seriously. This Article tries to mark a more straightforward path.

Past understandings have usually gone wrong in one of two ways. The first is to treat the entire doctrine of state sovereign immunity as somehow inscribed within the Eleventh Amendment's words. Some make this mistake by adopting a broad view of immunity, and by reading the Amendment for more than it's worth. Though the text refers only to plaintiffs from "another State" or a "Foreign State," this broad theory concludes that a penumbral "Eleventh Amendment immunity" extends even to in-state suits.[2] Others, who take a narrower view of sovereign immunity, have read the Amendment for less than it's worth. What might be called a "compromise theory" of the Amendment holds that its enactors, having named a precise set of cases in the text, deprived the states of any other immunity in any other federal cases.[3] And under the "diversity theory," which is narrower still, there is no immunity

---

[1] U.S. CONST. amend. XI.

[2] *See, e.g.*, Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 247 (1985); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984) (holding that a suit by a Pennsylvania citizen against an arm of the state "contravenes the Eleventh Amendment"); *cf.* William P. Marshall, Commentary, *The Diversity Theory of the Eleventh Amendment: A Critical Evaluation*, 102 HARV. L. REV. 1372, 1389 (1989) (arguing that both *Hans v. Louisiana*, 134 U.S. 1 (1890), and its critics "ultimately rest on non-textual assumptions").

[3] *See, e.g.*, Andrew B. Coan, Essay, *Text as Truce: A Peace Proposal for the Supreme Court's Costly War over the Eleventh Amendment*, 74 FORDHAM L. REV. 2511, 2527-39 (2006); John F. Manning, *The Eleventh Amendment and the Reading of Precise Constitutional Texts*, 113 YALE L.J. 1663, 1722-25 (2004); Lawrence C. Marshall, Commentary, *Fighting the Words of the Eleventh Amendment*, 102 HARV. L. REV. 1342, 1356-71 (1989); *cf.* Calvin R. Massey, *State Sovereignty and the Tenth and Eleventh Amendments*, 56 U. CHI. L. REV. 61, 66 (1989) (taking this position with respect to the Eleventh Amendment but suggesting that there may be Tenth Amendment immunities as well).

even for some cases falling *within* the Amendment's text, if they also fall within some other head of federal jurisdiction.[4]

A second wrong turn treats the Amendment as merely illustrative of sovereign-immunity doctrines writ large.[5] For example, common-law sovereign immunity can be waived by the sovereign, and maybe it can also be abrogated by certain federal statutes.[6] Modern interpreters have mistakenly inferred that the Eleventh Amendment can be waived or abrogated too.[7] Likewise, common-law sovereign immunity lets a state consent to suit in its own courts, sometimes exposing it to Supreme Court review on appeal.[8] But the Court has mistakenly concluded that its appellate jurisdiction is generally exempt from the Amendment's terms.[9]

The truth is simpler. The Eleventh Amendment means what it says. It eliminates federal judicial power over one set of cases: suits filed against states, in law or equity, by diverse plaintiffs. It strips subject-matter jurisdiction in *all* such cases, regardless of why or how the plaintiffs are in

---

4  Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 109-16, 153 (1996) (Souter, J., dissenting); *see, e.g.*, Welch v. Tex. Dep't of Highways & Pub. Transp., 483 U.S. 468, 509-10 (1987) (Brennan, J., dissenting); *Atascadero*, 473 U.S. at 259 (Brennan, J., dissenting); Akhil Reed Amar, Marbury, *Section 13, and the Original Jurisdiction of the Supreme Court*, 56 U. CHI. L. REV. 443, 490-98 (1989) [hereinafter Amar, Marbury]; Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425, 1474-75 (1987) [hereinafter Amar, *Sovereignty*]; Richard H. Fallon, Jr., *The "Conservative" Paths of the Rehnquist Court's Federalism Decisions*, 69 U. CHI. L. REV. 429, 443 (2002); William A. Fletcher, *The Diversity Explanation of the Eleventh Amendment: A Reply to Critics*, 56 U. CHI. L. REV. 1261, 1263-64 (1989) [hereinafter Fletcher, *Reply*]; William A. Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction*, 35 STAN. L. REV. 1033, 1035 (1983) [hereinafter Fletcher, *Interpretation*]; John J. Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 COLUM. L. REV. 1889, 1893-94 (1983); Vicki C. Jackson, *The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity*, 98 YALE L.J. 1, 45 (1988); Daniel J. Meltzer, *The Seminole Decision and State Sovereign Immunity*, 1996 SUP. CT. REV. 1, 10-13; James E. Pfander, *History and State Suability: An 'Explanatory' Account of the Eleventh Amendment*, 83 CORNELL L. REV. 1269, 1279-80 (1998); Edward A. Purcell, Jr., *The Particularly Dubious Case of* Hans v. Louisiana: *An Essay on Law, Race, History, and "Federal Courts,"* 81 N.C. L. REV. 1927, 1943 (2003); Thomas D. Rowe, Jr., *Exhuming the "Diversity Explanation" of the Eleventh Amendment*, 65 ALA. L. REV. 457, 459 (2013).

5  *See, e.g.*, Allen v. Cooper, 140 S. Ct. 994, 1000 (2020) (reading the Amendment "'not so much for what it says' as for the broader 'presupposition of our constitutional structure which it confirms'" (quoting Blatchford v. Native Vill. of Noatak, 501 U.S. 775, 779 (1991))).

6  *See* Curran v. Arkansas, 56 U.S. (15 How.) 304, 309 (1853) (consent); Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976) (abrogation).

7  *See, e.g.*, Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 618 (2002) (contending that a state is "free to waive its Eleventh Amendment immunity"); *Fitzpatrick*, 427 U.S. at 456 (describing "the Eleventh Amendment" as "necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment").

8  *See, e.g.*, *Curran*, 56 U.S. at 309.

9  S. Cent. Bell Tel. Co. v. Alabama, 526 U.S. 160, 166 (1999); McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, 496 U.S. 18, 31 (1990).

federal court, and in *only* such cases. It can't be waived. It can't be abrogated. It applies in the Supreme Court. It means what it says.

By the same token, the Eleventh Amendment *does not* mean what it *does not* say. The Amendment doesn't implicitly repeal any other, similar rules of sovereign immunity—including any limits on the federal courts' personal jurisdiction, properly derived from the common law and the law of nations. The general law of sovereign immunity existed before the Constitution; it remained mostly intact after the Constitution; and it survived the Eleventh Amendment, too.

Despite this confusion, the Supreme Court has arrived at mostly right answers in its sovereign immunity cases, most of the time.[10] But many of those right answers were wrongly defended, with the Court carelessly mushing the written and unwritten rules into a formless "hybrid" theory.[11] This carelessness exposed sound doctrines to needless criticism, and occasionally it caused the Court to veer off track. Distinguishing the unwritten rules of sovereign immunity from the written rules of the Eleventh Amendment lets us deal with each set of rules on its own terms, and lets us respect the text as meaning what it says.[12]

In this piece we try to set things right, by putting the Eleventh Amendment in its historical context. As understood when enacted, the Amendment's words made sense in light of the common-law principles that preceded them. In so arguing, we draw on insights from previous scholarship,[13] together with previously overlooked aspects of the historical materials—both of which we believe haven't yet been properly assembled, and which become far more persuasive when properly aligned. In sum:

---

[10] *See* William Baude, *Sovereign Immunity and the Constitutional Text*, 103 VA. L. REV. 1, 3 (2017); Stephen E. Sachs, *Constitutional Backdrops*, 80 GEO. WASH. L. REV. 1813, 1868-75 (2012); Brief of Professors William Baude & Stephen E. Sachs as Amici Curiae in Support of Neither Party at 12-15, Franchise Tax Bd. v. Hyatt, 139 S. Ct. 1485 (2019) (No. 17-1299) [hereinafter *Hyatt* Brief].

[11] Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 394 (1998) (Kennedy, J., concurring); *see also* Emps. of the Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare, 411 U.S. 279, 310-11 (1973) (Brennan, J., dissenting); Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 HARV. L. REV. 1559, 1609-11 (2002) (describing the "hybrid nature" of the Court's Eleventh Amendment jurisprudence).

[12] *Compare, e.g.*, Martha A. Field, *The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One*, 126 U. PA. L. REV. 515, 516 (1978) (arguing that the Amendment does *not* "mean what it says"), *with* Bradford R. Clark, *The Eleventh Amendment and the Nature of the Union*, 123 HARV. L. REV. 1817, 1819 (2010) (suggesting that it does).

[13] *See generally* Nelson, *supra* note 11. *See, e.g.*, Clark, *supra* note 12; Kurt T. Lash, *Leaving the Chisholm Trail: The Eleventh Amendment and the Background Principle of Strict Construction*, 50 WM. & MARY L. REV. 1577 (2009); Steven Menashi, *Article III as a Constitutional Compromise: Modern Textualism and State Sovereign Immunity*, 84 NOTRE DAME L. REV. 1135 (2009).

- States are protected by *two* forms of sovereign immunity.
- *The first* is a common-law immunity from compulsory process, one that prevents states from being forced into court without their consent. This immunity existed before the Constitution; it wasn't eliminated by Article III; and it largely can't be abrogated by Congress under Article I. Its limits derive from the common law itself.
- *The second* is the Eleventh Amendment. The Amendment supplements the traditional immunity, limiting the subject-matter jurisdiction of the federal courts when certain kinds of plaintiffs sue a state in law or equity. Its limits apply across-the-board, whatever the head of federal jurisdiction. They can't be waived. They can't be abrogated. They apply to the Supreme Court. They protect states, and states alone.

## I. "POSTULATES WHICH LIMIT AND CONTROL"

Sovereign immunity has a troubled relationship with text. Recall the confident declaration of *Monaco v. Mississippi*: "Behind the words of the constitutional provisions are postulates which limit and control."[14] This claim has come in for some ribbing,[15] and for good reason: when the text is clear, background "postulates" are the last refuge of scoundrels.

So *Monaco*'s claims are easy to dismiss—too easy. Read carefully, they reflect anything but indifference to text. On the contrary, they recognize the need to read enactments for what they actually say, in light of their unwritten antecedents, and with an eye to the preexisting *corpus juris*.[16] If anything, ignoring the "postulates" behind the Eleventh Amendment is what's gotten our textual analysis into trouble.

### A. *Beyond "Eleventh Amendment Immunity"*

The usual story of the Eleventh Amendment is well-known. In 1793, the Court in *Chisholm v. Georgia* let a South Carolina citizen use its original

---

[14] 292 U.S. 313, 322 (1934).

[15] *See, e.g.*, Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 n.13 (1996) (Souter, J., dissenting) (arguing that such reasoning "stray[s] beyond the boundaries of traditional constitutional analysis"); Henry Paul Monaghan, Comment, *The Sovereign Immunity 'Exception'*, 110 HARV. L. REV. 102, 121 (1996) (arguing that "the power of symbolism" swayed the Court to "reject[] clear constitutional text in preference to unarticulated and debatable historical explanations"); *cf.* Brannon P. Denning & Glenn Harlan Reynolds, Essay, *Comfortably Penumbral*, 77 B.U. L. REV. 1089, 1101 (1997) ("penumbral reasoning"); Robert Post, *Democracy, Popular Sovereignty, and Judicial Review*, 86 CALIF. L. REV. 429, 440 (1998) ("lively constitutional adjudication"); Ernest A. Young, Alden v. Maine *and the Jurisprudence of Structure*, 41 WM. & MARY L. REV. 1601, 1619 (2000) ("amorphous").

[16] William Baude & Stephen E. Sachs, *The Law of Interpretation*, 130 HARV. L. REV. 1079, 1099 (2017) ("The Constitution was a legal document, adopted in a world with legal rules of interpretation already in place, and those unwritten rules may well have shaped its legal content.").

jurisdiction to sue the State of Georgia for debt.[17] The ensuing "shock of surprise"[18] prompted Congress to propose, and the states to ratify, the Eleventh Amendment. That Amendment reversed *Chisholm*, forbidding suits "against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[19] In time, the Court came to read the Amendment as "confirm[ing]" a broader "presupposition of our constitutional structure,"[20] and to apply its terms to a much broader range of circumstances: suits by citizens of the same state,[21] suits by other unenumerated plaintiffs,[22] suits in admiralty (and not just "law or equity"),[23] and so on. Through a sort of synecdoche, all questions of state sovereign immunity have now come to touch on the Eleventh Amendment; the phrase "Eleventh Amendment immunity" thus serves as appropriate shorthand for state sovereign immunity in general.[24]

So goes the usual story. But at the risk of stating the obvious, it isn't a true story, at least where the Constitution is concerned. Neither the Eleventh Amendment nor any "Eleventh Amendment immunity" extends to suits not described in the Amendment's text. Reading the words "another State" as if they included "the same State," or the phrase "law or equity" as if it included "admiralty," and so on, is the most risible kind of purposivism—and would indeed be funny, if it weren't sometimes done seriously.

But. The Court has generally been *right* to hold the states immune to suits by in-state citizens, suits in personam in admiralty, and the like. It's merely that *this* immunity has nothing to do with the Eleventh Amendment.

Long before the Eleventh Amendment was ratified, indeed even before the Constitution was written, the states were protected by doctrines of sovereign immunity. These doctrines were drawn from the law of nations and

---

[17] 2 U.S. (2 Dall.) 419, 420 (1793).

[18] Hans v. Louisiana, 134 U.S. 1, 11 (1890). *Compare Seminole Tribe*, 517 U.S. at 69 (quoting *Monaco*, 292 U.S. at 325), *with id.* at 106 n.5 (Souter, J., dissenting) ("[T]he contentions in some of our earlier opinions that *Chisholm* created a great 'shock of surprise' misread the history.").

[19] U.S. CONST. amend. XI.

[20] Allen v. Cooper, 140 S. Ct. 994, 1000 (2020) (internal quotation marks and citation omitted).

[21] *Hans*, 134 U.S. at 1.

[22] *Monaco*, 292 U.S. at 330-32 (foreign principality); Smith v. Reeves, 178 U.S. 436, 440-41 (1900) (federally chartered railroad).

[23] *In re* New York, 256 U.S. 490, 497, 500 (1921).

[24] *E.g.*, Coleman v. Ct. of Appeals, 566 U.S. 30, 43 (2012) (plurality opinion) (describing Maryland's "Eleventh Amendment immunity from suits"); Pense v. Md. Dep't of Pub. Safety & Corr. Servs., 926 F.3d 97, 100-02 (4th Cir. 2019) (referring to state sovereign immunity as "Eleventh Amendment immunity"); *cf.* Kanuszewski v. Mich. Dep't of Health & Hum. Servs., 927 F.3d 396, 413 n.7 (6th Cir. 2019) ("State sovereign immunity is sometimes called 'Eleventh Amendment' immunity because that amendment reaffirmed the doctrine after it was thrown into doubt; however, this immunity emanates from our overall constitutional framework rather than existing in any one amendment.").

from the common law of which it was a part, and they exempted an unconsenting sovereign from what we today call a court's personal jurisdiction.[25] (We sometimes give these unwritten doctrines the label of "common law," but "general law" might be more precise:[26] this law was often shared by multiple jurisdictions, and it included rules of equity or admiralty more properly excluded from the "common law" label.)

As Caleb Nelson has persuasively shown, under these doctrines a sovereign state wasn't amenable to suit and couldn't be haled into court as a defendant.[27] Pennsylvania's attorney general explained in 1781 that "every kind of process, issued against a sovereign, is a violation of the laws of nations; and is in itself null and void."[28] While these doctrines were only rarely codified in statute or constitutional text, that was no cause for surprise: the states were already accustomed to applying a general law of personal jurisdiction.[29]

As is argued in more detail elsewhere,[30] there's very good reason to think the Constitution left these general doctrines alone. Article III expressly extended the federal judicial power "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority"—and, even more pointedly, to controversies "between a State and Citizens of another State," or "between a State . . . and foreign States, Citizens or Subjects."[31] One could read these

---

[25] Nelson, *supra* note 11, at 1574-79; *see also* Nathan v. Virginia, 1 U.S. (1 Dall.) 77 n., 78 n. (Pa. C.P. Phila. Cnty. 1781) (applying the international law of immunity); *cf.* 4 WILLIAM BLACKSTONE, COMMENTARIES *67 (describing the law of nations as part of the common law).

[26] *See* William A. Fletcher, *General Common Law and Section 34 of the Judiciary Act of 1789: The Example of Marine Insurance*, 97 HARV. L. REV. 1513, 1517-21 (1984); Caleb Nelson, *The Persistence of General Law*, 106 COLUM. L. REV. 503, 505-07 (2006).

[27] *See generally* Nelson, *supra* note 11.

[28] *Nathan*, 1 U.S. at 78 n. (argument of counsel); *see also* 3 THE PAPERS OF JAMES MADISON, CONGRESSIONAL SERIES 187 n.2 (William T. Hutchinson & William M.E. Rachal eds., 1963) (describing a 1781 message regarding *Nathan* from Pennsylvania's attorney general, chief justice, and one associate justice, stating that "all process directed against the person of a Sovereign or against his Goods is absolutely void; that the Sheriff cannot be compelled to serve or return it: and that all concerned in issuing or serving such process are guilty of a violation of the laws of nations," and could be committed "to Gaol to answer for the offence").

[29] *See, e.g.*, Kibbe v. Kibbe, 1 Kirby 119, 125-26 (Conn. Super. Ct. 1786) (rejecting a Massachusetts judgment, though "conformable to the laws and customs of the said commonwealth of Massachusetts," because that court "had no legal jurisdiction of the cause"); Jenkins v. Putnam, 1 S.C.L. (1 Bay) 8, 10 (1784) (stating that "the law of nations" required respecting foreign judgments, but only if they were issued by "a court of competent jurisdiction," for otherwise "the whole circumstances of the case would have been open for a full investigation, agreeable to the principles of the common law"); *cf.* Rose v. Himely, 8 U.S. (4 Cranch) 241, 276-77 (1808) (noting that a foreign court's judgments "are not regarded" by other courts "if it exercises a jurisdiction which, according to the law of nations, its sovereign could not confer").

[30] *See* Baude, *supra* note 10, at 4-12; Nelson, *supra* note 11, at 1580-1601; Clark, *supra* note 12, at 1863-75; Lash, *supra* note 13, at 1599-1603, 1618-27, 1641-50, 1653-76; Menashi, *supra* note 13, at 1155-75.

[31] U.S. CONST. art. III, § 2, cl. 1.

categories of subject-matter jurisdiction as abrogating the states' personal immunities, the way the provision for "Controversies between two or more States" presupposed that states could be sued against their will.[32] Indeed, some people did read Article III that way.[33] But when the issue came up during Ratification, most of the Constitution's defenders took the opposite view—including folks like Alexander Hamilton in New York,[34] James Madison and John Marshall in Virginia,[35] and Rufus King in Massachusetts.[36] They contended that the background principles of immunity remained in force, and that Article III had to be understood in their light.[37] As Madison pointed out, Article III's citizen-diversity clauses hadn't erased the disabilities of alien enemies or married women to sue and be sued; neither had the state-diversity clauses erased the states' immunity to judicial process.[38]

It was natural for Madison's audience to expect the new courts of the United States, hearing cases "in Law and Equity" or "of admiralty and maritime Jurisdiction,"[39] to continue to apply principles of general law that courts of law, equity, or admiralty had traditionally applied.[40] (Such principles were also needed to explain the sovereign immunity of the United States itself—which is less controversial, but no less unwritten.) In any case, in the view of the majority of Founding-era commentators, as well as most Supreme Court decisions of the past 130 years, the Constitution's defenders had the better of the argument.[41]

---

32  *Id.; see* Rhode Island v. Massachusetts, 37 U.S. (12 Pet.) 657, 720 (1838) (holding that, under this clause, "[t]he states waived their exemption from judicial power").

33  *See, e.g.,* Brutus, *XIII,* N.Y.J., Feb. 21, 1788, *reprinted in* 16 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 172, 172 (John P. Kaminski & Gaspare J. Saladino eds., 1993) [hereinafter DHRC]; Debates of the Virginia Convention (June 19, 1788), *in* 10 DHRC, *supra,* at 1387, 1406 (statement of George Mason); *see also, e.g.,* Debates of the Virginia Convention (June 21, 1788), *in* 10 DHRC, *supra,* at 1441, 1453-56 (statement of Edmund Randolph) (arguing that Article III abrogated sovereign immunity and was right to do so).

34  *See* THE FEDERALIST NO. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

35  *See* Debates of the Virginia Convention (June 20, 1788), *in* 10 DHRC, *supra* note 33, at 1412, 1414, 1433.

36  *See Marcus,* MASS. MERCURY (Salem, Mass.), July 13, 1793, *reprinted in* 5 DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789–1800, at 389, 389-90 (Maeva Marcus ed., 1994) [hereinafter DHSC] (noting that the Massachusetts convention assented to Article III on King's guarantee that state sovereign immunity would not be infringed); *Brutus,* INDEP. CHRON. (Bos.), July 18, 1793, *reprinted in* 5 DHSC, *supra,* at 392, 392; *Democrat,* Mass. Mercury (Bos.), July 23, 1793, *reprinted in* 5 DHSC, *supra,* at 393-94, 395 nn.3-4.

37  Nelson, *supra* note 11, at 1580-92.

38  Debates of the Virginia Convention, *supra* note 35, at 1414.

39  U.S. CONST. art. III, § 2, cl. 1.

40  *See* Stewart Jay, *Origins of Federal Common Law: Part Two,* 133 U. PA. L. REV. 1231, 1254-1300 (1985) (describing the Founding-era role of general law).

41  *See* Maeva Marcus & Natalie Wexler, *Suits Against States: Diversity of Opinion in the 1790s,* 1993 J. SUP. CT. HIST. 73, 73, 84 (describing the "relatively small but vocal group of pro-*Chisholm* commentators," and indicating that this group was "in the minority"); Nelson, *supra* note 11, at 1564 ("The Court never tires of reminding its critics that during the ratification debates, prominent

## B. *The "Postulates" and the Amendment*

Nonetheless, four Justices in *Chisholm* ruled against the common-law immunity, allowing a number of pending suits against states to proceed. The Eleventh Amendment was surely written to change the result in *Chisholm* and in these other suits.[42] In so doing, however, the Amendment neither codified nor repealed the preexisting law of sovereign immunity.

This followed from two basic features of our legal system. The first is that we have several kinds of law that layer on top of one another. An ordinary debt case might be governed by unwritten common law, state legislation, a state constitution, a federal treaty, federal legislation, the federal Constitution, or some combination of these. When one kind of law conflicts with another, the "superior" law naturally governs, as in *Marbury v. Madison*.[43] But when the superior law fails to speak to a particular question, that question is answered by some other type of law, lower down.[44]

The second feature is that, while any of these laws can be changed, we have a general presumption against implied repeal.[45] Whenever a legislature enacts a new statute, it changes certain rules, but it leaves most of the law alone. This presumption frees up lawmakers to codify a field one provision at a time—and it lets them solve today's problems as they arise, without having to reinvent all of yesterday's solutions.

So too with a constitutional amendment. When the Eleventh Amendment was adopted, it made new constitutional law, altering some of the rules about federal subject-matter jurisdiction over suits against states. But the Amendment did nothing to repeal or alter the preexisting, lower-down, *personal*-jurisdictional rules of state sovereign immunity that *Chisholm* had failed to apply. *Contra Chisholm*, these "backdrop" rules simply continued to govern, unless and until some *other* source of law interrupted them.[46]

This "backdrop" may seem strange to those who see common-law rules as resembling administrative agency regulations. On that view, the Amendment's precise words might have "occupied the field";[47] the courts had lost their

---

supporters of the proposed Constitution—including both James Madison and John Marshall—explicitly asserted that Article III would *not* expose unconsenting states to suit by individuals.").

[42] *See generally* Lash, *supra* note 13 (emphasizing the importance of suits other than *Chisholm*).

[43] 5 U.S. (1 Cranch) 137, 178 (1803).

[44] *See* Stephen E. Sachs, *Pennoyer Was Right*, 95 TEX. L. REV. 1249, 1267 (2017) (describing how different legal issues might "fall[] through the holes of one type of law to be answered by another—and sometimes slipping all the way through, falling outside the laws of any one state to be caught at the bottom by general law").

[45] Baude & Sachs, *supra* note 16, at 1110, 1118-20.

[46] *See* Sachs, *supra* note 10, at 1872 ("*Chisholm* was wrong because Article III really left the states' preexisting immunity in force.").

[47] ONEOK, Inc. v. Learjet, Inc., 135 S. Ct. 1591, 1594 (2015) (citation and internal quotation marks omitted).

"authority . . . to craft additional law on the same question," like agencies foreclosed from regulating pollutants that Congress had already addressed.[48] But the Eleventh Amendment's adopters saw the preexisting rules of sovereign immunity as *law*, not as a vague delegation to the courts to *go make law*.[49] The constitutional choice to create one type of protection for states neither erased, nor would have been understood to erase, other types of protections.

So our system is left with two distinct principles of state sovereign immunity. One is the common-law principle against forcing states into court—neither created by the Constitution, nor abolished by Article III, nor supplanted by the Eleventh Amendment. The other is the Eleventh Amendment itself, which bars federal jurisdiction over particular suits by particular plaintiffs. If the Amendment applies, it governs; if not, the general immunity governs instead. So principles of sovereign immunity do indeed protect states from many suits by their own citizens, or in their own courts, or in admiralty cases, or the like. But we shouldn't call those principles "Eleventh Amendment immunity," presuppositions of our constitutional structure, and so on. They come from a common-law immunity that predates and outlasts the Eleventh Amendment itself.

And though Supreme Court decisions like *Hans v. Louisiana*[50] wouldn't win any prizes for draftsmanship, on a careful reading they may have understood this distinction. After its references to the Eleventh Amendment, *Hans* went on to note the preratification arguments made by Hamilton, Madison, and Marshall (calling them "most sensible and just");[51] to argue that "the suability of a State without its consent was a thing unknown to the law";[52] and to speak of a "presumption that no anomalous and unheard-of proceedings or suits were intended to be raised up by the Constitution."[53] In other words, *Hans* can be read as an Article III case, rather than an Eleventh Amendment case.

The subsequent decision in *Monaco v. Mississippi*[54] was even more careful to distinguish the Amendment's text from the unwritten law. The Court acknowledged that the Amendment "contains no reference to a suit brought by a foreign State"; it then explained why this fact was "inconclusive," for the same thing might be said about *federal* sovereign immunity.[55] Article III

---

[48] Manning, *supra* note 3, at 1669, 1735 n.281.

[49] *See supra* Section I.A. *See generally* Stephen E. Sachs, *Finding Law*, 107 CALIF. L. REV. 527 (2019) (defending such views of unwritten law).

[50] 134 U.S. 1 (1890).

[51] *Id.* at 13-14.

[52] *Id.* at 16.

[53] *Id.* at 18.

[54] 292 U.S. 313 (1934).

[55] *Id.* at 321.

extends the judicial power "to Controversies to which the United States shall
be a Party," and "there is no express provision that the United States may not
be sued."[56] Yet the federal government is universally seen as protected by "the
established doctrine of the immunity of the sovereign from suit except upon
consent."[57] The same reasoning, argued the Court, had to apply to the states:
"Manifestly, we cannot rest with a mere literal application of the words of § 2
of Article III, or assume that the letter of the Eleventh Amendment exhausts
the restrictions upon suits against non-consenting States. Behind the words
of the constitutional provisions are postulates which limit and control."[58]

To identify these postulates, the Court relied in part on contemporary
statements of the law of jurisdiction—for example, Madison's understanding
that a foreign state couldn't sue "an American state . . . without the consent
of the parties," or Marshall's questioning whether a foreign-state defendant
would "be bound by the decision" otherwise.[59] In other words, whether or not
*Monaco* was rightly decided, the *form* of its reasoning appears to be correct.
The relevant postulates included the law of nations and the general doctrines
of sovereign immunity, which predated Article III and the Eleventh
Amendment, and which continue to lie behind them even now. Indeed, the
loose reasoning of which *Hans* and *Monaco* are accused may actually be that
of the Burger Court.[60]

### C. The "Postulates" and the Modern Court

Much of the time, the modern Supreme Court's confusion between the
constitutional law of the Eleventh Amendment and the general law of
sovereign immunity is harmless error: the opinion gets to the right place in
the end. But not always.

Consider the Court's recent decision in *Franchise Tax Board v. Hyatt*.[61] The
Court took the case to decide, for the third time, whether a state's sovereign
immunity must be recognized in the courts of another state. The Court
answered "yes," overturning prior precedent from 1979.[62] But it conflated
different aspects of the two immunity doctrines along the way, ignoring
important aspects of the Eleventh Amendment's text.

---

56 *Id.* (quoting U.S. CONST. art. III, § 2, cl. 1).
57 *Id.*
58 *Id.* at 322.
59 *Id.* at 323-24 (citations omitted).
60 *See, e.g.*, Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 247 (1985) (conflating the doctrine
and the text); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 103 n.12 (1984) (same).
61 139 S. Ct. 1485 (2019).
62 *Id.* at 1490 (overruling Nevada v. Hall, 440 U.S. 410 (1979)).

*What was conflated.* Most of the modern Court's sovereign immunity cases involved the federal government's power to hold states to answer. Some cases, such as *Hans* and *Monaco*, asked whether Article III eliminated a preexisting immunity. Others, such as *Seminole Tribe v. Florida*[63] and *Alden v. Maine*,[64] asked whether Congress could abrogate whatever immunity had remained. For the most part, in these cases, the Court said no.

This answer still makes sense even after one realizes that these cases involved the common-law immunity, not the Eleventh Amendment. The general law of immunity is in theory abrogable by statute, just like any other rule of common law or equity; but it's also a topic over which the federal government has quite limited power. Article III left the immunity in place, and a congressional power to force states into court may have been a "great substantive and independent" power—the kind that would have been mentioned explicitly, and not left out as "incidental to those powers . . . expressly given" in Article I.[65] (Congress can abrogate international law, but not necessarily to the states' disadvantage; it might have an easier time, say, redrawing the Northwest Territory's border with Canada than redrawing Maryland's border with the District of Columbia.[66]) Even the discrepancy between *Seminole Tribe* and earlier cases like *Fitzpatrick v. Bitzer*[67] was mostly comprehensible; abrogating immunity might turn out to be "incidental" to enforcing the Fourteenth Amendment's limits on states, but not (say) to the Patent Clause.[68]

*Hyatt* was more complicated, for the original action involved no *federal* power at all. The Nevada plaintiff had filed suit in Nevada court, under Nevada law, against what the parties took to be an arm of the state of California.[69] Whether Nevada had to respect the general law of immunity depended on its judicial and legislative powers. Nothing in the Constitution relevantly restricts those powers, and unlike federal powers, state powers don't have to be conferred by the Constitution. Had Nevada been one of the

---

63  517 U.S. 44 (1996).

64  527 U.S. 706 (1999).

65  M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 411 (1819); *see also* Baude, *supra* note 10, at 9–22; Nelson, *supra* note 11, at 1639–43; Sachs, *supra* note 10, at 1874–75.

66  For a broader treatment of courts' jurisdictional limits and Congress's potential power to abrogate them, see generally Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 VA. L. REV. 1703 (2020); *see also id.* at 1722, 1730-31, 1732 & n.180 (noting that Congress has power to abrogate international law, but that it might not extend to state sovereign immunity); *cf. infra* Section II.C. (discussing abrogation and the Eleventh Amendment).

67  427 U.S. 445 (1976).

68  *See* Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627 (1999) (finding no abrogation power for patents). *But see* John Harrison, *State Sovereign Immunity and Congress's Enforcement Powers*, 2006 SUP. CT. REV. 353 (questioning this power as to the Fourteenth Amendment).

69  *Cf. Hyatt* Brief, *supra* note 10, at 27 n.6 (noting that the parties might have been wrong about this). One of us may discuss this issue in future work.

original thirteen states, it arguably would have had the power before Ratification to abrogate the common-law immunity (at least within its own courts).[70] So, under the equal-footing doctrine,[71] it might seem that the Silver State retains this power today.

The Supreme Court disagreed, but in so doing it made a mush of sovereign immunity. For example, it correctly acknowledged that the "sovereign immunity of the States . . . neither derives from, nor is limited by, the terms of the Eleventh Amendment."[72] But rather than recognizing this broader form of immunity as a form of persistent common law, the Court described it as coming from the Constitution itself—something "preserved in the constitutional design," and perhaps even reflected in "[t]he Constitution's use of the term 'States.'"[73]

Here the Court subtly departed from the Constitution's design as understood for nearly a century after its enactment. The Constitution did offer states some security against the judgments of sister-state courts: by failing to make those judgments *enforceable*, not by imposing an affirmative constitutional ban on rendering them.[74] The Court was right to sense that an important safeguard of immunity had been lost, but the safeguard it resurrected wasn't the one that had been part of the law.

*What was ignored.* Having over-constitutionalized sovereign immunity in one respect, the Court then proceeded to undervalue the constitutional text in another. When a Nevada citizen files suit against California, that suit is one "commenced or prosecuted against one of the United States by [a] Citizen[] of another State."[75] Of course, Gilbert Hyatt's Nevada lawsuit wasn't barred by the Eleventh Amendment, because the Amendment doesn't affect state courts. (That's why the Court's opinion had to talk about airier stuff.) But when the Court took jurisdiction over the Board's appeal, that *did* call the Eleventh Amendment into play. The Supreme Court, unlike the Nevada courts, exercises only "the judicial Power of the United States."[76] That power is constrained by the Eleventh Amendment, and it "shall not be construed to extend to any suit in law or equity, commenced or prosecuted

---

[70] *See* The Schooner Exch. v. M'Faddon, 11 U.S. (7 Cranch) 116, 146 (1812) ("Without doubt, the sovereign of the place is capable of destroying this [immunity].").

[71] *See* PPL Mont., LLC v. Montana, 565 U.S. 576, 590-91 (2012) (describing the doctrine).

[72] Franchise Tax Bd. v. Hyatt, 139 S. Ct. 1485, 1496 (2019) (quoting Alden v. Maine, 527 U.S. 706, 713 (1999)).

[73] *Id.* at 1494, 1496; *see also* Michael B. Rappaport, *Reconciling Textualism and Federalism: The Proper Textual Basis of the Supreme Court's Tenth and Eleventh Amendment Decisions*, 93 NW. U. L. REV. 819, 873-74 (1999) (advancing this reading of "States" decades before *Hyatt*).

[74] *See Hyatt* Brief, *supra* note 10, at 19-22 (describing the details of this arrangement, which we don't rehash here).

[75] U.S. CONST. amend. XI.

[76] *Id.* art. III, § 1.

against one of the United States by Citizens of another State."[77] Hyatt was a citizen of Nevada when he filed suit, and both sides took him to have sued the State of California. As the matter was framed on appeal, the Supreme Court shouldn't have been able to hear the case at all.

To be sure, older precedents said that the Eleventh Amendment could be waived,[78] and that it didn't apply at all on review of state judgments.[79] But the *Hyatt* Court was obviously willing to overrule cases it saw as incorrect,[80] and these other precedents were incorrect too—indeed, far more obviously incorrect than the one the Court had before it. Issues of subject-matter jurisdiction being nonwaivable,[81] the Court shouldn't have allowed the parties' inattention to these questions to foreclose its own reconsideration.

So the Justices in *Hyatt* exercised a jurisdiction explicitly forbidden by the Eleventh Amendment but blessed by the Supreme Court, in order to overrule a *different* doctrine blessed by the Supreme Court but not actually in conflict with the Eleventh Amendment. The resulting mess suggests that the Eleventh Amendment ought to be better understood.

## II. THE ELEVENTH AMENDMENT

Once we stop misreading the Amendment as the only font of state sovereign immunity, we're free to read its text to mean just what it says. A straightforward reading of the Amendment has important consequences for modern doctrine. Consider each phrase in turn:[82]

- *The Judicial power of the United States*—The Amendment is a limit on the federal courts' subject-matter jurisdiction. Subject-matter jurisdiction is nonwaivable, and the Amendment is nonwaivable too. A diverse federal plaintiff may not sue a state in law or equity, even with that state's consent.

- *shall not be construed to extend*—The Amendment is a cross-cutting limit on the judicial power. It forbids federal courts, in specified cases, to exercise their subject-matter jurisdiction. That means the Amendment bars federal-question cases with the right alignment of parties, just as it bars all other suits within its terms.

---

[77] *Id.* amend. XI.

[78] *See infra* Section II.A.

[79] *See infra* Section II.E.

[80] Franchise Tax Bd. v. Hyatt, 139 S. Ct. 1485, 1499 (2019); *see also* Gamble v. United States, 139 S. Ct. 1960, 1984 (2019) (Thomas, J., concurring) (confirming that the author of *Hyatt* felt obligated not to adhere to "a decision that is demonstrably erroneous—i.e., one that is not a permissible interpretation of the text").

[81] Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).

[82] We borrow this organizational framework from Coan, *supra* note 3, at 2528.

- *to any suit*—The Amendment is mandatory and exceptionless. As a result, it may not be abrogated by Congress. Neither Article I nor the Fourteenth Amendment let Congress override express constitutional limits on the judicial power.
- *in law or equity*—The Amendment applies only to suits in law or equity. It leaves cases of admiralty and maritime jurisdiction alone. The unwritten immunity may apply in admiralty, but the differences between the Amendment and the common law make the limits of admiralty jurisdiction especially important.
- *commenced or prosecuted*—The Amendment limits the scope of federal subject-matter jurisdiction, whether original or appellate, in actions by diverse plaintiffs against states. It thus forbids the Supreme Court to hear such cases on appeal from state court, regardless of who is appealing.
- *against one of the United States*—The Amendment protects states, and only states. Its terms fail to shield Native American tribes, federal territories, the District of Columbia, Compact Clause entities, and so on. These entities may turn out to enjoy a common-law immunity, but not one under the Amendment.
- *by Citizens of another State, or by Citizens or Subjects of any Foreign State*—The Amendment restricts suits by diverse plaintiffs, and only by diverse plaintiffs. If a state is sued by a Native American tribe, a federal corporation, a Compact Clause entity, a sister state as an assignee-for-collection-only, and so on, the common-law immunity might apply, but the Eleventh Amendment might not.

The result is an Amendment significantly narrower than the general doctrine of immunity—but one that, where it applies, applies with drastic force. Indeed, this force may seem so drastic as to call the straightforward reading into question. Why should states be able to consent to federal suits by their own citizens, but not to suits by some other state's citizens? Why should a plaintiff's residence affect Congress's abrogation power (if it has one), or the Court's ability to hear federal-question appeals? Why put a bar to some suits into the Constitution itself, but leave so many others (admiralty, foreign states, etc.) to the vagaries of the common law? What sense does any of this make?

Stark as they are, these consequences flow from rough-cut decisions that made sense in the context of the Eleventh Amendment's enactment. The Amendment was drafted to solve a pressing problem: a flawed inference that Article III's heads of subject-matter jurisdiction—particularly the state-diversity provision—had repealed the states' personal immunities. Attorney General Charles Lee, arguing the very first case to construe the new Amendment, described it as "the policy of the people to cut off that branch of the judicial power, which had been supposed to authorize suits by

individuals against states."[83] The Amendment solved the problem, all right: it cut off that branch with a chainsaw.

The Amendment's supporters had sought, as they repeated over and over again, to "remove *any* clause or article of the said Constitution which can be construed to imply or justify a decision that a State is compellable to answer in *any* suit by an individual or individuals in *any* Court of the United States."[84] We will see in a moment why they thought the proposed text would achieve this, notwithstanding its limited reach. But their broad opposition to suits against states suggests that they weren't *trying* to draft an Amendment whose language cut too carefully, and especially not one that might generate any negative inference *supporting* federal jurisdiction in other individual suits against states. If the Amendment extended its constitutional bar to a few more suits against states than was absolutely necessary, so much the better. The urgent circumstances to which the Eleventh Amendment responded made it logical to write it in a particular way. This choice still has consequences for modern law, even if its logic is now obsolete.

### A.  *"The Judicial power of the United States": Waiver*

#### 1.  Text and History

The general law of sovereign immunity involves an immunity from compulsory process. Because it limits a court's *process*, it affects whether a sovereign may be haled into court. And because it concerns *compulsory* process, it can be waived by consent, as part of the doctrine we now call "personal jurisdiction."[85]

The Eleventh Amendment is different. It restricts "[t]he Judicial power of the United States"—a reference to subject-matter jurisdiction, not personal jurisdiction.[86] It creates a categorical rule limiting the federal courts' power to adjudicate certain cases, even if the parties were ready and willing to appear. Eleventh Amendment cases lie outside "[t]he Judicial power of the

---

83  Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378, 381 (1798) (argument of Charles Lee).

84  Resolution of the Massachusetts General Court (Sept. 27, 1793), *in* 5 DHSC, *supra* note 36, at 440, 440 (emphasis added); *see also* Resolution of the Connecticut General Assembly (Oct. 29, 1793), *in* 5 DHSC, *supra* note 36, at 609, 609; Proceedings of the South Carolina Senate (Dec. 17, 1793), *in* 5 DHSC, *supra* note 36, at 610, 611; Proceedings of the Maryland House of Delegates (Dec. 27, 1793), *in* 5 DHSC, *supra* note 36, at 611, 611; Proceedings of the Pennsylvania House of Representatives (Dec. 30, 1793), *in* 5 DHSC, *supra* note 36, at 612, 613; Resolution of North Carolina General Assembly (Jan. 11, 1794), *in* 5 DHSC, *supra* note 36, at 615, 615; Proceedings of a Joint Session of the New Hampshire General Court (Jan. 23, 1794), *in* 5 DHSC, *supra* note 36, at 618, 618.

85  Nelson, *supra* note 11, at 1565.

86  U.S. CONST. amend. XI; *accord* Nelson, *supra* note 11, at 1610.

Case 3:23-cv-00164-AGS-DDL    Document 21    Filed 03/30/23    PageID.988    Page 85 of 132

United States," so they can't be tried by consent, any more than two citizens of Pennsylvania can agree to bring their fender-bender into federal court.

This choice of language was consequential. Historically, if a court lacked power to compel a party's attendance, that problem was cured by the party's voluntary appearance.[87] The same doctrine applied to sovereign immunity. For example, in his dissent in *Chisholm*, Justice Iredell noted that an earlier case against Maryland hadn't presented the issue, "because the Attorney-General of the State voluntarily appeared."[88] And the first post-*Chisholm* amendment proposal, offered by Representative Sedgwick of Massachusetts the day after the decision was announced, was designed to protect the states from compulsory federal process, providing that "no state shall be liable to be made a party defendant" in private federal suits.[89]

But the actual Amendment grew out of a different proposal. Introduced the next day by Senator Strong of Massachusetts, this draft restricted federal subject-matter jurisdiction and the extent of "The Judicial Power."[90] While we can't read its drafters' minds, we do know that a number of federal suits were already pending against states; one case against New York eventually went to trial and final judgment while the Amendment was out for ratification.[91] Even if a new amendment eventually restored an immunity from compulsory process, there were still plausible arguments that the states dragged into court under *Chisholm* had lost their immunity in the interim. Designing the Eleventh Amendment as a limit on subject-matter jurisdiction eliminated this problem, making it clear that suits would have to be wiped off the docket without any question of waiver or forfeiture.[92]

The Amendment's contemporaries recognized the difference. Although the requisite number of states had ratified the Amendment by 1795, the news from the state legislatures didn't reach Philadelphia until 1798, when ratification was finally declared.[93] As soon as this happened, the Supreme Court scheduled argument in *Hollingsworth v. Virginia*, and it confirmed that the Amendment had uncompromisingly eradicated all pending suits.[94] Plaintiffs' counsel had argued that applying the Amendment to pending cases

87 *See, e.g.*, Mayhew v. Thatcher, 19 U.S. (6 Wheat.) 129, 130 (1821); Pollard v. Dwight, 8 U.S. (4 Cranch) 421, 428-29 (1808).

88 Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 429 (1793).

89 Proceedings of the United States House of Representatives (Feb. 19, 1793), GAZETTE OF THE U.S. (Phila.), Feb. 20, 1793, *reprinted in* 5 DHSC, *supra* note 36, at 605, 605-06.

90 Resolution in the United States Senate (Feb. 20, 1793), *in* 5 DHSC, *supra* note 36, at 607, 607.

91 For descriptions of these suits, see 5 DHSC, *supra* note 36, at 61-66 (New York); *id.* at 282-85 (Virginia); *id.* at 364-65 (Massachusetts).

92 *See* Nelson, *supra* note 11, at 1604-05 ("By using the language of subject matter jurisdiction, the Eleventh Amendment kept the Supreme Court from proceeding to judgment in these pending cases . . . .").

93 5 DHSC, *supra* note 36, at 289 & n.97.

94 *Id.* at 289; Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378, 382 (1798).

3:23-0164-AGS-DDL
Opposition Ex. 7 p. 018

would be a "great hardship" and contrary to "[t]he spirit of the constitution," permitting "the mischief of an *ex post facto* Constitution" (as well as arguing, more famously, that the Amendment hadn't been validly adopted).[95] To the contrary, said Attorney General Lee, the Amendment had been written to "cut off" or "annihilate[] a part, of the judicial authority of the United States"; it was "equally operative in all the cases against states, where there has been an appearance, or even where there have been a trial and judgment."[96] Lee won in a rout. As Dallas's report puts it:

> The Court, on the day succeeding the argument, delivered an unanimous opinion, that the amendment being constitutionally adopted, there could not be exercised any jurisdiction, *in any case, past or future*, in which a state was sued by the citizens of another state, or by citizens, or subjects, of any foreign state.[97]

As a subject-matter companion to the states' personal immunities, the Eleventh Amendment's limited restrictions made a good deal of sense. Consider the basis for the erroneous decision in *Chisholm*. Some provisions of Article III *do* seem to effect a waiver of immunity: the "judicial Power" over "Controversies between two or more States," for example, suggests that at least one state will always have to be a defendant, and it would be implausible to provide for such cases if the defendant state didn't need to show up.[98] *Chisholm's* supporters thought the same was true of the power to hear controversies "between a State and Citizens of another State," or foreign "Citizens or Subjects"; *Chisholm's* many critics thought this inference unwarranted.[99] But an amendment wiping out federal subject-matter jurisdiction in diverse-plaintiff cases against states would eliminate the only plausible grounds for such an inference: none of the *other* heads of subject-matter jurisdiction posed any similar threat of being misconstrued. (Maybe some, like Justice Wilson, might have found a similar waiver in a general grant

---

[95] 3 U.S. at 378-80 (arguments of counsel).

[96] *Id.* at 380-81 (emphasis omitted).

[97] *Id.* at 382 (emphasis added).

[98] U.S. CONST. art. III, § 2, cl. 1; *cf.* Debates of the Virginia Convention (June 20, 1788) *in* 10 DHRC, *supra* note 33, at 1412, 1414 (statement of James Madison) (footnote omitted) ("The next case, where two or more States are the parties, is not objected to. Provision is made for this by the existing articles of Confederation; and there can be no impropriety in referring such disputes to this tribunal.").

[99] *Compare* Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 473 (1793) (opinion of Jay, C.J.), *with id.* at 449-50 (Iredell, J., dissenting) (suggesting that "every word in the Constitution may have its full effect without involving this consequence"); *see also* Letter from Edmund Pendleton to Nathaniel Pendleton (Aug. 10, 1793), *in* 5 DHSC, *supra* note 36, at 232, 233 (admitting that Article III's words "will extend to the case," but doubting whether, "when they may be satisfied by an Application to one which is common & Ordinary, & the other is new & extraordinary . . . sound construction would confine the General words to the first case").

of federal-question jurisdiction; very few others would have joined him.[100] That's why an Eleventh Amendment focused only on state-diversity suits reassured those who feared "*any* suit by an individual" against a state;[101] the Amendment eliminated subject-matter jurisdiction over some suits, the better to preserve a personal-jurisdiction immunity against the rest.

That's also why one ought to be careful with modern claims "that Congress," in proposing the Eleventh Amendment, "acted not to change but to restore the original constitutional design."[102] By and large, the Amendment *had* restored the original design; private federal suits against states were barred, one way or another. But the Amendment didn't quite reestablish the *status quo ante Chisholmum*, because the new system of immunity was slightly more complicated than the old. Maybe the Amendment could have been drafted differently, reasserting the states' pre-*Chisholm* immunity from compulsory process (with special language to address waivers in pending cases, and so on). Instead, the drafters found it simpler to supplement one immunity with another. In so doing, they adopted a nonwaivable limit on federal judicial power.[103]

### 2. Judicial Misconstruction

This understanding of the Amendment survived for nearly a century, until the Supreme Court botched it in 1883. *Clark v. Barnard* was a complicated equity suit about a disputed sum of money arising out of the bankruptcy of a railroad company.[104] The company's officers deposited $100,000 with the treasurer of Boston, and then they used that deposit as

---

100 *Compare Chisholm*, 2 U.S. at 457 (opinion of Wilson, J.) (arguing that, "[a]s to the purposes of the Union . . . Georgia is NOT a sovereign state," because "the Supreme Power resides in the body of the people"), *with* Letter from John Wereat to Edward Telfair (Feb. 21, 1793), *in* 5 DHSC, *supra* note 36, at 222, 223 (repeating Rep. Sedgwick's statement doubting that "any professional Gentleman would have risqued his reputation on such a forced construction of the clause in the Constitution"), Nelson, *supra* note 11, at 1580 n.97 (noting contemporary "astonishment" at Wilson's opinion), *and id.* at 1584 ("Suits against a state need not be regarded as suits against an impersonal (and therefore nonsovereign) government, but can instead be seen as suits against the sovereign people of the state in their collective capacity.").

101 *See* sources cited *supra* note 84.

102 Alden v. Maine, 527 U.S. 706, 722 (1999).

103 Modern caselaw has extended state sovereign immunity to include limits on federal *executive* power, when that power is exercised in the form of an administrative-agency adjudication initiated by a private party. *See* Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 760 (2002). Thankfully, the Court didn't attribute those limits to the Eleventh Amendment, as opposed to background principles of immunity. *See id.* at 754. While the breadth of the common-law immunity is outside this Article's scope, we note that the Court partly rested its decision on the agency's purported ability to bind private rights, *id.* at 763, traditionally something that only judicial power could do. *See* William Baude, *Adjudication Outside Article III*, 133 HARV. L. REV. 1511, 1541-47, 1577-78 (2020).

104 Clark v. Barnard, 108 U.S. 436, 436-37 (1883).

*The Misunderstood Eleventh Amendment*

surety for a $100,000 bond from the treasurer of Rhode Island. After bankruptcy, the railroad's assignees filed a suit in federal court trying to get the money back from the Boston treasurer and to stop the Rhode Island treasurer from collecting it.[105]

Clark, the Rhode Island treasurer, tried to have the suit dismissed on Eleventh Amendment grounds. He argued that the real party in interest was his employer, the State of Rhode Island, and that the plaintiffs were citizens of Connecticut and Massachusetts.[106] But Clark had been sued "as a wrongdoer in his individual capacity," so the Amendment may not have applied.[107]

The plot, such as it was, thickened. The Boston treasurer paid the disputed sum into court, and the State of Rhode Island itself intervened in the case and filed a claim for the funds. But the lower court awarded the money to the railroad, at which point the state and its treasurer both appealed to the Supreme Court.[108] The Court concluded that the Eleventh Amendment question was resolved by the state's choice to file a claim:

> We are relieved, however, from its consideration by the voluntary appearance of the State in intervening as a claimant of the fund in court. *The immunity from suit belonging to a State, which is respected and protected by the Constitution within the limits of the judicial power of the United States, is a personal privilege which it may waive at pleasure;* so that in a suit, otherwise well brought, in which a State had sufficient interest to entitle it to become a party defendant, its appearance in a court of the United States would be a voluntary submission to its jurisdiction; while, of course, those courts are always open to it as a suitor in controversies between it and citizens of other States. In the present case the State of Rhode Island appeared in the cause and presented and prosecuted a claim to the fund in controversy, and thereby made itself a party to the litigation to the full extent required for its complete determination. *It became an actor as well as defendant,*

---

[105] *Id.* at 442-45.

[106] *Id.* The assignees—George Barnard, Charles Bradley, and Charles Chapman—didn't state their own personal citizenship in the bill of complaint, and the Supreme Court record sheds no light on the question. (Having been appointed by a federal court, they may not have needed to establish diversity jurisdiction.) The Rhode Island treasurer relied on the railroad's having been chartered in Connecticut and Massachusetts. *See* Transcript of Rec. at 6, *Clark*, 108 U.S. 436 (No. 266) ("[T]he complainants in said bill have commenced and do prosecute the same in their capacity of assignees in bankruptcy of a corporation which is a citizen of other States of the United States than the said State of Rhode Island and Providence Plantations . . . ."); *accord id.* at 12. The Supreme Court had by that time adopted the doctrine that a corporation, for Article III purposes, is a citizen of its state of incorporation. *See* Louisville, Cincinnati & Charleston R.R. Co. v. Letson, 43 U.S. (2 How.) 497, 558-59 (1844). *But see* Bank of the U.S. v. Deveaux, 9 U.S. (5 Cranch) 61, 91 (1809) (holding that a corporation's citizenship depends on that of "the real persons who come into court, in this case, under their corporate name").

[107] *Clark*, 108 U.S. at 448; *see also* Osborn v. Bank of the U.S., 22 U.S. (9 Wheat.) 738, 857-58 (1824) (limiting the Eleventh Amendment's scope to suits in which a state is a party of record).

[108] *Clark*, 108 U.S. at 445-46.

as by its intervention the proceeding became one in the nature of an interpleader, in which it became necessary to adjudicate the adverse rights of the State and the appellees to the fund, to which both claimed title.[109]

So far as we can tell, this is the first time the Supreme Court actually held the Eleventh Amendment to be waivable. Several decades earlier, it had heard an appeal in a state-court suit to which Arkansas had consented; but the plaintiff was an Arkansas citizen, and so the Amendment wasn't involved.[110] Two months before *Clark*, in *New Hampshire v. Louisiana*, the Court discussed in dicta the Amendment's "evident purpose" of "prohibit[ing] all suits against a State by or for citizens of other States, or aliens, *without the consent of the State to be sued.*"[111] But the Court's confusion here might be forgivable: the states' preexisting personal immunity could indeed be waived by consent, and as consent wasn't at issue in *New Hampshire*, there was no reason for the Court to think carefully about it.

In any event, *Clark* did reach a holding on waiver: the wrong holding. The Eleventh Amendment allows states to prosecute claims in federal court; it speaks only of suits "commenced or prosecuted *against*" a state.[112] This was enough to resolve the controversy in *Clark*, in which the state had filed its own claim to the funds, becoming "actor as well as defendant."[113] But it doesn't follow that a state, contrary to the Amendment's text, can let a suit be commenced or prosecuted *against it*—i.e., that a state can become a defendant, even voluntarily. Having conflated a state's choice to initiate a claim with a state's choice to defend one, the Court gave no explanation of how the latter complied with the Eleventh Amendment, nor (of course) did it discuss any of the history mentioned above.

---

109 *Id.* at 447-48 (emphasis added).

110 Curran v. Arkansas, 56 U.S. (15 How.) 304, 309 (1853); Transcript of Rec. at 3, *Curran*, 56 U.S. 304 (No. 205); *cf.* Bank of the U.S. v. Planters' Bank of Ga., 22 U.S. (9 Wheat.) 904, 907-08 (1824) (suggesting that "[t]he State of Georgia, by giving to the Bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the Bank, and waives all the privileges of that character," but resolving the Eleventh Amendment argument on the ground that "[t]he State does not, by becoming a corporator, identify itself with the corporation," and that "[t]he Planters' Bank of Georgia is not the State of Georgia" for purposes of subject-matter jurisdiction).

111 108 U.S. 76, 91 (1883) (emphasis added).

112 U.S. CONST. amend. XI (emphasis added).

113 *Clark*, 108 U.S. at 448; *accord* Paul Horton, Lapides v. Board of Regents *and the Untrustworthiness of Unanimous Supreme Court Decisions*, 41 SAN DIEGO L. REV. 1057, 1081 (2004) ("The Eleventh Amendment was irrelevant to this issue because the Amendment had nothing to say about litigation initiated by a State in federal court . . . ."); *cf.* 3 BLACKSTONE, *supra* note 25, at *25 (differentiating among "*actor, reus,* and *judex,*" in which "the *actor,* or plaintiff, . . . complains of an injury done").

Once the Court had openly stated that the Eleventh Amendment was a "personal privilege which [the state] may waive at pleasure,"[114] the seeds of confusion were sown. The Court repeated the point in *Hans v. Louisiana*,[115] a case which famously fell outside the Amendment's terms, and one which is regularly accused of conflating the Eleventh Amendment with the common-law immunity. Sure enough, the Court kept repeating its consent claim in actual Eleventh Amendment cases such as *Gunter v. Atlantic Coast Line Railroad Co.*[116] and *Missouri v. Fiske*.[117] And it reiterated the statement in other, more apt, cases such as *Smith v. Reeves*, brought by a federally chartered railroad,[118] and *Georgia v. City of Chattanooga*, which discussed a prospective suit in *state* court.[119]

A few Justices in the 1970s and 1980s briefly attempted to disentangle the issues of consent in real Eleventh Amendment cases from those in other cases involving immunity.[120] But the attempt failed quickly. By the time its modern cases addressed questions of constructive waiver[121] or removal,[122] the Court was describing consent as a "long recognized"[123] and "long accepted"[124] principle of sovereign immunity doctrine, paying no attention to whether the cases actually involved the Eleventh Amendment.[125] Some lower courts today

---

114 *Clark*, 108 U.S. at 447.

115 134 U.S. 1, 17 (1890).

116 200 U.S. 273, 284 (1906) (out-of-state shareholders).

117 290 U.S. 18, 24-25 (1933) (diversity litigation over a trust).

118 178 U.S. 436, 440-41 (1900). On whether this case should have been seen to fall within the Eleventh Amendment, see *infra* Section II.G.

119 264 U.S. 472, 483 (1924).

120 As Justice Brennan wrote,

> [t]he literal wording is thus a flat prohibition against the federal judiciary's entertainment of suits against even a consenting State brought by citizens of another State or by aliens . . . . It is true that cases since decided have said that federal courts do have power to entertain suits against consenting States. None has yet offered, however, a persuasively principled explanation for that conclusion in the face of the wording of the Amendment.

Emps. of Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare, 411 U.S. 279, 310 (1973) (Brennan, J., dissenting); *see also id.* at 295 n.10 (Marshall, J., concurring) (relying heavily on *Clark v. Barnard* to reply to Justice Brennan); Pennsylvania v. Union Gas Co., 491 U.S. 1, 23-24 (1989) (Stevens, J., concurring) (making a similar point regarding congressional abrogation).

121 *See* Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675-76 (1999).

122 *See* Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 620 (2002).

123 *Fla. Prepaid*, 527 U.S. at 675.

124 *Lapides*, 535 U.S. at 619.

125 *Compare, e.g.*, *Fla. Prepaid*, 527 U.S. at 670-71 (a "New Jersey chartered bank" suing "an arm of the State of Florida"), *with Lapides*, 535 U.S. at 616 (Georgia professor suing the state university).

even suggest that the Eleventh Amendment immunity is *more easily waived* than its common-law predecessor.[126]

All of this is wrong. The Eleventh Amendment restricts the courts' subject-matter jurisdiction; it can't be waived. That was a costly choice on its drafters' part, but one made for good reason. No amount of contrary judicial assertion, especially without reasoning or explanation, alters the Amendment's original meaning.

### B. *"shall not be construed to extend": Federal Questions*

As a textual matter, the Eleventh Amendment provides a rule of construction ("shall not be construed") for how far "[t]he Judicial power of the United States" may "extend."[127] It thus refers to all of Article III, not just to a few heads of jurisdiction. For more than thirty-five years, however, a group of scholars and judges have argued that the Amendment was understood to have a more restrictive scope.[128] On this "diversity theory," the Amendment doesn't actually apply to the judicial power as a whole. Rather, it only reconstrues the state-diversity provisions in particular, insisting that "Controversies . . . between a State" and a private party be read to refer to states as potential plaintiffs but not as potential defendants.[129] That leaves every other head of jurisdiction in Article III wide open for private suits—in particular, the jurisdiction over "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."[130]

Other scholars, in response, found the evidence inconclusive or unpersuasive.[131] For a time, the issue seemed to recede in importance. The sovereign immunity caselaw of the 1990s made the battles over diversity theory seem like sideshows: by enforcing "Eleventh Amendment immunity" well outside the Amendment's terms, the Court made the precise scope of those terms less relevant. Whether those cases were rightly decided (if wrongly reasoned) turns on the states' common-law immunity from process. But if the Amendment is of a different character than the common-law immunity, then the diversity question becomes important again.

---

126 *See, e.g.*, Church v. Missouri, 913 F.3d 736, 742–43 (8th Cir. 2019) (holding that removal by a state waives Eleventh Amendment immunity but not "general state sovereign immunity"); Beaulieu v. Vermont, 807 F.3d 478, 485-87 (2d Cir. 2015) (same).

127 U.S. CONST. amend. XI.

128 *See* sources cited *supra* note 4; *see also* Nelson, *supra* note 11, at 1615 ("There is much to be said for the view that the Eleventh Amendment targets only Article III's grants of diversity jurisdiction . . . .").

129 U.S. CONST. art. III, § 2, cl. 1.

130 *Id.*

131 *See* sources cited *supra* note 3.

On balance, we find the diversity theory unpersuasive. It isn't the most natural reading of the text. It has weaker historical support than the more categorical reading. And the modern rationales for the diversity theory are quite distant from the concerns actually motivating the Amendment. On this point we find ourselves in agreement with prevailing doctrine.

### 1. Text

Here is the best textual account of the diversity theory, as we understand it. The Eleventh Amendment was designed to reverse *Chisholm*. Madison and Marshall had warned against reading Article III's heads of state-diversity jurisdiction to authorize individual suits against states, but *Chisholm* did so anyway. So the Amendment's rule of construction corrected this particular misreading. It may have used broad language, but its words mirrored the phrasing of the state-diversity provisions, and it was implicitly restricted to that specific set of cases.[132] Just as the original-jurisdiction clauses included "those [cases] in which a State shall be Party," meaning only cases filed under state-party heads of jurisdiction,[133] and just as the Judiciary Act of 1789 spoke of suits "where . . . an alien is a party," meaning only cases of alienage jurisdiction,[134] so the Amendment's reference to diverse-plaintiff suits against states meant only those suits specifically relying on state-diversity jurisdiction. In other words, we should read the Amendment as providing that the judicial power "shall not be construed to extend to any suit in law or equity, [*by reason of its having been*] commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

This is surely a possible reading. But we don't consider it the best reading, for at least three reasons.

First, as noted above, the diversity reading isn't quite at ease with the text, which addresses "[t]he Judicial power" as a whole, rather than any particular heads of jurisdiction. As above, the Eleventh Amendment didn't just reverse *Chisholm*; it supplemented the personal immunity that shielded the states with a subject-matter restriction, which among other things the states could

---

132  *Cf.* Christopher R. Green, *Loyal Denominatorism and the Fourteenth Amendment: Normative Defense and Implications*, 13 DUKE J. CONST. L. & PUB. POL'Y 167, 171-74 (2017) (discussing tacit restrictions).

133  U.S. CONST. art. III, § 2, cl. 2; *see* Amar, Marbury, *supra* note 4, at 444; Nelson, *supra* note 11, at 1616 n.259. *But see* United States v. Texas, 143 U.S. 621, 644 (1892) (holding that the Court's original jurisdiction in state-party cases extends to "all cases mentioned in the preceding clause in which a State may, of right, be made a party defendant," or "may, of right, institute a suit in a court of the United States").

134  Ch. 20, § 11, 1 Stat. 73, 78; *see also* Mossman v. Higginson, 4 U.S. (4 Dall.) 12, 14 (1800) ("[A]s the legislative power of conferring jurisdiction on the federal Courts, is . . . confined to suits *between citizens and foreigners*, we must so expound the terms of the law . . . .").

no longer waive. So we already know that Amendment wasn't narrowly tailored to do the minimum necessary to undo *Chisholm*'s damage. (Some scholars read "shall not be construed to extend," added in place of the simpler "shall not extend,"[135] to limit the Amendment to a *Chisholm* fix.[136] But in the nineteenth century, this language was read as necessary to apply the Amendment to previous cases.[137] And in the eighteenth century, the phrase was used not only to resolve interpretive uncertainties,[138] but also to carve out statutory exceptions irrespective of any interpretive disputes.[139])

Second, we should be especially wary of reading tacit restrictions into the text of an "explanatory" provision like the Eleventh Amendment.[140] As an "authoritative declaration" of the proper construction of another text,[141] the Amendment had the status of "an explanatory law," which is how Attorney General Lee described it in *Hollingsworth v. Virginia*.[142] Courts were traditionally expected to "confine the construction" of explanatory statutes "strictly to the letter," for "[o]therwise there should be an explanation upon

---

[135] *Compare* Resolution in the United States Senate (Feb. 20, 1793), *in* 5 DHSC, *supra* note 36, at 607, 607 ("shall not extend"), *with* Resolution in the United States Senate (Jan. 2, 1794), *in* 5 DHSC, *supra* note 36, at 613, 613 ("shall not be construed to extend").

[136] *E.g.*, Amar, *Sovereignty*, *supra* note 4, at 1482; Fletcher, *Reply*, *supra* note 4, at 1270-74.

[137] *See Ex parte* Poulson, 19 F. Cas. 1205, 1207 (C.C.E.D. Pa. 1835) (No. 11,350) (Baldwin, Circuit Justice) (taking the Eleventh Amendment phrase to "refer[] to the past, the present, and the future"); *accord* Dudley's Case, 7 F. Cas. 1150, 1151 (C.C.E.D. Pa. 1842) (No. 4,114) (Baldwin, Circuit Justice) ("[I]t annulled all jurisdiction of such cases then pending . . . ."); Nelson, *supra* note 11, at 1604 n.222 (citing *Dudley's Case*).

[138] *See, e.g.*, An Act Concerning Consuls and Vice-Consuls, ch. 24, § 9, 1 Stat. 254, 257 (1792) (providing that a statutory "specification of certain powers and duties" of U.S. consuls "shall not be construed to the exclusion of others"); Act of Aug. 4, 1790, ch. 35, § 46, 1 Stat. 145, 169 (providing that a statutory means of appraising imported goods "shall not be construed to exclude other proof" at trial of the goods' actual cost).

[139] *See, e.g.*, Act of June 5, 1794, ch. 50, § 2, 1 Stat. 381, 383 (providing that a statute forbidding "any person" within the United States to enlist in a foreign military "shall not be construed to extend to" enlistment taking place on foreign warships, fitted as warships at the time they entered the United States, if the enlistee is a citizen or subject of the foreign state, with which the United States is then at peace); *accord* An Act to Establish Certain Impost Duties on Various Foreign Articles Imported into this State, ch. 40 (N.H. Mar. 4, 1786), *reprinted in* 5 LAWS OF NEW HAMPSHIRE 146, 146, 148 (Henry Harrison Metcalf ed., 1916) (providing that an import duty "upon all other Goods, Wares and Merchandize" "shall not be construed to extend . . . to the Article of Salt"); An Act for the Support of Government, ch. 63, 1792 N.Y. Laws 369, 369 (restricting the number of judges by providing that the provision for their £750 salary "shall not be construed to extend to any judges of the said court, that may be appointed after their number shall amount to five"); 1780 N.C. Sess. Laws, ch. 7, § 3, *reprinted in* 24 STATE RECORDS OF NORTH CAROLINA 324, 325 (Walter Clark ed., 1905) (providing that a flat prohibition on lotteries "shall not be construed to extend to any lottery established . . . for the encouragement of any school or schools").

[140] *See* Pfander, *supra* note 4, at 1323 (describing the Amendment as explanatory); Clark, *supra* note 12, at 1896-97 (same).

[141] Respublica v. Cobbett, 3 U.S. (3 Dall.) 467, 472, 2 Yeates 352 (Pa. 1798) (argument of counsel).

[142] 3 U.S. (3 Dall.) 378, 381 (1798).

*The Misunderstood Eleventh Amendment*

an explanation."[143] Thus, Lee argued, the Amendment couldn't "be expounded by foreign matter";[144] it had to be taken to mean what it says. If we're to read the Amendment under the prevailing law of interpretation,[145] then we should do as the Court did in *Hollingsworth*, and read "any suit" as if it meant "any suit"—including "any case, past or future, in which a state was sued by the citizens of another state, or by citizens, or subjects, of any foreign state."[146]

Third, the diversity theory has trouble explaining the Amendment's limitation to "any suit *in law or equity*."[147] The only apparent function of this phrase is to exempt admiralty cases. As noted below, on the straightforward reading of the Amendment this isn't too strange; no one had read anything about compulsory process against states into the phrase "Cases of admiralty and maritime jurisdiction," so no changes were required.[148] (Justice Washington offered a related explanation: admiralty could be safely excluded from the Amendment, because admiralty courts generally acted *in rem*, rather than directly upon defendants *in personam*.[149]) But the basic idea of the diversity theory is that the Amendment only amended "the state-citizen diversity clause," and that it "was not intended to eliminate or restrict other heads of jurisdiction," such as "admiralty jurisdiction or the federal question jurisdiction."[150] If a diversity-theory Amendment wouldn't have reached admiralty anyway, then the reference to "law or equity" was mere surplusage,[151] and especially puzzling surplusage at that: "Law and Equity" are paired in only one other part of the Constitution, namely Article III's

---

[143] Sawyer v. Shannon, 21 F. Cas. 579, 582 (C.C.D. Tenn. 1809) (No. 12,405) (Todd, Circuit Justice); *see also* 4 MATTHEW BACON, A NEW ABRIDGEMENT OF THE LAW *650 ("The Sense of Words used in an Explanatory Statute ought not to be extended by an equitable Constructio[n]: but their Meaning, the Explanatory Statute being a legislative Construction of the Words used in a former Statute, ought to be strictly adhered to.").

[144] *Hollingsworth*, 3 U.S. at 381.

[145] *See* Baude & Sachs, *supra* note 16, at 1118-20; *see also* John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751, 752 (2009).

[146] *Hollingsworth*, 3 U.S. at 382.

[147] U.S. CONST. amend. XI (emphasis added).

[148] *See infra* Section II.D.

[149] United States v. Bright, 24 F. Cas. 1232, 1236 (C.C.D. Pa. 1809) (No. 14,647) (Washington, Circuit Justice); *see also Ex parte* Madrazzo, 32 U.S. (7 Pet.) 627, 627 (1833) (argument of counsel); *id.* at 632 (opinion of the Court) (holding that because the suit wasn't really in rem, it was "a mere personal suit against a state," which "no private person has a right to commence"); David J. Bederman, *Admiralty and the Eleventh Amendment*, 72 NOTRE DAME L. REV. 935, 936 (1997); Thomas H. Lee, *Making Sense of the Eleventh Amendment: International Law and State Sovereignty*, 96 NW. U. L. REV. 1027, 1073-74 (2002); Fletcher, *Reply*, *supra* note 4, at 1274 & n.70.

[150] Fletcher, *Reply*, *supra* note 4, at 1264.

[151] Justice Washington's gesture toward the diversity theory shows the same hesitation: he suggested in *Bright* that the Amendment's rule of construction applies specifically to the "above provision" (on state-diversity cases), but still went on to consider at great length its potential application to admiralty cases. *See Bright*, 24 F. Cas. at 1236.

head of federal-question jurisdiction.[152] This pairing suggests that the Amendment still applies to federal-question cases—and that it's more than a mere commentary on the state-diversity provisions alone.

### 2. History

Sometimes a reading that seems odd today was nonetheless the better reading when a text became law. But so far as we can tell, that wasn't the case with the Eleventh Amendment. If anything, the historical record seems to favor the categorical reading. Without rehearsing the extensive historical debate over the diversity theory,[153] we highlight a few pieces of contemporary evidence that we find especially persuasive, and we offer some observations on subsequent developments in the nineteenth century.

*The Gallatin proposal.* While the Eleventh Amendment was under debate in the Senate, future Treasury Secretary Albert Gallatin unsuccessfully proposed to exempt any cases arising under U.S. treaties. His draft would have read:

> The judicial power of the United States, *except in cases arising under treaties, made under the authority of the United States*, shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States, by citizens of another state, or by citizens or subjects of any foreign state.[154]

Gallatin's proposal was voted down.[155] But because cases arising under treaties already fell under Article III's head of federal-question jurisdiction, the fact that he thought the exemption necessary—and that the rest of the Senate rejected it—seems to confirm that the final draft of the Amendment, which lacks this phrase, applied to federal-question cases.

To be sure, as with all rejected proposals, it's possible that Gallatin's proposed exemption was thought unnecessary, rather than objectionable; maybe the other senators thought treaty cases were already exempt.[156] But after Gallatin's proposal was rejected, he was one of only two senators to vote

---

152 U.S. CONST. art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . .").

153 For a more complete history of this debate, see sources cited *supra* notes 3–4, 13.

154 Proceedings of the United States Senate (Jan. 14, 1794), *in* 5 DHSC, *supra* note 36, at 617, 617 (emphasis added).

155 *Id.*

156 *See* James E. Pfander & Jessica Dwinell, *A Declaratory Theory of State Accountability*, 102 VA. L. REV. 153, 178 n.96 (2016) (suggesting that "others in the chamber may have quietly persuaded Gallatin and his supporters that the change was unnecessary, given the failure of the Eleventh Amendment to threaten treaty-based claims").

against the Amendment, with twenty-three voting in favor.[157] So he, at least, seemed to think the proposal necessary.

That's also the more natural inference, given the circumstances.[158] The Commonwealth of Massachusetts had been outspoken in seeking a constitutional amendment in response to *Chisholm*,[159] and the pending suit against the Commonwealth (*Vassall v. Massachusetts*) involved a claim under the Treaty of Paris.[160] Yet the Massachusetts delegation all voted for the Eleventh Amendment as written,[161] apparently without expressing any concern that it might let in future treaty claims. We're therefore inclined to agree with the late David Currie that "the historical context belies any attempt at wishful thinking: as the prompt rejection of all ameliorating alterations shows, Congress was in no mood to permit *any* federal suit against a state by a citizen of another state or of a foreign country."[162]

At the time, of course, there was no statutory provision for general federal-question jurisdiction; that would arrive (albeit briefly) seven years later.[163] So it's theoretically conceivable, as some scholars have suggested, that the senators who roundly rejected Gallatin's proposal *only* wanted to forbid those treaty cases, such as *Vassall*, which *also* relied on the constitutional grant of original state-party jurisdiction—while still hoarding the possibility of granting *statutory* federal-question jurisdiction over such cases in the future.[164] But given the expressed views of the Amendment's supporters,[165] that strikes us as by far the less natural reading of the available record. The more natural reading of these events is that Gallatin wanted diverse plaintiffs to be able to bring treaty claims, that the Eleventh Amendment as written would bar them, and that twenty-three other senators thought this was fine.

---

[157] Proceedings of the United States Senate, *supra* note 154, at 617. The two "nays," Sens. Gallatin and Rutherfurd, were from Pennsylvania and New Jersey respectively. *Id.* at 600; *John Rutherfurd*, BIOGRAPHICAL DIRECTORY OF THE U.S. CONG., https://bioguideretro.congress.gov/Home/MemberDetails?memIndex=R000550 [https://perma.cc/9SNS-HT5C].

[158] *See* DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE FEDERALIST PERIOD, 1789-1801, at 197-98 (1997) ("One can imagine a scenario in which a motion to exempt treaty cases is voted down as unnecessary because the amendment itself is inapplicable to cases arising under federal law. But the language of the actual amendment is not conducive to such an interpretation . . . .").

[159] *See* Resolution of the Massachusetts General Court, *supra* note 84, at 440.

[160] *See* 5 DHSC, *supra* note 36, at 354-55.

[161] Proceedings of the United States Senate, *supra* note 154, at 617; *Caleb Strong*, BIOGRAPHICAL DIRECTORY OF THE U.S. CONG., https://bioguideretro.congress.gov/Home/MemberDetails?memIndex=S000109 [https://perma.cc/7Y6X-TQ38]; *George Cabot*, BIOGRAPHICAL DIRECTORY OF THE U.S. CONG., https://bioguideretro.congress.gov/Home/MemberDetails?memIndex=C000009 [https://perma.cc/S4P7-XHNE].

[162] CURRIE, *supra* note 158, at 198.

[163] Judiciary Act of 1801, ch. 4, § 11, 2 Stat. 89, 92 (repealed 1802).

[164] *See* Fletcher, *Reply*, *supra* note 4, at 1285-87; Gibbons, *supra* note 4, at 1935-36.

[165] *See, e.g.*, *supra* note 84 and accompanying text.

*The* Hollingsworth *oral argument.* Once the Eleventh Amendment was declared ratified, the Supreme Court heard argument in *Hollingsworth,* where the plaintiffs gamely asserted that the Amendment exempted pending cases.[166] The plaintiffs faced an uphill battle for several reasons, among them the words "commenced or prosecuted": a case *commenced* before ratification might still be *prosecuted* afterwards, and so caught in the Amendment's net. In response, the plaintiffs read "prosecuted" to refer specifically to a set of *federal-question* cases—namely, those initiated against a state in its own courts (by consent), and then brought to the Supreme Court on appeal:

> It may be said, however, that the word "commenced" is used in relation to future suits, and that the word "prosecuted" is applied to suits previously instituted. But it will be sufficient to answer, in favor of the benign construction, for which the Plaintiffs contend, that the word "commencing" [sic] may, on this ground, be confined to actions originally instituted here, and the word "prosecuted" to suits brought hither by writ of error, or appeal. For, it is to be shewn, that a state may be sued originally, and yet not in the Supreme Court, though the Supreme Court will have an appellate jurisdiction; as where the laws of a state authorize such suits in her own courts, and there is drawn in question the validity of a treaty, or statute of, or authority exercised under, the *United States,* and the decision is against their validity.[167]

The plaintiffs' reading of "prosecuted" isn't very persuasive, and as far as we can tell, it has gone largely unnoticed by scholars.[168] But its importance lies in its explicit suggestion, made within weeks after the Amendment's ratification was announced, that the text applied fully to appellate cases arising under federal law. (Attorney General Lee rejected the plaintiffs' reading on other grounds, without mentioning the federal-question issue.[169]) That the Amendment's application to federal questions was explicitly argued before the Justices gives particular relevance to the Court's forceful declaration, the day after argument concluded, that "the amendment being constitutionally adopted, there could not be exercised any jurisdiction, in any case, past or future, in which a state was sued by the citizens of another state, or by citizens, or subjects, of any foreign state."[170]

*The Breckenridge proposal.* In our view these two contemporaneous events solidly buttress the more natural reading, to show that the Eleventh

---

166  Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378, 378 (1798) (arguments of counsel).

167  *Id.* at 380 (citing Judiciary Act of 1789, ch. 20, § 25, 1 Stat. 73, 85).

168  As of September 27, 2020, the Westlaw JLR database records not a single reference to a number of phrases from this passage, e.g., "suits brought hither by writ of error, or appeal," or "sued originally, and yet not in the Supreme Court."

169  *Hollingsworth,* 378 U.S. at 380-82 (argument of counsel).

170  *Id.* at 382 (opinion of the Court).

Amendment originally meant an across-the-board denial of subject-matter jurisdiction in the cases it lists. Perhaps that's all that need be said. Still, supporters and opponents of the diversity theory have taken hold of various nineteenth-century comments and events as secondary evidence. In our view, those subsequent events are at worst equivocal, and at best they lend additional support to the more natural reading. There's some evidence of later interpreters who may have held the diversity view, though it's far from clear. And this evidence is matched, if not bested, by evidence that others held the categorical view.

One piece of pro-diversity evidence is the so-called Breckenridge Proposal. In December 1804, the Kentucky legislature began a campaign to abolish diversity jurisdiction.[171] Pennsylvania and Vermont's legislatures eventually endorsed the idea, while Massachusetts and Rhode Island were opposed.[172] In the meantime, in February 1805, Senator Breckenridge of Kentucky duly introduced a draft:

> The judicial power of the United States shall not be construed to extend to controversies between a State and citizens of another State, between citizens of different States, between citizens of the same State, claiming lands under grants of different States; and between a State or the citizens thereof and foreign States, citizens, or subjects.[173]

The amendment was reintroduced during the next two years by Senators from Kentucky and Pennsylvania,[174] though it doesn't seem to have been debated. In any case, the wording of Breckenridge's amendment tends to favor the diversity theory. As others have discussed, Breckenridge apparently believed that the phrase "shall not be construed to extend" would strike out particular heads of jurisdiction, rather than act as a cross-cutting prohibition applicable to all of Article III.[175]

On the other hand, this episode has limited probative value about the Eleventh Amendment. On its own terms, the amendment never went anywhere. It's hard to know how many people shared Breckenridge's view of what his proposed language would accomplish. Indeed, his formulation wasn't

171 *See* Resolution of Dec. 19, 1804, 1804 KY. ACTS 147, 148.
172 *See* 16 ANNALS OF CONG. 216 (1806) (statement of Rep. Elliott) (reporting Vermont's endorsement); 15 ANNALS OF CONG. 826-27 (1805) (statement of Rep. Stanton) (reporting Rhode Island's disagreement); Resolve of June 13, 1805, ch. 28, 1804–1805 MASS. ACTS 612, 614-15 (calling the measure "inexpedient," and noting Pennsylvania's assent).
173 14 ANNALS OF CONG. 53 (1805).
174 16 ANNALS OF CONG. 76 (1807) (proposal by Sen. Clay) (Kentucky); 15 ANNALS OF CONG. 68 (1806) (proposal by Sen. Maclay) (Pennsylvania).
175 *See* Amar, *Sovereignty, supra* note 4, at 1482 n.233; Massey, *supra* note 3, at 118; Fletcher, *Reply, supra* note 4, at 1276-79. *But see* Lee, *supra* note 149, at 1076 (highlighting linguistic differences between the Eleventh Amendment and the Breckenridge amendment); Lawrence C. Marshall, *Exchange on the Eleventh Amendment,* 57 U. CHI. L. REV. 127, 129-30 (1990) (same).

universal, as the state legislative resolutions used different language that had no implications for the Eleventh Amendment.[176]

To be sure, one might say much the same of the Gallatin amendment: with little debate, competing interpretations are possible. But between the two of them, the Breckenridge amendment deserves less weight. While the Gallatin episode was a contemporaneous attempt to amend the Eleventh Amendment itself, the Breckenridge episode was a decade-later discussion of a different proposal. However one resolves the uncertainty, it doesn't carry much weight against other evidence from the text and the times.

*Judicial application.* The Breckenridge episode was followed two decades later by a pair of cases in which the Supreme Court appeared to reject the diversity theory. The first of the two was the decision in *Osborn v. Bank of the United States*.[177] *Osborn* was a federal-question case, and controversially so; it remains famous today for the breadth of its holding on federal-question jurisdiction.[178] Yet when Ralph Osborn (Ohio's state auditor) argued that the suit against him was barred by the Eleventh Amendment,[179] and when the Bank offered the diversity theory in response,[180] the Court refused to adopt it.

Indeed, as the arguments played out, the Court actually needed to *reject* the diversity theory for Osborn to lose—and it did so. Osborn argued to the Court that the suit violated the rules of joinder, which would have required the Bank to join the State of Ohio as a necessary party.[181] The Court "admitted" the state's "direct interest . . . in the suit, as brought," and it reasoned that, "had it been in the power of the Bank to make [Ohio] a party, perhaps no decree ought to have been pronounced in the cause, until the State was before the Court."[182] But, reasoned the Court, the Eleventh Amendment got in the way: it "was not in the power of the Bank"—whose membership

---

176  *See* sources cited *supra* notes 171–74; *see, e.g.*, 16 ANNALS OF CONG. 216 (1806) (statement of Rep. Elliott) (reporting Vermont's desire to confine "the judiciary power of the Courts of the United States to cases in law and equity, arising under the Constitution and laws of the United States," and so on).

177  22 U.S. (9 Wheat.) 738 (1824). The Court had also been presented a diversity-theory argument three years earlier in *Cohens v. Virginia*, and had neither rejected it nor adopted it, though it adopted multiple other theories of jurisdiction in the case. *See* 19 U.S. (6 Wheat.) 264, 305-06, 315, 348-49 (1821) (arguments of counsel); *id.* at 407-12 (opinion of the Court).

178  *See, e.g.*, Anthony J. Bellia Jr., *The Origins of Article III "Arising Under" Jurisdiction*, 57 DUKE L.J. 263, 266-67 (2007).

179  *Osborn*, 22 U.S. at 756, 803-04 (argument of counsel).

180  *Id.* at 798.

181  Osborn's counsel argued that

> [i]n all ordinary cases, if the Court sees from the face of the bill, that the actual and principal party in interest is not before them, it will either dismiss the bill, or stay the proceedings until proper parties are made. A decree, vitally affecting the interests of a principal, will never be pronounced, where his agent is the only party to the bill.

*Id.* at 755-56.

182  *Id.* at 846-47 (opinion of the Court).

included citizens of many different states—to "make [Ohio] a party," as "[t]he eleventh amendment of the constitution has exempted a State from the suits of citizens of other States, or aliens."[183] The state didn't have to be joined because it couldn't be joined, and because the case could proceed without it. And the reason the state couldn't be joined was that the Eleventh Amendment limited the judicial power over states, even in what the Court famously decided was a federal-question case.

This helps put a later passage of *Osborn* in context. The Court went on to resolve the case on the ground that the Amendment didn't apply to personal suits against individual state officers, and that it was "limited to those suits in which a State is a party on the record."[184] In the next sentence, the Court added that "[t]he amendment has its full effect, if the constitution be construed as it would have been construed, had the jurisdiction of the Court never been extended to suits brought against a State, by the citizens of another State, or by aliens."[185] This sentence has been taken to affirm the diversity theory, but that seems less likely in context. First, the Court had already said that the Amendment prevented the state from being sued in this federal-question case. Second, sandwiched between references to a state's "being a party on the record,"[186] the Court appears to be trying to illustrate a distinction between the defendant Ralph Osborn and the State of Ohio. Just as Osborn couldn't stand in for the state to *establish* jurisdiction under Article III, he also couldn't stand in for the state to *restrict* jurisdiction under the Eleventh Amendment. If he could, of course, this federal-question suit would fail.

Along with *Osborn*, the Court decided *Bank of the United States v. Planters' Bank of Georgia*, in which the State of Georgia was one of the members composing the defendant corporation.[187] At the time, under *Bank of United States v. Deveaux*, a federal civil suit involving corporations was understood to be a controversy between "the real persons who come into court, in this case, under their corporate name," letting corporations sue or be sued in diversity if their members had the requisite citizenship.[188] But because the Bank of the United States had shareholders from various states, and because Georgia held shares in the defendant, the Eleventh Amendment was

---

183 *Id.*; *see also id.* at 813 (argument of counsel) (noting the diverse citizenship of the Bank's membership).
184 *Id.* at 851-57. The Court of course went on to resolve the case on the ground that the Amendment didn't apply to personal suits against individual state officers, and that it was "limited to those suits in which a State is a party on the record." *Id.*
185 *Id.* at 857-58.
186 *Id.* at 858.
187 22 U.S. (9 Wheat.) 904, 905 (1824).
188 9 U.S. (5 Cranch) 61, 91 (1809).

potentially implicated: the controversy was between a state and the citizens of another state, with the latter as plaintiffs.[189]

The Court found jurisdiction nonetheless. But it didn't take what would have been the easy way out for a diversity theorist, holding the Eleventh Amendment inapplicable to a federal-question case (which the Bank's cases always were, as the Court had just held in *Osborn*). Instead, the Court discussed at length the differences between a suit against a state and one against a corporation, considering the Planters' Bank a separate legal person from the State of Georgia. A suit seeking relief against the bank alone, to be satisfied from the bank's property alone, was a suit "against a corporation," not "against" the state: "The State does not, by becoming a corporator, identify itself with the corporation."[190] Thus, "[t]he Planters' Bank of Georgia is not the State of Georgia" for Eleventh Amendment purposes[191]—just as the United States wasn't an Article III "Party" to suits involving the First Bank of the United States, in which the federal government had held shares.[192] The "Controvers[y]" at issue in *Planters' Bank* may have been "between" the Bank's shareholders and Georgia, but the "suit" wasn't actually "against" Georgia.

This may seem like slicing the baloney rather thin. Justice Johnson dissented in *Planters' Bank* (as he had in *Osborn*), arguing that Georgia really was a party under *Deveaux*, which brought the case "strictly within the letter of the 11th amendment."[193] Yet *still* the Court failed to invoke the diversity theory, even to respond to Johnson's dissent. Given that the case was argued together with *Osborn*, this seems to confirm that *Osborn* didn't endorse—and indeed rejected—the diversity theory of the Amendment.

*Planters' Bank* also undermines the diversity theory in a different way. The Court's understanding of the term "against" suggests that the Eleventh Amendment didn't actually revise the state-diversity heads of jurisdiction, as the diversity theorists would have it. To see this, suppose that some private citizens had sued Planters' Bank in diversity, with no federal questions involved. For Article III purposes, under *Deveaux*, the defendant would be made up of the State of Georgia and some individual corporators: the suit would be a "Controvers[y] . . . between a State and Citizens of another State," as well as "between Citizens of different States."[194] No common law immunity would apply, because compulsory process would issue only to the

---

[189] *Planters' Bank*, 22 U.S. at 906.

[190] *Id.* at 907.

[191] *Id.*

[192] *See id.* at 908; U.S. CONST. art. III, § 2, cl. 1 (addressing "Controversies to which the United States shall be a Party").

[193] *Id.* at 913 (Johnson, J., dissenting).

[194] U.S. CONST. art. III, § 2, cl. 1.

corporation, not the state. And under *Planters' Bank*, the Eleventh Amendment wouldn't apply either, because Georgia wouldn't be a party on the record, and so the suit wouldn't be "against" the state. By contrast, if the diversity theorists were right, and if the Amendment had specifically revised the state-diversity provisions in Article III to exclude private plaintiffs, then there ought to be no jurisdiction: part of the controversy would be between private citizens and Georgia, and that part would fall outside Article III's revised scope.[195]

The discussion of the Eleventh Amendment in both cases is complex; perhaps not all of the Justices fully understood or endorsed the logic of Chief Justice Marshall's opinions. At a minimum, however, these cases dispel any impression that the diversity theory was a widely-shared consensus reading of the Amendment in the early nineteenth century.

*The Madison letter.* Finally, it's worth noting one other reliable source who rejected the diversity theory: ex-President James Madison. Madison discussed the Amendment's effect on federal questions in an 1821 letter to Spencer Roane.[196] Madison was reacting to the Court's recent decision in *Cohens*, which correctly held that a state-court defendant wasn't prevented by state immunity from invoking the appellate jurisdiction of the U.S. Supreme Court.[197] While the facts of *Cohens* didn't obviously implicate the Amendment, Chief Justice Marshall's *dicta* about the common-law principle of immunity was inconsistent with much of what had been said at the founding, including by Marshall himself. For example, Marshall had argued in the Virginia ratification convention against the suability of states,[198] but now he seemed to contend that *Chisholm* was correctly decided—and, more startlingly, that the states had consented to all federal-question suits by ratifying Article III.[199] And he suggested that the collection of state debts, and not the "dignity of a state," was the sole basis of the opposition to *Chisholm*[200]—

---

195  We don't know what the Court would have made of such a suit. In the diversity case of *Bank of Kentucky v. Wister*, the state was the sole shareholder of the bank, but *Deveaux*'s application was complicated by a state statute under which "'the president and directors' alone constitute the body corporate, the metaphysical person liable to suit." 27 U.S. (2 Pet.) 318, 323 (1829). Under modern doctrine, the question never arises: a corporation is taken to be an Article III citizen of its state of incorporation only (regardless of its shareholders), *see* Louisville, Cincinnati & Charleston R.R. Co. v. Letson, 43 U.S. (2 How.) 497, 558-59 (1844), though Congress has seen fit to confer additional citizenships, *see* 28 U.S.C. § 1332(c).

196  Letter from James Madison to Spencer Roane (May 6, 1821) [hereinafter Madison Letter], *in* 2 THE PAPERS OF JAMES MADISON: RETIREMENT SERIES 317 (David B. Mattern et al. eds., 2013); *see also* Nelson, *supra* note 11, at 1616 n.259 (citing this source, though apparently unpersuaded by it).

197  Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 405-07 (1821).

198  *See supra* note 35 and accompanying text.

199  *See Cohens*, 19 U.S. at 380-83.

200  *Id.* at 406.

disregarding the widespread and furious arguments of the 1780s and '90s that states were generally not amenable to private suit or judicial coercion.[201]

In response, Madison expressed disappointment that "the Court seems not to have adverted at all to the expository language held when the Constitution was adopted."[202] Back then, he and Marshall had both expected that the common-law immunity would survive Article III.[203] So had Hamilton in *The Federalist*[204]—a work which the *Cohens* Court quoted, Madison thought, when doing so served its purposes, but not as carefully "when against the federal authority, as when agst. that of the States."[205] Nor had the *Cohens* Court paid enough attention to the nation's open rejection of *Chisholm*: "[T]o the expository language . . . of the 11th. amendment[,] which may as well import that it was declaratory, as that it was restrictive of the meaning of the original text."[206]

In the next paragraph, Madison expressed his understanding of this language:

> The Judicial power of the U.S. over cases arising under the Constitution, must be admitted to be a vital part of the System. But that there are limitations and exceptions to its efficient character is among the admissions of the Court itself. *The Eleventh amendment introduces exceptions if there were none before.*[207]

In other words, even if Article III had rendered the states amenable to federal-question suits, the Eleventh Amendment *still* deprived the federal courts of some portion of their judicial power to hear "cases arising under the Constitution," not just diversity cases.

On its own, a stray letter from an aging Founder proves little. But in combination with other evidence from this period, it confirms that there was no subsequent consensus in favor of the diversity reading, and a sizeable amount of evidence against it. This leads us to fall back on the natural meaning of the text and the contemporaneous evidence against the diversity theory.

### 3. Purpose

The core argument for the diversity theory is grounded in purpose. The theory gained force when it seemed to be the only candidate that could explain why the constitutional immunity might be limited to *diverse* plaintiffs. If the Eleventh Amendment were the only game in town, why would it have

---

201  *See, e.g.*, Lash, *supra* note 13, at 1635-76; Clark, *supra* note 12, at 1862-75, 1886-99.
202  Madison Letter, *supra* note 196, at 320.
203  *See supra* note 35 and accompanying text.
204  *See* THE FEDERALIST NO. 81, *supra* note 34, at 487.
205  Madison Letter, *supra* note 196, at 319 & n.2.
206  *Id.* at 320.
207  *Id.* (emphasis added) (footnote omitted).

left in-state citizens free to sue their own states?[208] If the problem posed by *Chisholm* were really the collection of state debts, couldn't out-of-state bondholders have sold their debt claims to in-staters?[209] The answer must have had something to do with the cause of action, and not merely the arrangement of the parties. If the debt claims arose under state law, not federal law, then the diversity theory would leave the bondholders with neither diversity nor federal-question jurisdiction, and the states would be secure. But if federal questions were involved, all bets were off.

That, however, is not how many prominent supporters of the Amendment understood what they were doing. As we read the evidence, their demands for an amendment weren't calls for a sort of proto-*Erie*, protecting states against state-law claims that might be heard in federal court.[210] Indeed, they don't seem to have worried very much about the *source of law* in suits against states at all. At most, it was a secondary concern—assuming, "for argument[']s sake," that "an individual can sue a State" in the first place.[211] The overriding concern expressed in the historical sources was that federal courts might call states to answer at the instance of private plaintiffs, period—and that these courts might issue judgments against states, not individual officials, which would have to be collectively and coercively enforced.[212]

Seeing the Eleventh Amendment against the backdrop of common-law sovereign immunity makes this understanding more plausible. Sovereign immunity wasn't limited to state debts or to the citizens of other states; it extended to any suit against a state without its consent. The Eleventh Amendment was more limited as to parties, just as its limit on subject-matter jurisdiction was more categorical: it "cut off" whatever part of the judicial

---

[208] *See, e.g.,* Amar, Marbury, *supra* note 4, at 499; Fletcher, *Reply, supra* note 4, at 1277-78, 1281-82. *But see* Nelson, *supra* note 11, at 1615-16, 1616 n.259 (concluding that there's "much to be said" for the diversity theory, despite also advocating the persistence of common-law sovereign immunity in same-state cases).

[209] *See, e.g., Lycurgus,* BOS. GAZETTE, Nov. 19, 1787, *reprinted in* 4 DHRC, *supra* note 33, at 276, 277 (raising this possibility even before Ratification); *To the Convention of Massachusetts,* AM. HERALD (Bos.), Jan. 14, 1788, *reprinted in* 5 DHRC, *supra* note 33, at 709, 712 (same).

[210] *See, e.g.,* Amar, *Sovereignty, supra* note 4, at 1469-73 (presenting such a view). *But see generally* Jay, *supra* note 40 (identifying stark differences between post-*Erie* and Founding-era views of general law).

[211] A Republican, *The Crisis, No. XIII,* INDEP. CHRON. (Bos.), July 25, 1793, *reprinted in* 5 DHSC, *supra* note 36, at 395, 397 (emphasis omitted); *see also id.* at 395-96 (disparaging such a possibility); *"Hampden,"* INDEP. CHRON. (Bos.), July 25, 1793, *reprinted in* 5 DHSC, *supra* note 36, at 399, 400-01 (criticizing *The Crisis* for giving too much ground on this point); *cf. Account of John Davis's Speech in the Massachusetts House of Representatives,* INDEP. CHRON. (Bos.), Sept. 23, 1793, *reprinted in* 5 DHSC, *supra* note 36, at 431, 431 (emphasizing federal limitations on state power, in the course of *disagreeing* with most of the Amendment's supporters).

[212] *See, e.g.,* Clark, *supra* note 12, at 1886-90 (discussing the "hostile" aftermath to *Chisholm* and the push for the Eleventh Amendment); Lash, *supra* note 13, at 1649-76 (explaining how the strong negative reaction to *Chisholm* developed into a movement in favor of amendment, starting in Massachusetts); Nelson, *supra* note 11, at 1574-79, 1592-1601; *see also* sources cited *supra* note 84 (expressing official state opposition to suability).

power might extend "to any suit" within its terms. This was rough justice, and it may have been overinclusive. But to the Amendment's supporters, language that removed too many individual suits against states was better than language that removed too few.

### C. *"to any suit": Abrogation*

Congress can't abrogate a state's sovereign immunity, most of the time. But since at least 1976, the Supreme Court has held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of [Section Five] of the Fourteenth Amendment."[213] Once again, this statement conflates a plausible account of the general law of sovereign immunity with an implausible account of the Eleventh Amendment's text.

Common-law doctrines can be abrogated by statute. But before that can happen, Congress needs authority to *pass* the statute. In general, there's good reason to think that Congress lacks this abrogation power.[214] It may well be that the Fourteenth Amendment is different—that it provides a special kind of enumerated power, one with a greater ability to abrogate these common-law doctrines.[215] It may even be conceivable, as the Supreme Court has held, that some other clauses might do so as well.[216] But none of these powers could have any effect on the Eleventh Amendment.

The Amendment, as we've seen, is more than a restatement of the general law of sovereign immunity: it restricts the subject-matter jurisdiction of the federal courts, in *"any* suit in law or equity."[217] Even if Section Five of the Fourteenth Amendment had special force against common-law principles of sovereignty, that section makes no particular mention of the judicial power of the United States. So Section Five can't plausibly be read as implicitly repealing the jurisdictional restrictions in the Eleventh Amendment, just as it can't plausibly be read as implicitly repealing the Fifth Amendment requirement of due process, the Sixth Amendment right to jury trial, or the Eighth Amendment ban on cruel and unusual punishments. Otherwise Congress could "abrogate" all of these, demanding the torture and summary

---

213  Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976) (citation omitted); *cf.* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." (footnote omitted)), *invalidated on other grounds by* Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 374 (2001).

214  *See supra* notes 65–68 and accompanying text.

215  *See* Baude, *supra* note 10, at 18-21. *But see* Harrison, *supra* note 68 (arguing that Section Five doesn't confer such power).

216  *Cf.* Baude, *supra* note 10, at 21-22 (discussing the Bankruptcy Clause).

217  U.S. CONST. amend. XI (emphasis added).

Case 3:23-cv-00164-AGS-DDL   Document 21   Filed 03/30/23   PageID.1009   Page 106 of 132

execution of civil rights violators (and their families). More to the point, the Fourteenth Amendment can't plausibly be read to let Congress dispense with other jurisdictional rules, allowing plaintiffs to file federal suits that fall outside the judicial power.[218] The Eleventh Amendment, unlike the common law, can't be abrogated by statute.

That said, it isn't clear how many Supreme Court cases actually turn on the point. The Court has recognized three successful instances of Fourteenth Amendment abrogation in the twenty-odd years since it set forth the current doctrine in *Boerne v. Flores*.[219] But none of these obviously implicated the Eleventh Amendment. In the successful abrogation case of *Tennessee v. Lane*, the two named respondents, George Lane and Beverly Jones, were citizens of Tennessee.[220] The suit permitted by the Court in *Nevada Department of Human Resources v. Hibbs* was brought by a resident of Nevada.[221] And the suit allowed in *Goodman v. Georgia* was brought by a prisoner of the Georgia prison system who was likely a citizen of that state.[222]

Earlier cases are a little muddier. In *Fitzpatrick* itself, the suit was brought against the State of Connecticut "on behalf of all present and retired male employees of the State."[223] Justice Brennan presumed the plaintiffs to be Connecticut citizens, and thought this meant that the suit fell outside the Eleventh Amendment.[224] But at least some people who retired from working in Connecticut might well have moved to warmer or cheaper places—a jurisdictional fact that the lower courts don't seem to have discussed, perhaps because nobody realized it mattered. A couple of subsequent abrogation cases featured attorney's fee awards to state prisoners or recipients of state benefits—who might well be state residents too, though again the Court failed to assure itself of this fact.[225]

218  *Cf.* Nelson, *supra* note 11, at 1626 ("The conclusion that Section 5 lets Congress expose states to private suits does not mean that Congress can abrogate the 'subject matter jurisdiction' type of immunity conferred by the Eleventh Amendment, but only that Congress has some power to abrogate the 'personal jurisdiction' type of immunity contemplated by Madison and Marshall.").

219  521 U.S. 507 (1997). *See generally* RICHARD H. FALLON, JR., JOHN F. MANNING, DANIEL J. MELTZER & DAVID L. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 958-62 (7th ed. 2015) (summarizing abrogation cases).

220  *See* Appellee's Brief on Rehearing at 16-18, Lane v. Tennessee, 315 F.3d 680, 681 (6th Cir. 2003) (No. 98-6730), 2002 WL 34347577, *aff'd*, 541 U.S. 509 (2004).

221  538 U.S. 721 (2003); *see also* Kurt Hildebrand, *State Could Reduce Settlement with Phone Call, Victor Says*, NEV. APPEAL (June 22, 2003), https://www.nevadaappeal.com/news/local/state-could-reduce-settlement-with-phone-call-victor-says/ [https://perma.cc/HGX9-USSR] ("'I'm not looking to bankrupt the state,' he said. 'I live here, too.'").

222  No. 04-1236 (U.S.), *decided sub nom.* United States v. Georgia, 546 U.S. 151 (2006).

223  Fitzpatrick v. Bitzer, 427 U.S. 445, 448 (1976).

224  *Id.* at 457 (Brennan, J., concurring in the judgment).

225  *E.g.*, Hutto v. Finney, 437 U.S. 678 (1978) (prisoners); Maher v. Gagne, 448 U.S. 122 (1980) (benefits).

The Court's carelessness in Fourteenth Amendment cases infected its other abrogation decisions too. In *Tennessee Student Assistance Corp. v. Hood*, it permitted a debtor's action to discharge a debt owed to a state, on the argument that an in rem bankruptcy proceeding "does not implicate a State's Eleventh Amendment immunity."[226] But the debtor in *Hood* was "a resident of Tennessee," so the Amendment was inapplicable by its terms.[227] The right question in the case was whether the bankruptcy court could issue compulsory process against the state, given its undisputed in rem jurisdiction over the debtor's assets: the power to dispose of a private estate, denying a creditor state the right to bring a future claim, as plaintiff,[228] doesn't confer any power to call a state to answer today, as a defendant.[229]

In *Central Virginia Community College v. Katz*, the Court went further, holding that bankruptcy proceedings generally "operate[] free and clear of the State's claim of sovereign immunity,"[230] on the theory that the states had "agreed in the plan of the Convention not to assert [their] immunity" in bankruptcy cases.[231] But this was the wrong question. The right question in *Katz* was whether the Eleventh Amendment took the choice of waiving their immunity away from them. Bernard Katz hailed from New Jersey,[232] so the federal courts were flatly forbidden by the Amendment from hearing any suit he filed against the State of Virginia, even to recover an allegedly preferential transfer. This result may not be "uniform," in the language of the Bankruptcy Clause,[233] but neither is the Eleventh Amendment: it carves out a particular exception to the federal judicial power, one that neither Congress nor the bankruptcy courts may evade.

### D. *"in law or equity": Admiralty Jurisdiction*

The Eleventh Amendment only applies to a "suit in law or equity." That means that it exempts any proceeding other than a suit in law or equity—say, a case "of admiralty and maritime Jurisdiction."[234]

---

[226] 541 U.S. 440, 445 (2004).
[227] *Id.* at 444.
[228] *Id.* at 446-47 (citing California v. Deep Sea Rsch., Inc., 523 U.S. 491 (1998)).
[229] *See id.* at 458-59 (Thomas, J., dissenting); *cf.* Allen v. Cooper, 140 S. Ct. 994, 1000-01 (2020) (holding that Congress lacks power to abrogate state sovereign immunity under the Copyright Clause, regardless of the plaintiff's citizenship).
[230] 546 U.S. 356, 373 (2006).
[231] *Id.*
[232] *See* Docket, *In re* Wallace's Bookstores, Inc., No. 5:01-bk-50545 (Bankr. E.D. Ky. Feb. 28, 2001); Second Plan Supplement at 4, *In re* EOGH Liquidation, Inc., No. 15-31232 (VFP) (Bankr. D.N.J. July 11, 2016).
[233] U.S. CONST. art. I, § 8, cl. 4; *Katz*, 546 U.S. at 369 (emphasizing "the importance of authorizing a uniform federal response").
[234] U.S. CONST. art. III, § 2, cl. 1.

As mentioned above, leaving admiralty out of the Amendment made sense at the time. Admiralty typically works *in rem*, not *in personam*, so it usually poses no threat to the states' personal immunity from compulsory process. Similar doctrines also stopped litigants from attaching state property, a prerequisite to a court's in rem jurisdiction.[235] Before the Constitution, for example, a Pennsylvania admiralty court had disclaimed jurisdiction over some sailors' attempt to recover their lost wages by libeling a South Carolina ship, because "mariners enlisting on board a ship of war, or vessel belonging to a sovereign independent state, cannot libel against a ship for wages due."[236] In 1812, the U.S. Supreme Court confirmed a similar common-law immunity for foreign nations in federal court.[237] The exact boundaries of this immunity were and are disputed—does it extend to all sovereign-owned property, or only to certain sovereign uses?[238] But as this in rem immunity was unthreatened by *Chisholm*, there was less need for the Eleventh Amendment to supplement it. Thus, in admiralty suits, even if filed in personam, only the common-law immunity applies.

The Court wiggled its way to more or less this resolution in *Ex parte New York*, a twentieth-century admiralty suit brought against two city-chartered tugboats.[239] The Court's opinion began with a near-conflation of the Eleventh Amendment and the unwritten general-law immunity—describing the latter as a "fundamental rule of which the Amendment is but an exemplification."[240] But the Court then got to the right place, concluding that the case was controlled by the general-law principle of "immunity of a State from suit *in personam* in the admiralty brought by a private person without its consent."[241]

---

235 *See* sources cited *supra* note 28 (explaining why traditional sovereign immunity doctrine covers the sovereign and its property).

236 Moitez v. The South Carolina, 17 F. Cas. 574, 574 (Adm. Pa. 1781) (No. 9,697).

237 The Schooner Exch. v. M'Faddon, 11 U.S. (7 Cranch) 116, 146 (1812).

238 *Compare* James E. Pfander, *Rethinking the Supreme Court's Original Jurisdiction in State-Party Cases*, 82 CALIF. L. REV. 555, 587 n.127 (1994) (explaining the *Moitez* court's theory that mere ownership of a ship by the sovereign necessitates dismissal), *with* Bederman, *supra* note 149, at 942, 984-85 (examining decisions in which courts required a sovereign to use property for a public or governmental purpose); *see also* Ellison v. The Bellona, 8 F. Cas. 559, 559 (D.S.C. 1798) (No. 4,407) (distinguishing privateers from the *Moitez* case); *Schooner Exch.*, 11 U.S. at 145 (noting potential exceptions to immunity for "the private property of the person who happens to be a prince" as well as for "[a] prince . . . acquiring private property in a foreign country," though "[w]ithout indicating any opinion on this question"); *cf.* Upper Skagit Indian Tribe v. Lundgren, 138 S. Ct. 1649, 1653-54 (2018) (detailing the common law immovable property exception to sovereign immunity); *id.* at 1657-61 (Thomas, J., dissenting) (same).

239 *In re* State of New York, 256 U.S. 490, 497 (1921).

240 *Id.*

241 *Id.* at 500. The proceeding against the state was in personam, because "the charters had expired according to their terms, and the tugs were in possession of the claimants, neither the State nor Walsh having any claim upon or interest in them." *Id.* at 496. That made it even easier to see

The general law, not the more unforgiving rule of the Eleventh Amendment, controls admiralty cases.

Understanding the relationship between the Eleventh Amendment and admiralty gives us additional reason to be careful about the scope of admiralty jurisdiction. Admiralty's reach has expanded quite a bit over time. The Taney Court held that the doctrine had been expanded from the "ebb and flow of the tide" (as it was in England) to include all "navigable waters" (such as America's Great Lakes).[242] Modern doctrine extends it even to some injuries on land, if they were originally caused by a vessel on navigable waters (such as the flooding of a skyscraper in the Chicago Loop, caused by pilings inserted by a crane that sat on a river barge).[243] Those expansions affect federal judicial power generally, but they also affect power over *states* specifically. A broader scope for admiralty means a broader range of cases to which the Eleventh Amendment is inapplicable. If those expansions were inconsistent with constitutional principles,[244] a question on which we take no position here, the Amendment cautions us to be even more chary of them.

### E.  *"commenced or prosecuted": Appellate jurisdiction*

The Supreme Court may occupy a special place in our constitutional system, but the Court isn't above the law. Rather, it's bound by the same principles that bind the other federal courts, which equally exercise "the judicial Power of the United States."[245] The Eleventh Amendment restricts that "Judicial power" by preventing any federal court from hearing any case, in law or equity, "commenced or prosecuted" against one state by the citizens of another.[246] But because the Supreme Court, by statute, is the only one that hears cases on appeal from state courts, it has gotten rather confused about the scope of its authority.

---

that no arguable in rem exceptions to sovereign immunity applied. *Id.* at 501-02; Bederman, *supra* note 149, at 979-80.

242 The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 454-58 (1851).

243 Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995). Justice Thomas would have expanded it still further, eliminating the current requirement that the incident have a maritime character. *Id.* at 549-56 (Thomas, J., concurring in the judgment).

244 *See, e.g., The Genesee Chief,* 53 U.S. at 465 (Daniel, J., dissenting) (concluding that the Court had impermissibly "enlarged" the Constitution "not by amendment in the modes provided, but according to the opinions of the judiciary"); Panama R.R. Co. v. Johnson, 264 U.S. 375, 386 (1924) (deeming it "well recognized" at the time that "there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation").

245 U.S. CONST. art. III, § 2, cl. 1.

246 *Id.* amend. XI.

### 1. Text and History

The Supreme Court can exercise two forms of jurisdiction: "original" and "appellate."[247] Its original jurisdiction is limited to cases "affecting Ambassadors" and other diplomats, as well as "those in which a State shall be Party"; its appellate jurisdiction includes "the other Cases before mentioned" in the first clause of Article III, Section Two.[248] As a result, the Court's appellate jurisdiction is a strict subset of "[t]he judicial Power" described in Section Two[249]—precisely the power limited by the Eleventh Amendment.

Whether the Court can hear a state-court appeal thus turns on whether the appeal falls within the Amendment's terms. Chief Justice Marshall first confronted this problem in *Cohens*. As noted above, the case involved an appeal from a state criminal prosecution: two brothers had been prosecuted in Virginia court for a violation of Virginia law (the illegal sale of D.C. lottery tickets).[250] The state court upheld the defendants' conviction, and the defendants sought a writ of error in the Supreme Court, arguing that the Virginia law was preempted by federal statute.

The Supreme Court correctly determined that the Eleventh Amendment didn't create any problems for its jurisdiction. The Amendment only applies to a suit "commenced or prosecuted *against* one of the United States."[251] As the Court elaborated, "[t]o commence a suit, is to demand something by the institution of process in a Court of justice, and to prosecute the suit, is, according to the common acceptation of language, to continue that demand."[252] Thus, "[w]hatever may be the stages of its progress, the actor is still the same."[253] On appeal, then, everything depends on how the parties had been arranged below, and which ones were asking the courts for relief. In *Cohens*, the plaintiff was the state, so the Amendment didn't apply.[254] And because Virginia wasn't the original target of compulsory process, the common-law immunity didn't apply either: private defendants had routinely sought writs of error after the United States prevailed against them below, and no one thought this infringed the *federal* government's common-law immunity.[255]

What happens when an individual is the one who originally brought the suit? If an in-state plaintiff sues a state in its own courts, the Eleventh Amendment is of course out of the picture, and the suit proceeds if and only

---

[247] *Id.* art. III, § 2, cl. 2.
[248] *Id.*
[249] *Id.* art. III, § 2, cl. 1.
[250] Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 265-66 (1821).
[251] U.S. CONST. amend. XI (emphasis added).
[252] *Cohens*, 19 U.S. at 408.
[253] *Id.*
[254] *Id.* at 409.
[255] *Id.* at 412.

if the state lets it. Should a federal issue arise, the case might well be appealed to the Supreme Court. The Amendment doesn't bar federal jurisdiction over suits by in-staters, and no new compulsory process would be needed on appeal.

When the plaintiff is from out of state, however, the Eleventh Amendment prevents federal courts from taking *any* jurisdiction over that suit. A state's own courts might be able to hear the case; they aren't bound by the Eleventh Amendment. But under the *Cohens* logic, it's plain what should happen next: *nothing.* The case should be heard in the state court system, and then stop. The Supreme Court is forbidden to review it. Just as *Cohens* retained its defensive character when it reached the Supreme Court, these suits retain their offensive character when *they* reach the Supreme Court—as suits "commenced or prosecuted against" the state, with an out-of-stater as plaintiff. It follows that "the judicial power of the United States" doesn't reach these suits, and so the Supreme Court can't hear them.

### 2. Precedent

In practice, however, the Court has said and done otherwise. It has granted review of state-court cases filed against states by out-of-state plaintiffs with little apparent concern for the Eleventh Amendment. In at least some of these cases, it seems likely that the Amendment barred the appeal.[256] As Professor Vicki Jackson observed in 1988, *Cohens* has become "popularly cited for the proposition that the Eleventh Amendment does not preclude Supreme Court review of state court judgments, whether in favor of or against the state as a formal party."[257] But this popular view is wrong. As noted above, *Cohens* requires something else.

The Supreme Court didn't fully confront this problem until its 1990 decision in *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco,* a Commerce Clause challenge to Florida's liquor taxes.[258] The case was brought against Florida in state court under the state's own tax refund statute, and the state supreme court decided the case unimpeded by the Eleventh Amendment. But when the taxpayer sought review in the U.S. Supreme Court, the state argued that the case was barred by the Eleventh Amendment,[259] which indeed it seemed to be. The suit was commenced by an out-of-state corporation against the state;[260] it thus fell outside of the

---

[256] *See infra* notes 268–274 and accompanying text (surveying the run of Eleventh Amendment and adjacent cases cited by *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco,* 496 U.S. 18 (1990)).

[257] Jackson, *supra* note 4, at 15.

[258] 496 U.S. 18, 22 (1990).

[259] *Id.* at 26.

[260] This assumes that the Division and the Comptroller could stand in for the state itself, which the parties indeed assumed. *E.g.,* Petition for Writ of Certiorari at 3, *McKesson,* 496 U.S. 18 (No. 88-192).

"judicial power of the United States," and a fortiori outside of the Supreme Court's appellate jurisdiction.

The Court's reasons for hearing the case anyway can be disaggregated into three:

*Consent.* Florida had allowed the suit to proceed in its own courts. This meant, the Court suggested, that "the State assents to appellate review by this Court of the federal issues raised in the case."[261] As noted above, that's not quite right. Whether or not allowing a suit in state court waives the common-law immunity from process in federal court, the common-law immunity isn't the one at issue. The Eleventh Amendment, as we have seen, is a restriction on subject-matter jurisdiction—and that can't be bestowed by consent.[262]

*The Constitutional Plan.* Alternatively, offered the Court, its jurisdiction was "inherent in the constitutional plan."[263] The Court noted, correctly, that it may review cases arising from state courts, a principle established as long ago as *Martin v. Hunter's Lessee*.[264] And it concluded, without much evidence, that this review wasn't just a power but a universal condition:

> To secure state-court compliance with, and national uniformity of, federal law, the exercise of jurisdiction by state courts over cases encompassing issues of federal law is subject to two conditions: State courts must interpret and enforce faithfully the "supreme Law of the Land," and their decisions are subject to review by this Court.[265]

Again, the Court's logic is faulty on its own terms. If appellate review is available *most* of the time, then we can enjoy a good deal of uniformity without demanding that state judgments be subject to review *in every case*. Indeed, the Court acknowledged that other jurisdictional bars, such as the adequate-and-independent-state-ground rule, sometimes preclude its review of state decisions about federal law.[266] So it was far from clear why the Eleventh Amendment was so contrary to the constitutional plan.

More fundamentally, though, the Court's opinion reflected the most nefarious form of structural reasoning, inferring a "constitutional plan" apart from any actual provisions in the Constitution or any actual plans of those who enacted it. The Eleventh Amendment is a *part* of the constitutional plan. Indeed, it was enacted by those dissatisfied with a previous reading of the constitutional plan, who insisted on changing the constitutional plan to (what they thought was) a better plan. And within weeks of the announcement of

---

261  *McKesson*, 496 U.S. at 30.
262  *See supra* Section II.A.
263  *McKesson*, 496 U.S. at 30 (quoting Monaco v. Mississippi, 292 U.S. 313, 329 (1934)).
264  *Id.* at 28 (citing Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 340 (1816)).
265  *Id.* at 28-29 (footnote omitted) (quoting U.S. CONST. art. VI, cl. 2).
266  *Id.* at 29 n.12 (citing Michigan v. Long, 463 U.S. 1032, 1038 n.4 (1983)).

ratification, lawyers suggested that the Amendment applied to cases brought to the Supreme Court on appeal from state courts.[267] To reject the straightforward reading of a constitutional amendment because of one's own view of a supposedly paramount "plan" is to make great mischief, and also to nullify the power of the people to make their own law.

*Practice.* That left the fact that most favored the Court, which is that "consistent practice" seemed to favor the exercise of jurisdiction:

> We have repeatedly and without question accepted jurisdiction to review issues of federal law arising in suits brought against States in state court; indeed, we frequently have entertained cases analogous to this one, where a taxpayer who had brought a refund action in state court against the State asked us to reverse an adverse state judicial decision premised upon federal law.[268]

Here, too, the Court overclaimed. There was no judicial holding to cite. The Court's opinion in *Cohens* provided no support. The two reasoned opinions the Court could cite were a 1908 concurrence by Justice Harlan and an 1837 dissent by Justice Story, both of which assumed that *Cohens* settled the issue.[269] What's more, these weren't even Eleventh Amendment cases. The 1908 case, *General Oil v. Crain*, was a suit by a Tennessee corporation in Tennessee court against a Tennessee oil inspector;[270] the 1837 case, *Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge*, was a suit between two Massachusetts corporations.[271]

True, the Court had heard some appeals that were in fact forbidden by the Eleventh Amendment. But the Court usually places little stock in "drive-

---

267 Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378, 380 (1798) (arguments of counsel) (discussed *supra* text accompanying note 167).

268 *McKesson*, 496 U.S. at 27; *see also id.* at 27 n.8 (citing Davis v. Mich. Dep't of the Treasury, 489 U.S. 803 (1989); Tex. Monthly, Inc. v. Bullock, 489 U.S. 1 (1989); Tyler Pipe Indus. v. Wash. State Dep't of Revenue, 483 U.S. 232 (1987); Ark. Writers' Project, Inc. v. Ragland, 481 U.S. 221 (1987); Williams v. Vermont, 472 U.S. 14 (1985); Bacchus Imps., Ltd. v. Dias, 468 U.S. 263 (1984); Aloha Airlines, Inc. v. Dir. of Tax'n of Haw., 464 U.S. 7 (1983); Exxon Corp. v. Eagerton, 462 U.S. 176 (1983); Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div., 450 U.S. 707 (1981); Cent. Mach. Co. v. Ariz. State Tax Comm'n, 448 U.S. 160 (1980); White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980); Bonelli Cattle Co. v. Arizona, 414 U.S. 313 (1973); Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64 (1963); Laurens Fed. Sav. & Loan Ass'n v. S.C. Tax Comm'n, 365 U.S. 517 (1961); Memphis Steam Laundry Cleaner, Inc. v. Stone, 342 U.S. 389 (1952); Best & Co. v. Maxwell, 311 U.S. 454 (1940); Iowa–Des Moines Nat'l Bank v. Bennett, 284 U.S. 239 (1931); Int'l Paper Co. v. Massachusetts, 246 U.S. 135 (1918); State Tonnage Tax Cases, 79 U.S. (12 Wall.) 204 (1871)); *McKesson*, 496 U.S. at 28 n.9 (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 65 n.5 (1989); Maine v. Thiboutot, 448 U.S. 1, 9 n.7 (1980); Nevada v. Hall, 440 U.S. 410, 420 (1979)).

269 *Id.* at 27 (citing General Oil Co. v. Crain, 209 U.S. 211, 233 (1908) (Harlan, J., concurring); Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge, 36 U.S. (11 Pet.) 420, 585 (1837) (Story, J., dissenting)).

270 209 U.S. at 212-13.

271 36 U.S. at 536-37.

by jurisdictional rulings."[272] In any case, its count was wrong. *McKesson* string-cited twenty-two cases. Of these, only eight would normally be taken to trigger the Eleventh Amendment: seven involved foreign corporations,[273] and one, *Nevada v. Hall*, involved California residents suing the State of Nevada.[274] The others involved in-state corporations or residents, or other entities such as a Native American tribe or a federal savings-and-loan.[275] In rejecting the applicability of the Eleventh Amendment, the Court still merrily conflated in-state and out-of-state plaintiffs.

Judge John Gibbons and others have made a similar mistake in citing the Marshall Court's decision in *Worcester v. Georgia* as supporting federal jurisdiction over these appeals.[276] Gibbons finds it "especially telling" that "[i]n *Worcester v. Georgia* the party alignment was exactly that proscribed by the eleventh amendment, but the Court found no eleventh amendment bar to the issuance of a writ of error; indeed, it did not even discuss the issue."[277] But again, this critique demonstrates inattention to the Eleventh Amendment's text. The suit had been commenced when *the State of Georgia* prosecuted Worcester for a violation of Georgia law, sentencing him "to hard labour, in the penitentiary, for the term of four years."[278] Worcester appealed his criminal conviction.[279] Under the *Cohens* rule, the Eleventh Amendment was inapplicable because Georgia, not Worcester, had "commenced or prosecuted" the suit. Little wonder that the Court didn't discuss the Eleventh Amendment.

Putting aside such overstatements of the historical record, it's still true that before *McKesson* the Court sometimes exercised a jurisdiction forbidden by the Eleventh Amendment. But without any reasoning, and in conflict with the Amendment itself, these exercises should have been grounds for

---

[272] Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 91 (1998); *accord* Arbaugh v. Y & H Corp., 546 U.S. 500, 511 (2006).

[273] *See Tyler Pipe*, 483 U.S. at 232 (identifying appellant as "an out-of-state manufacturer"); *Exxon*, 462 U.S. at 179 n.2 (noting that appellants included Louisiana and California corporations); Brief for Petitioners (cover), *Bonelli*, 414 U.S. 413 (No. 72-397) ("Bonelli Cattle Company, a California corporation"); *Halliburton*, 373 U.S. at 66 (concerning an Oklahoma corporation's oil production in Louisiana); *Memphis Steam Laundry Cleaner*, 342 U.S. at 389 (identifying appellant as "a foreign corporation operating . . . in Tennessee"); *Best & Co.*, 311 U.S. at 454-55 (describing Appellant as a New York establishment bringing suit against North Carolina); *Int'l Paper*, 246 U.S. at 138-39 (noting that the suit was brought by a New York corporation against Massachusetts).

[274] 440 U.S. 410, 411 (1979), *overruled by* Franchise Tax Bd. v. Hyatt, 139 S. Ct. 1485 (2019).

[275] This discussion assumes, perhaps contrary to fact, the correctness of modern doctrines on corporate citizenship. *See supra* notes 106, 195.

[276] Gibbons, *supra* note 4, at 1953-54 (citing Worcester v. Georgia, 31 U.S. (6 Pet.) 515 (1832)); *see also* Lee, *supra* note 149, at 1073 (making the same mistake). Gibbons makes the argument as a point in favor of the diversity theory, in an article that predates *McKesson*.

[277] Gibbons, *supra* note 4, at 1953 (footnote omitted).

[278] *Worcester*, 31 U.S. at 537-40.

[279] *Id.* at 515.

embarrassment and apology by the Court, not for embracing the error and repeating it out loud.

Less than a decade after *McKesson*, another state tried to sway the Court in *South Central Bell Telephone Co. v. Alabama*.[280] Again the plaintiffs were out-of-state corporations who had sued the state under the Commerce Clause in state court.[281] Again the plaintiffs appealed to the Supreme Court, and again the state pointed out "that th[e] Amendment's literal language applies here."[282] But the Court simply responded that it had "recently considered and rejected the very argument that the State now makes"; that *McKesson* "confirmed a long-established and uniform practice"; and that there was no "convincing reason why we should revisit that relatively recent precedent."[283] So much for the Constitution.

*McKesson* and *South Central Bell Telephone* may have been entangled with the broader sovereign immunity debates aired in *Seminole Tribe* and subsequent cases. Justice Brennan, the author of *McKesson*, was no fan of sovereign immunity, and he was especially committed to the Supreme Court's ability to police state misconstructions of federal rights.[284] Yet Justice Souter, in his subsequent dissent in *Seminole Tribe*, correctly called *McKesson's* rule "specious" and declared that it "makes no sense."[285] This wasn't because Justice Souter disagreed with the result: he thought it axiomatic that the Court must have power to review state-court holdings on federal law, and if *McKesson* wasn't the reason why, then the diversity theory of the Eleventh Amendment must be.[286] In any event, these statements made it plausible for Alabama (represented by Chuck Cooper and now-Judge William Pryor[287]) to think that the issue could be reconsidered in 1999. Five Justices had expanded sovereign immunity in *Seminole Tribe*; the other four had stated explicitly that

---

[280]  526 U.S. 160 (1999).

[281]  *Id.* at 160, 162-63.

[282]  *Id.* at 165. The petitioners replied that even if *McKesson* were overruled, the tax refund claim at issue was "not a suit against the State." Reply Brief for Petitioners at 13, *S. Cent. Bell Tel.*, 526 U.S. 160 (No. 97-2045) (quoting State v. Norman Tobacco Co., 273 Ala. 420, 421 (1962)).

[283]  *S. Cent. Bell Tel.*, 526 U.S. at 166 (citing Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 854-55 (1992)).

[284]  Laura Krugman Ray, *Justice Brennan and the Jurisprudence of Dissent*, 61 TEMP. L. REV. 307, 321-22 (1988); Robert C. Post, *Remembering Justice Brennan: A Eulogy*, 37 WASHBURN L.J., at xix, xix-xx (1997).

[285]  Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 113 n.10 (1996) (Souter, J., dissenting).

[286]  *Id.* at 113-14; *see also* Gibbons, *supra* note 4, at 1953-55 (taking a similar view); Jackson, *supra* note 4, at 25-39 (describing the thin historical rationales for Supreme Court review of controversies that cannot otherwise be decided by federal courts); Nelson, *supra* note 11, at 1625 n.287 (arguing that *McKesson* reflects "[t]he Supreme Court's tacit acceptance of the 'diversity' reading of the Eleventh Amendment").

[287]  *S. Cent. Bell Tel.*, 526 U.S. at 162.

*McKesson's* rule made no sense.[288] The court's unanimous refusal to rethink the question papered all this over.

One might have hoped that twenty years after *South Central Bell Telephone*, the Court would finally be prepared to come to terms with its mistake, or at least to offer a better explanation. The issue was gamely raised by amici in *Hyatt*,[289] but alas, the Court declined to discuss it at all.

### F. *"against one of the United States": Defendants*

Sovereign immunity is for sovereigns, and the Eleventh Amendment is for states specifically. In identifying the parties whom the Amendment protects, the Supreme Court has gotten things mostly right—but with no shortage of confusing terminology that may lead others astray.

On the same day that it decided *Hans v. Louisiana*, the Court also decided *Lincoln County v. Luning*,[290] another collection of suits by disappointed bondholders. Lincoln County exercised governmental authority in the state of Nevada, so the county argued that the Eleventh Amendment barred the suit.[291] Indeed, the plaintiffs were citizens of California and Germany,[292] so in some sense the case seemed easier than *Hans*; the plaintiffs were actually from another state! But the Supreme Court rightly found the Eleventh Amendment inapplicable, for a simple and textually sensible reason. "The Eleventh Amendment limits the jurisdiction only as to suits against a State,"[293] and counties aren't states.[294]

By the same logic, and even more obviously, the Eleventh Amendment extends no protection to Indian tribes. Tribes may well have, as current doctrine holds, a form of common-law immunity that counties lack.[295] But they haven't

---

288 *See Seminole Tribe*, 517 U.S. at 100 (Souter, J., dissenting) (noting that Justices Ginsburg and Breyer had joined his opinion); *id.* (Stevens, J., dissenting) (stating that he dissented for his own reasons "as well as those set forth in Justice Souter's opinion").

289 Namely, us. *See Hyatt* Brief, *supra* note 10, at 33-34.

290 133 U.S. 529, 530 (1890).

291 *Id.* at 530-31.

292 Vincent v. Lincoln Cnty., 30 F. 749, 749 (C.C.D. Nev. 1887).

293 *Luning*, 133 U.S. at 530.

294 To be sure, there are a range of more complicated questions about when a suit against a nonstate entity is really against a state. Is the test the party on the record, *e.g.*, Osborn v. Bank of the U.S., 22 U.S. (9 Wheat.) 738, 838-42, 857-58 (1824), the real party in interest, *e.g.*, *Ex parte* Ayers, 123 U.S. 443, 488 (1887), or the legal capacity of the entity under state law, *e.g.*, Workman v. New York City, 179 U.S. 552, 565 (1900); P.R. Ports Auth. v. Fed. Mar. Comm'n, 531 F.3d 868, 881-82 (D.C. Cir. 2008) (Williams, J., concurring)? These questions may well apply equally, or similarly, to the common-law rules of sovereign immunity and the Eleventh Amendment's reference to "one of the United States." As above, one of us may address them in future work. *See supra* note 69.

295 *Compare* United States v. U.S. Fid. & Guar. Co., 309 U.S. 506, 512 (1940) ("These Indian Nations are exempt from suit without Congressional authorization."), *with* Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 756 (1998) ("Though the doctrine of tribal immunity is settled law

been held to fall within the Eleventh Amendment, and for good reason. As Chief Justice Marshall confirmed with respect to Article III in *Cherokee Nation v. Georgia*, a tribe isn't "a state of the union." [296] By the same logic, it can't be "one of the United States" to which the Eleventh Amendment applies. [297]

Federal territories have created slightly more confusion. The Supreme Court, per Justice Holmes, attributed sovereign immunity to the then-Territory of Hawaii, "not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." [298] We have doubts about this reasoning, which appears to conflate immunity with the merits. [299] But whether the result was right or wrong obviously depends on the scope of the common-law immunity, not the Eleventh Amendment, for territories also aren't states. Still, some courts can be found saying (for example) that "Puerto Rico, despite the lack of formal statehood, enjoys the shelter of the Eleventh Amendment in all respects." [300] This is wrong; for all its virtues, the Commonwealth of Puerto Rico currently isn't "one of the United States," [301] and so any immunity it might possess must come from some other source. [302] Courts confronting claims by Guam and the Northern Mariana Islands, by contrast, have gotten at least that much right. [303]

---

and controls this case, we note that it developed almost by accident."). *See also* Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 804 (2014) (Sotomayor, J., concurring) (arguing that tribal immunity is deeply rooted).

[296] 30 U.S. (5 Pet.) 1, 16 (1831). Nor, for that matter, is it "a foreign state in the sense of the constitution"—the more important holding of the case. *Id.*

[297] U.S. CONST. amend. XI.

[298] Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907).

[299] *See, e.g., id.* ("A suit presupposes that the defendants are subject to the law invoked."); *cf.* Territory of Wisconsin v. Doty, 1 Pin. 396, 406-07 (Wis. Terr. July 1844) (simultaneously and contradictorily characterizing the territory as "a municipal corporation" and "a sovereignty . . . entitled to the same immunities" and "a part of the United States").

[300] Ramirez v. P.R. Fire Serv., 715 F.2d 694, 697 (1st Cir. 1983); *accord* Torres-Álamo v. Puerto Rico, 502 F.3d 20, 24 (1st Cir. 2007); Acevedo López v. Police Dep't, 247 F.3d 26, 28 (1st Cir. 2001); De Leon Lopez v. Corporacion Insular de Seguros, 931 F.2d 116, 121 (1st Cir. 1991); *see also* Adam D. Chandler, Comment, *Puerto Rico's Eleventh Amendment Status Anxiety*, 120 YALE L.J. 2183, 2184-85, 2188-89 (2011).

[301] U.S. CONST. amend. XI.

[302] *See, e.g.,* Porto Rico v. Rosaly y Castillo, 227 U.S. 270, 274 (1913) (following *Kawananakoa* to find common-law immunity). The D.C. Circuit has attributed Puerto Rico's sovereign immunity, at least from federal statutory claims, to 48 U.S.C. § 734, which provides that "[t]he statutory laws of the United States not locally inapplicable . . . shall have the same force and effect in Puerto Rico as in the United States." § 734; *see* Rodriguez v. P.R. Fed. Affs. Admin., 435 F.3d 378, 381-82 (D.C. Cir. 2006).

[303] *E.g.,* Paeste v. Gov't of Guam, 798 F.3d 1228, 1234 (9th Cir. 2015) (Guam); Fleming v. Dep't of Pub. Safety, 837 F.2d 401, 405 (9th Cir. 1988) (Northern Mariana Islands).

On the other hand, when it comes to multistate entities created by interstate compacts,[304] the Court's caselaw is hopelessly lost. Constitutionally neither fish nor fowl, a Compact Clause entity can't claim to be part of any one of its member state governments. So a suit against the entity can't be "against one of the United States," as the Eleventh Amendment requires—even if, as in *Planters' Bank*, the controversy might be "between" the plaintiffs and the member states.[305] Nonetheless, the Court in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*[306] and *Hess v. Port Authority Trans-Hudson Corp.*[307] kludged together a different test: one that focuses on whether the member states *wanted* the entity to share in their immunity,[308] or (when all else fails) on the threat posed to state dignity and state treasuries.[309] Maybe these factors might be relevant to the scope of the common-law immunity, or to distinguishing bodies within a state's government from independent municipal corporations (as in *Luning*). But on their own, these policy interests can't expand the terms of the Eleventh Amendment, whose coverage isn't for states to confer.

### G.  *"by Citizens of another State, or by Citizens or Subjects of any Foreign State": Plaintiffs*

The other side of the *"v."* presents a similar need for precision in a range of more complicated circumstances.

*Assignments.* Consider first the relatively obscure sovereign-immunity dispute decided in *New Hampshire v. Louisiana*.[310] In an effort to help its citizens collect on their Louisiana bonds (a recurring theme), the State of New Hampshire by statute let citizens assign their bonds to the state, which would then sue to enforce the bonds and return the proceeds.[311] By having New Hampshire bring the suits in its own name, the idea went, the bondholders could sidestep sovereign immunity as well as the Eleventh Amendment.

The Court didn't buy it. But it took the hard way out. It insisted that the claim was barred by the Eleventh Amendment, even though the Amendment refers only to suits by "citizens" and "subjects," not by states themselves. It squeezed the state's suit into the Amendment's text by holding that it had

---

304  *Cf.* U.S. CONST. art. I, § 10, cl. 3 (requiring congressional consent for such compacts).

305  *See supra* notes 194–95 and accompanying text (explaining why a suit against a bank in which Georgia held shares did not implicate the Eleventh Amendment).

306  440 U.S. 391 (1979).

307  513 U.S. 30 (1994).

308  *Id.* at 43–44 (citing *Lake Country Estates*, 440 U.S. at 401).

309  *Id.* at 39–40, 47–48.

310  108 U.S. 76 (1883).

311  *Id.* at 76–78. The state of New York passed a similar one. *Id.* at 78–79.

been truly "commenced" and "prosecuted" by New Hampshire citizens: "No one can look at the pleadings and testimony in these cases without being satisfied, beyond all doubt, that they were in legal effect commenced, and are now prosecuted, solely by the owners of the bonds and coupons."[312]

That wasn't actually free from doubt. True, as the Court pointed out, the bondholder deposited money to start the case, paid for the case, got the money back at the end, and could veto settlements.[313] But on the other hand, the attorney general was to rely on his own "opinion" as to whether there was "a valid claim" and whether it "shall be just and equitable to enforce" it, and the statute said the attorney general would "*prosecute* such action or actions to final judgment."[314] Indeed, the Court itself later described the states as "assuming the prosecution of debts."[315]

It would have been more straightforward to acknowledge that this was a case to which the Eleventh Amendment failed to apply, but that was instead governed by the common law. Perhaps those common-law principles would still have afforded reason to bar the suit—for instance, by analogy to the statutory rules against manipulation of federal jurisdiction,[316] or by analogy to principles of international law that the Court discussed in its opinion.[317] The Eleventh Amendment didn't supplant these common-law rules; it simply declared that such suits, whether permitted by the common law or not, couldn't be brought in federal court by the citizens of another state.

*Foreign states.* As noted earlier, the Court handled this relationship more precisely in *Monaco v. Mississippi*—yet another strategic bond collection suit,

---

312 *Id.* at 89.

313 *Id.* In a subsequent case where the bonds were an outright gift to the state, the Court allowed the suit, South Dakota v. North Carolina, 192 U.S. 286, 310, 321 (1904), even though the purpose of the gift may have been to make money off of the state's successful suit. *See* 3 J.G. DE ROULHAC HAMILTON, HISTORY OF NORTH CAROLINA 326-30 (1919) (describing scheme by the "Carlisle syndicate" to collect and sell repudiated bonds to other states); *see also South Dakota*, 192 U.S. at 310 ("[S]uch action might enure to his benefit as the owner of other like bonds. But the motive with which a gift is made, whether good or bad, does not affect its validity or the question of jurisdiction.").

314 *New Hampshire*, 108 U.S. at 77 (emphasis added). Again, the New York statute was similar. *Id.* at 79.

315 *Id.* at 91.

316 Indeed, had the case been filed in a lower federal court rather than in the Supreme Court's original jurisdiction, it could have been blocked by the anti-assignment statute:

> [N]or shall any circuit or district court have cognizance of any suit founded on contract in favor of an assignee, unless a suit might have been prosecuted in such court to recover thereon if no assignment had been made, except in cases of promissory notes negotiable by the law merchant and bills of exchange.

Act of Mar. 3, 1875, ch. 137, § 1, 18 Stat. 470; *see also* Farmington v. Pillsbury, 114 U.S. 138, 141-45 (1885) (interpreting this statute); Comment, *Manufactured Diversity*, 117 U. PA. L. REV. 751, 751-54 (1969) (tracing this and similar provisions).

317 *New Hampshire*, 108 U.S. at 91.

this time brought by a foreign state.[318] Since the foreign state wasn't a "Citizen[] or Subject[]" of itself, the Court rightly accepted that the Eleventh Amendment didn't apply. Yet it also recognized that this failed to exhaust the inquiry. After all, the Court noted, the federal government's sovereign immunity wasn't mentioned in the Eleventh Amendment (or anywhere else in the Constitution), and yet it existed. The same was true for a state's common-law immunity against plaintiffs not named in the Amendment, such as in-staters or foreign states.[319]

*Federal corporations.* A trickier question is posed by federally chartered corporations, such as the federal railroad thrown out of court in *Smith v. Reeves,*[320] or the suits by the Bank of the United States discussed above. Whether these plaintiffs are bound by the Eleventh Amendment depends on the nature of corporate citizenship.

When considering this question for diversity purposes, the Supreme Court first held in *Deveaux* that a corporation's citizenship is determined by the citizenship of its members (often understood as its shareholders).[321] It later changed course, holding in *Louisville, Cincinnati & Charleston Railroad Co. v. Letson* that a state-created corporation is always and only a citizen of the state by which it was incorporated.[322]

Presumably the same principles apply to the Eleventh Amendment, which also makes the federal judicial power depend on the parties' citizenship. If so, then jurisdiction over suits by corporations against states will depend on which of these principles is correct. If jurisdiction is based on the shareholders' citizenship, per *Deveaux,* then a suit by a corporation against a state runs into the Eleventh Amendment whenever there are out-of-state shareholders. If jurisdiction is based on the state of incorporation, per *Letson*—and if federal corporations, not having been incorporated by any state, aren't citizens of any state—then federal corporations fall outside of the Eleventh Amendment entirely, facing only the common-law immunity.

*Indian tribes.* An extension of this problem is posed by Indian tribes as plaintiffs. A tribe is recognized as a sovereign, not a mere corporation, so it's implausible to view it merely as an agglomeration of its own tribal members— and also implausible to view it as the citizen of any particular state. So suits by tribes aren't bound by the Eleventh Amendment. But, like the Principality of Monaco, that doesn't exempt them from the common-law principles of

---

318  292 U.S. 313, 320-21 (1934). The strategy seemed especially viable after *South Dakota v. North Carolina,* discussed *supra* note 313.

319  *Monaco,* 292. U.S. at 321; *see also supra* notes 54–58 and accompanying text.

320  178 U.S. 436, 446 (1900) (relying on *Hans v. Louisiana* rather than the Eleventh Amendment).

321  Bank of the U.S. v. Deveaux, 9 U.S. (5 Cranch) 61, 91-92 (1809); *see, e.g.,* Hertz Corp. v. Friend, 559 U.S. 77, 84 (2010) (describing the members as shareholders).

322  43 U.S. (2 How.) 497, 558 (1844) (overruling *Deveaux*).

immunity, which (according to the Court) protect against suits by foreign states just as much as by domestic tribes.[323]

*Compact Clause entities.* Another extension is posed by Compact Clause entities as plaintiffs. In *Alabama v. North Carolina*, for instance, Chief Justice Roberts objected to letting the Interstate Low-Level Radioactive Waste Management Commission tag along as a plaintiff in an original action among states, partly because of the Eleventh Amendment.[324] This may be right as a matter of Article III, which "does not countenance such 'no harm, no foul' jurisdiction";[325] but the Amendment probably doesn't decide the issue. If the *Letson* principle applies, and congressional consent under the Compact Clause creates a separate, stateless entity, then the suit falls outside the Eleventh Amendment (and, indeed, outside the Supreme Court's original jurisdiction). If the *Deveaux* principle applies, and the Compact Clause entity is really just an agglomeration of states, then the suit also falls outside the Eleventh Amendment. (Under that view, the suit would be outside the common-law principles of sovereign immunity too, though other barriers might apply.[326]) In any event, the Eleventh Amendment seems the wrong place to look.[327]

## CONCLUSION

The picture we've proposed is simple, if somewhat counterintuitive. There are two overlapping principles of sovereign immunity. One is a common-law principle against forcing states into court without their consent. The other is the Eleventh Amendment's cross-cutting restriction on subject-matter jurisdiction, which can't be waived, abrogated, or ignored.

---

[323] *See* Blatchford v. Native Vill. of Noatak, 501 U.S. 775, 780-82 (1991) (relying on *Monaco v. Mississippi*). As to whether the Court was correct in interpreting the common-law immunity to apply to sovereign suits, we aren't sure. *See id.* at 780 (acknowledging that the tribe's "conception of the nature of sovereign immunity finds some support both in the apparent understanding of the Founders and in dicta of our own opinions").

[324] 560 U.S. 330, 360-61 (2010) (Roberts, C.J., concurring in part and dissenting in part).

[325] *Id.* at 360.

[326] Because North Carolina was both the defendant and a member of the compact, this view would raise tricky questions about a state's ability to sue itself in federal court, *cf.* Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 259 (2011); *id.* at 270-72 (Roberts, C.J., dissenting), and whether the jurisdiction over "Controversies between two or more States," U.S. CONST. art. III, § 2, cl. 1, requires minimal or complete diversity—questions that the Court hasn't yet had to confront, because it currently adheres to the *Letson* principle.

[327] A true tag-along Eleventh Amendment issue was briefly raised in 2020 by President Trump's motion to intervene in an original action: his intervention would have pit Texas and a Florida citizen against Pennsylvania, Georgia, Michigan, and Wisconsin. Motion of Donald J. Trump, President of the U.S., to Intervene in His Pers. Capacity as Candidate for Re-Election, Texas v. Pennsylvania, No. 22O155 (U.S. Dec. 11, 2020), 2020 WL 7263246. But the issue was mooted when the Court denied leave to file a bill of complaint. *Texas*, No. 22O155, 2020 WL 7296814.

3:23-0164-AGS-DDL
Opposition Ex. 7 p. 054

We acknowledge that at least two of these features might be hard to swallow. Why would the Amendment's drafters have carefully left out suits by citizens of the same state, if they expected those suits to be barred by other principles of sovereign immunity anyway? And why would the drafters have chosen to entrench a constitutional immunity that was so inflexible and unyielding, given how difficult it might be to amend?

As we hope we've shown, the second question has a good answer, which also provides an answer to the first. The Eleventh Amendment was indeed enacted to eliminate cases like *Chisholm*, where the disregard of common-law immunity threatened both the sovereignty and the solvency of the states. But to do this safely and conveniently, the Amendment adopted a principle significantly more forceful and uncompromising than the common-law principle had been.

As a result, it made sense to write the Eleventh Amendment narrowly, while leaving the common-law rule in place. The restriction on subject-matter jurisdiction imposed by the Eleventh Amendment is very different from the common-law immunity: it can't be waived; it can't be abrogated; it interferes with the Supreme Court's review; and so on.

There was good reason for the Eleventh Amendment to do these things, but its blunt textual force renders it a constitutional sledgehammer. It was quite reasonable for the drafters to level that sledgehammer at a smaller class of cases, where its full force might sometimes be needed. For this very reason, however, our courts ought to be more careful about how they wield that sledgehammer today.

EXHIBIT 8
RJN

Electronically Filed by Superior Court of California, County of Orange, 07/26/2022 05:45:00 PM.
30-2021-01237499-CU-PN-CJC - ROA # 117 - DAVID H. YAMASAKI, Clerk of the Court By E. efilinguser, Deputy Clerk.

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Justin Beck<br>3501 Roselle St<br>Oceanside, CA 92056<br>TELEPHONE NO.: **(760) 449-2509**    FAX NO. *(Optional):*<br><br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):*  **Self Represented** | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CENTRAL**
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: 700 Civic Center Drive West
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CENTRAL

| PLAINTIFF/PETITIONER: Justin S. Beck | CASE NUMBER:<br>30-2021-01237499-CU-PN-CJC |
|---|---|
| DEFENDANT/RESPONDENT: Ruben Duran | |

| PROOF OF SERVICE SUMMONS | Ref. No. or File No.: |
|---|---|

*(Separate proof of service is required for each party served.)*

1.  At the time of service I was at least 18 years of age and not a party to this action.

2.  I served copies of: *Summons; Plaintiff Justin S. Beck's First Amended Complaint for Damages &amp; Injunctive Relief*

3.  a. Party served *(specify name of party as shown on documents served): THE STATE OF CALIFORNIA*

    b.  [ x ] Person (other than the party in Item 3a) served on behalf of an entity or as an authorized agent (and not a person under Item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):* **Officer B. Silkwood, Authorized Agent**

4.  Address where the party was served: *1300 I St, Sacramento, CA 95814*

5.  I served the party *(check proper box)*
    a.  [ x ] by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: 7/21/2022 (2) at: 11:45 AM
    b.  [  ] by substituted service. On: at: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*
        (Gender: Female Height: Weight: Race: Hair: Other: )

    (1)  [  ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

    (2)  [  ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

    (3)  [  ] **(physical address unknown)** a person of at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

    (4)  [  ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents:
        on:        from:        or [  ] a declaration of mailing is attached.

---

| POS-010 [Rev. January 1, 2007] | PROOF OF SERVICE OF SUMMONS | Page 1 of 3 |
|---|---|---|

Invoice # 6173009

| PLAINTIFF/PETITIONER:      Justin S. Beck | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:      Ruben Duran | 30-2021-01237499-CU-PN-CJC |

     (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

5.   c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

     (1) on:                     (2) from:

     (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. (*Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

     (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** (*specify means of service and authorizing code section*):

     ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. ☐ as an individual defendant.
  b. ☐ as the person sued under the fictitious name of (*specify*):
  c. ☐ as occupant.
  d. ☒ On behalf of (*specify*): **THE STATE OF CALIFORNIA**
     under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☒ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**
  a. Name: **Michael Lynn Henry**
  b. Address: **500 Allerton Street Suite 105, Redwood City, CA 94063**
  c. Telephone number: **650-364-9612**
  d. The fee for service was: \ \ell \ell .OO
  e. I am:
     (1) ☐ not a registered California process server.
     (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
     (3) ☒ a registered California process server:
        (i) ☐ owner    ☐ employee    ☒ independent contractor.
        (ii) Registration No.: **2019-24**
        (iii) County: **Sacramento**

**PROOF OF SERVICE OF SUMMONS**

3:23-0164-AGS-DDL
Opposition RJN Ex. 8 p. 002

| PLAINTIFF/PETITIONER: Justin S. Beck<br>DEFENDANT/RESPONDENT: Ruben Duran | CASE NUMBER:<br>30-2021-01237489-CU-PN-CJC |
|---|---|

8.  ☒  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Michael Lynn Henry                    Date: 07/22/2022

POS-010 [Rev. January 1, 2007]          PROOF OF SERVICE OF SUMMONS          Page 3 of 3

Invoice#: 6173008

3:23-0164-AGS-DDL
Opposition RJN Ex. 8 p. 003

EXHIBIT 9
RJN

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | TELEPHONE NUMBER (760) 449-2509 | FOR COURT USE ONLY |
|---|---|---|
| Justin Beck<br>3501 Roselle St<br>Oceanside, CA 92056<br>ATTORNEY FOR   Self Represented | | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE - CIVIL COMPLEX CENTER<br>751 W Santa Ana Blvd<br>Santa Ana, CA 92701 | |
|---|---|

| SHORT TITLE OF CASE:<br>Justin S. Beck vs. Kenneth Catanzarite | |
|---|---|

| DATE:<br>11/04/2022 | TIME:<br>10:00 AM | DEP./DIV.<br>CX105 | CASE NUMBER:<br>30-2020-01145998-CU-BT-CXC |
|---|---|---|---|
| | **Proof of Service** | | Ref. No. or File No: |

1. At the time of service I was at least 18 years of age and not a party to this action, and I served copies of the:

   Complaint; Amendment to Complaint; CMS - Case Management Statement; Notice of Motion and Motion for Summary Judgment; Declaration in Support; Separate Statement; Request for Judicial Notice

2. Party Served: **THE STATE OF CALIFORNIA, a public entity By Serving Office of the Attorney General, Agent for Service**

3. Address: 1300 I St,  Sacramento, CA 95814

   On: 8/10/2022                        At: 03:26 PM

4. I served the Party named in item 2
   By substituted service:
   E. Maldonado  (Gender: M Age: 40 Height: 5'8" Weight: 200 Race: Caucasian Hair: Brown Other: )
   Badge #30

   (Business) A person at least 18 years of age apparently in charge at the office or usual place of business of the person served.
   I informed him or her of the general nature of the papers.

5. A declaration of diligence and/or mailing is attached, if applicable.

Person attempting service:

   a. Name: Ricky Siebel
   b. Address: 500 Allerton Street Suite 105, Redwood City, CA 94063
   c. Reg. No.: 2021-041  d.County: Sacramento
   e. Telephone number: 650-364-9612
   f. The fee for this service was: 449.75
   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

S W I F T
MORE THAN JUST OUR NAME
IT'S WHAT WE DO

Ricky Siebel                                         Date: 08/11/2022

Proof of Service                                    Invoice #: 6280637

3:23-0164-AGS-DDL
Opposition Ex. 9 p. 001

Electronically Filed by Superior Court of California, County of Orange, 01/03/2023 07:06:00 PM.
30-2020-01145998-CU-BT-CXC - ROA # 897 - DAVID H. YAMASAKI, Clerk of the Court By E. efilinguser, Deputy Clerk.

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| JUSTIN S. BECK<br>3501 ROSELLE ST.<br>OCEANSIDE, CA 92056<br><br>TELEPHONE NO.: 760-449-2509   FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* justintimesd@gmail.com<br>ATTORNEY FOR *(Name):* In Pro Per | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF **ORANGE**<br>STREET ADDRESS: **751 W. SANTA ANA BLVD.**<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: **SANTA ANA, CA 92701**<br>BRANCH NAME: **CIVIL COMPLEX CENTER** | |
|---|---|

| PLAINTIFF/PETITIONER: JUSTIN S. BECK | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: THE STATE OF CALIFORNIA | 30-2020-01145998-CU-BT-CXC |

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents):*  Moving Papers for Summary Judgment and Summary Adjudication

3. a. Party served *(specify name of party as shown on documents served):*
      THE STATE OF CALIFORNIA, a public entity

   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      Rob Bonta, Attorney General | Michael Redding, Asst. AG       AGElectronicService@doj.ca.gov
                                                                     Michael.Redding@doj.ca.gov
4. Address where the party was served:   Office of Attorney General     Rob.Bonta@doj.ca.gov
                                         1300 "I" Street
                                         Sacramento, CA 95814
5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*                    (2) at *(time):*
   b. [ ] **by substituted service.** On *(date):*              at *(time):*              I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*        from *(city):*        or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

| PLAINTIFF/PETITIONER: JUSTIN S. BECK | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: THE STATE OF CALIFORNIA | 30-2020-01145998-CU-BT-CXC |

5. c. [ ]  **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):*                   (2) from *(city):*

   (3) [ ] with two copies of the *Notice and Acknowledgement of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

   (4) [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. [✓]  **by other means** *(specify means of service and authorizing code section):*

**CCP 1010.6**

**CCP 474**

    [✓] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. [ ]  as an individual defendant.
  b. [ ]  as the person sued under the fictitious name of *(specify):*
  c. [ ]  as occupant.
  d. [ ]  On behalf of *(specify):*
    under the following Code of Civil Procedure section:

    [ ] 416.10 (corporation)            [ ] 415.95 (business organization, form unknown)
    [ ] 416.20 (defunct corporation)        [ ] 416.60 (minor)
    [ ] 416.30 (joint stock company/association) [ ] 416.70 (ward or conservatee)
    [ ] 416.40 (association or partnership)   [ ] 416.90 (authorized person)
    [✗] 416.50 (public entity)            [ ] 415.46 (occupant)
                                 [ ] other:

7. **Person who served papers**
  a. Name:        **JUSTIN S. BECK**
  b. Address:   **3501 ROSELLE ST, OCEANSIDE, CA 92056**
  c. Telephone number:  **760-449-2509**
  d. **The fee** for service was: $
  e. I am:
    (1) [X]  not a registered California process server.
    (2) [ ]  exempt from registration under Business and Professions Code section 22350(b).
    (3) [ ]  a registered California process server:
      (i) [ ] owner [ ] employee [ ] independent contractor.
      (ii) Registration No.:
      (iii) County:

*Also Served Physically On Office of Attorney General By Third-Party Process Server*

8. [X]  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. [ ]  I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: JANUARY 3, 2023

**JUSTIN S. BECK**                ▶     *JUSTIN BECK*
  (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)              (SIGNATURE )

**3:23-0164-AGS-DDL**

**Opposition Ex. 9 p. 003**

**Describing Service of Summons, Complaint, and Supplement to Complaint on
THE STATE OF CALIFORNIA, a public entity**

1) By third-party process server, who delivered it to Office of Attorney General and filed proof.

2) By electronic service under CCP 1010.6 to agelectronicservice@doj.ca.gov which is responsible for defending tort claims under Government Claims Act for THE STATE OF CALIFORNIA, and for paying judgments in tort claims on behalf of THE STATE OF CALIFORNIA.

3) By electronic service, again, through TrueFiling in connection with antitrust proceedings as a real party in interest, now pending before Federal Trade Commission.

4) By electronic service, again, through TrueFiling in current, original writ proceedings against respondent Orange County Superior Court (C11 and CX105) (G061896) as real parties in interest.

5) By electronic service, again, in connection with pending federal proceedings filed under Racketeer Influenced Corrupt Organizations Act 18 U.S.C Section 1962(a)-(d) ("RICO"), 15 U.S.C. Section 1 ("Sherman Act"), 42 U.S.C. § 1983 against defendants in this action and nominal defendant United States Attorney General.

6) By electronic service, again, in connection with racketeering investigation demand under 18 U.S.C. § 1968 on the United States Attorney General as nominal defendant.

7) By electronic service, again, in connection with claims against Orange County Superior Court and Orange County in ratification and carrying on unlawful activity and under RICO.

8) By electronic service, again, in connection with legislative audit demand on Board of Trustees for The State Bar of California related to the instant case and related cases for concealment of material state liability.

**Describing Service of Summons, Complaint, and Supplement to Complaint on
THE STATE BAR OF CALIFORNIA, a public entity; SUZANNE GRANDT, an individual; RUBEN
DURAN, an individual; ELI DAVID MORGENSTERN, an individual**

1) By electronic service to counsel of record, Office of General Counsel, in all related cases.

2) By electronic service to each party to their public email address.

3) By electronic service, again, through TrueFiling in connection with antitrust proceedings as real parties in interest, now pending before Federal Trade Commission.

4) By electronic service, again, through TrueFiling in current, original writ proceedings against respondent Orange County Superior Court (C11 and CX105) (G061896) as real parties in interest.

5) By electronic service, again, in connection with pending federal proceedings filed under Racketeer Influenced Corrupt Organizations Act 18 U.S.C Section 1962(a)-(d) ("RICO"), 15 U.S.C. Section 1 ("Sherman Act"), 42 U.S.C. § 1983 against most defendants in this action and nominal defendant United States Attorney General pending summons (3:22-CV-01616-BAS-DDL).

6) By electronic service, again, in connection with racketeering investigation demand under 18 U.S.C. § 1968 on the United States Attorney General as nominal defendant. (3:22-CV-01616-BAS-DDL)

7) By electronic service, again, in connection with claim notice delivered Orange County Superior Court and Orange County in ratification, RICO, and constitutional violations by court officials under color of state law and California Code of Civil Procedure under 42 U.S.C. § 1983.

8) By electronic service, again, in connection with audits commenced through Legislature concerning Board of Trustees, Office of General Counsel, and State of California's deliberate avoidance of merits-based hearings and concealment of material claims against each.

**Describing Service of Summons, Complaint, and Supplement to Complaint on**
**NICOLE MARIE CATANZARITE WOODWARD, ESQ., an individual**

1) By electronic service to counsel of record, Catanzarite Law Corporation et al.

2) By electronic service to individual email address.

DECLARED TRUE UNDER PENALTY OF PERJURY

January 3, 2023

Justin S. Beck – Plaintiff